UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

EDWARD RANDOLPH,

                                    Plaintiff,

                                                                9:19-cv-1161
v.                                                              (DNH/TWD)

LISA KALIES and STEPHANIE AGOSH,

                                    Defendants.
_____

APPEARANCES:                              OF COUNSEL:

EDWARD RANDOLPH
  *Plaintiff, pro se*
12639161
CNY PC
PO BOX 300
Marcy, NY 13403

HON. LETITIA JAMES                        DAVID C WHITE, ESQ.
Attorney General for the State of New York    Assistant Attorney General
  *Counsel for Defendants*
The Capitol
Albany, New York 12224

**THÉRÈSE WILEY DANCKS**, United States Magistrate Judge

## ORDER AND REPORT-RECOMMENDATION

*Pro se* Plaintiff Edward Randolph ("Plaintiff" or "Randolph") commenced this civil

rights action, pursuant to 42 U.S.C. § 1983, asserting claims arising from his incarceration at

Auburn Correctional Facility ("Auburn") while in the custody of the New York State

Department of Corrections and Community Supervision ("DOCCS"). (Dkt. No. 1.) The

Honorable David N. Hurd, United States District Judge, reviewed the amended complaint, the

operative pleading, in accordance with 28 U.S.C. § 1915, and found Plaintiff's Eighth

Amendment deliberate medical indifference claims against Defendants Stephanie Agosh

("Agosh"), a Senior Social Worker/Therapist, Office of Mental Health ("OMH"), Lisa Kalies

("Kalies"), the Unit Chief, OMH, and Jane Doe ("Jane Doe"), a Therapist/Social Worker, OMH,

required a response. (Dkt. Nos. 19, 23.)

Presently before the Court for a Report and Recommendation is Defendants' motion,

brought pursuant to Federal Rule of Civil Procedure 12(b)(6), to dismiss Plaintiff's Eighth

Amendment deliberate medical indifference claim against Defendant Kalies. (Dkt. No. 35.[1])

Plaintiff elected not to respond to Defendants' motion. (Dkt. No. 40; *see also* Dkt. Nos. 43, 38,

49.) For the reasons that follow, the Court recommends that Defendants' motion be denied.

## I.    PLAINTIFF'S AMENDED COMPLAINT[2]

Plaintiff has a documented history of depression, mental distress, and suicidal thoughts

throughout his incarceration in DOCCS' custody beginning in 2016. (Dkt. No. 19 at 3-5.[3]) On

August 24, 2017, Plaintiff was confined in the Special Housing Unit ("SHU") at Auburn. *Id.* at

3. After reporting that he was depressed and feeling suicidal, Plaintiff was referred to the

---

[1]  Although Defendants' motion identifies Kalies as "Kaelin," (Dkt. No. 35), Defendants'
counsel represents such identification was in error, and her surname is Kalies. (*See* Dkt. No. 53.)
The Court notes the pending motion was filed on behalf of both Defendants Agosh and Kalies,
even though Agosh filed an answer to the amended complaint. (Dkt. No. 39.) To date, Jane Doe
has not been identified. (*See generally* Dkt. Report.)

[2]  The following relevant facts are drawn from Plaintiff's amended complaint (Dkt. No. 19) and
are taken as true for the purpose of resolving the instant motion. For a more complete summary
of Plaintiff's factual allegations, the Court refers to the amended complaint, as well as the initial
screening in this action, conducted by Judge Hurd. (Dkt. Nos. 19, 23.)

[3]  Page references to documents identified by docket number are to the page numbers assigned
by the CM/ECF docketing system maintained by the Clerk's Office. Paragraph numbers are
used where documents identified by the CM/ECF docket number contain consecutively
numbered paragraphs. Unless noted, excerpts from the record are reproduced exactly as they
appear in the original and errors in spelling, punctuation, and grammar have not been corrected.

Residential Crisis Treatment Program ("RCTP").  *Id*. at 3-8.  Plaintiff was escorted to the RCTP,

strip frisked, and given an "MHU[4] Smock".  *Id*. at 8.  Plaintiff remained in the RCTP until

September 5, 2017.  *Id*. at 8.

      On September 5, 2017, after meeting with Agosh, Plaintiff was discharged from the

RCTP.  *Id*. at 11-13.  Plaintiff refused to leave his RCTP cell and was forcibly removed by an

extraction team and transferred to the SHU.  *Id*. at 15.  Later that day, after threatening to hang

himself using ripped threads from his SHU mattress, Plaintiff was admitted to the MHU on

suicide watch.  *Id*. at 16.

      On September 7, 2017, Plaintiff was discharged from the MHU and escorted back to the

SHU.  *Id*.  When he was locked in the cell, Plaintiff began to rip his sheets and fashion a noose

while "making statements" that he wanted to kill himself.  *Id*. at 19.  Plaintiff was then escorted

to another SHU cell under a "cell property deprivation order" instead of being placed on suicide

watch.  *Id*.  Before Randolph was escorted to the new SHU cell, officers cleared the cell of all

property but overlooked a "stereo head phone jack" that was in the radio outlet in the wall.  *Id*. at

20.  Plaintiff found the adapter, broke it apart, and used pieces of metal to cut his wrist

"viciously."  *Id*.  An officer noticed blood and immediately contacted his supervisor.  *Id*.

Officers attempted to persuade Plaintiff to surrender the adapter.  *Id*. at 20-21.  When they were

unsuccessful, the extraction team and facility chaplain were summoned.  *Id*. at 21.  The chaplain

was able to persuade Randolph to voluntarily leave the cell for a medical examination.  *Id*.

However, before he did, Plaintiff swallowed the items he used to cut himself.  *Id*.

---

[4]  Although not defined in the amended complaint, the Court assumes "MHU" refers to Auburn's
mental health unit.

Randolph was escorted to the infirmary, examined, and placed in Isolation Room 8 on a contraband suicide watch. *Id*. at 21-22. Plaintiff remained on suicide watch until Septmeber 25, 2017. *Id*. at 22. While on suicide watch, Plaintiff was visited daily by "OMH staff," including Agosh. *Id*. Plaintiff's request for "special mental health treatment" and an appointment with a psychiatrist were denied. *Id*. On Septmeber 26, 2017, Randolph was extracted from his cell, with force and four applications of a chemical agent. *Id*. at 23. Plaintiff was placed in Isolation Tank 4 in the infirmary. *Id*.

On October 24, 2017, Randolph was "cleared" and scheduled to be transferred to the MHU. *Id*. at 25-26. Plaintiff felt that he should not be released because he was still in possession of pieces of the wall adapter and, in fact, he had used small pieces of metal to continue to harm himself while he was on suicide watch. *Id*. at 26. Plaintiff claims that he would defecate and retrieve the metal from his stool. *Id*. When Randolph refused to voluntarily leave his cell, the extraction team was called and, after four applications of a chemical agent, Plaintiff was "forced to the cell door" and handcuffed. *Id*. Plaintiff was transferred to the MHU for observation. *Id*. A report dated October 24, 2017, attached to the amended complaint, states "MHU Unit Chief [name redacted] determined that inmate Randolph [] would need to be moved to MHU-OBS-04 Cell." (Dkt. No. 19-1 at 33.)

On November 16, 2017, Plaintiff was "cleared and discharged" from the MHU by Agosh "having gotten approval from the MHU unit chief defendant L. Kalies and the treatment team." (Dkt. No. 19 at 27.) Randolph personally spoke with Kalies on "at least three separate occasions throughout the time that he was in the RCTP." *Id*. at 28. One of these occasions took place right after Plaintiff "was extracted and being escorted back to his SHU cell following decontamination" and was recorded by a hand held video recorder. *Id*. Randolph informed

4

Kalies that he was "really depressed and wanted to kill himself" because he "did not feel he had anything to live for." *Id*. Kalies "only managed to upset [Randolph] further by not taking the time to listen to him, as she was only concerned with getting [him] to leave the RCTP unit and return to his cell in the SHU, and had only come to tell [Plaintiff] that she herself agreed that he was fit to be discharged." *Id*.

The chaplain and other facility staff attempted to persuade Randolph to leave his MHU cell voluntarily. *Id*. at 29. Plaintiff explained to the chaplain that he had not received any assistance from the MHU staff and that the medications he was being given were not working and were "making him feel worse." *Id*. He further explained that "on numerous occasions" he tried to get Agosh and Kalies to "schedule him to see a doctor so his medication could be changed, and or, adjusted." *Id*. When Plaintiff refused to leave, the extraction team was assembled and gave him the final order to "cuff up." *Id*. at 30. After one application of chemical agents by a sergeant, Plaintiff went to the cell door. *Id.*

Randolph was then escorted to the MHU shower area for decontamination. *Id*. Plaintiff was transferred to the SHU and interviewed by a sergeant. *Id*. When Plaintiff "failed" the "suicide prevention/mental health questionnaire," OMH staff was alerted. *Id*. at 30-31. Jane Doe arrived at Plaintiff's cell and "cleared" him "on the spot" and informed security staff that Plaintiff was "discharged and cleared by mental health." *Id*. Plaintiff told Jane Doe that he had a piece of copper "secreted" in his body. *Id*. A hand-held monitor detector did not reveal any such substance. *Id*.

On November 17, 2017, Randolph used a piece of metal to cut his wrists and forearms. *Id*. at 32. When Plaintiff refused to come out of his cell for medical treatment, a lieutenant extracted Plaintiff with three applications of chemical agents. *Id*. at 32-33.

On November 20, 2017, while Randolph was in the infirmary on suicide watch, Plaintiff used a piece of metal to cut his inner arm. *Id.* at 34. The medical staff responded and asked Plaintiff to leave his cell voluntarily for medical attention. *Id.* at 35. As Plaintiff began to lose consciousness, someone "smash[ed] his face hard against the ground[.]" *Id.* 36. When Plaintiff regained consciousness, he was in the hospital. *Id.*

## II.   DISCUSSION

### A.   Standard of Review

A defendant may move to dismiss a complaint for "failure to state a claim upon which relief can be granted" under Rule 12(b)(6) of the Federal Rules of Civil Procedure. The motion tests the legal sufficiency of the complaint and whether it conforms to Rule 8(a)(2) of the Federal Rules of Civil Procedure. To survive a motion to dismiss, the complaint must "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "Determining whether a complaint states a plausible claim for relief . . . requires the . . . court to draw on its judicial experience and common sense [and] where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not shown—that the pleader is entitled to relief." *Id.* at 679 (internal citation and punctuation omitted). "Factual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555.

A complaint may be dismissed pursuant to Rule 12(b)(6) only where it appears there are not "enough facts to state a claim to relief that is plausible on its face." *Id.* at 570. While Rule 8(a)(2) "does not require detailed factual allegations, . . . it demands more than an unadorned, the-defendant-unlawfully-harmed-me-accusation." *Iqbal*, 556 U.S. at 678 (citation and internal

quotation marks omitted).  In other words, a complaint which "tenders 'naked assertion[s]' devoid of 'further factual enhancement'" does not suffice.  *Id*. (citation omitted).

"In reviewing a complaint for dismissal under Rule 12(b)(6), the court must accept the material facts alleged in the complaint as true and construe all reasonable inferences in the plaintiff's favor." *Hernandez v. Coughlin*, 18 F.3d 133, 136 (2d Cir. 1994).  However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions.  Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678.

Where a party is proceeding *pro se*, the court is obliged to "read [the *pro se* party's] supporting papers liberally, and . . . interpret them to raise the strongest arguments that they suggest." *See Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994); *see also Harris v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009) (courts remain obligated to construe *pro se* complaints liberally even after *Twombly*).  Where a *pro se* complaint fails to state a cause of action, the court generally "should not dismiss without granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated." *Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000) (citation and internal quotation marks omitted).  An opportunity to amend is not required where "[t]he problem with [the plaintiff's] causes of action is substantive" such that "better pleading will not cure it." *Id*.

### B.    Plaintiff's Deliberate Medical Indifference Claim against Defendant Kalies

Plaintiff alleges, *inter alia*, Defendant Kalies was deliberately indifferent to his serious medical needs in violation of his Eighth Amendment rights during his confinement at Auburn. (Dkt. No. 19.)  Defendant Kalies moves to dismiss Plaintiff's Eighth Amendment medical indifference claims for failure to state a claim upon which relief can be granted.  (Dkt. No. 35.)

"[D]eliberate indifference to serious medical needs of prisoners constitutes the unnecessary and wanton infliction of pain . . . proscribed by the Eighth Amendment." *Estelle v. Gamble*, 429 U.S. 97, 104 (1976) (internal quotation marks and citation omitted).  To state a claim for deliberate indifference to a serious medical need, a plaintiff's claim must satisfy both objective and subjective elements.  *Hathaway v. Coughlin*, 37 F.3d 63, 66 (2d Cir. 1994).

Under the objective element, the inmate's medical need or condition must be "a serious one." *Brock v. Wright*, 315 F.3d 158, 162 (2d Cir. 2003).  Factors relevant to the seriousness of a medical condition include whether "a reasonable doctor or patient would find [it] important and worthy of comment," whether the condition "significantly affects an individual's daily activities," and whether it causes "chronic and substantial pain." *Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998) (internal quotation marks and citations omitted).

Cases from within this circuit have observed that mental disorders can represent serious medical needs, particularly when those disorders are accompanied by suicidal ideations and attempts.  *See Loadholt v. Lape*, No. 09-CV-0658, 2011 WL 1135934, at *3 (N.D.N.Y. Mar. 3, 2011); *Zimmerman v. Burge*, No. 9:06-CV-0176 (GLS/GHL), 2009 WL 3111429, at *8 (N.D.N.Y. Sept. 24, 2009) (collecting cases); *Allah v. Kemp*, No. 9:08-CV-1008 (NAM/GHL), 2010 WL 1036802, at *6 n.9 (N.D.N.Y. Feb. 25, 2010); *Hamilton v. Smith*, No. 06-CV-805, 2009 WL 3199531, at *14 (N.D.N.Y. Jan. 13, 2009) (plaintiff's claimed history of suicidal thoughts were sufficient to raise a question of fact as to serious medical need).

Under the subjective element, the defendant must act "with a sufficiently culpable state of mind." *Smith v. Carpenter*, 316 F.3d 178, 183-84 (2d Cir. 2013) (citation omitted).  "Deliberate indifference requires more than negligence, but less than conduct undertaken for the very purpose of causing harm." *Hathaway*, 37 F.3d at 66 (citation omitted).  "Prison officials are not

8

obligated to provide inmates with whatever care the inmates desire.  Rather, prison officials fulfill their obligations under the Eighth Amendment when the care provided is 'reasonable.'" *Jones v. Westchester Cty. Dept. of Corr.*, 557 F. Supp. 2d 408, 413 (S.D.N.Y. 2008) (citing *Salahuddin*, 467 F.3d at 280) (other citation omitted).  An "inadvertent failure to provide adequate medical care" does not constitute "deliberate indifference."  *Estelle*, 429 U.S. at 105-06.

Additionally, "[i]t well-settled in this circuit that 'personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.'" *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994) (quoting *Moffitt v. Town of Brookfield*, 950 F.2d 880, 885 (2d Cir. 1991)).  In order to state a cause of action under § 1983 against an individual defendant, a plaintiff must plausibly allege some tangible connection between the alleged unlawful conduct and that defendant.  *Bass v. Jackson*, 790 F.2d 260, 263 (2d Cir. 1986).

If the defendant is a supervisory official, a mere linkage to the unlawful conduct through the chain of command, *i.e.*, under the doctrine of *respondeat superior*, is insufficient to show his or her personal involvement in that unlawful conduct.  *Polk Cty. v. Dodson*, 454 U.S. 312, 325 (1981); *Richardson v. Goord*, 347 F.3d 431, 435 (2d Cir. 2003) (per curiam).  In other words, supervisory officials may not be held liable merely because they held positions of authority. *Black v. Coughlin*, 76 F.3d 72, 74 (2d Cir. 1996) (citations omitted).

Here, assuming *arguendo* Plaintiff has adequately plead a sufficiently serious medical need, Defendants argue Plaintiff has not plausibly alleged Kalies was deliberately indifferent. (Dkt. No. 35-1 at 6.)  According to Defendants, Plaintiff's allegations against Kalies are conclusory and vague and there is "nothing" in Plaintiff's amended complaint indicating that Kalies "ever consciously and intentionally disregarded his need for mental health treatment."  *Id.*

Defendants further contend Plaintiff has failed to allege personal involvement with respect to Kalies. *Id*. at 7.

With respect to the subjective prong and suicide, "deliberate indifference may exist pursuant to one of two broad fact scenarios." *Kelsey v. City of New York*, No. 03-CV-5978, 2006 WL 3725543, at *5 (E.D.N.Y. Dec. 18, 2006) (citation omitted). The defendant "could be deliberately indifferent to the risk of suicide by failing to discover an individual's suicidal tendencies[,]" or defendants "could have discovered and have been aware of the suicidal tendencies, but could be deliberately indifferent in the manner by which they respond to the recognized risk of suicide." *Id*.

Upon review, accepting the material facts alleged in the amended complaint as true and drawing all inferences in Plaintiff's favor, the Court finds the amended complaint states a plausible claim that Kalies was deliberately indifferent towards Plaintiff's mental health needs.

As set forth above, the amended complaint describes several incidents, over the course of a few months at Auburn, of Plaintiff engaging in multiple acts of self-harm and suicidal statements. (Dkt. No. 19.) On October 24, 2017, following such an incident, Kalies, alleged to be the Unit Chief of the OMH, determined Plaintiff would need to be moved to an observation cell in the MHU. (Dkt. Nos. 19 at 28, 19-1 at 33.[5]) Plaintiff spoke with Kalies, on three separate

---

[5] According to Defendants, presuming Kalies is the "MHU Unit Chief" referenced in the October 24, 2017, report, such actions to move Plaintiff to an observation cell in the Auburn MHU would not demonstrate that Kalies acted with deliberate indifference to Plaintiff's mental health needs. (Dkt. No. 35-1 at 6-7; citing *Robinson v. Taylor*, No. 9:16-cv-285 (DJS), 2019 WL 1429592, at *7 (N.D.N.Y. Mar. 29, 2019) (Inmate-plaintiff failed to raise a triable question of fact regarding the deliberate indifference claim against defendant where defendant placed "Plaintiff for observation in the OBS Unit.").) However, drawing all reasonable inferences in Plaintiff's favor, at this juncture, the Court finds that contrary to Defendants' assertion, this report lends support that Kalies was aware of Plaintiff's serious medical needs, not that she was deliberately indifferent on that date.

occasions, one of which was recorded as he was escorted back to his SHU cell following

decontamination from a cell extraction.  (Dkt. No. 19 at 28.)  Plaintiff told Kalies that he was

really depressed and wanted to kill himself.  *Id*.  Kalies told Plaintiff that he was fit to discharged

from the RCTP unit.  *Id*. at 28.

On November 16, 2017, Plaintiff was discharged from the mental health unit by Aogsh,

who received "approval" from Kalies.  *Id*.  The next day, Randolph used a piece of metal to cut

his wrists and forearms, and on November 2, 2017, while on infirmary suicide watch, Plaintiff

used a piece of metal to cut his inner arm.  *Id*. at 32.

While the amended complaint lacks facts related to when the aforementioned

conversations occurred, the Court cannot say that these allegations, if true, and with all

reasonable inferences drawn in Plaintiff's favor, do not amount to deliberate indifference.  *See*

*Thomas v. Ashcroft*, 470 F.3d 491, 497 (2d Cir. 2006) (reversing the dismissal of a prisoner's

complaint that sufficiently alleged that defendants ignored his serious medical needs despite

being made aware of them).  Additionally, because the Court construes the amended complaint

to allege personal involvement on behalf of Kalies, "there is no cause to consider other grounds

for supervisory liability under § 1983 at this juncture."  *Case v. Anderson*, No. 16 Civ. 983

(NSR), 2017 WL 3701863, at *13 n.14 (S.D.N.Y. Aug. 25, 2017).

Therefore, the Court recommends denying Defendants' motion to dismiss the Eighth

Amendment deliberate medical indifference claims against Kalies.  It bears repeating that this

recommendation is based on the relatively lenient standard applicable to Rule 12(b)(6) motions.

It remains to be seen whether, after discovery, summary judgment may be appropriate.

**ACCORDINGLY**, it is hereby

**RECOMMENDED** that Defendants' motion to dismiss (Dkt. No. 35) be **DENIED**; and it is further

**ORDERED** that the Clerk provide to Plaintiff a copy of this Order and Report-Recommendation, along with copies of the unpublished decisions cited herein in accordance with the Second Circuit decision in *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (*per curiam*).

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen (14) days within which to file written objections to the foregoing report.[6]  Such objections shall be filed with the Clerk of the Court.  **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL PRECLUDE APPELLATE REVIEW**.  *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72.

Dated: January 19, 2021
        Syracuse, New York

Thérèse Wiley Dancks
United States Magistrate Judge

---

[6]  If you are proceeding *pro se* and are served with this Order and Report-Recommendation by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date the Order and Report-Recommendation was mailed to you to serve and file objections.  Fed. R. Civ. P. 6(d).  If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday.  Fed. R. Civ. P. 6(a)(1)(C).

Case 9:19-cv-01161-DNH-TWD    Document 55    Filed 01/19/21    Page 13 of 103
Loadholt v. Lape, Not Reported in F.Supp.2d (2011)
2011 WL 1135934

2011 WL 1135934
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Ronald LOADHOLT, Plaintiff,

v.

William LAPE, Superintendent of Coxsackie
Corr. Facility; Dr. Miller, Facility Health Services
Director; K. Cavanaugh, Psychological Services
Unit Chief; McDermott, Lieutenant; Dr. Schlenger,
Dental Health Services; J. Smith, Deputy
Superintendent of Health Services, Defendants.

Civ. No. 9:09–CV–0658 (LEK/RFT).
|
March 3, 2011.

**Attorneys and Law Firms**

Ronald Loadholt, Hempstead, NY, pro se.

Hon. Eric T. Schneiderman, New York State Attorney
General, Cathy Y. Sheehan, Esq., Richard Lombardo, Esq.,
Assistant Attorney Generals, of Counsel, Albany, NY, for
Defendants.

***REPORT–RECOMMENDATION and ORDER***

RANDOLPH E. TREECE, United States Magistrate Judge.

**\*1** *Pro se* Plaintiff Ronald Loadholt filed this civil rights
action, pursuant to 42 U.S.C. § 1983, alleging that the
Defendants violated his constitutional rights under the Eighth
and Fourteenth Amendments. Dkt. No. 9, Second Am.
Compl. Defendants bring a Motion to Dismiss the Complaint
pursuant to Federal Rule of Civil Procedure 12(b)(6), Dkt. No.
28, which Plaintiff opposes, Dkt. No. 36. For the reasons that
follow, we recommend that Defendants' Motion be **granted**
and Plantiff's Second Amended Complaint be dismissed in its
entirety.

**I. BACKGROUND**

Plaintiff initiated this action on June 8, 2009, while an inmate
at Coxsackie Correctional Facility, with the filing of a civil
rights Complaint. *See* Dkt. No. 1. The Honorable Lawrence

E. Kahn, Senior United States District Judge, found that both
Plaintiff's Complaint and his subsequent Amended Complaint
(Dkt. No. 7) could not proceed as drafted, but permitted
Plaintiff, in light of his *pro se* status, the opportunity to amend
his pleadings to cure various deficiencies therein. *See* Dkt.
Nos. 6, Order, dated Aug. 12, 2009 & 8, Order, dated Sept.
29, 2009. In accordance with those Orders, Plaintiff filed his
Second Amended Complaint with this Court on October 10,
2009. Dkt. No. 9.

On a motion to dismiss, the allegations of the complaint
must be accepted as true. *See Cruz v. Beto,* 405 U.S. 319,
322 (1972). In light of the terse, sparse, and vague claims in
Plaintiff's Second Amended Complaint, we now restate the
allegations in full and verbatim:

> defendant McDermott refuse to give Plaintiff hearing
> assistance Plaintiff is Learning disable and refuse OMH
> testment of Plaintiff mental illness Dates 10/20/08, 12/5/08,
> 10/23/08 causing Plaintiff to lose freedom

> defendant K cavanaugh no Psychological crisis treatment
> or suicide prevention when Plaintiff stop eat And drink lost
> alot of weight pacing not sleeping, or showering Date 12–
> 23–08 to 1–5–09 causing Plaintiff Mental condition to get
> even more bad coming close to dead phyical pain,

> defendant: Dr: Schlenger no dental services for tooth pain
> from 10–3–09 to 2–3–09 [1] wait at coxsaxie receive no
> dental services causing Plaintiff more pain and lost of tooth

[1]

> Without additional supporting facts or clarification,
> this Court is unsure whether Plaintiff means to
> claim the pertinent dates were from February 3,
> 2009 until October 3, 2009, and simply stated
> in reverse, or rather from October 3, 2008
> until February 3, 2009, and simply inserted a
> typographical error. Regardless, ambiguity on the
> stated dates does not change this Court's analysis.

> defendant: J SMITH refuse to remove Plaintiff from RMV
> and place (Plaintiff) in hospital after lose alot of weight
> to be force feeded Date 12–21–09 to 1–05–09 [2] causing
> mental and phyical pain

[2]

> *See supra* note 1.

> defendant: William Lape

not given Plaintiff hearing, or grievance or legal
assistance from 10–20–08 to 2–3–09 causing mental and
phyical pain

defendant Dr Miller allow mental ill patients to lose
alot of weight 12–23–08 to 1–5–09 place plaintiff on
3 floor and not on flat 10–5–09–2–2–09 [3] not give
better pain medical, cane, mattress, pillow, no medical
accomodational better shoe's etc.

[3]    *See supra* note 1.

Second Am. Compl. at pp. 5–7.

## II. DISCUSSION

### A. Standard of Review

On a motion to dismiss, the allegations of the complaint must
be accepted as true. *See Cruz v. Beto,* 405 U.S. 319, 322
(1972). The trial court's function "is merely to assess the legal
feasability of the complaint, not to assay the weight of the
evidence which might be offered in support thereof." *Geisler
v. Petrocelli,* 616 F.2d 636, 639 (2d Cir.1980). "The issue is
not whether a plaintiff will ultimately prevail but whether the
claimant is entitled to offer evidence to support the claims."
*Scheuer v. Rhodes,* 416 U.S. 232, 236 (1974) (*overruled on
other grounds by Davis v. Scherer,* 468 U.S. 183 (1984)).

**\*2** "Generally, in determining a 12(b)(6) motion, the court
may only consider those matters alleged in the complaint,
documents attached to the complaint, and matters to which
the court may take judicial notice." *Spence v. Senkowski,*
1997 WL 394667, at \*2 (N .D.N.Y. July 3, 1997) (citing
*Kramer v. Time Warner Inc.,* 937 F.2d 767, 773 (2d Cir.1991)).
Moreover, "even if not attached or incorporated by reference,
a document 'upon which [the complaint] *solely* relies and
which is *integral to the complaint'* may be considered by
the court in ruling on such a motion." *Roth v. Jennings,* 489
F.3d 499, 509 (2d Cir.2007) (emphasis in original) (quoting
*Cortec Indus., Inc. v. Sum Holding L.P.,* 949 F.2d 42, 47 (2d
Cir.1991)).

The court is bound to give the plaintiff the benefit of every
reasonable inference to be drawn from the "well-pleaded"
allegations of the complaint. *See Retail Clerks Intern. Ass'n,
Local 1625, AFL–CIO v. Schermerhorn,* 373 U.S. 746, 754
n. 6 (1963); *see also Arar v. Ashcroft,* 532 F.3d 157, 168 (2d

Cir.2008). Nevertheless, "the tenet that a court must accept
as true all of the allegations contained in a complaint is
inapplicable to legal conclusions." *Ashcroft v. Iqbal,* ––– U.S.
––––, 129 S.Ct. 1937, 1949 (2009). Therefore, "[t]hreadbare
recitals of the elements of a cause of action, supported by mere
conclusory statements, do not suffice." *Id.* (citation omitted).

A motion to dismiss pursuant to Rule 12(b)(6) may not be
granted so long as the plaintiff's complaint includes "enough
facts to state a claim to relief that is plausible on its face."
*Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007); *Ashcroft
v. Iqbal,* ––– U.S. ––––, 129 S.Ct. 1960 (citing *Twombly*
). [4] "A claim has facial plausibility when the plaintiff pleads
factual content that allows the court to draw the reasonable
inference that the defendant is liable for the misconduct
alleged." *Ashcroft v. Iqbal,* ––– U.S. ––––, 129 S.Ct. at
1949. This plausibility standard "is not akin to a 'probability
requirement,' but it asks for more than a sheer possibility
that a defendant has acted unlawfully." *Id.* Thus, in spite
of the deference the court is bound to give to the plaintiff's
allegations, it is not proper for the court to assume that "the
[plaintiff] can prove facts [which he or she] has not alleged, or
that the defendants have violated the ... laws in ways that have
not been alleged." *Assoc. Gen. Contractors of California,
Inc. v. California State Council of Carpenters,* 459 U.S. 519,
526 (1983). The process of determining whether a plaintiff
has "nudged [his] claims ... across the line from conceivable
to plausible," entails a "context-specific task that requires
the reviewing court to draw on its judicial experience and
common sense." *Ashcroft v. Iqbal,* ––– U.S. ––––, 129 S.Ct.
at 1950–51.

[4]    By its opinion in *Bell Atl. Corp. v. Twombly* and
then again in *Ashcroft v. Iqbal,* the Supreme Court
abrogated the often-cited language of *Conley v.
Gibson* "that a complaint should not be dismissed
for failure to state a claim unless it appears beyond
doubt that the plaintiff can prove no set of facts
in support of his claim which would entitle him
to relief." *Bell Atl. Corp. v. Twombly,* 550 U.S.
561 (2007) (quoting *Conley,* 355 U.S. 41, 45–
46 (1957)). In so doing, the Court found that
*Conley* "described the breadth of opportunity to
prove what an adequate complaint claims, not the
minimum standard of adequate pleading to govern
a complaint's survival." *Id.* at 563.

With this standard in tow, we consider the plausibility of
Plaintiff's Second Amended Complaint.

**B. Eighth Amendment**

**\*3** Plaintiff claims, albeit in a quite cursory manner, that the Defendants violated his constitutional rights under the Eighth Amendment by their deliberate indifference to his medical needs and by subjecting him to harsh and atypical prison conditions.

To state a claim under § 1983 for deprivation of medical treatment in violation of the Eighth Amendment, a plaintiff must show that the defendant acted with "deliberate indifference to serious medical needs." *Estelle v. Gamble,* 429 U.S. 97, 104 (1976). Thus, "[t]he deliberate indifference standard embodies both an objective and a subjective prong" which the plaintiff must establish. *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994), *cert. denied,* 513 U.S. 1154 (1995). Under the objective prong, the alleged medical need must be "sufficiently serious." *Id.; Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998). Under the subjective component, the plaintiff must demonstrate that the defendants acted with "a sufficiently culpable state of mind." *Hathaway v. Coughlin,* 37 F.3d at 66. This standard must be met for each claim against each individual Defendant in this action.

*1. Defendant Cavanaugh*

Plaintiff alleges that Defendant Cavanaugh did not provide "psychological crisis treatment or suicide prevention" after Plaintiff stopped eating, drinking, sleeping, or showering. Second Am. Compl. at p. 5. In accordance with the deliberate indifference standard, we will delve into Plaintiff's allegation to determine if this statement—Plaintiff's only mention of Defendant Cavanaugh—is enough to implicate both an objective substantial risk of serious harm and a sufficiently culpable state of mind.

"A serious medical condition must be 'a condition of urgency, one that may produce death, degeneration, or extreme pain.' " *Osacio v. Greene,* 2009 WL 3698382, at \*4 (N.D.N.Y. Nov. 2, 2009) (quoting *Hathaway v. Coughlin,* 37 F.3d at 66). "Factors that have been considered in determining whether a condition is serious include '[t]he existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain.' " *Id.* (quoting *Chance v. Armstrong,* 143 F.3d at 702)

(other citations omitted). The "factors listed above, while not the only ones that might be considered, are without a doubt highly relevant to the inquiry into whether a given medical condition is a serious one." *Chance v. Armstrong,* 143 F.3d at 703.

Here, the question is whether the deprivation of psychological treatment or suicide prevention procedures triggers an objectively serious risk of harm within the context of the Eighth Amendment. Taking the Plaintiff's claims as true, it appears he had a need for mental health services that went unmet. This Court, in accord with multiple decisions in this Circuit, recognizes that allegations of mental illness, especially when accompanied with suicidal ideation, state a plausible claim that Plaintiff's mental health needs were sufficiently serious. *See, e.g., Allah v. Kemp,* 2010 WL 1036802, at \*6, n. 9 (N.D.N.Y. Feb. 25, 2010) (finding the failure to provide plaintiff with a mental health evaluation, notwithstanding his attempted suicide three days earlier, was enough to meet the "sufficiently serious" standard); *Hamilton v. Smith,* 2009 WL 3199531, at \*14 (N.D.N.Y. Jan. 13, 2009) (finding plaintiff's claimed history of suicidal thoughts enough to raise a question of fact as to serious medical need); *Covington v. Westchester Cnty. Dept. of Corrs.,* 2010 WL 572125, at \*6 (S.D.N.Y. Jan. 25, 2010) (citing cases where courts have found that depression with suicidal ideation, or severe anxiety attacks, are sufficiently severe conditions to meet the objective prong of deliberate indifference); *see also Zimmerman v. Burge,* 2009 WL 3111429, at \*8 (N.D.N.Y. Sept. 24, 2009) (reviewing published case law discussing whether depression either with or without suicidal ideation is a "sufficiently serious" medical condition). Therefore, Plaintiff's statement pertaining to Defendant Cavanaugh, though brief, is enough to satisfy the objective prong of the deliberate indifference standard.

**\*4** Regarding the subjective component, however, Plaintiff does not allege that Defendant Cavanaugh denied him medical services with any ill state of mind, or even that Cavanaugh was aware of the substantial medical risk. An official acts with the requisite deliberate indifference when that official "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer v. Brennan,* 511 U.S. 825, 837 (1994).

Upon reading Plaintiff's Second Amended Complaint liberally, as well as his Opposition to Defendants' Motion to

Case 9:19-cv-01161-DNH-TWD    Document 55    Filed 01/19/21    Page 16 of 103
Loadholt v. Lape, Not Reported in F.Supp.2d (2011)
2011 WL 1135934

Dismiss, Dkt. No. 36, we conclude that Plaintiff makes no allegation as to Cavanaugh's awareness of Plaintiff's serious health risk. Thus, while mental illness and corresponding suicidal tendencies left untreated can be sufficiently serious to reach an Eighth Amendment claim, there are no facts in Plaintiff's pleading to allow this court to infer, let alone find, that Defendant Cavanaugh possessed the culpable state of mind required to allege deliberate indifference to a medical need. Accordingly, we recommend Plaintiff's claim against Defendant Cavanaugh be **dismissed.**

### 2. Defendant Miller

Plaintiff additionally alleges Eighth Amendment violations against Defendant Miller, who, according to the best interpretation this Court can muster, violated Plaintiff's constitutional rights by allowing him to lose weight and by failing to give Plaintiff "better pain medica[tion], cane, mattress, pillow ... better shoes," and by placing Plaintiff on "3 floor and not on flat." Second Am. Compl. at p. 7.

This claim against Defendant Miller also fails to allege facts sufficient to survive Defendants' 12(b)(6) Motion to Dismiss. As with Defendant Cavanaugh, Plaintiff does not make any mention that Defendant Miller was aware of any serious risk to the Plaintiff, let alone that he acted with the requisite wantonness. Therefore, Plaintiff cannot claim Miller was deliberately indifferent to his medical needs.

Furthermore, to the extent that Plaintiff is claiming that the conditions of his confinement constituted cruel and unusual punishment in violation of the Eighth Amendment, this claim also falls short. In the context of an Eighth Amendment claim based on prison conditions, the prisoner must demonstrate that the deprivation is objectively sufficiently serious such that the plaintiff was "den[ied] the minimal civilized measure of life's necessities," and that the prison officials subjectively "knew of and disregarded an excessive risk to inmate health or safety." *Branham v. Meachum,* 77 F.3d 626, 630–31 (2d Cir.1996) (internal citations omitted).

Turning to the objective analysis, Plaintiff's allegations do not trigger the conclusion that Plaintiff was denied the minimal civilized measure of life's necessities, as the Constitution "does not mandate comfortable prisons," *Rhodes v. Chapman,* 452 U.S. 337, 349 (1981), but instead only requires that inmates not be deprived of their "basic human needs—*e.g.,* food, clothing, shelter, medical care, and reasonable safety," *Helling v. McKinney,* 509 U.S. 25, 32 (1993) (citation omitted). In accord, courts in this Circuit have found the

deprivations of better pain medicine, a cane, a mattress, a pillow, or "better shoes," as the Plaintiff has alleged, do not meet, neither singularly nor collectively, the objective standard under the Eighth Amendment. [5] However, it is more complete to say that Plaintiff's failure to allege any facts indicating that Defendant Miller acted, or did not act, with a wanton state of mind, forecloses any colorable allegation that he was denied his constitutional rights under the Eighth Amendment regarding prison conditions. *See Vaughan v. Erno,* 8 F. App'x 145, 146–47 (2d Cir.2001) (finding complained conditions of confinement did not constitute an Eighth Amendment violation because plaintiff failed to show defendants acted with deliberate indifference, even assuming that he sufficiently alleged a serious harm); *Carr v. Canty,* 2011 WL 309667, at *2 (S.D.N.Y. Jan. 19, 2011) (finding a plaintiff did not satisfy the deliberate indifference requirement of an Eighth Amendment claim regarding conditions of confinement because defendants responded to complaints of a wet and slippery floor "albeit, not in the manner in which [plaintiff] preferred" and took action to cover the water); *Hughes v. Butt,* 2009 WL 3122952, at *10 (N.D.N.Y. Sept. 28, 2009) (concluding that a defendant, who the plaintiff did not allege to have any visual indication or awareness that plaintiff needed a cane, back brace, or knee brace, did not act deliberately indifferent towards plaintiff); *Savage v. Brue,* 2007 WL 3047110, at *9 (N.D.N.Y. Oct. 18, 2007) (finding a nurse, who refused pain medication to an inmate confined in a special housing unit for forty-eight (48) hours with no mattress and back and neck pain due to a recent injury and who advised the inmate that he would need to "adjust to it," to be possibly negligent in her care, but not deliberately indifferent). Therefore, we recommend Plaintiff's claim against Defendant Miller be **dismissed.**

5    *See Brown v. Eagen,* 2009 WL 815724, at *9 (N.D.N.Y. Mar. 26, 2009) (stating that the prison officials have the broad discretion to determine the nature and character of the medical treatment afforded to inmates, as "[a]n inmate does not have the right to treatment of his choice") (citing, *inter alia, Dean v. Coughlin,* 804 F.2d 207, 215 (2d Cir.1986)); *Williams v. Perlman,* 2009 WL 1652193, at *6–7 (N.D.N.Y. Feb. 5, 2009) (finding a prisoner who specifically complained that his orthopedic shoes created "intense pain on [his] toes and arches" and caused him to develop painful callouses which needed to be "lanced from [his] feet" did not adequately suggest in his complaint that his foot, ankle, or arch condition

2011 WL 1135934

presented an issue of degeneration or extreme pain); *Borges v. McGinnis,* 2007 WL 1232227, at *4–6 (W.D .N.Y. Apr. 26, 2007) (find that an inmate given only a paper gown, slippers, a thin mattress, and no blanket, while confined for three days in a room with an open window that reduced the temperature to approximately 50 degrees, failed to meet the objective element of an Eighth Amendment violation); *Bell v. Artuz,* 1999 WL 253607, at *3–4 (S.D.N.Y. Apr. 29, 1999) (noting that no Eighth Amendment claim is implicated where prisoner alleges no pillows, a lack of space in double-occupancy cell, poor ventilation, asbestos on catwalk behind cells, no bacterial soap, and insufficient lighting); *Veloz v. New York,* 35 F.Supp.2d 305, 309 & 312 (S.D.N.Y.1999) (stating prisoner's foot condition, which involved increasing pain and required surgery, was not sufficiently serious); *Alston v. Howard,* 925 F.Supp. 1034, 1040 (S.D.N.Y.1996) (finding prisoner's ankle condition and resulting foot pain requiring the use of special footwear was not sufficiently serious).

*3. Defendant Schlenger*

**\*5** Plaintiff also claims that Defendant Schlenger, presumably in his position as a doctor of dental health at Coxsackie, did not give Plaintiff "dental services for tooth pain from 10–3–09 to 2–3–09 ... causing Plaintiff more pain and los[s] of tooth." Second Am. Compl. at p. 6.

"Dental conditions, like other medical conditions, may be of varying severity." *Chance v. Armstrong,* 143 F.3d at 702. Thus, the constitutionality of a decision to leave a dental condition untreated will depend on the facts of the particular case. *Harrison v. Barkley,* 219 F.3d 132, 137–38 (2d Cir.2000). The Second Circuit has held, in the context of failing to treat a dental injury, that a "serious medical condition exists where 'the failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain.' " *Id.* at 136 (finding that while a tooth cavity is not strictly a serious medical condition, it is a degenerative condition which "is likely to produce agony and to require more invasive and painful treatments" if left untreated) (quoting *Chance v. Armstrong,* 143 F.3d at 702).

However, Plaintiff does not allege any facts regarding any particular type of oral injury or condition that would aid

this Court in its 12(b)(6) inquiry, but rather only "tooth pain," which eventually led to the loss of the tooth. Plaintiff also alleges no facts to suggest that Defendant Schlenger or anyone else should have been aware of his tooth pain. [6] This claim against Defendant Schlenger is utterly bereft of factual allegations which would allow for the Court to deduce the plausibility of a cognizable cause of action, *Ashcroft v. Iqbal,* —— U.S. ——, 129 S.Ct.1937, 1949 & 1960 (2009), or which would permit a defendant "to have a fair understanding of what the plaintiff is complaining about and to know whether there is a legal basis for recovery," *Ricciuti v. New York City Transit Auth.,* 941 F.2d 119, 123 (2d Cir.1991). Thus, because this claim is without factual allegations setting forth that Defendant Schlenger violated Plaintiff's constitutional rights, we recommend that this claim be **dismissed.**

6    Curiously, in opposing Defendants' request for dismissal, Plaintiff fails to mention Defendant Schlenger or allegations of facts supporting his claim of tooth pain, though he references his various other claims. *See* Dkt. No. 36.

*4. Defendant Smith*

Lastly, Plaintiff alleges that Defendant Smith, Deputy of Health Services, violated his rights under the Eighth Amendment by refusing to place him in a hospital after Plaintiff lost a lot of weight, resulting in "mental and physical pain." Second Am. Compl. at pp. 3 & 6.

In this case, unlike with Plaintiff's allegations against any of the previously considered Defendants, Plaintiff claims that "Smith refuse[d]" to act, which led to the alleged constitutional violation. As this Court is charged with the mandate of construing Plaintiff's claims leniently, we are willing to impute from the use of the word "refuse" enough to satisfy the wanton state of mind requirement of deliberate indifference. In order to "refuse" or decline to do something, one must necessarily be aware of the request or the issue, and subsequently choose not to act, implicating that Defendant Smith acted, or did not act, with a culpable mind set of more than mere negligence. Thus, Plaintiff has alleged enough, in this case, to satisfy the subjective prong of Eighth Amendment deliberate indifference.

**\*6** Regardless, Plaintiff's claim must fail, as he does not allege a sufficiently serious injury or risk of injury. He claims that Defendant Smith failed to place Plaintiff in a hospital due to Plaintiff's loss of weight. Plaintiff does not allege how much weight he lost, if that weight loss was dangerous to his

health, or why he lost the weight. [7] Notably, Plaintiff also does not state why hospitalization was warranted or necessary to remedy this weight loss, as opposed to another form of treatment. *See O'Connor v. McArdle,* 2006 WL 436091, at *5 ("It is well-established that mere disagreement over the proper treatment does not create a constitutional claim. So long as the treatment given is adequate, that fact that a prisoner might prefer a different treatment does not give rise to an Eighth Amendment violation."). Therefore, there are no allegations in the pleading to "conclude that [P]laintiff's ... weight loss concerns represented a condition of urgency or resulted in degeneration or extreme pain sufficient to implicate an Eighth Amendment violation." *Evans v. Albany Cnty. Corr. Facility,* 2009 WL 1401645, at *10 (N.D.N.Y. May 14, 2009) (quoting *Bost v. Bockelmann,* 2007 WL 527320, at *8 (N.D.N.Y. Feb. 20, 2007)). Thus, while Plaintiff has alleged enough to satisfy the subjective prong of the Eighth Amendment deliberate indifference standard, his failure to allege a sufficiently serious medical condition means this claim should be **dismissed.**

[7]    The Court notes that Plaintiff mentions he "stop[ped] eat[ing] and drink[ing] lost alot [sic] of weight" in relation to a claim separate from his claim against Defendant Smith. Second Am. Compl. at p. 5.

### C. Due Process

While not explicitly stated in Plaintiff's pleadings, this Court concludes that, by liberally construing Plaintiff's Second Amended Complaint, some of his allegations concern a violation of his rights under the Due Process clause of the Fourteenth Amendment. Specifically, Plaintiff complains that Defendants Lape and McDermott acted in such a way that they violated his right to procedural due process. We will examine the claims against each Defendant *seriatim.*

#### 1. Defendant Lape

Plaintiff claims, in cursory fashion, that Defendant Lape, who Plaintiff describes as the "superintendent" of Coxsackie, did "not give[ ] Plaintiff hearing, or grievance or legal assistance from 10–20–08 to 2–3–09 causing mental and physical pain." Second. Am. Compl. at pp. 1 & 6.

It is well-settled that the personal involvement of a defendant is a prerequisite for the assessment of damages in a §

1983 action. *McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir.1977). Furthermore, the doctrine of *respondeat superior* is inapplicable to § 1983 claims. *See Polk County v. Dodson,* 454 U .S. 312, 325 (1981) (internal citations omitted); *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995). Thus, a defendant may not be liable for damages simply by virtue of holding a supervisory position, without more. *See, e.g., Black v. Coughlin,* 76 F.3d 72, 74 (2d Cir.1996). Rather, the personal involvement of a supervisory defendant may be shown by evidence that:

> **\*7** (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

*Colon v. Coughlin,* 58 F.3d at 873.

Plaintiff does not explain what Defendant Lape purportedly did to deny Plaintiff of assistance in any hearing or grievance process, nor suggest facts that Lape himself was involved in any way in any constitutional violation. Rather, Plaintiff appears to be bringing legal action against Lape due to his supervisory position only. Because the "proper focus is the [D]efendant's direct participation in, and connection to, the constitutional deprivation," *McClary v. Coughlin,* 87 F.Supp.2d 205, 215 (W.D .N.Y.2000), and because one cannot be liable solely from holding a supervisory position, we find Plaintiff's claim against Defendant Lape should be **dismissed** for lack of personal involvement.

#### 2. Defendant McDermott

2011 WL 1135934

Liberally construed, Plaintiff claims that Defendant McDermott refused to give Plaintiff "hearing assistance" or allow the Office of Mental Health to testify that Plaintiff is "learning disable[d]" and has a mental illness, which caused the Plaintiff to "lose freedom." Second Am. Compl. at p. 5.

In order to state a procedural due process claim pursuant to the Fourteenth Amendment, an inmate must show that he possessed an actual liberty or property interest, and that he was deprived of that interest without sufficient process. *See Shakur v. Selsky,* 391 F.3d 106, 118 (2d Cir.2004). Inmates' liberty interests are typically derived from two sources: the Due Process Clause of the Fourteenth Amendment, and state statute or regulations. *Arce v. Walker,* 139 F.3d 329, 333 (2d Cir.1998) (citing *Kentucky Dep't of Corr. v. Thompson,* 490 U.S. 454, 460 (1989)). With regard to liberty interests arising directly under the Due Process Clause, the Supreme Court has "narrowly circumscribed its scope to protect no more than the 'most basic liberty interests in prisoners.' " *Id.* (quoting *Hewitt v. Helms,* 459 U.S. 460, 467 (1983)). With regard to State created liberty interests, the Supreme Court held in *Sandin v. Conner* that state created liberty interests shall be limited to those deprivations which subject a prisoner to "atypical and significant hardship ... in relation to the ordinary incidents of prison life." 515 U.S. 472, 484 (1995).

Here, Plaintiff has not alleged enough facts to indicate a viable Due Process violation under the Constitution. He argues, in effect, that he did not receive a meaningful hearing because Defendant McDermott denied Plaintiff assistance in some unidentified hearing. The only liberty interest that Plaintiff alleged to have lost was the loss of freedom. *See* Second Am. Compl. at p. 5. Without specifics about the nature and conditions of the alleged loss of freedom, Plaintiff does not state an "atypical and significant hardship ... to which the conditions of the disciplinary segregation differ from other routine prison conditions and the duration of the disciplinary segregation compared to discretionary confinement." *Shuler v. Brown,* 2009 WL 790973, at *7 (N.D.N.Y. Mar. 23, 2009) (quoting *Palmer v. Richards,* 364 F.3d 60, 64 (2d Cir.2004)). The loss of freedom, inherent in the "ordinary incidents of prison life," *Sandin v. Conner,* 515 U.S. at 483–86, does not constitute, without alleging more, an atypical and significant hardship on an inmate. Nor has he shown a deprivation of liberty under the Due Process Clause. Furthermore, this statement is devoid of any factual allegation that this Court could examine to determine if the procedure provided by the State to Plaintiff was in fact insufficient, or what the deprivation exactly was. Plaintiff does not specify what

hearing or hearings he is referring to, or even what the hearings were regarding. Therefore, because Plaintiff's naked assertions do not rise to the pleading standards required to withstand a Motion to Dismiss under Rule 12(b) (6), we recommend that the claim against Defendant McDermott be **dismissed.**

### D. Americans with Disability Act

**\*8** In his Second Amended Complaint, Plaintiff states that he has a cause of action under the Americans with Disability Act ("ADA"). Second Am. Compl. at p. 7. This claim is not supported with any facts, nor the names of the parties it is purportedly directed. Besides previously stating, with relation to his claims against Defendant McDermott, that he suffers from some type of learning disability, Plaintiff does not specifically allege what disability he suffers from, nor what he was denied. Furthermore, Plaintiff does not allege under which Title of the ADA he is suing under. Thus, for the preceding reasons and because the Plaintiff states no facts, allegations, nor specific discussion of this claim, we find that to the extent that Plaintiff is attempting to assert a claim under the ADA against any individual Defendant, the claim should be **dismissed.**

### III. CONCLUSION

While this Court recognizes the Second Circuit's preference to provide *pro se* plaintiffs with leave to amend their pleadings prior to dismissal, Loadholt has already been afforded two opportunities to amend his Complaint.

For the reasons stated herein, it is hereby

**RECOMMENDED,** that the Defendants' Motion to Dismiss (Dkt. No. 28) be **GRANTED** and Plaintiff's Second Amended Complaint (Dkt. No. 9) be **DISMISSED;** and it is further

**ORDERED,** that the Clerk of the Court serve a copy of this Report–Recommendation and Order upon the parties to this action.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen (14) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. ***FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL PRECLUDE***

2011 WL 1135934

**APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Sec'y of Health and Human Servs .,* 892 F.2d 15 (2d Cir.1989)); *see also* 28 U.S.C. § 636(b) (1); FED. R. CIV. P. 72, 6(a), & 6(e).

**All Citations**

Not Reported in F.Supp.2d, 2011 WL 1135934

---

**End of Document**

© 2021 Thomson Reuters. No claim to original U.S. Government Works.

2009 WL 3111429
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Nicholas ZIMMERMAN, Plaintiff,

v.

John W. BURGE, Superintendent of Auburn
Correctional Facility, et al., Defendants.

No. 9:06–cv–0176 (GLS/GHL).
|
Sept. 24, 2009.

**Attorneys and Law Firms**

Nicholas Zimmerman, Auburn, NY, pro se.

Hon. Andrew M. Cuomo, New York Attorney General,
Heather M. Rubinstein, Esq., Assistant Attorney General, of
Counsel, Syracuse, NY, for the Defendants.

## I. *Introduction*

### *MEMORANDUM–DECISION AND ORDER*

GARY L. SHARPE, District Judge.

**\*1** Nicholas Zimmerman, an inmate at Auburn Correctional
Facility, brings this action under 42 U.S.C. § 1983 alleging
that defendants, Joe Wolczyk, Donald Selsky, Captain
Rourke, Harold Graham, and Thomas Eagen of the New York
State Department of Correctional Services (DOCS), violated
his Eighth Amendment rights by sentencing Zimmerman to
a term of ten years in solitary confinement with limited
visitation privileges and denying him participation in the
Intermediate Care Program (ICP). [1] (*See* Compl., Dkt. No.
1.) Defendants moved for partial summary judgment seeking
dismissal of Zimmerman's (1) Eighth Amendment medical
care claim and (2) suit against defendants in their official
capacity. (Dkt. No. 42.) In a Report and Recommendation
Order (R & R) filed April 20, 2009, Magistrate Judge George
H. Lowe recommended that defendants' motion for partial
summary judgment be granted. [2] (Dkt. No. 44.) Pending are
Zimmerman's timely objections to the R & R. (Dkt. No.
45 .) For the reasons that follow, the R & R is adopted and
defendants motion for partial summary judgment is granted.

[1]   Plaintiff's additional claims against additional
defendants were dismissed on March 28, 2008.
(Dkt. No. 35.)

[2]   The Clerk is directed to append the R & R to this
decision, and familiarity therewith is presumed.

## II. *Discussion*

Before entering final judgment, this court routinely reviews
all report and recommendation orders in cases it has
referred to a magistrate judge. If a party has objected to
specific elements of the magistrate judge's findings and
recommendations, this court reviews those findings and
recommendations de novo. *See Almonte v. New York State
Div. of Parole,* No. 04–cv–484, 2006 WL 149049, at
*6–7 (N.D.N.Y. Jan.18, 2006).* In those cases where no
party has filed an objection, or only a vague or general
objection has been filed, this court reviews the findings and
recommendations of a magistrate judge for clear error. *See id.*

First, with regards to Zimmerman's Eighth Amendment
claim, Judge Lowe determined that, even if Zimmerman had a
sufficiently serious medical need, defendants Rourke, Eagen,
and Graham were not deliberately indifferent to such a need.
(*See* R & R at 19, Dkt. No. 44.) Specifically, Judge Lowe
explained that while Zimmerman received monthly care and
prescription drugs from mental health providers, "he was
not constitutionally entitled to his preferred care." (R & R
at 19, Dkt. No. 44.) In response, Zimmerman claims that
this finding was incorrect: "this was not only the care that
(I) preferred, but the care that my doctor preferred (by his
recommendation) as well." (Objections at 4, Dkt. No. 45;
*see also id.* at 4–7 (listing Mental Health Unit personnel,
Prisoners' Legal Services representatives, and a number of
publications as further support for his objection).) In light of
Zimmerman's specific objection, the court has reviewed the
relevant portion of the R & R de novo. The court concurs
with Judge Lowe's conclusion, for "[s]o long as the treatment
given is adequate, the fact that a prisoner might prefer a
different treatment does not give rise to an Eighth Amendment
violation." *Chance v. Armstrong,* 143 F.3d 698, 703 (2d
Cir.1998) (citation omitted).

**\*2** Zimmerman also generally objects to Judge Lowe's
finding that defendants Rourke, Graham, and Eagen were
not deliberately indifferent. (*See* Objections at 1–2, Dkt.
No. 45.) While he does not object to Judge Lowe's finding

that Rourke, Graham, and Eagen are not medical personnel, Zimmerman contends that they interfered with his prescribed treatment by failing to transfer him to the ICP. (*See id.* at 2.) Upon de novo review, it is clear that Zimmerman received adequate treatment. Furthermore, Zimmerman has failed to raise a genuine issue of material fact showing that Rourke, Graham, or Eagen intentionally delayed or denied Zimmerman's access to medical care. *See Baumann v. Walsh*, 36 F.Supp.2d 508, 512 (N.D.N.Y.1999). Accordingly, Judge Lowe's recommendation that Zimmerman's medical care claims against Rourke, Graham, and Eagen be dismissed was appropriate.

Lastly, Judge Lowe recommended that the court grant the motion for summary judgment with regards to all claims against all defendants in their official capacities. (*See* R & R at 16, 16 n. 32, Dkt. No. 44.) Zimmerman has failed to raise any objections to these recommendations. Therefore, upon review for clear error, the court finds that the R & R correctly concluded that Zimmerman's claims against all the defendants in their official capacity should be dismissed.

In summary, upon reviewing the remainder of the R & R for clear error, the court finds no error. The R & R is adopted in its entirety, and, for the reasons articulated therein, defendants' motion for partial summary judgment is granted.

### III. *Conclusion*

**WHEREFORE,** for the foregoing reasons, it is hereby

**ORDERED** that Magistrate Judge Lowe's Report and Recommendation is adopted and defendants' motion for partial summary judgment is granted, whereby:

1. Zimmerman's Eighth Amendment medical care claims against defendants Rourke, Graham, and Eagen are dismissed;

2. Zimmerman's claims against each remaining defendant in his official capacity is dismissed; and it is further

**ORDERED** that the Clerk provide copies of this Memorandum–Decision and Order to the parties.

**IT IS SO ORDERED.**

### *REPORT–RECOMMENDATION*

GEORGE H. LOWE, United States Magistrate Judge.

This *pro se* prisoner civil rights action, commenced pursuant to 42 U.S.C. § 1983, has been referred to me for Report and Recommendation by the Honorable Gary L. Sharpe, United States District Judge, pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3(c). Plaintiff Nicholas Zimmerman alleges that Defendants Joe Wolczyk, Donald Selsky, Captain Rourke, Harold Graham, and Thomas Eagen [1] violated his Eighth Amendment rights by sentencing him to ten years of solitary confinement in the Special Housing Unit ("SHU") and refusing to allow him to participate in the Intermediate Care Program [2]. Currently pending before the Court is Defendants' partial motion for summary judgment pursuant to Federal Rule of Civil Procedure 56. (Dkt. No. 42.) Defendants seek dismissal of (1) Plaintiff's claims against Defendants in their official capacities; and (2) Plaintiff's Eighth Amendment medical care claim. Defendants do not seek dismissal of Plaintiff's Eighth Amendment claim regarding his ten-year SHU confinement. For the reasons that follow, I recommend that Defendants' motion be granted.

[1]   The caption of Defendants' moving papers refers to this Defendant as "Egan." The body of Defendants' papers refer to him as "Eagen." In light of this discrepancy, I have used the spelling provided by Plaintiff in the complaint.

[2]   Plaintiff's complaint contained additional claims against additional Defendants. Those claims were dismissed on March 28, 2008. (Dkt. No. 35.)

### I. BACKGROUND

#### A. Summary of Plaintiff's Complaint

**\*3** Plaintiff's complaint is quite cursory. Regarding his Eighth Amendment medical care claim, Plaintiff alleges that:

On October 25, 2005, Defendant[ ] Captain Rourke violated Plaintiff's Eighth Amendment rights to adequate medical care by refusing to allow Plaintiff to seek mental health by participating in the Intermediate Care Program.

On November 10, 2005, Defendant Superintendent Graham violated Plaintiff's Eighth Amendment rights to adequate medical care by affirming Captain Rourke's

decision to deny Plaintiff's admittance to the Intermediate Care Program.

On December 14, 2005, Defendant Thomas Eagen violated Plaintiff's rights to adequate medical care by affirming Superintendent Graham's decision to deny Plaintiff's admittance to the Intermediate Care Program.

(Dkt. No. 1 at 5, ¶¶ 16–18.)

Plaintiff sues Defendants "in their individual capacities and in their official capacities as officials of the New York State Department of Corrections." (Dkt. No. 1 at 2.)

In his prayer for relief Plaintiff requests (1) a declaration that Defendants violated Plaintiff's constitutional rights; (2) an injunction requiring Defendants to place Plaintiff in the Intermediate Care Program; (3) the reversal and expungement or reduction of Plaintiff's ten-year SHU sentence; (4) $1 million in compensatory damages; (5) $200,000 in punitive damages from each Defendant; and (6) costs and attorney fees. (Dkt. No. 1 at 8.)

### B. Summary of Grounds in Support of Defendants' Motion

Defendants argue that (1) the Eleventh Amendment bars Plaintiff's claims against Defendants in their official capacities; (2) Plaintiff does not allege sufficient personal involvement on the part of Defendants Rourke, Graham, or Eagen; (3) Plaintiff cannot prevail on his Eighth Amendment medical care claim because Defendants were not deliberately indifferent to a serious medical need; and (4) Defendants are entitled to qualified immunity. (Dkt. No. 42–4.)

### C. Summary of Plaintiff's Response to Defendants' Arguments

In response, Plaintiff argues that (1) even if the Eleventh Amendment bars his claims against Defendant in their official capacities, he has also sued them in their individual capacities; (2) Defendants were personally involved because they failed to remedy a wrong after learning of it; (3) Plaintiff suffered from depression and suicidal tendencies and Defendants' refusal to allow him to participate in the Intermediate Care Program constituted deliberate indifference; and (4) Defendants are not entitled to qualified immunity. (Dkt. No. 43.)

### II. APPLICABLE LEGAL STANDARDS

### A. Legal Standard Governing Motions for Summary Judgment

Under Federal Rule of Civil Procedure 56, summary judgment is warranted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The party moving for summary judgment bears the initial burden of showing, through the production of admissible evidence, that no genuine issue of material fact exists. *Major League Baseball Properties, Inc. v. Salvino,* 542 F.3d 290, 309 (2d Cir.2008). Only after the moving party has met this burden is the non-moving party required to produce evidence demonstrating that genuine issues of material fact exist. *Salahuddin v. Goord,* 467 F.3d 263, 272–73 (2d Cir.2006). The nonmoving party must do more than "rest upon the mere allegations ... of the [plaintiff's] pleading" or "simply show that there is some metaphysical doubt as to the material facts." [3] Rather, "[a] dispute regarding a material fact is *genuine* if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." [4] In determining whether a genuine issue of material [5] fact exists, the Court must resolve all ambiguities and draw all reasonable inferences against the moving party. [6]

[3]    *Matsushita,* 475 U.S. at 585–86; *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *see also* Fed.R.Civ.P. 56(e) ("When a motion for summary judgment is made [by a defendant] and supported as provided in this rule, the [plaintiff] may not rest upon the mere allegations ... of the [plaintiff's] pleading ....").

[4]    *Ross v. McGinnis,* 00–CV–0275, 2004 WL 1125177, at *8 (W.D.N.Y. Mar.29, 2004) [internal quotations omitted] [emphasis added].

[5]    A fact is "material" only if it would have some effect on the outcome of the suit. *Anderson v. Liberty Lobby,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

[6]    *Schwapp v. Town of Avon,* 118 F.3d 106, 110 (2d Cir.1997) [citation omitted]; *Thompson v. Gjivoje,* 896 F.2d 716, 720 (2d Cir.1990) [citation omitted].

2009 WL 3111429

### B. Legal Standard Governing Motion to Dismiss for Failure to State a Claim

**\*4**  To the extent that a defendant's motion for summary judgment under Federal Rule of Civil Procedure 56 is based entirely on the plaintiff's complaint, such a motion is functionally the same as a motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). As a result, "[w]here appropriate, a trial judge may dismiss for failure to state a cause of action upon motion for summary judgment." *Schwartz v. Compagnie General Transatlantique,* 405 F.2d 270, 273–74 (2d Cir.1968) [citations omitted]; *accord, Katz v. Molic,* 128 F.R.D. 35, 37–38 (S.D.N.Y.1989) ("This Court finds that ... a conversion [of a Rule 56 summary judgment motion to a Rule 12(b)(6) motion to dismiss the complaint] is proper with or without notice to the parties."). Moreover, even where a defendant has not advanced such a failure-to-state-a-claim argument on a motion for summary judgment, a district court may, *sua sponte,* address whether a *pro se* prisoner has failed to state a claim upon which relief may be granted. [7] For these reasons, it is appropriate to briefly summarize the recently clarified legal standard governing Federal Rule of Civil Procedure 12(b)(6) motions to dismiss.

[7]    The authority to conduct this *sua sponte* analysis is derived from two sources: (1) 28 U.S.C. § 1915(e)(2)(B)(ii), which provides that "the court shall dismiss [a] case [brought by a prisoner proceeding *in forma pauperis* ] at any time if the court determines that ... the action ... is frivolous or malicious[,] ... fails to state a claim on which relief may be granted[,] ... or ... seeks monetary relief against a defendant who is immune from such relief"; and (2) 28 U.S.C. § 1915A(b), which provides that, "[o]n review, the court shall ... dismiss the [prisoner's] complaint, or any portion of the complaint, if the complaint ... is frivolous, malicious, or fails to state a claim upon which relief may be granted ...."

Under Federal Rule of Civil Procedure 12(b)(6), a defendant may move to dismiss a complaint for "failure to state a claim upon which relief can be granted." Fed.R.Civ.P. 12(b)(6). It has long been understood that a defendant may base such a motion on either or both of two grounds: (1) a challenge to the "sufficiency of the pleading" under Federal Rule of Civil Procedure 8(a)(2); [8] or (2) a challenge to the legal cognizability of the claim. [9]

[8]    See 5C Wright & Miller, *Federal Practice and Procedure* § 1363 at 112 (3d ed. 2004) ("A motion to dismiss for failure to state a claim for relief under Rule 12(b)(6) goes to the sufficiency of the pleading under Rule 8(a)(2).") [citations omitted]; *Princeton Indus., Inc. v. Rem,* 39 B.R. 140, 143 (Bankr.S.D.N.Y.1984) ("The motion under F.R.Civ.P. 12(b)(6) tests the formal legal sufficiency of the complaint as to whether the plaintiff has conformed to F.R.Civ.P. 8(a)(2) which calls for a 'short and plain statement' that the pleader is entitled to relief."); *Bush v. Masiello,* 55 F.R.D. 72, 74 (S.D.N.Y.1972) ("This motion under Fed.R.Civ.P. 12(b)(6) tests the formal legal sufficiency of the complaint, determining whether the complaint has conformed to Fed.R.Civ.P. 8(a)(2) which calls for a 'short and plain statement that the pleader is entitled to relief.' ").

[9]    See *Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 514, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002) ("These allegations give respondent fair notice of what petitioner's claims are and the grounds upon which they rest.... In addition, they state claims upon which relief could be granted under Title VII and the ADEA."); *Wynder v. McMahon,* 360 F.3d 73, 80 (2d Cir.2004) ( "There is a critical distinction between the notice requirements of Rule 8(a) and the requirement, under Rule 12(b)(6), that a plaintiff state a claim upon which relief can be granted."); *Phelps v. Kapnolas,* 308 F.3d 180, 187 (2d Cir.2002) ("Of course, none of this is to say that a court should hesitate to dismiss a complaint when the plaintiff's allegation ... fails as a matter of law.") [citation omitted]; *Kittay v. Kornstein,* 230 F.3d 531, 541 (2d Cir.2000) (distinguishing between a failure to meet Rule 12[b][6]'s requirement of stating a cognizable claim and Rule 8 [a]'s requirement of disclosing sufficient information to put defendant on fair notice); *In re Methyl Tertiary Butyl Ether Prods. Liab. Litig.,* 379 F.Supp.2d 348, 370 (S.D.N.Y.2005) ("Although Rule 8 does not require plaintiffs to plead a theory of causation, it does not protect a legally insufficient claim [under Rule 12(b)(6) ].") [citation omitted]; *Util. Metal Research & Generac Power Sys.,* 02–CV–6205, 2004 U.S. Dist. LEXIS 23314, at \*4–5, 2004 WL 2613993 (E.D.N.Y. Nov. 18, 2004) (distinguishing

WESTLAW   © 2021 Thomson Reuters. No claim to original U.S. Government Works.

between the legal sufficiency of the cause of action under Rule 12[b][6] and the sufficiency of the complaint under Rule 8[a] ); *accord, Straker v. Metro Trans. Auth.,* 331 F.Supp.2d 91, 101–102 (E.D.N.Y.2004); *Tangorre v. Mako's, Inc.,* 01–CV–4430, 2002 U.S. Dist. LEXIS 1658, at *6–7, 2002 WL 313156 (S.D.N.Y. Jan. 30, 2002) (identifying two sorts of arguments made on a Rule 12[b][6] motion-one aimed at the sufficiency of the pleadings under Rule 8[a], and the other aimed at the legal sufficiency of the claims).

Rule 8(a)(2) requires that a pleading contain "a short and plain statement of the claim *showing* that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2) [emphasis added]. By requiring this "showing," Rule 8(a)(2) requires that the pleading contain a short and plain statement that "give[s] the defendant *fair notice* of what the plaintiff's claim is and the grounds upon which it rests." [10] The main purpose of this rule is to "facilitate a proper decision on the merits." [11] A complaint that fails to comply with this rule "presents far too heavy a burden in terms of defendants' duty to shape a comprehensive defense and provides no meaningful basis for the Court to assess the sufficiency of [plaintiff's] claims." [12]

[10]  *Dura Pharm., Inc. v. Broudo,* 544 U.S. 336, 125 S.Ct. 1627, 1634, 161 L.Ed.2d 577 (2005) (holding that the complaint failed to meet this test) [citation omitted; emphasis added]; *see also Swierkiewicz,* 534 U.S. at 512 [citation omitted]; *Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit,* 507 U.S. 163, 168, 113 S.Ct. 1160, 122 L.Ed.2d 517 (1993) [citation omitted].

[11]  *Swierkiewicz,* 534 U.S. at 514 (quoting *Conley,* 355 U.S. at 48); *see also Simmons v. Abruzzo,* 49 F.3d 83, 86 (2d Cir.1995) ("Fair notice is that which will enable the adverse party to answer and prepare for trial, allow the application of res judicata, and identify the nature of the case so it may be assigned the proper form of trial.") [citation omitted]; *Salahuddin v. Cuomo,* 861 F.2d 40, 42 (2d Cir.1988) ("[T]he principle function of pleadings under the Federal Rules is to give the adverse party fair notice of the claim asserted so as to enable him to answer and prepare for trial.") [citations omitted].

[12]  *Gonzales v. Wing,* 167 F.R.D. 352, 355 (N.D.N.Y.1996) (McAvoy, J.), *aff'd,* 113 F.3d 1229 (2d Cir.1997) (unpublished table opinion); *accord, Hudson v. Artuz,* 95–CV–4768, 1998 WL 832708, at *2 (S.D.N.Y. Nov.30, 1998), *Flores v. Bessereau,* 98–CV–0293, 1998 WL 315087, at *1 (N.D.N.Y. June 8, 1998) (Pooler, J .). Consistent with the Second Circuit's application of § 0.23 of the Rules of the U.S. Court of Appeals for the Second Circuit, I cite this unpublished table opinion, not as precedential authority, but merely to show the case's subsequent history. *See, e.g., Photopaint Technol., LLC v. Smartlens Corp.,* 335 F.3d 152, 156 (2d Cir.2003) (citing, for similar purpose, unpublished table opinion of *Gronager v. Gilmore Sec. & Co.,* 104 F.3d 355 [2d Cir.1996] ).

The Supreme Court has long characterized this pleading requirement under Rule 8(a)(2) as "simplified" and "liberal," and has repeatedly rejected judicially established pleading requirements that exceed this liberal requirement. [13] However, it is well established that even this liberal notice pleading standard "has its limits." [14] As a result, several Supreme Court and Second Circuit decisions exist, holding that a pleading has failed to meet this liberal notice pleading standard. [15]

[13]  *See, e.g., Swierkiewicz,* 534 U.S. at 513–514 (noting that "Rule 8(a)(2)'s simplified pleading standard applies to all civil actions, with limited exceptions [including] averments of fraud or mistake.").

[14]  2 *Moore's Federal Practice* § 12.34[1][b] at 12–61 (3d ed.2003).

[15]  *See, e.g., Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 127 S.Ct. 1955, 1964–1974, 167 L.Ed.2d 929 (2007) (pleading did not meet Rule 8[a][2]'s liberal requirement); *accord, Dura Pharm.,* 125 S.Ct. at 1634–1635, *Christopher v. Harbury,* 536 U.S. 403, 416–422, 122 S.Ct. 2179, 153 L.Ed.2d 413 (2002), *Freedom Holdings, Inc. v. Spitzer,* 357 F.3d 205, 234–235 (2d Cir.2004), *Gmurzynska v. Hutton,* 355 F.3d 206, 208–209 (2d Cir.2004). Several unpublished decisions exist from the Second Circuit affirming the Rule 8(a)(2) dismissal of a complaint after *Swierkiewicz. See, e.g., Salvador v. Adirondack Park Agency*

*of the State of N.Y.,* No. 01–7539, 2002 WL 741835, at *5 (2d Cir. Apr.26, 2002) (affirming pre-*Swierkiewicz* decision from Northern District of New York interpreting Rule 8[a][2] ). Although these decisions are not themselves precedential authority, *see* Rules of the U.S. Court of Appeals for the Second Circuit, § 0.23, they appear to acknowledge the continued precedential effect, after *Swierkiewicz,* of certain cases from within the Second Circuit interpreting Rule 8(a)(2). *See Khan v. Ashcroft,* 352 F.3d 521, 525 (2d Cir.2003) (relying on summary affirmances because "they clearly acknowledge the continued precedential effect" of *Domond v. INS,* 244 F.3d 81 (2d Cir.2001], after that case was "implicitly overruled by the Supreme Court" in *INS v. St. Cyr,* 533 U.S. 289 [2001] ).

Most notably, in *Bell Atlantic Corporation v. Twombly,* the Supreme Court, in reversing an appellate decision holding that a complaint had stated an actionable antitrust claim under 15 U.S.C. § 1, "retire[d]" the famous statement by the Court in *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957), that "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." 550 U.S. 544, 127 S.Ct. 1955, 1968–69, 167 L.Ed.2d 929 [16] (2007). [17] Rather than turning on the *conceivability* of an actionable claim, the Court clarified, the Rule 8 "fair notice" standard turns on the *plausibility* of an actionable claim. *Id.* at 1965–74.

[16]    All references to *Bell Atlantic* will cite the Supreme Court Reporter rather than the United States Reports. The United States Reports version of the case does not include page numbers at this time.

[17]    The Court in *Bell Atlantic* further explained: "The phrase is best forgotten as an incomplete, negative gloss on an accepted pleading standard: once a claim has been adequately stated, it may be supported by showing any set of facts consistent with the allegations in the complaint.... *Conley,* then, described the breadth of opportunity to prove what an adequate complaint claims, not the minimum standard of adequate pleading to govern a complaint's survival." *Bell Atlantic,* 127 S.Ct. at 1969.

*5 More specifically, the Court reasoned that, by requiring that a pleading "show[ ] that the pleader is entitled to relief," Rule 8(a)(2) requires that the pleading give the defendant "fair notice" of (1) the nature of the claim and (2) the "grounds" on which the claim rests. *Id.* at 1965, n. 3 [citation omitted]. While this does not mean that a pleading need "set out in detail the facts upon which [the claim is based]," it does mean that the pleading must contain at least "some factual allegation[s]." *Id* . [citations omitted]. More specifically, the "[f]actual allegations must be enough to raise a right to relief above the speculative level [to a plausible level]," assuming (of course) that all the allegations in the complaint are true. *Id.* at 1965 [citations omitted]. What this means, on a practical level, is that there must be "plausible grounds to infer [actionable conduct]," or, in other words, "enough fact to raise a reasonable expectation that discovery will reveal evidence of [actionable conduct]." *Id* .

As have other Circuits, the Second Circuit has repeatedly recognized that the clarified plausibility standard that was articulated by the Supreme Court in *Bell Atlantic* governs *all* claims, not merely antitrust claims brought under 15 U.S.C. § 1 (as were the claims in *Bell Atlantic* ). [18] The Second Circuit has also recognized that this *plausibility* standard governs claims brought even by *pro se* litigants (although the plausibility of those claims is be assessed generously, in light of the special solicitude normally afforded *pro se* litigants). [19]

[18]    *See, e.g., Ruotolo v. City of New York,* 514 F.3d 184, 188 (2d Cir.2008) (in civil rights action, stating that "To survive a motion to dismiss, a complaint must plead 'enough facts to state a claim to relief that is plausible on its face.' ") [citation omitted]; *Goldstein v. Pataki,* 07–CV–2537, 2008 U.S.App. LEXIS 2241, at *14, 2008 WL 269100 (2d Cir. Feb. 1, 2008) (in civil rights action, stating that "*Twombly* requires ... that the complaint's '[f]actual allegations be enough to raise a right to relief above the speculative level ....' ") [internal citation omitted]; *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.,* 493 F.3d 87, 98, n. 2 (2d Cir.2007) ("We have declined to read Twombly's flexible 'plausibility standard' as relating only to antitrust cases.") [citation omitted]; *Iqbal v. Hasty,* 490 F.3d 143, 157–58 (2d Cir.2007) (in prisoner civil rights action, stating, "[W]e believe the [Supreme] Court [in *Bell Atlantic Corp. v. Twombly* ] is ... requiring a flexible 'plausibility standard,'

which obliges a pleader to amplify a claim with some factual allegations in those contexts where such amplification is needed to render the claim *plausible.*") [emphasis in original].

19    *See, e.g., Jacobs v. Mostow,* 281 F. App'x 85, 87 (2d Cir. March 27, 2008) (in pro se action, stating, "To survive a motion to dismiss, a complaint must plead 'enough facts to state a claim to relief that is plausible on its face.' ") [citation omitted] (summary order, cited in accordance with Local Rule 32.1[c][1] ); *Boykin v. KeyCorp.,* 521 F.3d 202, 215–16 (2d Cir.2008) (finding that borrower's *pro se* complaint sufficiently presented a "*plausible* claim of disparate treatment," under Fair Housing Act, to give lenders fair notice of her discrimination claim based on lenders' denial of her home equity loan application) [emphasis added].

It should be emphasized that Rule 8's plausibly standard, explained in *Bell Atlantic,* was in no way retracted or diminished by the Supreme Court's decision (two weeks later) in *Erickson v. Pardus,* in which the Court stated, "Specific facts are not necessary" to successfully state a claim under Rule 8(a) (2). *Erickson v. Pardus,* 551 U.S. 89, 127 S.Ct. 2197, 2200, 167 L.Ed.2d 1081 (2007) [citation omitted]. That statement was merely an abbreviation of the often-repeated point of law—first offered in *Conley* and repeated in *Bell Atlantic*—that a pleading need not "set out in detail the facts upon which [the claim is based]" in order to successfully state a claim. *Bell Atlantic,* 127 S.Ct. 1965, n. 3 (citing *Conley v. Gibson,* 355 U.S. 41, 47 [1957] ). That statement in no way meant that all pleadings may achieve the requirement of giving a defendant "fair notice" of the nature of the claim and the "grounds" on which the claim rests without ever having to allege any facts whatsoever. [20]    There must still be enough facts alleged to raise a right to relief above the speculative level to a plausible level, so that the defendant may know what the claims are and the grounds on which they rest (in order to shape a defense).

20    For example, in *Erickson,* a district court had dismissed a *pro se* prisoner's civil rights complaint because, although the complaint was otherwise factually specific as to how the prisoner's hepatis C medication had been wrongfully terminated by prison officials for a period of approximately 18 months, the complaint (according to the district court) failed to allege facts plausibly suggesting that the termination caused the prisoner

"substantial harm." 127 S.Ct. at 2199. The Supreme Court vacated and remanded the case because (1) under Fed.R.Civ.P. 8 and *Bell Atlantic,* all that is required is "a short and plain statement of the claim" sufficient to "give the defendant fair notice" of the claim and "the grounds upon which it rests," and (2) the plaintiff had alleged that the termination of his hepatitis C medication for 18 months was "endangering [his] life" and that he was still in need of treatment for [the] disease." *Id.* at 2200. While *Erickson* does not elaborate much further on its rationale, a careful reading of the decision (and the dissent by Justice Thomas) reveals a point that is perhaps so obvious that it did not need mentioning in the short decision: a claim of deliberate indifference to a serious medical need under the Eighth Amendment involves two elements, i.e., the existence of a sufficiently serious medical need possessed by the plaintiff, and the existence of a deliberately indifferent mental state possessed by prison officials with regard to that sufficiently serious medical need. The *Erickson* decision had to do with only the first element, not the second element. *Id.* at 2199–2200. In particular, the decision was merely recognizing that an allegation by a plaintiff that, during the relevant time period, he suffered from hepatis C is, in and of itself, a factual allegation plausibly suggesting that he possessed a sufficiently serious medical need; the plaintiff need not *also* allege that he suffered an independent and "substantial injury" as a result of the termination of his hepatis C medication. *Id.* This point of law is hardly a novel one. For example, numerous decisions, from district courts within the Second Circuit alone, have found that suffering from hepatitis C constitutes having a serious medical need for purposes of the Eighth Amendment. *See, e .g., Rose v. Alvees,* 01–CV–0648, 2004 WL 2026481, at *6 (W.D.N.Y. Sept.9, 2004); *Verley v. Goord,* 02–CV–1182, 2004 WL 526740, at *10 n. 11 (S.D.N.Y. Jan.23, 2004); *Johnson v. Wright,* 234 F.Supp.2d 352, 360 (S.D.N.Y.2002); *McKenna v. Wright,* 01–CV–6571, 2002 WL 338375, at *6 (S.D.N.Y. March 4, 2002); *Carbonell v. Goord,* 99–CV–3208, 2000 WL 760751, at *9 (S.D.N.Y. June 13, 2000).

Having said all of that, it should also be emphasized that, "[i]n reviewing a complaint for dismissal under Fed.R.Civ.P.

2009 WL 3111429

12(b)(6), the court must accept the material facts alleged in the complaint as true and construe all reasonable inferences in the plaintiff's favor." [21] "This standard is applied with even greater force where the plaintiff alleges civil rights violations or where the complaint is submitted *pro se*." [22] In other words, while all pleadings are to be construed liberally under Rule 8(e), *pro se* civil rights pleadings are to be construed with an *extra* degree of liberality.

[21]   *Hernandez v. Coughlin,* 18 F.3d 133, 136 (2d Cir.1994) (affirming grant of motion to dismiss) [citation omitted]; *Sheppard v. Beerman,* 18 F.3d 147, 150 (2d Cir.1994).

[22]   *Hernandez,* 18 F.3d at 136 [citation omitted]; *Deravin v. Kerik,* 335 F.3d 195, 200 (2d Cir.2003) [citations omitted]; *Vital v. Interfaith Med. Ctr.,* 168 F.3d 615, 619 (2d Cir.1999) [citation omitted].

 **\*6** For example, the mandate to read the papers of *pro se* litigants generously makes it appropriate to consider a plaintiff's papers in opposition to a defendant's motion to dismiss as effectively amending the allegations of the plaintiff's complaint, to the extent that those factual assertions are consistent with the allegations of the plaintiff's complaint. [23] Moreover, "courts must construe *pro se* pleadings broadly, and interpret them to raise the strongest arguments that they suggest." [24] Furthermore, when addressing a *pro se* complaint, *generally* a district court "should not dismiss without granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated." [25] Of course, an opportunity to amend is not required where the plaintiff has already amended his complaint. [26] In addition, an opportunity to amend is not required where "the problem with [plaintiff's] causes of action is substantive" such that "[b]etter pleading will not cure it." [27]

[23]   "Generally, a court may not look outside the pleadings when reviewing a Rule 12(b)(6) motion to dismiss. However, the mandate to read the papers of *pro se* litigants generously makes it appropriate to consider plaintiff's additional materials, such as his opposition memorandum." *Gadson v. Goord,* 96–CV–7544, 1997 WL 714878, at \*1, n. 2 (S.D.N.Y. Nov.17, 1997) (citing, *inter alia, Gil v. Mooney,* 824 F.2d 192, 195 [2d Cir.1987] [considering plaintiff's response affidavit

on motion to dismiss] ). Stated another way, "in cases where a pro se plaintiff is faced with a motion to dismiss, it is appropriate for the court to consider materials outside the complaint to the extent they 'are consistent with the allegations in the complaint.' " *Donhauser v. Goord,* 314 F.Supp.2d 119, 212 (N.D.N.Y.2004) (considering factual allegations contained in plaintiff's opposition papers) [citations omitted], *vacated in part on other grounds,* 317 F.Supp.2d 160 (N.D.N.Y.2004). This authority is premised, not only on case law, but on Rule 15 of the Federal Rules of Civil Procedure, which permits a plaintiff, as a matter of right, to amend his complaint once at any time before the service of a responsive pleading—which a motion to dismiss is not. *See Washington v. James,* 782 F.2d 1134, 1138–39 (2d Cir.1986) (considering subsequent affidavit as amending *pro se* complaint, on motion to dismiss) [citations omitted].

[24]   *Cruz v. Gomez,* 202 F.3d 593, 597 (2d Cir.2000) (finding that plaintiff's conclusory allegations of a due process violation were insufficient) [internal quotation and citation omitted].

[25]   *Cuoco v. Moritsugu,* 222 F.3d 99, 112 (2d Cir.2000) [internal quotation and citation omitted]; *see also* Fed.R.Civ.P. 15(a) (leave to amend "shall be freely given when justice so requires").

[26]   *Yang v. New York City Trans. Auth.,* 01–CV–3933, 2002 WL 31399119, at \*2 (E.D.N.Y. Oct.24, 2002) (denying leave to amend where plaintiff had already amended complaint once); *Advanced Marine Tech. v. Burnham Sec., Inc.,* 16 F.Supp.2d 375, 384 (S.D.N.Y.1998) (denying leave to amend where plaintiff had already amended complaint once).

[27]   *Cuoco,* 222 F.3d at 112 (finding that repleading would be futile) [citation omitted]; *see also Cortec Indus., Inc. v. Sum Holding L.P.,* 949 F.2d 42, 48 (2d Cir.1991) ("Of course, where a plaintiff is unable to allege any fact sufficient to support its claim, a complaint should be dismissed with prejudice.") (affirming, in part, dismissal of claim with prejudice) [citation omitted]; *see, e.g., See Rhodes v. Hoy,* 05–CV–0836, 2007 WL 1343649, at \*3, 7 (N.D.N.Y. May 5, 2007) (Scullin, J., adopting Report–Recommendation of Peebles,

M.J.) (denying *pro se* plaintiff opportunity to amend before dismissing his complaint because the error in his complaint—the fact that plaintiff enjoyed no constitutional right of access to DOCS' established grievance process—was substantive and not formal in nature, rendering repleading futile); *Thabault v. Sorrell,* 07–CV–0166, 2008 WL 3582743, at *2 (D.Vt. Aug.13, 2008) (denying *pro se* plaintiff opportunity to amend before dismissing his complaint because the errors in his complaint—lack of subject-matter jurisdiction and lack of standing—were substantive and not formal in nature, rendering repleading futile) [citations omitted]; *Hylton v. All Island Cob Co.,* 05–CV–2355, 2005 WL 1541049, at *2 (E.D.N.Y. June 29, 2005) (denying *pro se* plaintiff opportunity to amend before dismissing his complaint arising under 42 U.S.C. § 1983 because the errors in his complaint—which included the fact that plaintiff alleged no violation of either the Constitution or laws of the United States, but only negligence—were substantive and not formal in nature, rendering repleading futile); *Sundwall v. Leuba,* 00–CV–1309, 2001 WL 58834, at *11 (D.Conn. Jan.23, 2001) (denying *pro se* plaintiff opportunity to amend before dismissing his complaint arising under 42 U.S.C. § 1983 because the error in his complaint—the fact that the defendants were protected from liability by Eleventh Amendment immunity—was substantive and not formal in nature, rendering repleading futile).

However, while this special leniency may somewhat loosen the procedural rules governing the form of pleadings (as the Second Circuit has observed),[28] it does not completely relieve a *pro se* plaintiff of the duty to satisfy the pleading standards set forth in Rules 8, 10 and 12.[29] Rather, as both the Supreme Court and Second Circuit have repeatedly recognized, the requirements set forth in Rules 8, 10 and 12 are procedural rules that even *pro se* civil rights plaintiffs must follow.[30] Stated more plainly, when a plaintiff is proceeding *pro se,* "all normal rules of pleading are not absolutely suspended."[31]

[28]     *Sealed Plaintiff v. Sealed Defendant # 1,* No. 06–1590, 2008 WL 3294864, at *5 (2d Cir. Aug.12, 2008) ("[The obligation to construe the pleadings of *pro se* litigants liberally] entails, at the very least, a permissive application of the rules governing the

form of pleadings.") [internal quotation marks and citation omitted]; *see also Traguth v. Zuck,* 710 F.2d 90, 95 (2d Cir.1983) ("[R]easonable allowances to protect *pro se* litigants from inadvertent forfeiture of important rights because of their lack of legal training ... should not be impaired by harsh application of technical rules.") [citation omitted].

[29]     *See Prezzi v. Schelter,* 469 F.2d 691, 692 (2d Cir.1972) (extra liberal pleading standard set forth in *Haines v. Kerner,* 404 U.S. 519 [1972], did not save *pro se* complaint from dismissal for failing to comply with Fed.R.Civ.P. 8] ); *accord, Shoemaker v. State of Cal.,* 101 F.3d 108 (2d Cir.1996) (citing *Prezzi v. Schelter,* 469 F.2d 691] [unpublished disposition cited only to acknowledge the continued precedential effect of *Prezzi v. Schelter,* 469 F.2d 691, within the Second Circuit]; *accord, Praseuth v. Werbe,* 99 F.3d 402 (2d Cir.1995).

[30]     *See McNeil v. U.S.,* 508 U.S. 106, 113, 113 S.Ct. 1980, 124 L.Ed.2d 21 (1993) ("While we have insisted that the pleadings prepared by prisoners who do not have access to counsel be liberally construed ... we have never suggested that procedural rules in ordinary civil litigation should be interpreted so as to excuse mistakes by those who proceed without counsel."); *Faretta v. California,* 422 U.S. 806, 834, n. 46, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975) ("The right of self-representation is not a license ... not to comply with relevant rules of procedural and substantive law."); *Triestman v. Fed. Bureau of Prisons,* 470 F.3d 471, 477 (2d Cir.2006) (*pro se* status "does not exempt a party from compliance with relevant rules of procedural and substantive law") [citation omitted]; *Traguth v. Zuck,* 710 F.2d 90, 95 (2d Cir.1983) (*pro se* status "does not exempt a party from compliance with relevant rules of procedural and substantive law") [citation omitted]; *cf. Phillips v. Girdich,* 408 F.3d 124, 128, 130 (2d Cir.2005) (acknowledging that *pro se* plaintiff's complaint could be dismissed for failing to comply with Rules 8 and 10 if his mistakes either "undermine the purpose of notice pleading [ ] or prejudice the adverse party").

[31]     *Stinson v. Sheriff's Dep't of Sullivan Cty.,* 499 F.Supp. 259, 262 & n. 9 (S.D.N.Y.1980).

## III. ANALYSIS

### A. Claims Against Defendants in Their Official Capacities

Plaintiff's complaint names Defendants "in their individual capacities and in their official capacities as officials of the New York State Department of Corrections." (Dkt. No. 1 at 2.) Defendants argue that Plaintiff's claims against them in their official capacities are barred by the Eleventh Amendment. (Dkt. No. 42–4 at 3.) Defendants are correct.

The Eleventh Amendment has long been construed as barring a citizen from bringing a suit against his or her own state in federal court, under the fundamental principle of "sovereign immunity." *See* U.S. Const. amend XI ("The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State."); *Hans v. Louisiana,* 134 U.S. 1, 10–21, 10 S.Ct. 504, 33 L.Ed. 842 (1890); *Idaho v. Coeur d'Alene Tribe of Idaho,* 521 U.S. 261, 267, 117 S.Ct. 2028, 138 L.Ed.2d 438 (1997); *Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. 89, 100, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984). State immunity extends not only to the states, but to state agencies and state officers who act on behalf of the state. *See Puerto Rico Aqueduct & Sewer Auth. v. Metcalf,* 506 U.S. 139, 142–47, 113 S.Ct. 684, 121 L.Ed.2d 605 (1993); *Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. 89, 101–06, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984). DOCS employees are state officials for the purposes of the Eleventh Amendment. *See e.g. Davis v. New York,* 316 F.3d 93, 101 (2d Cir.2002); *Tolliver v. N.Y. State Correctional Officers,* No. 99 CIV 9555, 2000 WL 1154311, at *2 (S.D.N.Y. Aug.14, 2000) ("All of the defendants in this case are state officials because they are employees of the New York State Department of Correctional Services."). Where it has been successfully demonstrated that a defendant is entitled to sovereign immunity under the Eleventh Amendment, the federal court lacks subject matter jurisdiction over the case, and "the case must be stricken from the docket." *McGinty v. State of New York,* 251 F.3d 84, 100 (2d Cir.2001) (citation omitted); *see also* Fed.R.Civ.P. 12(h)(3).

**\*7** Here, the face of the complaint alleges that Defendants are each "officials of the New York State Department of Corrections." (Dkt. No. 1 at 2.) Therefore, any claims against Defendants in their officials capacities are barred by the Eleventh Amendment. Accordingly, I recommend that the Court grant Defendants' motion and dismiss all claims against Defendants in their official capacities [32].

[32]   It is not clear from Defendants' papers whether they intended to move for summary judgment dismissing the claims against *all* of the remaining Defendants in their official capacities or whether they moved solely on behalf of Defendants Rourke, Eagen, and Graham. To the extent that Defendants neglected to explicitly move on behalf of Defendants Wolczyk and Selsky, I recommend that the Court *sua sponte* dismiss any claims against those Defendants in their official capacities pursuant to 28 U.S.C. § 1915(e)(2)(B).

### B. Medical Care Claims

Plaintiff alleges that Defendants violated his Eighth Amendment right to adequate medical care by refusing to allow him to participate in the Intermediate Care Program. (Dkt. No. 1 at 5.) The Intermediate Care Program is a program for prisoners with mental health issues that provides treatment, medication, group therapy, and other counseling. (Dkt. No. 42–5, P's Depo. at 35:22–36:6.)

To prevail on an Eighth Amendment claim of inadequate medical care, a plaintiff must show two things: (1) that the plaintiff had a *sufficiently serious* medical need; and (2) that the defendant was *deliberately indifferent* to that serious medical need. *Estelle v. Gamble,* 429 U.S. 97, 104, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976); *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998).

Defendants argue that Plaintiff can establish neither that he suffered from a sufficiently serious medical need nor that Defendants were deliberately indifferent. (Dkt. No. 42–4 at 5–8.) I find that Plaintiff suffered from a sufficiently serious medical need but that Defendants were not deliberately indifferent to that need.

#### 1. Serious Medical Need

Defendants argue that Plaintiff cannot establish that he suffered from a sufficiently serious medical need because "Plaintiff acknowledges that his allegations are only with regard to his mental health treatment and not medical treatment." (Dkt. No. 42–4 at 6–7 .)

To be sufficiently serious for purposes of the Constitution, a medical condition must be "a condition of urgency, one that

may produce death, degeneration, or extreme pain." *Nance v. Kelly,* 912 F.2d 605, 607 (2d Cir.1990) (Pratt, J. dissenting) [citations omitted], *accord, Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1996), *cert. denied,* 513 U.S. 1154, 115 S.Ct. 1108, 130 L.Ed.2d 1074 (1995); *Chance,* 143 F.3d at 702.

Neither Defendants nor Plaintiff have provided the Court with any of Plaintiff's medical records to establish the precise nature of Plaintiff's mental health diagnosis. The evidence before the Court establishes that Plaintiff was initially prescribed the medication Celexa in February 2005 and has been compliantly taking it. (Dkt. No. 42–5, P's Depo. at 33:18–34:3; Dkt. No. 42–6 at 3, Intermediate Care Program Referral form.) Celexa is prescribed to treat major depression. *The PDR Pocket Guide to Prescription Drugs* 275 (Bette LaGow, ed., 7th ed.2005). Plaintiff states that he began having suicidal thoughts sometime prior to October 25, 2005. (Dkt. No. 43 at 3.) He attempted suicide on July 5, 2008, and October 12, 2008. *Id.* I find, based on the limited information in the record before me, that Plaintiff suffered from major depression with suicidal ideation at the time he was denied entrance into the Intermediate Care Program in September 2005.

**\*8** Neither party has cited any case law discussing whether depression, either with or without suicidal ideation, is a "sufficiently serious" medical condition for Eighth Amendment purposes. I have independently researched the issue and located limited published case law on the subject. The First Circuit has found that depression combined with severe anxiety attacks or suicide attempts is a serious medical need. *Mahan v. Plymouth County House of Corrections,* 64 F.3d 14, 16, 18 (1st Cir.1995); *Torraco v. Maloney,* 923 F.2d 231, 235 n. 4 (1st Cir.1991). A District Court in Delaware has presumed that a combination of depression, anxiety, and post-traumatic stress disorder is a serious medical need. *Simpson v. Penobscot County Sheriff's Dept.,* 285 F.Supp.2d 75 (D.Me.2003). A District Court in North Dakota has held that self-diagnosed depression with suicidal ideation is not a serious medical condition for Eighth Amendment purposes, but depression that actually manifests in attempted suicide is sufficiently serious. *White v. Crow Ghost,* 456 F.Supp.2d 1096, 1102–03 (D.N.D.2006).

Here, Plaintiff was not merely self-diagnosed: prison officials prescribed Celexa to treat his depression. Although he did not attempt suicide until three years after he was denied admission to the Intermediate Care Program, these later attempts illustrate that his suicidal thoughts in 2005 were

not ephemeral. In light of these facts, and because the summary judgment standard requires the Court to resolve all ambiguities and draw all reasonable inferences against the moving party, I will assume that Plaintiff suffered from a sufficiently serious medical need.

2. *Deliberate Indifference*

Defendants argue that even if Plaintiff had a serious medical need, they were not deliberately indifferent to it. (Dkt. No. 42–4 at 7–8.) Defendants are correct.

Defendants Rourke, Eagen, and Graham are not medical personnel. (Dkt. No. 42–5, P's Depo. at 45:25–46:7.) "Non-medical personnel engage in deliberate indifference where they intentionally delayed access to medical care when the inmate was in extreme pain and has made his medical problem known to attendant prison personnel." *Baumann v. Walsh,* 36 F.Supp.2d 508, 512 (N.D.N.Y.1999) (Scullin, J., adopting Report–Recommendation of Sharpe, M.J.). Here, Plaintiff was not denied access to mental health care. Beginning in February 2005, Plaintiff was seen by mental health providers once a month. (Dkt. No. 42–5, P's Depo. at 18:7–20:14.) As discussed above, he was also prescribed Celexa, an anti-depressant. While Plaintiff may have preferred to receive his mental health treatment through the Intermediate Care Program, he was not constitutionally entitled to his preferred care. "It is well established that mere disagreement over the proper treatment does not create a constitutional claim." *Chance v. Armstrong,* 143 F.3d 698, 703 (2d Cir.1998). Therefore, I find that there is no genuine issue of material fact showing that Defendants Rourke, Eagen, or Graham were deliberately indifferent to Plaintiff's serious medical need. Accordingly, I recommend that Defendants' motion for summary judgment dismissing Plaintiff's Eighth Amendment medical care claim be granted.

**\*9** In light of my finding that Defendants are entitled to summary judgment dismissing Plaintiff's Eighth Amendment medical care claim on the constitutional merits, I decline to address Defendants' arguments regarding personal involvement and qualified immunity.

**ACCORDINGLY,** it is

**RECOMMENDED** that Defendants' motion for partial summary judgment (Dkt. No. 42) be ***GRANTED.*** It is recommended that the Court (1) dismiss Plaintiff's claims against all Defendants in their official capacities; and (2) dismiss Plaintiff's Eighth Amendment medical care

2009 WL 3111429

claim against Defendants Rourke, Eagen, and Graham, thus terminating those Defendants from this litigation; and it is further

**RECOMMENDED** that this matter be set for a pretrial conference on Plaintiff's Eighth Amendment conditions of confinement claim against Defendants Wolczyk and Selsky.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have ten days within which to file written objections to the foregoing report.

Such objections shall be filed with the Clerk of the Court. ***FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW.*** *Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993) (citing *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989)); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(e).

**All Citations**

Not Reported in F.Supp.2d, 2009 WL 3111429

---

**End of Document**                    © 2021 Thomson Reuters. No claim to original U.S. Government Works.

Allah v. Kemp, Not Reported in F.Supp.2d (2010)
2010 WL 1036802

2010 WL 1036802
Only the Westlaw citation is currently available.

**This decision was reviewed by West editorial staff and not assigned editorial enhancements.**

United States District Court,
N.D. New York.

Kah'sun Creator ALLAH, Plaintiff,

v.

Tim KEMP, Office of Mental Health Unit Chief, Upstate Correctional Facility; Wayne Crosier, Mental Health Social Worker, Upstate Correctional Facility, Defendants.

No. 9:08-CV-1008 (NAM/GHL).
|
Feb. 25, 2010.

**Attorneys and Law Firms**

Kah'sun Creator Allah, Comstock, New York.

Hon. Andrew M. Cuomo, Attorney General for the State of New York, Charles J. Quackenbush, Esq., of Counsel, Albany, NY, Counsel for Defendants.

*REPORT-RECOMMENDATION and ORDER*

GEORGE H. LOWE, United States Magistrate Judge.

**\*1** This *pro se* prisoner civil rights action, commenced pursuant to 42 U.S.C. § 1983, has been referred to me for Report and Recommendation by the Honorable Norman A. Mordue, Chief United States District Judge, pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3(c).

Currently pending before the Court is Defendants' Motion for Judgment on the Pleadings pursuant to Federal Rule of Civil Procedure 12(c). [1] Dkt. No. 14. Plaintiff opposes the motion. Dkt. No. 29. [2]

---

[1] Defendants filed their Answer on November 17, 2008 and a Mandatory Pretrial Discovery and Scheduling Order was issued. Dkt. Nos. 10, 11. Defendants deposed plaintiff on April 6, 2009 and filed the transcript in support of their Motion

for Sanctions arising out of plaintiff's refusal to answer questions regarding his criminal record and prison disciplinary history. *See* Dkt. No. 24. The deposition transcript is not part of the record before this Court on Defendants' Motion for Judgment on the Pleadings.

[2] Plaintiff's opposition papers include excerpts from his mental health records. Dkt. No. 29. Defendants advised in reply that they have no objection to the Court's consideration of these records. Dkt. No. 30 at 1. Defendants object, however, to Plaintiff's request that this motion be converted to a motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. *Id.* As discussed, *infra,* Plaintiff's submissions may be properly considered in addressing Defendants' Motion for Judgment on the Pleadings, and the Court therefore, in the exercise of its discretion, declines to convert the motion to one seeking summary judgment. *See Avgerinos v. Palmyra-Macedon Central School Dist.,* 08-CV-6572, 2010 U.S. Dist. LEXIS 11988, 2010 WL 547173, at *3 (W.D.N.Y. Feb.11, 2010) (federal courts have complete discretion in determining whether to convert a motion to dismiss to one for summary judgment).

The Court will provide Plaintiff with a copy of each unpublished decision in accordance with the Second Circuit's decision in *LeBron v. Sanders,* 557 F.3d 76 (2d Cir.2009).

For the reasons that follow, I recommend that Defendants' Motion for Judgment on the Pleadings be denied.

**I. BACKGROUND**

Plaintiff Kah'Sun Creator Allah alleges in his Complaint that his Eighth Amendment rights were violated during his confinement at Upstate Correctional Facility ("Upstate") during the period July, 2006 through March, 2007. Dkt. No. 1.

Plaintiff arrived at Upstate on July 24, 2006, three days after he was observed at Downstate Correctional Facility ("Downstate") "putting a noose around his neck attempting suicide" and confined on "suicide watch". Dkt. No. 1 ¶ 9. Plaintiff states that mental health providers at Downstate told him that he had been assigned to the mental health case load and would be seen by mental health staff at Upstate immediately upon his arrival. *Id.* ¶¶ 12-13.

2010 WL 1036802

Plaintiff's Downstate providers "recommended continued clinical support and individual therapy." *Id.* ¶ 13; Dkt. No. 29 Exs. A-C.

According to Plaintiff, upon his arrival at Upstate, Defendant Tim Kemp, Mental Health Unit Chief, "never seen to it that plaintiff be seen by his mental health staff." Dkt. No. 1 ¶ 15.

On January 23, 2007, Plaintiff "again attempted suicide by tying a noose around his neck and tying it to shower dead [sic] ... ." *Id.* ¶ 16. Plaintiff's cell-mate intervened and summoned assistance. *Id.* Plaintiff told Defendant Wayne Crosier, Mental Health Social Worker, that "he couldn't take it any more and had nothing to live for and didn't want to live no more." *Id.* ¶ 18. Plaintiff was moved to an observation cell and put on suicide watch. *Id.* ¶ 19. During this time, Plaintiff refused seven meals and was uncommunicative "due to his depression." *Id.* ¶¶ 20, 21. Plaintiff claims that Defendants did not provide for his evaluation by a psychiatrist nor did they otherwise provide him with mental health treatment. *Id.* ¶ 23.

Plaintiff was released from observation on January 25, 2007. *Id.* ¶ 21. Plaintiff was returned to his cell without provision for ongoing mental health care. *Id.* ¶ 23. Plaintiff did not see mental health staff again until March 8, 2007. *Id.*

On March 8, 2007, Plaintiff started hearing voices and attempted suicide by "cutting along his arm severely with a razor causing severe pain and suffering." *Id.* ¶ 24. Correctional officers intervened, and Plaintiff was taken to the facility hospital where his arm wounds were treated. Plaintiff was again taken to an observation cell and placed on suicide watch. *Id.* ¶¶ 26-27.

**\*2** Plaintiff was moved from the observation cell at Upstate to the Mental Health Satellite Unit at Clinton Correctional Facility on March 12, 2007. While at Clinton, Plaintiff was evaluated by Dr. Berggren, diagnosed with "Brief Psychotic Disorder, Psychosis and Adjustment Disorder," and treated with medication. *Id.* ¶¶ 28-29; Dkt. No. 29 at 4 and Ex. K.

Plaintiff claims that Defendants Kemp and Crosier acted with deliberate indifference in violation of his Eighth Amendment rights in failing to provide Plaintiff with mental health evaluation and treatment upon his arrival at Upstate in July, 2006, and thereafter by returning Plaintiff to his cell two days after his January 23, 2007 suicide attempt without adequate mental health evaluation and treatment. Dkt. No. 1 at ¶¶ 30-32. Plaintiff seeks compensatory and punitive damages.

## II. LEGAL STANDARD GOVERNING MOTIONS FOR JUDGMENT ON THE PLEADINGS

"The standard for addressing a Rule 12(c) motion for judgment on the pleadings is the same as that for a Rule 12(b)(6) motion to dismiss for failure to state a claim." *Cleveland v. Caplaw Enter. .,* 448 F.3d 518, 521 (2d Cir.2006). In order to state a claim upon which relief can be granted, a complaint must contain, *inter alia,* "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2). The requirement that a plaintiff "show" that he or she is entitled to relief means that a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is *plausible* on its face.' " *Ashcroft v. Iqbal,* --- U.S. ----, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009) (quoting *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)) (emphasis added).

"A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal,* 129 S.Ct. at 1949 (quoting *Twombly,* 550 U.S. at 556-57, 570). Accordingly, "where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged-but it has not *shown*-that the pleader is entitled to relief." *Iqbal,* 129 S.Ct. at 1950 (internal citation and punctuation omitted) (emphasis added).

It should also be emphasized that, "[i]n reviewing a complaint for dismissal under Rule 12(b)(6), the court must accept the material facts alleged in the complaint as true and construe all reasonable inferences in the plaintiff's favor." *Hernandez v. Coughlin,* 18 F.3d 133, 136 (2d Cir.1994) (affirming grant of motion to dismiss); *Sheppard v. Beerman,* 18 F.3d 147, 150 (2d Cir.1994). "This standard is applied with even greater force where the plaintiff alleges civil rights violations or where the complaint is submitted *pro se." Hernandez,* 18 F.3d at 136; *see also Deravin v. Kerik,* 335 F.3d 195, 200 (2d Cir.2003). In other words, while all pleadings are to be construed liberally under Rule 8(e), *pro se* civil rights pleadings are to be construed with an *extra* degree of liberality.

**\*3** For example, the mandate to read the papers of *pro se* litigants generously makes it appropriate to consider a plaintiff's papers in opposition to a defendant's motion

2010 WL 1036802

to dismiss as effectively amending the allegations of the plaintiff's complaint, to the extent that those factual assertions are consistent with the allegations of the plaintiff's complaint. *See, e.g., Gill v. Mooney,* 824 F.2d 192, 195 (2d Cir.1987) (considering plaintiff's response affidavit on motion to dismiss); *Gadson v. Goord,* 96-CV-7544, 1997 U.S. Dist. LEXIS 18131, 1997 WL 714878, at *1 n. 2 (S.D.N.Y. Nov.17,1997). [3]

[3]     This authority is premised, not only on case law, but on Rule 15 of the Federal Rules of Civil Procedure, which permits a plaintiff to amend the complaint once as a matter of right, and otherwise with the court's leave, which should be "freely give[n] ... when justice so requires." Fed.R.Civ.P. 15; *see Washington v. James,* 782 F.2d 1134, 1138-39 (2d Cir.1986) (considering subsequent affidavit as amending *pro se* complaint, on motion to dismiss).

Thus, "courts must construe *pro se* pleadings broadly, and interpret them to raise the strongest possible argument that they suggest." *See Cruz v. Gomez,* 202 F.3d 593, 597 (2d Cir.2000) (internal quotation and citation omitted). Furthermore, when a *pro se* complaint fails to state a cause of action, the court *generally* "should not dismiss without granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated." *Cuoco v. Moritsugu,* 222 F.3d 99, 112 (2d Cir.2000) (internal quotation and citation omitted). [4]

[4]     Of course, an opportunity to amend is not required where the plaintiff has already amended the complaint. *See Advanced Marine Technologies, Inc. v. Burnham Securities, Inc.,* 16 F.Supp.2d 375, 384 (S.D.N.Y.1998) (denying leave to amend where plaintiff had already amended complaint once). In addition, an opportunity to amend is not required where "the problem with [the plaintiff's] causes of action is substantive" such that "better pleading will not cure it." *Cuoco,* 222 F.3d at 112.

## III. ANALYSIS

### A. Eighth Amendment

Reading the complaint generously, Plaintiff alleges that Defendants failed to provide him with mental health evaluation and treatment during the period July, 2006 to January, 2007, notwithstanding the fact that he had attempted suicide three days before he arrived at Upstate, and despite the fact that Plaintiff's health records advised of his need for such care. Plaintiff further alleges that following his second suicide attempt in January, 2007, Defendants again failed to properly evaluate his condition and withheld treatment, leading to a third suicide attempt just two months later. *See* Dkt. No. 1.

Defendants argue that Plaintiff has made an insufficient showing of an Eighth Amendment claim and that dismissal of the Complaint is warranted as a matter of law. Dkt. No. 14-1 at pp. 4-8.

The Eighth Amendment to the United States Constitution prohibits "cruel and unusual" punishments. The word "punishment" refers not only to deprivations imposed as a sanction for criminal wrongdoing, but also to deprivations suffered during imprisonment. *Estelle v. Gamble,* 429 U.S. 97, 102-03, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). Punishment is "cruel and unusual" if it involves the unnecessary and wanton infliction of pain or if it is incompatible with "the evolving standards of decency that mark the progress of a maturing society." *Estelle,* 429 U.S. at 102. Thus, the Eighth Amendment imposes on jail officials the duty to "provide humane conditions of confinement" for prisoners. *Farmer v. Brennan,* 511 U.S. 825, 832, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). In fulfilling this duty, prison officials must "ensure that inmates receive adequate food, clothing, shelter, and medical care, and must 'take reasonable measures to guarantee the safety of the inmates.' " *Id.* (quoting *Hudson v. Palmer,* 468 U.S. 517, 526-27, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984)).

**\*4** The duties which fall within the ambit of the Eighth Amendment include both the duty to safeguard inmates from harm, often referred to as the "duty to protect" and the duty to provide medical and mental health care. [5] Violations of the duty to protect are commonly asserted in cases involving inmate on inmate violence and are analyzed under the Eighth Amendment with reference to whether the conditions under which the inmate was confined posed an unreasonable risk of harm. *See Snyder v. McGinnis,* 03-CV-902F, 2004 U.S. Dist. LEXIS 17976, 2004 WL 1949472, *4 (W.D.N.Y. Sep.2, 2004). "The Constitution does not guarantee an assault-free prison environment; it promises only reasonable good faith protection." *McGriff v. Coughlin,* 640 F.Supp. 877, 880 (S.D.N.Y.1986). As a result, not every injury suffered by an inmate at the hands of another constitutes an Eighth Amendment violation by the prison official responsible for the inmate's safety. *See Farmer,* 511 U .S. at 834. Courts in this Circuit have emphasized that "the standard for prisoner

2010 WL 1036802

'failure to protect' claims brought under 42 U .S.C. § 1983 is quite high." *Snyder,* 2004 WL 1949472, at *4 (citations omitted); *Hamilton v. Riordan,* 07 Civ. 7163, 2008 U.S. Dist. LEXIS 69116, 2008 WL 4222089, *1 (S.D.N.Y. Sep.11, 2008).

5      "Courts have repeatedly held that treatment of a psychiatric or psychological condition may present a 'serious medical need.' " *Cuoco,* 222 F.3d at 106 (quoting *Meriwether v. Faulkner,* 821 F.2d 408, 413 (7th Cir.1987)).

Presumably in order to invoke the higher standard of scrutiny applicable to "failure to protect" claims, Defendants refer to the Complaint as alleging a claim "that defendants subjected [Plaintiff] to cruel and unusual conditions of confinement by failing to protect him from himself" on the two occasions when he attempted suicide at Upstate. Dkt. No. 14-1 at 3. [6] While claims involving the risk of suicide have been articulated and addressed as violations of the duty to protect, particularly when asserted against non-medical personnel, "[t]he bulk of cases dealing with the right of a person in custody for protection from suicide analyze the issue as an Eighth Amendment claim dealing with the inadequate provision of medical care." *Kelsey v. City of New York,* 03-CV-5978, 2006 U.S. Dist. LEXIS 91977, 2006 WL 3725543, * 4 n. 5 (E.D.N.Y. Dec.18, 2006), *aff'd,* 2009 WL 106374 (2d Cir.2009). [7]

6      Defendants then address the sufficiency of Plaintiff's claims in terms of "the severity of the conditions under which plaintiff has been incarcerated" and whether he faced a "risk" that was objectively substantial, *see* Dkt. No. 14-1 at 5, rather than whether his mental health need was sufficiently "serious".

7      *Kelsey* involved a claim that police officers acted with deliberate indifference to an arrestee's safety while he was in their custody, and failed to prevent his suicide. *Kelsey,* 2006 WL 3725543, at *4. *See also Burke v. Warren County Sheriff's Dept.,* 1994 U.S. Dist. LEXIS 17233, 1994 WL 675042, *6 (N.D.N.Y. Nov.25, 1994) (Munson, J.) (jailers are not required to safeguard every inmate; only those presenting a "strong likelihood of suicide" *e.g.,* due to a previous threat or an earlier attempt are entitled to protection).

In this case, the Court is not aware of any reason to characterize Defendants' duty to provide adequate and proper mental health care to Plaintiff as the duty to protect him from himself, or to invoke the "high" standard applicable to claims arising out of inmate on inmate violence. [8] Accordingly, the Court construes Plaintiff's Eighth Amendment claims as alleging the deprivation of proper and adequate medical care.

8      The Court notes, however, that its conclusion regarding the sufficiency of the Complaint on Defendants' Rule 12(c) motion would not be altered if Plaintiff's Eighth Amendment claim was assessed pursuant to the standard applicable to "failure to protect" claims.

A viable Eighth Amendment claim must contain both an objective and a subjective component. *Farmer,* 511 U.S. at 834. To satisfy the objective component, "the deprivation alleged must be, objectively, 'sufficiently serious.' " *Farmer,* 511 U.S. at 834 (quoting *Wilson v. Seiter,* 501 U.S. 294, 298, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991)). Analyzing the objective element of an Eighth Amendment medical care claim requires two inquiries. "The first inquiry is whether the prisoner was actually deprived of adequate medical care." *Salahuddin v. Goord,* 467 F.3d 263, 279 (2d Cir.2006). The word "adequate" reflects the reality that "[p]rison officials are not obligated to provide inmates with whatever care the inmates desire. Rather, prison officials fulfill their obligations under the Eighth Amendment when the care provided is 'reasonable.' " *Jones v. Westchester County Dept. of Corrections,* 557 F.Supp.2d 408, 413 (S.D.N.Y.2008).

 *5 The second inquiry is "whether the inadequacy in medical care is sufficiently serious. This inquiry requires the court to examine how the offending conduct is inadequate and what harm, if any, the inadequacy has caused or will likely cause the prisoner." *Salahuddin,* 467 F.3d at 280. The focus of the second inquiry depends on whether the prisoner claims to have been completely deprived of treatment or whether he claims to have received treatment that was inadequate. *Id.* If "the unreasonable medical care is a failure to provide any treatment for an inmate's medical condition, courts examine whether the inmate's medical condition is sufficiently serious." *Id.* A "serious medical condition" is "a condition of urgency, one that may produce death, degeneration, or extreme pain." *Nance v. Kelly,* 912 F.2d 605, 607 (2d Cir.1990) (Pratt, J. dissenting) [citations omitted], *accord, Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1996), *cert. denied,* 513 U.S. 1154, 115 S.Ct. 1108, 130 L.Ed.2d

Case 9:19-cv-01161-DNH-TWD    Document 55    Filed 01/19/21    Page 37 of 103
Allah v. Kemp, Not Reported in F.Supp.2d (2010)
2010 WL 1036802

1074 (1995); *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998). Relevant factors to consider when determining whether an alleged medical condition is sufficiently serious include, but are not limited to: (1) the existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; (2) the presence of a medical condition that significantly affects an individual's daily activities; and (3) the existence of chronic and substantial pain. *Chance,* 143 F.3d at 702-03.

If the claim is that treatment was provided but was inadequate, the second inquiry is narrower. *Salahuddin,* 467 F.3d at 280. For example, "[w]hen the basis for a prisoner's Eighth Amendment claim is a temporary delay or interruption in the provision of otherwise adequate medical treatment, it is appropriate to focus on the challenged *delay* or *interruption* in treatment rather than the prisoner's *underlying medical condition* alone in analyzing whether the alleged deprivation" is sufficiently serious. *Smith v. Carpenter,* 316 F.3d 178, 185 (2d Cir.2003).

To satisfy the subjective component of an Eighth Amendment claim, the defendant's behavior must be "wanton." Where a prisoner claims that a defendant provided inadequate medical care, he must show that the defendant acted with "deliberate indifference." *Estelle,* 429 U.S. at 105.

Medical mistreatment rises to the level of deliberate indifference only when it "involves culpable recklessness, i.e., an act or a failure to act ... that evinces 'a conscious disregard of a substantial risk of serious harm.' " *Chance,* 143 F.3d at 703 (quoting *Farmer,* 511 U.S. at 835). Thus, to establish deliberate indifference, an inmate must prove that (1) a prison medical care provider was aware of facts from which the inference could be drawn that the inmate had a serious medical need; and (2) the medical care provider actually drew that inference. *Farmer,* 511 U.S. at 837; *Chance,* 143 F.3d at 702-03. The inmate then must establish that the provider consciously and intentionally disregarded or ignored that serious medical need. *Farmer,* 511 U.S. at 835. An "inadvertent failure to provide adequate medical care" does not constitute "deliberate indifference." *Estelle,* 429 U.S. at 105-06. Moreover, "a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim ... under the Eighth Amendment." *Id.* Stated another way, "medical malpractice does not become a constitutional violation merely because the victim is a prisoner." *Id.; Smith v. Carpenter,* 316 F.3d 178, 184 (2d Cir.2003). However, malpractice that amounts to culpable

recklessness constitutes deliberate indifference. Accordingly, "a physician may be deliberately indifferent if he or she consciously chooses an easier and less efficacious treatment plan." *Chance,* 143 F.3d at 703.

**\*6** Regarding the objective component, the complaint alleges that Defendants failed to provide Plaintiff with mental health evaluation and care upon his arrival at Upstate on July 24, 2006, notwithstanding the notations in his records that he had attempted suicide three days earlier. Plaintiff further alleges that his need for mental health services remained unmet and that he attempted suicide in January, 2007, and again in March, 2007.

Defendants acknowledge that "death by hanging or self-laceration would obviously be a serious harm." Dkt. No. 14-1 at 5. *See Hamilton v. Smith,* No. 06-CV-805, 2009 U.S. Dist. LEXIS 91032, 2009 WL 3199531, \*14 (N.D.N.Y. Jan. 13, 2009) (Homer, M.J.) (plaintiff's claimed history of suicidal thoughts sufficient to raise a question of fact as to serious medical need); *White v. Ghost,* 456 F.Supp.2d 1096, 1102-03 (D. Dakota 2006) (two suicide gestures and/or suicide attempts "obviously created an objective serious medical need.").[9] Defendants argue, however, that the Complaint is subject to dismissal as a matter of law because "based on the circumstances alleged, the risk was not objectively serious" because "OMH staff monitoring [Plaintiff's] status could reasonably discern that he was stable and safe" during the intervals between his suicide attempts. Dkt. No. 14-1 at 6.

9       Moreover, courts have found that depression with suicidal ideation, or severe anxiety attacks are sufficiently severe conditions to meet the objective element of the deliberate indifference standard. *Covington v. Westchester County Dept. of Corrections,* 06 Civ. 5369, 2010 U.S. Dist. LEXIS 11020, 2010 WL 572125, \*6 (S.D.N.Y. Jan.25, 2010) (citing cases); *see also Zimmerman v. Burge,* 2009 U.S. Dist. LEXIS 88343, 2009 WL 3111429, \*8 (N.D.N.Y. Sep.24, 2009) (Sharpe, J. & Lowe, MJ) (reviewing published case law discussing whether depression either with or without suicidal ideation is a "sufficiently serious" medical condition).

The Court disagrees. Whatever conclusions might be warranted after the record is developed, accepting the material facts alleged in the Complaint as true, and drawing all inferences in Plaintiff's favor, the Complaint states a plausible

claim that Plaintiff's mental health needs were unmet and were, objectively, sufficiently serious. *See Salahuddin,* 467 F.3d at 280.

Regarding the subjective component, the Complaint alleges that Defendants were aware of Plaintiff's July, 2006 suicide attempt and of his need for mental health care, but consciously and intentionally disregarded or ignored that need. The Complaint further alleges that following the January, 2007 suicide attempt, Defendants again withheld mental health care.

Defendants argue that the Complaint is insufficient as a matter of law because "[p]laintiff's two widely-spaced efforts at suicide at Upstate cannot fairly be regarded as the product of wanton, callous indifference to his medical condition." Dkt. No. 14-1 at 7. Rather, Defendants maintain that they "can only be faulted, if at all, for being mistaken in their exercise of psychiatric judgment." *Id.* at 8. [10] However, this conclusion presumes the existence of a factual record which does not exist on Defendants' Rule 12(c) motion. *See Farmer,* 511 U.S. at 842 ("Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways ...."); *Chance,* 143 F.3d at 703 ("Whether a course of treatment was the product of sound medical judgment, negligence, or deliberate indifference depends on the facts of the case.").

[10]    Defendants cite several cases in which the court concluded either after trial or on a properly supported motion for summary judgment, that the evidence adduced was not sufficient to demonstrate the defendants' subjective culpability. Dkt. No. 14-1 at 8. As discussed above, the inquiry on Defendants' Motion for Judgment on the Pleadings is significantly different, the question being limited to whether the complaint states a claim for relief that is "plausible" on its face. *Iqbal,* 129 S.Ct. at 1949.

**\*7** The factual allegations in the Complaint, accepted as true, satisfy the subjective component of an Eighth Amendment claim. *See Chance,* 143 F.3d at 703. [11]

[11]    See *Chance,* 143 F.3d at 703-04 (reversing district court's dismissal of medical indifference claim at 12(b)(6) stage because "even if we think it highly unlikely that Chance will be able to prove his allegations, that fact does not justify dismissal for

failure to state a claim, for Rule 12(b)(6) does not countenance ... dismissals based on a judge's disbelief of a complaint's factual allegations ....") (citations and quotation marks omitted).

In light of the foregoing, the Court declines to conclude at this stage that Plaintiff has failed to state a claim for deliberate indifference against Defendants. Accordingly, I recommend that Defendants' Motion for Judgment on the Pleadings to dismiss the Eighth Amendment claim be denied.

**B. Qualified Immunity**

Defendants also assert that they are entitled to dismissal of Plaintiff's Complaint on the ground of qualified immunity. Dkt. No. 14-1 at 8-9.

"Qualified immunity is an affirmative defense that shields government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.' " *Stephenson v. Doe,* 332 F.3d 68, 76 (2d Cir.2003) (quoting *McCardle v. Haddad,* 131 F.3d 43, 50 (2d Cir.1997)).

The Second Circuit has recognized that the availability of qualified immunity may turn "on factual questions that cannot be resolved at [the motion to dismiss] stage of proceedings." *Taylor v. Vermont Dept. of Educ.,* 313 F.3d 768, 793 (2d Cir.2002). [12] Thus, where the "objective reasonableness" of Defendants' actions depends at least in part on what information they had regarding the substance of Plaintiff's complaints, an adjudication as to the applicability of the qualified immunity affirmative defense on the basis of the pleadings alone would be premature.

[12]    In *Stephenson,* the court advised that a "defendant should press a qualified immunity defense during pretrial proceedings so that such a claim can be disposed of by summary judgment where possible, or factual disputes material to the defense can be identified and presented to the jury." *Stephenson,* 332 F.3d at 76.

Here, after liberally reviewing the Complaint, accepting all of its allegations as true, and construing them in Plaintiff's favor, the Court declines to conclude that Defendants are entitled to qualified immunity at this stage. Plaintiff alleges that Defendants were aware of his need for mental health evaluation and treatment upon his arrival at Upstate in July,

2006, and that mental health services were not provided either before or after his January, 2007 suicide attempt, which was followed by a third attempt in March, 2007, resulting in pain, suffering, and injuries. Thus, "[r]esolution of qualified immunity depends on the determination of certain factual questions that cannot be answered at this stage of the litigation." *Denton v. McKee,* 332 F.Supp.2d 659, 666 (S.D.N.Y.2004). [13]

[13]    *See McKenna v. Wright,* 386 F.3d 432, 437-38 (2d Cir.2004) (affirming district court's denial of qualified immunity at motion to dismiss stage on deliberate indifference claim, "[h]owever the matter may stand at the summary judgment stage, or perhaps at trial ....").

Therefore, Defendants' motion for judgment on the pleadings dismissing the complaint on the ground of qualified immunity should be denied.

**ACCORDINGLY,** it is

**RECOMMENDED** that Defendants' Motion for Judgment on the Pleadings (Dkt. No. 14) be *DENIED,* and it is further

**ORDERED** that the clerk provide copies of *Avgerinos v. Palmyra-Macedon Central School Dist.,* 08-CV-6572, 2010 U.S. Dist. LEXIS 11988, 2010 WL 547173 (W.D.N.Y. Feb.11, 2010); *Gadson v. Goord,* 96-CV-7544, 1997 U.S. Dist. LEXIS 18131, 1997 WL 714878 (S.D.N.Y. Nov.17, 1997); *Snyder v. McGinnis,* 03-CV-902F, 2004 U .S. Dist. LEXIS 17976, 2004 WL 1949472 (W.D.N.Y. Sep.2, 2004); *Hamilton v. Riordan,* 07 Civ. 7163, 2008 U.S. Dist. LEXIS 69116, 2008 WL 4222089 (S.D.N.Y. Sep.11, 2008); *Kelsey v. City of New York,* 03-CV5978, 2006 U.S. Dist. LEXIS 91977, 2006 WL 3725543 (E.D.N.Y. Dec.18, 2006), *aff'd,* 2009 WL 106374 (2d Cir.2009); *Burke v. Warren County Sheriff's Dept.,* 1994 U.S. Dist. LEXIS 17233, 1994 WL 675042 (N.D.N.Y. Nov.25, 1994); *Hamilton v. Smith,* No. 06-CV-805, 2009 U.S. Dist. LEXIS 91032, 2009 WL 3199531 (N.D.N.Y. Jan. 13, 2009); *Covington v. Westchester County Dept. of Corrections,* 06 Civ. 5369, 2010 U.S. Dist. LEXIS 11020, 2010 WL 572125 (S.D.N.Y. Jan.25, 2010); and *Zimmerman v. Burge,* 2009 U.S. Dist. LEXIS 88343, 2009 WL 3111429 (N.D.N.Y. Sep.24, 2009) to plaintiff.

**\*8**  Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. *FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW. Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993) (citing *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989)); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(d).

**All Citations**

Not Reported in F.Supp.2d, 2010 WL 1036802

KeyCite Yellow Flag - Negative Treatment

Report and Recommendation Adopted as Modified by   Hamilton v. Smith,
N.D.N.Y.,   September 30, 2009

2009 WL 3199531
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Derrick HAMILTON, Plaintiff,

v.

J.T. SMITH, Superintendent, Shawangunk
Correctional Facility; J. Maly, Deputy
Superintendent of Security; William M. Gonzalez,
Deputy Counsel; M. Genovese, Medical Doctor; M.
Skies, Registered Nurse; Donald Selsky, Director
of Special Housing; D. Parisi, Mail Room Clerk;
F. Chiapperino, Counselor; and Elaine Davis,
Steward, Attica Correctional Facility, Defendants.

No. 06–CV–805 (GTS/DRH).
|
Jan. 13, 2009.

**Attorneys and Law Firms**

Derrick Hamilton, Wallkill, NY, pro se.

Hon. Andrew M. Cuomo, Attorney General for the State
of New York, Christina L. Roberts–Ryba, Esq., Assistant
Attorney General, of Counsel, Albany, NY, for Defendants.

**REPORT–RECOMMENDATION AND ORDER** [1]

[1]     This matter was referred to the undersigned for
report and recommendation pursuant to 28 U.S.C.
§ 636(b) and N.D.N.Y.L.R. 72.3(c).

DAVID R. HOMER, United States Magistrate Judge.

**\*1**   Plaintiff pro se Derrick Hamilton ("Hamilton"), an
inmate in the custody of the New York State Department
of Correctional Services ("DOCS"), brought this action
against nine DOCS employees [2] pursuant to the Civil
Rights Act, 42 U.S.C. § 1983; the Religious Land Use and
Institutionalized Persons Act of 2000, 42 U.S .C. § 2000cc et
seq. ("RLUIPA"); [3] and the Health Insurance Portability and

Accountability Act, 29 U.S.C. § 1182 ("HIPAA"). Hamilton
alleges that defendants violated his rights to religious freedom
and confidentiality as well as his constitutional rights under
the First, Eighth, and Fourteenth Amendments. Am. Compl.
(Docket No. 17). Presently pending is defendants' motion for
summary judgment pursuant to Fed.R.Civ.P. 56. Docket No.
51. Hamilton opposes the motion. Docket No. 58. For the
following reasons, it is recommended that defendants' motion
be granted in part and denied in part.

[2]       In his memorandum of law, Hamilton concedes that
defendant Parisi "should be withdrawn from the
complaint ... [as she] was simply following orders
from defendant's [sic] Smith and Maly, therefore is
not liable in this action." Hamilton Mem. of Law
(Docket No. 58) at 34. Defendants' motion as to
Parisi should, therefore, be granted.

[3]       Hamilton mistakenly brings this action pursuant
to the Religious Freedom Restoration Act, 42
U.S.C. § 2000bb et seq. ("RFRA"). However,
"[t]he [RFRA ... was declared unconstitutional by
the ... Supreme Court in 1997 ... [and] was amended
by the [RLUIPA." Hankins v. New York State Dep't
of Corr. Serv., No. 07–CV–408 (FJS/GHL), 2008
WL 2019655, at \*1 n. 1 (N.D.N.Y. Mar. 10, 2008).
"[A] plaintiff's RLUIPA claim may be construed as
an extension of its inartfully pleaded RFRA claim,"
particularly when asserted by a pro se litigant
whose pleadings are "construed with [an] extra
liberal leniency ...." Id. (citing Phillips v. Girdich,
408 F.3d 124, 130 (2d Cir.2005) ("[T]he court's
imagination should be limited only by Phillips'
factual allegations, not by the legal claims set out
in his pleadings.")). accordingly, Hamilton's claim
under the RFRA will be deemed asserted under the
RLUIPA.

**I. Background**

The wide-ranging facts asserted by Hamilton are related
herein in the light most favorable to Hamilton as the non-
moving party. See subsection II(A) infra. At all times relevant
herein, Hamilton was incarcerated first at the DOCS facility
at Attica and then at the DOCS facility at Shawgunk. Am.
Compl. ¶ 2.

2009 WL 3199531

**A. Family Court Proceedings**

On October 10, 2003, while Hamilton was still incarcerated at Attica, he was ordered to be produced in Kings County Family Court for a paternity proceeding. Docket No. 58–2 at 3. On December 29, 2003, defendant Gonzalez, a DOCS Deputy Counsel, wrote to that court advising that "certain security and logistical impediments ... ma[d]e it impractical for [DOCS] to produce [Hamilton] personally at the court." *Id.* at 4; Am. Compl. ¶ 19; Docket No. 51–5 at 220. Gonzalez requested that Hamilton be allowed to appear telephonically on the appointed date. Am. Compl. ¶ 9; Docket No. 51–5 at 221; Docket No. 58–2 at 3. On January 7, 2004, Hamilton participated telephonically in the court proceedings, which were adjourned to April 28, 2004. Am. Compl. ¶ 20. Facility records indicated that "on March 3, 2006 [Hamilton] refused to attend the teleconference scheduled for March 21, 2006." J. Smith Decl. (Docket No. 53–3) ¶¶ 42–43.

On April 28, 2004, "[b]oth parties failed to appear ... and [pursuant to a court order dated July 23, 2004,] the petition was dismissed without prejudice." Docket No. 51–5 at 217; Docket No. 58–2 at 8. The court advised Hamilton that his "remedies [we]re to make a motion before the Support Magistrate to vacate the default and reargue the matter, file a new petition, or appeal the dismissal ." Docket No. 51–5 at 217; Docket No. 58–2 at 8. Hamilton filed a grievance complaining that defendants interfered with his court proceeding and their failure to produce him on April 28, 2004 which resulted in the dismissal of his paternity suit. Docket No. 58–2 at 11. The grievance was denied on the ground that "[t]here [wa]s no record of a request being made for [a conference] call after [January 7, 2004]." *Id.* at 12.

**B. Medical Treatment**

**1. Mental Health Assessment**

**\*2** On March 17, 2005, Hamilton arrived at Shawangunk and was given a health screening interview by defendant Skies. Am. Compl. ¶ 21; Docket No. 58–2 at 16. During the interview, Hamilton stated that he had previously attempted suicide and was feeling suicidal during the inquiry. Am. Compl. ¶ 21; Docket No. 58–2 at 16. Hamilton testified that while he has had suicidal thoughts before, he has never harmed himself nor attempted to commit suicide. Hamilton

Dep. (Docket No. 51–5) at 19–20. Skies did not recommend Hamilton for a mental health referral or place him on suicide watch. Am. Compl. ¶ 21.

**2. Confidentiality**

On or about January 24, 2006, Hamilton filed a grievance for defendants' alleged failure to treat him. Am. Compl. ¶ 37. Hamilton alleged that the medical department failed to (1) order blood tests,[4] (2) determine whether the medication that Hamilton was taking would cause or contribute to liver damage, and (3) whether his diagnoses of high blood pressure, high cholesterol, and hepatitis A were causing or contributing to Hamilton's other medical ailments. *Id.* On or about February 1, 2006, the medical department disclosed Hamilton's medical records to the grievance department in connection with the grievance. *Id.* ¶ 38; Hamilton Dep. at 38, 78–80. The disclosure was made without Hamilton's prior consent. Am. Compl. ¶ 38. Hamilton filed another grievance on February 3, 2006, arguing that the rules which surrounded his medical confidentiality had been violated. Docket No. 51–5 at 208; Docket No. 58–2 at 31. On February 9, 2006, the grievance was denied because "when the grievant files a grievance concerning medical care or treatment he [or she] affirmatively puts the issue into contention resulting in an implied waiver of confidentiality." Docket No. 58–2 at 33; J. Smith Decl. ¶¶ 28–30; Hamilton Dep. at 38–39.

[4]     During his deposition, Hamilton withdrew any contentions regarding defendant Genovese's failure to order blood screening. Hamilton Dep. (Docket No. 51–5) at 37–38, 40–41, 75.

**3. Drug Addiction**

Hamilton is allergic to marijuana and even second-hand inhalation contaminates his urine.[5] Am. Compl. ¶ 84; Hamilton Dep. 62–63; Docket No. 58–5 at 2–4. This allergy was the basis of a complaint of medical indifference for a failure to treat Hamilton's drug addiction disease. Hamilton Dep. at 111–12. While in the Special Housing unit (SHU),[6] Hamilton was exposed to marijuana smoke from other unidentified inmates. *Id.* at 113. Additionally, the policy of ordering all windows closed in SHU and allowing the smoke to linger resulted in an aggravation of Hamilton's allergy and his positive urinalysis tests. *Id.* at 115–16. After moving to a

different unit, Hamilton's urinalysis tests were negative and he has not felt the effects he experienced in SHU. *Id.* at 113–15.

5    Hamilton adamantly denies ever smoking marijuana while in prison or being addicted to it prior to his incarceration. Hamilton Dep. at 119–20.

6    SHUs exist in all maximum and certain medium security facilities. The units "consist of single-occupancy cells grouped so as to provide separation from the general population...." N.Y. Comp.Codes R. & Regs. tit. 7, § 300.2(b) (1995). Inmates are confined in a SHU as discipline, pending resolution of misconduct charges, for administrative or security reasons, or in other circumstances as required. *Id.* at pt. 301.

### 4. Water Treatment

Hamilton also contends that the facility's water was treated with chemicals with deliberate indifference to their effects on his health in light of other medications which Hamilton regularly took. Am. Compl. ¶ 54; Hamilton Dep. at 51–52, 77–78. More specifically, Hamilton asserts that the sodium in the water interfered with the treatment of his high blood pressure and cholesterol. Docket No. 51–5 at 229. On October 10, 2006, Hamilton's grievance was denied on the ground that the "facility water sodium level is below the 20 mg/l benchmark for individuals on severely restricted sodium diet[s]." *Id.*

### C. Living Conditions

### 1. Contaminated Drinking Water

 **\*3**  Additionally, on March 17, 2005, Hamilton was placed in a cell which had a "plumbing problem that caused feces and other bacteria to contaminate the water." Am. Compl. ¶ 22; Hamilton Dep. at 65–66. Hamilton remained in that cell for more than sixty days, from March 17 to July 1, 2005, and suffered severe stomach aches and pains and contracted Hepatitis A. *Id.* ¶¶ 22, 52; Hamilton Dep. at 27–30. Hamilton alleges that he received no medical treatment for his Hepatitis. Am. Compl. ¶ 23; Hamilton Dep. at 30–32.

Hamilton filed a grievance on March 29, 2006, complaining that since his return to SHU five days earlier, the water

was "tinted yellowish-brown ... [and he had been] unable to drink the water because it [wa]s obvious [that] it [wa]s contaminated with bacteria." Docket No. 58–5 at 23. Additionally, on September 11, 2008, a memorandum was sent to defendant Smith complaining about the water, stating that it "was jet black and full of dross and sediment .... " Docket No. 58–5 at 12. Despite the appearance of the water, correctional facility staff indicated that it was still safe to consume. *Id.* Complaints about the water had persisted for a substantial period of time and stated that there had been multiple inquiries from prisoners to the administrators as to why the "water [wa]s either beige, brown, or black, and reeks the scent of sewage," on a daily basis. *Id.* at 13. [7]

7    Attached as an exhibit are three responses which were difficult to decipher due to poor photocopying quality. Two of the three documents were dated, one May 5, 2006 and the other September 22, 2008. Docket No. 58–5 at 22, 25. Additionally, Hamilton submits an affidavit from a fellow prisoner who discusses "the strange taste of the water and the frequent and often unannounced shut downs of the water system," as well as the "constant complaints from the men around [him] ... regarding drinking water, [specifically] the color, smell and taste of the water." Docket No. 58–5 at 16. This same inmate describes the discoloration and peculiar odor of the drinking water. *Id.*

Defendants did not provide bottled water to the inmates during these occurrences and also did not allow SHU prisoners who had lost commissary privileges to buy bottled water from the commissary. Am. Comp. ¶ 43. The water at Shawangunk is regularly tested and "[a]t all times relevant to this litigation ... has met all standards established by the Department of Health." J. Smith Decl. ¶ 22, Docket No. 53–3 at 64–68; *see also* Docket No 51–5 at 235 ("[A] complete battery of tests were performed on [the] facilit [y's] drinking water. There was no lead or copper detected and only a trace amount of iron .... [T]hus the f]acility water ... meets all standards as established by the Department of Health.")

Hamilton still suffers from minor gas pains and bowel irregularities attributed to the water. Hamilton Dep. at 71–72. The only treatment given Hamilton was a topical ointment for his legs and feet. *Id.* at 72, 134–35. Additionally, he contends that the high iron levels in the water have compromised his nervous system, but he has not sought medical attention for that specific ailment. *Id.* at 135.

### 2. Ventilation

From November 30, 2005 until March 25, 2006, Shawangunk policy dictated that all windows in the unit remain closed. Am. Compl. ¶ 36; Hamilton Dep. at 35–36. The lack of ventilation caused Hamilton to suffer nose bleeds and a watering throat and eyes. Am. Compl. ¶ 36. On December 15, 2005, Hamilton, and the other inmates were given a memorandum stating that (1) the current heating and cooling system was in excellent working condition, (2) windows must remain closed at all times during the winter months, and (3) during these winter months, inmates received fresh air from the ventilation system and the inner courtyards. Docket No. 51–5 at 245; Docket No. 58–3 at 51; J. Smith Decl. ¶¶ 10–11; Hamilton Dep. at 36. On or about January 10, 2006, Hamilton filed a grievance relating to the ventilation system claiming that its constant malfunction was causing him medical problems. Docket No. 58–3 at 12.

**\*4** From March 24 until May 6, 2006, the ventilation vents and grates were saturated "with dust, soot and carbon dioxide," and the light fixtures were extremely dusty and dirty. Am. Compl. ¶ 44. Also, between approximately July 14 and July 23, 2008, fifty complaints were lodged by inmates pertaining to the cleanliness and functionality of the ventilation system. Docket No. 58–3 at 13–50. Moreover, Hamilton complained that the recreational area was covered with mold and dust. Hamilton Dep. at 92–95. The mold was green, black, and brown, and covered the walls and gates. *Id.* at 93. The mold also caused Hamilton to suffer bloody noses, an irritated throat, and a burning sensation in his eyes. *Id.* at 94–95.

### 3. Lighting

From March 24 until approximately May 7, 2006, the lights were not turned off in the SHU galley. Am. Compl. ¶ 45; Hamilton Dep. at 56–58. The exposure to bright lights [8] all night caused Hamilton to lose sleep. Am. Compl. ¶ 45. Hamilton spoke to the medical staff about his insomnia, and they recommended doing exercises to assist him with falling asleep. Hamilton Dep. at 57. Correctional facility staff explained that the lights remained on in the SHU for security reasons. Hamilton Dep. at 56–58.

[8]    During Hamilton's deposition, he described this as an exaggeration and testified that the lights were neither blinding nor shining directly on him. Hamilton Dep. at 141–42.

### D. Disciplinary Hearing and Rehearing

On January 12, 2005, Hamilton was selected for a random drug test and tested positive.[9] Selsky Decl. (Docket No. 53–3 at 33–36) ¶ 8; Docket No. 58–3 at 53. Hamilton was found guilty of violating Rule 113.24 [10] at a disciplinary hearing at Attica on January 31, 2005. Selsky Decl. ¶¶ 8–9. Hamilton appealed the decision and on April 7, 2005, a rehearing was ordered for April 12, 2005 at Shawangunk. *Id.* ¶ 10; Docket No. 58–4 at 29.

[9]    *See* subsection B(2) *supra.*

[10]    Rule 113.24 prohibits the use of any controlled substance unless prescribed by facility medical staff. Selsky Decl. ¶ 9.

Hamilton refused to attend the rehearing. Docket No. 58–3 at 53. Hamilton alleges "that the rehearing was perfunctory and ... violated more due process rights than the first hearing ..." because (1) he was not provided with appropriate employee assistance to retrieve information sufficient to defend his case, (2) Hamilton was still unable to call the witnesses he deemed necessary which had led to the reversal of the first hearing,[11] and (3) over three months had passed since the time of the incident and in the interim Hamilton had been transferred, a witness had been released from custody, requested documents were difficult to locate or recall, the case was irreparably flawed, and DOCS should have been found at fault. Docket No. 58–4 at 30–38. Hamilton took issue with DOCS' refusal to contact D. Mathis, a former inmate, who eventually submitted an affidavit admitting that an Officer Fix told Mathis to provide him with what they both knew was dirty urine, attached Hamilton's name on Mathis' sample, tested the sample with positive results, and wrote Hamilton an unwarranted disciplinary charge for alleged drug use. Mathis Aff. (Docket No. 58–4 at 50–51) ¶¶ 2, 4, 6; Hamilton Dep. at 96–98, 121–23.

[11]    These witnesses included individuals who were aware of the selection and urinalysis testing procedures, counselors from the substance abuse

program Hamilton was attending, and Mathis. Hamilton Dep. at 47–48, 96–98.

**\*5** Defendants determined that Hamilton refused to attend the rehearing and proceeded in his absence. Selsky Decl. ¶¶ 13, 15. Hamilton was ultimately found guilty of the charges and sentenced to eighteen months in SHU, loss of package privileges, commissary, telephone privileges, and twelve months loss of good time credit. *Id.* ¶ 15; Am. Compl. ¶ 25. On June 13, 2005, the conviction was affirmed, but the SHU penalty was modified to twelve months. Am. Compl. ¶ 26. Hamilton ultimately served ten months of the sentence. Am. Compl. ¶ 27. Hamilton was removed from the drug and alcohol treatment program in which he was enrolled pursuant to facility rules.

### E. Mail Tampering

On May 18, 2005, Hamilton was sent a letter from Brooklyn Law School responding to a request for legal assistance from Hamilton on March 21, 2005. Am. Compl. ¶ 28; Docket No. 58–3 at 5. The law school's response referred to other communications which Hamilton contends he never received. Am. Compl. ¶ 28; Docket No. 58–3 at 5. However, the law school "informed [Hamilton] in July 2002 that it could not be of assistance ... [and requested that s]ince [they would] not be able to assist [him, that he] please refrain from sending [them] any further papers." Docket No. 58–3 at 5.

Additionally, in June 2005, Nicole Esters sent Hamilton the Mathis affidavit,[12] but Hamilton did not receive it. Am. Compl. ¶ 29. On July 27, 2005, Esters sent Hamilton a letter stating that "on two separate occasions [she] mailed ... a notarized affidavit ...." to him at Shawangunk. Docket No. 58–3 at 2. The document was mailed on June 21 and July 5, 2005, both times by first class mail. *Id.* The documents were never returned to Esters. *Id.* On August 25, 2005, Hamilton wrote a letter requesting an investigation regarding mail being stolen from several inmates by staff. Docket No. 58–3 at 6; Am. Compl. ¶ 31.

[12]     *See* subsection D *supra.*

In December 2005, Nicole Saunders sent Hamilton legal documents via Federal Express. Am. Compl. ¶ 34. The documents never reached Hamilton, but they were assigned a tracking number. *Id.* When Saunders tracked the items, she discovered that the items were received at the Shawangunk facility. *Id.* She was informed by mail room staff that

defendant Maly was in possession of the documents and that if the documents did not comply with facility protocol, they would be sent back to her with a letter. *Id.* ¶ 35; Hamilton Dep. at 32–33. Saunders never received either the letter or the legal documents. Am. Compl. ¶ 35.[13]

[13]     Hamilton testified at his deposition that he could not recall to whether Esters or Saunders was the person involved in this mailing. *Id.* at 27.

While Saunders was attempting to send Hamilton the legal documents, Hamilton was placed on mail watch "[d]ue to an investigation involving all inmate correspondence with Prisoner Legal Services of Buffalo New York." J. Smith Decl. ¶ 6. The mail watch lasted from December 12, 2005 to March 10, 2006. *Id.* During that period, any mail which met the DOCS criteria articulated in Directives 4422 and 4421 would be delivered to Hamilton. *Id.* ¶ 7.

### F. Religious Meals

**\*6** On July 20, 2005, Hamilton declared that "after religious counseling, [he] profess[ed] to be of the Jewish faith and not of the Roman Catholic faith as previously listed." Docket No. 58–2 at 19. Sometime thereafter, Hamilton was diagnosed with high blood pressure and cholesterol and was placed on a low-sodium medical diet. Am. Compl. ¶ 40; Hamilton Dep. at 41–42. Hamilton filed a grievance on January 27, 2006 alleging that Shawangunk refused to provide him with a medical diet which also complied with his religious tenets. Docket No. 58–2 at 24; Hamilton Dep. at 101–103. The grievance was denied because, pursuant to Directive 4311, "[i]nmate requests for religious foods/diets, shall not be prescribed by the health care provider ... [and thus i]t is [Hamilton's] option to select either a religious diet or a medically prescribed diet." Docket No. 58–2 at 24 (internal citations omitted); J. Smith Decl. ¶¶ 32–35 (explaining that the religious diet is a state-wide menu provided by an outside vendor and, as such, there is currently no religious diet option for those practicing Judaism who require the therapeutic standards of meals which are low in fat, cholesterol, and sodium); Hamilton Dep. at 43–44.

On October 13, 2006, Hamilton complained that Shawangunk "refuse[d] to allow [him] to receive kosher foods low in sodium, [w]hich [he is] required to eat due to religious and medical dietary needs." Docket No. 58–2 at 23. Hamilton requested that he be allowed either to purchase foods through

the commissary to supplement his diet or that the facility order an additional low-sodium, kosher, cold, alternative diet tray. *Id.* Again, Hamilton's grievance was denied. Docket No. 51–5 at 237; Docket No. 58–2 at 22. Hamilton appealed the denial, but that appeal was denied. Docket No. 58–2 at 25–26.

While Hamilton was receiving the religious and not the therapeutic diet, his blood pressure and cholesterol levels elevated. Hamilton Dep. 43. Because Hamilton was unable to receive a religious meal that complied with his therapeutic conditions, he was forced to change his religion. [14] *Id.* at 44.

[14]    Hamilton testified that "[I] studied ... [and] affiliated with almost every religion ... [because] you're only limited to go to one religious service at a time, so if [he] wanted to learn about Judaism, I just couldn't go down to the Judaism service to learn. I had to convert first and then go there to learn." Hamilton Dep. at 45–46. Hamilton recently converted to Christianity but continued to assert the religious meals claim. *Id* . at 70.

### G. Notification of the Death of a Family Member

Hamilton's son, Andrell Napper, died while Hamilton was incarcerated at Shawangunk. *See generally* Docket No. 58–5 at 40. Hamilton had never listed Napper as one of his children when he entered DOCS custody and Napper did not identify himself as Hamilton's son when he visited Hamilton in prison. Hamilton Dep. at 124–26, 128–29. Additionally, Hamilton was not legally recognized as Napper's father until January 3, 2000 when the child was approximately fifteen years old. Docket No. 58–5 at 44.

Hamilton was thus unable to request leave to attend Napper's funeral. On August 24, 2006, Hamilton was advised by Napper's mother of the circumstances surrounding Napper's death. Hamilton Dep. at 138–39. "Maly reports that the facility made every reasonable effort to verify the relationship between [Hamilton] ... and [the] deceased. Unfortunately, no documentary evidence was found to confirm a relationship." Docket No. 51–5 at 252; Docket No. 58–5 at 45, Hamilton Dep. at 136–38. Hamilton appealed the denial, claiming that he was never questioned about his relationship to Napper. *Id.;* Hamilton Dep. at 131–34 On appeal, the request was again denied. Docket No. 51–5 at 254; Docket No. 58–5 at 46–47.

### H. Placement in Close Supervision Unit

 **\*7**  On June 1, 2006, Hamilton was placed in Shawangunk's Close Supervision Unit (CSU) without a hearing or an opportunity to dispute the placement. Am. Compl. ¶ 81. This placement was based on false information given by Smith. Hamilton Dep. at 104–11. Hamilton's placement in CSU was "based on ... [his] proven inability to coexist in the general population evidenced by [his] disruptive conduct, poor custodial adjustment and ... involvement in an unusual incident which resulted in the stabbing death of another inmate." Docket No. 58–5 at 27; Hamilton Dep. at 104–05. Hamilton contends that he was not involved in the stabbing, an assertion with which Smith concurred but did nothing to correct in Hamilton;s records. Hamilton Dep. at 110–11.

While in CSU, Hamilton lost the opportunity to engage in employment in the mess hall. However, Hamilton did not want a job and, if he did, CSU permitted employment as a porter. *Id.* at 108–09. Hamilton was still permitted to go to the library and commissary. *Id.* at 109.

## II. Discussion

In his amended complaint, Hamilton alleges multiple violations of federal statutes and constitutional rights. First, Hamilton asserts that his First Amendment rights were violated when defendants (1) disclosed his confidential medical information to other staff in retaliation for Hamilton filing grievances, (2) tampered with his mail, (3) failed to produce him for his Family Court proceedings, and (4) refused to provide him with a therapeutic meal which also complied with his religious tenets. Second Hamilton asserts that his Eighth Amendment rights were violated when defendants (1) subjected him to contaminated water, dusty cells, broken ventilators, and mold-infested recreation areas; (2) failed to protect his medical confidentiality; (3) refused to provide him with medical treatment for his mental health ailments, drug addiction, or Hepatitis A; and (4) deliberately treated the drinking water with chemicals that aggravated his underlying medical problems. Finally, Hamilton asserts that his Fourteenth Amendment rights were violated when defendants, (1) improperly conducted his disciplinary rehearing, (2) failed to notify him of the death of his son, and (3) inappropriately placed him in CSU.

2009 WL 3199531

Defendants move for summary judgment on the grounds that (1) there is no merit to Hamilton's HIPPA, RLUIPA, or constitutional claims; (2) defendants Gonzales, Slesky, Parisi, Genovese, and Davis were not personally involved; and (3) defendants are entitled to qualified immunity.

### A. Legal Standard

A motion for summary judgment may be granted if there is no genuine issue as to any material fact if supported by affidavits or other suitable evidence and the moving party is entitled to judgment as a matter of law. The moving party has the burden to show the absence of disputed material facts by informing the court of portions of pleadings, depositions, and affidavits which support the motion. *Fed.R.Civ.P. 56*; *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Facts are material if they may affect the outcome of the case as determined by substantive law. *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986). All ambiguities are resolved and all reasonable inferences are drawn in favor of the non-moving party. *Skubel v. Fuoroli*, 113 F.3d 330, 334 (2d Cir.1997).

**\*8** The party opposing the motion must set forth facts showing that there is a genuine issue for trial. The non-moving party must do more than merely show that there is some doubt or speculation as to the true nature of the facts. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). It must be apparent that no rational finder of fact could find in favor of the non-moving party for a court to grant a motion for summary judgment. *Gallo v. Prudential Residential Servs.* 22 F.3d 1219, 1223–24 (2d Cir.1994); *Graham v. Lewinski*, 848 F.2d 342, 344 (2d Cir.1988).

When, as here, a party seeks summary judgment against a pro se litigant, a court must afford the non-movant special solicitude. *Triestman v. Fed. Bureau of Prisons,* 470 F.3d 471, 477 (2d Cir.2006); *see also Sealed Plaintiff v. Sealed Defendant # 1,* 537 F.3d 185, 191 (2d Cir.2008) ("On occasions too numerous to count, we have reminded district courts that 'when [a] plaintiff proceeds *pro se,* ... a court is obliged to construe his pleadings liberally.' " (citations omitted)). However, the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact. *Anderson,* 477 U.S. at 247–48.

### C. First Amendment

#### 1. Retaliation

Hamilton contends that defendants disclosed his confidential medical information in retaliation for filing grievances. To establish a claim for retaliation, a plaintiff must first demonstrate that the plaintiff's conduct was constitutionally protected and that this protected conduct was a substantial factor that caused the adverse action against plaintiff. *Graham v. Henderson,* 89 F.3d 75, 79 (2d Cir.1996). "Under this analysis, adverse action taken for both proper and improper reasons may be upheld if the action would have been taken based on the proper reasons alone." *Jackson v. Onondaga County,* 549 F.Supp.2d 204, 215 (N.D.N.Y.2008) (citing *Graham v. Henderson,* 89 F.3d 75, 79 (2d Cir.1996)). Additionally, courts must view retaliation claims with care and skepticism to avoid judicial intrusion into prison administration matters. *Id.* Conclusory allegations alone are insufficient. *Id.* (citing *Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983).

In this case, Hamilton has failed to demonstrate facts sufficient to support a retaliation claim. Filing grievances is an activity protected by the First Amendment. However, as discussed *infra,* there is no evidence to support the contention that defendants disclosed any medical information as retaliation rather than for proper purposes. To investigate effectively and thoroughly the grievances Hamilton submitted concerning the medical treatment which he received, the staff and inmate representatives needed to view his medical records to assess whether there was validity to his claim. Docket No. 58–2 at 33; J. Smith Decl. ¶¶ 28–30; Hamilton Dep. at 38–39. When viewing the facts in the light most favorable to Hamilton, no evidence has been presented to support a claim that any disclosure was motivated by retaliation.

**\*9** Accordingly, defendants' motion should be granted on this ground.

#### 2. Denial of Access to Courts

"It is now established beyond a doubt that prisoners have a constitutional right of access to the courts." *Bounds v. Smith,* 430 U.S. 817, 821 (1977). "Interference with legal mail implicates a prison inmate's rights to access to the courts

and free speech as guaranteed by the First and Fourteenth Amendments to the U .S. Constitution." *Davis v. Goord,* 320 F.3d 346, 351 (2d Cir.2003). In order to state a claim of denial of access to the courts, including those premised on interference with legal mail, a plaintiff must allege "that a defendant caused 'actual injury,' i.e. took or was responsible for actions that 'hindered [a plaintiff's] efforts to pursue a legal claim.' " *Id.* (*citing Monsky v. Moraghan,* 127 F.3d 243, 247 (2d Cir.1997) (*quoting Lewis v. Casey,* 518 U.S. 343, 351 (1996)).

"[R]egardless of the type of legal access claim, the plaintiff would have to show actual harm to a legal claim ... [and t]he cause of the injury must be the inadequacy of the method of access." *Bowe v. Barkley,* No. 95–CV–247 (RSP/GJD), 1997 WL 204311, at *2 (N.D.N.Y. Apr, 15, 1997) (*citing Lewis,* 518 U.S. at 351). "[A]n isolated incident of mail tampering is usually insufficient to establish a constitutional violation .... Rather, the inmate must show that prison officials regularly and unjustifiably interfered with the incoming legal mail." *Id.* (citations omitted); *see also Washington v. James,* 782 F.2d 1134, 1139 (2d Cir.1986) (explaining that an action may not give rise to damages if there was "no showing ... that the inmate's right of access to the courts was chilled or the legal representation was impaired."); *Morgan v. Montanye,* 516 F.2d 1367, 1371 (2d Cir.1975) (holding that a single instance of mail tampering which did not lead the plaintiff to suffer any damage was insufficient to support a constitutional challenge).

Defendants allegedly precluded Hamilton from attending a court proceeding telephonically. Docket No. 58–2 at 11. The failure to appear resulted in a dismissal of the case. *Id.* However, this dismissal was without prejudice and permitted reinstated at any time. Docket No. 5105 at 217; Docket No. 58–2 at 8. Therefore, Hamilton has failed to show that he suffered an actual injury. At best, he has suffered a delay in the resolution of the ongoing legal proceedings, but he was not prohibited from re-instituting the proceeding and carrying it forward to conclusion. Therefore, defendants' motion for summary judgment as to this claim should be granted on this ground.

Additionally, Hamilton contends that defendants interfered with the delivery to him of Mathis' affidavit and legal papers from Brooklyn Law School. Docket No. 58–4 at 30–38. First, Hamilton only alleged one instance involving mail from the law school, which is insufficient to establish a First Amendment violation. *See Davis v. Goord,* 320 F.3d 346, 351

(2d Cir.2003) ( "[A]n isolated incident of mail tampering is usually insufficient to establish a constitutional violation .... Rather, the inmate must show that prison officials regularly and unjustifiably interfered with the incoming legal mail."). Furthermore, Hamilton eventually received the paperwork from the law school which indicated that they had previously assessed Hamilton's case in 2002 and determined that there was no assistance which the law school could provide. Docket No. 58–3 at 5. Thus, even viewing Hamilton's allegations in the light most favorable to him, he had already received notice that the law school would not assist him in his case and he suffered no actual injury. *See GonzalezCifuentes v. Torres,* No. 04–CV–1470 (GLS/DRH), 2007 WL 499620, at *6 (N.D.N.Y. Feb. 13, 2007) (stating that plaintiff "identifies no particular case or claim which was impeded or how any defendant's conduct impeded his litigation of a claim or defense [and h]e has thus failed sufficiently to allege any actual injury from this alleged incident, much less that [the] conduct was deliberate and malicious.") (internal citations and quotations omitted). Thus, defendants' motion for summary judgment should be granted on this ground.

 **10** However, the alleged denial of Mathis' affidavit yields a different result. When Hamilton was sent the affidavit, he was on mail watch. J. Smith Decl. ¶ 6. Viewing the facts in the light most favorable to Hamilton, defendants received the affidavit, reviewed it, and were obligated either to forward it to Hamilton or return it to the sender. Am. Compl. ¶ 35; Hamilton Dep. at 32–33. The delivery of mail to Hamilton stopped multiple times at the second stage of review. Am. Compl. ¶ 35. As Hamilton was never given the Mathis affidavit nor was Esters instructed on how to resend the affidavit to comply with DOCS regulations, a question of fact is raised as to whether defendants intentionally interfered with Hamilton's ability to receive the exculpatory evidence in the Mathis affidavit. While it is unclear whether the affidavit would have altered the outcome of the proceeding, viewing the evidence in the light most favorable to Hamilton, it reasonably likely that it would have. Thus, if proven, these repeated incidents of seizing the Mathis affidavit rather than delivering it or returning it constitute more than mere negligence and indicate intentional interference sufficient to raise a material question of fact. *See generally Holmes v. Grant,* No. 03–CV–3426 (RJH/RLE), 2006 WL 851753, at *12 (S.D.N.Y. Mar. 31, 2006) ("Mere negligence resulting in the loss of legal papers, ... does not state an actionable claim [as] plaintiff must allege facts demonstrating that defendants deliberately and maliciously interfered with his access to the courts ... [such as allegations] that the defendants

WESTLAW    © 2021 Thomson Reuters. No claim to original U.S. Government Works.

deliberately stole his legal papers.") (internal quotations and citations omitted). Therefore, defendants' motion for summary judgement should be denied on this ground as to Maly for his failure to either deliver or return the mail and Smith for alleged negligent supervision and the procedures followed with respect to such packages but granted as to all other defendants.

### 3. Religious Meals

Hamilton alleges that his First Amendment right to the free exercise of his religion was violated when defendants failed to provide him with kosher meals which were also low in sodium and cholesterol as required by his therapeutic diet.

"The First Amendment ... guarantees the right to the free exercise of religion." *Johnson v. Guiffere,* No. 04–CV–57 (DNH), 2007 WL 3046703, at *4 (N.D.N.Y. Oct. 17, 2007) (citing *Cutter v. Wilkinson,* 544 U.S. 709, 719 (2005). "Prisoners have long been understood to retain some measure of the constitutional protection afforded by the First Amendment's Free Exercise Clause." *Ford v. McGinnis,* 352 F.3d 582, 588 (2d Cir.2003) (citing *Pell v. Procunier,* 417 U.S. 817, 822 (1974)). This right "is not absolute or unbridled, and is subject to valid penological concerns ...." *Johnson,* 2007 WL 3046703, at * 4.

The Free Exercise Clause extends "into other aspects of prison life including ... that of an inmate's diet ...." *Id.* The Second Circuit has held that it is "clearly established that a prisoner has a right to a diet consistent with his or her religious scruples ...." *Ford,* 352 F.3d at 597 (citations omitted). Therefore, to "deny prison inmates the provision of food that satisfies the dictates of their faith ... unconstitutionally burden[s] their free exercise rights." *McEachin v. McGuinnis,* 357 F.3d 197, 203 (2d Cir.2004).

**\*11** A party asserting a free exercise claim bears the initial burden of establishing that the disputed conduct infringes on his or her sincerely held religious beliefs.... [T]he burden then shifts to the defendant to identify a legitimate penological purpose justifying the decision ... [and i]n the event such a[n] interest is articulated,

its reasonableness is then subject to analysis under ... *Turner* ....

*Johnson,* 2007 WL 3046703, at * 4–5 (citations omitted).

In this case, defendants first contend that Hamilton's conversion to Judaism and request for kosher meals was not the result of his sincerely held religious beliefs but only his curiosity. Defs. Mem. of Law (Docket No. 51–6) at 11–12. To determine the sincerity of a religious belief, "the relevant inquiry is not whether, as an objective matter, the belief is accurate or logical ... [but] ... whether the beliefs ... are sincerely held and whether they are, in his own scheme of things, religious." *Jackson v. Mann,* 196 F.3d 316, 320 (2d Cir.1999); *see also Jolly v. Coughlin,* 76 F.3d 468, 476 (2d Cir.1996) (holding that a court's inquiry is limited to "whether the belief is religious in nature").

An inquiry any more intrusive would be inconsistent with our nation's fundamental commitment to individual religious freedom; thus, courts are not permitted to ask whether a particular belief is appropriate or true-however unusual or unfamiliar the belief may be. While it is a delicate task to evaluate religious sincerity without questioning religious verity, our free exercise doctrine is based upon the premise that courts are capable of distinguishing between these two questions.)

*Jolly,* 76 F.3d at 476. Therefore, courts are instructed to "[v]iew ... [the question] through the prism of sincerity, [examining whether an inmate] ... has produced sufficient evidence to raise a genuine issue of material fact as to whether his religious beliefs are 'sincerely held.' " *Jackson,* 196 F.3d at 320.

It is clear that Hamilton has produced sufficient evidence to raise a question of material fact as to whether his beliefs were sincerely held as he (1) listed his religious preference as Jewish, (2) participated in the kosher meal program, and (3) attended religious services. *See id.* (finding a material

issue of fact when plaintiff listed his religious preference as Jewish, participated in kosher meal programs in several other correctional facilities, and abstained from eating for several days to avoid eating non-kosher food). Thus, defendants' contention on this ground should be rejected.

Additionally, Hamilton has raised an issue of fact as to whether defendants imposed a substantial burden on his exercise of his religious beliefs because he effectively was forced to choose between his religion and his health. The applicability of the substantial burden test has been much discussed in this circuit, but as long as "an asserted claim [is not] so bizarre, [or] clearly nonreligious in motivation, [it is] ... entitled to protection under the Free Exercise Clause." *Thomas v. Review Bd. of Ind. Employment Sec.,* 450 U.S. 707, 725; *see also Ford,* 352 F.3d at 591–93 (discussing the development of the substantial burden test in Free Exercise challenges).[15]

[15]    As the Supreme Court has stated, "it is not within the judicial function and judicial competence to inquire whether the petitioner ... more correctly perceived the commands of [his] faith [as c]ourts are not arbiters of scriptural interpretation." *Thomas,* 450 U.S. at 715–16; *see also Ford,* 352 U.S. at 593 (explaining the trepidation of applying the substantial burden test because it "requires courts to distinguish important from unimportant religious beliefs, a task for which [a court is] particularly ill-suited [due to] the danger that courts will make conclusory judgments about the unimportance of the religious practice to the adherent[.]")

**\*12**  In this case, Hamilton has sufficiently demonstrated a First Amendment violation. Subscription to a kosher diet constitutes a material tenet of Judaism consistently found entitled to protection under the Free Exercise Clause. *See, e.g., Jackson v. Mann,* 196 F.3d 316, 320–21 (2d Cir.1999) (denying government's motion for summary judgment on claim for denial of kosher meals for Jewish prisoner because, *inter alia,* prisoners are "entitled to a reasonable accommodation of [their] religious beliefs ... includ[ing their] religious dietary beliefs ... [mandating] prison officials [to] provide a prisoner a diet that is consistent with his religious scruples.") (internal quotations and citations omitted). Defendants have not challenged the validity of this religious practice. The denial of such meals on a constant basis infringes Hamilton's religious beliefs.

However, defendants did not refuse Hamilton a kosher diet but stated that they could not provide him with the low-sodium, low cholesterol kosher diet he required for his health. Defendants assert that DOCS policy required an inmate either to choose a religious or a therapeutic meal as medical staff were responsible for prescribing therapeutic meals but have no authority to provide kosher meals. Docket No. 58–2 at 24; J. Smith Decl. ¶¶ 32–35. Defendants advise that DOCS contracted with outside providers for the preparation and delivery of religious and therapeutic meals and that these providers did not offer an option for low-sodium, low-cholesterol kosher food. Thus, DOCS lacked the ability to provide inmates with meals which were kosher as well as low-sodium and low-cholesterol. J. Smith Decl. ¶¶ 32–35. However, defendants have proffered no legitimate penological reason other than administrative inconvenience why Hamilton could not receive a meal that was both therapeutic and kosher. Defendants' refusal required Hamilton to elect between his health needs and his religious beliefs. This burden on Hamilton's exercise of his religious beliefs creates a question of fact on this issue. *See Bass v. Coughlin,* 976 F.2d 98, 99 (2d Cir.1992) (stating that "as early as 1975, it was established that prison officials must provide a prisoner a diet that is consistent with his religious scruples" and noting that this precedent "remains the law.") (*citing Kahane v. Carlson,* 527 F.2d 492, 495 (2d Cir.1975) and *Benjamin v. Coughlin,* 905 F.2d 571, 579 (2d Cir.1990)).

Even assuming that economic or administrative convenience constituted a legitimate penological interest in these circumstances, forcing Hamilton to this choice here remained unreasonable. *See Moore v. Goord,* No. 01–CV–1607(GLS/GJD), Mem.-Decision & Order (Docket No. 60) at 22–35 (N.D.N.Y. filed Sept. 28, 2005) (assessing the reasonableness of mandating a prisoner to choose between his health and religion and finding that the weight of the *Turner* factors precluded a grant of summary judgment for defendants).[16]

[16]    To determine reasonableness, courts must assess whether the challenged regulation or official action has a valid, rational connection to a legitimate governmental objective; whether prisoners have alternative means of exercising the burdened right; the impact on guards, inmates, and prison resources of accommodating the right; and the existence of alternative means of facilitating exercise of the right that have only

a de minimis adverse effect on valid penological interests.

*Salahuddin v. Goord,* 467 F.3d 263, 274 (2d Cir.2006) (*citing Turner v. Safley,* 482 U.S. 78, 84 (1987).* As previously noted, the challenged regulation is a product of economic and administrative convenience. It could not be circumvented by prisoners confined to SHU as they had lost their commissary privileges and could not purchase food to supplement their diet. Additionally, the impact on the prison staff, inmates, and prison resources was no greater than that which already existed except that an additional menu option. The effect of offering a diet which was low-sodium, low-cholesterol, and kosher would have had a de minimis effect on DOCS as each inmate had to be provided with a meal and these changes would only involve a small percentage of inmates. Thus, the DOCS policy fails the reasonableness determination.

**\*13** Accordingly, defendants' motion for summary judgment should be denied on this ground as to Smith for his alleged failure to create a procedure for inmates with low-sodium and low-cholesterol needs to receive religious meals and granted as to all other defendants.

### E. Eighth Amendment

The Eighth Amendment explicitly prohibits the infliction of "cruel and unusual punishment." U.S. CONST. amend. VIII.

### 1. Medical Treatment

The Eighth Amendment provision against cruel and unusual punishment includes the provision of medical care. *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994) (citations omitted). A prisoner advancing an Eighth Amendment claim for denial of medical care must demonstrate deliberate indifference to a serious medical need. *Wilson v. Seiter,* 501 U.S. 294, 297 (1991); *Hathaway,* 37 F.3d at 66. More than negligence is required "but less than conduct undertaken for the very purpose of causing harm." *Hathaway,* 37 F.3d at 66. The test for a § 1983 claim is twofold. First, the prisoner must show that there was a sufficiently serious medical need. *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998). Second, the prisoner must show that the prison official demonstrated deliberate indifference by having knowledge of the risk and

failing to take measures to avoid the harm. *Id.* "[P]rison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted." *Farmer v. Brennan,* 511 U.S. 825, 844 (1994).

" 'Because society does not expect that prisoners will have unqualified access to healthcare,' a prisoner must first make [a] threshold showing of serious illness or injury" to state a cognizable claim. *Smith v. Carpenter,* 316 F.3d 178, 184 (2d Cir.2003) (quoting *Hudson v. McMillian,* 503 U.S. 1,9 (1992)). Because there is no distinct litmus test, a serious medical condition is determined by factors such as "(1) whether a reasonable doctor or patient would perceive the medical need in question as 'important and worthy of comment or treatment,' (2) whether the medical condition significantly affects daily activities, and (3) the existence of chronic and substantial pain." *Brock v. Wright,* 315 F.3d 158, 162–63 (2d Cir.2003) (citing *Chance,* 143 F.3d at 702). The severity of the denial of care should also be judged within the context of the surrounding facts and circumstances of the case. *Smith,* 316 F.3d at 185.

Deliberate indifference requires the prisoner "to prove that the prison official knew of and disregarded the prisoner's serious medical needs." *Chance,* 143 F.3d at 702. Thus, prison officials must be "intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed." *Estelle v. Gamble,* 429 U.S. 97, 104, (1976). "Mere disagreement over proper treatment does not create a constitutional claim," as long as the treatment was adequate. *Id.* at 703. Thus, "disagreements over medications, diagnostic techniques (e.g., the need for X-rays), forms of treatment, or the need for specialists ... are not adequate grounds for a § 1983 claim." *Magee v. Childs,* No. 04–CV1089 (GLS/RFT), 2006 WL 681223, at \*4 (N.D.N.Y. Feb. 27, 2006). Furthermore, allegations of negligence or malpractice do not constitute deliberate indifference unless the malpractice involved culpable recklessness. *Hathaway v. Coughlin,* 99 F.3d 550, 553 (2d Cir.1996).

### a. Mental Health Treatment

**\*14** "Treatment of mental disorders of mentally disturbed inmates is ... a serious medical need" as contemplated by *Estelle. Guglielmoni v. Alexander,* 583 F.Supp. 821, 826 (D.Conn.1984). Thus, Hamilton's contentions that he had a

history of suicidal thoughts, including the evening he reported to Shawangunk, are sufficient to raise a question of fact as to a serious medical need. Am. Compl. ¶ 21; Hamilton Dep. at 19–20.

However, Hamilton has failed to demonstrate facts sufficient to support a finding of deliberate indifference. Hamilton underwent a mental health examination upon his arrival at Shawangunk and, in defendant Skies' professional opinion, further observation was not necessary because Hamilton was not displaying harmful tendencies despite his statements. Skies Aff. ¶ 11. Hamilton testimony that he had never attempted suicide despite his depression and suicidal thoughts corroborates this evidence. Hamilton's claim here reduces to a disagreement over the course of treatment Hamilton underwent. This is insufficient to establish a claim under the Eighth Amendment. Because Hamilton received an entrance interview and Skies appropriately evaluated him, the record is devoid of any evidence that Skies was either deliberately indifferent or intentionally delayed access to care or treatment options. Hamilton's conclusory allegations are insufficient to withstand a motion for summary judgment.

Accordingly, defendants' motion for summary judgement on this ground should be granted.

### b. Hepatitis A

Hamilton also contends that his Eighth Amendment rights were violated when defendants refused to treat his Hepatitis A.[17] Am. Compl. ¶ 23; Hamilton Dep. at 30–32. First, it does not appear that Hamilton was suffering from any severe symptoms which would render his Hepatitis a severe medical condition. However, even viewing the facts in the light most favorable to Hamilton and regardless of the fact that asymptomatic Hepatitis A may not constitute a serious medical condition, Hamilton has failed to raise an issue of fact whether defendants were deliberately indifferent. No treatment exists for Hepatitis A, the disease must run its course, and the individual will never again be infected by the disease. It is unclear what medical intervention Hamilton contends that defendants should have undertaken, but, again, the basis of Hamilton's claim here is a dispute over the medical treatment rendered by defendants. Because there was no known treatment or cure for Hepatitis A and in the absence of any demonstrated treatment offered by Hamilton, there can be no dispute that defendants acted pursuant to generally

accepted medical guidelines. *Hathaway v. Coughlin,* 99 F.3d 550, 553 (2d Cir.1996).

[17]   "Hepatitis A is a contagious liver disease ... [that] can range in severity from a mild illness lasting a few weeks to a severe illness lasting several months. Hepatitis A is usually spread when a person ingests fecal matter ... from contact with objects, food or drinks contaminated by the feces ... of an infected person." http:// www.cdc.gov/ hepatis/A/aFAQ.htm. Hepatitis is generally spread when a person does not properly wash his or her hands and then handles food or other objects. *Id.* Once an individual recovers from Hepatitis A, the body develops protective antibodies for life, and the individual can never be infected again. *Id.* Thus, "[t]here are no special treatments for hepatitis A. Most people ... will feel sick for a few months before they begin to feel better. A few people will need to be hospitalized ... [R]est, adequate nutrition, and fluids" are the recommended treatment. *Id.*

Therefore, defendants' motion for summary judgment on this ground should be granted.

### c. Substance Abuse

To the extent that Hamilton attempts to assert that defendants improperly dealt with his addiction because they did not mandate substance abuse treatment, it is noted that "[t]he claim to a constitutional right to treatment for narcotics addiction has no basis in either the provisions of the Constitution or the decisions of the courts ...." *Smith v. Follette,* 445 F.2d 955, 961 (2d Cir.1971); *see also Doe v. Goord,* No. 04–CV–570 (GBD/AJP), 2005 WL 3116413, at *16 (S.D.N.Y. Nov. 22, 2005). Thus, defendants' motion for summary judgment should be granted on this ground.

### d. Confidentiality

 *15  Hamilton has alleged that defendants' disclosure of his medical records constituted a deliberate indifference to his serious medical needs. As previously discussed, Hamilton's Hepatitis A was not a serious medical need. Additionally, while high blood pressure and cholesterol may require medical treatment, they do not substantially affect

an individual's quality of life or leave an individual in pain and agony. Thus, these ailments, which are controllable with medication, without more serious indications of decline or deterioration, does not warrant Eighth Amendment protection.

However, even if the conditions reflected in Hamilton's records constituted serious medical needs, the disclosure of that information to staff and inmate representatives did not constitute malicious interference or deliberate indifference. The disclosures were necessary to investigate the pending grievances to determine their validity. The disclosures were limited in scope and purpose and, at most, could be categorized as negligent if others viewed them. As previously discussed, negligent behavior is not actionable under § 1983. *Hathaway,* 99 F.3d at 553. [18]

[18]    Claims surrounding disclosure of confidential medical information have been analyzed under both the Eighth and Fourteenth Amendments. *See generally Rodriguez v. Ames,* 287 F.Supp.2d 213, 218–221 (S.D.N.Y.2003). Liberally construing the complaint, Hamilton has also alleged a Fourteenth Amendment violation pertaining to the disclosure of his medical records.

As of 1999, prisoners retained a right to privacy for medical information unless (1) that disclosure was reasonably related to legitimate penological interests or (2) the information contained within the medical records was not the type of sensitive medical information contemplated by the courts for constitutional protection. *See Powell v. Schriver,* 175 F.3d 107, 111–13 (2d Cir.1999); *see also Rodriguez v. Ames,* 287 F.Supp.2d 213, 219–20 (W.D.N.Y .2003) (upholding Fourteenth Amendment protection in cases where the prisoner "has an unusual medical problem which, if disclosed unnecessarily to other inmates, would likely expose plaintiff to discrimination, intolerance, or potential violence," or where the information "spread through 'humor or gossip.' ") (quotations omitted); *Webb v. Goldstein,* 117 F.Supp.2d 289, 298–99 (E.D.N.Y.2000) (dismissing a Fourteenth Amendment claim because the prisoner "has not alleged that his prison records contained the sort of sensitive medical information at issue in ... *Powell.* "); *Khalfani v. Sec., Dep't of Veterans Affairs,* No. 94–CV–5720 (JG), 1999 WL 138247, at *6 (E.D.N.Y.

Mar. 10, 1999) ("The records at issue in this case contained rather mundane information regarding [plaintiff]'s tendon avulsion, his physical therapy and limitations on his ability to work-not the type of deeply personal information that was at issue in prior cases.").

Here, information surrounding Hamilton's high blood pressure and cholesterol and previous Hepatitis A infection are not the kind of facts expected to invoke discrimination, intolerance, or violence. Additionally, the disclosures were made in conducting an investigation of Hamilton's grievance, a legitimate penological interest. Accordingly, to the extent that Hamilton has alleged a Fourteenth Amendment claim, it is without merit.

Therefore, defendants' motion for summary judgment in this respect should be granted.

**e. Water Treatment**

Liberally construing the amended complaint, Hamilton also contends that defendants' treatment of the water left its saline content at dangerously high levels, jeopardizing his high blood pressure and cholesterol and leading to neurological damage. As discussed above, Hamilton's high blood pressure and cholesterol was well monitored and controlled with medication. Thus, his conclusory assertions, without more, are insufficient to establish a serious medical condition. In the same vein, Hamilton has offered no proof of any neurological conditions he has suffered as a result of the water. Hamilton Dep. at 135. Conclusory allegations are insufficient to withstand a motion for summary judgment.

Additionally, to the extent that defendants treated the water, they neither did so in a deliberately indifferent manner. The water readings, as confirmed by state agencies regularly checking the water, indicate that the facility was appropriately purifying the water and that it was within state-mandated specifications. Docket No. 51–5 at 229. Hamilton has offered no evidence to the contrary. Thus, the record demonstrates that defendants' water treatment nullified and eradicated potential toxins. Their efforts were tested, confirmed, and authenticated by state agencies also responsible for providing potable water. J. Smith Decl. ¶ 22; Docket No. 51–5 at 235; Docket No. 53–3 at 64–68.

Therefore, defendants' motion on this ground should be granted.

### 2. Living Conditions

Hamilton alleges that he was confined in inhumane conditions in violation of the Eighth Amendment. "The Constitution does not mandate comfortable prisons but neither does it permit inhumane ones, and it is now settled that the treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment." *Farmer v. Brennan,* 511 U.S. 825, 832 (1970); *see also Johnson v. Smith,* No. 03–CV–1050 (FJS/DEP), 2006 WL 1843292, at \*8 (N.D.N.Y. June 29, 2006). As with other Eighth Amendment claims, a "plaintiff must satisfy both an objective ... and subjective test." *Jolly v. Coughlin,* 76 F.3d 468, 480 (2d Cir.1996) (citations omitted). Thus, "[c]onditions of confinement only constitute an Eighth Amendment violation if they involve the deprivation of a single identifiable human need or denial of the minimum civilized measure of life's necessities, and the defendants' state of mind was one of deliberate indifference to that deprivation." *Johnson,* 2006 WL 1843292, at \*9 (citations omitted).

\*16  The objective prong can be satisfied by

> conditions of confinement ... [which] in combination [constitute an Eighth Amendment violation] when each would not do so alone ... [such as] when the conditions have a mutually enforcing effect that produces the deprivation of a single, identifiable human need such as food, warmth, or exercise—for example, a low cell temperature at night combined with a failure to issue blankets.

*Davidson v. Murray,* 371 F.Supp.2d 361, 370 (W.D.N.Y.2005) (citations omitted). However, "[n]othing so amorphous as overall conditions can rise to the level of cruel and unusual punishment when no specific deprivation of a single human need exists." *Id.* (*citing Wilson v. Seiter,* 501 U.S. 294, 304– 05 (1991)). The subjective prong requires "a prison official

[to] have a sufficiently culpable state of mind ..., of deliberate indifference to inmate health or safety" *Farmer,* 511 U.S. at 834 (citations omitted).

In this case, Hamilton has alleged facts sufficient to satisfy the objective prong of the analysis concerning the water and ventilation at Upstate. The objective prong is satisfied as to the contaminated water claim because multiple inmates have corroborated Hamilton's complaints of (1) non-potable water, (2) the refusal of DOCS to provide inmates with bottled water, and (3) the inability of inmates in SHU to purchase bottled water from the commissary. Am. Compl. ¶ 43; Docket No. 58–5 at 12, 13, 16, 22, 25. If proven, these facts, in combination, are separately, suffice to constitute a constitutional violation as they result in the deprivation of a single, identifiable human need, fresh water fit for consumption.

Additionally, the objective prong is satisfied as to the ventilation claim because multiple inmates have corroborated Hamilton's complaints of (1) poorly or non-functional ventilation units, (2) poor air quality and breathing conditions, (3) poor cleaning and sanitary services to clean the resulting dust which was not properly circulated from the cells. Am. Compl. ¶ 44; Docket No. 58–3 at 13–50. If proven, these facts, in combination, suffice to constitute a constitutional violation as they result in the deprivation of a single, identifiable need, air with a quality which is breathable and does not result in nose bleeds, headaches, and colds.

However, Hamilton has not offered evidence sufficient to satisfy the objective prong of the analysis concerning the lights that remained on in SHU and the growth of mold in the recreation areas. When Hamilton testified concerning the lights, he admitted that the claim was dramatic and overstated. Hamilton Dep. 141–42. This claim, as well as the reference to mold, relate at best to the general living conditions. Additionally, Hamilton does not articulate how this constant lighting or growth of mold resulted in the deprivation of an identifiable human need. Even if it could be said that Hamilton satisfied the objective prong, he has not offered facts sufficient to satisfy the subjective element.

\*17  In any event, Hamilton has not shown in any instance that defendants possessed the requisite culpable state of mind. Defendants did not disregard the multiple prisoner complaints. As demonstrated by the water tests, memoranda circulated throughout the prison, and correspondence with Hamilton, defendants were constantly assessing the quality of

2009 WL 3199531

the water and air. J. Smith ecl. ¶¶ 10–11, 22; Docket No. 51–5 at 235, 245; Docket No. 53–3 at 64–68; Docket No. 58–3 at 51. Additionally, the windows needed to remain closed during the winter months to retain a comfortable temperature for inmates and staff and the ventilation system was, therefore, regularly inspected. Docket No. 51–1 at 245; Docket No. 58–3 at 51; J. Smith Aff. ¶¶ 10–11; Hamilton Dep. at 36. Furthermore, the lights remained on in the gallery for inmate safety as Hamilton's gallery housed particularly dangerous inmates. Hamilton Dep. 56–58. Finally, with all of the actions taken by defendants, any residual conditions which resulted at worst from defendants' negligence and not from any conscious and deliberate disregard for the inmates' health and safety. As previously stated, negligence is insufficient to sustain an Eighth Amendment claim. *Hathaway v. Coughlin,* 99 F.3d 550, 553 (2d Cir.1996).

Accordingly, defendants' motion for summary judgment on this ground should be granted.

### F. Fourteenth Amendment

### 1. Due Process

Hamilton contends that defendants violated his due process rights by refusing to allow him to call witnesses in his rehearing, failing to notify him of the death of his son, and improperly placing him in CSU. Additionally, liberally construing the amended complaint, it appears that Hamilton contends that Maly, the hearing officer, was biased.

As a threshold matter, an inmate asserting a violation of his or her right to due process must establish the existence of a protected interest in life, liberty, or property. *See Perry v. McDonald,* 280 F.3d 159, 173 (2d Cir.2001). To establish a protected liberty interest, a prisoner must satisfy the standard set forth in *Sandin v. Conner,* 515 U.S. 472, 483–84 (1995). This standard requires a prisoner to establish that the deprivation was atypical and significant in relation to ordinary prison life. *Id.* at 484; *Jenkins v. Haubert,* 179 F.3d 19, 28 (2d Cir.1999); *Frazier v. Coughlin,* 81 F.3d 313, 317 (2d Cir.1996). The fact that an inmate has been disciplined with a SHU confinement alone is insufficient to establish an atypical and significant deprivation. The Second Circuit has articulated a two-part test whereby the length of time a prisoner was placed in SHU as well as "the conditions of the prisoner's confinement in SHU relative to the conditions of the general prison population" are to be considered. *Vasquez*

*v. Coughlin,* 2 F.Supp.2d 255, 259 (N.D.N.Y.1998) (citing *Brooks v. DiFasi,* 112 F.3d 46, 49 (2d Cir.1997)).

### a. Disciplinary Hearing and Rehearing

### i. Length of Incarceration in SHU

**\*18** The Second Circuit has held "that a sentence of one year in SHU was a sufficient length to be atypical under *Sandin." Gates v. Selsky,* No. 02–CV–496, 2005 WL 3132725, at *5 (W.D.N.Y. Nov. 22, 2005) (citing *Sims v. Artuz,* 230 F.3d 14, 23 (2d Cir.2000)). As Hamilton ultimately served twelve months in SHU, the duration of his SHU confinement suffices to create an issue of fact on this issue. Am. Compl. ¶ 26.

### ii. Biased Hearing Officers and Prohibition on Calling Witnesses

Prisoners have a constitutional right to have a fair and impartial hearing officer preside over their disciplinary hearings. *See, e.g., Sira v. Morton,* 380 F.3d 57, 69 (2d Cir.2004). However, "[t]he degree of impartiality required of prison officials does not rise to the level of that required of judges ... [as i]t is well recognized that prison disciplinary hearing officers are not held to the same standard of neutrality as adjudicators in other contexts." *Allen v. Cuomo,* 100 F.3d 253, 259 (2d Cir.1996) (citations omitted). While the Supreme Court held "that the requirements of due process are satisfied if some evidence supports the decision by the [hearing officer] ...." the Second Circuit has held that the test is whether there was " 'reliable evidence' of the inmate's guilt." *Luna v. Pico,* 356 F.3d 481, 487–88 (2d Cir.2004); *see also Superintendent, Mass. Corr. Inst. v. Hill,* 472 U.S. 445, 455 (1985).

To the extent that Hamilton alleges that he was not provided with impartial hearing officers, nothing in the hearing transcripts or either parties' submissions indicate that Davis or Maly was biased in any regard. Additionally, the findings produced during the investigations and drug tests leading to the misbehavior reports, the regulations in question, and the information upon which Davis and Maly relied all serve as reliable evidence supporting Hamilton's convictions and sentences. Selsky Decl. ¶ 8; Docket No. 58–3 at 53.

Additionally, Hamilton's amended complaint alleges that he was precluded from calling additional witnesses during his hearings. "It is well settled that an official may refuse to call witnesses as long as the refusal is justifiable [such as] ... on the basis of irrelevance or lack of necessity." *Scott v. Kelly,* 962 F.2d 145, 146–47 (2d Cir.1992) (internal quotations and citations omitted); *see also Richardson,* 833 F.Supp. at 152. However, Mathis was no longer incarcerated but was specifically identified and allegedly possessed exculpatory evidence regarding Hamilton's innocence. It appears that Maly's refusal to call him as a witness was unjustified. Mathis Aff. ¶¶ 2, 4, 6; Hamilton Dep. at 96–98, 121–23. Furthermore, it appears that Hamilton has raised a question of fact as to the refusal to call a representative from the substance abuse program to provide mitigating evidence.

Thus, defendants' motion should be denied concerning Hamilton's claim against Maly and Selsky for refusing to allow Hamilton to call Mathis and substance abuse program representatives as witnesses but should otherwise be granted as to all other defendants.

### b. Notification of Death in the Family

**\*19** "It is well-settled that there is no constitutionally protected liberty or property interest in attending the funeral of a family member." *Roman v. Donelli,* No. 06–CV–1071 (GLS/GJD), 2007 WL 2993825, at \*4 (N.D.N.Y. Oct. 10, 2007). Therefore, Hamilton had no constitutional right to the notification of or attendance at his son's funeral.

Additionally, while the "state may create liberty or property interests that are not conferred by the constitution ..., [the creation of such interests] must use explicitly mandatory language, must place substantive limitations on official discretion, and must require that a particular result is to be reached upon the finding of substantive predicates." *Id.* (internal quotations and citations omitted).

> The authority for deathbed and funeral visits is articulated in section 113 of the New York Corrections Law [and] ... simply states that the commissioner of correctional services **"may permit"** inmates to attend funerals of certain family members or to visit the individual if "death be imminent." The statute further provides that the power to grant these visits will be governed by rules and regulations promulgated by the commissioner. There is **no mandatory language** in this statute that would confer a liberty interest in being afforded the opportunity to go on either one of these types of visits.... [Additionally t]he notification of the death ... of an inmate's family member is governed by [DOCS] Directive No. 4206 ... [which] also shows that there is **no mandatory language** in that directive that would assure the approval of a deathbed or funeral visit if certain substantive criteria were met.... [T]he visit is contingent upon both verification of relationship **and Superintendent approval.** There is no mandatory language indicating that the Superintendent must approve any type of visit. Thus, no liberty interest is created by the statute or directives ... and [b]ecause there was no liberty interest created, [Hamilton's] due process claim must fail.

*Id.* (internal quotations and citations omitted) (emphasis in the original).

Thus, Hamilton had no protected liberty interest. Additionally, to the extent that Hamilton alleges that defendants did not comply with the DOCS directive in conducting an adequate investigation into his relationship to his son, Hamilton neither declared Napper as his son in his personal papers filed at the facility nor did Napper declare Hamilton to be his father when he visited the prison. Hamilton Dep. at 124–26, 128–29. Therefore, at best, defendants were negligent in their investigation of Hamilton's relationship to Napper which is insufficient to establish a constitutional violation. *Roman,* 2007 WL 2993825 at \*6.

Accordingly, defendants' motion as to this claim should be granted.

2009 WL 3199531

#### c. Placement in CSU

Hamilton contends that his placement and subsequent hearings affirming the appropriateness of his assignment to CSU violated his due process rights. However, Hamilton has "no liberty interest ... in remaining free from confinement in the CSU." *Frazier v. Coughlin,* 81 F.3d 313, 318 (2d Cir.1996).

> **\*20** [I]nmates in the CSU are confined to their cells for the same amount of time per day as inmates in the general prison population. Moreover, ... the only substantive differences between confinement in the CSU and in the general prison population are (i) that prisoners in the CSU are ineligible for certain prison jobs, and (ii) that additional corrections officers may be assigned to the CSU.

*Id.*

Additionally, to the extent that Hamilton alleges that this placement deprived him of his constitutionally protected right to engage in certain types of employment, that argument also fails. First, "New York law does not give a prisoner any statutory, regulatory or precedential right to his prison job ... [thus] the State commissioner or prison officials may provide jobs for prisoners," but no liberty or property interest results. *Gill v. Mooney,* 824 F.2d 192, 194 (2d Cir.1987). Moreover, inmates have no constitutional right to any particular position or employment. *Hodges v. Jones,* 873 F.Supp. 737, 745 (N.D.N.Y.1995) (citations omitted). Finally, since Hamilton failed to establish a protected liberty interest in remaining free from confinement in CSU, no claim lies for denial of due process. *Frazier,* 81 F.3d at 318.

Accordingly, it is recommended that defendants be granted summary judgment as to any claim on this ground.

#### G. RLUIPA Claim

The RLUIPA provides that "[n]o government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution ... unless the government demonstrates that imposition of the burden on that person (1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000cc–1. In a RLUIPA claim, "[t]he prisoner must show at the threshold that the disputed conduct substantially burdens his sincerely held religious beliefs. The defendants then bear the relatively limited burden of identifying the legitimate penological interests that justify the impinging conduct." *Salahuddin v. Goord,* 467 F.3d 263, 274–75 (2d Cir.2006).

As discussed above in subsection C(3), Hamilton has raised questions of fact as to whether defendants substantially burdened his religious beliefs. Defendants have failed to offer facts sufficient to satisfy their burden of identifying a legitimate penological interest. Accordingly, defendants' motion for summary judgment on this ground should be denied.

#### H. HIPAA Claim

HIPAA creates a monetary remedy for the wrongful disclosure of medical information. 42 U.S.C. § 1320d–6. However, HIPAA "does not confer a private cause of action to any particular class of individuals ... [or] either explicitly or implicitly, confer to private individuals a right of enforcement." *Barnes v. Glennon,* No. 9:05–CV–0153 (LEK/RFT), 2006 WL 2811821 at \*5 (N.D.N.Y. Sept. 28, 2006) (citations omitted). Furthermore, "HIPAA provides for no federal cause of action; instead, HIPAA provides for an enforcement mechanism for the Secretary of Health and Human Services [HHS]." *Id.* at \*6 (internal quotations and citations omitted). Therefore, Hamilton cannot sustain his HIPAA claim since there is no private cause of action granted by the statute. Hamilton's only recourse through this statute is to request the State of New York or the Secretary of HHS to bring the action on his behalf.

**\*21** Accordingly, defendants' motion for summary judgment on this ground should be granted.

#### I. Personal Involvement

Defendants contend that Hamilton has failed to establish the personal involvement of defendants Gonzalez, Selsky, Genovese, and Davis. " '[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.' " *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (quoting *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir.1991)). Thus, supervisory officials may not be held liable merely because they held a position of authority. *Id.; Black v. Coughlin,* 76 F.3d 72, 74 (2d Cir.1996). However, supervisory personnel may be considered "personally involved" if:

> (1) [T]he defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

*Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995) (citing *Williams v. Smith,* 781 F.2d 319, 323–24 (2d Cir.1986)).

#### a. Gonzalez

Gonzalez was DOCS Deputy Counsel. Am. Compl. Viewing the record on this motion in the light most favorable to Hamilton, Gonzalez' only personal involvement with Hamilton was as the author of the letter to the Kings County Family Court requesting that Hamilton be allowed to appear telephonically. Docket No. 51–5 at 221. Pursuant to the letter's request, Hamilton was allowed to and did appear telephonically at the date and time arranged by Gonzalez. Am. Compl. ¶ 20. The case was adjourned, although Gonzalez had no involvement or reason to know about the resolution of those proceedings or subsequent developments. Even when

construing the amended complaint in the light most favorable to Hamilton, the record contains no other factual basis for finding personal involvement by Gonzalez. There likewise exists no basis in the record to find that Gonzalez negligently supervised any subordinate, created a hiring or retention policy which allowed constitutional violations to continue, or was grossly negligent in managing subordinates.

Accordingly, defendants' motion for summary judgment in this respect should be granted as to Gonzalez.

#### b. Genovese

Genovese, a physician, was involved in the provision of inmate health care and was able to prescribe therapeutic meals to inmates. However, she had no authority to provide an inmate with a religious meal or make a religious meal available to an inmate. Genovese Decl. ¶ 6. Additionally, as a physician, Genovese had no authority to change DOCS policies and procedures for prescribing special inmate diets. *See Hatzfield v. Goord,* No. 04–CV159, 2007 WL 700961, at *3 (N.D.N.Y. Feb. 28, 2007) (dismissing claims against a prison superintendent as there were no allegations that he had the power to create or to terminate the policy in question). Even construing the amended complaint in the light most favorable to Hamilton, any conclusory allegations that Genovese could prescribe both a religious and a therapeutic diet would still lack any factual basis. Additionally, there exists no basis in the record to find that there was any negligent supervision by Genovese, she created a hiring or retention policy which allowed constitutional violations to continue, or she was grossly negligent in managing subordinates.

**\*22** Accordingly, defendants' motion for summary judgment in this respect should be granted.

#### c. Selsky

Selsky, DOCS Director of SHU, directly reviewed and ruled on three disciplinary convictions which form the basis of Hamilton's due process claims. Selsky Decl. ¶¶ 8–10. "[A]ffirming the administrative denial of a prison inmate's grievance by a high-level official is insufficient to establish personal involvement under section 1983." *Manley v. Mazzuca,* No. 01–CV–5178 (KMK), 2007 WL 162476, at *10 (S.D.N.Y. Jan. 19, 2007) (*citing Foreman v. Goord,*

2009 WL 3199531

No. 02–CV–7089 (SAS), 2004 WL 1886928, at *7 (S.D.N.Y. Aug. 23, 2004) ("The fact that [the prison superintendent] affirmed the denial of plaintiff's grievances is insufficient to establish personal involvement.")). However, where a supervisory official receives, reviews, and responds to a prisoner's complaint, personal involvement may be found. *See Bodie,* 342 F.Supp.2d at 203 (citations omitted).

In this case, the record is undisputed that Selsky was a supervisory official. While personal involvement cannot be founded solely on supervision, liability can be found if the official proactively participated in reviewing the administrative appeals as opposed merely to rubber-stamping the results. Selsky was intimately involved with the hearings and rehearing which gave rise to Hamilton's due process claims as Selsky was the individual who signed all administrative findings and ordered the rehearing of Hamilton's disciplinary proceedings. This suffices to raise questions of fact as to Selsky's personal involvement.

Accordingly, defendants' motion for summary judgment in this respect should be denied.

### d. Davis

Davis presided as the hearing officer at Hamilton's first disciplinary proceeding. Davis' finding that Hamilton was guilty and the sentence imposed were reversed by Selsky and the charge was remanded for a rehearing. The rehearing was held before a different hearing officer. Selsky Decl ¶¶ 8–9; Docket No. 58–3 at 53. As the hearing officer, Davis was directly involved in the hearing which is the subject matter of Hamilton's claims of a due process violation. Accordingly, defendants' motion for summary judgment in this respect should be denied.

### J. Qualified Immunity

Defendants claim that even if plaintiffs' constitutional claims are substantiated, they are entitled to qualified immunity. Qualified immunity generally protects governmental officials from civil liability "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982); *Aiken v. Nixon,* 236 F.Supp.2d 211, 229–30 (N.D.N.Y.2002) (McAvoy, J.), *aff'd,* 80 Fed.Appx. 146 (2d Cir. Nov. 10, 2003). However,

even if the constitutional privileges "are clearly established, a government actor may still be shielded by qualified immunity if it was objectively reasonable for the ... official to believe that his [or her] acts did not violate those rights." *Smith v. City of Albany,* No. 03–CV–1157, 2006 WL 839525 *16 (N.D.N.Y. Mar. 27, 2006) (quoting *Kaminsky v. Rosenblum,* 929 F.2d 922, 925 (2d Cir.1991); *Magnotti v. Kuntz,* 918 F.2d 364, 367 (2d Cir.1990) (internal citations omitted)).

 **\*23** A court must first determine whether, if plaintiff's allegations are accepted as true, there would be a constitutional violation. *Saucier v. Katz,* 533 U.S. 194, 201 (2001). Only if there is a constitutional violation does a court proceed to determine whether the constitutional rights of which a reasonable person would have known were clearly established at the time of the alleged violation. *Aiken,* 236 F.Supp.2d at 230. Here, the second prong of the inquiry need not be reached concerning any of Hamilton's claims except (1) his First Amendment claims concerning the provision of his religious meals and the interference with the delivery of the Mathis affidavit prior to his disciplinary rehearing, and (2) his due process claims concerning his inability to call witnesses during his disciplinary rehearing.

As to those claims, it was clearly established by November 30, 2006 that inmates had (1) a First Amendment right to be provided with meals that conformed to their religious tenets, *see Ford,* 352 F.3d at 597;(2) a First Amendment right of access to the courts which included access to legal mail, *see David v. Goord,* 320 F.3d 346, 351 (2d Cir.2003);and (3) a Fourteenth Amendment right to a fair and impartial disciplinary hearing including the ability to call witnesses. *See Scott,* 962 F.2d at 145. Thus, accepting all of Hamilton's allegations concerning these claims as true, questions of fact exist precluding summary judgment for defendants on this ground.

Accordingly, defendants should be granted summary judgment on the ground of qualified immunity on all claims except those described above, and defendants' motion on this ground should otherwise be denied.

### III. Conclusion

For the reasons stated above, it is hereby **RECOMMENDED** that defendants' motion for summary judgment (Docket No. 51) be:

2009 WL 3199531

1. **DENIED** as to Hamilton's:

    A. First Amendment claims against Smith regarding the provision of meals which complied with both his health needs and religious tenets;

    B. First Amendment claims against Smith and Maly regarding the tampering with his legal mail, specifically the Mathis affidavit;

    C. Fourteenth Amendment claims against Maly and Selsky regarding the violation of his due process rights during his disciplinary rehearing where he was precluded from calling Mathis and substance abuse counselors during his presentation of evidence;

2. **GRANTED** as to as to all other claims and defendants; and

3. The case be **TERMINATED** in its entirety as to defendants Gonzalez, Genovese, Skies, Parisi, Chiapperino, and Davis.

Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993); *Small v. Sec'y of HHS,* 892 F.2d 15 (2d Cir.1989); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(e).

**All Citations**

Not Reported in F.Supp.2d, 2009 WL 3199531

---

**End of Document**

© 2021 Thomson Reuters. No claim to original U.S. Government Works.

2006 WL 3725543

KeyCite Overruling Risk - Negative Treatment

Overruling Risk   Pearson v. Callahan,   U.S.,   January 21, 2009

2006 WL 3725543
Only the Westlaw citation is currently available.
United States District Court,
E.D. New York.

Valerie KELSEY, Theodore Goddard,
Individually, and as Co-Administrators of
the Estate of Curtis Goddard, Plaintiffs,

v.

The CITY OF NEW YORK, P.O. Thomas
Marrone, Shield # 07784, Sergeant George
Kallas, Shield # 01144, Lt. James Marron, P.O.
Michael Sykora, Shield # 18496, P.O. Cory Fink,
Shield # 14713, P.O. Martin Halligan, Shield
# 18367, P.O. Paul Bernal, Shield # 10349,
P.O. Matthew Lindner, Shield # 19417, P.O.
Shawline Senior, Shield # 02385, Defendants.

No. 03-CV-5978(JFB)(KAM).
|
Dec. 18, 2006.

**Attorneys and Law Firms**

Kenechukwu Chudi Okoli, Esq., New York, NY, for plaintiffs.

Jennifer Amy Rossan, Esq., Assistant Corporation Counsel of the City of New York for Michael A. Cardozo, Esq., Corporation Counsel of the City of New York, New York, NY, for defendants.

MEMORANDUM AND ORDER

JOSEPH F. BIANCO, District Judge.

 **\*1**  Plaintiffs Valerie Kelsey and Theodore Goddard bring this action on behalf of themselves and the estate of Curtis Goddard, alleging, *inter alia,* claims for violation of civil rights under 42 U.S.C. § 1983 and a pendent wrongful death/negligence claim under state law. Defendants move for summary judgment on all claims. For the reasons stated below, summary judgment is granted as to plaintiffs' claim alleging violation of § 1983. Further, with the dismissal of the federal claim from the instant lawsuit, the Court exercises

its discretion to decline jurisdiction over the remaining state claim arising in negligence, and, thus, dismisses that claim without prejudice.

**I. BACKGROUND**

The following facts are undisputed unless otherwise indicated. On August 15, 2002, Curtis Goddard ("Goddard") arrived at and entered an apartment on Beach Channel Drive ("the apartment"), a residence at which Maria Buffamante ("Buffamante") lived with her children. (*See* Defs.' Rule 56.1 Statement of Material Facts ("Defs.' 56.1 Stmt."), ¶¶ 7, 11.) Goddard lived occasionally at the apartment as well, as Buffamante's boyfriend. (*See* Pls.' Rule 56.1 Statement of Material Facts ("Pls.' 56.1 Stmt."), ¶ 7; *see also* Defs.' 56.1 Stmt., ¶ 9.) On the previous day, August 14, 2002, Buffamante had informed Goddard that their relationship was over. (*See* Pls.' 56.1 Stmt., ¶ 10(a); *see also* Defs.' 56.1 Stmt., ¶ 10.) At the time Goddard entered the apartment, it was occupied by Buffamante, her children, and her friends Tyisha Safford, Leonar Jesus Espinal and an individual known as "Blue." (*See* Defs.' 56.1 Stmt., ¶ 8.) After Goddard entered the apartment, Buffamante, Espinal and "Blue" asked Goddard to leave the premises. (*See id.,* ¶ 12.) Goddard refused, and brandished a firearm. [1] (*See* Defs.' 56.1 Stmt., ¶ 13; *see also* Pls.' 56.1 Stmt., ¶ 13(b).)

[1]   According to the deposition testimony of Buffamante, Goddard pulled his gun after he observed "Blue" reach into his pocket in a manner appearing to indicate that he was reaching for a knife. (*See* Declaration of K.C. Okoli ("Okoli Decl."), Ex. J at 71-73.) After he pulled the firearm, Goddard forced "Blue" to go out into the hallway outside the apartment, and then locked the door. (*See id.* at 73.)

New York City Police Department Sergeant George Kallas and Police Officers Thomas Marrone, Michael Sykora, Cory Fink, Martin Halligan, and Paul Bernal responded to a call regarding a dispute with a firearm at the apartment. (*See* Defs.' 56.1 Stmt., ¶ 5.) As the officers arrived at the apartment, "Blue" informed them that there was an individual with a gun inside the apartment. (*See* Defs.' 56.1 Stmt., ¶ 14; *see also* Pls.' 56.1 Stmt., ¶ 14.) Although it is disputed whether or not the police officers knocked on the apartment door, it is undisputed that the door was opened by Espinal, and the occupants of the apartment, save Goddard, ran out. (*See* Defs.' 56.1 Stmt., ¶

2006 WL 3725543

15; *see also* Pls.' 56.1 Stmt., ¶ 15.) The officers entered the apartment, and observed Goddard run towards the kitchen. [2] (*See* Defs.' 56.1 Stmt., ¶ 16.)

[2]     Plaintiffs dispute whether or not Sergeant Kallas followed the other officers into the apartment, but do not cite anything from the record to substantiate this claim, as required in a statement submitted pursuant to Rule 56.1. Local Civil Rule 56.1(d) ("Each statement made by the movant or opponent pursuant to Rule 56.1(a) and (b), including each statement controverting any statement of material fact, must be followed by citation to evidence which would be admissible, set forth as required by Federal Rule of Civil Procedure 56(e).""). Notwithstanding that defect, the Court notes that the factual dispute regarding whether Sergeant Kallas followed the other officers into the apartment has no bearing on the adjudication of the instant motion for summary judgment.

The officers attempted to arrest Goddard in the kitchen, who resisted and refused to be handcuffed. (*See id.,* ¶ 17.) The officers were eventually successful in restraining and handcuffing Goddard. (*See id.,* ¶ 22.) The officers searched Goddard and seized a sock filled with ammunition, a ski mask, his gun, and a razor blade. [3] (*See* Defs.' 56.1 Stmt., ¶¶ 22-23, 28; *see also* Pls.' 56.1 Stmt., ¶¶ 22-23, 28.)

[3]     Plaintiffs dispute the location from which these items were recovered. (*See* Pls.' 56.1 Stmt., ¶¶ 22-23, 28.) However, plaintiffs do not dispute the fact that these items were in fact seized by the officers from Goddard, which is all that is necessary to address the instant motion for summary judgment.

**\*2** Goddard was escorted out of the apartment with his hands cuffed behind his back. (*See* Defs.' 56.1 Stmt., ¶ 24.) As he was being escorted out of the apartment, Goddard attempted to grab Officer Barnal's gun, while exclaiming "shoot me, kill me." (*See id.,* ¶ 25.) Officer Marrone held Goddard until he was able to confirm that Officer Bernal had control of his gun. (*See id.,* ¶ 26.) Goddard was brought out into the hallway, and was positioned facing the wall, approximately four to five feet from a stairwell door. (*See* Defs.' 56.1 Stmt., ¶ 27; *see also* Pls.' 56.1 Stmt., ¶ 27(a).) While placed facing the wall, Goddard was surrounded by Officers Sykora, Fink, Hallagan and Bernal in a semi-circle. (*See* Defs.' 56.1 Stmt., ¶ 29.)

Sergeant Kallas instructed the officers to physically hold onto Goddard. (*See id.,* ¶ 30.) Pursuant to that order, Officer Sykora held onto Goddard while he was stood against the wall. (*See id.,* ¶ 32.)

Sergeant Kallas requested that the Emergency Services Unit and an ambulance respond to the scene to assist with an emotionally disturbed person (EDP). (*See* Defs.' 56.1 Stmt., ¶ 31; *see also* Pls.' 56.1 Stmt., ¶ 31.) Kallas and Lieutenant Marron then went down the hall to interview the occupants of the apartment. (*See* Defs.' 56.1 Stmt., ¶ 39.) After approximately five minutes, Goddard was turned around, so that he faced the surrounding officers. (*See* Defs.' 56.1 Stmt., ¶ 33.) Officer Sykora spoke to Goddard to ascertain what had happened prior to the arrival of the police at the apartment. (*See id.*) The parties agree that Goddard was relatively calm, although plaintiffs point to evidence in the record indicating that he was sweating and fidgety. (*See* Defs.' 56.1 Stmt., ¶ 34; *see also* Pls.' 56.1 Stmt., ¶ 34.) Officer Sykora released his physical hold on Goddard. (*See* Defs .' 56.1 Stmt., ¶ 35.) Goddard then made a sudden move at Sykora, and Officer Fink pushed Sykora out of the way, in order to prevent contact. (*See* Defs.' 56.1 Stmt., ¶¶ 36-37; *see also* Pls .' 56.1 Stmt., ¶¶ 36-37.) Goddard proceeded to escape from the officers, and ran towards the stairwell door. (*See* Defs.' 56.1 Stmt., ¶ 37.) According to defendants, Officer Shawline Senior was standing next to the stairwell door, and attempted to grab Goddard as he ran through the stairwell door, but failed. [4] (*See* Defs.' 56.1 Stmt., ¶ 38.)

[4]     Plaintiffs assert that no officer attempted to grab Goddard when he escaped, citing the deposition testimony of Officer Fink. (*See* Pls.' 56.1 Stmt., ¶ 38.) That testimony proceeded as follows:

    Q. When Mr. Goddard came off the wall, did you attempt to grab him?

    A. No.

    Q. Did you see any officer attempt to grab him?

    A. No.

    (Okoli Decl., Ex. D at 32.) On the other hand, defendants cite the deposition of Officer Senior, who testified that she attempted to grab Goddard but her hand slipped off his shirt, and Officer Bernal, who testified that he observed Goddard run through the door while being grasped by Officer Senior. (*See* Affirmation of Jennifer

Rossan ("Rossan Decl."), Ex. J at 58; Ex. L. at 16-21.)

Sykora, Fink, Bernal, Halligan, Marrone, Lindner and Marron immediately chased after Goddard as he ran up the stairway to the rooftop of the building, while rear-cuffed. (*See* Defs.' 56.1 Stmt., ¶ 42.) Officer Sykora observed Goddard lean over a fence on the roof, and then twist his body so that he fell off the rooftop. (*See id.,* ¶ 44.) Goddard died as a result of injuries he assumed from the fall. (*See* Okoli Decl., Ex. O.)

The New York Police Department investigated the incident, and disciplined Officer Sykora for failing and neglecting to safeguard a prisoner, resulting in the loss of the prisoner. (*See* Pls.' 56.1 Stmt., ¶ 54.) The report noted that Sykora was responsible for securing Goddard, and that the circumstances warranted him physically holding on to Goddard. (*See* Okoli Decl., Ex. M.) Further, the report noted that it was Sykora's duty to maintain physical control of Goddard, since he was the one holding Goddard when Kallas gave him the order to not let go of him. (*See id.*) The same report investigated the actions of Fink, Kallas, Marrone, Halligan, Bernal, Linder, Senior and Marron, but found that discipline was not warranted as to those officers. (*See id.*)

 **\*3** Valerie Kelsey and Theodore Goddard, the co-administrators of Curtis Goddard's estate, filed the instant action, against the City of New York and the individual officers mentioned above, alleging causes of action under 42 U.S.C. §§ 1983 and 1985, based upon the following: (1) deliberate indifference to Goddard's safety needs; (2) the failure by the City to train and supervise the defendants; (3) the use of excessive force when handcuffing Goddard; and (4) a conspiracy by the defendants to not recapture Goddard after his escape from custody and/or a conspiracy to let Goddard fall from the rooftop. In addition, the complaint alleged a pendent claim for negligence arising under state law.

Defendants moved for summary judgment on all claims. In plaintiffs' opposition papers, they explicitly abandoned all claims except "1) damages for wrongful death based upon defendants' deliberate indifference to his safety needs, pursuant to 42 U.S.C. § 1983, and 2) damages for the wrongful death of the decedent due to the negligence of the individual defendants." (Pls.' Opp. Br., at 2.)

The case was re-assigned to the undersigned from the Honorable Carol B. Amon on February 10, 2006. The Court held oral argument on the instant motion as to the two remaining claims on August 11, 2006.

## II. STANDARD OF REVIEW

Pursuant to Federal Rule of Civil Procedure 56(c), a court may not grant a motion for summary judgment unless "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." FED.R.CIV.P. 56(c); *Globecon Group, LLC v. Hartford Fire Ins. Co.,* 434 F.3d 165, 170 (2d Cir.2006). The moving party bears the burden of showing that he or she is entitled to summary judgment. *See Huminski v. Corsones,* 396 F.3d 53, 69 (2d Cir.2005). The court "is not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments." *Amnesty America v. Town of West Hartford,* 361 F.3d 113, 122 (2d Cir.2004) (citation omitted); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (stating that summary judgment is unwarranted if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."). Once the moving party has met its burden, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts ... [T]he nonmoving party must come forward with specific facts showing that there is a *genuine issue for trial." Caldarola v. Calabrese,* 298 F.3d 156, 160 (2d Cir.2002) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586-87 (1986)).

## III. DISCUSSION

 **\*4** As a threshold matter, the Court notes that defendants moved for summary judgment on all claims contained within the Amended Complaint. In their opposition papers, plaintiffs explicitly abandoned all of their claims, save two: (1) plaintiffs' claim under 42 U.S.C. § 1983 against the individual officers, alleging deliberate indifference to Goddard's safety needs under the Fourteenth Amendment; and (2) plaintiffs' state law negligence claim for the alleged wrongful death of Goddard, as against both the City of New York and the individual officer defendants. (*See* Memorandum of Law of Plaintiffs in Opposition to Defendants' Motion for Summary Judgment ("Pls.' Opp. Mem.") at 1-2.) The Court proceeds to address defendants' motion with respect to each of the remaining claims in turn.

2006 WL 3725543

A. Failure to Protect Under 42 U.S.C. § 1983

Section 1983 "is not itself a source of substantive rights, but a method for vindicating federal rights elsewhere conferred by those parts of the United States Constitution and federal statutes that it describes." *Baker v. McCollan,* 443 U.S. 137, 145 n. 3, 99 S.Ct. 2689, 61 L.Ed.2d 433 (1979). Section 1983provides as follows:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law.

42 U.S.C. § 1983. For claims under § 1983, a plaintiff must prove "that (1) the challenged conduct was attributable at least in part to a person who was acting under color of state law and (2) the conduct deprived the plaintiff of a right guaranteed under the Constitution or laws of the United States." *Snider v. Dylag,* 188 F.3d 51, 53 (2d Cir.1999) (citation omitted).

Plaintiffs' remaining § 1983 claim alleges a violation of Goddard's substantive due process rights under the Fourteenth Amendment. Specifically, plaintiffs allege that the defendant officers failed to protect Goddard from himself, while he was in custody. When in the custody of police, an arrestee has the right to care and protection, including protection from suicide.[5] *Cook ex rel. Estate of Tessier v. Sheriff of Monroe County, Fla.,* 402 F.3d 1092, 1115 (11th Cir.2005) ("[P]retrial detainees like [plaintiff] plainly have a Fourteenth Amendment due process right 'to receive medical treatment for illness and injuries, which encompasses a right to psychiatric and mental health care, and a right to be protected from self-inflicted injuries, including suicide.' ") (quoting *Belcher v. City of Foley,* 30 F.3d 1390, 1396 (11th Cir.1994) (citations omitted)); *see also Hare v. Corinth, Miss.,* 74 F.3d

633, 647 & 648 n. 3 (5th Cir.1996) (collecting cases involving claims for failure to protect individuals in custody from suicide). In the detainee suicide context, the relevant inquiry is whether defendants were deliberately indifferent to the medical need of the detainee to be protected from himself. *See Weyant,* 101 F.3d at 856.

[5]
> The bulk of cases dealing with the right of a person in custody for protection from suicide analyze the issue as an Eighth Amendment claim dealing with the inadequate provision of medical care. *See, e.g., Woodward v. Correctional Medical Servs. of Ill., Inc.,* 368 F .3d 917, 926 (7th Cir.2004); *Olson v. Bloomberg,* 339 F.3d 730, 735 (8th Cir.2003). Although Eighth Amendment protections only apply to individuals who have been convicted, the Second Circuit has explicitly noted that pretrial detainees are protected by the Due Process Clause, and their rights to medical treatment are "at least as great as those of a convicted prisoner." *Weyant v. Okst,* 101 F.3d 845, 856 (2d Cir.1996) (citations omitted). "Thus, the official custodian of a pretrial detainee may be found liable for violating the detainee's due process rights if the official denied treatment needed to remedy a serious medical condition and did so because of his deliberate indifference to that need." *Id.* (citation omitted); *see also Cuoco v. Motisgugu,* 222 F.3d 99, 106 (2d Cir.2000) (noting that standards from Eighth Amendment context apply to claims brought by pretrial detainees under the Fourteenth Amendment). Based on this logic, other Circuits have applied the same standards applicable to prisoner suicide cases arising under the Eighth Amendment to claims brought by individuals in custody prior to conviction under the Fourteenth Amendment. *See, e.g., Cook ex rel. Estate of Tessier v. Sheriff of Monroe Cty, Fla.,* 402 F.3d 1092, 1115 (11th Cir.2005); *Barrie v. Grand Cty, Ut.,* 119 F.3d 862, 868 (10th Cir.1997); *Partridge v. Two Unknown Police Officers of the City of Houston,* 791 F.2d 1182, 1187 n. 20 (5th Cir.1986).

**\*5** Defendants argue that summary judgment should be granted in their favor on plaintiffs' § 1983 claim because no jury could reasonably find that defendants acted with deliberate indifference to the safety needs of the decedent.[6] " 'Deliberate indifference' describes a mental state more blameworthy than negligence; but a plaintiff is not required

2006 WL 3725543

to show that the defendant acted for the 'very purpose of causing harm or with knowledge that harm will result.' " *Hernandez v. Keane,* 341 F.3d 137, 144 (2d Cir.2003) (quoting *Farmer v. Brennan,* 511 U.S. 825, 835, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994)); *Brock v. Wright,* 315 F.3d 158, 164 (2d Cir.2003) ( "[N]egligence is not deliberate indifference.") "Deliberate indifference is 'a state of mind that is the equivalent of criminal recklessness.' " *Hernandez,* 341 F.3d at 144 (quoting *Hathaway v. Coughlin,* 99 F.3d 550, 553 (2d Cir.1996)). "[D]eliberate indifference involves unnecessary and wanton infliction of pain, or other conduct that shocks the conscience." *Hathaway,* 99 F.3d at 553 (2d Cir.1996). In order for the plaintiffs to satisfy their burden to show deliberate indifference, they must demonstrate that each charged official "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Johnson v. Wright,* 412 F.3d 398, 403 (2d Cir.2005) (quoting *Farmer,* 511 U.S. at 837); *accord Phelps v. Kapnolas,* 308 F.3d 180, 185-86 (2d Cir.2002).

6    This argument assumes, *arguendo,* that the defendants owed a duty to protect to the plaintiff from himself at the time of the accident, even though he was no longer in their physical custody because of his escape. The general rule is that the Fourteenth Amendment solely imposes a limitation on the State's power to act, and does not create an affirmative obligation on the State to protect the public from harm. *DeShaney v. Winnebago Dep't of Soc. Servs.,* 489 U.S. 189, 196 (1989) ("[T]he Due Process Clauses [of the Fifth and Fourteenth Amendments] generally confer no affirmative right to governmental aid, even where such aid may be necessary to secure life, liberty, or property interests of which the government itself may not deprive the individual.") Since state actors did not directly kill the decedent-he committed suicide-in order for plaintiffs to proceed, they must demonstrate that they are not subject to the general rule that "a State's failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause." *Id.* at 197; *accord Pena v. DePrisco,* 432 F.3d 98, 107-08 (2d Cir.2005). However, defendants concede that they did owe a duty when they had decedent in custody, based upon the "special relationship" theory of liability which escapes the general rule asserted by

*DeShaney,* under which a State has a constitutional obligation to protect an individual from private actors. *See Ying Jing Gan v. City of New York,* 996 F.2d 522, 533 (2d Cir.1993). Under the "special relationship" theory, the Supreme Court and Second Circuit have both "recognized that a constitutionally significant special relationship generally involves some type of custody or other restraint on the individuals' ability to fend for themselves." *Matican v. City of New York,* 424 F.Supp.2d 497, 504 (E.D.N.Y.2006) (citing *DeShaney,* 489 U.S. at 200 ("The affirmative duty to protect arises not from the State's knowledge of the individual's predicament or from its expressions of intent to help him, but from the limitation which it has imposed on his freedom to act on his own behalf."); *Ying Jing Gan,* 996 F.2d at 533 ("Special relationships that have been recognized to give rise to a governmental duty to protect against third-person attacks have included custodial relationships such as a prison and inmate or a mental institution and involuntarily committed patient, and the relationship between a social service agency and a foster child.") Although the defendants concede that their affirmative action of taking Goddard into custody formed a special relationship which engendered a duty to protect, they argue that the "special relationship" and accompanying duty terminated at the moment that decedent voluntarily removed himself from custody by escaping. The defendants have not been able to provide any authority directly supporting the proposition that an individual's escape from custody terminates the duty to protect under the Fourteenth Amendment. However, the Court does not reach the issue of whether the duty is terminated because, even assuming *arguendo* that the defendant officers had a duty to protect the decedent, the facts of this case do not permit a jury determination of deliberate indifference, as discussed *infra.*

In the detainee suicide context, deliberate indifference may exist pursuant to one of two broad fact scenarios. *See Rellergert v. Cape Girardeau County, Mo.,* 924 F.2d 794, 796 (8th Cir.1991). First, state officials could be deliberately indifferent to the risk of suicide by failing to discover an individual's suicidal tendencies. *See id.* (collecting cases). Alternatively, the detaining authorities could have discovered and have been aware of the suicidal tendencies, but could be

deliberately indifferent in the manner by which they respond to the recognized risk of suicide, an inquiry which focuses on the adequacy of preventative measures. *See id.* In the instant case, defendants argue that they were not deliberately indifferent in either respect, specifically they argue: (1) that the decedent's acts were more "homicidal" than "suicidal," and so that plaintiffs cannot establish that defendants were deliberately indifferent to decedent's suicidal tendencies; and (2) that the actions of the officers in dealing with the threat of suicide were reasonable and did not exhibit "deliberate or willful lack of concern" to the safety needs of decedent.

As a threshold matter, the Court rejects defendants' argument that the record does not support a finding that the officers were aware of Goddard's suicidal tendencies. The defendants do not dispute that Goddard exclaimed "shoot me, kill me" to the defendant officers when he was trying to grab Officer Bernal's gun. (*See* Defs.' 56.1 Stmt., ¶ 25.) Viewing that statement in a light most favorable to the plaintiffs, a reasonable jury could conclude that decedent was exhibiting a readily ascertainable desire to have his life ended through "suicide by cop." In fact, the actions of Sergeant Kallas support the conclusion that the defendant officers were aware of Goddard's suicidal tendencies because he requested emergency services to respond to assist with an emotionally disturbed person. Thus, the proper inquiry in the instant motion for summary judgment is whether a rational jury could find that insufficient preventative measures were taken by the defendant officers, such that they were deliberately indifferent to the risk of suicide.

**\*6** Where officers take affirmative and deliberate steps to protect inmates from suicide, other circuits have generally found deliberate indifference lacking, even in the face of potentially negligent actions by the officers and/or a failure to comply with standard policies or procedures. For example, in *Rellergert, 924 F.2d at 797,* the Eighth Circuit assumed, drawing all inferences in favor of a plaintiff's jury verdict, that an officer let an inmate out of his sight with a bedsheet, notwithstanding the fact that the inmate was on suicide watch. The Eighth Circuit noted that the evidence supported the statement that the officer had conflicting responsibilities to which he had to attend, which prevented him from leaving his observation booth and monitoring the inmate. *See id.* Under these facts, the Eighth Circuit affirmed the district court's judgment notwithstanding the verdict, noting that while "the jury might reasonably conclude that [the defendant officer] acted imprudently, wrongly, or negligently," the evidence

could not support a finding of deliberate indifference as a matter of law. *See id.* at 797-98.

Similarly, in *Brown v. Harris,* 240 F.3d 383, 390 (4th Cir.2001), the Fourth Circuit asserted the proposition that even where an officer is aware of the substantial risk of serious harm, he or she may avoid liability "if he responded reasonably to the risk of which he knew." The Fourth Circuit noted that the defendant officer had responded to the decedent's medical needs-volatility from drug withdrawal and a suicide risk of some kind-by placing him under "medical watch," which involved constant video surveillance. *See id.* Although it was noted that the officer failed to place the inmate in a paper gown, as was the ordinary custom with suicidal detainees, the court stated that the officer's failure to take certain precautions do not create a jury issue as to deliberate indifference "if his actions were nonetheless reasonable in response to the risk of which he actually knew." *Id.* The officer "simply took less action than he could have, and by his own admission, should have ... at most [the defendant officer's] failure to take additional precautions was negligent, and not deliberately indifferent, because by placing [the decedent] on constant video surveillance, he simply did not 'disregard [ ] an excessive risk to [decedent's] health or safety.' " *Id.* at 390-91 (quoting *Farmer, 511 U.S. at 837).* Accordingly, the Fourth Circuit concluded that there was no basis for a reasonable finder of fact to conclude that the defendant officer acted with deliberate indifference. *See id.* at 391.

Moreover, in *Liebe v. Norton,* 157 F.3d 574, 578 (8th Cir.1998), the Eighth Circuit held that prison officials did not demonstrate deliberate indifference and were entitled to qualified immunity where a detainee classified as a suicide risk was able to hang himself on a metal-framed electrical conduit in a temporary holding cell. In affirming the district court's decision to grant summary judgment for the defendants, the Eighth Circuit recognized the high burden imposed by the deliberate indifference standard and emphasized that the court must closely examine the actions taken by the officials to prevent suicide, even if other steps were omitted:

> **\*7** Appellant contends that the district court erred in focusing on the efforts which [the prison official] undertook. Instead, Appellant points to all of the actions which [the official]

should have taken. Unfortunately, [the official] did not have the benefit of twenty-twenty hindsight, as we do now. Thus, we must examine those precautionary actions which were undertaken. Appellant seems to ignore the fact that [the official] did classify [the detainee] as a suicide risk, and he did take the preventive measures of placing him in the temporary holding cell and removing his shoes and belt. Additionally, [the official] periodically checked on [the detainee]. While [the official] may have been negligent in not checking on [the detainee] more often, or in failing to notice the exposed electrical conduit in the temporary holding cell, we cannot say as a matter of law that his actions were indifferent. To the contrary, [the official's] actions constituted affirmative, deliberate steps to prevent [the detainee's] suicide. Despite [the official's] ultimate failure to prevent that suicide, [the official] did not act with deliberate indifference.

*Id.* at 578.

Finally, in *Rhyne v. Henderson County,* 973 F.2d 386, 393-94 (5th Cir.1992), the Fifth Circuit held that, as a matter of law, a jury could not find deliberate indifference whereofficials checked suicidal inmates only every ten minutes. The Fifth Circuit noted that, although under the facts of the case, periodic checks may have been in fact inadequate and could form the basis of a sound negligence claim, the periodic checks reflected concern, rather than apathy for inmate safety, and no evidence indicated that frequent periodic checks were obviously inadequate. *See id.*

Viewing the facts of this case in a light most favorable to the plaintiffs, even though the steps taken by the police in hindsight were insufficient to prevent Goddard from committing suicide, there is no reasonable basis for a jury to find that the defendant officers exhibited deliberate indifference to Goddard's safety needs. It is *undisputed* that the defendants took a number of affirmative steps towards protecting Goddard, including the following: (1) they seized

dangerous items that he possessed, including a firearm and a razor blade; (2) they handcuffed him behind his back; (3) they called for the assistance of the Emergency Services Unit ("ESU"); (4) they cornered him against a wall in the hallway, surrounded by four police officers while they waited for ESU; and (5) after Goddard escaped, seven officers immediately chased him as he ran up the stairway to the roof. (*See* Defs.' 56.1 Stmt., ¶¶ 22-23, 27-29, 42; *see also* Pls.' 56.1 Stmt., ¶¶ 22-23, 27-29, 42.) These actions exhibited concern, rather than apathy, for Goddard's safety needs.

The real focus of plaintiffs' deliberate indifference claim is the failure of Officer Sykora to physically hold Goddard, rather than merely surrounding him with officers. Although in hindsight it may have been more prudent for Sykora to maintain a physical hold on Goddard, despite the fact that he appeared to be calming down, a reasonable finder of fact could not conclude that the steps taken were obviously inadequate to the risk that Goddard would be able to extricate himself from custody and take his own life by running up the stairwell and jumping off the roof of the building.[7] *See Taylor v. Wausau Underwriters Ins. Co.,* 423 F.Supp.2d 882, 896-97 (E.D.Wis.2006) (finding lack of deliberate indifference as a matter of law where it was not foreseeable that the actions of the state official-allowing cell to be dark for a few minutes-would allow for decedent's suicide). In light of the significant steps taken to protect Goddard, including the belief that surrounding him against a wall would be sufficient to prevent him from escaping, the mere fact that these measures failed does not provide a basis from which a reasonable jury could conclude that the defendants were deliberately indifferent. *See Rellergert,* 924 F.2d at 797 ("It is deceivingly inviting to take the suicide, *ipso facto,* as conclusive proof of deliberate indifference. However, where suicidal tendencies are discovered and preventive measures taken, the question is only whether the measures taken were so inadequate as to be deliberately indifferent to the risk.").

[7]     Although plaintiffs argue there is evidence that Officer Sykora knew the stairwell door was broken from previous experience in the building, plaintiffs have not pointed to any evidence in the record which would suggest that Sykora or the other police officers were aware that, if Goddard was able to escape to the stairwell doorway while handcuffed, he would be able to obtain ready access to the roof.

**\*8** Although plaintiffs place emphasis on the fact that Officer Sykora's decision to release his physical hold on

2006 WL 3725543

Goddard was contrary to Sergeant Kallas' instruction, the failure to follow that instruction, by itself, does not provide a sufficient basis for a jury to find deliberate indifference. For example, in *Belcher v. Oliver,* 898 F.2d 32, 35-36 (4th Cir.1990), the officers' failure to follow the instruction of the police chief to remove shoelaces and belts from prisoners resulted in a prisoner's suicide. In reversing the district court's denial of summary judgment, the Fourth Circuit noted that "a failure to carry out established procedures, without more, does not constitute 'deliberate disregard for the possibility' that [the prisoner] 'would take his own life.' " *Id.* at 36 (quoting *State Bank of St. Charles v. Camic,* 712 F.2d 1140, 1146 (7th Cir.1983)). One would not generally view a handcuffed prisoner, whose weapons had been removed and was surrounded by police in a hallway, to be at risk for suicide. Given all the other steps taken by the officers to prevent Goddard from harming himself, the failure to follow Sergeant Kallas' instruction to hold Goddard cannot support a finding of "deliberate indifference" by a jury. [8]

[8]    To the extent that plaintiffs' claim of deliberate indifference attaches to the decision of Officer Fink to push Officer Sykora out of the way when decedent lunged at him, the Court notes that in that context of emergency situations in which officers must make quick decisions, a higher level of culpability is required to make a showing of deliberate indifference. *County of Sacramento v. Lewis,* 523 U.S. 833, 851 (1998) ( "[A]ttention to the markedly different circumstances of normal pretrial custody and high-speed law enforcement chases shows why the deliberate indifference that shocks in one case is less egregious in the other.... As the very term 'deliberate indifference' implies, the standard is sensibly employed only when actual deliberation is practical ...") (internal citations and footnote omitted). There is absolutely no evidence that Officer Fink sought to facilitate Goddard's escape by pushing Sykora out of Goddard's way as he charged forward; rather, the only evidence in the record, and the only reasonable inference from the facts, is that it was a sudden reaction to ensure officer safety. Consequently, the Court finds that the decision made by Officer Fink in the heat of the moment out of his concern for officer safety cannot rise to the level of culpability required for a finding of deliberate indifference, as a matter of law.

In sum, had the officers acted differently, the tragedy of Goddard's death might have been prevented. The Court is cognizant of the great caution that district courts must exercise in granting summary judgment, especially where state of mind is the core issue. *See Bryant v. Maffuci,* 923 F.2d 979, 985 (2d Cir.1991); *Quarles v. General Motors Corp.,* 758 F.2d 839, 840 (2d Cir.1985). However, the record does not include evidence from which a reasonable jury could find that the defendant officers were deliberately indifferent such that the plaintiffs' constitutional claim may proceed. Far from being deliberately indifferent, the officers took several steps, though insufficient in hindsight, to ensure Goddard would not hurt himself or others once in custody. A reasonable jury could not find deliberate indifference where the officers removed dangerous items from Goddard, handcuffed him, called for ESU, and surrounded him with at least four officers while waiting for ESU. As the Fourth Circuit noted in *Belcher,* *"[w]e* do not for one moment dismiss the sadness for those involved" and "hold only that their tragic character cannot be ameliorated by efforts to affix constitutional blame where it does not belong." *Belcher,* 898 F.2d at 36. That is precisely the situation here. Accordingly, summary judgment is granted with respect to plaintiffs' remaining claim arising under § 1983. [9]

[9]    Defendants argue that, in deciding the motion for summary judgment, the Court should not consider the testimony of the police liability expert. Specifically, defendants assert that "the expert testimony is speculative, conjectural, illogical, and not grounded in any authoritative source or expertise." (Defendants' Reply Brief, at 18.) The Court finds that, even if the expert's testimony is admissible, the conclusory assertions contained therein are insufficient to create any issues of fact on the question of deliberate indifference.

### B. Qualified Immunity

Defendants also argue that, even if the Court found a constitutional duty to prevent someone from escaping custody and that their conduct violated Goddard's constitutional right to be free from harm to himself even after escaping custody, their conduct should still be entitled to qualified immunity. The Court agrees.

**\*9** It is well settled that a police officer may be shielded from liability for civil damages if "his conduct did not violate

2006 WL 3725543

plaintiff's clearly established rights or if it would have been objectively reasonable for the official to believe that his conduct did not violate plaintiff's rights." *Mandell v. County of Suffolk,* 316 F.3d 368, 385 (2d Cir.2003). "The availability of the defense [of qualified immunity] depends on whether a reasonable officer could have believed his action to be lawful, in light of clearly established law and the information he possessed." *Weyant v. Okst,* 101 F.3d at 858 (internal quotation marks, citation and alterations omitted).

Thus, when a qualified immunity defense is raised, a court must conduct a two-fold inquiry. First, the court must ascertain whether the facts, "[t]aken in the light most favorable to the party asserting the injury, ... show the officer's conduct violated a constitutional right[.]" *Saucier v. Katz,* 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). Second, even if a constitutional right has been violated, the court should still find qualified immunity exists " 'if either (a) the defendant's action did not violate clearly established law, or (b) it was objectively reasonable for the defendant to believe that this action did not violate such law.' " *Anderson v. Recore,* 317 F.3d 194, 197 (2d Cir.2003) (quoting *Johnson v. Newburgh Enlarged Sch. Dist.,* 239 F.3d 246, 250 (2d Cir.2001)).

The Court has already concluded that, taking the proof in the light most favorable to plaintiffs, they have failed to demonstrate a violation of a constitutional right in this case under the deliberate indifference standard. Although the inquiry could end there, the Court will proceed to analyze the defendants' conduct under the second part of the qualified immunity test because it demonstrates that, even if Goddard's constitutional right was violated, the officers are entitled to qualified immunity.

Under the second part of the qualified immunity test, "[a] right is clearly established if (1) the law is defined with reasonable clarity, (2) the Supreme Court or the Second Circuit has recognized the right, and (3) 'a reasonable defendant [would] have understood from the existing law that [his] conduct was unlawful.' " *Anderson,* 317 F.3d at 197 (alterations in original) (quoting *Young v. County of Fulton,* 160 F.3d 899, 903 (2d Cir.1998)); *accord LaBounty v. Coughlin,* 137 F.3d 68, 73 (2d Cir.1998). Moreover, the right must be clearly established "in light of the specific context of the case." *Saucier,* 533 U.S. at 201.

As noted earlier, the Second Circuit has found that pretrial detainees have the right to medical treatment for serious

medical needs under the Fourteenth Amendment, *see, supra,* note 5, which would clearly include treatment to prevent suicide. Thus, a pretrial detainee's right to be free from deliberate indifference by police officers to suicide, *while in custody,* is a clearly established right. Here, however, Goddard committed suicide after he escaped from police custody. [10] As discussed *supra,* the Court is unaware of any Supreme Court or Second Circuit cases which have found that a detainee has the right to medical attention, including prevention of suicide, *after* he has escaped from custody. *See, supra,* note 6; *see also Purvis v. City of Orlando,* 273 F.Supp.2d 1321, 1327 (M.D.Fla.2003) ("[Police officer] cannot be held accountable for [arrestee's] actions subsequent to his escape" where "[officer] had no way of knowing [arrestee] would jump the fences he jumped, or enter the retention pond where he drowned."). Although such a right may exist, the Court does not find any basis to conclude that such a right was "clearly established" at the time the incident took place in the instant case.

10    In its earlier discussion of the duty owed to Goddard by defendants the Court assumed, without deciding, that Goddard remained in custody even after he had escaped. *See, supra,* note 6. The Court made that assumption for the sole purpose of considering plaintiffs' claim that defendants were deliberately indifferent toward Goddard's medical need.

**\*10** Even assuming *arguendo* that such a right was clearly established, the officers here would still be shielded by qualified immunity because it was objectively reasonable for them to believe that their conduct was not deliberately indifferent to Goddard's needs. *See McKenna v. Wright,* 386 F.3d 432, 437 (2d Cir.2004) ("[T]o establish their qualified immunity defense, the defendants must show that it was 'objectively reasonable' for them to believe that they had not acted with the requisite deliberate indifference.") (citation omitted). As noted earlier, the key decision being challenged here is Officer Sykora's decision not to maintain a hold on Goddard while they waited for ESU to arrive. Against the backdrop of the deliberate indifference standard, that decision cannot be viewed as objectively unreasonable in light of the other evidence in the case. *See Rellergert,* 924 F.2d at 797 ("While we conclude that the law is clearly established that jailers must take measures to prevent inmate suicides once they know of the suicide risk, we cannot say that the law is established with any clarity as to what those measures must be.") In particular, the officers took substantial steps

2006 WL 3725543

to ensure Goddard's safety-they seized dangerous items from him, handcuffed him, called ESU, cornered him against a wall in the hallway, and surrounded him with officers. It is also undisputed that Officer Sykora was initially physically holding Goddard when he was standing facing the wall and, after approximately five minutes, turned Goddard outward to begin speaking with him in order to find out what had happened prior to the arrival of the police. (*See* Defs.' 56.1 Stmt., ¶¶ 32-33; *see also* Pls.' 56.1 Stmt., ¶¶ 32-33.) Although plaintiffs point to evidence that Goddard was sweating and fidgety, they also admit he was otherwise calm. (*See* Pls.' 56.1 Stmt., ¶ 34.)

Under such circumstances, the decision to release the physical grasp on Goddard in the hallway (especially when he had calmed down), while he was still handcuffed and surrounded by officers, should not deprive the officers of qualified immunity. In fact, one might conclude that, if the officers had continued to physically hold Goddard even after he calmed down, that could have agitated and unnecessarily provoked him, and exacerbated the situation, rather than de-escalating the situation by releasing the hold. This type of split-second judgment call in an extremely difficult situation is exactly the type of discretionary decision, within the bounds of objectively reasonable conduct under the deliberate indifference standard, that should be protected under the doctrine of qualified immunity. In particular, the Court notes that, unlike decisions by prison officials usually made under the controlled circumstances of a detention facility, *see supra*, the decisions here had to be made quickly in the context of a temporary detention in the hallway of a residential building. *See Parrish ex rel. Lee v. Cleveland,* 372 F.3d 294, 309 (4th Cir.2004) (finding that the defendant officers were not deliberately indifferent to the medical needs of an arrestee who died while in transport to a detention center where "the record ... contains no evidence suggesting that these officers recognized that their actions were inappropriate *under the circumstances"* ) (emphasis added). These officers' inability to spend a substantial period of time deliberating about the best course of action in this uncontrolled hallway environment must be taken into consideration and, under the circumstances of the instant case, it is clear that the officers did not possess a sufficiently culpable state of mind to deprive them of qualified immunity. Accordingly, even if plaintiffs could establish that Goddard's constitutional rights were violated, the defendants would be entitled to dismissal of the claims under the doctrine of qualified immunity.

## C. Supplemental Jurisdiction

**\*11** Having granted summary judgment dismissing plaintiffs' federal claim under § 1983, the only remaining claim is plaintiffs' negligence claim arising under state law. Under 28 U.S.C. § 1367(c)(3), the Court must consider whether it should continue to exercise jurisdiction over the remaining state claim. In determining whether to continue to retain jurisdiction, district courts consider factors such as judicial economy, convenience, fairness and comity. *See Nowak v. Ironworkers Local 6 Pension Fund,* 81 F.3d 1182, 1191 (2d Cir.1996). Although a court possesses the discretion to retain jurisdiction, "in the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine-judicial economy, convenience, fairness, and comity-will point toward declining to exercise jurisdiction over the remaining state-law claims." *Valencia ex rel. Franco v. Lee,* 316 F.3d 299, 305 (2d Cir.2003) (citing *Carnegie-Mellon Univ. v. Cohill,* 484 U.S. 343, 350 n. 7 (1988)); *Baylis v. Marriott Corp.,* 843 F.2d 658, 665 (2d Cir.1988) ("When all bases for federal jurisdiction have been eliminated from a case so that only pendent state claims remain, the federal court should ordinarily dismiss the state claims.") (quoting *Mine Workers v. Gibbs,* 383 U.S. 715, 725 (1966)).

In the instant case, the Court exercises its discretion to decline jurisdiction over the remaining state claim. Although discovery has been completed and the instant case has proceeded to the summary judgment stage, it is not clear to the Court why the discovery would need to be repeated if the negligence claim is litigated in state court. *See Adee Motor Cars, LLC v. Amato,* 388 F.Supp.2d 250, 255 (S.D.N.Y.2005) (exercising discretion to decline jurisdiction over state claims after summary judgment was granted as to all federal claims, noting that there was no indication that discovery would need to be repeated). Moreover, addressing the plaintiffs' negligence claim would require this court to perform at least some non-obvious interpretations of New York State law, including, *inter alia,* whether plaintiffs' recovery is barred by what defendants allege was the commission of a class A misdemeanor, escape in the third degree, under *Johnson v. Lee,* 253 A.D.2d 274 (N.Y.App.Div.1999), or whether decedent's emotional state removes this action from the ambit of *Johnson.* Resolution of this and similar issues is best left to state courts.[11] *Valencia,* 316 F.3d at 305 (" '[N]eedless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties, by

2006 WL 3725543

procuring for them a surer-footed reading of applicable law.' ") (quoting *Gibbs,* 383 U.S. at 726); *see also Rounseville v. Zahl,* 13 F.3d 625, 631-32 (2d Cir.1994) (finding that although the state law at issue was well-settled, the application of the law to the facts of the case at hand was potentially novel and was therefore more appropriately resolved in state court); *Adee Motor Cars,* 388 F.Supp.2d at 256 (refraining from exercising jurisdiction over remaining state claim and noting that resolution of the claim would "involve at least some nonobvious interpretations of New York state law ... the resolution of these issues would be best left to state courts"). Finally, "since New York's CPLR § 205 allows a plaintiff to recommence a dismissed suit within six months without regard to the statute of limitations, plaintiff[s] will not be unduly prejudiced by the dismissal of [their] state law claims." *Trinidad v. New York City Dept. of Correction,* 423 F.Supp.2d 151, 169 (S.D.N.Y.2006) (citing *Mayer v. Oil Field Systems Corp.,* 620 F.Supp. 76, 77-78 (S.D.N.Y.1985)). Accordingly, plaintiffs' state law claim is dismissed without prejudice.

11    It is important to note that the Court's analysis of the officers' conduct under the "objectively reasonable" standard for purposes of addressing qualified immunity is not the same analysis that would be conducted under the state negligence standard. As noted earlier, the question of objective reasonableness for qualified immunity purposes is conducted against the backdrop of the "deliberate indifference" standard under the circumstances of this case. In other words, the question is whether an objectively reasonable officer could believe that he was not being deliberately indifferent to Goddard's needs. *See McKenna,* 386 F.3d at 437. That analysis is obviously different than simply examining whether an officer's conduct was negligent under state law. *See Hernandez v. Keane,* 341 F.3d 137, 144 (2d Cir.2003) (" 'Deliberate indifference' describes a mental state more blameworthy than negligence.").

## IV. CONCLUSION

**\*12** For the foregoing reasons, summary judgment is GRANTED as to plaintiffs' federal claims arising under 42 U.S.C. § 1983. Further, pursuant to 28 U.S.C. § 1367(c)(3), the Court declines to retain jurisdiction over the remaining claim arising under state law, and dismisses such claim, without prejudice. The Clerk of the Court shall close this case.

SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2006 WL 3725543

---

    © 2021 Thomson Reuters. No claim to original U.S. Government Works.

Case 9:19-cv-01161-DNH-TWD    Document 55    Filed 01/19/21    Page 71 of 103

Case v. Anderson, Not Reported in Fed. Supp. (2017)

2017 WL 3701863

KeyCite Yellow Flag - Negative Treatment
Distinguished by Lara-Grimaldi v. County of Putnam, S.D.N.Y., March 29, 2018

2017 WL 3701863
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Elaine CASE, as Administratrix of the
Estate of Kaseem J. Pankey, Plaintiff,

v.

Adrian H. ANDERSON, individually and in
his official capacity as Sheriff of the County of
Dutchess; John Doe (1) and Richard Roe (1),
Deputy Sheriffs of the County of Dutchess;
the County of Dutchess; Ronald J. Spero, individually
and in his official capacity as Chief of the Town
of Poughkeepsie Police Department, John Doe
(2) and Richard Roe (2), Police Officers in the
Town of Poughkeepsie Police Department; Town
of Poughkeepsie; John Doe (3) and Richard Roe
(3), Police Officers and/or Dispatchers in the City
of Poughkeepsie Police Department; Westchester
Medical Center Health Care Corporation,
doing business as, Westchester Medical Center,
through its subsidiary, the Midhudson Regional
Hospital of Westchester Medical Center; and
Correctional Medical Care, Inc., Defendants.

No. 16 Civ. 983 (NSR)
|
Signed 08/25/2017

**Attorneys and Law Firms**

Alex J. Smith, Robert Nathan Isseks, Middletown, NY, for Plaintiff.

David Lewis Posner, McCabe & Mack LLP, Lll Thomas Francis Kelly, Kelly & Meenagh, Jonathan Edward Symer, Law Offices of James A. Steinberg, Ellen Anne Fischer, Steinberg & Symer, LLP, Poughkeepsie, NY, Steven Charles Stern, Sokoloff Stern LLP, Carle Place, NY, Alexander Joseph Eleftherakis, Kevin Levine, Sokoloff Stern LLP, Carl Place, NY, William Harold Bave, Wilson, Bave, Conboy, Cozza & Cozza, P.C., White Plains, NY, for Defendants.

OPINION & ORDER

NELSON S. ROMÁN, United States District Judge

**\*1** This case concerns the events surrounding the pre-trial detainment and eventual suicide of Mr. Kaseem J. Pankey, who was admitted to and escaped from a mental health facility at The MidHudson Regional Hospital of Westchester Medical Center (the "Hospital"), later arrested by police officers from the City of Poughkeepsie (the "City") pursuant to an outstanding criminal warrant previously issued by the Town of Poughkeepsie (the "Town"), thereafter transferred to the custody of the Town and arraigned on the warrant, and held at the County of Dutchess (the "County") jail for two days until his death on November 26, 2014. Plaintiff Elaine Case, grandmother to the deceased and administratrix of his estate, alleges that during these events Mr. Pankey was subjected to negligence and deprivations of his Fourteenth Amendment Due Process rights in violation of 42 U.S.C. § 1983.

On behalf of Mr. Pankey's estate, Plaintiff brings this action against the County, the County Sheriff Adrian H. Anderson ("Sheriff Anderson"), Deputy Sheriffs for the County John Doe (1) and Richard Roe (1) (the "County Deputies"); Correctional Medical Care, Inc. ("CMC"); the Town, the Town Chief of Police Ronald J. Spero ("Chief Spero"), Town Officers John Doe (2) and Richard Roe (2) (the "Town Officers"); the City, Police Officers and/or Dispatchers in the City Police Department John Doe (3) and Richard Roe (3) (the "City Officers"); and Westchester Medical Center Health Care Corporation, doing business as Westchester Medical Center through its subsidiary the Hospital, for the alleged violations of state and federal law. All Defendants have moved to dismiss the complaint pursuant to Federal Rules of Civil Procedure 12(b)(6) or 12(c). Plaintiff has cross-moved to amend the operative complaint in order to specifically allege claims against the City Officers. [1]

1    As part of Plaintiff's opposition to the City's motion to dismiss, she indicated she was withdrawing her claims against Chief Knapp of the City of Poughkeepsie Police Department and the City, but she has since clarified that she continues to assert negligence claims against the City despite withdrawing her federal claims. (See Letter from Counsel for Plaintiff dated Oct. 19, 2016 ("Plaintiff [ ] requests that the arguments contained in her

Case 9:19-cv-01161-DNH-TWD    Document 55    Filed 01/19/21    Page 72 of 103

Case v. Anderson, Not Reported in Fed. Supp. (2017)

2017 WL 3701863

Memorandum in support of her negligence claims against the City Police Officers also be read in support of her negligence claim against the City under the doctrine of *respondeat superior.*"), ECF No. 94.)

For the following reasons, Plaintiff's motion to amend is GRANTED and Defendants' motions to dismiss are GRANTED in part and DENIED in part.

**BACKGROUND**

**I. Factual Allegations** [2]

[2]     The following facts are taken from Plaintiffs' proposed third amended complaint (ECF No. 86, Ex. A) ("PAC"). *See Polanco v. NCO Portfolio Mgmt., Inc.,* 23 F. Supp. 3d 363, 366 n.1 (S.D.N.Y. 2014)* (Freeman, J.) (accepting facts alleged in proposed amended complaint as true for the purposes of deciding a motion to amend). Many of the allegations contained therein are made "upon information and belief," which is still permissible post-*Iqbal* to the extent they are not conclusory or speculative. *See New York v. United Parcel Serv., Inc.,* 131 F. Supp. 3d 132, 137 (S.D.N.Y. 2015) (quoting *Arista Records, LLC v. Doe 3,* 604 F.3d 110, 120 (2d Cir. 2010)) ("A plaintiff may plead facts alleged upon information and belief 'where the facts are peculiarly within the possession and control of the defendant.' ").

**\*2**     Over the span of less than a week, Kaseem J. Pankey was, as Plaintiff alleges, negligently allowed to leave the Hospital and subjected to additional negligence and deliberate indifference to his mental health problems as he was shuffled between various law enforcement agencies.

**a. Admitted to the Hospital**

On November 20, 2014, Mr. Pankey was admitted to Defendant Hospital's facilities as a psychiatric patient. (PAC ¶ 23.) At that time, he was accompanied by City of Poughkeepsie police officers (*id.* ¶ 53) and his grandmother, Plaintiff Elaine Case—who informed the Hospital of her relationship to Mr. Pankey and that he lived with her, and provided the Hospital with her contact information (*id.* ¶ 24). This was not the first time Mr. Pankey had been admitted to the Hospital as a psychiatric patient or that they were informed

of his familial and living relationship with Mrs. Case. (*Id.* ¶ 25.)

After he was admitted, the Hospital's mental health treatment unit diagnosed him with, among other disorders, suicidal behavior and psychosis, and provided him with medication. (*Id.* ¶¶ 26-27.) At this time, he expressed to Hospital staff members that he sought protection from "devils and their demons." (*Id.* ¶ 28.) On the same day as his admission to the Hospital, the staff determined he required inpatient mental health stabilization. (*Id.* ¶ 30.)

Over the course of the next two days, Mr. Pankey was agitated and disruptive during meals, refused the medication provided for him, and shouted at staff members. (*Id.* ¶¶ 31-32.) He stated his belief that he was being held hostage and made frequent requests to leave the facility. (*Id.* ¶ 32.) The staff determined he was "disorganized, delusional, and in need of reorienting." (*Id.*) During this time, Mr. Pankey caused a number of "Code Green" events to occur—*i.e.,* he tried to leave the facility despite the staff determining he required inpatient services. (*Id.* ¶ 29.)

On November 22, 2014, after becoming increasingly unstable and agitated, stating to staff members that he was "God" and "God does not have to take meds," he pushed past a staff member near a safety exit door and absconded from the Hospital. (*Id.* ¶¶ 34-35.) The Hospital issued a Code Green and staff members tried to locate Mr. Pankey, but could not. (*Id.* ¶ 36.)

Plaintiff alleges the Hospital was negligent in allowing Mr. Pankey to leave the facility, for not properly restraining him, for failing to have adequate security measures in place to prevent him from leaving, for failing to supervise him, and for failing to properly medicate him. (*Id.* ¶ 159.)

**b. After the Escape**

After Mr. Pankey escaped, a psychiatrist employed at the Hospital issued an order pursuant to § 9.55 of the New York State Mental Hygiene Law requiring Mr. Pankey be apprehended by law enforcement authorities. (*Id.* ¶ 38.) [3] Hospital staff called various police agencies within the County of Dutchess, including the City of Poughkeepsie police and the Town of Poughkeepsie police. (*Id.* ¶¶ 39-40, 54, 57.) Plaintiff alleges the Hospital was negligent, however, because it failed to send copies of the Mental Hygiene order to all local law enforcement agencies. (*Id.* ¶ 159.)

Case v. Anderson, Not Reported in Fed. Supp. (2017)

2017 WL 3701863

3    The order is referenced throughout Plaintiff's complaint, and the City has provided a copy as part of its motion to dismiss. (*See* Decl. Thomas F. Kelly III in Supp. City Mot. ("Kelly Decl."), Ex. F (Mental Hygiene order issued the evening of Nov. 22, 2014), ECF No. 90.) The Court takes judicial notice of the text of the order.

**\*3** When the Defendant Town police received the call from the Hospital, they informed the staff member that he should contact the City police because Mr. Pankey's home address was within the City's jurisdiction. (*Id.* ¶¶ 40-41, 55.) The Town is alleged to have made no efforts to apprehend Mr. Pankey. (*Id.* ¶ 46.) The Hospital also contacted the Defendant City Officers, who were familiar with Mr. Pankey and knew of his psychiatric problems, and informed them that he needed to be apprehended pursuant to a Mental Hygiene order issued that day. (*Id.* ¶¶ 56-57.) The Hospital explained that he was a "threat to his [own] safety" and "to the safety and well-being of others[.]" (*Id.* ¶ 57.) Nevertheless, the City Officers made no efforts to apprehend Mr. Pankey, to return him to the Hospital, or to contact Mrs. Case. (*Id.* ¶ 58.)

### c. Apprehended by the City and Turned Over to the Town

On November 25, 2014, the City Officers apprehended Mr. Pankey (*id.* ¶ 59), but despite their knowledge of his psychiatric history and of the Mental Hygiene order, they did not attempt to enforce the order or to contact Mrs. Case (*id.* ¶¶ 60-61). Instead, the City advised the Town that Mr. Pankey had been apprehended and held for arraignment. (*Id.* ¶¶ 42, 59.) The City turned Mr. Pankey over to the Town because of an outstanding criminal warrant, [4] and allegedly made no efforts to inform the Town of the Mental Hygiene order. (*Id.* ¶¶ 43, 47, 62.) Plaintiff alleges the Defendant City Officers were negligent or deliberately indifferent to Mr. Pankey's well-being as a result of these failings. (*Id.* ¶ 179.)

4    The warrant is referenced in Plaintiff's complaint (PAC ¶¶ 43, 48), and the Town has provided a copy as part of its motion to dismiss. (*See* Decl. Steven C. Stern in Supp. Town Mot. ("Stern Decl."), Ex. A (arrest warrant issued by Justice Paul O. Sullivan of the Town of Poughkeepsie Justice Court on November 19, 2014 for the crime of grand larceny), ECF No. 110.) The Court takes judicial notice of the text of the warrant, though, as with the

text of the Mental Hygiene order (*see supra* note 3), it does not impact the viability of Plaintiff's claims. Additionally, the Court notes that the City Officers were alerted to Mr. Pankey's activities on November 25 when he asked a store owner for money and "grabbed a free cookie off of the counter" as he exited the store. (*See* Kelly Decl., Ex. E.)

The Defendant Town similarly, despite its own independent knowledge, did not inform the City of the Mental Hygiene order that required Mr. Pankey be returned to the Hospital. (*Id.* ¶ 44.) Nor did the Town contact Mrs. Case. (*Id.* ¶ 46.) Plaintiff alleges these failings amounted to negligence on the part of the Town (*id.* ¶ 164) and that the Town Officers were either negligent or deliberately indifferent to Mr. Pankey's due process rights when they failed to return him to the Hospital (*id.* ¶¶ 169, 172-74).

### d. Arraigned by the Town and Turned Over to the County

The Defendant Town Officers brought Mr. Pankey to the Town Justice Court to be arraigned on the outstanding criminal warrant. (*Id.* ¶ 48.) During his arraignment and subsequent transfer to the Defendant County, the officers did not inform those involved that a Mental Hygiene order had been issued with regard to Mr. Pankey. (*Id.* ¶¶ 49-50, 63.) Plaintiff alleges the Town Officers were either negligent or deliberately indifferent to Mr. Pankey's due process rights when they failed to impart this material information to the court and the Sheriff. (*Id.* ¶¶ 170-74.)

### e. Detained by the Sheriff at the County Jail

At the time that Mr. Pankey was in the custody of the County, Defendant CMC was under contract with the Sheriff's department to provide medical and mental health services to all inmates held at the jail. (*Id.* ¶ 101.) Thus, once Mr. Pankey was in the Defendant Sheriff's custody, he was under the care of either the Sheriff's office or CMC. [5] Mr. Pankey had been in the custody of the County Sheriff before, and on at least three prior occasions the Sheriff had been made aware of Mr. Pankey's mental illness. (*Id.* ¶¶ 64-66.) But once he was taken into custody by the Sheriff and placed in the County Jail on this occasion, Deputy Sheriff Shane Roth—who was neither a psychiatrist nor a mental health professional—conducted a suicide prevention screening with Mr. Pankey. (*Id.* ¶¶ 63, 67-69, 103-104.) Deputy Roth noted Mr. Pankey was "bipolar" and "acting strange." (*Id.* ¶¶ 69,

Case 9:19-cv-01161-DNH-TWD    Document 55    Filed 01/19/21    Page 74 of 103

Case v. Anderson, Not Reported in Fed. Supp. (2017)

2017 WL 3701863

105.) The Sheriff's office noted that he needed a psychiatric referral. (*Id.* ¶¶ 74, 109-10.)

[5]    Therefore, the description of the subsequent events, while only referencing the Sheriff's office, also includes alternative pleading regarding CMC. (*See generally* ¶¶ 101-36.)

**\*4** The next day, November 26, 2014, members of the Sheriff's office noted his past psychiatric history included a bipolar disorder diagnosis and that he had been hospitalized for psychiatric disorders. (*Id.* ¶¶ 76, 77 (the office was aware he was a "known entity in the mental health system with a diagnosis of bipolar"), ¶ 78 (aware of his history of "psychiatric illness and substance use"); *see also id.* ¶¶ 112-13, 115 (same for CMC).) The Sheriff's office found Mr. Pankey to be exhibiting poor insight, judgment, and impulse control, and determined he had bipolar disorder as well as an anti-social personality disorder. (*Id.* ¶¶ 78, 81-82, 111, 114, 117-18.) Furthermore, during an interview with a member of the Sheriff's office, he stated that he had "escaped" from the Hospital. (*Id.* ¶¶ 79, 116.) At that time, the department recommended that Mr. Pankey be transferred to mental health housing and evaluated by a psychiatrist. (*Id.* ¶¶ 83-84, 119-20.) Unfortunately, neither of those things occurred. (*Id.* ¶¶ 85-87, 121-23.)

Instead, after completing their initial assessment and interview, members of the Sheriff's office escorted him back to his cell in the County jail. (*Id.* ¶¶ 88-89.) During his return to his cell, Mr. Pankey complained about being touched by a Deputy Sheriff and behaved aggressively. (*Id.* ¶ 91.) Once he was in his cell, lying face down on his bunk, his restraints were removed and a nurse was called to medically evaluate him. (*Id.* ¶¶ 92-93.) But, because Mr. Pankey stood up during the evaluation, the nurse, Kimberly Stickle, was directed to leave and could not complete the examination. (*Id.* ¶ 94.) While in his cell and in the presence of members of the Sheriff's office, he stated that "he wanted to go home." (*Id.* ¶ 90.)

After the members of the Sheriff's office and Nurse Stickle departed, Mr. Pankey was left alone and unattended in his cell, with access to materials with which he could harm himself. (*Id.* ¶¶ 95, 97 (the precise materials are not described in the complaint).) Mr. Pankey proceeded to commit suicide. (*Id.* ¶¶ 100, 136.)

As a result, Plaintiff alleges the County Defendants and CMC either acted negligently or pursuant to a policy of deliberate indifference to Mr. Pankey's well-being and his Due Process rights by, *inter alia,* failing to implement sufficient procedural safeguards to protect inmates suffering from mental illness. (*Id.* ¶¶ 184, 195, 204.) Plaintiff further alleges the County Deputies were deliberately indifferent as evidenced by their failing to stand guard by his cell, failing to obtain his medication, and failing to remove dangerous items from his cell. (*Id.* ¶ 199.)

## II. Procedural History

Between October 20, 2015, and December 30, 2015, within 90 days of Mrs. Case being appointed as Administratrix of Mr. Pankey's estate (*id.* ¶ 138), Plaintiff served Notices of Claim upon the Defendant Sheriff (*id.* ¶ 137), the Defendant Hospital (*id.* ¶ 142), the Defendant City and its Police Department (*id.* ¶ 147), and upon the Defendant Town and its Police Department (*id.* ¶ 152). On February 3, 2016, a Section 50-h hearing was held pursuant to New York State General Municipal Law, where the attendees included the majority of the Defendants in this action. (*See id.* ¶ 140 (Sheriff), ¶ 145 (Hospital), ¶ 150 (City), ¶ 155 (Town).) Plaintiff commenced this lawsuit on February 9, 2016. (*See* Compl., ECF No. 1.)

Each set of Defendants has moved to dismiss the operative complaint pursuant to Rule 12(b)(6) or 12(c). (*See* ECF Nos. 78 (Hospital), 88 (City), 97 (County), 109 (Town), & 114 (CMC).)[6] Plaintiff has cross-moved to amend the complaint to focus her federal claims on the City Officers as opposed to the City of Poughkeepsie, though she seeks to continue her negligence claims against the City. (*See* ECF No. 85 & No. 86, Ex. A (proposed Third Am. Compl.), No. 94 (letter clarifying withdrawal of claims), No. 49 at ¶¶ 56-64, 179-86 (currently operative complaint asserting claims against City).)

[6]    Briefing of all of the motions was complete as of January 25, 2017. (*See* Hospital Mem. in Supp. Mot. ("Hosp. Mem."), ECF No. 80; Decl. William H. Bave, Jr. in Supp. Mot. ("Bave Decl."), ECF No. 79; Pl. Mem. in Opp'n Hosp. Mot. ("Pl. Opp'n Hosp."), ECF No. 83; Hosp. Mem. in Reply to Pl. Opp'n ("Hosp. Reply"), ECF No. 82; City Mem. in Supp. Mot. ("City Mem."), ECF No. 89; Kelly Decl., ECF No. 90; Pl. Mem. in Opp'n City Mot. ("Pl. Opp'n City"), ECF No. 84; City Mem. in Reply to Pl. Opp'n ("City Reply"), ECF No. 92; Town Mem. in Supp. Mot. ("Town Mem."), ECF No. 111; Stern Decl., ECF No. 110; Pl. Mem. in Opp'n Town Mot. ("Pl. Opp'n Town"), ECF No.

Case 9:19-cv-01161-DNH-TWD Document 55 Filed 01/19/21 Page 75 of 103

Case v. Anderson, Not Reported in Fed. Supp. (2017)

2017 WL 3701863

112; Town Mem. in Reply to Pl. Opp'n ("Town Reply"), ECF No. 113; County Mem. in Supp. Mot. ("County Mem."), ECF No. 99; Aff. David L. Posner, Esq. in Supp. County Mot. ("Posner Aff."), ECF No. 98; Pl. Mem. in Opp'n County Mot. ("Pl. Opp'n County"), ECF No. 102; County Mem. in Reply to Pl. Opp'n ("County Reply"), ECF No. 103; CMC Mem. in Supp. Mot. ("CMC Mem."), ECF No. 115; Decl. Ellen A. Fischer in Supp. CMC Mot. ("Fischer Decl."), ECF No. 116; Pl. Mem. in Opp'n CMC Mot. ("Pl. Opp'n CMC"), ECF No. 118; CMC Mem. in Reply to Pl. Opp'n ("CMC Reply"), ECF No. 119; Pl. Mem. in Supp. Mot. to Amend. ("Pl. Amend. Mem."), ECF No. 87; Decl. Robert N. Isseks in Supp. Mot. to Amend ("Isseks Decl."), ECF No. 86.)

## LEGAL STANDARDS ON A MOTION TO DISMISS AND CROSS-MOTION TO AMEND THE PLEADINGS

**\*5** Under Rule 12(b)(6) or 12(c) motions to dismiss, the inquiry is whether the complaint "contain[s] sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007)); *accord Hayden v. Paterson,* 594 F.3d 150, 160 (2d Cir. 2010) (applying same standard to Rule 12(c) motions). "While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Id.* at 679. To survive a motion to dismiss, a complaint must supply "factual allegations sufficient 'to raise a right to relief above the speculative level.' " *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.,* 493 F.3d 87, 98 (2d Cir. 2007) (quoting *Twombly,* 550 U.S. at 555). The Court must take all material factual allegations as true and draw reasonable inferences in the non-moving party's favor, but the Court is "'not bound to accept as true a legal conclusion couched as a factual allegation,'" or to credit "mere conclusory statements" or "[t]hreadbare recitals of the elements of a cause of action." *Iqbal,* 556 U.S. at 678 (quoting *Twombly,* 550 U.S. at 555).

Federal Rule of Civil Procedure 15 governs amendments to pleadings. After the first permissive amendment, further amendments are conditioned on either "the opposing party's written consent or the court's leave"—the latter of which should be "freely give[n] ... when justice so requires." Fed. R. Civ. P. 15(a)(2). Although the standard is lenient, "[r]easons for a proper denial of leave to amend include undue delay,

bad faith, futility of amendment, and perhaps most important, the resulting prejudice to the opposing party." *State Teachers Ret. Bd. v. Fluor Corp.,* 654 F.2d 843, 856 (2d Cir. 1981) (citing *Foman v. Davis,* 371 U.S. 178, 182 (1962) ("In the absence of any apparent or declared reason—such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of ... the amendment, [or] futility of amendment—the leave sought should, as the rules require, be 'freely given.' ")).

Federal Rule of Civil Procedure 21 provides that, "[o]n motion or on its own, the court may at any time, on just terms, add or drop a party." Fed. R. Civ. P. 21. Federal Rule of Civil Procedure 20(a)(2) permits the joinder of persons as defendants in an action if "(A) any right to relief is asserted against them jointly, severally, or in the alternative with respect to or arising out of the same transaction or occurrence or series of transactions or occurrences; and (B) any question of law or fact common to all defendants will arise in the action." Fed. R. Civ. P. 20(a)(2). "According to the Supreme Court, 'joinder of claims, parties and remedies is strongly encouraged,' and 'the impulse is toward the broadest possible scope of action consistent with fairness to the parties.' " *Ferrara v. Smithtown Trucking Co.,* 29 F. Supp. 3d 274, 279-80 (E.D.N.Y. 2014) (quoting *United Mine Workers v. Gibbs,* 383 U.S. 715, 724 (1966)). "Thus, '[l]ike Rule 15, the requirements of Rule 20(a) should be interpreted liberally in order to enable the court to promote judicial economy by permitting all reasonably related claims for relief by or against different parties to be tried in a single proceeding.' " *Id.* (quoting *Liegey v. Ellen Figg, Inc.,* No. 02 Civ. 1492 (JSM) (JCF), 2003 WL 21361724, at \*3 (S.D.N.Y. June 11, 2003)).

If during the proceedings the Court enters a Rule 16 scheduling order that further restricts amendments, then "the lenient standard under Rule 15(a) ... must be balanced against the [stricter] requirement under Rule 16(b)[.]" *Holmes v. Grubman,* 568 F.3d 329, 334-35 (2d Cir. 2009) (internal citations omitted). Rule 16(b)(4) provides that "[a] schedule may be modified only for good cause and with the judge's consent," where " 'good cause' depends on the diligence of the moving party." Fed. R. Civ. P. 16(b)(4); *Parker v. Columbia Pictures Indus.,* 204 F.3d 326, 340 (2d Cir. 2000).

**\*6** Irrespective of whether undue delay, prejudice, bad faith, or, if applicable, lack of good cause can be established, leave to amend may independently be denied "on grounds of futility if the proposed amendment fails to state a legally cognizable

2017 WL 3701863

claim or fails to raise triable issues of fact." *AEP Energy Servs. Gas Holding Co. v. Bank of Am., N.A.,* 626 F.3d 699, 726 (2d Cir. 2010) (quoting *Milanese v. Rust-Oleum Corp.,* 244 F.3d 104, 110-11 (2d Cir. 2001)); *accord Ruotolo v. City of New York,* 514 F.3d 184, 191 (2d Cir. 2008) (quoting *Foman,* 371 U.S. at 182). In other words, "[a]n amendment to a pleading is futile if the proposed claim could not withstand a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6)," or if the proposed amendments would be insufficient to support Article III standing—a threshold inquiry for courts. *Lucente v. Int'l Bus. Machines Corp.,* 310 F.3d 243, 258 (2d Cir. 2002); *Treiber v. Aspen Dental Mgmt., Inc.,* 94 F. Supp. 3d 352, 367 (N.D.N.Y. 2015), *aff'd,* 635 Fed.Appx. 1 (2d Cir. 2016) (summ. order); *Morrison v. Nat'l Australia Bank Ltd.,* 547 F.3d 167, 170 (2d Cir. 2008), *aff'd,* 561 U.S. 247 (2010). Thus, a court should deny a motion to amend if it does not contain enough factual allegations, accepted as true, to state a claim for relief that is "plausible on its face" or to demonstrate standing to bring the claim. *Riverhead Park Corp. v. Cardinale,* 881 F. Supp. 2d 376, 379 (E.D.N.Y. 2012) (quoting *Twombly,* 550 U.S. at 570) (denying motion to add claims as futile); *Ashmore v. Prus,* 510 Fed.Appx. 47, 49 (2d Cir. 2013) (summ. order) ("granting leave to amend would be futile as the barriers to relief for [the alleged] claims cannot be surmounted by reframing the complaint" where *inter alia* plaintiff lacked standing to seek injunctive relief).

The central inquiry for the Court when considering a motion to dismiss in tandem with a motion to amend is, therefore, whether the proposed amended complaint can survive the motion to dismiss. In determining whether a complaint states a plausible claim for relief, a district court must consider the context and "draw on its judicial experience and common sense." *Iqbal,* 556 U.S. at 679. It is important to note that "pleading is not an interactive game in which plaintiffs file a complaint, and then bat it back and forth with the Court over a rhetorical net until a viable complaint emerges." *In re Merrill Lynch Ltd. P'ships Litig,* 7 F. Supp. 2d 256, 276 (S.D.N.Y. 1997). The court's "duty to liberally construe a plaintiff's complaint [is not] the equivalent of a duty to re-write it." *Geldzahler v. New York Medical College,* 663 F. Supp. 2d 379, 387 (S.D.N.Y. 2009) (internal citations and quotation marks omitted). A claim is facially plausible when the factual content pleaded allows a court "to draw a reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal,* 556 U.S. at 678.

## DISCUSSION

Plaintiff's proposed Third Amended Complaint alleges the Town Officers were negligent or deliberately indifferent to Mr. Pankey's Due Process rights (Count III) and the Town was thus also negligent (Count II), the City Officers were negligent or deliberately indifferent (Count IV) and the City was thus similarly negligent, the County and Sheriff Anderson were negligent or deliberately indifferent to Mr. Pankey's Due Process rights (Count V), the County Deputies were deliberately indifferent to Mr. Pankey's Due Process rights (Count VI), CMC was negligent or had a policy of deliberate indifference towards the Due Process rights of pre-trial detainees, such as Mr. Pankey (Count VII), and the Hospital was negligent (Count I). During the briefing of Defendants' motions to dismiss, and after proposing her latest complaint, Plaintiff has withdrawn all claims against Chief Ronald J. Knapp of the City Police Department (Pl. Opp'n City at 1) and Chief Spero of the Town Police Department (Pl. Opp'n Town at 1). Furthermore, Plaintiff has withdrawn her § 1983 claims against the City, the Town, and CMC. (*See* Pl. Opp'n City at 1; Pl. Opp'n Town at 1; Pl. Opp'n CMC at 1.) Plaintiff has indicated, however, that she wishes to continue her negligence claims against the City based on her allegations—made as part of the proposed amended complaint—against the City Officers. (*See supra* note 1.)

*7 The Court will address the remaining claims alleged against the various sets of Defendants starting with the federal causes of action. If Plaintiff's federal claims are plausibly alleged, exercising supplemental jurisdiction over her state law claims as they relate to the Defendants will be appropriate at this juncture. [7]

[7] The Court's supplemental jurisdiction, 28 U.S.C. § 1367(a), is available for these common law claims. *See Kirschner v. Klemons,* 225 F.3d 227, 239 (2d Cir. 2000) ("pendent party jurisdiction [is] possible where the claim in question arises out of the same set of facts that give rise to an anchoring federal question claim against another party"); *see, e.g., Jones v. Nickens,* 961 F. Supp. 2d 475, 495 (E.D.N.Y. 2013) (court exercised supplemental jurisdiction over negligence claims asserted against hospitals, despite dismissing § 1983 claims against those entities, where federal

2017 WL 3701863

claims remained against county and claims derived from a common nucleus of fact).

## I. Federal Claims (Section 1983)

The gravamen of Plaintiff's federal claims concerns the conditions of Mr. Pankey's confinement, or more specifically the law enforcement agencies' responses to his mental health needs, after he escaped from the Hospital and was later detained on the unrelated criminal warrant. "A pretrial detainee's claims of unconstitutional conditions of confinement are governed by the Due Process Clause of the Fourteenth Amendment, rather than the Cruel and Unusual Punishments Clause of the Eight Amendment ... because, pretrial detainees have not been convicted of a crime and thus may not be punished in any manner—neither cruelly and unusually nor otherwise." *Darnell v. Pineiro,* 849 F.3d 17, 29 (2d Cir. 2017) (internal quotations, modifications, and citations omitted); *see also Bell v. Wolfish,* 441 U.S. 520, 579 (1979) (Stevens, J., dissenting) (pretrial detainees "are innocent[s] ... who have been convicted of no crimes[;] [t]heir claim is not that they have been subjected to cruel and unusual punishment in violation of the Eighth Amendment, but that to subject them to any form of punishment at all is an unconstitutional deprivation of their liberty"). It thus logically follows that "[a] detainee's [Due Process] rights are '*at least* as great as the Eighth Amendment protections available to a convicted prisoner.' " *Darnell,* 849 F.3d at 29 (quoting *City of Revere v. Massachusetts Gen. Hosp.,* 463 U.S. 239, 244 (1983)) (emphasis added).

The duty of a state actor to protect those in state custody from harm stems from the special relationship created between the State and such an individual once the State choses to exercise plenary control over a detainee or inmate. "[I]t is the State's affirmative act of restraining [an] individual's freedom to act on his own behalf—through incarceration, institutionalization, or other similar restraint of personal liberty—which is the 'deprivation of liberty' triggering the protections of the Due Process Clause[.]" *DeShaney v. Winnebago Cty. Dep't of Soc. Servs.,* 489 U.S. 189, 200 (1989). "[W]hen the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being." *Id.* at 199-200.

"For example, ... '[neither] prisoners [nor detainees] may [ ] be deprived of their basic human needs—*e.g.,* food, clothing, shelter, medical care, and reasonable safety—and they may not be exposed to conditions that pose an unreasonable risk

of serious damage to [their] future health.' " *Darnell,* 849 F.3d at 30 (quoting *Jabbar v. Fischer,* 683 F.3d 54, 57 (2d Cir. 2012)); *see also Estelle v. Gamble,* 429 U.S. 97, 105 (1976) ("deliberate indifference to a prisoner's serious illness or injury" violates Constitutional guarantees); *Farmer v. Brennan,* 511 U.S. 825, 828 (1994) (same with regard to " 'deliberate indifference' to a substantial risk of serious harm to an inmate"). Relevant here, "[c]ourts have repeatedly held that treatment of a psychiatric or psychological condition may present a serious medical need." *Cuoco v. Moritsugu,* 222 F.3d 99, 106 (2d Cir. 2000) (internal quotation marks and citation omitted); *see also Spavone v. New York State Dep't of Corr. Servs.,* 719 F.3d 127, 138 (2d Cir. 2013) (quoting *Estelle,* 429 U.S. at 104, and citing *Langley v. Coughlin,* 888 F.2d 252, 254 (2d Cir. 1989)) (the "medical needs" of prisoners or detainees includes "needs for mental health care").

**\*8** As such, "[w]hile in custody, a pretrial detainee has a Fourteenth Amendment substantive due process right to care and protection, including protection from suicide" resulting from a pre-existing mental health disorder. *Kelsey v. City of New York,* 306 Fed.Appx. 700, 702 (2d Cir. 2009). "A pretrial detainee may establish a § 1983 claim for allegedly unconstitutional conditions of confinement"—such as the denial of mental health care—"by showing that the officers acted with deliberate indifference to the challenged conditions." *Id.* (citation omitted); *see also Hare v. City of Corinth, Miss.,* 74 F.3d 633, 648 (5th Cir. 1996) ("Most circuits have endorsed a deliberate indifference inquiry as the measure of state officials' constitutional duty to safeguard the basic human needs of pretrial detainees, including protection from suicide.").

Determining whether the conditions challenged rise to a "conscious shocking" level, however, requires "an exact analysis of the circumstances" in deference to the consistently limited nature of substantive due process rights. *Cty. of Sacramento v. Lewis,* 523 U.S. 833, 850 (1998) ("Deliberate indifference that shocks in one environment may not be so patently egregious in another"). As the Second Circuit has recently explained:

> This means that a pretrial detainee must satisfy two prongs to prove a claim, an "objective prong" showing that the challenged conditions were sufficiently serious to constitute objective deprivations of the right

2017 WL 3701863

> to due process, and a "subjective
> prong"—perhaps better classified as a
> "*mens rea* prong" or "mental element
> prong"—showing that the officer acted
> with at least deliberate indifference to
> the challenged conditions.

*Darnell,* 849 F.3d at 29. Plaintiff's allegations in this case are that the various law enforcement Defendants were deliberately indifferent to Mr. Pankey's mental health needs when they failed to enforce the Mental Hygiene order, failed to inform others of the issuance of the order, and failed to provide him treatment or medication for his mental illness.

### a. Seriousness of the Alleged Deprivation of Medical Care

"There is no 'static test' to determine whether a deprivation is sufficiently serious; instead, 'the conditions themselves must be evaluated in light of contemporary standards of decency.' " *Darnell,* 849 F.3d at 30 (quoting *Blissett v. Coughlin,* 66 F.3d 531, 537 (2d Cir. 1995) (citing *Rhodes v. Chapman,* 452 U.S. 337, 346 (1981))). "This inquiry requires the court to examine how the offending conduct is inadequate and what harm, if any, the inadequacy has caused or will likely cause the prisoner." *Salahuddin v. Goord,* 467 F.3d 263, 280 (2d Cir. 2006). "For example, if the unreasonable medical care is a failure to provide any treatment for an inmate's medical condition, courts examine whether the inmate's medical condition is sufficiently serious." *Id.* Courts may also consider whether "a temporary delay or interruption in the provision of otherwise adequate medical treatment" constitutes deliberate indifference to a serious risk of harm. *Id.*

In cases of alleged delay, "the seriousness inquiry is 'narrower,' and focuses on the particular risk of harm that resulted from the delay or interruption in treatment rather than the severity of the [plaintiff's] underlying medical condition." *Hamm v. Hatcher,* No. 05 Civ. 503 (ER), 2013 WL 71770, at *8 (S.D.N.Y. Jan. 7, 2013) (quoting *Salahuddin,* 467 F.3d at 280 (quoting *Smith v. Carpenter,* 316 F.3d 178, 185 (2d Cir. 2003))). A claim of an unconstitutional delay or interruption in treatment is only cognizable if it "reflects deliberate indifference to a serious risk of health or safety, to a life-threatening or fast-degenerating condition[,] or to some other condition of extreme pain that might be alleviated through reasonably prompt treatment." *Amaker v. Coombe,* No. 96 Civ. 1622 (JGK), 2002 WL 523388, at *8 (S.D.N.Y. Mar. 29, 2002). "[I]n most cases, the actual medical consequences that flow from the alleged denial of care will be highly relevant to the question of whether the denial of treatment subjected the prisoner to a significant risk of serious harm." *Smith,* 316 F.3d at 187-88.

**\*9** Here, as discussed below with regard to whether the law enforcement agencies were indifferent to Mr. Pankey's needs, none of the agencies are alleged to have taken *any* actions [8] related to Mr. Pankey's mental health care aside from the Sheriff's diagnostic inquiries directed at determining if he was in fact a suicide risk. *Cf. Leandry v. Cty. of Los Angeles,* 352 Fed.Appx. 214, 216 (9th Cir. 2009) (plaintiff with serious mental health needs "was seen repeatedly by jail medical staff, all of whom determined that his symptoms were inconsistent with bipolar disorder"). Therefore, the inquiry for the Court is whether Mr. Pankey was either suffering from a condition that was *per se* sufficiently serious such that the denial of treatment could have led to serious harm, or —if the officers' alleged decisions to disregard the Mental Hygiene order is construed as a decision to *delay* his treatment —was subject to "a life-threatening or fast-degenerating condition or to some other condition of extreme pain that might [have] be[en] alleviated through reasonably prompt treatment." *See Salahuddin,* 467 F.3d at 280; *Amaker,* 2002 WL 523388, at *8; *see also Liscio v. Warren,* 901 F.2d 274, 277 (2d Cir. 1990) (considering the mistreatment of alcohol withdrawal, a "condition [that] was both life-threatening and fast-degenerating").

[8]
> This renders the question of whether the treatment
> provided was "inadequate," *Salahuddin v. Goord,*
> 467 F.3d 263, 280 (2d Cir. 2006), inapplicable. *See
> cf. Pooler v. Nassau Univ. Med. Ctr.,* 848 F. Supp.
> 2d 332, 347 (E.D.N.Y. 2012) ("conclude[ing] that
> the 'reasonable care' component of the objective
> prong needs to be considered in each case,
> including cases involving suicidality").

A detainee, or a prisoner, need not actually commit suicide to have been suffering from a serious medical condition. *See Young v. Choinski,* 15 F. Supp. 3d 172, 184 (D. Conn. 2014) ("case law within this Circuit recognizes that 'depression combined with severe anxiety attacks *or* suicide attempts is a serious medical need' ") (emphasis added); *Barnes v. Ross,* 926 F. Supp. 2d 499, 506 (W.D.N.Y. 2013) (propensity to harm oneself or attempt suicide viewed as "sufficiently serious"); *Hale v. Rao,* 768 F. Supp. 2d 367, 378 (N.D.N.Y. 2011) (inmate's mental illness coupled with verbalized

Case 9:19-cv-01161-DNH-TWD   Document 55   Filed 01/19/21   Page 79 of 103

Case v. Anderson, Not Reported in Fed. Supp. (2017)

2017 WL 3701863

suicidal desires sufficiently serious); *Allah v. Kemp,* No. 08 Civ. 1008 (NAM) (GHL), 2010 WL 1036802, at *6 n.9 (N.D.N.Y. Feb. 25, 2010) (failure to provide plaintiff with a mental health evaluation, notwithstanding his attempted suicide three days earlier, was enough to meet "sufficiently serious" standard); *Zimmerman v. Burge,* No. 06 Civ. 0176 (GLS) (GHL), 2009 WL 3111429, at *8 (N.D.N.Y. Sept. 24, 2009) (collecting cases from other circuits) (inmate, diagnosed with depression by prison officials, who harbored potentially suicidal thoughts "suffered from a sufficiently serious medical need"); *Sims v. Daley,* No. 95 Civ. 3239 (LAP), 1997 WL 33608, at *5 (S.D.N.Y. Jan. 29, 1997) ("hearing voices and experiencing suicidal thoughts" with a history of mental illness was a serious medical need).

Indeed, even serious mental disorders that do not exhibit suicidal ideations qualify as sufficiently serious. *See, e.g., Harvey v. Sawyer,* No. 09 Civ. 0598 (FJS) (DRH), 2010 WL 3323665, at *7 (N.D.N.Y. July 22, 2010), *report and recommendation adopted,* 2010 WL 3323669 (N.D.N.Y. Aug. 20, 2010) (inmate "undoubtedly suffering from a serious medical need, whether from bipolar disorder or paranoid schizophrenia"); *Guarneri v. Hazzard,* No. 06 Civ. 0985 (NAM) (DRH), 2008 WL 552872, at *6 (N.D.N.Y. Feb. 27, 2008) (inmate suffering from PTSD, bipolar disorder, and depression sufficiently alleged "a serious medical need as a result of his mental illnesses"); *Leandry,* 352 Fed.Appx. at 216 (inmate's mental health needs were serious whether he suffered from bipolar disorder or intermittent explosive disorder); *Olsen v. Layton Hills Mall,* 312 F.3d 1304, 1316 (10th Cir. 2002) (court assumed, after discussing the severe impact obsessive compulsive disorder (OCD) can have on an individual, that it "qualifies as 'sufficiently serious' "); *Page v. Norvell,* 186 F. Supp. 2d 1134, 1137 (D. Or. 2000) (court assumed medical need was sufficiently serious due to inmate's diagnosed bipolar disorder).

**\*10** Nevertheless, "[i]t goes without saying that '[s]uicide is a serious harm,' " which may result from a mental disorder. *See Sanville v. McCaughtry,* 266 F.3d 724, 733-34 (7th Cir. 2001) (citation omitted); *Silvera v. Conn. Dept. of Corr.,* 726 F. Supp. 2d 183, 191-92 (D. Conn. 2010) (plaintiff who suffered from severe mental health issues, was an acute suicide risk, and ultimately committed suicide due to acts and omissions of prison medical staff, was found to have demonstrated a sufficiently serious medical need); *Guglielmoni v. Alexander,* 583 F. Supp. 821, 826 (D. Conn. 1984) (court concluded that "[t]reatment of mental disorders of mentally disturbed inmates [was] a 'serious medical need'

under *Estelle*" in case where inmate repeatedly tried and eventually succeeded in committing suicide). Therefore, no matter whether the denial of treatment alleged here constitutes "a failure to provide *any* treatment" or "a temporary delay" in the provision of what would otherwise have been adequate treatment, the specific risk of self-harm to which Mr. Pankey was subject as a result of his bipolar disorder demonstrates the seriousness of his medical condition.

"In this case, not only was there a risk of serious harm but that harm actually materialized—[Mr. Pankey] committed suicide. It would be difficult to think of a more serious deprivation than to be deprived of life[.]" *Sanville,* 266 F.3d at 733-34 (thus inmate clearly "demonstrated a serious medical need"); *cf. Moots v. Lombardi,* 453 F.3d 1020, 1023 (8th Cir. 2006) (inmate failed to allege suffering harm as a result of temporary delay in treatment for his bipolar disorder when he was transferred to solitary confinement). As the preceding examples demonstrate, the fact that the symptoms he exhibited while in the custody of the various law enforcement agencies may have fallen short of announcing his suicidal intentions does not reduce the seriousness of Mr. Pankey's medical needs. His alleged condition was not only *per se* serious, it was life-threatening, as confirmed by the hospital's decision to issue the Mental Hygiene order in the first place. *See* N.Y. Mental Hyg. Law § 9.55 (McKinney) (empowering a qualified psychiatrist to issue such an order upon a determination that the individual in question "appears to have a mental illness for which immediate observation, care and treatment in a hospital is appropriate and which *is likely to result in serious harm to himself* or herself or others") (emphasis added); *Project Release v. Prevost,* 722 F.2d 960, 966 (2d Cir. 1983) ("for a person to be admitted as an emergency involuntary patient under section 9.39, he must have 'a mental illness ... which is likely to result in serious harm to himself or others' ").

Therefore, on the basis of the allegations in the complaint, Plaintiff has plausibly alleged that Mr. Pankey suffered from a serious medical condition that carried with it a serious risk of harm if it was left untreated—even for a short period of time.

### b. Officers' Alleged Level of Indifference to the Deprivations

The degree of deliberate indifference required to state a claim for a serious deprivation of a detainee's due process rights is lower than that required when considering a deprivation involving a convicted prisoner. As this Circuit recently recognized, a pretrial detainee can show either that "the

Case 9:19-cv-01161-DNH-TWD   Document 55   Filed 01/19/21   Page 80 of 103

Case v. Anderson, Not Reported in Fed. Supp. (2017)

2017 WL 3701863

defendant-official acted intentionally to impose the alleged condition, or recklessly failed to act with reasonable care to mitigate the risk that the condition posed to the [ ] detainee even though the defendant-official knew, *or should have known,* that the condition was excessive risk to health or safety." *Darnell,* 849 F.3d at 35 (emphasis added); *see also Salahuddin,* 467 F.3d at 280 (quoting *Farmer,* 511 U.S. at 847) ("failing 'to take reasonable measures' in response to a medical condition can lead to liability"). Thus, "a pretrial detainee can prevail by providing *only* objective evidence" of irrational or excessive governmental action. *Kingsley v. Hendrickson,* 135 S. Ct. 2466, 2473-74 (2015) (involving detainee's claims of excessive force) (emphasis added). [9] In short, the *mens rea* prong can be satisfied objectively rather than subjectively, [10] though there is still a floor: "any § 1983 claim for a violation of due process requires proof of a *mens rea* greater than mere negligence." *Darnell,* 849 F.3d at 35-36 ("A detainee must prove that an official acted intentionally or recklessly").

[9]   This recent shift away from the Supreme Court's heightened awareness requirement, which originated in the prisoner and Eighth Amendment context, as detailed in *Farmer v. Brennan,* 511 U.S. 825 (1994), is in recognition of the distinctions drawn between prisoner's claims of cruel and unusual punishment as compared to those charged with caring for pretrial detainees. *See Darnell v. Pineiro,* 849 F.3d 17, 30 (2d Cir. 2017) ("conclude[ing] that the Supreme Court's decision in *Kingsley* [v. *Hendrickson,* 135 S. Ct. 2466 (2015),]* altered the standard for deliberate indifference claims under the Due Process Clause"); *compare Kingsley,* 135 S. Ct. at 2473-74 ("a pretrial detainee can prevail by providing only objective evidence" of irrational or excessive governmental action), *with Farmer,* 511 U.S. at 838 ("an official's failure to alleviate a significant risk that he should have perceived *but did not,* while no cause for commendation, cannot under our cases be condemned as [an unconstitutional] infliction of punishment").

[10]   Despite the importance of this issue to the pending motions to dismiss, none of the parties briefed this development. Nevertheless, because Plaintiff generally alleges awareness on the part of the officers, the parties' failure to do so did not greatly impact the analysis of the issues contained herein.

**\*11**   To avoid liability, each state entity seeks to pass the blame—and the Hospital argues it had nothing to do with the lapses that led to Mr. Pankey's eventual suicide. (*See, e.g.,* City Mem. at 8-9 ("while the City's transfer of [Mr. Pankey] to the custody [of] the Town [ ] was one link in a chain of events that ended in [his] demise, its actions cannot be said to be a proximate cause of his death"); Town Mem. at 1 ("[t]he Town Defendants only transported Pankey to court on a lawful arrest warrant.... [and] [t]he litany of alleged failures by the County defendants and their medical services provider to address Pankey's mental health issues severed the chain of causation as to the Town Defendants"); Hosp. Mem. at 7 ("[t]he arrest of decedent and subsequent remand to jail were not situations which were the 'normal or foreseeable consequence of the situation created' by the Hospital's alleged [acts]").) The Sheriff's office argues that because it attempted to screen Mr. Pankey for mental illnesses and had no actual knowledge of his suicidal condition, it did all that it had to do to protect him. (*See* County Reply at 4 ("[t]he screening about which plaintiff complains did not itself harm Mr. Pankey").)

But Plaintiff has alleged that the officers involved at each juncture had *some* level of awareness of Mr. Pankey's mental illness. (*See* PAC ¶¶ 53, 56-57 (City); *id.* ¶¶ 40-41, 55 (Town); *id.* ¶¶ 64-66, 76-78 (County).) Thus, to provide no treatment would be to ignore a serious medical need, and to delay treatment would be to run the very risk of self-harm that reasonably prompt treatment was designed to avoid.

### i. City & Town Officers

Plaintiff alleges that the City "John Doe" Officers accompanied Mr. Pankey to the hospital when he was first admitted, received a call from the hospital when he escaped, were informed of the Mental Hygiene order issued because Mr. Pankey was a threat to his own safety, and chose to ignore the order and, instead, turn him over to the Town on the basis of an outstanding criminal warrant (issued the day before he was admitted to the Hospital). (PAC ¶¶ 53, 56-57, 59.) Similarly, Plaintiff alleges the Town "John Doe" Officers received a call from the hospital when Mr. Pankey escaped, were informed of the Mental Hygiene order, and chose to ignore the order and, instead, take Mr. Pankey to the Town Court to be arraigned on the outstanding criminal warrant. (*Id.* ¶¶ 40-41, 44, 55.) Just as the City Officers allegedly failed to impart any pertinent information to the Town Officers (*id.* ¶¶

Case 9:19-cv-01161-DNH-TWD    Document 55    Filed 01/19/21    Page 81 of 103

Case v. Anderson, Not Reported in Fed. Supp. (2017)

2017 WL 3701863

43, 47, 62), the Town Officers allegedly failed to impart any of the relevant information to either the Town Court or the Sheriff's office (*id.* ¶¶ 49-50, 63).

The complete inaction on the part of the City and Town Officers with regard to Mr. Pankey's mental condition, of which the officers were either aware or should have been aware, rises above the level of negligence. Taking as true Plaintiff's allegations that the City Officers and the Town Officers were aware of the issuance of the Mental Hygiene order and failed to impart any of this information—or to act on the order—their inaction constitutes a failure to alleviate a significant risk of harm. *See Thomas v. Ashcroft,* 470 F.3d 491, 497 (2d Cir. 2006) (allegations sufficiently demonstrated deliberate indifference where "complaint allege[d] that the prison officials were on notice of [detainee's] medical needs and were aware of the improper administration" of his medications, yet failed to address the situation"); *Colburn v. Upper Darby Twp.,* 946 F.2d 1017, 1025 n.1 (3d Cir. 1991) ("Custodians have been found to 'know' of a particular vulnerability to suicide when they have had actual knowledge of an obviously serious suicide threat, a history of suicide attempts, *or a psychiatric diagnosis identifying suicidal propensities.*") (emphasis added).

Even if the officers ignored the order because of a belief that the criminal warrant trumped the need to return Mr. Pankey to the hospital (*see* City Mem. at 6 & Town Mem. at 7-8), [11] their failure to alert the next set of authorities that he had been deemed a risk to himself demonstrates an indifference to Mr. Pankey's mental health needs that rises at least to the level of recklessness. *See, e.g., Soriano v. Cty. of Riverside,* No. 16 Civ. 0155 (BRO) (SPX), 2016 WL 6694491, at *1, 6 (C.D. Cal. Sept. 8, 2016) (plaintiffs sufficiently alleged deliberate indifference to detainee's medical health needs where officers, who were "allegedly aware of [his] prior mental health issues," decided to arrest him rather than place him in an "involuntary psychiatric hold"); *cf. Conn v. City of Reno,* 572 F.3d 1047, 1062 (9th Cir. 2009), *as reinstated by* 658 F.3d 897 (9th Cir. 2011) ("When a detainee attempts or threatens suicide en route to jail, it is obvious that the transporting officers must report the incident to those who will next be responsible for her custody and safety.").

[11]    Contrary to the Town's contention that "the decision to bring Pankey to the Justice Court pursuant to the arrest warrant did not amount to 'unnecessary and wanton infliction of pain, or other conduct that shocks' " (Town Mem. at 7), the

deliberate indifference inferred is that of the Town failing to address Mr. Pankey's medical health needs in any fashion during that process.

Moreover, neither the City nor the Town present any authority for the proposition that enforcing a criminal warrant should supersede a Mental Hygiene order (and arguably even pressing this contention demonstrates an ongoing lack of appreciation for the acute danger that an individual subject to such an order is facing at that moment in time). *See also cf. Rivera v. Russi,* 243 A.D.2d 161, 166 (2d Dep't 1998) ("police have not only the authority, but the obligation, to enforce an order of the court to produce [ ], and remove to a proper facility, a mentally ill person").

**\*12**  Therefore, Plaintiff has plausibly alleged at this stage that the City and Town Officers were deliberately indifferent to Mr. Pankey's plight. [12]

[12]    Contrary to the City's position, Plaintiff has plausibly alleged that harm—a delay in treatment —was inflicted upon Mr. Pankey while he was in the City's custody. (*See* City Mem. at 4 ("no harm was inflicted upon [Mr. Pankey] from the time that the City of Poughkeepsie Police took [him] into custody ... until he was transferred to the custody of the Town of Poughkeepsie").)

### ii. County Sheriff and Deputies

Plaintiff alleges, contrary to the County's assertions (*see* County Reply at 2), that the Sheriff was personally involved in Mr. Pankey's arraignment (PAC ¶ 63) [13] and that the Sheriff was aware—due to Mr. Pankey's multiple incarcerations at the County jail—of his mental health issues (*id.* ¶¶ 64-66). *See also Iqbal,* 556 U.S. at 676 ("Because vicarious liability is inapplicable to ...§ 1983 suits, a plaintiff must plead that each [ ]official defendant, through the official's own individual actions, has violated the Constitution."). Furthermore, once he was booked, a member of the Sheriff's office noted Mr. Pankey was "bipolar," "acting strange," and needed a psychiatric referral. (PAC ¶¶ 69, 74, 105, 109-10.) The next day, the office allegedly became aware of his history of psychiatric illness, that he had "escaped" from a hospital, and determined he was exhibiting poor insight, judgment, and impulse control. (*Id.* ¶¶ 76-79, 111-18.) Yet, the only action the jail took was to mark Mr. Pankey for a transfer to mental

Case 9:19-cv-01161-DNH-TWD   Document 55   Filed 01/19/21   Page 82 of 103
Case v. Anderson, Not Reported in Fed. Supp. (2017)

2017 WL 3701863

health housing and a psychiatric evaluation. In the end, Mr. Pankey, who suffered from a serious mental health disorder, was left completely unguarded, unwatched, and unsafe (from himself) in a standard county jail cell. The result is hardly unforeseeable.

13    The County claims that Plaintiff does not allege any personal involvement on the part of the Sheriff, requiring the claims against him be dismissed. (*See* County Mem. at 3); *see Grullon v. City of New Haven,* 720 F.3d 133, 139 (2d Cir. 2013) (claims properly dismissed where "no [direct or] indirect allegations [were present] sufficient to permit an inference the [defendant] Warden had acted or failed to act in any of the ways that would subject him to personal liability for the deprivations alleged by [detainee]"). Plaintiff's opposition to the County's motion to dismiss argues the County is "interpreting the [complaint's] allegations incorrectly." (Pl. Opp'n County at 6-7, 8 ("Plaintiff submits that these specific factual allegations sufficiently support the [complaint's] more conclusory allegations and therefore state a claim against [Sheriff] Anderson based upon his personal involvement in the deprivations").) Whatever their contentions about the plain meaning of the allegations in the complaint, the Court has an obligation to take all material factual allegations as true and draw reasonable inferences in the non-moving party's favor. The proposed amended complaint (and the operative complaint) allege that "following the arraignment in the Town of Poughkeepsie Justice Court, Kaseem J. Pankey was taken into custody *by the Dutchess County Sheriff* and placed in the Dutchess County Jail." (*See* PAC ¶ 63.) The Court must accept this fact as true.

**\*13** Plaintiff also alleges that the employees of the Sheriff's office (and CMC) "were aware" or "should have been aware" that a Mental Hygiene order has been issued, that Mr. Pankey was a danger to himself and others, and that he needed medication to control his bipolar disorder. (¶¶ 70-72, 106-108.) Neither the operative complaint nor the proposed amended complaint, however, gives any indication as to how the County, including the Sheriff and the Deputies, would have been aware of the order or related information, and in fact allege, as explained above, that neither the City nor the Town informed them of the issuance of the order. On the basis of Plaintiff's allegations, the Court cannot infer that the County employees were aware—or should have been aware

—of the issuance of the Mental Hygiene order. But the Court can infer the Sheriff's office and its employees were aware of Mr. Pankey's need for mental health care.

"[O]ther Circuits [and this Circuit] have, in general, found deliberate indifference lacking where officers take affirmative and reasonable steps to protect detainees from suicide[.]" *Kelsey v. City of New York,* 306 Fed.Appx. 700, 703 (2d Cir. 2009); *see, e.g., Brown v. Harris,* 240 F.3d 383, 390 (4th Cir. 2001) (no deliberate indifference where officer "responded reasonably" to suicide risk by placing detainee under "medical watch," which involved constant video surveillance); *Rhyne v. Henderson County,* 973 F.2d 386, 393-94 (5th Cir. 1992) (no deliberate indifference where officers checked suicidal inmates only every ten minutes); *Rellergert v. Cape Girardeau Cty., Mo.,* 924 F.2d 794, 797-98 (8th Cir. 1991) (no deliberate indifference where officer attending to conflicting responsibilities let inmate out of his sight with a bed sheet, although inmate was on suicide watch).

In contrast to such reasonable protective steps, Plaintiff has alleged that the Sheriff and his Deputies became aware of Mr. Pankey's serious mental health needs and chose to largely do nothing. Their alleged failure to act plausibly constitutes deliberate indifference to a serious risk of harm, which in this case materialized. *Compare Kelsey,* 306 Fed.Appx. at 703 ("In light of [the] [d]efendants' substantial efforts to secure [the detainee]," which included "seizing dangerous items he possessed" and "handcuffing him behind his back," summary judgment in their favor was appropriate since "no reasonable fact finder could find that [they] were deliberately indifferent to the risk of [his] suicide"), *with Thomas,* 470 F.3d at 497 (allegations sufficiently demonstrated deliberate indifference where "complaint allege[d] that the prison officials were on notice of [detainee's] medical needs and were aware of the improper administration of his medications, yet failed to address the situation").

The Court recognizes that the County employees tasked with Mr. Pankey's care may have been unaware of the Mental Hygiene order, and they therefore may not have been specifically aware of his acute risk of self-harm, in contrast to the City and Town Officers. *See, e.g., Madden v. City of Meriden,* 602 F. Supp. 1160, 1168 (D. Conn. 1985) (officers exhibited "deliberate indifference to [detainee's] medical needs" when he "was placed alone in a jail cell" and "allowed to hang himself" despite officers' "actual knowledge of his psychological problems and previous attempts at self-injury"). Nevertheless, on the basis of Plaintiff's allegations,

Case v. Anderson, Not Reported in Fed. Supp. (2017)

Case 9:19-cv-01161-DNH-TWD    Document 55    Filed 01/19/21    Page 83 of 103

2017 WL 3701863

Mr. Pankey's behavior combined with the information the Sheriff's office did possess—his prior mental health issues, his bipolar disorder, his strange behavior, and his statement that he had "escaped" from a hospital—should have made them aware that he needed *some* form of immediate mental health treatment including heightened monitoring or safety precautions.

Therefore, Plaintiff has plausibly alleged that the Sheriff [14] and the Deputies were deliberately indifferent to Mr. Pankey's serious medical needs.

[14]    Because the Court construes the allegations in Plaintiff's complaint to allege personal involvement on behalf of the Sheriff, there is no cause to consider other grounds for supervisory liability under § 1983. *See Raspardo v. Carlone,* 770 F.3d 97, 117 (2d Cir. 2014) (noting that the Second Circuit has "not yet determined the contours of the supervisory liability test" *post-Iqbal*); *see also Starr v. Baca,* 652 F. 3d 1202, 1207 (9th Cir. 2011) ("We see nothing in *Iqbal* indicating that the Supreme Court intended to overturn longstanding case law on deliberate indifference claims against supervisors in conditions of confinement cases.").

### c. Allegations of Due Process Deprivations Relating Specifically to the Enforcement of the Mental Hygiene Order

**\*14**  Plaintiff also asserts that the failure to enforce the Mental Hygiene order was, standing alone, a violation of Mr. Pankey's due process rights. (*See, e.g.,* PAC ¶ 173 (alleged against Town Officers).) Such a claim can theoretically implicate a detainee's rights to procedural due process, substantive due process, or both.

### i. Procedural Due Process

"The procedural component of the Due Process Clause 'provides that certain substantive rights—life, liberty, and property—cannot be deprived *except* pursuant to constitutionally adequate procedures.' " *Nnebe v. Daus,* 184 F. Supp. 3d 54, 62 (S.D.N.Y. 2016) (quoting *Cleveland Bd. of Educ. v. Loudermill,* 470 U.S. 532, 541 (1985)) (emphasis added). Plaintiff, in one paragraph of her complaint, asserts that the failure to enforce the Mental Hygiene order also implicates Mr. Pankey's *procedural* due process rights.

(PAC ¶ 173.) Such a claim would hinge, therefore, on Plaintiff having a protected interest in the order, which he was subsequently deprived of without proper process. Yet Plaintiff appears primarily concerned with the immediate ramifications of depriving Mr. Pankey of his interest in the order, which is still in essence a *substantive* due process claim: "[u]nlike procedural due process, which permits a state to deprive a person of life, liberty or property when it provides a procedural remedy, substantive due process imposes limits on what a state may do regardless of what process is provided." *Madden,* 602 F. Supp. at 1166.

None of Plaintiff's allegations focus on the inadequacy of the procedures used to arraign Mr. Pankey on the outstanding warrant despite the issuance of the Mental Hygiene order. *See Nnebe,* 184 F. Supp. 3d at 62 (quoting *Green v. Bauvi,* 46 F.3d 189, 194 (2d Cir. 1995)) ("in evaluating a claim for a denial of *procedural* due process, a court must consider two questions: (1) 'whether the plaintiff possessed a liberty or property interest protected by the United States Constitution or ... [by] statute[ ]"; and if so, (2) '*what process was due* before the plaintiff could be deprived of that interest' ") (emphasis added). Rather, the allegations point to failings on the part of the officers to address Mr. Pankey's mental health issues by, *inter alia,* ignoring the order altogether. Since Plaintiff has not alleged procedural deficiencies in the process used to deprive Mr. Pankey of his interest, if any, in the enforcement of the Mental Hygiene order, this claim is best considered irrespective of process—as a deprivation of a substantive due process right.

### ii. Substantive Due Process: Liberty or Property Interest

Substantive due process, in contrast, protects individuals from proscribed deprivations of life, liberty, and property no matter the process employed by the State. *See Madden,* 602 F. Supp. at 1166 ("substantive due process ... is a source of rights which may not be taken away under any circumstances"). In this case, the failure to enforce the Mental Hygiene order coincided with the City and Town Officers' failure to provide any form of mental health care for Mr. Pankey while he was in their respective custody or to document his condition with the other agencies involved. As discussed above, conditions of confinement are quintessential questions of an individual's substantive due process protected liberty interests. But if Plaintiff is also seeking to assert an independent claim for denial of substantive due process rights with regard to an interest in the order itself—claiming that Mr. Pankey had

Case 9:19-cv-01161-DNH-TWD    Document 55    Filed 01/19/21    Page 84 of 103

Case v. Anderson, Not Reported in Fed. Supp. (2017)

2017 WL 3701863

a right to have the order enforced and was deprived of his interest in that enforcement—then the right sought to be protected would be a *property* interest in the order, *see Town of Castle Rock, Colo. v. Gonzales,* 545 U.S. 748, 766 (2005) (considering whether "an individual entitlement to enforcement of a restraining order could constitute a 'property' interest for purposes of the Due Process Clause"), as opposed to his protected *liberty* interests—*i.e.,* to be safeguarded while in state custody.

**\*15**  To assert such a substantive due process claim with regard to enforcement of the order, meaning "for deprivation of property without due process of law, a plaintiff must identify a property interest protected by the Due Process Clause." *Harrington v. Cty. of Suffolk,* 607 F.3d 31, 34 (2d Cir. 2010). But to qualify as a protected property interest, such an interest must mandatorily arise out of "an independent source such as state law" and be sufficiently individual in its nature. *Id.* Moreover, the plausible allegations here, including the alleged decision to ignore the order, evince deliberate indifference to Mr. Pankey's medical needs rather than a separate substantive due process violation designed to deprive him of the benefit of the order. This is not a case where the alleged violation is simply that a Mental Hygiene order was issued and the officers ignored calls to enforce the order up to the point where Mr. Pankey took his own life. Rather, the officers did act—arresting Mr. Pankey on a separate outstanding warrant—and simultaneously chose not to act regarding the order.

In these circumstances, the officers' alleged inaction with regard to the order more squarely implicates Mr. Pankey's protected liberty interests rather than constituting an independent deprivation of a protected property interest. The Court can easily infer from the facts alleged that the City and Town Officers were aware that Mr. Pankey posed a significant risk of harm to himself and others vis-à-vis their knowledge of the order yet acted indifferently to that risk when they opted not to return him to a hospital for mental health treatment and, moreover, not to impart that information to the next jurisdiction asserting custody over Mr. Pankey as he was passed down the line. *See, e.g., Whitley v. Hanna,* 726 F.3d 631, 651-52 (5th Cir. 2013) (Elrod, J., concurring) (quoting *DeShaney,* 489 U.S. at 195, and *Doe v. Taylor Indep. Sch. Dist.,* 15 F.3d 443, 450-51 (5th Cir. 1994)) ("although the substantive component of the Due Process Clause does not 'requir[e] the State to protect the life, liberty, and property of its citizens against invasion by private actors,' it does

protect against 'state-occasioned damage to a person's bodily integrity' ").

Because the Court has already determined that ignoring the order as alleged would violate Mr. Pankey's protected liberty interests, it declines to decide whether Mr. Pankey had a separate protected property interest in the enforcement of the order such that failure to enforce the order was, on its own, a violation of his substantive due process rights. *See Gonzales,* 545 U.S. at 768 ("[estranged wife] did not, for purposes of the Due Process Clause, have a property interest in police enforcement of the restraining order against her [estranged] husband"). "[T]he existence of an underlying constitutional violation differentiates [such a] case from *Gonzales* and *DeShaney,* which examined the scope of a state official's duty to interfere with private violence," requiring an inquiry into other forms of protected interests pursuant to substantive due process. *Whitley,* 726 F.3d at 651-52 (Elrod, J., concurring). Plaintiff has already identified actionable substantive due process violations; thus, there is no need to decide whether a subset of the officers' actions would have independently violated his substantive due process rights, particularly where Plaintiff has done little to allege a protected property interest stemming from state law and individualized to Mr. Pankey.

### d. Qualified Immunity

Having determined that Plaintiff has plausibly alleged deliberate indifference to Mr. Pankey's constitutionally protected rights on the part of the City and Town Officers, the County Deputies, and the County Sheriff, the Court must consider whether these Defendants are nonetheless immune from liability. "The doctrine of qualified immunity gives officials 'breathing room to make reasonable but mistaken judgments about open legal questions.' " *Ziglar v. Abbasi,* 137 S. Ct. 1843, 1866 (2017) (quoting *Ashcroft v. al-Kidd,* 563 U.S. 731, 743 (2011)). Thus, "qualified immunity shields ... officials from suit 'unless [1] the official violated a statutory or constitutional right that [2] was clearly established at the time of the challenged conduct.' " *Terebesi v. Torreso,* 764 F.3d 217, 230 (2d Cir. 2014) (quoting *Reichle v. Howards,* 566 U.S. 658, 132 S. Ct. 2088, 2093 (2012)).

**\*16**  Defendants invoke the doctrine (see, *e.g.,* Town Mem. at 11-12 & County Mem. at 6-7) hoping to cast the question of Mr. Pankey's care—or lack thereof—into a constitutional grey zone, immunizing the individuals involved from liability for the acts or omissions alleged. To do so, Defendants' rely on *Taylor v. Barkes,* 135 S. Ct. 2042, 2044-45 (2015), where the Supreme Court recently explained that none of

Case 9:19-cv-01161-DNH-TWD    Document 55    Filed 01/19/21    Page 85 of 103

Case v. Anderson, Not Reported in Fed. Supp. (2017)

2017 WL 3701863

its prior decisions clearly "establishe[d] a right to the proper implementation of adequate suicide prevention protocols." In surveying the relevant precedent from the circuit courts, and specifically leaving open the question of whether "a right can be 'clearly established' by circuit precedent despite disagreement in the courts of appeals," *Barkes,* 135 S. Ct. at 2044-45, the Court determined that as of November 2004 such a right was not clearly established. *See Cox v. Glanz,* 800 F.3d 1231, 1250 (10th Cir. 2015) ("Consequently, in November 2004, a jail's nonexistent or deficient suicide-screening measures would not have *necessarily* indicated that an individual prisoner's suicide was the product of deliberate indifference in violation of the Eighth Amendment.") (emphasis added).

But this case is about more than the County's allegedly inferior mental health screening process or the lack of screening conducted by the City and Town. As Plaintiff aptly states with regard to Defendant Sheriff Anderson:

> Once a jail has actual or constructive notice that an inmate is in danger of committing suicide due process requires the jail to take reasonable measures to abate that danger. This is not a new due process requirement; it was clearly established long before [Sheriff] Anderson's subordinates left [Mr.] Pankey alone and unmonitored in the cell where he killed himself.

(Pl. Opp'n County at 13); *Bays v. Cty. of Montmorency,* No. 15-10534 (RHC), 2016 WL 1728569, at *3 n.1 (E.D. Mich. May 2, 2016) (quoting *Barkes,* 135 S. Ct. at 2043) ("*Barkes* is distinguishable from the case at hand because, unlike here, it was 'undisputed that neither petitioner had personally interacted with [the decedent] or knew of his condition before his death.' "); *see also Weishaar v. Cty. of Napa,* No. 14 Civ. 1352 (LB), 2016 WL 7242122, at *11 (N.D. Cal. Dec. 15, 2016) (when considering the issue of qualified immunity in this context, "the pivotal question ... might be phrased thus: On the 'particular facts' of this case, in this 'specific context,' did [the detainee] pose a 'serious risk of suicide' so that any 'reasonable,' 'competent' officer would have known that they could not be 'deliberately indifferent' to his plight, and that by failing to do more than they did to protect him from suicide ... they were clearly violating his constitutional rights?"). [15]

[15] The Town Defendants have incorrectly framed issue solely around "their decision to transport Pankey to the Justice Court, pursuant to a lawful arrest warrant, despite knowledge of the Mental Hygiene order." (*See* Town Mem. at 11-12.) This formulation wholly ignores the Town's alleged omissions regarding Mr. Pankey's mental health needs, including the alleged failure to pass the information on to the Justice Court and the Sheriff. The City similarly attempts to narrow the question to *only* the enforcement of the order. (*See* City Mem. at 6-8.)

On reply, the Town refines its argument, asserting: "No clearly established law either required the police to prefer the alleged notification about a Mental Hygiene order over a written court-issued arrest warrant, and no clearly established law renders unconstitutional the failure to tell the court or Sheriff about such notification." (*See* Town Reply at 3.) But, as discussed *infra,* the latter contention is false: it is clearly established that custodians need to provide for the mental health needs of pretrial detainees—and in this case, that might have been as simple as informing the next jurisdiction of either Mr. Pankey's risk of self-harm or the existence of the order. Failing to do either, however, constitutes deliberate indifference to clearly established law.

**\*17** Plaintiff alleges more than a simple failure to implement proper suicide screening procedures: she alleges Mr. Pankey had interactions with officers in three jurisdictions, each of which were aware of his history of mental illness, of the Mental Hygiene order, or both, where the officers proceeded to process Mr. Pankey in the normal course despite this information. Perhaps if he was an entirely unknown detainee with no known history of incarceration or mental health issues then the law enforcement agencies' failures to adequately screen him for suicide risks *alone* would not violate clearly established rights based on this Circuit's precedent. [16] Given the facts alleged here, however, Defendants' qualified immunity arguments ignore that the right of those in state custody "to be free from deliberate indifference to [their] serious medical needs has been clearly established for decades." *Cf. Randle v. Alexander,* 170 F. Supp. 3d 580, 596 (S.D.N.Y. 2016) (considering and rejecting qualified immunity in the Eighth Amendment context where officials ignored a prisoner's history of suicidal tendencies);

Case v. Anderson, Not Reported in Fed. Supp. (2017)

2017 WL 3701863

*see Sinkov v. Americor, Inc.,* 419 Fed.Appx. 86, 89 (2d Cir. 2011) (affirming jury verdict where "evidence was sufficient 'to support a conclusion by a reasonable juror' " that company which had contracted with a county "to provide medical care to detainees" was " 'actually aware' of [detainee's] risk of suicide and was deliberately indifferent to that risk"); *Kelsey v. City of New York,* No. 03 Civ. 5978 (JFB) (KAM), 2006 WL 3725543, at *9 (E.D.N.Y. Dec. 18, 2006), *aff'd,* 306 Fed.Appx. 700 (2d Cir. 2009) ("a pretrial detainee's right to be free from deliberate indifference by police officers to suicide, while in custody, is a clearly established right"); Kyla Magun, *A Changing Landscape for Pretrial Detainees? The Potential Impact of Kingsley v. Hendrickson on Jail-Suicide Litigation,* 116 Colum. L. Rev. 2059, 2068 (2016) ("The Supreme Court has never explicitly established that a prisoner has the right to be protected from suicide, and lower courts have found no duty to screen all detainees for 'suicidal tendencies.' However, *Farmer* and *Estelle* establish that there is a duty to protect prisoners from conditions leading to suicide when they amount to a "condition[ ] posing a substantial risk of harm" or when the officer failed to attend to a "serious medical need[ ].") (citations omitted). [17]

16    This Court could, based on authority from this Circuit and others, consider whether the County's alleged failure to implement adequate suicide-screening protocols plausibly alleges deliberate indifference to the rights of pre-trial detainees in contravention of clearly established law. *See Dolan v. Connolly,* No. 13 Civ. 5726 (GBD) (GWG), 2017 WL 193286, at *8 (S.D.N.Y. Jan. 18, 2017) (rejecting the argument that *Barkes* foreclosed this avenue), *report and recommendation adopted,* 2017 WL 825311 (S.D.N.Y. Mar. 2, 2017) (quoting *Terebesi v. Torreso,* 764 F.3d 217, 231 (2d Cir. 2014)) ("a court may [ ] treat the law as clearly established if decisions from [the Second Circuit] or other circuits clearly foreshadow a particular ruling on the issue") (internal quotation omitted); *cf. United States v. Erie Cty., NY,* 724 F. Supp. 2d 357, 363 (W.D.N.Y. 2010) (Department of Justice alleged county was "deliberately indifferent to the health and safety of pretrial detainees "in violation of the Eighth and Fourteenth Amendments" for, *inter alia,* "provid[ing] inadequate suicide prevention and mental health care"); *Langley v. Coughlin,* 715 F. Supp. 522, 540 (S.D.N.Y. 1989) ("[expert] affidavits [were] sufficient to create triable issues with respect to whether plaintiffs

were injured by the deliberate indifference of state officials in the handling of medical care," including "alleged failure to provide minimally adequate screening and care for those placed on SHU"); *Conn v. City of Reno,* 572 F.3d 1047, 1063 (9th Cir. 2009) ("Had the[ ] [officers] been trained in suicide prevention, there is a reasonable probability that they would have responded differently and reported to the jail that [arrestee] was at risk of suicide, or taken her directly to the hospital."); *but see Belcher v. Oliver,* 898 F.2d 32, 34-35 (4th Cir. 1990) ("The general right of pretrial detainees to receive basic medical care does not place upon jail officials the responsibility to screen every detainee for suicidal tendencies."); *Burns v. City of Galveston,* 905 F.2d 100, 104 (5th Cir. 1990) ("Failure to train police officers in screening procedures geared toward detection of detainees with suicidal tendencies may rise to the level of a constitutional deprivation only if the right of detainees to adequate medical care includes an absolute right to psychological screening. We perceive no such right."); *Gray v. City of Detroit,* 399 F.3d 612, 616 (6th Cir. 2005) ("there is no general constitutional right of detainees to receive suicide screenings or to be placed in suicide safe facilities, unless the detainee has somehow demonstrated a strong likelihood of committing suicide"); *Cox v. Glanz,* 800 F.3d 1231, 1247 (10th Cir. 2015) ("an inmate's right to proper prison suicide screening procedures during booking [ ] was not clearly established in July 2009"). Such consideration, however, is unnecessary in this case.

17    This is not circular reasoning, as asserted by the County. (*See* County Reply at 4 ("Under plaintiff's theory, the immunity afforded a Sheriff against a claim based upon an inadequate suicide prevention protocol has no meaning. If he/she can still be sued, for instance, for not having constant supervision, the need for which was not identified in the inadequate screening, immunity is functionally erased.").) The reason that qualified immunity does not apply based on the facts alleged is that Plaintiff has alleged an additional avenue by which the County could have deprived Mr. Pankey of his substantive due process rights—deliberate indifference to his serious medical needs. Whether or not the "inadequate screening" picked up his need for constant—or periodic—supervision, the

Case 9:19-cv-01161-DNH-TWD Document 55 Filed 01/19/21 Page 87 of 103

Case v. Anderson, Not Reported in Fed. Supp. (2017)

2017 WL 3701863

County *should have known* that his mental health disorders carried a serious risk of harm requiring additional care.

**\*18** The Supreme Court's holding in *Barkes* is, thus, not in tension with a finding that a detainee has a clearly established right to protection from serious risks of harm, including suicide. [18] Furthermore, the defense of qualified immunity faces a "formidable hurdle" when asserted on a motion to dismiss, since Plaintiff "is entitled to all reasonable inferences from the facts alleged, not only those that support his claim, but also those that defeat the immunity defense." *McKenna v. Wright,* 386 F.3d 432, 434-36 (2d Cir. 2004). Plaintiff has made sufficient allegations of deliberate indifference to Mr. Pankey's serious medical needs and, based on those allegations, the Court will infer at this stage that the officers did not "make reasonable but mistaken judgments," *al-Kidd,* 563 U.S. at 743, but instead made reckless decisions in violation of the clearly established law in this Circuit. *See cf. Elliott v. Cheshire Cty.,* 940 F.2d 7, 11 n.3 (1st Cir. 1991) ("Qualified immunity should be denied if the officials were or should have been aware that the prisoner presented a substantial risk of suicide").

[18]   Indeed, courts considering this right *post-Barkes* continue to conclude the right is clearly established. *See Estate of Clark v. Walker,* No. 16-3560, 2017 WL 3165632, at \*6 (7th Cir. July 26, 2017) (in the Seventh Circuit, the right to treatment of a serious medical need, including risk of suicide, is clearly established); *Campos v. Cty. of Kern,* No. 14 Civ. 1099 (DAD) (JLT), 2017 WL 915294, at \*10 (E.D. Cal. Mar. 7, 2017) ("the law regarding the Fourteenth Amendment right to adequate medical care," including right "to be protected from the known risks of suicide in jail," was "clearly established" in the Ninth Circuit by "the time of decedent's suicide, August 2013").

For these reasons, the Court will not dismiss any of the claims on the basis of qualified immunity at this juncture.

### e. Municipal Liability for the County or CMC

The only municipality against which Plaintiff is currently asserting § 1983 claims is the County. Under *Monell v. New York City Dept. of Social Servs.,* 436 U.S. 658 (1978), "municipalities are responsible only for their own illegal acts, and cannot be held vicariously liable under § 1983 for their employees' actions." *Cash v. Cty. of Erie,* 654 F.3d

324, 333 (2d Cir. 2011) (internal quotation marks omitted). "[T]o establish municipal liability under § 1983, a plaintiff must prove that 'action pursuant to official municipal policy' caused the alleged constitutional injury." *Id.* (quoting *Connick v. Thompson,* 563 U.S. 51, 61 (2011)). "Official municipal policy includes the decisions of a government's lawmakers, the acts of its policymaking officials, and practices so persistent and widespread as to practically have the force of law." *Connick,* 563 U.S at 61. A "policy" may be established under the following theories:

> (1) a formal policy officially endorsed by the municipality; (2) actions taken by government officials responsible for establishing the municipal policies that caused the particular deprivation in question; (3) a practice so consistent and widespread that, although not expressly authorized, constitutes a custom or usage of which a supervising policy-maker must have been aware; or (4) a failure by policymakers to provide adequate training or supervision to subordinates to such an extent that it amounts to deliberate indifference to the rights of those who come into contact with the municipal employees.

*Brandon v. City of New York,* 705 F. Supp. 2d 261, 276-77 (S.D.N.Y. 2010) (citations omitted).

"Where the contention is not that the actions complained of were taken pursuant to a [formal] local policy ... but rather that they were taken or caused by an official whose actions represent official policy," the court considers whether the official implicated "had final policymaking authority in the particular area involved." *Jeffes v. Barnes,* 208 F.3d 49, 57 (2d Cir. 2000). If that inquiry is answered affirmatively, then the actions of the policymaker will lead to liability for the municipality. *Weber v. Dell,* 804 F.2d 796, 803 (2d Cir. 1986) (citing *Pembaur v. City of Cincinnati,* 475 U.S. 469 (1986)) (where Sheriff established county jail policy, county could be held liable for the policy); *cf. Roe v. City of Waterbury,* 542 F.3d 31, 37-38 (2d Cir. 2008) (citing *Jeffes,* 208 F.3d at 57) (the "critical inquiry" is thus "whether the government official is a final policymaker with respect to the

Case 9:19-cv-01161-DNH-TWD    Document 55    Filed 01/19/21    Page 88 of 103

Case v. Anderson, Not Reported in Fed. Supp. (2017)

2017 WL 3701863

particular conduct challenged in the lawsuit") (mayor was not establishing city policy when deciding to sexually abuse children). "[C]onclusory allegations of a municipal custom or practice of tolerating official misconduct are insufficient to demonstrate the existence of such a custom unless supported by factual details." *Kucharczyk v. Westchester Cty.,* 95 F. Supp. 3d 529, 540 (S.D.N.Y. 2015).

**\*19** Here, Plaintiff alleges municipality liability on that basis that a municipal "custom, policy, or usage can be inferred from evidence of deliberate indifference of supervisory officials," here the Sheriff, "to such abuses." *Iacovangelo v. Corr. Med. Care, Inc.,* 624 Fed.Appx. 10, 13 (2d Cir. 2015); *see also Green v. City of Mount Vernon,* 96 F. Supp. 3d 263, 306 (S.D.N.Y. 2015) ("where a policymaking official exhibits deliberate indifference to constitutional deprivations caused by subordinates, such that the official's inaction constitutes a 'deliberate choice,' that acquiescence may 'be properly thought of as a city policy or custom that is actionable under § 1983.' "); *see, e.g., Benacquista v. Spratt,* 217 F. Supp. 3d 588, 601 (N.D.N.Y. 2016) *(Monell* claims plausibly alleged where "plaintiff allege[d] that the [school] [d]istrict's policymaking officials failed to take any meaningful corrective or preventive action despite being repeatedly warned by various teachers, administrators, and at least one parent over the course of the school year about [teacher's] improper and increasingly sexualized misconduct". The Supreme Court has established that "a final decisionmaker's adoption of a course of action tailored to a particular situation and not intended to control decisions in later situations may, in some circumstances, give rise to municipal liability under § 1983." *Board of Comm'rs of Bryan Cty. v. Brown,* 520 U.S. 397, 406 (1997) (quotation marks and citation omitted). Thus, the Court must determine whether, on the basis of Plaintiff's allegations, the Sheriff can be considered a final policymaker concerning the treatment of detainees at the County jail and the County therefore may be potentially liable for his actions based on the situation Mr. Pankey confronted. *See, e.g., Leather v. Ten Eyck,* 2 Fed.Appx. 145, 149 (2d Cir. 2001) (sheriff could be a policymaker for *Monell* purposes).

As Plaintiff alleges the Sheriff has control over the policies at the jail (PAC ¶¶ 3, 184, 193), which is supported by New York law, *see* N.Y. Corr. Law § 500-c ("the sheriff of each county shall have custody of the county jail of such county"), the Court can infer at this stage that the Sheriff is indeed a final policymaker. The required "nexus" between "the sheriff's actions and his job functions" can also plausibly

be inferred since the alleged deprivations occurred during a standard intake at the jail. *See Roe,* 542 F.3d at 40.

Moreover, given Plaintiff's allegations that the Sheriff was *directly involved* in transferring Mr. Pankey from the Town Court to the County Jail, [19] his knowledge of Mr. Pankey's mental health issues, and his supervision of the County Deputies once Mr. Pankey was held on the warrant, Plaintiff plausibly alleges the Sheriff should have had enough awareness of these issues that it represents "a failure by policymakers to provide adequate training or supervision to subordinates to such an extent that it amounts to deliberate indifference to the rights of those who come into contact with the municipal employees." *Brandon,* 705 F. Supp. 2d at 276-77; *see Vann v. City of New York,* 72 F.3d 1040, 1049 (2d Cir. 1995) (holding that a plaintiff "may establish the pertinent custom or policy by showing that the municipality, alerted to the [unconstitutional action by its employees], exhibited deliberate indifference"); *Hines v. Albany Police Dep't,* 520 Fed.Appx. 5, 8 (2d Cir. 2013) (police chief's involvement in allegedly unconstitutional deprivations subjected city to *Monell* liability); *cf. Iacovangelo,* 624 Fed.Appx. at 14 *(Monell* claim properly dismissed where "nothing in the complaint plausibly allege[d] knowledge of th[e] matter on the part of any supervisory personnel"); *Ricciuti v. N.Y.C. Transit Auth.,* 941 F.2d 119, 123 (2d Cir. 1991) ("a single incident alleged in a complaint, especially if it involved only actors below the policy-making level, does not suffice to show a municipal policy") (citations omitted); *Perez v. Ponte,* 236 F. Supp. 3d 590 (E.D.N.Y. 2017), *report and recommendation adopted,* No. 16-CV-645 (JFB)(AKT), 2017 WL 1050109 (E.D.N.Y. Mar. 15, 2017) ("with no facts asserting direct involvement by a policymaking official, the actions taken by [ ] a lower-level employee[ ] cannot be attributed to the City"). Plaintiff's additional conclusory arguments, however, that the Sheriff implemented, *e.g.,* a fiscally-driven policy to avoid placing guards on 24-hour watch (*see* PAC ¶¶ 184(C), 186-87, 190-93), fail to plausibly allege either the existence of a municipal policy or the Sheriff's involvement.

[19]    Though the County argues there are no allegation of personal involvement, the Court must accept as true Plaintiff's allegation that Mr. Pankey was transferred into Sheriff Anderson's custody and taken to the jail. (PAC ¶ 63); *see supra* note 13.

**\*20** Therefore, at this stage, Plaintiff plausibly, though only barely, states a claim against the County. [20] The Court agrees with the County that "as [Plaintiff's] claim against

Case 9:19-cv-01161-DNH-TWD   Document 55   Filed 01/19/21   Page 89 of 103

Case v. Anderson, Not Reported in Fed. Supp. (2017)

2017 WL 3701863

[Sheriff Anderson falls, so falls [the] claim against the County." (*See* County Reply at 3.) Whether the Sheriff's personal involvement and notice of Mr. Pankey's condition will be borne out by the record is a question for either summary judgment or trial, which will necessarily impact the claim against the County.

20    Plaintiff has requested that her § 1983 claims against CMC "be deemed withdrawn," (*see* Pl. Opp'n CMC at 1), in recognition that she has failed to plausibly allege such claims. The Court notes with regard to CMC that "[c]orporate entities ... are treated the same as a municipality when performing the public function of running a jail." *Helijas v. Corr. Med. Care, Inc.,* No. 15 Civ. 1049 (GTS) (DJS), 2016 WL 5374124, at *15 n.20 (N.D.N.Y. Sept. 26, 2016) (citation omitted). The Court also agrees that Plaintiff "has not alleged facts plausibly suggesting 'a sufficiently widespread practice among' CMC employees generally, or at the Jail in particular, to support the conclusion that insufficient screening and supervision of detainees with respect to medical and/or mental health problems was a custom of which CMC supervisory personnel was aware." *Id.* at *15. Nor does Plaintiff's alternative pleading scheme— substituting CMC for the Sheriff's office—suffice to establish liability on the part of CMC without similar allegations that a supervisor within CMC, like the Sheriff within the Sheriff's office, was knowledgeable of and directly involved in the treatment of Mr. Pankey's mental condition.

* * *

Plaintiff's federal claims against the individual John Doe officers and deputies of the City, Town, and County, therefore, survive Defendants' motions to dismiss, as do her claims against Sheriff Anderson and the County.

## II. State Claims (Negligence and Wrongful Death)

Plaintiff's common law negligence and wrongful death claims against the Hospital and the law enforcement Defendants stem from the same set of events discussed above. Under New York law, which governs Plaintiff's negligence claims, "[t]o establish a prima facie case of negligence, a plaintiff must establish the existence of a duty owed by a defendant to the plaintiff, a breach of that duty, and that such breach

was a proximate cause of injury to the plaintiff." *S.W. ex rel. Marquis-Abrams v. City of New York,* 46 F. Supp. 3d 176, 205 (E.D.N.Y. 2014) (quoting *Nappi v. Inc. Vill. of Lynbrook,* 19 A.D.3d 565, 566 (2d Dep't 2005)). As for her wrongful death claims, "the essence of the cause of action for wrongful death in [New York] is that the plaintiff's reasonable expectancy of future assistance or support by the decedent was frustrated by the decedent's death." *Gonzalez v. New York City Hous. Auth.,* 77 N.Y.2d 663, 668, 572 N.E.2d 598, 601 (1991); *see also Chong v. New York City Transit Auth.,* 83 A.D.2d 546, 547 (2d Dep't 1981) (in addition to an actionable negligence claim, a claim seeking recovery for wrongful death as a result of such negligence also requires "the death of a human being," "the survival of distributees who suffered pecuniary loss by reason of the death of decedent," and "the appointment of a personal representative of the decedent").

There is no question that "negligent tort-feasors may be liable for the wrongful death, by suicide, of a person injured by their negligence." *Fuller v. Preis,* 35 N.Y.2d 425, 427 (1974). Therefore, if Mrs. Case, Mr. Pankey's grandmother and the administratrix of his estate, pleads a plausible negligence claim, then she may also assert a claim for wrongful death so long as she has suffered a pecuniary loss as a result of his passing. Here, however, "[P]laintiff has neither alleged nor presented evidence that she—or any other person—suffered pecuniary loss as a result of [Mr. Pankey's] death." *Singleton v. City of Newburgh,* 1 F. Supp. 2d 306, 317 (S.D.N.Y. 1998). Thus, the Court must dismiss the wrongful death portion of her negligence claims, though without prejudice to amend to allege or offer proof of such a loss. *See, e.g., id.* (grandmother-administratrix granted leave to demonstrate such a loss where other elements of a wrongful death claim were alleged).

**\*21** As for her underlying negligence claims, when the alleged negligence involves "the failure to prevent a suicide" by a facility, such as a hospital, failing "to detect suicidal tendencies" despite being tasked with "car[ing] for the person's well-being" or if a jail "fails to take reasonable steps to prevent a reasonably foreseeable suicide" when it has "actual physical custody of an individual." *Cygan v. City of New York,* 165 A.D.2d 58, 67 (1st Dep't 1991). The Court addresses the former with regard to the Hospital and the later with respect to the law enforcement agencies.

### a. Hospital

A hospital must use "reasonable care in the care of the patient," here Mr. Pankey, "pursuant to the psychiatrists' directions[.]" *Lichtenstein v. Montefiore Hosp.,* 56 A.D.2d

281, 284 (1st Dep't 1977). The "reasonableness" of that care is "to be judged relative to all the circumstances, including the foreseeability and severity of the actual risk of suicide in the medical judgment of the psychiatrists." *Id.* This includes "the patient's physical and mental ills and deficiencies as known to the officers and employees of the institution." *Zajaczkowski v. State of New York,* 189 Misc. 299, 302 (Ct. Cl. 1947). In sum, the duty of reasonable care owed to a mental patient by a mental health facility includes, as relevant here, protection from foreseeable risks of suicide and other known risks, as well as reasonably competent care in accordance with the treating psychiatrist's decisions.

Once the Hospital determined that Mr. Pankey needed in-patient services and monitoring, its duty of care encompassed his remaining at the facility, which included guarding Mr. Pankey from his own machinations for escape of which the facility was aware. *See, e.g., Shattuck v. State,* 166 Misc. 271, 274 (Ct. Cl.), *aff'd,* 254 A.D. 926 (4th Dep't 1938) ("The State was forewarned by the first escape and should have taken proper measures to prevent the second[;] [in] [f]ailing to do so, it was guilty of negligence"); *Martindale v. State,* 269 N.Y. 554, 554 (1935) (finding of negligence warranted where hospital "knew that the deceased, while a patient in the hospital, was possessed of a desire and propensity to escape[,] [and] that on a previous occasion she had escaped through a similar window" yet left her sufficiently unguarded that she "removed a lug from the window of the toilet room through which she escaped," falling or jumping to her death); *see also Huntley v. State,* 62 N.Y.2d 134, 137 (1984) (psychiatric hospital "failed in its duty to supervise its patient adequately, leading to her injury," when staff members did not adequately share safety concerns with staff psychiatrist or take measures to secure patient's physical safety); *Miltz v. Ohel, Inc.,* 165 Misc. 2d 167, 170 (Sup. Ct. Nassau Cty. 1995) ("The duty to exercise reasonable care to restrain, and supervise [individual suffering from mental disorder] to prevent him from injuring himself or others was on the group home where he had resided for six years prior to the subject incident").

"Whether a breach of duty has occurred depends upon whether the resulting harm was a reasonably foreseeable consequence of the defendant's acts or omissions." *Gordon v. City of New York,* 70 N.Y.2d 839, 841 (1987). "Certainly suicide is within the realm of foreseeable consequences for a delusional patient even where there is no evidence of such ideations." *Bell v. New York City Health & Hosps. Corp.,* 90 A.D.2d 270, 284 (2d Dep't 1982). But, based on the facts alleged, it was also foreseeable that Mr. Pankey would attempt to escape from the Hospital in the manner alleged.

**\*22** The Hospital was aware the Mr. Pankey did not want to take his medication and had already attempted to flee from the unit in contravention of the decision to keep him as an inpatient. (*See* PAC ¶¶ 29, 36.) Nevertheless, the Hospital allegedly did little to guard against the chance that he would "push past" a nurse stationed at the exit—a known risk. *Compare Martindale,* 269 N.Y. at 554 (left patient unguarded despite known risk of escaping through windows), *and Shattuck,* 166 Misc. at 274 (failed to take steps to prevent a second, similar to the first, escape), *with Lichtenstein,* 56 A.D.2d at 283-84 ("a patient dressed in street clothes like visitors [ ], and intent on leaving the unit, could slip through the unlocked door without any negligence on the part of the hospital," where patient was in an open psychiatric unit); *Paradies v. Benedictine Hosp.,* 77 A.D.2d 757, 758 (3d Dep't 1980) (not negligent to allow a patient who was voluntarily admitted to later discharge himself after a finding that he was not a danger to himself or others), *and Hirsh v. State of New York,* 8 N.Y.2d 125, 126-27 (1960) ("Nobody knew where or how [a] drug was obtained by [the patient] nor where he had kept or accumulated these capsules in his room," making patient's overdose an unforeseeable event); *see also cf. Dunn v. State,* 29 N.Y.2d 313, 317 (1971) ("the State," which ran the institution in question, "should have foreseen, in the person of [the escapee]—a man with a history of violence and criminal behavior—a hazard to be guarded against," leading the court to conclude the institution had breached its duty "to protect the public").

The Court recognizes that sometimes a nurse is simply "a nurse, not a sentinel," *Lichtenstein,* 56 A.D.2d at 283, but Mr. Pankey required in-patient care and was not housed in an open unit. Moreover, once he had escaped, the Hospital issued an order *confirming* that he was a danger to himself and others. [21] Therefore, on the basis of the facts alleged in the complaint, Plaintiff has plausibly alleged that the Hospital was negligent—that it breached its duty of care as "measured by the patient's physical and mental ills and deficiencies as known to the officers and employees of the institution"— when it failed to prevent Mr. Pankey from leaving. [22] *See Zajaczkowski,* 189 Misc. at 302; *Cygan,* 165 A.D.2d at 67 (liability may exist "where an institution or mental health professional ... with the control necessary to care for the person's well-being fails to take such steps").

Case 9:19-cv-01161-DNH-TWD    Document 55    Filed 01/19/21    Page 91 of 103

Case v. Anderson, Not Reported in Fed. Supp. (2017)
2017 WL 3701863

21 These potentially negligent acts highlight the degree to which the claims asserted in this action overlap, *i.e.,* a determination of exactly what steps the Hospital undertook to inform the City, Town, and/or Sheriff will inform the inquiry as to those Defendants' potential deliberate indifference to Mr. Pankey's mental condition.

22 Plaintiff also alleges the Hospital should have ordered Mr. Pankey involuntarily committed (PAC ¶ 33), but on the basis of the allegations, the Court cannot infer that such a commitment would have been permissible, *see, e.g., Paradies v. Benedictine Hosp.,* 77 A.D.2d 757, 758-59 (3rd Dep't 1980) ("decedent was admitted as an informal patient under section 9.15 [of the Mental Hygiene Law], and, therefore, ... had the right to leave the hospital once he demanded his discharge"), making it impossible to infer the alleged failing could be negligent. Nevertheless, Plaintiff does plausibly allege additional negligence on the part of the Hospital when it failed to adequately inform all local law enforcement agencies of the issued Mental Hygiene order.

**b. Municipalities and Law Enforcement Officers**

"When a negligence claim is asserted against a municipality or its employees, the threshold inquiry is 'whether the municipal entity was engaged in a proprietary function or acted in a governmental capacity at the time the claim arose.' " *Velez v. City of New York,* 730 F.3d 128, 134 (2d Cir. 2013) (quoting *Applewhite v. Accuhealth, Inc.,* 21 N.Y.3d 420, 425 (2013)). If the State is "engage[d] in a proprietary function, such as providing medical and psychiatric care ..., the State is held to the same duty of care as private individuals and institutions engaging in the same activity[.]" *Schrempf v. State of New York,* 66 N.Y.2d 289, 294 (1985); *Sebastian v. State,* 93 N.Y.2d 790, 793 (1999) ("proprietary functions" are those "in which governmental activities essentially substitute for or supplement 'traditionally private enterprises' "). Running a jail or arresting an individual suspected of a crime, however, is prototypically governmental in nature. *See Villar v. Howard,* 28 N.Y.3d 74, 80-81 (2016) (without specifically addressing functional considerations, the Court of Appeals implied claims against a municipality and its employees related to its jail involved governmental functions); *see also Eddy v. Vill. of Ellicottville,* 35 A.D. 256, 262 (4th Dep't 1898) (though governments are no longer absolutely immune, "it has been held that the duty and function of keeping a jail are plainly and properly governmental in character").

*23 Where the State, or a municipality, is engaged in a governmental function—"when its acts are undertaken for the protection and safety of the public pursuant to the general police powers," *Applewhite,* 21 N.Y.3d at 425—two considerations arise. First, to be subject to liability the government must owe the plaintiff a "special duty" beyond that owed to the general public. *Velez,* 730 F.3d at 135; *Graham v. City of New York,* 136 A.D.3d 747, 748 (2d Dep't 2016) (a "special duty is a duty to exercise reasonable care toward the plaintiff, and is born of a special relationship between the plaintiff and the governmental entity") (quotation marks and citations omitted). Second, a determination as to whether the governmental function was discretionary or ministerial is required. This is because in New York "the common law doctrine of governmental immunity continues to shield public entities from liability for discretionary actions taken during the performance of governmental functions," as opposed to those acts which are "essentially clerical or routine[.]" *Valdez v. City of New York,* 18 N.Y.3d 69, 75-76, 79 (2011). "[W]hen both of these doctrines are asserted in a negligence case, the rule that emerges is that '[g]overnment action, if discretionary, may not be a basis for liability, while ministerial actions may be, but only if they violate a special duty owed to the plaintiff, apart from any duty to the public in general." *Id.* (quoting *McLean v. City of New York,* 12 N.Y.3d 194, 203 (2009)).

Addressing the first part of the test applicable to governmental actions, it is well-established in New York that when the State "assume[s] physical custody of inmates [or detainees], who cannot protect and defend themselves in the same way as those at liberty can, the State owes a duty of care to safeguard" those individuals from harm. *See Sanchez v. State of New York,* 99 N.Y.2d 247, 252 (2002) (considering harm from other inmates); *Gordon,* 70 N.Y.2d at 840 ("a duty of care is owed by prison authorities with respect to the health and safety of their charges") (considering duty to protect an arrestee from self-harm). The special relationship between the State and a pretrial detainee differs from the usual case where courts are "asked to impose liability on the government because it failed to prevent the acts of third persons who are the primary wrongdoers," *see Pelaez v. Seide,* 2 N.Y.3d 186, 205-06 (2004), because "[t]he affirmative duty to protect arises not from the State's knowledge of the individual's predicament or from its expression of intent to help him, but from the limitation which it has imposed on his freedom to

2017 WL 3701863

act on his own behalf." *DeShaney,* 489 U.S. at 200; *see also Bailey v. Tricolla,* No. 94 Civ. 4597 (CPS), 1996 WL 733078, at *3 (E.D.N.Y. Dec. 11, 1996) ("Special relationships that ... give rise to a [constitutional] governmental duty to protect [ ] have included ... the relationship between a police officer and a pretrial detainee.").

This recognized special duty on the part of officers, jails and jailers, owed to pretrial detainees does not mean, however, that all negligent acts undertaken during the care of a detainee will result in liability. It will, at some point, be necessary to determine whether the activity was ministerial or discretionary, since the former will render the governmental immunity defense inapplicable while the latter will compel its immunizing force. Nevertheless, having determined that as a matter of law municipalities and their employees owe a special duty of care to detainees, the defense turns on questions of fact which are not appropriately determined at the motion to dismiss stage. *See Villar,* 28 N.Y.3d at 80-81 (party asserting governmental immunity, an affirmative defense, bears burden of proof, precluding resolution of issue at the pleading stage).[23]

[23]    Another court in this District has recently had occasion to consider the application of governmental immunity to jailer's alleged negligence, similarly concluding at the summary judgment stage that disputed questions of fact required the fact finder to determine whether the government was exercising ministerial or discretionary authority in particular aspects of the operation of a jail. *See Torres v. City of New York,* No. 09 Civ. 9357 (LGS), 2017 WL 2191601, at *5 (S.D.N.Y. May 17, 2017) ("If the jury finds that the City did owe [detainee] a special duty and that the City's conduct was unconstitutional, then the affirmative defense of governmental immunity is unavailable as a matter of law as the City's conduct was ministerial."); *id.* at *4 (concluding "City officials lack discretion to violate the governing rules set forth by the United States Constitution").

 *24  Upon this background, the Court turns to addressing whether the law enforcement officers or their respective municipalities breached the duty of care owed to Mr. Pankey. Although "a duty of care is owed by prison authorities with respect to the health and safety of their charges," *Gordon,* 70 N.Y.2d at 840, "the State's duty to prisoners does not mandate unremitting surveillance in all circumstances, and does not

render the State an insurer of inmate safety." *Sanchez,* 99 N.Y.2d at 256. "[T]he scope of the State's duty to protect inmates is limited," as in all negligence actions, "to risks of harm that are reasonably foreseeable." *Id.* at 253. Yet "foreseeability is defined not simply by actual notice *but by actual or constructive notice*[.]" *Id.* at 255 (emphasis added). The Court thus returns to the question of whether these officers "fail[ed] to take reasonable steps to prevent a reasonably foreseeable suicide" while having "actual physical custody" of Mr. Pankey. *Cygan,* 165 A.D.2d at 67.

### i. City & Town Officers

"When [ ] authorities know or should know that a prisoner has suicidal tendencies or that a prisoner might physically harm himself, a duty arises to provide reasonable care to assure that such harm does not occur." *Gordon,* 70 N.Y.2d at 840. Since the Court has already determined that the allegations plausibly support an inference that the officers were reckless —or deliberately indifferent—with regard to Mr. Pankey's mental health needs, Plaintiff has sufficiently alleged they were potentially negligent, or grossly negligent, in their handling of his arrest and transfer in light of their knowledge of the Mental Hygiene order. The City and Town Officers, therefore, breached their respective duties to provide Mr. Pankey with reasonable care to ensure he did not physically harm himself.[24]

[24]    The City concedes the allegations could amount to negligence. (*See* City Mem. at 6 ("At most, mere negligence is alleged."); *id.* at 8 (focusing on proximate cause rather than the allegedly breached duty of care).)

### ii. Sheriff & Deputies

"Inasmuch as 'the Sheriff is [similarly] prescribed, by law, to safely keep inmates of the County Jail,' " the "duty of care to safeguard inmates" is equally applicable to Sheriffs, Deputies, and Counties. *See Villar,* 28 N.Y.3d at 80; *Stevens v. Dutchess Cty.,* 445 F. Supp. 89, 93-94 (S.D.N.Y. 1977) (finding "alleg[ations] [of] gross negligence on the part of the sheriff in maintaining and supervising [a] jail in violation of his duty of care" actionable).[25] A Sheriff cannot, however, be held vicariously liable for deputies' negligent acts committed while performing criminal justice functions, *see Barr v. Albany County,* 50 N.Y.2d 247, 257 (1980), such as

" 'guarding prisoners' in a county jail[.]" *Trisvan v. County of Monroe,* 26 A.D.3d 875, 876 (4th Dep't 2006) (quoting *Wilson v. Sponable,* 81 A.D.2d 1, 4 (4th Dep't 1981)); *see also D'Amico v. Corr. Med. Care, Inc.,* 120 A.D.3d 956, 959 (4th Dep't 2014) ("a Sheriff cannot be held personally liable for the acts or omissions of his deputies while performing criminal justice functions, and that this principle precludes vicarious liability for the torts of a deputy"). The County employees, therefore, each had an individual duty to use reasonable care to prevent inmate harm, including when conducting the screening per their usual practices.

25   Though Plaintiff need not "allege that [the Sheriff] was present and failed to prevent the [harm] [to Mr. Pankey], or had specific prior knowledge that [Mr. Pankey] was particularly vulnerable to [self-harm]," here she has done just that, making the allegations more than sufficient to withstand a motion to dismiss. *See Villar v. Howard,* 28 N.Y.3d 74, 80-81 (2016).

The Court has already determined that the law enforcement Defendants—including the Sheriff personally—acted with at least recklessness with regard to Mr. Pankey's mental health issues. Thus, these individual acts and omissions constitute breaches of their respective duties of care owed to Mr. Pankey. [26] It may be that at summary judgment the record will not support a finding that the law enforcement officers knew or should have known that Mr. Pankey was a risk to his own well-being, making his suicide unforeseeable. [27] *Moore v. City of Troy,* 179 A.D.2d 842, 843 (3d Dep't 1992) (where "unruly behavior" could not be viewed as "manifestation of suicidal tendencies," evidence presented at trial was "insufficient to establish that defendant knew or should have known that decedent would harm himself"); *Mayo v. Cty. of Albany,* No. 07 Civ. 0823 (GLS) (DRH), 2009 WL 935804, at *5 (N.D.N.Y. Apr. 3, 2009), *aff'd,* 357 Fed.Appx. 339, 343 (2d Cir. 2009) (an entirely conclusory assertion that plaintiff was a suicide risk was insufficient to defeat summary judgment, where all other evidence indicated that "defendants could not have reasonably perceived the risk that [detainee] would attempt suicide nor c[ould] it be said that defendants acted unreasonably by not treating her as a suicide risk"); *but see Black v. City of Schenectady,* 21 A.D.3d 661, 662 (3d Dep't 2005) (jury considered whether placing arrestee on active watch rather than constant supervision was negligent despite little to no indication that detainee was at risk of suicide).

26   Plaintiff's allegations that the Sheriff's office employees were also negligent in failing to provide Mr. Pankey with the medication necessary to control his disorder, (PAC ¶¶ 96, 132), however, are conclusory as they assume that jail should have been aware he needed such medication. Such allegations, therefore, cannot support her negligence claims.

27   The County essentially concedes, additionally evidenced by its lack of argument to the contrary, that the allegations in this matter may amount to negligence. (*See* County Mem. at 6 ("The case against the County belongs in state court based upon Plaintiff's negligence theories").)

**\*25**  But at this juncture, Plaintiff has plausibly alleged that each set of officers, deputies, and the Sheriff breached their respective duties to safeguard Mr. Pankey from the known, or apparent, risk of self-harm. *See Cygan,* 165 A.D.2d at 67; *Gordon,* 70 N.Y.2d at 840; *cf. Fischer v. City of Elmira,* 75 Misc. 2d 510, 513 (Sup. Ct. Chemung Cty. 1973) (where complaint alleged failure to make a proper examination and failure to provide, as requested, adequate medication on the part of city and county, plaintiff alleged negligence including the "reasonable inference [of] a failure to take proper medical precautions to guard the plaintiff, a known epileptic, from causing injuries to himself").

### iii. City & Town Municipal Liability

"[I]n contrast to claims brought under 42 U.S.C. § 1983, *respondeat superior* liability does apply to claims brought under New York state law" against municipalities. *Aponte v. City of New York,* No. 14 Civ. 3989 (KMK), 2016 WL 5394754, at *7 (S.D.N.Y. Sept. 26, 2016) (collecting cases); *Poniatowski v. City of New York,* 14 N.Y.2d 76, 82 (1964) ("municipalities have been repeatedly held liable on a master and servant basis for every variety of negligence by its policemen"). In this fashion, municipalities have been held liable for the acts of their jailers—for example, in the case of a man, arrested and held in a village jail, dying from pneumonia as a result of negligent exposure and failure to treat his medical injury. *See, e.g., Dunham v. Vill. of Canisteo,* 303 N.Y. 498, 503 (1952) ("the village authorities were under a duty to obtain medical care for the deceased"). [28] Thus, the City and the Town may be held liable for the acts of their officers, if the eventual record supports a finding that they

Case 9:19-cv-01161-DNH-TWD    Document 55    Filed 01/19/21    Page 94 of 103

Case v. Anderson, Not Reported in Fed. Supp. (2017)

2017 WL 3701863

were acting within the scope of their employment. "Because the question of whether an officer's actions 'were committed within the scope of his public employment and the discharge of his duties raises factual questions,' such inquiries often survive motions for summary judgment, let alone motions to dismiss." *Guzman v. United States,* No. 11 Civ. 5834 (JPO), 2013 WL 543343, at *9 (S.D.N.Y. Feb. 14, 2013) (quoting *Williams v. City of New York,* 64 N.Y.2d 800, 802 (1985)), *on reconsideration,* 2013 WL 5018553 (S.D.N.Y. Sept. 13, 2013) (dismissing *Monell* claims).

28    The Court also notes that New York Corrections Law § 24 does not bar claims against a city's correctional employees or claims against the city itself asserted on a *respondeat superior* basis. *See Plair v. City of New York,* 789 F. Supp. 2d 459, 467 (S.D.N.Y. 2011) (provision applies only to *state* correctional employees).

However, although "an employer may generally be liable for an employee's negligence where the employee is acting within the scope of his or her employment under a theory of *respondeat superior,* [ ] no claim may proceed against the employer for negligent hiring, retention, supervision or training" on that basis alone. *Nesheiwat v. City of Poughkeepsie, N.Y.,* No. 11 Civ. 7072 (ER), 2013 WL 620267, at *2 (S.D.N.Y. Feb. 13, 2013) (noting a limited exception where gross negligence in the hiring or retention of an employee is alleged and punitive damages are sought) (citations omitted). Rather, "a cause of action sounding in negligence is legally sustainable against a [municipality] when the injured party demonstrates that he was injured *due to* the negligent training and supervision of a law enforcement officer." *Barr,* 50 N.Y.2d at 257 (citing *Meistinsky v. City of New York,* 285 A.D. 1153 (2d Dep't 1955), *aff'd,* 309 N.Y. 998 (1956)) (emphasis added); *Rew v. Cty. of Niagara,* 115 A.D.3d 1316, 1318 (4th Dep't 2014) (applying principal to defendant sheriff); *Martinetti v. Town of New Hartford Police Dep't,* 307 A.D.2d 735, 736 (4th Dep't 2003) (reinstating claim "alleg[ing] that the Town failed to train and supervise the police properly").

**\*26**  To the extent Plaintiff is asserting policy based claims against the City and the Town, such claims are based on conclusory allegations of "a policy of deliberate indifference to the rights, safety and welfare of [Mr. Pankey]," (see, *e.g.,* PAC ¶ 164), without any specifics alleged other than the failings by the John Doe officers of the respective jurisdictions in the handling of Mr. Pankey's arrest and transfer. Plaintiff neither alleges that the officers occupied a policymaking role within the City nor that they were acting outside of the scope of their employment. These conclusory allegations against the municipalities, therefore, fail to state an independent claim under New York law with regard to supervision or training. *See, e.g., Leftenant v. City of New York,* 70 A.D.3d 596, 597 (1st Dep't 2010) ("since the officers were acting within the scope of their employment, which plaintiff does not dispute, the claim of negligent hiring, training and supervision must also fail"); *cf. Ryan v. Moss,* No. 11 Civ. 6015P (MWP), 2013 WL 956722, at *19 (W.D.N.Y. Mar. 12, 2013) (summary judgment granted in favor of defendants where plaintiff "failed to provide any evidence that the Sheriff Office's manner or practice of training and supervising [employees] was deficient or inadequate"); *Scott v. City of Mount Vernon,* No. 14 Civ. 4441 (KMK), 2017 WL 1194490, at *32 (S.D.N.Y. Mar. 30, 2017) (same).

### iv. County Liability

Counties, however, are treated differently under New York law. Absent a legislative assumption of responsibility, a county cannot be held liable on the theory of *respondeat superior* for the negligent acts of either the Sheriff or Sheriff's deputies. *Marashian v. City of Utica,* 214 A.D.2d 1034, 1034 (4th Dep't 1995) ("The 1989 amendment to the New York Constitution, article XIII, § 13(a) merely allows a county to accept responsibility for the negligent acts of the Sheriff; it does not impose liability upon the county for the acts of the Sheriff or his deputies on a theory of *respondeat superior*"); *D'Amico,* 120 A.D.3d at 959. Thus, only specific allegations relating to the County's "negligent training and supervision" of its law enforcement officers will state a claim against the County. *Cf. Meistinsky,* 285 A.D. at 1153, *aff'd,* 309 N.Y. 998 (1956) ("negligence on the part of [the city], on the theory that the officer had not received sufficient and proper training in the use of small firearms, was established"). Additionally, as mentioned above, the "State's constructive notice—what the State reasonably should have known"—can stem, "for example, from its knowledge of risks to a class of inmates based on the institution's expertise or prior experience, or from its own policies and practices designed to address such risks." *Sanchez,* 99 N.Y.2d at 254; *see also Wilson,* 81 A.D.2d at 9 ("a scheme [designed to further inmate protection] once drawn up may render the state liable, if carried out negligently").

On the basis of the allegations in the complaint, the Court cannot conclude that the County jail had a duty to employ

2017 WL 3701863

trained psychologists "to detect suicidal tendencies," rather than the Deputies or CMC employees (see, *e.g.,* PAC ¶ 184(b) (policy demonstrated, *inter alia,* by "not using a medical professional to conduct a suicide screening")) —and thus cannot conclude that the duty owed to Mr. Pankey by the County also included a *more rigorous* suicide screening protocol. *See* 9 N.Y. Comp. Codes R. & Regs. § 7013.7 (a) & (b)(4-5) ("Each inmate upon admission to a facility shall undergo an initial screening and risk assessment which shall consist of a screening interview, visual assessment and review of commitment documents. Such screening and risk assessment shall occur immediately upon an inmate's admission," and include areas such as "history of mental illness or treatment" and "potential for self-injury or suicide"); *see, e.g., Burke v. Warren Cty. Sheriff's Dep't,* 916 F. Supp. 181, 186 (N.D.N.Y. 1996) (court determined that the county, despite having undertaken to install surveillance cameras, was not under a duty to keep them continually operational).

As discussed above, however, Plaintiff has plausibly alleged the Sheriff was involved in the alleged acts and omissions such that a reasonable inference exists that he failed to properly train or supervise the County Deputies with regard to the proper treatment and screening of pretrial detainees, which also plausibly alleges County acquiescence in such a policy. *Cf. Cash v. Cty. of Erie,* No. 04 Civ. 0182C(F) (JTC), 2007 WL 2027844, at *5 (W.D.N.Y. July 11, 2007) (denying summary judgment on negligence claims where genuine issue of fact existed with regard to whether sheriff failed to properly train deputy in question). Because Plaintiff has alleged a degree of personal involvement by the Sheriff which allows both the inference that the Sheriff himself was negligent and the inference that he failed to supervise and to train his Deputies during the time when Mr. Pankey was held at the jail, the claims against the County cannot be dismissed at this juncture.

 *27  With regard to CMC, although § 1983 claims would fail if asserted against it (*see supra* note 20), Plaintiff's alternative pleading suffices at this stage to allege CMC may be liable for negligent acts of its employees. CMC employees, acting within the scope of their employment, are alleged to have taken part in the care of Mr. Pankey. Exactly which employees —County Deputies or CMC personnel—were involved in Mr. Pankey's treatment is wholly within the knowledge of the County and CMC. The Court notes that CMC's arguments for dismissal centered solely on Mr. Pankey's constitutional claims (*see* CMC Mem. at 1, 6), implying a tacit acceptance that if

those claims were not dismissed then the state law negligence claims would proceed. (*See id.* at 4 ("it is implied that unnamed CMC employees were negligent").) Therefore, the negligence claims asserted against CMC survive.

### c. Questions of Causation

"A defendant's negligence qualifies as a proximate cause where it is 'a substantial cause of the events which produced the injury.' " *Mazella v. Beals,* 27 N.Y.3d 694, 706 (2016) (quoting *Derdiarian v. Felix Contr. Corp.,* 51 N.Y.2d 308, 315 (1980)). As the New York Court of Appeals has made clear: "it is rather obvious[ ] that there never can be a sole cause for suicide." *Fuller,* 35 N.Y.2d at 433. Instead, the issue is "whether the defendants' negligence *substantially contributed* to [the decedent's] death." *Id.* (emphasis added). And while "there may be and undoubtedly have been cases where the causal nexus becomes too tenuous to permit a jury to 'speculate' as to the proximate cause of [a] suicide," *id.* at 434, this is not such a case. *See, e.g., Paradies,* 77 A.D.2d at 758 (no evidence was presented to establish a causal connection between the alleged acts of negligence and the subsequent suicide, which occurred approximately three weeks after the decedent's release from the hospital); *cf. Mroz v. City of Tonawanda,* 999 F. Supp. 436, 458-61 (1998) (no causal connection existed between alleged failure to protect a minor's suicide, where he was arrested by police, cried continuously while in custody, and was then released and taken home less than one hour later); *Van Valkenburgh v. Robinson,* 225 A.D.2d 839, 840-41 (3d Dep't 1996) (alleged negligence of village police and officer—allowing wife of officer to gain access to officer's service weapon—was not the proximate cause of wife's suicide, an intentional intervening act that was not reasonably foreseeable as a result of such negligence); *Watkins v. Labiak,* 282 A.D.2d 601, 602 (2d Dep't 2001) ("suicide was not a foreseeable consequence of the defendants' alleged negligence," medical malpractice during a back surgery).

Rather, as to each set of Defendants, there were opportunities at each juncture to avoid the harm which occurred. The escape and then transfer from jurisdiction to jurisdiction does not sever the causal link at each step; instead, it demonstrates the potential for a number of actors to exhibit similar negligence for which they may ultimately be liable. *See Mazella,* 27 N.Y.3d at 706 ("The mere fact that other persons share some responsibility for plaintiff's harm does not absolve defendant from liability because 'there may be more than one proximate cause of an injury.' ") (citation omitted); *Bell,* 90 A.D.2d at 285 ("an "intervening act must be a new and independent

Case 9:19-cv-01161-DNH-TWD   Document 55   Filed 01/19/21   Page 96 of 103

Case v. Anderson, Not Reported in Fed. Supp. (2017)

2017 WL 3701863

force, for it is well settled that a defendant will not be relieved of liability where the intervening act was set in motion by the defendant's own wrongful acts").

With regard to the Hospital:

> If the danger (from the patient's leaving) foreseen and to be guarded against by the hospital was suicide and the hospital failed to use reasonable care—reasonable being determined in the light of the circumstances discussed above—to safeguard the patient against escape and suicide, and if as a result of that lack of reasonable care, the patient escaped and suffered the very harm foreseen and to be guarded against—suicide— then the jury could reasonably find that the hospital's negligence was a proximate cause of the suicide.

**\*28** *Lichtenstein,* 56 A.D.2d at 285. Despite arguing that Mr. Pankey's "elopement did not cause or trigger the acts or omissions of the municipal defendants as alleged in the complaint," (see Hosp. Reply at 3), which may be true, the Hospital ignores that the alleged negligence may have substantially contributed to putting Mr. Pankey into harm's way—such that the very harm to be protected against was realized.

Thus, the Hospital's attempt to analogize this situation to the one presented in *Dunn v. State,* 29 N.Y.2d 313 (1971), involving claims brought by the estate of an innocent bystander, is unavailing, and Mr. Pankey's escape, brought about by the Hospital's alleged negligence, more closely resembles the attempted suicide in *Bell v. New York City Health & Hosps. Corp.,* 90 A.D.2d 270 (2d Dep't 1982), where a patient committed suicide after the treating hospital was negligent. *Compare Dunn,* 29 N.Y.2d at 317 (when escapee found keys in a car and eventually crashed into an unsuspecting driver, "[t]hese were intervening causes which brought about the death of [the driver] and consequently, because of this break in the chain of causation, the [institution's] negligence was not the proximate cause of the injuries complained of"), *with Bell,* 90 A.D.2d at 285 (suicide "was a product of the illness for which [the patient]

was negligently treated, and his premature release from the hospital."). The duty allegedly breached was owed directly to Mr. Pankey (as in *Bell*) not a third-party (like the bystander in *Dunn*), and the breach of that duty was to *his* detriment (again, as in *Bell*).

Moreover, when the intervening acts are "but part of a continuum of events initiated by the defendants' original misconduct,' *id.* at 286, the acts which follow will not sever the causal chain, though they may contribute to the ultimate injury. *See also Derdiarian,* 51 N.Y.2d at 315 ("[b]ecause questions concerning what is foreseeable and what is normal may be the subject of varying inferences, as is the question of negligence itself, these issues generally are for the fact finder to resolve"). Thus, it cannot be decided at the motion to dismiss stage whether the City and the Town, their actions and inactions, "substantially contributed' to Mr. Pankey's eventual demise, though the Court notes that on the basis of the allegations, they certainly could have. The City's attempt to rely on *Dunn* to defeat causation as a matter of law (*see* City Mem. at 9) is similarly unavailing, since it allegedly breached its own independent duty of care and that breach led to the harm it was supposed to protect against. Nor can the Town absolve itself "[e]ven if [it] breached a duty by delivering [Mr. Pankey] to the court" by pointing out that, afterwards, he was "arraigned and lawfully remanded into the custody of Dutchess County." (*See* Town Mem. at 14.) Such a transfer does not constitute a "new and independent force," *Bell,* 90 A.D.2d at 285, but instead continues the chain of events set into motion by the Hospital—and continued by the City and again by the Town. *See Derdiarian,* 51 N.Y.2d at 316 ("An intervening act may not serve as a superseding cause, and relieve an actor of responsibility, where the risk of the intervening act occurring is the very same risk which renders the actor negligent."). And the County and CMC, the final set of allegedly negligent tort-feasors, rightly do not argue the impossibility that the claimed negligence contributed to Mr. Pankey's death. (*See, e.g.,* County Reply at 5 ("This case presents common law negligence issues with respect to [ ] the claims ... that his care, once at the jail, was inadequate.").)

**\*29** Therefore, at this stage, it is not purely speculative as a matter of law to conclude that the Defendants may have each substantially contributed to this unfortunate outcome.

\* \* \*

2017 WL 3701863

This case, as alleged, does not involve "an ingenious and motivated patient" that simply could not be stopped. *See Hirsh*, 8 N.Y.2d at 127 ("An ingenious patient harboring a steady purpose to take his own life cannot always be thwarted."). Rather, Mr. Pankey appears to have been a mental health patient that needed monitoring but instead, after an alleged breach of a duty of care, ran free. He was then allegedly subjected to deliberate indifference when he was arrested and detained by law enforcement officers. Each set of officers owed Mr. Pankey the duty "to provide reasonable care to assure that [ ] harm [resulting from his mental illness] d[id] not occur." *Gordon*, 70 N.Y.2d at 840. But Plaintiff has sufficiently pleaded negligent acts and omissions against the Defendants to plausibly allege that those duties were breached. Therefore, these claims survive Defendants' motions to dismiss.

## III. Motion to Amend

Plaintiff's motion to amend only implicated the City Defendants—as the amendments involved the addition of City "John Doe" Officers and, by subsequent letter, a continuation of Plaintiff's negligence causes of action from the Second Amended Complaint (Second Am. Compl. ¶¶ 56-64, 179-86, ECF No. 49), based on the City Officers alleged misconduct under a *respondeat superior* theory. In response, the City argues that Plaintiff's amendments are too late pursuant to the scheduling order in this case, which set a deadline of September 15, 2016, though admits discovery has been stayed pending the resolution of these motions. (City Reply at 3.) Because leave to amend would not be futile based on the proposed amendments, this Court must decide whether there was undue delay in seeking leave, whether the proposed amendments are made in bad faith or would unduly prejudice Defendant City, or whether Plaintiff has failed to show "good cause" under Rule 16(b) to amend the scheduling order.

There is no indication from the proposed Third Amended Complaint that the amendments are made in bad faith—in fact, Plaintiff has been conscientious during briefing and withdrawn claims lacking support. Moreover, the initial scheduling order was issued at the same time that the briefing schedule on the motions to dismiss was set, and Plaintiff served her motion to amend *during* the briefing of the motions to dismiss on September 26, 2016, ten days after the cut-off. Plaintiff's diligence in this regard provides "good cause." *See Parker*, 204 F.3d at 326. Finally, there is no indication that *any* of the Defendants—all of whom have been on notice of this action since the Notices of Claim were filed, and all of

which took part in the 50-h hearing—would be prejudiced by the amendments.

Leave to amend is, therefore, granted. Plaintiff's proposed complaint should also formally assert her negligence claim—requested by follow-up letter—against the City and allege any facts regarding pecuniary loss as applicable to the dismissed wrongful death claims.

## IV. Hospital's Counterclaims

Certain Defendants also sought dismissal of the Hospital's counterclaims for contribution and indemnification. (*See* CMC Mem. at 7; Town Mem. at 16.) When the Hospital did not submit a reply to these arguments, CMC further argued that the Hospital had abandoned its claims. (*See* CMC Reply at 1.) This ignores, however, that CMC's pre-motion letter (ECF No. 95) did not seek leave to address the Hospital's counterclaims. Moreover, the Court did not grant such leave when it allowed CMC to file its motion to dismiss Plaintiff's claims alleged against it pursuant to § 1983. But in any event, under New York law, "contribution may be claimed [ ] against 'persons who are subject to liability for damages for the same personal injury.' " *Goldstein v. Consol. Edison Co. of New York*, 115 A.D.2d 34, 41 (1st Dep't 1986). Therefore, the contribution based counterclaims will not be dismissed at this juncture, given the uncertainty surrounding which Defendants, if any, may ultimately be found liable in this action.

**\*30** As the Town Defendants correctly explain (see Town Mem. at 16), however, contribution is distinct from indemnification:

> Contribution arises automatically when certain factors are present and does not require any kind of agreement between or among the wrongdoers. Indemnity, on the other hand, *arises out of a contract* which may be express or may be implied in law "to prevent a result which is regarded as unjust or unsatisfactory."

*Rosado v. Proctor & Schwartz, Inc.*, 66 N.Y.2d 21, 24 (1985) (citations omitted and emphasis added). Because the Hospital has failed to allege the existence of an agreement, implied or otherwise, between it and any of the Defendants (see Hosp. Ans. and Counterclaims, ECF No. 105), the indemnification based counterclaims must be dismissed.

2017 WL 3701863

## CONCLUSION

For the foregoing reasons, Plaintiff's motion seeking leave to amend her complaint is GRANTED, and Defendants' motions to dismiss are GRANTED in part and DENIED in part. Plaintiff has withdrawn her § 1983 claims against the City and Town, as well as their respective police chiefs. She has also withdrawn her § 1983 claims against CMC. These claims are dismissed. Additionally, Plaintiff has failed to state a claim for wrongful death under New York law, and those claims are dismissed without prejudice with leave to amend. Plaintiff's other claims survive in accordance with this Opinion. On the basis of CMC and the Town's cross-motions to dismiss the Hospital's counterclaims of indemnification, those claims are also dismissed against all Defendants. The Hospital's counterclaims of contribution, however, are not dismissed. The Clerk of the Court is respectfully directed to terminate the motions at ECF Nos. 78, 85, 88, 97, 109 & 114.

Plaintiff shall file the proposed Third Amended Complaint on or before September 18, 2017. The only modifications to the proposed complaint allowed by this Order include a) clarifying which causes of action are asserted directly against the City, and b) adding allegations, if any exist, regarding Plaintiff's loss in support of the dismissed wrongful death claims. Defendants are directed to thereafter file an answers, if any, to the Third Amended Complaint on or before October 16, 2017. The parties are directed to inform Judge McCarthy of this Court's ruling in writing before September 18, 2017.

SO ORDERED:

**All Citations**

Not Reported in Fed. Supp., 2017 WL 3701863

---

End of Document

© 2021 Thomson Reuters. No claim to original U.S. Government Works.

2019 WL 1429592
Only the Westlaw citation is currently available.
United States District Court, S.D. California.

ARCTIC ZERO, INC., a
Delaware Corporation, Plaintiff,

v.

ASPEN HILLS, INC., an Iowa Corporation,
Thomas Lundeen, an individual, Nancy
Lundeen, an individual and Does 1
through 25, inclusive, Defendants.

Case No.: 17-CV-00459-AJB-LL
|
Signed 03/29/2019

**Attorneys and Law Firms**

J. Noah Hagey, John Tobias Rowe, Taylor Altman, BraunHagey & Borden, LLP, San Francisco, CA, for Plaintiff.

J. Barrett Marum, Sheppard Mullin Richter & Hampton LLP, San Diego, CA, for Defendant Aspen Hills, Inc.

Johannes Howard Moorlach, Pro Hac Vice, Peter Joseph Chalik, Pro Hac Vice, Whitfield & Eddy Law, Des Moines, IA, Joseph John Kagan, Peter S. Doody, Higgs Fletcher & Mack, San Diego, CA, for Defendants Thomas Lundeen, Nancy Lundeen.

**ORDER:**

**(1) GRANTING IN PART AND DENYING IN PART ASPEN HILL'S MOTION FOR JUDGMENT ON THE PLEADINGS; AND**

**(2) DENYING ARCTIC ZERO'S MOTION FOR SUMMARY JUDGMENT**

Hon. Anthony J. Battaglia, United States District Judge

**\*1** Presently before the Court are Aspen Hills, Inc.'s motion for judgment on the pleadings, (Doc. No. 57), and Artic Zero, Inc.'s motion for summary judgment, (Doc. No. 64). Having reviewed the parties' arguments and controlling legal authority, and pursuant to Civil Local Rule 7.1.d.1, the Court finds the matters suitable for decision on the papers

and without oral argument. As will be explained in greater detail below, the Court **GRANTS** in part and **DENIES** in part Defendant's motion for judgment on the pleadings and **DENIES** Plaintiff's motion for summary judgment.

**FACTUAL AND PROCEDURAL BACKGROUND**

Plaintiff is a corporation organized under the laws of the state of Delaware with its principal place of business in San Diego, California. (Doc. No. 3 ¶ 4.) Aspen Hills is a former cookie dough manufacturer, organized under the laws of the state of Iowa with its principal place of business in Garner, Iowa. (Id. ¶ 5; Doc. No. 6 at 8.) [1] The Lundeens are individuals who reside in the state of Iowa and are co-owners of Aspen Hills. (Doc. No. 3 ¶¶ 6, 7.)

[1]   Page numbers refer to the CM/ECF page number and not the number listed on the original document.

The events leading up to this dispute arose in 2016, when Aspen Hills recalled 287 cases of allegedly negligently manufactured brownie dough. (Doc. No. 6 at 8; Doc. No. 24 at 9.) There were over $ 11 million in claims being asserted against Aspen Hills. (Doc. No. 6 at 8.) As a result of the substantial claims asserted against Aspen Hills and the limited assets available for distribution, receivership proceedings involving Aspen Hills commenced in Iowa District Court for Hancock County—A.H. Properties v. Aspen Hills, Inc., Hancock County Case No.: EQCV019535. (Id.)

Plaintiff and Aspen Hills were in an arrangement that centers on an October 1, 2015 Ingredient Supply Agreement. (Doc. No. 3 ¶ 19.) Under this agreement, Aspen Hills, among other things, agreed to indemnify Plaintiff against any and all claims, warranted that each ingredient conformed strictly to all domestic and foreign regulatory requirements, and merited that each ingredient would be fit and sufficient for the purpose intended. (Id. ¶¶ 20–22; Doc. No. 3-1 at 7.) Additionally, Aspen Hills agreed to reimburse Plaintiff for all costs and expenses incurred as a result of a recall of ingredients supplied by it. (Doc. No. 3-1 at 10.) Section 15(a) of the Agreement provides that:

> In the event an Ingredient is the subject of a recall (which includes safety notices) initiated by Arctic Zero, Supplier, or a government or

consumer protection agency, Supplier will be responsible for all costs and expenses associated with the recall or notice and shall reimburse Arctic Zero, for all costs and expenses incurred by Arctic Zero related to the recall or notice, including recalling, shipping and/or destroying the Ingredient (and where applicable, any products with which the Ingredient has been packaged, consolidated, processed or commingled), including Arctic Zero's net landed cost of unsold products containing the Ingredient.

**\*2** (*Id.*)

After the recall, Plaintiff allegedly incurred costs and expenses amounting to at least $ 572,375.33, including the cost of disposed product, lost revenue, credits for products returned to vendors, and various costs associated with transportation, landfill fees, and testing fees. (Doc. 3 ¶ 33.) On December 23, 2016, Plaintiff tendered this documentation of its costs and expenses to Mr. Lundeen. (*Id.* ¶ 34.)

On November 20, 2017, the Court denied Defendants' motions to dismiss or stay. (Doc. No. 32.) Accordingly, receivership proceedings in the Iowa Court have run parallel to this action. (Doc. 64-1 at 5.) The Iowa Court allowed Plaintiff's claims against Aspen Hills for breach of contract and negligence. (*Id.* at 6.) Plaintiff tendered its breach of contract and negligence claims in the Iowa Court. (*Id.*) The Iowa Court required that Aspen Hills' liability insurer perform an initial review to determine whether creditors had established liability for a covered claim. (*Id.*) The Insurer Report established that Plaintiff's damages for negligence and breach of contract were covered and payable in the amount of $ 439,859.33. (*Id.*; Doc. No. 57-2 at 13, 29.) On November 8, 2017, the Iowa Court issued an Order Approving Receiver's Recommendations on Claims and Proposed Distribution Plan. (Doc. No. 57-1 at 3; Doc. No. 64-1 at 7.) Accordingly, Plaintiff is to be awarded $ 439,859.33 for Plaintiff's receivership claim. (*Id.*) This Order now follows.

## LEGAL STANDARD

### A. Motion for Judgment on the Pleadings

"After the pleadings are closed – but early enough not to delay trial – a party may move for judgment on the pleadings." *Fed. Civ. Pro. R. 12(c)*. "A district court will render a 'judgment on the pleadings when the moving party clearly establishes on the face of the pleadings that no material issue of fact remains to be resolved and that it is entitled to judgment as a matter of law." *Enron Oil Trading & Transp. Co. v. Walbrook Ins. Co. Ltd.*, 132 F.3d 526, 529 (9th Cir. 1997) (quoting *George v. Pacific – CSC Work Furlough*, 91 F.3d 1227, 1229 (9th Cir. 1996) ). "In considering a motion for judgment on the pleadings, a court must accept as true all material allegations in the complaint and must construe those allegations in the light most favorable to the plaintiff." *United States v. In re Seizure of One Blue Nissan Skyline Auto., & One Red Nissan Skyline*, 683 F. Supp. 2d 1087, 1089 (C.D. Cal. 2010) (citing *Pillsbury, Madison & Sutro v. Lerner*, 31 F.3d 924, 928 (9th Cir. 1994) ). Judgment on the pleadings is appropriate when, accepting as true all material allegations in the nonmoving party's pleadings, the moving party is entitled to judgment as a matter of law. *Hal Roach Studios, Inc. v. Richard Feiner &Co., Inc.*, 896 F.2d 1542, 1550 (9th Cir. 1989).

### B. Motion for Summary Judgment

Summary judgment is appropriate under Federal Rule of Civil Procedure 56 if the moving party demonstrates the absence of a genuine issue of material fact and entitlement to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A fact is material when, under the governing substantive law, it could affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is genuine if a reasonable jury could return a verdict for the nonmoving party. *Id.*

**\*3** A party seeking summary judgment bears the initial burden of establishing the absence of a genuine issue of material fact. *Celotex Corp.*, 477 U.S. at 323. The moving party can satisfy this burden in two ways: (1) by presenting evidence that negates an essential element of the nonmoving party's case; or (2) by demonstrating the nonmoving party failed to establish an essential element of the nonmoving party's case on which the nonmoving party bears the burden of proving at trial. *Id. at 322–23.* "Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment." *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).

2019 WL 1429592

Once the moving party establishes the absence of a genuine issue of material fact, the burden shifts to the nonmoving party to set forth facts showing a genuine issue of a disputed fact remains. *Celotex Corp.,* 477 U.S. at 330. When ruling on a summary judgment motion, a court must view all inferences drawn from the underlying facts in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986).

## DISCUSSION

Aspen Hills argues in its motion for judgment on the pleadings that Plaintiff's claims for negligence and breach of contract are barred under the doctrine of claim preclusion. (*See generally* Doc. No. 57-1.) However, Plaintiff contends in its motion for summary judgment that Aspen Hills is barred from re-litigating liability and damages for Plaintiff's claims for negligence and breach of contract on the basis of issue preclusion. (*See generally* Doc. No. 64-1.)

A. Judicial Notice

As a threshold issue, the Court will first turn to Plaintiff and Aspen Hills' requests for judicial notice. (Doc. Nos. 57-2, 65.) Aspen Hills requests judicial notice of (1) a copy of the Receivership's Report and Recommendation on Claims and Proposed Distribution Plan dated August 28, 2017; (2) a copy of the Order Approving Receiver's Recommendations on Claims and Proposed Distribution Plan dated November 8, 2017; and (3) a copy of the Proof of Claim filed by Arctic Zero in the Iowa Receivership Proceeding dated May 11, 2017. (Doc. No. 57-2 at 2.) Plaintiff seeks judicial notice of (1) the affidavit of Thomas S. Lundeen filed on December 23, 2016; (2) the Insurance Report filed on July 31, 2017; and (3) the Receiver's Reply to Arctic Zero's Opposition to Receiver's Thirteenth Monthly Operating Report and Receiver's Opposition to Arctic Zero's Motion for Settlement of Claims filed on March 1, 2018. (Doc. No. 65 at 2.)

*Federal Rule of Evidence 201(b)* provides the criteria for judicially noticed facts: a judicially noticed fact must be one not subject to reasonable dispute in that it "(1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." *Fed. R. Evid. 201(b).* A court "must take judicial notice if a party requests it and the court is supplied with the necessary information." *Fed. R. Evid. 201(c).*

The Court finds judicial notice of both Plaintiff and Aspen Hills' documents warranted as they are documents of public record related to the Iowa state proceedings. *See United States v. S. Cal. Edison Co.,* 300 F. Supp. 2d 964, 973 (E.D. Cal. 2004) ("Federal courts may 'take notice of proceedings in other courts, both within and without the federal judicial system, if those proceedings have a direct relation to the matters at issue.' ") (citing *U.S. ex rel. Robinson Rancheria Citizens Council v. Borneo, Inc.,* 971 F.2d 244, 248 (9th Cir. 1992) ). Moreover, "[j]udicially noticed facts often consist of matters of public record." *Botelho v. U.S. Bank, N.A.,* 692 F. Supp. 2d 1174, 1178 (N.D. Cal. 2010) (citations omitted). However, while "[a] court may take judicial notice of the existence of matters of public record, such as a prior order or decision," it should not take notice of "the truth of the facts cited therein." *Marsh v. San Diego Cty.,* 432 F. Supp. 2d 1035, 1043 (S.D. Cal. 2006).

**\*4** Accordingly, with the limitation stated above in mind, the Court **GRANTS** Plaintiff and Aspen Hills' unopposed requests for judicial notice.

B. Aspen Hills' Motion for Judgment on the Pleadings

Federal courts apply state claim preclusion principles when determining the preclusive effect of a state court judgment in federal court. *See Marrese v. Am. Acad. Of Orthopaedic Surgeons,* 470 U.S. 373, 381 (1985) ("[28 U.S.C.] § 1738 requires a federal court to look first to state preclusion law in determining the preclusive effects of a state court judgment.") "The general rule of claim preclusion provides a valid and final judgment on a claim precludes a second action on that claim or any part of it." *Arnevik v. Univ. of Minnesota Bd. of Regents,* 642 N.W.2d 315, 319 (Iowa 2002). "[T]he party seeking to invoke the doctrine of claim preclusion must establish three elements: (1) 'the parties in the first and second action were the same;' (2) 'the claim in the second suit could have been fully and fairly adjudicated in the prior case;' and (3) 'there was a final judgment on the merits in the first action.' " *Spiker v. Spiker,* 708 N.W.2d 347, 353 (Iowa 2009) (quoting *Arnevik,* 642 N.W.2d at 319.)

It is undisputed that the action in front of this Court is an *in personam* action and the receivership action was an *in rem* proceeding. Artic Zero asserts that claim preclusion does not apply because an *in rem* proceeding does not preclude this Court from entering an *in personam* judgment since the proceedings are fundamentally different in their purpose and jurisdictional scope. (Doc. No. 63 at 13.) However, "where the

2019 WL 1429592

judgment sought is strictly *in personam*, both the state court and the federal court, having concurrent jurisdiction, may proceed with the litigation at least until judgment obtained in one of them which may be set up as res judicata in the other." *Donovan v. Dallas*, 377 U.S. 408, 412 (1964) (citing *Princess Lida v. Thompson*, 305 U.S. 456, 466 (1939) ); *see Farm Credit Bank of Omaha v. Faught*, 492 N.W.2d 422, 424 (Iowa 1992) ("We have long held that a mortagee may not seek foreclosure of a mortgage in one action, and in a later one ask for personal judgment against the mortgagor."); *cf. Goncalves v. Rady Children's Hosp. San Diego*, 865 F.3d 1237, 1254 (9th Cir. 2017) ("A federal court 'may proceed to judgment *in personam*, adjudicating rights in the res and leaving the *in personam* judgment to bind as res judicata the court having jurisdiction of the res." "A second claim is likely to be considered precluded if the acts complained of, and the recovery demanded, are the same, or when the same evidence will support both actions." *Whalen v. Connelly*, 621 N.W.2d 681, 685 (Iowa 2000), *as amended on denial of reh'g* (Jan. 31, 2001).

Here, the Court agrees with Defendant that the *in rem/in personam* distinction is irrelevant for the purposes of merger in this specific case. The doctrine of merger "is well-settled law in Iowa." *United States v. Peckham*, 72 F.3d 672, 674 (8th Cir. 1995). Merger "serves to prevent the splitting of causes of action" to prevent a party from pursuing double recovery. *Brenton State Bank of Jefferson v. Tiffany*, 440 N.W.2d 583, 585 (Iowa 1989); *see Madison v. Colby*, 348 N.W.2d 202, 205 (Iowa 1984) (precluding double recovery). Accordingly, the Court will now address the factors of claim preclusion.

#### i. The Parties are Identical

**\*5** Plaintiff asserts that the parties are not identical in the receivership action and this action because Plaintiff was a "claimant" rather than a "party" in the receivership action. (Doc. No. 63 at 13.) Plaintiff specifically relies upon the Receiver's reply that stated, "[i]n order to seek such equitable relief, Iowa law requires that Arctic Zero to be a party to the lawsuit: which it is not." (*Id.*, Doc. No. 61-2 at 11.) However, Plaintiff provides no case law to support this contention and the Court finds that what the Receiver stated in a reply that is not before this Court is not persuasive. Further, "by the presentation of a claim in receivership proceedings a creditor submits himself to the jurisdiction of the court and must take notice of and is bound by subsequent proceedings relative thereto." *Heinz v. Davenport Bank & Trust Co.*, 298 N.W. 785, 788 (1941) (citing *Henderson v. Farmers' Sav. Bank*,

200 N.W. 581 (1924) ). Accordingly, the Court finds that the parties are identical.

#### ii. The Claims have been Fully and Fairly Adjudicated

Plaintiff argues that it was not given a "full and fair opportunity to litigate" their claims against Aspen Hills. *See Whalen v. Connelly*, 621 N.W.2d 681, 685 (Iowa 2000). The Court has already found, "the claims that are the subject of the present motion–negligence, express indemnity, and breach of contract–are substantially similar if not identical to the causes of action listed in the proof of claim filed by Plaintiff in the Iowa state court petition." (Doc. No. 32 at 9.) Plaintiff fully participated in the Receivership Proceeding. (See Doc. No. 57-2 at 32.) Further, Plaintiff did not object to the Receiver's Recommendations. (Doc. No. 67 at 8.) Accordingly, the Court finds that Plaintiff was given a full and fair opportunity to litigate its breach of contract and negligence claims in the Receivership Proceeding against Aspen Hills.

#### iii. The Iowa Receivership Proceeding Terminated in a Final Judgment on the Merits

Plaintiff asserts that the Iowa Receivership Proceeding did not result in a final judgment on the merits. (Doc. No. 63 at 15.) However, Iowa law is clear that a receivership proceeding "constitutes a final legal adjudication, having the force and effect of a judgment." *Heinz*, 289 N.W. at 788 (citations omitted); *see Henderson*, 200 N.W. at 582; *see also Andrew v. Marshalltown State Bank*, 227 N.W. 899 (1929); *Spooner v. Blair*, 229 N.W. 826 (1930). Arctic Zero did not object to the Receiver's Recommendation and the appeal period of the Order dated November 8, 2017 has run. *See* Iowa Rule of Appellate Procedure 6.101(1)(b) (providing a 30-day appeal period). Accordingly, the Court finds that this was a final judgment on the merits. However, the Court agrees with Plaintiff that the receivership judgment was only final as to its negligence and breach of contract claims against Aspen Hills.

#### iv. The Court Does Not Declare that the Iowa Allowance Order is an Enforceable Money Judgment and Declines to Register it in this District

Plaintiff argues that if the Court is not inclined to deny Aspen Hills' motion for judgment on the pleadings and is inclined to deny Plaintiff's motion for summary judgment, the Court, in the alternative, should declare that the Iowa allowance order is an enforceable money judgment and register it in this district. (Doc. No. 63 at 15; Doc. No. 69 at 10.) However, Plaintiff relies upon a single Seventh Circuit case for this assertion.

*See GE Betz, Inc. v. Zee Co., Inc.*, 718 F.3d 615, 625 (7th Cir. 2013). In *GE Betz, Inc.*, the court explained that it was unable to find any decisions by sister circuits that interpret 28 U.S.C. § 1963 as permitting a district court to register a state court judgment. *Id.* The Ninth Circuit has not held that a district court may register a judgment of a state court. Rather, the Ninth Circuit has held that "28 U.S.C. § 1963 permits plaintiffs to take a judgment entered in one federal district court and register it in another." *Fidelity Nat. Fin., Inc. v. Friedman*, 803 F.3d 999, 1001 (9th Cir. 2015); *see also Friis v. City of San Jose*, No. MISC-08-80027 RMW, 2009 WL 1690439, at *1 (N.D. Cal. June 16, 2009) ("the federal courts lack the power to register and enforce state court judgments"); *Republic Bank, Inc. v. Ethos Envtl., Inc.*, No. 12-CV-2654-BTM-BLM, 2013 WL 321692, at *1 (S.D. Cal. Jan. 28, 2013) ("28 U.S.C. § 1963 [ ] allows parties to enforce a judgment entered by an out-of-district federal court"). Thus, the Court declines to declare that the Iowa Allowance Order is an enforceable money judgment and register it in this district.

**\*6** Accordingly, the Court finds that the elements of claim preclusion are met. The Court **DISMISSES** Arctic Zero's claims for negligence and breach of contract against Aspen Hills. Thus, the Court **GRANTS** in part and **DENIES** in part Aspen Hills' motion for judgment on the pleadings.

### C. Arctic Zero's Motion for Summary Judgment

As the Court has found that claim preclusion rather than issue preclusion applies, Plaintiff's motion for summary judgment on the basis of issue preclusion is thus **DENIED**. (Doc. No. 64.)

### CONCLUSION

As explained more fully above, the Court **GRANTS** in part and **DENIES** in part Aspen Hills' motion for judgment on the pleadings and **DENIES** Arctic Zero's motion for summary judgment. This Court retains jurisdiction over the remaining claims.

**IT IS SO ORDERED.**

**All Citations**

Slip Copy, 2019 WL 1429592

---

**End of Document**                    © 2021 Thomson Reuters. No claim to original U.S. Government Works.