UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

EDWARD RANDOLPH,

                                        Plaintiff,

                                                              9:19-cv-1161
v.                                                            (DNH/TWD)


LISA KALIES, et al.,

                                Defendants.

_____

APPEARANCES:                        OF COUNSEL:

EDWARD RANDOLPH
  *Plaintiff, pro se*
9002100192- B&C
AMKC
18-18 Hazen Street
East Elmhurst, New York 11370

HON. LETITIA JAMES                  DAVID C. WHITE, ESQ.
Attorney General for the State of New York    Assistant Attorney General
  *Counsel for Defendants*
The Capitol
Albany, New York 12224

**THÉRÈSE WILEY DANCKS**, United States Magistrate Judge

<u>**ORDER AND REPORT-RECOMMENDATION**</u>

I.     **INTRODUCTION**

        Edward Randolph ("Plaintiff"), who was at all relevant times in the custody of the New

York State Department of Corrections and Community Supervision ("DOCCS"), commenced

this *pro se* civil rights action under 42 U.S.C. § 1983 asserting claims arising out of his

incarceration at Auburn Correctional Facility ("Auburn").  (Dkt. No. 19 (the "amended

complaint").)  Plaintiff alleges Office of Mental Health ("OMH") Forensic Unit Chief Lisa

Kalies ("Kalies"), OMH Licensed Clinical Social Worker and Residential Crisis Treatment Program ("RCTP") Coordinator Stephanie Agosh ("Agosh"), and social worker Jane Doe were deliberately indifferent to his serious medical needs in violation of the Eighth Amendment.  (Dkt. Nos. 19, 23, 55.)  Kalies and Agosh (together "Defendants") now move for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure.  (Dkt. No. 62.)  Plaintiff filed a response.  (Dkt. No. 72.)  Defendants filed a reply.  (Dkt. No. 76.)

Defendants' motion has been referred for a Report-Recommendation by the Honorable David N. Hurd, United States District Judge, pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3(c).  For reasons explained below, the Court recommends granting Defendants' motion.

## II.     BACKGROUND

Plaintiff claims he was denied adequate care for his serious mental health needs at Auburn from August 2017 through November 2017.  (Dkt. No. 19.)  Plaintiff also claims Defendants were deliberately indifferent to his mental health needs by discharging him from the RCTP resulting in his attempted suicide on November 21, 2017.  *Id*.  In support of their motion, Kalies and Agosh submitted declarations, along with relevant medical records, which the Court summarizes below.

On August 24, 2017, Plaintiff was housed in the Special Housing Unit ("SHU") at Auburn and alerted a corrections officer that he was depressed and having suicidal thoughts.  (Dkt. No. 62-2 at ¶ 6.[1])  He was then transferred from the SHU to the RCTP, where he remained for twelve days for observation and treatment.  *Id*.

---

[1] Page references to documents identified by docket number are to the page numbers assigned by the CM/ECF docketing system maintained by the Clerk's Office.  Paragraph numbers are used where documents identified by the CM/ECF docket number contain consecutively numbered paragraphs.  Unless noted, excerpts from the record are reproduced exactly as they appear in the original and errors in spelling, punctuation, and grammar have not been corrected.

Agosh evaluated Plaintiff on September 5, 2017.  (Dkt. No. 62-2 at ¶ 7.)  It was noted

Plaintiff had been resting comfortably throughout the day, there were no reports of any

disruptive sleep behaviors throughout the night, he was not tearful or crying, he had not engaged

in any self-harming behaviors, he had no behavioral issues, he had been eating all meals, and he

had been socializing with his peers.  *Id*.  Plaintiff was talkative and engaged and they discussed

potential triggers/stressors in Plaintiff's life, including his sentence, his anger at his children's

mother regarding missed visitation, thoughts about his children's wellbeing, the loss of his

grandmother who was his emotional and financial support, and issues with his sister's health.  *Id*.

Overall, Agosh found Plaintiff's objective presentation was incongruent with his prior reports of

thoughts of self-harm.  *Id*.  Based upon this comprehensive evaluation and collaboration with the

treatment team, Plaintiff was discharged from the RCTP.  *Id*.[2]

Plaintiff, however, refused orders to return to the SHU and was forcibly extracted by

corrections staff.  (Dkt. No. 62-1 at ¶ 6.)  Thereafter, Plaintiff threatened self-harm in his SHU

cell and was re-admitted to the RCTP.  *Id*. at ¶ 8.

Plaintiff remained under observation and was evaluated by Agosh on September 6, 2017.

(Dkt. No. 62-2 at ¶ 9.)  Plaintiff was resting comfortably and exhibited no signs of mental

distress or self-harm.  *Id*.  Security advised Agosh that Plaintiff had been eating meals, had not

had any behavioral issues, had not engaged in any self-harming behaviors, and was witnessed

socializing with his peers.  *Id*.  Agosh consulted with the treatment team, and it was determined

Plaintiff would remain in the RCTP overnight and would be discharged the following day

pending any notable changes to his mental status.  *Id*.

---

[2]  As set forth in Agosh's declaration, the determination to discharge inmates, including Plaintiff, from the RCTP is made by the treatment team with a final decision made by the treating psychiatrist/psychiatric nurse practitioner, or the Unit Chief.  (Dkt. No. 62-2 at ¶ 8.)

The next day, security reported that Plaintiff had no issues sleeping through the night, he was witnessed on several occasion socializing and laughing with peers, and was overheard discussing plans to remain in the RCTP rather than returning to the SHU. *Id*. Although Plaintiff reported that he wanted to hurt himself, Agosh found his presentation continued to be incongruent with such statements. *Id*. Plaintiff displayed no objective signs of depression or anxiety and only presented angry when discussion of returning to the SHU was mentioned. *Id*. After being informed of the treatment team's decision to discharge him from the RCTP, Plaintiff responded, "I'm not fucking leaving." *Id*. After Agosh left, Plaintiff smeared feces on his body, refused to leave the RCTP, and was forcibly extracted from his cell. *Id*. Thereafter, Kalies accompanied Plaintiff from the RCTP to the SHU. (Dkt. No. 62-3 at ¶ 9.[3])

Once in his SHU cell, Plaintiff fashioned a noose with a bed sheet and threatened self-harm. *Id*. Plaintiff was then transferred to another SHU cell under a cell property deprivation order. (Dkt. No. 19 at 19.) There, Plaintiff located a "stereo headphone jack" in the wall, broke it apart, and used pieces of metal to cut his wrist "viciously." *Id*. at 20; *see also* Dkt. No. 62-6 at 26-28. Plaintiff swallowed the pieces of metal and received medical attention for his injuries, which did not require a Band-Aid or other form of closure. (Dkt. No. 62-3 at ¶ 10.)

Kalies was notified that Plaintiff had used a piece of a headphone jack to "superficially" scratch himself and she authorized Plaintiff's readmission to the RCTP. *Id*. Plaintiff was placed on a 1:1 watch in the infirmary for both mental health observation and contraband watch, pending retrieval of the piece of metal. *Id*.[4] Plaintiff was evaluated by mental health staff daily.

---

[3] As Chief Forensic Officer, Kalies was charged with supervision of administrative and clinical services provided within the MHU. (Dkt. No. 62-3 at ¶¶ 1, 2.)

[4] As set forth in Agosh's declaration, DOCCS is in charge of any contraband watch and makes any decision in regard to placing an inmate on a watch or removing the inmate from one. (Dkt. No. 62-2 at ¶ 8.)

*Id.* Plaintiff claims his requests for "special mental health treatment" and an appointment with a psychiatrist were denied. (Dkt. No. 19 at 22.)

On September 8, 2017, Kalies performed a comprehensive sixty-minute evaluation of Plaintiff. (Dkt. No. 62-3 at ¶ 11.) Plaintiff vented his frustrations to Kalies and discussed his grandmother's passing. *Id.* Over the course of the next two weeks, Plaintiff was housed in the infirmary, where he was evaluated daily by medical professionals, and was generally sleeping throughout the night, eating meals, and socializing throughout the day. *Id.* He showed no active signs of distress, significant depression, or anxiety. *Id.* Kalies evaluated Plaintiff on September 20, 2018, during which time he resisted her attempts to counsel him on ways to feel better, including taking his medications and implementing coping skills. *Id.* at ¶ 12.

Plaintiff was also examined by non-party Jesse Palermo ("Palermo"), a licensed master social worker, on September 29, 2017. (Dkt. No. 62-1 at ¶ 24.) Plaintiff reported that he had been engaging in self-harming behavior, such as scratching and picking at his scabs, because he "needed treatment" and help. *Id.*

Agosh examined Plaintiff on October 2, 2017, and Plaintiff expressed his frustration that the mental health treatment was not helping. *Id.* at ¶ 25. Agosh noted Plaintiff continued to be resistant to engage in therapeutic discussions. *Id.*

On October 17, 2017, security reported Plaintiff had used his mattress to cover himself and was picking his scabs. *Id.* at ¶ 23. He also had blocked the hatch on the cell door for several hours. *Id.* Nursing staff indicated Plaintiff refused psychiatric medications. *Id.* Thereafter, Kalies and the treatment team determined Plaintiff would be moved from the infirmary to an observation cell in the RCTP. (Dkt. No. 62-3 at ¶ 13.) As set forth in her declaration, Kalies made this determination based upon Plaintiff's mental state at that time, and determined that the

MHU observation cell offered the best means by which to treat Plaintiff as he could be monitored and observed at all times. *Id*. Plaintiff refused this transfer and was extracted by security. *Id*.

On October 25, 2017, Plaintiff refused to meet with Agosh. (Dkt. No. 62-2 at ¶ 35.) Security advised Plaintiff had no behavioral issues that day, had not engaged in any self-harm, and continued to eat his meals. *Id*. (Dkt. No. 62-2 at ¶ 35.)

On November 3, 2017, Plaintiff was temporarily transferred to the RCTP at Five Points Correctional Facility ("Five Points"). (Dkt. No. 62-10 at 2.) There, Plaintiff engaged in no self-harming behavior, was seen by a psychiatrist three times, and was offered interviews with OMH clinicians during his admission, which he mostly refused. (Dkt. No. 62-2 at ¶ 29.) It was noted Plaintiff showed no signs of any distress, was socializing with peers, and was overheard discussing that he wanted to remain in the RCTP. *Id*. The treatment team at Five Points did not find any clinical indication to warrant Plaintiff's continued admission in the RCTP and discharged Plaintiff back to Auburn on November 15, 2017. *Id*.; *see also* Dkt. No. 72-2 at 61.[5]

Plaintiff was discharged from Auburn's RCTP to the SHU on November 16, 2017. (Dkt. No. 62-2 at ¶ 29.) However, Plaintiff failed his SHU screening and was readmitted to the RCTP almost immediately after cutting his arm and swallowing a small piece of metal in front of staff. (Dkt. No. 63-6 at 4.[6])

---

[5] Plaintiff testified he did not receive any mental health treatment, was not examined by a psychiatrist, and did not speak to any inmates at Five Points. (Dkt. No. 62-6 at 70-71.)
[6] Plaintiff claims social worker Jane Doe, "cleared" him for SHU admission. (Dkt. No. 19 at 30-31.) In his opposition submission, Plaintiff states Jane Doe is "known now" as "Doe McLeod". (Dkt. No. 72 at 57.) To date, Plaintiff had not moved to substitute "Doe McLeod" in place of Jane Doe. (*See* Docket Report.)

Agosh evaluated Plaintiff on November 21, 2017.  (Dkt. No. 62-2 at ¶ 30.)  During this interview, Plaintiff discussed his past history of significant time in the SHU.  *Id*.  Plaintiff reported, "I never minded it . . . my lawyer said the longer I stay in the SHU . . . the bigger the payout I get".  *Id*.  Agosh asked Plaintiff why he felt that coming to Auburn had triggered him as he had never before threatened self-harm.  *Id*.  Plaintiff responded, "I asked for help . . . and you people cleared me".  *Id*.

Later that evening, Plaintiff attempted to commit suicide by lacerating his antecubital fossa with a sharp object and was taken to Erie County Medical Center ("ECMC") for further treatment.  (Dkt. No. 62-1 at ¶ 38.)  Plaintiff was discharged from ECMC on November 22, 2017, and subsequently transferred to Wende Correctional Facility.  *Id*. at ¶ 39.

## III.   DISCUSSION

### A.   Legal Standard

A court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  An issue of fact is material for purposes of this inquiry if it "might affect the outcome of the suit under the governing law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute of material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Id*.

The party moving for summary judgment bears the initial burden of showing, through the production of admissible evidence, that no genuine issue of material fact exists.  *Salahuddin v. Gourd*, 467 F.3d 263, 272–73 (2d Cir. 2006).  The movant may meet this burden by showing that the nonmoving party has "fail[ed] to make a showing sufficient to establish the existence of an

element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

If the moving party satisfies its burden, the nonmoving party must move forward with specific facts showing that there is a genuine issue for trial. *Salahuddin*, 467 F.3d at 273. In that context, the nonmoving party must do more than "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "Conclusory allegations, conjecture and speculation . . . are insufficient to create a genuine issue of fact." *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998).

The Second Circuit has reminded that on summary judgment motions "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could *reasonably* find for the plaintiff." *Jeffreys v. City of New York*, 426 F.3d 549, 554 (2d Cir. 2005). "At the summary judgment stage, a nonmoving party must offer some hard evidence showing that [his] version of the events is not wholly fanciful." *Id*. (citation and internal quotation marks omitted). Accordingly, statements "that are devoid of any specifics, but replete with conclusions, are insufficient to defeat a properly supported motion for summary judgment." *Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 452 (2d Cir. 1999).

In determining whether a genuine issue of material fact exists, the court must resolve all ambiguities and draw all reasonable inferences against the moving party. *Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 309 (2d Cir. 2008). Where a party is proceeding *pro se*, the court is obligated to "read [the *pro se* party's] supporting papers liberally,

and . . . interpret them to raise the strongest arguments that they suggest." *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994).

### B.    Plaintiff's Failure to Comply with Local Rules

Pursuant to this District's Local Rules, "[t]he Court may deem admitted any properly supported facts set forth in the Statement of Material Facts that the opposing party does not specifically controvert."  N.D.N.Y. L.R. 56.1(b).  Where a party has failed to respond to the movant's statement of material facts as required by the Local Rules, the facts in the movant's statement will be accepted as true (1) to the extent they are supported by evidence in the record, and (2) the nonmovant, if proceeding *pro se*, has been specifically advised of the possible consequences of failing to respond to the motion.  *Champion v. Artuz*, 76 F.3d 483, 486 (2d Cir. 1996).

As required by the Local Rules, Defendants advised Plaintiff of the consequences of failing to file a response to Defendants' Statement of Material Facts.  (Dkt. No. 62 at 3.)  While Plaintiff submitted a response to Defendants' motion, he failed to do so in the manner required under the Local Rules.[7]  "Although a *pro se* litigant is entitled to a liberal construction of his filings, *see Sykes v. Bank of America*, 723 F.3d 399, 403 (2d Cir. 2013), his *pro se* status does not relieve him of his obligation to comply with the relevant procedural rules."  *Marino v. Watts*, No. 9:12-CV-801 (NAM/DJS), 2018 WL 3121612, at *1 (N.D.N.Y. Mar. 7, 2018), *report-*

---

[7]  Local Rule 56.1(b) requires the opposing party to file a response to the movant's statement of material facts.  Under the rule, the response "shall mirror the movant's Statement of Material Facts by admitting and/or denying each of the movant's assertions in a short and concise statement, in matching numbered paragraphs.  Each denial shall set forth a specific citation to the record where the factual issue arises."  (*See* Dkt. No. 72-3.)  Additionally, pursuant to Local Rule 10.1, a response memorandum of law is limited to 25 pages without leave of Court.  Plaintiff's memorandum of law in opposition to Defendants' motion is 61 pages in length.  (Dkt. No. 72.)

*recommendation adopted sub nom. Marino v. Schult*, 2018 WL 1578163 (N.D.N.Y. Mar. 30, 2018), *aff'd*, 764 F. App'x 73 (2d Cir. 2019) (summary order).

Although this Circuit adheres to the view that nothing in Rule 56 imposes an obligation on a court to conduct a searching and independent review of the record to find proof of a factual dispute where a non-movant willfully fails to respond to a properly filed summary judgment motion, *Amnesty Am. v. Town of West Hartford*, 288 F.3d 467, 470 (2d Cir. 2002), the Second Circuit has ruled that "[a] district court has broad discretion to determine whether to overlook a party's failure to comply with local court rules," including local rules relating to requirements regarding the submission of and response to statements of material facts on summary judgment motions, and whether to "conduct an assiduous review of the record." *Holtz v. Rockefeller & Co., Inc.*, 258 F.3d 62, 73 (2d Cir. 2001) (citation and quotation marks omitted). In deference to Plaintiff's *pro se* status, the Court has opted to review the entire summary judgment record.[8]

## C.    Deliberate Indifference

The Eighth Amendment explicitly prohibits the infliction of "cruel and unusual punishment." U.S. Const. amend. VIII. This prohibition encompasses the provision of medical care involving "the unnecessary and wanton infliction of pain." *Hathaway v. Coughlin*, 37 F.3d 63, 66 (2d Cir. 1994) (citations omitted). However, not "every injury" a prisoner suffers "translates into constitutional liability for prison officials." *Farmer v. Brennan*, 511 U.S. 825,

---

[8] *See Vermont Teddy Bear Co., Inc. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d. Cir. 2004) ("[I]n determining whether the moving party has met [the] burden of showing the absence of a genuine issue for trial, the district court may not rely solely on the statement of undisputed facts contained in the moving party's [Statement of Material Facts]. It must be satisfied that the citation to evidence in the record supports the assertion.") (citations omitted). As to any facts not contained in Defendants' Statement, in light of the procedural posture of this case, the Court is "required to resolve all ambiguities and draw all permissible factual inferences" in favor of Plaintiff. *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003).

834 (1994).  In order to establish an Eighth Amendment claim for medical indifference, a

plaintiff must allege that the defendant was deliberately indifferent to a serious medical need.

*See id*.  This standard requires proof of both an objective and subjective element.

The objective component "requires that the alleged deprivation must be sufficiently

serious, in the sense that a condition of urgency, one that may produce death, degeneration, or

extreme pain exists." *Hill v. Curcione*, 657 F.3d 116, 122 (2d Cir. 2011) (quoting *Hathaway v.

Coughlin*, 99 F.3d 550, 553 (2d Cir. 1996)) (internal quotation marks omitted).  Courts have

found that '[t]reatment of mental disorders of mentally disturbed inmates is . . . a serious medical

need . . . .'" *Fontaine v. Cornwall*, No. 9:15-CV-432 (DNH), 2019 WL 4257136, at *4

(N.D.N.Y. Sept. 9, 2019) (alternations in original) (quoting *Hamilton v. Smith*, No. 06-CV-805

(GTS/DRH), 2009 WL 3199531, at *14 (N.D.N.Y. Jan. 13, 2009)); *see also Helijas v. Corr.

Med. Care, Inc.*, No. 115-CV-1049 (GTS/DJS), 2016 WL 5374124, at *13 (N.D.N.Y. Sept. 26,

2016) ("With respect to the objective prong of an Eighth Amendment claim, courts have found

that depression with suicidal ideation, or severe anxiety attacks are sufficiently severe conditions

to meet the objective element of the deliberate indifference standard." (quotation marks and

citation omitted)).

Under the subjective component, medical mistreatment rises to the level of deliberate

indifference only when it "involves culpable recklessness, i.e., an act or a failure to act . . . that

evinces 'a conscious disregard of a substantial risk of serious harm.'" *Chance v. Armstrong*, 143

F. 3d 698, 703 (2d Cir. 1998) (quoting *Hathaway*, 99 F.3d at 553).  Thus, the defendant "official

must both be aware of facts from which the inference could be drawn that a substantial risk of

serious harm exists, and [the official] must also draw the inference." *Farmer*, 511 U.S. at 837.

Satisfying this standard "entails something more than mere negligence . . . [but] something less

than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." *Id*. at 835. Accordingly, "an official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot under our cases be condemned as the infliction of punishment." *Farmer*, 511 U.S. at 838; *see also Estelle v. Gamble*, 429 U.S. 97, 105-06 (1976) (holding that an "inadvertent failure to provide adequate medical care" does not constitute "deliberate indifference"); *Chance*, 143 F.3d at 703 (holding that "[m]ere disagreement over proper treatment does not create a constitutional claim," as long as the treatment was adequate); *Hathaway*, 99 F.3d at 553 (holding that "mere medical malpractice" does not constitute deliberate indifference unless the malpractice involved "culpable recklessness").

"In an inmate suicide context, there are two scenarios where deliberate indifference may exist." *Allah v. Kemp*, No. 9:08-CV-1008 (NAM/GHL), 2010 WL 5860290, at *7 (N.D.N.Y. Nov. 9, 2010). "First, officials could be deliberately indifferent to the risk of suicide by failing to discover an individual's suicidal tendencies." *Id*. (quotation marks and citation omitted). "Second, officials could have discovered and have been aware of the suicidal tendencies, but could be deliberately indifferent in the manner by which they respond to the recognized risk of suicide." *Id*. (quotation marks and citation omitted). "The second scenario focuses on the adequacy of preventive measures." *Id*. (quotation marks and citation omitted). However, even if a medical defendant's "treatment decision was erroneous, deliberate indifference cannot be inferred [where] the decision was not such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible did not base the decision on such a judgment." *Sims v. Gorman*, No. 09-CV-6643, 2012 WL 566875, at *6 (W.D.N.Y. Feb. 21, 2012) (quotation marks and citation omitted).

Here, Defendants argue that assuming, *arguendo*, Plaintiff has satisfied the objective

prong of the analysis, Plaintiff has failed to satisfy the subjective component.  (Dkt. No. 62-4 at

7-12.)  According to Defendants, the record evidence establishes that they treated Plaintiff in

accordance with their professional judgment at all times and did not act with deliberate

indifference in the care provided to Plaintiff at any time.  Defendants contend Plaintiff has not,

and cannot, establish that any actions by them rise to the level of deliberate indifference.  At best,

Defendants assert Plaintiff's claim amounts to a difference in opinion as to the mental health

treatment Plaintiff required.

Generally, in opposition, Plaintiff argues Defendants have "fabricated a lot of the

information" they provided, "fudged [their] notes", "falsified" information, and have not

"truthfully reported" their encounters with Plaintiff.  (Dkt. No. 72-3 at 2, 3, 11, 27, 36; *see also*

Dkt. No. 72 at 59-60.)  Plaintiff further claims Defendants were "deliberately indifferent" to

Plaintiff's established emotional and psychological instabilities, including by discharging him

from the RCTP, refusing to refer Plaintiff to a psychiatrist or other medical professional, and

relying on "hearsay" information from unidentified security and treatment team staff, which

resulted in his suicide attempt.  *Id*.

After carefully considering the entire record, the Court finds Defendants have met their

initial burden of establishing that there is no genuine issue of material fact to be decided.  Insofar

as Plaintiff contends that Defendants failed to provide him with adequate or appropriate mental

health treatment, his claim is belied by the record.  To that end, Agosh's sworn declaration and

treatment notes establish that during each of her twenty-four visits with Plaintiff, she performed,

or attempted to perform, a medical evaluation of Plaintiff:

> Throughout the time period at issue, I continuously evaluated and
> treated plaintiff for his mental health issues, including suicidal

> thoughts, statements, and self harming behaviors. Not only did I
> personally evaluate and treat plaintiff, but I consulted with multiple
> members of the treatment team who also treated plaintiff, as well
> as other OMH licensed staff whether through consultation and
> when he was transferred to Five Points RCTP for evaluation by
> another treatment team. At no time did I act with deliberate
> indifference toward plaintiff regarding his mental issues and self-
> harming behaviors. The records in this matter conclusively
> establish that my treatment of plaintiff, and associated treatment
> decisions, were based upon comprehensive and constant
> evaluations of plaintiff and my professional judgment as a licensed
> master social worker.

(Dkt. No. 62-2 at ¶ 31.) For her part, Kalies declares:

> Plaintiff was seen and treated multiple times per day for his mental
> health issues and no actions were taken with deliberate
> indifference to plaintiff's ongoing complaints and threats of self-
> harm. In fact, just the opposite, as myself and the treatment team
> members treated plaintiff continuously and to the best of our
> abilities. Further, all treatment and associated decisions I made
> were based upon my professional judgment and plaintiff's
> condition with the intent of providing plaintiff with the best
> possible care.

(Dkt. No. 62-3 at ¶ 14.) Kalies further states that "[t]he records of my treatment and that of my

co-workers establish that the treatment provided to plaintiff was appropriate and thorough at all

times." *Id*. at ¶ 5. Additionally, Plaintiff was evaluated on a daily basis and received nursing

visits at least twice per day to provide medication and to check on his welfare. (Dkt. No. 62-6 at

18, 29.) In sum, the declarations of Agosh and Kalies submitted in support of their motion for

summary judgment establish that the treatment they provided to Plaintiff during the time period

at issue was reasonable, appropriate, and based upon their professional judgment. (Dkt. No. 62-2

at ¶¶ 5, 31, Dkt. No. 62-3 at ¶¶ 5, 14.)

In this case, although Plaintiff has submitted over 148 pages of opposition papers,

Plaintiff does not offer the testimony or report of any other mental health professional to

demonstrate the treatment provided was inappropriate or not responsive to any recognized risk of

suicide, which may show that there is a genuine unresolved issue of material fact for trial. Instead, in conclusory and speculative terms, Plaintiff claims the medical records at issue were "fudged" and "falsified" and contain "conflicting" testimony that cannot be resolved on summary judgment. (*See*, *e.g.*, Dkt. No. 72-3 at 2, 3, 11, 27, 36.)

Moreover, as pointed out by Defendants in their reply, while Plaintiff contends that Defendants were involved in some sort of conspiracy with unknown members of the Auburn staff, at no point in Plaintiff's voluminous opposition papers does Plaintiff cite to or produce any admissible evidence or facts in support of his contention that Defendants acted with deliberate indifference to his Eighth Amendment rights and instead Plaintiff relies on unfounded conspiracy theories and speculation. (Dkt. No. 76 at 5.[9])

Further, while Plaintiff clearly takes issue with the medical attention and treatment he received at Auburn, prison officials have broad discretion in determining the nature and character of medical treatment afforded to inmates. *Sonds v. St. Barnabas Hosp. Corr. Health Servs.*, 151 F. Supp. 2d 303, 311 (S.D.N.Y. 2001) (citations omitted). A plaintiff's disagreement with prescribed treatment does not rise to the level of a constitutional claim. *Id*. As such,

---

[9] For example, Plaintiff "firmly believes . . . [Agosh] was providing falsely contrived misinformation within her daily progress notes in order to make it appear as if she had been right in her clinical assessments of the plaintiff and within her professional judgments when making the recommendations to have the plaintiff cleared and discharged from the RCTP." (Dkt. No. 72-3 at 18-19.) Plaintiff further claims Agosh has a "history" and "pattern of behavior" of discharging inmates from the RCTP and her "only concern" was to "clear out the RCTP observation unit . . . and she was dead set on doing that regardless of the likely consequences to which she had become clearly adapted to working around and explaining away were her usual explanations." *Id*. at 20. Plaintiff claims Defendants "acted in conjunction with one another, but not to provide the claimant with adequate or meaningful mental health care/treatment. They acted in conjunction with each other's personal views that plaintiff may have been attempting to manipulate the OMH system . . . ." (Dkt. No. 72 at 59-60.) However, such conclusory statements of deliberate indifference and conspiracy do not create a genuine issue of material fact to survive summary judgment. *See*, *e.g.*, *Morales v. Fischer*, 46 F. Supp. 3d 239, 250 (W.D.N.Y. 2014).

disagreements over medications, forms of treatment, the need for specialists, and the timing of

medical intervention implicate medical judgment and do not rise to the level of a constitutional

violation. *Sonds*, 151 F. Supp. 2d at 312 (citing *Estelle*, 429 U.S. at 107); *see also Sims v.

*Gorman*, 2012 WL 566875, at *5 (finding no deliberate indifference despite an eventual suicide

attempt by the plaintiff because "the decisions made by mental health professionals 'are issues

within a professional medical judgment' which does not form a basis for an Eighth Amendment

claim"); *see also Robinson v. Taylor*, No. 9:16-CV-285 (DJS), 2019 WL 1429529, at *6

(N.D.N.Y. Mar. 29, 2019) ("In making a decision about whether [the plaintiff] could be

medically cleared for SHU admission, [the doctor-defendant] was clearly exercising medical

judgment.").

    As to Plaintiff's claims that he was "denied" medical treatment that he "felt" he

"needed", and that Agosh was "indifferent" to his serious medical needs because, among other

things, she denied Plaintiff access to medical treatment, specifically psychiatric care, Plaintiff's

subjective belief that "more" should have been done for him is insufficient to establish deliberate

indifference. *See Burgos*, 418 F. Supp. 2d at 265; *see also Sereika v. Patel*, 411 F. Supp. 2d 397,

407 (S.D.N.Y. 2006) ("allegations that [plaintiff] . . . was not referred to a specialist . . . do not

state a claim for deliberate indifference"). As discussed, a "mere disagreement over the proper

treatment does not create a constitutional claim." *Chance*, 143 F.3d at 70.

    In this case, although Plaintiff claims he was "improperly" discharged from the RCTP to

the SHU, the record demonstrates Plaintiff was discharged from the RCTP on multiple occasions

based upon the comprehensive psychiatric evaluation by the Auburn treatment team, including

Defendants, both of whom were exercising medical judgment. (Dkt. No. 62-2 at ¶ 31.) In any

event, the record demonstrates that from Plaintiff's initial admission to the RCTP in August of

2017 through November of 2017, he spent virtually no time outside of the RCTP.  (Dkt. No. 62-6 at 72.)  Moreover, as the summary of the treatment records as outlined above show, Plaintiff was frequently evaluated and/or examined by Defendants or someone else on the treatment team.

Contrary to Plaintiff's assertions, that "[t]here is absolutely nothing in the record to support that there were even treatment team meetings, or how many people participated, if any did, in these alleged meetings[,]" (Dkt. No. 72-3 at 13), the sworn declarations of both Agosh and Kalies constitute such evidence.  (Dkt. Nos. 62-2, 62-3.)  Further, to the extent Plaintiff takes issue with Defendants relying on "security" and "staff" and other "hearsay information" (Dkt. No. 72-3 at 20, 33, 40), "medical opinions are often based upon the representations of third parties as to a patient's conduct or exhibition of symptoms[.]"  *Zimmerman v. Racette*, No. 9:17-CV-375 (TJM/CFH), 2020 WL 1329138, at *7 (N.D.N.Y. Mar. 23, 2020) (granting summary judgment to doctor-defendant where, *inter alia*, the doctor-defendant's declaration indicated "staff informed [him] that while in the RCTP, plaintiff had been eating and sleeping well without any problems").  Here, like in *Zimmerman*, Defendants' opinions were based upon a number of factors including their personal observations during examinations and their discussions with Plaintiff; any references to third-party representations were not the central basis of Defendants' medical opinions.

In sum, the undisputed *material* facts demonstrate that Defendants consistently and reasonably treated Plaintiff's serious medical needs.  While Plaintiff is clearly dissatisfied with his medical care and believes that additional treatment and care were warranted based on his complaints, threats of self-harm, and suicidal actions, the record evidence demonstrates that Defendants did not ignore, refuse, or fail to treat Plaintiff's conditions.  Rather, as detailed above, the record evidence demonstrates that Defendants, together with other medical

professionals at Auburn, were responsive to Plaintiff's mental health, threats of self-harm, and actions and were *not* deliberately indifferent to Plaintiff's serious medical needs. *See Gumbs v. Dynan*, No. 11-CV-857, 2012 WL 3705009, *14 (E.D.N.Y. Aug. 26, 2012) ("[A] medical judgment is not deliberate indifference just because it is not the inmate's preferred course of treatment.").

Lastly, while Plaintiff claims deliberate indifference is established because "Defendants misjudged the plaintiff's psychological instability" and he "nearly succeeded in taking his own life," (Dkt. No. 72 at 60), contrary to Plaintiff's assertion, "[t]he fact that Plaintiff attempted suicide after medical professionals had examined him and found him not to be a risk of harm to himself does not itself establish deliberate indifference." *Robinson v. Taylor*, 2019 WL 1429529, at *7 (finding no deliberate indifference where medical professionals released the plaintiff from the OBS unit who attempted suicide because mere fact that defendants "might have ultimately been wrong in [their] professional judgment does not support a showing of deliberate indifference").

After careful review of the record evidence, the Court finds no reasonable juror could conclude Defendants acted with deliberate indifference to Plaintiff's serious medical needs. Accordingly, the Court recommends granting Defendants' motion for summary judgment.

## IV.    CONCLUSION

For the reasons stated above, Plaintiff fails to raise any triable question of material fact that Defendants were acting with deliberate indifference rather than in exercise of their medical judgment.

**WHEREFORE**, it is hereby

**RECOMMENDED** that Defendants' motion for summary judgment (Dkt. No. 62) be

**GRANTED**; and it is further

**ORDERED** that the Clerk provide to Plaintiff a copy of this Order and Report-

Recommendation, along with copies of the unpublished decisions cited herein in accordance

with the Second Circuit decision in *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (*per curiam*).

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen (14) days within which to

file written objections to the foregoing report.[10]  Such objections shall be filed with the Clerk of

the Court.  **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS**

**WILL PRECLUDE APPELLATE REVIEW**.  *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993)

(citing *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C.

§ 636(b)(1); Fed. R. Civ. P. 72.

Dated: November 10, 2021
        Syracuse, New York

Thérèse Wiley Dancks
United States Magistrate Judge

---

[10]  If you are proceeding *pro se* and are served with this Order and Report-Recommendation by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date the Order and Report-Recommendation was mailed to you to serve and file objections.  Fed. R. Civ. P. 6(d).  If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday.  Fed. R. Civ. P. 6(a)(1)(C).

Case 9:19-cv-01161-DNH-TWD    Document 79    Filed 11/10/21    Page 20 of 125

Marino v. Watts, Not Reported in Fed. Supp. (2018)
2018 WL 3121612

2018 WL 3121612
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Vincent Michael MARINO, Plaintiff,
v.
Harrell WATTS, et al., Defendants.

Civ. No. 9:12-CV-801 (NAM/DJS)
|
Signed 03/07/2018

**Attorneys and Law Firms**

VINCENT MICHAEL MARINO, 14431-038, FCI FORT DIX, P.O. Box 2000, Joint Base MDL, New Jersey 08640, Pro Se.

HON. GRANT C. JAQUITH, Acting United States Attorney, OF COUNSEL: KAREN FOLSTER LESPERANCE, ESQ., Assistant United States Attorney, Northern District of New York, James T. Foley U.S. Courthouse, 445 Broadway, Albany, New York 12207, Attorney for Defendants.

## AMENDED REPORT-RECOMMENDATION and ORDER

DANIEL J. STEWART, United States Magistrate Judge

 **\*1**  This action, brought pursuant to *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics*, 403 U.S. 388 (1971), returns to the Court on Defendants' Motion for Summary Judgment. Dkt. No. 133, Defs.' Mot. Summ. J. The only remaining claims in this action are First Amendment retaliation claims against Defendants Lucas, Sepanek, and Schult. Defendants move for summary judgment on these remaining claims. Plaintiff has opposed Defendants' Motion, and Defendants have filed a Reply. Dkt. Nos. 139, Pl.'s Resp., & 140, Defs.' Reply. After the Court ordered the Defendants to respond to outstanding discovery requests (Dkt. No. 157), and Defendants complied (Dkt. No. 158), Plaintiff filed supplemental papers in opposition to Defendants' Motion. Dkt. Nos. 162 & 163. For the reasons that follow, the Court recommends that Defendants' Motion be **granted** and this action **dismissed**.

## I. BACKGROUND

### A. Plaintiff's Failure to File a Response to Defendants' Rule 7.1 Statement

Pursuant to this District's Local Rules, "[t]he Court shall deem admitted any properly supported facts set forth in the Statement of Material Facts that the opposing party does not specifically controvert." N.D.N.Y.L.R. 7.1(a)(3). As required by the Local Rules, Defendants' counsel advised Plaintiff of the consequences of failing to file a response to Defendants' Rule 7.1 Statement of Material Facts. Dkt. No. 133-1. Plaintiff, however, did not file a response to Defendants' Statement of Material Facts. *See* Pl.'s Resp. & Dkt. No. 162, Pl.'s Reply Brief. [1] Although a *pro se* litigant is entitled to a liberal construction of his filings, *see Sykes v. Bank of America*, 723 F.3d 399, 403 (2d Cir. 2013), his *pro se* status does not relieve him of his obligation to comply with the relevant procedural rules, *see Edwards v. INS*, 59 F.3d 5, 8-9 (2d Cir. 1995). The Court therefore will deem the facts as set forth in Defendants' Statement of Material Facts admitted, to the extent they are properly supported by the record. Dkt. No. 133-3, Defs.' Rule 7.1 Statement of Material Facts ("Defs.' SMF"); *see also GlobalRock Networks, Inc. v. MCI Commc'ns Servs., Inc.*, 943 F. Supp. 2d 320, 329 (N.D.N.Y. 2013) ("Where the non-movant either does not respond to the motion or fails to dispute the movant's statement of material facts, the court may not rely solely on the moving party's Rule 56.1 statement; rather the court must be satisfied that the citations to evidence in the record support the movant's assertions.") (citing *Giannullo v. City of New York*, 322 F.3d 139, 143 n.5 (2d Cir. 2003) ).

[1]  On March 5, 2018 the Clerk's office received Plaintiffs "Reply Motion In Opposition to Defendant's Local Rule 7.1 ..." Dkt. No. 163. This document was in addition to the Plaintiff's Reply Brief. Dkt. No. 162. Dkt. No. 163 violates this Court's directives in several respects. First, it is not a properly formulated Rule 7.1 Reply. The local Rules provide as follows: "The non-movant's response shall mirror the movant's Statement of Material Facts by admitting and /or denying each of the movant's assertions in matching numbered paragraphs. Each denial shall set forth a specific citation to the record where the factual issue arises." N.D.N.Y. L.R. 7.1(a)(3). The Plaintiff's

Marino v. Watts, Not Reported in Fed. Supp. (2018)

2018 WL 3121612

Rule 7.1 reply does not address any of the facts listed in the Defendants Rule 7.1 Statement of Material Facts. Further, Dkt. No. 163 is, in essence, a supplemental reply brief, and when combined with Dkt. No. 162, substantially exceeds the Court-imposed five page limit on this additional brief.

**B. Factual Background**

**\*2** On December 3, 2009, Plaintiff was incarcerated at FCI Ray Brook, when unit officers discovered $2,729.32 of postage stamps, gambling paraphernalia, and a homemade intoxicant in his cell during a routine cell search. Defs.' SMF at ¶¶ 26-27. A disciplinary hearing was held on December 15, 2009, at the conclusion of which Plaintiff was found guilty of several disciplinary violations and sentenced to sixty days in disciplinary segregation, twenty-seven days loss of good time credits, and 180 days restriction on his visiting, telephone, and commissary privileges. *Id.* at ¶ 28. Following the disciplinary hearing, the Special Investigative Supervisor ("SIS") conducted an investigation into the incident, which revealed that Plaintiff's girlfriend had entered into a series of financial transactions with a number of different inmates. *Id.* at ¶ 29. The report concluded that Plaintiff had been running an illegal gambling operation and recommended that he be transferred to another institution in order to "shut down" the operation. *Id.* at ¶ 30.

Defendant Lucas, Plaintiff's case manager, accepted the recommendation of the SIS, as was his standard practice, and completed the necessary paperwork to request a transfer for Plaintiff. *Id.* at ¶ 31. Lucas drafted a Request for Transfer, Form 409. *Id.* at ¶ 33; Dkt. No. 133-10, Decl. of Steven Lucas, dated Aug. 18, 2017, Ex. F ("Form 409"). The transfer request was a "Code 323," which, according to Lucas, means that the inmate "need[s] closer supervision as the result of a disciplinary incident." Dkt. No. 133-4, Lucas Decl. at ¶ 14. In stating the reason for the transfer request, Lucas summarized the findings of the SIS report, and noted that Plaintiff had a previous disciplinary violation in 2007 for operating a gambling operation at USP Canaan. Form 409. Lucas recommended "a transfer to a High security facility no closer to [Plaintiff's] release area of Massachusetts." *Id.* On the Form 409, Lucas indicated that Plaintiff's inmate security level [2] was twenty-four. *Id.* After researching suitable facilities, Lucas identified USP Hazelton and USP Big Sandy as potential facilities to which Plaintiff might be

transferred. Lucas Decl. at ¶ 17. Lucas also completed a new BP-338. [3] *Id.* at ¶ 37.

[2]    Each inmate in the custody of the Federal Bureau of Prisons ("BOP") is assigned a point score, which is used to determine their security classification. Defs.' SMF at ¶¶ 9-11. An inmate's point score, however, is not the sole factor used in determining a security classification; public safety factors and management variables are also considered. *Id.* at ¶ 11. An inmate's security classification is re-assessed at regular intervals throughout the period of incarceration. *Id.* at ¶ 13.

[3]    An Inmate Load and Security Designation Form, or BP-337, is prepared when an inmate first enters federal custody. Defs.' SMF at ¶¶ 7-8. Seven months after the inmate enters federal custody, and annually thereafter, a Custody Classification form, or BP-338, containing updated information relevant to the inmate's security classification, is prepared. *Id.* at ¶¶ 13-14. Additionally, a new BP-338 is issued at any time an event occurs that may affect the inmate's security classification, such as an incident report. *Id.* at ¶ 14.

The Request for Transfer Form was reviewed and approved by the Unit Manager, the Case Management Coordinator, the Assistant Warden, and the Warden, Defendant Schult. *Id.* at ¶ 41. The Request for Transfer Form was then submitted to the Designation and Sentence Computation Center ("DSCC") in Grand Prairie, Texas. *Id.* Once a transfer request is submitted to the DSCC, the determination of whether to approve the request and if approved, what facility the inmate is transferred to, is made solely by the DSCC. *Id.* at ¶¶ 41-42. The staff of the facility submitting the request—in this case, Ray Brook—have no further control over the request after it is submitted. *Id.* at ¶ 42. Plaintiff was transferred out of FCI Ray Brook on February 12, 2010, and arrived at USP Pollock, his new assigned facility, on July 13, 2010. *Id.* at ¶ 43.

**\*3** The remaining claims in this action are First Amendment retaliation claims arising from an affidavit Plaintiff alleges that he submitted in support of a fellow inmate named McCarroll's civil rights action against a BOP employee named Matteau. Am. Compl. at p. 4. [4] Plaintiff claims that on December 2, 2009, Helms and Poirier [5] discovered the affidavit in Plaintiff's cell during a cell search. *Id.* at pp. 6 & 16. Plaintiff claims that the Defendants intentionally

2018 WL 3121612

retaliated against him based upon this affidavit. *Id.* at pp. 13-15. Plaintiff claims that he experienced the following specific acts of retaliation:[6] (1) Defendants Lucas and Sepanek confiscated his legal work and law books when he was housed in the Special Housing Unit ("SHU") at Ray Brook, *id.* at pp. 34-35; (2) Defendants Lucas and Sepanek falsified his security level from eleven to twenty-four, causing him to be transferred to USP Pollock, which was known to have violent conditions, *id.* at p. 27; and (3) Defendant Schult caused him to be placed in BOP's "Diesel Therapy" program, whereby he was frequently transferred while on route from Ray Brook to Pollock and did not have access to his legal work, *id.* at p. 21.

4    Because some paragraphs of the Amended Complaint are not numbered, the Court cites to the pagination assigned by Plaintiff.

5    Poirier was dismissed as a Defendant from this action, Dkt. No. 62, and Plaintiff voluntarily discontinued his claims against Helms after he passed away, Dkt. No. 145.

6    Plaintiff has alleged other acts of retaliation—including that the incident report filed against him as a result of the cell search was retaliatory—that have been dismissed by the Court. *See* Dkt. No. 49.

## II. STANDARD OF REVIEW

Pursuant to FED. R. CIV. P. 56(a), summary judgment is appropriate only where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The moving party bears the burden to demonstrate through "pleadings, depositions, answers to interrogatories, and admissions on file, together with [ ] affidavits, if any," that there is no genuine issue of material fact. *F.D.I.C. v. Giammettei*, 34 F.3d 51, 54 (2d Cir. 1994) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) ). "When a party has moved for summary judgment on the basis of asserted facts supported as required by [Federal Rule of Civil Procedure 56(e) ] and has, in accordance with local court rules, served a concise statement of the material facts as to which it contends there exist no genuine issues to be tried, those facts will be deemed admitted unless properly controverted by the nonmoving party." *Glazer v. Formica Corp.*, 964 F.2d 149, 154 (2d Cir. 1992).

To defeat a motion for summary judgment, the non-movant must set out specific facts showing that there is a genuine issue for trial, and cannot rest merely on allegations or denials of the facts submitted by the movant. FED. R. CIV. P. 56(c); *see also Scott v. Coughlin*, 344 F.3d 282, 287 (2d Cir. 2003) ("Conclusory allegations or denials are ordinarily not sufficient to defeat a motion for summary judgment when the moving party has set out a documentary case."); *Rexnord Holdings, Inc. v. Bidermann*, 21 F.3d 522, 525-26 (2d Cir. 1994). To that end, sworn statements are "more than mere conclusory allegations subject to disregard ... they are specific and detailed allegations of fact, made under penalty of perjury, and should be treated as evidence in deciding a summary judgment motion" and the credibility of such statements is better left to a trier of fact. *Scott v. Coughlin*, 344 F.3d at 289 (citing *Flaherty v. Coughlin*, 713 F.2d 10, 13 (2d Cir. 1983) and *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995) ).

When considering a motion for summary judgment, the court must resolve all ambiguities and draw all reasonable inferences in favor of the non-movant. *Nora Beverages, Inc. v. Perrier Group of Am., Inc.*, 164 F.3d 736, 742 (2d Cir. 1998). "[T]he trial court's task at the summary judgment motion stage of the litigation is carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them. Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution." *Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1224 (2d Cir. 1994). Furthermore, where a party is proceeding *pro se*, the court must "read [his or her] supporting papers liberally, and ... interpret them to raise the strongest arguments that they suggest." *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994), *accord, Soto v. Walker*, 44 F.3d 169, 173 (2d Cir. 1995). Nonetheless, mere conclusory allegations, unsupported by the record, are insufficient to defeat a motion for summary judgment. *See Carey v. Crescenzi*, 923 F.2d 18, 21 (2d Cir. 1991). Summary judgment is appropriate "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

## III. DISCUSSION

**\*4** Defendants move for summary judgment on Plaintiff's remaining First Amendment retaliation claims. For the reasons that follow, the Court agrees that Plaintiff's retaliation claims fail as a matter of law and recommends that Defendants' Motion be **granted**.[7]

2018 WL 3121612

7    Defendants have argued that the Court should reconsider its holding allowing Plaintiff's First Amendment retaliation claim to proceed under *Bivens* in light of the Supreme Court's recent decision in *Ziglar v. Abbasi*, 137 S. Ct. 1843 (2017). Dkt. No. 133-2, Defs.' Mem. of Law at pp. 9-10. *Ziglar*—as all of the Supreme Court's recent *Bivens* decisions—emphasizes that *Bivens* is a " 'disfavored' judicial activity." 137 S. Ct. at 1857. However, because the Court finds that summary judgment is appropriate on the merits of Plaintiff's First Amendment claims, it declines to revisit the issue of whether a *Bivens* remedy should be implied under the First Amendment.

### A. Legal Standard [8]

8    Due to the similarity between *Bivens* and § 1983 actions, "federal courts have typically incorporated § 1983 law into *Bivens* actions." *Tavarez v. Reno*, 54 F.3d 109, 110 (2d Cir. 1995).

To state a First Amendment claim for retaliation, an inmate must demonstrate (1) he or she was engaged in constitutionally protected speech or conduct, (2) the defendant took adverse action against the plaintiff, and (3) there was a causal connection between the protected activity and the adverse action in that the alleged conduct was substantially motivated by the protected activity. *Gill v. Pidlypchak*, 389 F.3d 379, 380 (2d Cir. 2004) (citing *Dawes v. Walker*, 239 F.3d 489, 492 (2d Cir. 2001), *overruled on other grounds*, *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002) ). "Only retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights constitutes an adverse action for a claim of retaliation." *Davis v. Goord*, 320 F.3d 346, 353 (2d Cir. 2003) (citing *Dawes v. Walker*, 239 F.3d at 493). Otherwise, the retaliatory act is "*de minimis* and therefore outside the ambit of constitutional protection." *Dawes v. Walker*, 239 F.3d at 493.

The plaintiff bears the initial burden in showing that "the protected conduct was a substantial or motivating factor" for the defendant's actions. *Graham v. Henderson*, 89 F.3d 75, 79 (2d Cir. 1996). To satisfy the causal connection prong, a prisoner must present evidence inferring that a defendant acted with an improper motive. Such evidence includes: (1) temporal proximity between the protected activity and the alleged retaliatory act; (2) the prisoner's prior good disciplinary record; (3) the prisoner's vindication at his disciplinary hearing; and (4) the defendants' statements regarding their motive for the discipline. *See Colon v. Coughlin*, 58 F.3d at 872-73. Direct evidence is not required and a plaintiff may meet this burden by presenting "sufficiently compelling" circumstantial evidence of a retaliatory motive. *Bennett v. Goord*, 343 F.3d 133, 138-39 (2d Cir. 2003). If the plaintiff carries this initial burden, the burden then shifts to the defendants to show that they would have taken the same action absent the retaliatory motive. *Graham v. Henderson*, 89 F.3d at 79 (citing, *inter alia*, *Lowrance v. Achtyl*, 20 F.3d 529, 535 (2d Cir. 1994) ).

**\*5** Because of the relative ease with which claims of retaliation can be invoked, courts should examine such claims "with skepticism and particular care." *Colon v. Coughlin*, 58 F.3d at 872 (citation omitted); *Dawes v. Walker*, 239 F.3d at 491("[V]irtually any adverse action taken against a prisoner by a prison official—even those otherwise not rising to the level of a constitutional violation—can be characterized as a constitutionally proscribed retaliatory act."); *see also Graham v. Henderson*, 89 F.3d at 79.

### B. Analysis

Defendants argue that: (1) Plaintiff was transferred to USP Pollock for legitimate non-retaliatory reasons; (2) undisputed evidence shows that Plaintiff's security classification was not falsified; (3) there is no evidence that the Defendants were personally involved in the decision to transfer Plaintiff to USP Pollock or in the manner in which that transfer was conducted; and (4) Plaintiff has not shown that he suffered any injury due to the deprivation of his legal materials. Dkt. No. 133-2, Defs.' Mem. of Law at pp. 2-3.

### 1. Confiscation and Denial of Access to Legal Work while in SHU

Plaintiff alleges that the Defendants confiscated his legal materials—his Federal Rules of Civil Procedure book, in particular—while he was in the SHU at Ray Brook. Am. Compl. at pp. 34-35. According to Plaintiff, the Defendants specifically told him that the reason they were confiscating his legal materials was the affidavit he had filed against Matteau. *See* Dkt. No. 133-25, Dep. of Vincent Michael Marino, dated

Apr. 18, 2017 ("Pl.'s Dep.") at pp. 16-17. Participation in a lawsuit constitutes a protected activity, *see Baskerville v. Blot*, 224 F. Supp. 2d 723, 731 (S.D.N.Y. 2002), and the intentional destruction of an inmate's property may constitute an adverse action for the purposes of a retaliation claim, *Mateo v. Bristow*, 2013 WL 3863865, at *5 (S.D.N.Y. July 16, 2013).

Plaintiff's claim, however, fails because there is insufficient evidence to conclude that he suffered an adverse action. Plaintiff has not elaborated on his allegations regarding legal work that was confiscated, and indeed, at his deposition, was unable to identify any impact on his court actions due to his legal materials being confiscated. Pl.'s Dep. at pp. 71-72, & 85. Furthermore, while Plaintiff claims that Defendants confiscated his Federal Rules of Civil Procedure book, Defendants have produced evidence that inmates in SHU at Ray Brook have access to a basic law library from 8:00 am to 9:00 pm, seven days a week. Dkt. No. 133-23, Decl. of Karen Folster Lesperance, Esq., dated Aug. 18, 2017, Ex. I, at p. 2. Plaintiff has not claimed that he was denied access to legal materials through the law library, or that any of the Defendants had any personal involvement in restricting his access to the law library. The lack of evidence demonstrating that Plaintiff suffered an adverse action is insufficient to withstand summary judgment. Accordingly, the Court recommends that Defendants' Motion be **granted** as to Plaintiff's retaliation claim based on the confiscation and denial of access to legal materials while he was in the SHU at Ray Brook.

### 2. Falsification of Security Level and Transfer to USP Pollock

Plaintiff alleges that the Defendants falsified his security level and caused him to be transferred to a "facility which had harsher prison conditions such as ... over 16 murders, over 300 stabbings & knife shots." Am. Compl. at p. 27. Based on conversations with the Defendants, Plaintiff asserts that he believes this was out of retaliation for filing the affidavit against Matteau. *See* Pl.'s Dep. at pp. 31-32.

 **\*6** Although a transfer to a facility with harsher conditions may constitute an adverse action for the purposes of a retaliation claim, *see Davis v. Kelly*, 160 F.3d 917, 920 (2d Cir. 1998), in this case Plaintiff has failed to establish a causal connection between his protected conduct (filing the affidavit) and the Defendants' request for his transfer. "As

a general matter, it is difficult to establish one defendant's retaliation for complaints against another defendant." *Hare v. Hayden*, 2011 WL 1453789, at *4 (S.D.N.Y. Apr. 14, 2011); *see also Roseboro v. Gillespie*, 791 F. Supp. 2d 353, 369 (S.D.N.Y. 2011) (collecting cases). Plaintiff has claimed that certain of the Defendants had conversations with him regarding his placement in SHU and the diesel therapy program in retaliation for his litigation activities, but notably does not allege such conversations regarding his security level and transfer to USP Pollock. While Plaintiff's unsupported allegations that the Defendants retaliated against him by manipulating his security level and causing his transfer to Pollock may have been sufficient to survive at the motion to dismiss stage, they are insufficient to survive a motion for summary judgment.

Moreover, even if Plaintiff were able to establish a causal connection between his affidavit and Defendants' alleged adverse actions, Defendants have provided significant evidence rebutting the evidence that Plaintiff claims shows Defendants' retaliatory motivation.

As proof of his claim that Defendants manipulated his security level, Plaintiff compares a BP-338 dated April 27, 2006 where his security level was 11, with a BP-338 dated February 2, 2011 where his security level was 24. *See* Am. Compl. at pp. 47-48. [9] Plaintiff claims that the transfer forms completed by the Defendants contained false information that there were pending drug and criminal enterprise charges against him and that he had been convicted of assaulting a police officer; Plaintiff asserts that these falsifications inflated his security level. Pl.'s Resp. at p. 16.

[9]      Citation is to the pagination assigned by the Court's Case Management Electronic Case Files ("CM/ECF") System.

Contrary to Plaintiff's claims, Defendant Lucas explains that on the Form 409 he is required to note any discrepancies between the inmate's initial BP-337 and the BP-338 completed at the time of the transfer request. Lucas Decl. at ¶ 22. Lucas noted two discrepancies between the BP-337 and the information available when he was completing the Form 409: (1) the BP-337 referenced pending drug and criminal enterprise charges, which had never been lodged as a detainer; and (2) a traffic stop had been scored as a crime of Serious Violence instead of a crime of Minor Violence. *Id.* at ¶ 23; Form 409. Lucas states that both of these discrepancies would have lowered Plaintiff's point score. Lucas Decl. at ¶

Case 9:19-cv-01161-DNH-TWD Document 79 Filed 11/10/21 Page 25 of 125
Marino v. Watts, Not Reported in Fed. Supp. (2018)
2018 WL 3121612

24. Lucas further explains that in the five years intervening between the two BP-338 forms relied upon by Plaintiff, Plaintiff had three disciplinary incidents, including the two violations for running gambling operations, and BOP changed its Program Statement regarding security classification. *Id.* at ¶¶ 27-28. Lucas' explanations rebut Plaintiff's assertions that the Defendants manipulated his security level in order to transfer him to a higher security facility.

In any event, Lucas explains that the transfer request was "standard practice" following the recommendation of SIS that Plaintiff be transferred in order to "shut down" his gambling operation. *Id.* at ¶¶ 12-13. Plaintiff was transferred pursuant to Program Statement Number P5100.08, "Inmate Security Designation and Custody Classification" Code 323. Lucas Decl. ¶ 14, Ex. A, Chapt. 7, p. 5. Pursuant to that Code, an inmate may be transferred as a result of documented misconduct, to an institution of greater security. *Id.* In such cases, the inmate may only be transferred to a facility of the same level security if placement at a greater security level institution is not possible or other overriding circumstances exist. *Id.* As evidenced on Plaintiff's Form 409, the basis for the transfer was Plaintiff's misconduct. Lucas Decl., ¶ 16, Ex. F ¶ 3 ("An SIS Investigation has recommended the transfer of inmate Marino from FCI Ray Brook to 'shut down' his illicit gambling operation.... Based on the scale of this gambling operation, and the repetitive nature of these infractions, we recommend a transfer to a High security level facility no closer to his release area of Massachusetts. To do otherwise would be a reward for this type of behavior."). Defendants have demonstrated that they would have transferred Plaintiff to a higher security level facility independent of any retaliatory motive.

 **\*7** Plaintiff also contends that Defendants specifically transferred him to USP Pollock because of its dangerousness. Defendants have demonstrated this is not the case. On Plaintiff's Form 409, Defendant Lucas requested transfer to either USP Hazelton or USP Big Sandy. Lucas Decl. ¶ 17, Ex. F. Thus, even if Plaintiff had established a causal connection between his protected activity and the Defendants' decision to request his transfer, the Defendants have shown that they would have requested Plaintiff's transfer to a higher level security facility even in the absence of the protected activity, and that the assignment to USP Pollock was not Defendants' decision. *See Graham v. Henderson*, 89 F.3d at 79.

Accordingly, the Court recommends that Defendants' Motion be **granted** as to Plaintiff's First Amendment claim based on the alleged manipulation of his security level. [10]

[10]   Since the issuance of the Court's Original Report-Recommendation and Order, Plaintiff has had the benefit of receiving Defendants' Answers to certain Notices to Admit served by Plaintiff, and being able to make further arguments to the Court. *See* Dkt. No. 158-1, Defs' Objections and Responses to Pl.'s First Set of Requests for Admissions; Dkt. No. 162, Pl.'s Reply Brief. The Court has reviewed and considered these additional documents, but nothing contained therein causes the Court to change its analysis. The Defendants generally deny the admissions sought in the Notices to Admit, and provide additional explanations that are wholly consistent with the Affidavit of Defendant Lucas previously submitted. *See* Dkt. No. 133-4. Plaintiff objects to the Defendants' narrative contained within the Responses to the Notices to Admit, and generally claims that those responses constitute "criminal perjury." Pl.'s Reply Brief at pp. 2-4. Aside from the Plaintiff's general characterizations, Plaintiff again emphasizes that the drug and criminal enterprise charges that are referenced in Form 409 were not pending at the time of the creation that Form. Defendant Lucas responds that the reference to those charges was merely to note discrepancies between the BP-338 form he filled out and the original BP-337 Form. Accordingly, despite these additional submissions, and utilizing the standard of "skepticism and care" mandated by the Second Circuit, the Court again finds that summary judgment is warranted on this First Amendment retaliation claim.

### 3. Placement in Diesel Therapy Program

Plaintiff alleges that the Defendants orchestrated his placement in the "Diesel Therapy" program for eight months, where he was denied access to his legal work. Am. Compl. at p. 26. Plaintiff claims that Defendant Schult told him that placement in the "Diesel Therapy" program was retaliation for his litigation activities. Pl.'s Dep. at p. 17.

With respect to this claim, there is no evidence, aside from Plaintiff's unsupported assertions, that any of the Defendants

had any personal involvement in Plaintiff's placement in the "Diesel Therapy" program, or any control over Plaintiff's access to his legal materials once he was transferred from Ray Brook. As stated by Defendant Lucas, once a transfer request is submitted to DSCC, the staff submitting the request have no further control over the request. Lucas Decl. at ¶ 19. "A *Bivens* action lies against a defendant only when the plaintiff can show the defendant's personal involvement in the constitutional violation." *Cohen v. Holder*, 2011 WL 809773, at *2 (E.D.N.Y. Mar. 1, 2011); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009) ("Because vicarious liability is inapplicable to *Bivens* ... a plaintiff must plead that each Government-official defendant, though the official's own individual actions, has violated the Constitution.").

**\*8** Accordingly, the Court recommends that Defendants' Motion be **granted** as to Plaintiff's First Amendment claim based upon his placement in the "Diesel Therapy" program.

### IV. CONCLUSION

For the reasons stated herein, it is hereby

**RECOMMENDED**, that Defendants' Motion for Summary Judgment (Dkt. No. 133) be **GRANTED** and this action **DISMISSED**; and it is further

**ORDERED**, that the Clerk of the Court serve a copy of this Report-Recommendation and Order upon the parties to this action.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen (14) [11] days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993) (citing *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15 (2d Cir. 1989) ); *see also* 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 72 & 6(a).

[11]     If you are proceeding *pro se* and are served with this Order by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date the order was mailed to you to serve and file objections. FED. R. CIV. P. 6(d). If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday. FED. R. CIV. P. 6(a)(1)(C).

**All Citations**

Not Reported in Fed. Supp., 2018 WL 3121612

---

**End of Document**                   © 2021 Thomson Reuters. No claim to original U.S. Government Works.

Marino v. Schult, Not Reported in Fed. Supp. (2018)

2018 WL 1578163

2018 WL 1578163
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Vincent Michael MARINO, Plaintiff,

v.

Deborah G. SCHULT, et al., Defendants.

9:12-CV-801 (NAM/DJS)
|
Signed 03/30/2018

**Attorneys and Law Firms**

Vincent Michael Marino, 14431-038, FCI Fort Dix, P.O. Box 2000, Joint Base MDL, NJ 08640, pro se.

Hon. Grant C. Jaquith, Acting United States Attorney, Northern District of New York, Karen Folster Lesperance, Assistant United States Attorney, James T. Foley U.S. Courthouse, 445 Broadway, Room 218, Albany, NY 12207, Attorneys for Defendants.

**MEMORANDUM-DECISION AND ORDER**

Hon. Norman A. Mordue, Senior U.S. District Court Judge

**I. Introduction**

**\*1** Plaintiff *pro se* Vincent Michael Marino brought this action pursuant to *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388 (1971), alleging violations of his civil rights. (Dkt. No. 52). The only remaining claims are for First Amendment retaliation against Defendants Schult, Sepanek, and Lucas, who at all relevant times were employed at FCI Ray Brook, where Plaintiff was formerly incarcerated. (*See* Dkt. No. 86). Defendants have moved for summary judgment on the remaining claims. (Dkt. No. 133). On December 11, 2017, United States Magistrate Judge Daniel J. Stewart issued a Report-Recommendation and Order, recommending that Defendants' motion be granted and the action dismissed. (Dkt. No. 149). Subsequently, Plaintiff filed objections to the Report-Recommendation, [1] a motion to compel certain discovery and for permission to amend his opposition to summary judgment, and a motion for rejection of the Report-Recommendation, denial of summary judgment, imposition of the sanction of default, and other relief. (Dkt. Nos. 152–154).

[1] The Court has reviewed Plaintiff's objections to Magistrate Judge Stewart's December 11, 2017 Report-Recommendation, which were based on the outstanding discovery Plaintiff sought in order to respond to Defendants' motion for summary judgment. (Dkt. No. 152). This discovery issue was resolved before the March 7, 2018 Amended Report-Recommendation. (Dkt. Nos. 157, 162–63). Therefore, Plaintiff's objections to the December 11, 2017 Report-Recommendation are not relevant to the March 7, 2018 Amended Report-Recommendation or this decision.

On January 11, 2018, this Court referred Plaintiff's new motions to Magistrate Judge Stewart for decision on non-dispositive issues and/or recommendation on dispositive issues, and held in abeyance the Report-Recommendation and Defendants' motion for summary judgment. (Dkt. No. 155). On January 16, 2018, Plaintiff filed an additional "reply in opposition to Magistrate Judge Stewart's Report-Recommendation and Order," wherein Plaintiff again emphasized the outstanding discovery he needed to oppose Defendants' motion. (Dkt. No. 156). On January 31, 2018, Magistrate Judge Stewart granted Plaintiff's motion to compel, allowed him to submit additional briefing in connection with Defendants' motion for summary judgment, and denied his motion for default judgment. (Dkt. No. 157). Plaintiff then submitted supplemental papers in further opposition to Defendants' motion. (Dkt. Nos. 162–63).

On March 7, 2018, Magistrate Judge Stewart issued an Amended Report Recommendation and Order, which again recommended that Defendants' motion for summary judgment be granted and the action dismissed. (Dkt. No. 164). On March 28, 2018, Plaintiff filed timely objections to the Amended Report-Recommendation. [2] (Dkt. No. 167). For the reasons set forth below, the Amended Report-Recommendation is adopted in its entirety.

[2] Although Plaintiff's objections were received on March 28, 2018—two days after the March 26, 2018 deadline, they are dated March 20, 2018 and were mailed on March 26, 2018, and therefore, the Court will consider the objections as timely.

**II. Standard of Review**

**\*2** This court reviews *de novo* those portions of the Magistrate Judge's findings and recommendations that have been properly preserved with a specific objection. *Petersen*

Case 9:19-cv-01161-DNH-TWD Document 79 Filed 11/10/21 Page 28 of 125

Marino v. Schult, Not Reported in Fed. Supp. (2018)

2018 WL 1578163

*v. Astrue*, 2 F. Supp. 3d 223, 228–29 (N.D.N.Y. 2012); 28 U.S.C. § 636(b)(1)(C). Findings and recommendations as to which there was no properly preserved objection are reviewed for clear error. *Id.* "A proper objection is one that identifies the specific portions of the [Report and Recommendation] that the objector asserts are erroneous and provides a basis for this assertion." *Kruger v. Virgin Atlantic Airways, Ltd.*, 976 F. Supp. 2d 290, 296 (E.D.N.Y. 2013) (citation omitted). Properly raised objections must be "specific and clearly aimed at particular findings" in the Report. *Molefe v. KLM Royal Dutch Airlines*, 602 F. Supp. 2d 485, 487 (S.D.N.Y. 2009). "To the extent ... that the party makes only conclusory or general arguments ... the Court will review the Report strictly for clear error." *DiPilato v. 7-Eleven, Inc.*, 662 F Supp. 2d 333, 339 (S.D.N.Y. 2009). "The objections of parties appearing *pro se* are generally accorded leniency and should be construed to raise the strongest arguments that they suggest." *Id.* at 340 (quotations and citation omitted).

Summary judgment may be granted only if all the submissions taken together "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *In re World Trade Center Lower Manhattan Disaster Site Litig.*, 758 F.3d 202, 210 (2d Cir. 2014). A fact is material if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *see also Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005). A fact is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* In ruling on a summary judgment motion, the court "must construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Dallas Aerospace, Inc. v. CIS Air Corp.*, 352 F.3d 775, 780 (2d Cir. 2003). Still, "[m]ere conclusory allegations or denials ... cannot by themselves create a genuine issue of material fact where none would otherwise exist." *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (quoting *Fletcher v. Atex, Inc.*, 68 F.3d 1451, 1456 (2d Cir. 1995) (internal quotation marks and citations omitted)).

### III. Discussion

#### a. The Amended Report-Recommendation

In the Amended Report-Recommendation, Magistrate Judge Stewart deemed admitted the facts set forth in Defendants'

Statement of Material Facts, to the extent they were properly supported by the record, based on Plaintiff's failure to file a response to Defendants' Statement. (Dkt. No. 164, p. 2). Magistrate Judge Stewart then recommended that Defendants' motion for summary judgment be granted as to Plaintiff's First Amendment retaliation claims, which alleged that after Plaintiff filed an affidavit in support of a fellow inmate's civil rights action, the Defendants took the following actions against him: 1) the confiscation of legal work and law books when Plaintiff was housed in the Special Housing Unit ("SHU") at FCI Ray Brook; 2) the falsification of Plaintiff's security level from eleven to twenty-four, and consequent transfer to USP Pollock, which was known to have violent conditions; and 3) his placement in so-called "Diesel Therapy," whereby he was in transit for eight months from one facility to another. (*Id.*).

As to the first claim, Magistrate Judge Stewart Recommended summary judgment based on "insufficient evidence to conclude that [Plaintiff] suffered an adverse action." (*Id.*, p. 10). Magistrate Judge Stewart observed that "Plaintiff has not elaborated on his allegations regarding legal work that was confiscated, and indeed, at his deposition, was unable to identify any impact on his court actions due to his legal materials being confiscated." (*Id.*). Further, while Plaintiff claimed that Defendants confiscated his Federal Rules of Civil Procedure book, it was noted that Defendants "produced evidence that inmates in SHU at Ray Brook had access to a basic law library from 8:00 am to 9:00 pm, seven days a week," and "Plaintiff has not claimed that he was denied access to legal materials through the law library, or that any of the Defendants had any personal involvement in restricting his access to the law library." (*Id.*).

**\*3** For Plaintiff's second claim based on the alleged manipulation of his security level and his transfer to a different facility, Magistrate Judge Stewart found that Plaintiff failed to establish a causal connection between his protected conduct—filing the affidavit, and Defendants' request for his transfer. (*Id.*, pp. 10–11). Magistrate Judge Stewart noted that "[w]hile Plaintiff's unsupported allegations that the Defendants retaliated against him by manipulating his security level and causing his transfer to Pollock may have been sufficient to survive at the motion to dismiss stage, they are insufficient to survive a motion for summary judgment." (*Id.*, p. 11). Magistrate Judge Stewart also found that even if Plaintiff were able to establish a causal connection between his affidavit and the alleged adverse actions, Defendants "provided significant evidence rebutting the

Marino v. Schult, Not Reported in Fed. Supp. (2018)

2018 WL 1578163

evidence that Plaintiff claims shows Defendants' retaliatory motivation." (*Id.*, p. 11). Defendants' evidence supporting the increase in Plaintiff's security level included that "in the five years intervening between the two BP-338 forms relied upon by Plaintiff, Plaintiff had three disciplinary incidents, including the two violations for running gambling operations, and BOP changed its Program Statement regarding security classification." (*Id.*, pp. 11–12). Further, there was evidence that "the transfer request was 'standard practice' following the recommendation of SIS that Plaintiff be transferred in order to 'shut down' his gambling operation." (*Id.*, p. 12). Thus, Magistrate Judge Stewart found that Defendants "demonstrated that they would have transferred Plaintiff to a higher security level facility independent of any retaliatory motive." (*Id.*, p. 13). In addition, the evidence showed that Defendants had no personal involvement in choosing the particular facility, USP Pollock, where Plaintiff was transferred. (*Id.*).

For Plaintiff's third claim related to "Diesel Therapy," Magistrate Judge Stewart found that "there is no evidence, aside from Plaintiff's unsupported assertions, that any of the Defendants had any personal involvement in Plaintiff's placement in the 'Diesel Therapy' program, or any control over Plaintiff's access to his legal materials once he was transferred from Ray Brook." (*Id.*, p. 14). Furthermore, Magistrate Judge Stewart noted evidence that "once a transfer request is submitted to DSCC, the staff submitting the request have no further control over the request." (*Id.*).

### b. Plaintiff's Objections

As an initial matter, Plaintiff claims for the first time in his objections that he never received Defendants' Statement of Material Facts in support of their motion for summary judgment, which he now seeks to compel. (Dkt. No. 167, p. 1). The Court has considered this claim as an objection to Magistrate Judge Stewart's decision to deemed admitted the facts set forth in Defendants' Statement of Material Facts based on Plaintiff's failure to file a response. (Dkt. No. 164, p. 2).

Contrary to Plaintiff's claim, the record shows that he received Defendants' Statement of Material Facts, along with notice of the consequences of failing to file a response to Defendants' Statement of Material Facts. (Dkt. Nos. 133-1, 133-3, 133-27). In the December 11, 2017 Report-Recommendation, Magistrate Judge Stewart noted that Plaintiff failed to file a

response to Defendants' Statement of Material Facts. (Dkt. No. 149, p. 2). Therefore, under Local Rule 7.1(a)(3), Magistrate Judge Stewart deemed that the facts set forth by Defendants were admitted by Plaintiff, to the extent the facts were properly supported by the record. (*Id.*). Despite that clear notification, Plaintiff never claimed to be missing Defendants' Statement of Material Facts in his objections filed on December 29, 2017. (Dkt. No. 152). Nor did he raise the issue in his motion to compel or letters to the Court thereafter. (Dkt. Nos. 153–54, 156). After Plaintiff obtained additional discovery, Magistrate Judge Stewart permitted Plaintiff to submit a supplemental Rule 7.1 Reply Statement of Material Fact. (Dkt. No. 157). Plaintiff submitted a document entitled "Marino's Reply Motion in Opposition to Defendant's Local Rule 7.1/Statement of Material Fact Motion with Marino's Supportive Affidavit." (Dkt. No. 163). But this document did not specifically address any of the facts listed in Defendants' Statement of Material Facts. Based on Plaintiff's failure to file a proper response, Magistrate Judge Stewart once again, in the Amended Report-Recommendation, deemed admitted Defendants' Statement of Material Facts to the extent they were properly supported by the record. (Dkt. No. 164, p. 2).

After carefully reviewing the issue *de novo*, the Court agrees with Magistrate Judge Stewart's decision because the record shows that Plaintiff received Defendants' Statement of Material Facts, he was warned of the consequences of not responding, and he failed to do so despite multiple opportunities. *See* N.D.N.Y.L.R. 7.1(a)(3). Moreover, Magistrate Judge Stewart only deemed the facts admitted to the extent they were properly supported by the record, and Plaintiff makes no claim that he lacked the record evidence in this case. Indeed, Plaintiff's objections reference such evidence. (*See, e.g.*, Dkt. No. 167, pp. 4–5). Therefore, the Court also denies Plaintiff's request to submit a response to Defendants' Statement of Material Facts.

**\*4** As to the substance of Plaintiff's First Amendment retaliation claims, he does not appear to challenge, with any evidentiary basis, the specific findings made by Magistrate Judge Stewart. Nonetheless, recognizing Plaintiff's *pro se* status, and out of an abundance of caution, the Court has undertaken a *de novo* review. In order to prevail on his retaliation claims, Plaintiff "bears the burden of showing, first, that he engaged in constitutionally protected conduct and, second, that the conduct was a substantial or motivating factor for the adverse actions taken by prison officials." *Bennett v. Goord*, 343 F.3d 133, 137 (2d Cir. 2003). "Because prisoner retaliation claims are easily fabricated, and

Marino v. Schult, Not Reported in Fed. Supp. (2018)

2018 WL 1578163

accordingly pose a substantial risk of unwarranted judicial intrusion into matters of general prison administration, [courts] are careful to require non-conclusory allegations." *Id.* (quotations and citations omitted). If a plaintiff adduces evidence of protected conduct, an adverse action, and a causal connection, the burden shifts to the defendant to demonstrate he "would have disciplined or transferred him even in the absence of the protected conduct." *Id.* (quotations and citations omitted). In other words, a defendant is entitled to judgment in his favor if he shows that the adverse action "would have been taken based on the proper reasons alone." *See Graham v. Henderson*, 89 F.3d 75, 79 (2d Cir. 1996). "A finding of sufficient permissible reasons to justify state action is readily drawn in the context of prison administration where we have been cautioned to recognize that prison officials have broad administrative and discretionary authority." *Id.* (quotations and citations omitted).

First, for all three claims, there is no dispute that Plaintiff engaged in protected conduct by filing an affidavit in support of a fellow inmate's civil rights action. However, for Plaintiff's retaliation claim based on the alleged confiscation and denial of access to legal materials, he has failed to adduce any specific evidence of an adverse action. Plaintiff's vague allegations that, while in SHU, he was deprived of his "legal work & legal mail" are insufficient at this stage. (*See* Dkt. No. 52, pp. 21–22; Dkt. No. 167, p. 18). The record also shows that Defendant had access to a law library while in SHU. (*See* Dkt. No. 133-23, p. 3). Moreover, Plaintiff has not adduced evidence of *who* allegedly deprived him of legal materials; he simply testified that "[t]hey lost a lot of it," and "[t]hey destroyed a lot of it." (Dkt. No. 133-25, p. 40). But there is no evidence that Defendants worked at SHU or exercised control over his legal materials there. Thus, Plaintiff has also failed to raise an issue of material fact as to Defendants' personal involvement in the alleged adverse action. *See Hallock v. Bonner*, 567 F. Supp. 2d 334, 338 (N.D.N.Y. 2008) ("[T]o defeat the defendants' motion for summary judgment, the plaintiffs must raise an issue of material fact as to the requisite personal involvement of the named defendants under *Bivens*."). Accordingly, the Court agrees with Magistrate Judge Stewart that Defendants are entitled to summary judgment on this retaliation claim.

Second, for Plaintiff's retaliation claim based on the alleged manipulation of his security level and his transfer to a different facility, the Court agrees with Magistrate Judge Stewart's finding that Defendants demonstrated that they would have increased his security level and requested his transfer even in absence of Plaintiff's protected conduct. Plaintiff argues that Defendants put false information in his prison files in order to raise his security level and get him transferred. (Dkt. No. 167, pp. 3–9). But the record shows that Plaintiff's security classification and transfer were driven by his multiple disciplinary incidents for running gambling operations. (*See* Dkt. No. 133-4, ¶¶ 8–16; Dkt. No. 133-7; Dkt. No. 133-8; Dkt. No. 133-9; Dkt. No. 133-10; Dkt. No. 133-20). The allegedly "inaccurate" files submitted by Plaintiff do not show otherwise. (*See* Dkt. No. 167, pp. 15–22). Defendant Lucas explained that in the five years intervening between the two classification forms relied on by Plaintiff, Plaintiff had three disciplinary incidents, including the two violations for running gambling operations, and BOP changed its Program Statement regarding security classification. (Dkt. No. 133-4, ¶¶ 27–28). Moreover, Plaintiff's transfer was specifically recommended by the Special Investigative Supervisor "as a means to 'shut down' Marino's [gambling] operation," and it was "standard practice" for Defendants to follow that recommendation. (Dkt. No. 133-4, ¶¶ 12–13; Dkt. No. 133-9, p. 5). In sum, Defendants have shown that Plaintiff's security classification and transfer would have taken place even if he had never filed an affidavit for a fellow inmate, and no reasonable jury could find otherwise. Accordingly, the Court agrees with Magistrate Judge Stewart that Defendants are entitled to summary judgment on this retaliation claim.

**\*5** Third, for Plaintiff's retaliation claim based on his alleged placement in so-called "Diesel Therapy," the Court also agrees that Defendants are entitled to summary judgment. Upon review of the record, "there is no evidence, aside from Plaintiff's unsupported assertions, that any of the Defendants had any personal involvement in Plaintiff's placement in the 'Diesel Therapy' program, or any control over Plaintiff's access to his legal materials once he was transferred from Ray Brook." (Dkt. No. 164, p. 14). For example, Plaintiff alleges that Defendant Schult told him that he was going to experience "Diesel Therapy" and that Defendant Sepanek was involved too because all of the Defendants "were conspiring through this whole retaliation." (Dkt. No. 133-25, pp. 72–75). However, the record shows that Defendants requested the transfer based on Plaintiff's disciplinary incidents, and thereafter, they had no control over the request, Plaintiff's transit schedule, or his specific destination. (*See* Dkt. No. 133-4, ¶¶ 16, 19). Thus, Plaintiff's claim cannot survive summary judgment since he has again failed to raise an issue of material fact as to Defendants' personal involvement. *See Hallock*, 567 F. Supp. 2d at 338.

2018 WL 1578163

Plaintiff also puts forward a hodgepodge of other objections. He correctly asserts that "credibility determinations are jury functions and not those of a Judge," (Dkt. No. 167, p. 2), but Magistrate Judge Stewart made no such credibility determinations. Plaintiff writes that "in ruling on a motion to Dismiss/Summary Judgment Rule 12(b)(6) '[t]he evidence of Marino's Amended Complaint is to be believed and all justifiable inferences are to be drawn in his Marino's favor.' " (*Id.*). But Magistrate Judge Stewart correctly stated the standard of review *for summary judgment.* (Dkt. No. 164, pp. 5–7). Plaintiff also once again takes issue with Defendants' discovery responses, arguing that "they failed to comply with Marino's Discovery Requests using word gymnastics to prevail." (Dkt. No. 167, p. 6). But Magistrate Judge Stewart already resolved this discovery dispute, as discussed above. Finally, Plaintiff rehashes a number of the conclusory allegations from his Amended Complaint. (Dkt. No. 167, pp. 4–5, 11). However, once again, it must be emphasized that "more than conclusory allegations are required to survive a summary judgment motion." *Barclay v. New York*, 477 F. Supp. 2d 546, 558 (N.D.N.Y. 2007). In sum, the Court finds no error in the Amended Report-Recommendation based on these general objections.

**IV. Conclusion**

**WHEREFORE**, for the foregoing reasons, it is hereby

**ORDERED** that Magistrate Judge Stewart's Amended Report-Recommendation (Dkt. No. 164) is **ADOPTED in all respects**; and it is further

**ORDERED** that Defendants' Motion for Summary Judgment (Dkt. No. 133) is **GRANTED**; and it is further

**ORDERED** that Plaintiff's Amended Complaint (Dkt. No. 52) is **DISMISSED with prejudice**; and it is further

**ORDERED** that the Clerk of the Court is directed to serve this Memorandum-Decision and Order in accordance with the Local Rules of the Northern District of New York and to serve Plaintiff by both regular mail and certified mail, return receipt requested.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in Fed. Supp., 2018 WL 1578163

---

    © 2021 Thomson Reuters. No claim to original U.S. Government Works.

2019 WL 4257136

2019 WL 4257136
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Jon FONTAINE, Plaintiff
v.
Michael CORNWALL; Marcos Nieves;
and Mary France, Defendants.

9:15-CV-432
|
Signed 09/09/2019

**Attorneys and Law Firms**

OF COUNSEL: JESSICA M. GORMAN, ESQ., LAW
OFFICE OF JESSICA M. GORMAN, P.O. Box 706, Albany,
NY 12201, Attorneys for Plaintiff.

HON. LETITIA JAMES, Attorney General for the State of
New York, OF COUNSEL: ADRIENNE J. KERWIN, ESQ.,
Ass't Attorney General, The Capitol, Albany, NY 12224,
Attorneys for Defendants.

**MEMORANDUM–DECISION and ORDER**

DAVID N. HURD, United States District Judge

**I. INTRODUCTION**

 **\*1** This complaint arises from plaintiff Jon Fontaine
("Fontaine" or "plaintiff")'s medical and psychiatric
treatment at Groveland Correctional Facility ("Groveland"),
where he was incarcerated in 2013. Plaintiff alleges that
Marcos Nieves, M.D. ("Dr. Nieves"), who worked for the
New York Office of Mental Health ("OMH") and treated
plaintiff at Groveland, failed to adequately treat plaintiff's
depression, which led to his attempted suicide on April
12, 2013. Mary France ("France"), a Licensed Master
of Social Work, also worked for OMH and treated plaintiff
at Groveland, and, plaintiff alleges, failed to properly care
for his mental health. Nurse Practitioner Michael Cornwall
("N.P. Cornwall") is a DOCCS employee at Groveland, and
prescribed plaintiff several medications, including Baclofen,
a muscle relaxer that N.P. Cornwall allowed plaintiff to carry
unsupervised.

On April 12, 2013, Fontaine alleges that he took six weeks'
worth of Baclofen in an attempt to take his own life. On April

11, 2015, he filed a complaint against Dr. Nieves, France,
and N.P. Cornwall, alleging that Dr. Nieves and France failed
to adequately treat his depression and suicidal thoughts and
ideations, and that N.P. Cornwall improperly allowed him
to self-carry medication. [1] Plaintiff brings three claims: (1)
deliberate indifference to his need for adequate medical care
under 42 U.S.C. § 1983 ("§ 1983"); (2) negligence under New
York Common Law; and (3) negligent infliction of emotional
distress under New York Common Law. On July 28, 2017,
defendants filed the present motion for summary judgment
under Federal Rule of Civil Procedure ("Rule") 56.

[1]     The complaint also alleges that Subbarao
        Ramineni, M.D., failed to care for Fontaine's
        illnesses and injuries after his suicide attempt.
        Dkt. 26, ¶ 45. Plaintiff voluntarily dismissed his
        complaints against Dr. Ramineni with prejudice on
        June 23, 2017. Dkt. 44.

**II. BACKGROUND**

In the autumn of 2012, Fontaine pled guilty to attempted
burglary in the Second Degree in Monroe County, New York.
Dkt. 46-1 ("Fontaine Dep."), p. 14. [2] Plaintiff received a
sentence of five years' imprisonment. Id. at 15. He began
serving his sentence in Wayne County Jail where he was
prescribed the drug Remeron for anxiety and depression. Id.
at 42-44.

[2]     Page numbers correspond to CM/ECF.

On December 4, 2012, Fontaine was placed on 2:1 watch
in the residential crisis treatment program at Fishkill
Correctional Facility ("Fishkill") because he expressed a
desire to take his own life. Dkt. 46-5, p. 130. On December
7, 2012, Fishkill medical staff noted plaintiffs' diagnoses
of dysthymia, [3] posttraumatic stress disorder, and antisocial
personality disorder. Dkt. 45-10 ("France Dep."), pp. 19-20.

[3]     Dysthymia involves depression or depressive
        symptoms recurring on an on-and-off basis for a
        minimum of two years. France Dep. 65; Nieves
        Dep. 23. It is generally considered a less severe
        diagnosis than major depression. Nieves Dep.
        24-25.

On December 31, 2012, Fontaine left Fishkill and arrived at
Groveland. Fontaine Dep. 49. After his arrival at Groveland,
plaintiff "started getting more depressed." Id. at 50. Fishkill
provided Groveland with plaintiff's treatment notes, which

Case 9:19-cv-01161-DNH-TWD    Document 79    Filed 11/10/21    Page 33 of 125

Fontaine v. Cornwall, Not Reported in Fed. Supp. (2019)

2019 WL 4257136

were available to defendants Dr. Nieves and France. France Dep. 20-21; Dkt. 45-15 ("Nieves Dep."), p. 35. The notes provided that OMH had designated plaintiff as a Level Two mental health risk. [4] Dkt. 46-4 p. 158. The notes additionally informed OMH staff that plaintiff had been on suicide watch at Fishkill in December of 2012. Dkt. 46-5, p. 130.

[4]    OMH labels inmates based on the severity of their mental health needs on a scale of one to six, with one being the highest need for mental help and six requiring no mental help. France Dep. 32.

### A. Defendant Dr. Nieves

**\*2** On January 22, 2013, defendant Dr. Nieves, whose office was located at the Capital District Psychiatric Center in Albany, first treated Fontaine via video conference. Nieves Dep. 14, 16; Dkt. 46-5, pp. 80-82. Doctor Nieves knew from the outset that plaintiff had attempted suicide in 2002. Dkt. 45-13, ¶ 6.

During his interview, Dr. Nieves noted that Fontaine had a "depressed mood, blunted affect, and coherent speech; no psychosis, suicidal or homicidal ideas, intent, or plan." [5] Nieves Dep. 30-31; Dkt. 46-5, p. 80. Plaintiff had been on the maximum permitted dose of Remeron of forty-five milligrams per day, and although this had initially helped with his depression, his symptoms had subsequently returned. Nieves Dep. 16-17.

[5]    Doctor Nieves defines suicidal ideas, intent, or plans as demonstrating an intent to carry out suicidal impulses, as opposed to death wishes, which are merely thoughts of death. Nieves Dep. 31.

Fontaine told Dr. Nieves that he experienced "daily death wishes." Fontaine Dep. 53. Doctor Nieves believed that plaintiff's behavior in the interview was sincere. Nieves Dep. 34. Given the sum total of plaintiff's mental health history and his presentation during the interview, he nevertheless determined that plaintiff presented no risk of suicide, because of his lack of suicidal intentions or plan. *Id.* at 32; Dkt. 46-5, p. 80. Nevertheless, the doctor added Celexa, an additional antidepressant, to plaintiff's existing prescription of Remeron. Nieves Dep. 18; Dkt. 46-5, p. 81.

Dr. Nieves recommended a follow-up appointment with Fontaine for six to eight weeks later. Dkt. 46-5, p. 81. He wanted to make sure that there was at least a six-week period

for plaintiff's new medications to begin taking effect. Nieves Dep. 19-20. The doctor in fact did not schedule to see plaintiff again until April 22, 2013. Nieves Dep. 37-38; Dkt. 46-5, pp. 82-83.

### B. Defendant France

During Fontaine's four months at Groveland, defendant France believes that she met with him twice. France Dep. 24. On February 14, 2013, she first examined plaintiff. Dkt. 46-5, p. 161. She believes that she knew of plaintiff's psychological diagnoses before meeting with him from the notes taken by Fishkill staff. France Dep. 17-18. Plaintiff's suicidal feelings contained in the Fishkill notes caused her some concern, because part of her job is to assess the lethality of a patient: the danger they pose to themselves or others. *Id.* at 23-24. As part of this inquiry, she took down plaintiff's mental health history. *Id.* at 27-28. Plaintiff told her that he had overdosed on sleep medications in 2002. Dkt. 46-5, p. 161. Plaintiff also recounted that he had tied a sheet around his neck but had not fully attempted to hang himself. France Dep. 28; Dkt. 46-5, p. 161.

Despite the Fishkill notes, France had no "particular concerns" of Fontaine's lethality. France Dep. 24. In their first conversation, Fontaine presented to her as "narcissistic," through his use of language, poor decision-making, and impulse control. France Dep. 40. Nevertheless, she wrote in her notes that he presented zero indication of suicidality, because he made no statements indicating suicidal thoughts or intent despite her specific questions geared at suicide. Dkt. 46-5 p. 162.

France saw Fontaine again on March 14, 2013. Dkt. 46-5, p. 163. She observed plaintiff to be "well engaged, cooperative ... calm, irritable at times, playful at others." *Id.* at 39-40; Dkt. 46-5, p. 163. She noted that plaintiff did not present as depressed. France Dep. 39-40. Plaintiff told her, however, that he had "daily thoughts of suicide." Fontaine Dep. 50-51. She responded that plaintiff "couldn't let [him]self think that way." *Id.* at 51. Plaintiff also told her that "sometimes [he] think[s] [he]'d be better off dead...." Dkt. 46-5, p. 163. However, in her notes, she wrote that plaintiff then smiled and quickly told her that he wouldn't actually kill himself. *Id.*

**\*3** According to France's notes, Fontaine admitted these comments were "attention-seeking." France Dep. 49; Dkt. 46-5, p. 164. She stated at her deposition, however, that patients sometimes attempt suicide simply for attention.

Case 9:19-cv-01161-DNH-TWD    Document 79    Filed 11/10/21    Page 34 of 125

Fontaine v. Cornwall, Not Reported in Fed. Supp. (2019)

2019 WL 4257136

France Dep. 50-51. Nevertheless, at the end of the session, she had no concerns that plaintiff was at a particular risk of suicide. France Dep. 51. She attributes that determination both to his stating that he had no plans to commit suicide and that he presented as "smug" rather than "in distress." *Id.* at 51-53. She also noted that plaintiff appeared neat, clean, and rested. Dkt. 46-5, p. 163.

In general, France felt that Fontaine's self-reported symptoms conflicted with the symptoms observed by staff at Groveland. France Dep. 56-58. She thought that plaintiff's stated suicidal ideations could be symptoms of his antisocial personality disorder, rather than his depression. *Id.* at 58. Accordingly, she took no further steps to monitor plaintiff's psychological condition. *Id.* at 60. She did, however, schedule plaintiff to return to the clinic in four weeks, unless he requested to return sooner. Dkt. 46-5 p. 164.

### C. Defendant N.P. Cornwall

Early in 2013, Fontaine injured himself while exercising in the prison yard. Fontaine Dep. 54. On January 28, 2013, plaintiff went to sick call for treatment. Dkt. 46-4, p. 48. Groveland staff provided him with Motrin and scheduled a follow up in one week with a nurse practitioner. *Id.* On February 6, 2013, N.P. Cornwall prescribed plaintiff Robaxin, a muscle relaxer, to treat his injury. Fontaine Dep. 55-56; Dkt. 46-4 p. 47. Plaintiff self-carried the Robaxin. Fontaine Dep. 56-57.

Fontaine took Robaxin for approximately one full month without issue. Fontaine Dep. 57. On March 4, 2013, plaintiff returned to sick call to obtain a new prescription for Robaxin, and scheduled an appointment with N.P. Cornwall. Dkt. 46-4, p. 47. He saw plaintiff on March 29, 2013, and wrote him a prescription for sixty tablets of Baclofen, another muscle relaxer. Fontaine Dep. 58; Dkt. 46-4, p. 46. Plaintiff similarly self-carried the Baclofen. Fontaine Dep. 58.

Fontaine's medical chart, which N.P. Cornwall had access to, included a notification that OMH had labelled Fontaine a Level Two mental health risk. Dkt. 45-12 ("Cornwall Dep."), pp. 20-21. His practice was to review the OMH section of every patient's records before he saw them. *Id.* at 26-27. If he saw that a patient is a Level Two risk, he typically looks at the rest of their records to determine if there are any "red flags" that might require additional investigation with OMH. [6] *Id.* at 21-22. This defendant did not, however, have access to plaintiff's mental health records. *Id.* at 23. He never reached

out to OMH to resolve any concerns. *Id.* Plaintiff never told this defendant that he felt suicidal. Fontaine Dep. 59.

[6]     In his deposition, N.P. Cornwall provided some examples of red flags including whether the patient suffers from schizophrenia or takes several medications. Cornwall Dep. 21-22.

### D. Fontaine's April 2013 Suicide Attempt

Fontaine remembers nothing unusual about the night of April 12, 2013. Fontaine Dep. 60-61. He had no fights, confrontations, or personal disasters. *Id.* at 60. Plaintiff does not remember having told anyone that he was suicidal in the preceding forty-eight hours. *Id.* Plaintiff began his night by watching a film that DOCCS played for the inmates, and then returned to his cell. *Id.* He went into his dormitory, opened his locker, and saw the Baclofen. *Id.* at 65. Plaintiff removed the Baclofen from his locker and took every remaining pill. *Id.* at 61, 65.

**\*4** On April 13, 2013, at 1:25 a.m., a DOCCS officer found Fontaine sitting on the edge of his bed vomiting into a plastic jug. Dkt. 46-5, p. 279. Plaintiff was incoherent, but still conscious. *Id.* The officer took plaintiff to the facility infirmary. *Id.* Staff documented that he had dilated pupils, uncontrolled vomiting, decreased body temperature, irregular breathing, no muscle tone, and no response to pain or communication. *Id.* Prison staff then transported plaintiff to Wyoming County Community Hospital. *Id.* Plaintiff spent five days in the hospital after his attempted suicide before returning to Groveland. Fontaine Dep. 66-67.

### E. Procedural History of the Present Claim

On April 11, 2015, Fontaine filed the instant complaint. Dkt. 1. On April 25, 2016, plaintiff filed an amended complaint, which has become the operative pleading. Dkt. 26. On June 21, 2017, plaintiff voluntarily dismissed his claims against defendant Dr. Ramineni. Dkt. 43. On July 28, 2017, defendants moved for summary judgment under Rule 56. Dkt. 45. The parties having fully briefed the motion, the Court now considers it on the parties' submissions without oral argument.

## III. LEGAL STANDARD

Under Rule 56, summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). The party moving for summary

WESTLAW    © 2021 Thomson Reuters. No claim to original U.S. Government Works.    3

Case 9:19-cv-01161-DNH-TWD   Document 79   Filed 11/10/21   Page 35 of 125

Fontaine v. Cornwall, Not Reported in Fed. Supp. (2019)
2019 WL 4257136

judgment bears the initial burden of showing, through the production of admissible evidence, that no genuine issue of material fact exists. *Salahuddin v. Good*, 467 F.3d 263, 272-73 (2d Cir. 2006). Only after the moving party has met this burden is the nonmoving party required to produce evidence demonstrating that genuine issues of material fact exist. *Id.* at 273.

The nonmoving party must do more than "rest upon the mere allegations ... of [the plaintiff's] pleading" or "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 & n.11 (1986). Instead, a dispute regarding a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In determining whether a genuine issue of material fact exists, the Court must resolve all ambiguities and draw all reasonable inferences against the moving party. *Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 309 (2d Cir. 2008).

## IV. DISCUSSION

Defendants assert eight total defenses against Fontaine's claims. Against plaintiff's § 1983 claims, defendants argue that: (1) plaintiff failed to exhaust his administrative remedies as required by the Prison Litigation Reform Act ("PLRA"); (2) defendants are entitled to qualified immunity; and (3) plaintiff cannot establish that defendants were deliberately indifferent to his medical needs.

Against Fontaine's New York law claims, defendants raise the following defenses: (1) plaintiff's claims of negligence actually sound in medical malpractice, which plaintiff has no expert support to prove; (2) plaintiff cannot adequately establish negligent infliction of emotional distress; (3) this Court should decline to exercise supplemental jurisdiction of these claims under 28 U.S.C. § 1367(c)(3) ("§ 1367"); and (4) this Court lacks subject-matter jurisdiction over the state law claims against N.P. Cornwall, because N.Y. CORR. LAW § 24 exclusively vests jurisdiction of state law claims against DOCCS employees in the New York Court of Claims.

Finally, defendants assert against all of Fontaine's claims the defense of Eleventh Amendment Immunity, to the extent that plaintiff asserts a claim against defendants in their official capacities. [7]

[7]   Defendants correctly assert that the Eleventh Amendment bars suit against state officials in their official capacities. *Ying Jing Gan v. City of New York*, 996 F.2d 522, 529 (2d Cir. 1993). However, Fontaine's suit is entirely against defendants in their personal capacities, so the point is moot.

### A. Deliberate Indifference to Fontaine's Medical Needs

**\*5**  Fontaine alleges that defendants Dr. Nieves and France exhibited deliberate indifference to plaintiff's medical needs by failing to properly treat his suicidal ideations. Similarly, he alleges that defendant N.P. Cornwall exhibited deliberate indifference by allowing him to self-carry Baclofen despite his history of suicides and depression. Plaintiff bases all three claims on § 1983.

Section 1983 allows citizens to bring civil suits against actors under color of state law who infringe their constitutional rights. *See Sykes v. James*, 13 F.3d 515, 519 (2d Cir. 1993). The Eighth Amendment provides an express constitutional right to freedom from "cruel and unusual punishments." U.S. CONST. amend. VIII. "[T]he Due Process Clause of the Fourteenth Amendment incorporates the Eighth Amendment's guarantee" and renders it applicable to the states and state actors. *See United States v. Georgia*, 546 U.S. 151, 157 (2006) (citing *Louisiana ex rel. Francis v. Resweber*, 329 U.S. 459, 463 (1947)). Courts have extended the prohibition on cruel and unusual punishment to note that state officials must provide inmates with "adequate medical care." *Salahuddin*, 467 F.3d at 279.

To prove an Eighth Amendment violation for inadequate medical care, the plaintiff must prove: (1) "that she [or he] had a serious medical condition;" and (2) "that it was met with deliberate indifference." *Caiozzo v. Koreman*, 581 F.3d 63, 72 (2d Cir. 2009) (alteration in original) (internal citations and quotation marks omitted).

Regarding the serious medical condition prong, courts have found that "[t]reatment of mental disorders of mentally disturbed inmates is ... a serious medical need...." *Hamilton v. Smith*, 2009 WL 3199531, at \*14 (N.D.N.Y. Jan. 13, 2009); *see Jean v. Barber*, 2011 WL 2975218, at \*1, 5 (July 21, 2011) (affirming magistrate's determination that plaintiff who had attempted suicide had pled a serious medical need).

The second prong of the test requires plaintiff to prove the defendants acted with deliberate indifference to that

Fontaine v. Cornwall, Not Reported in Fed. Supp. (2019)

2019 WL 4257136

established medical need. *Chance v. Armstrong*, 143 F.3d 698, 703 (2d Cir. 1998). The plaintiff must therefore establish that "[s]ubjectively, the official charged with deliberate indifference must act with a 'sufficiently culpable state of mind.' " *Hill v. Curcione*, 657 F.3d 116, 122 (2d Cir. 2011).

In other words, the official must "know[ ] of and disregard[ ] an excessive risk to inmate health or safety; the official must be both aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Hill*, 657 F.3d at 122 (quoting *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)). As a result, "[m]ere medical malpractice is not tantamount to deliberate indifference, but it may rise to the level of deliberate indifference when it involves culpable recklessness, i.e., an act or a failure to act ... that evinces a conscious disregard of a substantial risk of serious harm." *Cuoco v. Moritsugu*, 222 F.3d 99, 107 (2d Cir. 2000) (internal citations and quotation marks omitted). Similarly, disagreement about a caregiver's choice of treatment is not evidence of deliberate indifference. *Wright v. Rao*, 622 F App'x 46, 47 (2d Cir. 2015) (summary order).

There is little dispute that Fontaine has successfully pled a serious medical condition in the form of his mental wellbeing, which resulted in attempted suicide. *See Jean*, 2011 WL 2975218 at *1, 5. Instead, the parties' chief area of dispute is whether plaintiff has sufficiently established that defendants acted with deliberate indifference to that medical need.

### 1. Dr. Nieves.

 **\*6** First, it is true that Dr. Nieves was aware of Fontaine's 2002 suicide attempt at the time he treated him. Dkt. 45-13, ¶ 6. However, that attempt had occurred nearly eleven years prior to the events giving rise to this claim. The doctor examined plaintiff specifically to gauge his likelihood of suicidal tendencies, and found no evidence of "psychosis, suicidal or homicidal ideas, intent, or plan." Nieves Dep. 30-31; Dkt. 46-5, p. 80. Moreover, he did not ignore plaintiff's medical history, but instead treated plaintiff by prescribing him Celexa, an additional antidepressant. Dkt. 46-5, p. 81. Because he did, in fact, treat plaintiff, these arguments amount only to disagreement with his chosen care, and cannot rise to the level of deliberate indifference. *Wright*, 622 F. App'x at 47.

Fontaine's only further argument for Dr. Nieves' deliberate indifference is that he did not see plaintiff again within

six to eight weeks of their January 22, 2013 examination, despite his awareness of plaintiff's mental health history and recent placement in 2:1 watch in Fishkill, and that plaintiff appeared to be depressed with a blunted affect during therapy. Dkt. 46-5, p. 80-81. This argument is also unavailing. The doctor expressed a legitimate reason to delay seeing plaintiff again, namely, giving time for his adjustments to plaintiff's medications to take effect. Nieves Dep. 19-20. He in fact tried to see plaintiff again on April 22, 2013, while plaintiff was in the facility infirmary. Dkt. 46-5, pp. 82-83. He also renewed plaintiff's medications to prevent a lapse in treatment. *Id.* at 83.

This time lapse alone does not amount to a knowing disregard of a risk to Fontaine's medical needs, especially when in Dr. Nieves' opinion he presented a low risk of suicide. *Hill*, 657 F.3d at 122. Accordingly, plaintiff has not demonstrated that the doctor exhibited deliberate indifference to his mental health. *See, e.g.*, *Atkins v. Cty. of Orange*, 372 F. Supp. 2d 377, 413-14 (S.D.N.Y. 2005) (noting that even after two suicide attempts, counseling and medication from a psychiatrist constituted medical care that was "not, as a matter of law, so inadequate as to rise to the level of a constitutional deprivation").

### 2. France.

Fontaine also fails to establish that France exhibited deliberate indifference. Plaintiff needed to prove that she in fact drew the inference that he was subject to a substantial risk of harm by suicide, and he failed to do so. *Hill*, 657 F.3d at 122. On the contrary, after two examinations of plaintiff, with recurring examinations scheduled, she determined that plaintiff was largely seeking attention, and made the express inference that plaintiff presented no risk of suicidality and presented no evidence of an increase in that risk. Dkt. 46-5, p. 162-64. Moreover, the last time that she saw plaintiff before April 13, 2013, plaintiff expressly told her that he "wouldn't kill himself." *Id.* at 163.

To rebut this point, Fontaine relies on the fact that France noted in her deposition that attention seeking behavior and suicide are not mutually exclusive. France Dep. 50-51. Similarly, he argues that this defendant exhibited deliberate indifference because when informed of plaintiff's "daily thoughts of suicide," she responded only that plaintiff "couldn't let [him]self think that way." Fontaine Dep. 51-52. These too, however, are insufficient to carry plaintiff's burden.

Case 9:19-cv-01161-DNH-TWD Document 79 Filed 11/10/21 Page 37 of 125
Fontaine v. Cornwall, Not Reported in Fed. Supp. (2019)
2019 WL 4257136

The immediate documentary evidence shows that France thought that plaintiff showed no signs of suicidality at the time of their second meeting. Dkt. 46-5, p. 164. Plaintiff provides no evidence to dispute that his lack of any suicidal intent or plan beyond death wishes led her to the conclusion that he was not a suicide risk. *Id.*

**\*7** Without establishing France's subjective awareness that plaintiff was an active suicide risk, his deliberate indifference claim against her must be dismissed. *See, e.g.*, *Robinson v. Taylor*, 2019 WL 1429529, at \*7 (N.D.N.Y. Mar. 29, 2019) ("The fact that [p]laintiff attempted suicide after medical professionals had examined him and found him not to be a risk of harm to himself does not itself establish deliberate indifference.") (citing *Sonberg v. Niagara Cty. Jail*, 2012 WL 5617539, at \*9 (W.D.N.Y. Nov. 15, 2012)); *Pooler v. Nassau Univ. Med. Ctr.*, 848 F. Supp. 2d 332, 349-50 (E.D.N.Y. 2012) (noting that therapist without ability to prescribe medication did not act with deliberate indifference for failing to take action where plaintiff informed therapist that he wanted to commit suicide but had no plans to do so).

### 3. <u>N.P. Cornwall.</u>

Lastly, Fontaine's claim against N.P. Cornwall for deliberate indifference also fails because plaintiff has not established his subjective awareness that plaintiff was at risk. Plaintiff asserts three facts which he claims establish this defendant's awareness that plaintiff posed a suicide risk. First, he claims that the OMH section of his medical records would establish that he was being treated for dysthymia with Remeron and Celexa. Second, plaintiff claims that his file included notation of his placement on suicide watch in 2012 and also claims—without evidence—that a "front sheet" attached to his records would reinforce the same. Third, plaintiff claims that his mental health screening form from December 3, 2012 would have alerted this defendant that on that date plaintiff had acknowledged that he had attempted suicide in 2002, and noted that he had been thinking about committing suicide on that date.[8]

[8]     On an identical screening sheet dated December 31, 2012, Fontaine referenced his 2002 suicide attempt, but denied that he had "been thinking about suicide." Dkt. 46-4, p. 21.

Assuming for the purposes of summary judgment that N.P. Cornwall did, in fact, know all three facts that Fontaine asserts

establish knowledge of plaintiff's suicide risk, those facts are insufficient to establish that he knew that plaintiff presented an imminent risk of suicide, especially during the relevant timeframe of the March 29, 2013 decision to allow plaintiff to self-carry Baclofen. Dkt. 46-4, p. 47. His mere knowledge that plaintiff took Celexa and Remeron to treat his depression is of no moment. Mere treatment for depression does not preclude a patient from self-carrying medication.

Moreover, Fontaine had carried and appropriately taken Robaxin for a full course of treatment between February 14 and March 29, 2013. *Id.* at 46-47. Additionally, plaintiff identified no triggering event that would have given anyone notice of his intention to commit suicide, nor did he notify anyone of that intent within forty-eight hours of his attempt. Fontaine Dep. 61. He also never told N.P. Cornwall that he wanted to take his own life. *Id.* at 59.

Put together, even assuming that N.P. Cornwall knew that Fontaine could pose a suicide risk, there is no evidence whatsoever that he drew the necessary inference that plaintiff posed such a substantial present danger of suicide that allowing him to self-carry Baclofen created an unreasonable risk that plaintiff would use it to overdose. *Hill*, 657 F.3d at 122.

Accordingly, Fontaine has failed to provide sufficient evidence that any defendant was deliberately indifferent to his mental well-being. It is possible plaintiff has successfully established negligence for the purposes of summary judgment, but the Eighth Amendment requires a higher standard of proof. Plaintiff has not shown any defendant to have sufficient actual awareness of plaintiff's suicide risks to meet the standard of deliberate indifference. Accordingly, plaintiff's § 1983 claim must be dismissed. *See, e.g.*, *Robinson*, 2019 WL 1429529, at \*7 (finding no deliberate indifference for failure to properly monitor inmate who attempted suicide because mere fact that defendants "might have ultimately been wrong in [their] professional judgment does not support a showing of deliberate indifference").[9]

[9]     Because the Court finds that plaintiff has failed to establish a claim of deliberate indifference capable of surviving summary judgment, the Court need not address defendants' remaining defenses to the § 1983 claim.

### B. <u>State Law Claims</u>

Case 9:19-cv-01161-DNH-TWD   Document 79   Filed 11/10/21   Page 38 of 125

Fontaine v. Cornwall, Not Reported in Fed. Supp. (2019)
2019 WL 4257136

**\*8** The Court now turns to Fontaine's supplemental state law claims. Plaintiff asserts claims of negligence and negligent infliction of emotional distress against all defendants.

### 1. N.P. Cornwall's Immunity Under N.Y. CORR. LAW § 24.

For the first time in their reply to Fontaine's opposition to summary judgment, defendants asserted as a defense that the state law claims against N.P. Cornwall are barred by N.Y. CORR. LAW § 24. As a general rule, "[t]his Circuit has made it clear it disfavors new issues being raised in reply papers." *S.M.R.C., Inc. v. Watkins*, 2015 WL 5774777, at *6 n.10 (E.D.N.Y. May 4, 2015) (alterations in original). However, "a court must satisfy itself that it has subject matter jurisdiction and may at any time in the course of litigation consider whether such jurisdiction exists[.]" *Mitskovski v. Buffalo & Fort Erie Pub. Bridge Auth.*, 435 F.3d 127, 133 (2d Cir. 2006).

"New York law prevents an inmate from suing, in either federal or state court, a correctional employee in her individual capacity[.]" *Gordon v. City of New York*, No. 05-0351-PR, slip op. 2005 WL 2899863, at *1 (2d Cir. Nov. 3, 2005) (citing *Baker v. Coughlin*, 77 F.3d 12, 14-15 (2d Cir. 1996)). Instead, plaintiffs can only bring these claims in New York's Court of Claims. N.Y. CORR. LAW § 24.2. Section 24 by extension serves to deprive federal courts of subject matter jurisdiction over all claims against correctional employees. *See Jackson v. Yando*, 2016 WL 6267967, at *2 (N.D.N.Y. Oct. 26, 2016) (dismissing state law claims against corrections officials for lack of subject matter jurisdiction). However, § 24 does not apply to independent contractors working on DOCCS' behalf. *Rothschild v. Braselmann*, 69 N.Y.S.3d 375, 378 (App. Div. 3d Dep't 2018) (noting that plaintiff could still sue doctors providing contractual services to prisoner plaintiff in general state court).

Defendants' argument that this Court lacks subject-matter jurisdiction over plaintiff's state law claims against N.P. Cornwall in light of § 24 has merit. It also would have had merit at any other point in the course of this action. Defendants' failure to raise this defense earlier wasted Fontaine's—and this Court's—time and resources in the litigation of a claim over which this Court has no authority to proclaim judgment. Nevertheless, plaintiff's state law claims against this defendant must be dismissed. Section 24 does not apply, however, to plaintiff's claims against France and Dr. Nieves, who work for OMH, rather than DOCCS. Dkt.

45-9, ¶ 2 (declaring that France is employed by OMH and not DOCCS); Dkt. 45-13, ¶ 2 (declaring that Dr. Nieves is also an OMH employee).

### 2. Supplemental Jurisdiction over Dr. Nieves and France.

This Court still maintains supplemental jurisdiction of Fontaine's claims against Dr. Nieves and France under 28 U.S.C. § 1367(a). *See Briarpatch, Ltd. v. Phoenix Pictures, Inc.*, 373 F.3d 296, 308 (2d Cir 2004) ("[F]ederal courts have supplemental jurisdiction to hear state law claims that are so related to federal question claims brought in the same action as to form part of the same case or controversy under Article III of the United States Constitution.") (internal quotation marks omitted).

**\*9** This Court may, however, "decline to exercise supplemental jurisdiction over a claim ... if ... the district court has dismissed all claims over which it has original jurisdiction[.]" 28 U.S.C. § 1367(c)(3). "[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered ...—judicial economy, convenience, fairness and comity—will point toward declining to exercise jurisdiction over the remaining state-law claims." *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988).

Especially because Fontaine cannot attain relief from N.P. Cornwall in this Court, the balance of factors favors declining supplemental jurisdiction. It would be unfair to continue the claim against Dr. Nieves and France but to allow N.P. Cornwall to sit to the side. In the New York Court of Claims, plaintiff could proceed against all three defendants simultaneously, rendering that the better forum for plaintiff's state law claims. Accordingly, plaintiff's remaining state law claims are dismissed without prejudice. [10]

[10]   Because this Court lacks or declines jurisdiction over Fontaine's state law claims, it need not reach defendants' other asserted defenses.

### V. CONCLUSION

Fontaine attempted suicide under DOCCS' watch. This is a serious matter, and merits concern and scrutiny. However, this Court can only hold defendants liable for their own wrongdoings, and only to the extent their acts were wrong.

2019 WL 4257136

Plaintiff has not met the high burden of proving that defendants were deliberately indifferent to his mental health. Therefore, his claims in federal court must fail. But that does not end his path to what remedy, if any, he merits. Plaintiff may bring his state law claims before the New York Court of Claims, so long as he does so within the next six months, and try his hand again before that court. N.Y. C.P.L.R. § 205(a) (noting that if plaintiff's timely action is "terminated in any other manner than by a voluntary discontinuance, a failure to obtain personal jurisdiction over the defendant, a dismissal of the complaint for neglect to prosecute the action, or a final judgment upon the merits, the plaintiff ... may commence a new action upon the same transaction ... within six months after the termination"). This Court, however, dismisses his complaint in its entirety.

Therefore, it is

ORDERED that

1. Defendants' motion for summary judgment is GRANTED;

2. Plaintiff's claims for deliberate indifference under § 1983 are DISMISSED WITH PREJUDICE; and

3. Plaintiff's claims for relief under state law are DISMISSED WITHOUT PREJUDICE.

The Clerk of Court is directed to enter judgment accordingly and close the file.

IT IS SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2019 WL 4257136

---

End of Document

© 2021 Thomson Reuters. No claim to original U.S. Government Works.

🚩 KeyCite Yellow Flag - Negative Treatment

Report and Recommendation Adopted as Modified by  Hamilton v. Smith,
N.D.N.Y.,  September 30, 2009

2009 WL 3199531
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Derrick HAMILTON, Plaintiff,

v.

J.T. SMITH, Superintendent, Shawangunk
Correctional Facility; J. Maly, Deputy
Superintendent of Security; William M. Gonzalez,
Deputy Counsel; M. Genovese, Medical Doctor; M.
Skies, Registered Nurse; Donald Selsky, Director
of Special Housing; D. Parisi, Mail Room Clerk;
F. Chiapperino, Counselor; and Elaine Davis,
Steward, Attica Correctional Facility, Defendants.

No. 06–CV–805 (GTS/DRH).
|
Jan. 13, 2009.

**Attorneys and Law Firms**

Derrick Hamilton, Wallkill, NY, pro se.

Hon. Andrew M. Cuomo, Attorney General for the State
of New York, Christina L. Roberts–Ryba, Esq., Assistant
Attorney General, of Counsel, Albany, NY, for Defendants.

**REPORT–RECOMMENDATION AND ORDER** [1]

[1]  This matter was referred to the undersigned for
report and recommendation pursuant to 28 U.S.C.
§ 636(b) and N.D.N.Y.L.R. 72.3(c).

DAVID R. HOMER, United States Magistrate Judge.

**\*1**  Plaintiff pro se Derrick Hamilton ("Hamilton"), an
inmate in the custody of the New York State Department
of Correctional Services ("DOCS"), brought this action
against nine DOCS employees [2] pursuant to the Civil
Rights Act, 42 U.S.C. § 1983; the Religious Land Use and
Institutionalized Persons Act of 2000, 42 U.S.C. § 2000cc et
seq. ("RLUIPA"); [3] and the Health Insurance Portability and

Accountability Act, 29 U.S.C. § 1182 ("HIPAA"). Hamilton
alleges that defendants violated his rights to religious freedom
and confidentiality as well as his constitutional rights under
the First, Eighth, and Fourteenth Amendments. Am. Compl.
(Docket No. 17). Presently pending is defendants' motion for
summary judgment pursuant to Fed.R.Civ.P. 56. Docket No.
51. Hamilton opposes the motion. Docket No. 58. For the
following reasons, it is recommended that defendants' motion
be granted in part and denied in part.

[2]     In his memorandum of law, Hamilton concedes that
defendant Parisi "should be withdrawn from the
complaint ... [as she] was simply following orders
from defendant's [sic] Smith and Maly, therefore is
not liable in this action." Hamilton Mem. of Law
(Docket No. 58) at 34. Defendants' motion as to
Parisi should, therefore, be granted.

[3]     Hamilton mistakenly brings this action pursuant
to the Religious Freedom Restoration Act, 42
U.S.C. § 2000bb et seq. ("RFRA"). However,
"[t]he [RFRA ... was declared unconstitutional by
the ... Supreme Court in 1997 ... [and] was amended
by the [RLUIPA]." Hankins v. New York State Dep't
of Corr. Serv., No. 07–CV–408 (FJS/GHL), 2008
WL 2019655, at *1 n. 1 (N.D.N.Y. Mar. 10, 2008).
"[A] plaintiff's RLUIPA claim may be construed as
an extension of its inartfully pleaded RFRA claim,"
particularly when asserted by a pro se litigant
whose pleadings are "construed with [an] extra
liberal leniency ...." Id. (citing Phillips v. Girdich,
408 F.3d 124, 130 (2d Cir.2005) ("[T]he court's
imagination should be limited only by Phillips'
factual allegations, not by the legal claims set out
in his pleadings.")). accordingly, Hamilton's claim
under the RFRA will be deemed asserted under the
RLUIPA.

**I. Background**

The wide-ranging facts asserted by Hamilton are related
herein in the light most favorable to Hamilton as the non-
moving party. See subsection II(A) infra. At all times relevant
herein, Hamilton was incarcerated first at the DOCS facility
at Attica and then at the DOCS facility at Shawgunk. Am.
Compl. ¶ 2.

### A. Family Court Proceedings

On October 10, 2003, while Hamilton was still incarcerated at Attica, he was ordered to be produced in Kings County Family Court for a paternity proceeding. Docket No. 58–2 at 3. On December 29, 2003, defendant Gonzalez, a DOCS Deputy Counsel, wrote to that court advising that "certain security and logistical impediments ... ma[d]e it impractical for [DOCS] to produce [Hamilton] personally at the court." *Id.* at 4; Am. Compl. ¶ 19; Docket No. 51–5 at 220. Gonzalez requested that Hamilton be allowed to appear telephonically on the appointed date. Am. Compl. ¶ 9; Docket No. 51–5 at 221; Docket No. 58–2 at 3. On January 7, 2004, Hamilton participated telephonically in the court proceedings, which were adjourned to April 28, 2004. Am. Compl. ¶ 20. Facility records indicated that "on March 3, 2006 [Hamilton] refused to attend the teleconference scheduled for March 21, 2006." J. Smith Decl. (Docket No. 53–3) ¶¶ 42–43.

On April 28, 2004, "[b]oth parties failed to appear ... and [pursuant to a court order dated July 23, 2004,] the petition was dismissed without prejudice." Docket No. 51–5 at 217; Docket No. 58–2 at 8. The court advised Hamilton that his "remedies [we]re to make a motion before the Support Magistrate to vacate the default and reargue the matter, file a new petition, or appeal the dismissal ." Docket No. 51–5 at 217; Docket No. 58–2 at 8. Hamilton filed a grievance complaining that defendants interfered with his court proceeding and their failure to produce him on April 28, 2004 which resulted in the dismissal of his paternity suit. Docket No. 58–2 at 11. The grievance was denied on the ground that "[t]here [wa]s no record of a request being made for [a conference] call after [January 7, 2004]." *Id.* at 12.

### B. Medical Treatment

#### 1. Mental Health Assessment

**\*2**  On March 17, 2005, Hamilton arrived at Shawangunk and was given a health screening interview by defendant Skies. Am. Compl. ¶ 21; Docket No. 58–2 at 16. During the interview, Hamilton stated that he had previously attempted suicide and was feeling suicidal during the inquiry. Am. Compl. ¶ 21; Docket No. 58–2 at 16. Hamilton testified that while he has had suicidal thoughts before, he has never harmed himself nor attempted to commit suicide. Hamilton

Dep. (Docket No. 51–5) at 19–20. Skies did not recommend Hamilton for a mental health referral or place him on suicide watch. Am. Compl. ¶ 21.

#### 2. Confidentiality

On or about January 24, 2006, Hamilton filed a grievance for defendants' alleged failure to treat him. Am. Compl. ¶ 37. Hamilton alleged that the medical department failed to (1) order blood tests,[4] (2) determine whether the medication that Hamilton was taking would cause or contribute to liver damage, and (3) whether his diagnoses of high blood pressure, high cholesterol, and hepatitis A were causing or contributing to Hamilton's other medical ailments. *Id.* On or about February 1, 2006, the medical department disclosed Hamilton's medical records to the grievance department in connection with the grievance. *Id.* ¶ 38; Hamilton Dep. at 38, 78–80. The disclosure was made without Hamilton's prior consent. Am. Compl. ¶ 38. Hamilton filed another grievance on February 3, 2006, arguing that the rules which surrounded his medical confidentiality had been violated. Docket No. 51–5 at 208; Docket No. 58–2 at 31. On February 9, 2006, the grievance was denied because "when the grievant files a grievance concerning medical care or treatment he [or she] affirmatively puts the issue into contention resulting in an implied waiver of confidentiality." Docket No. 58–2 at 33; J. Smith Decl. ¶¶ 28–30; Hamilton Dep. at 38–39.

| 4 | During his deposition, Hamilton withdrew any contentions regarding defendant Genovese's failure to order blood screening. Hamilton Dep. (Docket No. 51–5) at 37–38, 40–41, 75. |
|---|---|

#### 3. Drug Addiction

Hamilton is allergic to marijuana and even second-hand inhalation contaminates his urine.[5] Am. Compl. ¶ 84; Hamilton Dep. 62–63; Docket No. 58–5 at 2–4. This allergy was the basis of a complaint of medical indifference for a failure to treat Hamilton's drug addiction disease. Hamilton Dep. at 111–12. While in the Special Housing unit (SHU),[6] Hamilton was exposed to marijuana smoke from other unidentified inmates. *Id.* at 113. Additionally, the policy of ordering all windows closed in SHU and allowing the smoke to linger resulted in an aggravation of Hamilton's allergy and his positive urinalysis tests. *Id.* at 115–16. After moving to a

different unit, Hamilton's urinalysis tests were negative and he has not felt the effects he experienced in SHU. *Id.* at 113–15.

5      Hamilton adamantly denies ever smoking marijuana while in prison or being addicted to it prior to his incarceration. Hamilton Dep. at 119–20.

6      SHUs exist in all maximum and certain medium security facilities. The units "consist of single-occupancy cells grouped so as to provide separation from the general population...." N.Y. Comp.Codes R. & Regs. tit. 7, § 300.2(b) (1995). Inmates are confined in a SHU as discipline, pending resolution of misconduct charges, for administrative or security reasons, or in other circumstances as required. *Id.* at pt. 301.

### 4. Water Treatment

Hamilton also contends that the facility's water was treated with chemicals with deliberate indifference to their effects on his health in light of other medications which Hamilton regularly took. Am. Compl. ¶ 54; Hamilton Dep. at 51–52, 77–78. More specifically, Hamilton asserts that the sodium in the water interfered with the treatment of his high blood pressure and cholesterol. Docket No. 51–5 at 229. On October 10, 2006, Hamilton's grievance was denied on the ground that the "facility water sodium level is below the 20 mg/l benchmark for individuals on severely restricted sodium diet[s]." *Id.*

### C. Living Conditions

### 1. Contaminated Drinking Water

**\*3**   Additionally, on March 17, 2005, Hamilton was placed in a cell which had a "plumbing problem that caused feces and other bacteria to contaminate the water." Am. Compl. ¶ 22; Hamilton Dep. at 65–66. Hamilton remained in that cell for more than sixty days, from March 17 to July 1, 2005, and suffered severe stomach aches and pains and contracted Hepatitis A. *Id.* ¶¶ 22, 52; Hamilton Dep. at 27–30. Hamilton alleges that he received no medical treatment for his Hepatitis. Am. Compl. ¶ 23; Hamilton Dep. at 30–32.

Hamilton filed a grievance on March 29, 2006, complaining that since his return to SHU five days earlier, the water

was "tinted yellowish-brown ... [and he had been] unable to drink the water because it [wa]s obvious [that] it [wa]s contaminated with bacteria." Docket No. 58–5 at 23. Additionally, on September 11, 2008, a memorandum was sent to defendant Smith complaining about the water, stating that it "was jet black and full of dross and sediment .... " Docket No. 58–5 at 12. Despite the appearance of the water, correctional facility staff indicated that it was still safe to consume. *Id.* Complaints about the water had persisted for a substantial period of time and stated that there had been multiple inquiries from prisoners to the administrators as to why the "water [wa]s either beige, brown, or black, and reeks the scent of sewage," on a daily basis. *Id.* at 13. 7

7      Attached as an exhibit are three responses which were difficult to decipher due to poor photocopying quality. Two of the three documents were dated, one May 5, 2006 and the other September 22, 2008. Docket No. 58–5 at 22, 25. Additionally, Hamilton submits an affidavit from a fellow prisoner who discusses "the strange taste of the water and the frequent and often unannounced shut downs of the water system," as well as the "constant complaints from the men around [him] ... regarding drinking water, [specifically] the color, smell and taste of the water." Docket No. 58–5 at 16. This same inmate describes the discoloration and peculiar odor of the drinking water. *Id.*

Defendants did not provide bottled water to the inmates during these occurrences and also did not allow SHU prisoners who had lost commissary privileges to buy bottled water from the commissary. Am. Comp. ¶ 43. The water at Shawangunk is regularly tested and "[a]t all times relevant to this litigation ... has met all standards established by the Department of Health." J. Smith Decl. ¶ 22, Docket No. 53–3 at 64–68; *see also* Docket No 51–5 at 235 ("[A] complete battery of tests were performed on [the] facilit [y's] drinking water. There was no lead or copper detected and only a trace amount of iron .... [T]hus the f]acility water ... meets all standards as established by the Department of Health.")

Hamilton still suffers from minor gas pains and bowel irregularities attributed to the water. Hamilton Dep. at 71–72. The only treatment given Hamilton was a topical ointment for his legs and feet. *Id.* at 72, 134–35. Additionally, he contends that the high iron levels in the water have compromised his nervous system, but he has not sought medical attention for that specific ailment. *Id.* at 135.

### 2. Ventilation

From November 30, 2005 until March 25, 2006, Shawangunk policy dictated that all windows in the unit remain closed. Am. Compl. ¶ 36; Hamilton Dep. at 35–36. The lack of ventilation caused Hamilton to suffer nose bleeds and a watering throat and eyes. Am. Compl. ¶ 36. On December 15, 2005, Hamilton, and the other inmates were given a memorandum stating that (1) the current heating and cooling system was in excellent working condition, (2) windows must remain closed at all times during the winter months, and (3) during these winter months, inmates received fresh air from the ventilation system and the inner courtyards. Docket No. 51–5 at 245; Docket No. 58–3 at 51; J. Smith Decl. ¶¶ 10–11; Hamilton Dep. at 36. On or about January 10, 2006, Hamilton filed a grievance relating to the ventilation system claiming that its constant malfunction was causing him medical problems. Docket No. 58–3 at 12.

**\*4** From March 24 until May 6, 2006, the ventilation vents and grates were saturated "with dust, soot and carbon dioxide," and the light fixtures were extremely dusty and dirty. Am. Compl. ¶ 44. Also, between approximately July 14 and July 23, 2008, fifty complaints were lodged by inmates pertaining to the cleanliness and functionality of the ventilation system. Docket No. 58–3 at 13–50. Moreover, Hamilton complained that the recreational area was covered with mold and dust. Hamilton Dep. at 92–95. The mold was green, black, and brown, and covered the walls and gates. *Id.* at 93. The mold also caused Hamilton to suffer bloody noses, an irritated throat, and a burning sensation in his eyes. *Id.* at 94–95.

### 3. Lighting

From March 24 until approximately May 7, 2006, the lights were not turned off in the SHU galley. Am. Compl. ¶ 45; Hamilton Dep. at 56–58. The exposure to bright lights [8] all night caused Hamilton to lose sleep. Am. Compl. ¶ 45. Hamilton spoke to the medical staff about his insomnia, and they recommended doing exercises to assist him with falling asleep. Hamilton Dep. at 57. Correctional facility staff explained that the lights remained on in the SHU for security reasons. Hamilton Dep. at 56–58.

[8]     During Hamilton's deposition, he described this as an exaggeration and testified that the lights were neither blinding nor shining directly on him. Hamilton Dep. at 141–42.

### D. Disciplinary Hearing and Rehearing

On January 12, 2005, Hamilton was selected for a random drug test and tested positive. [9] Selsky Decl. (Docket No. 53–3 at 33–36) ¶ 8; Docket No. 58–3 at 53. Hamilton was found guilty of violating Rule 113.24 [10] at a disciplinary hearing at Attica on January 31, 2005. Selsky Decl. ¶¶ 8–9. Hamilton appealed the decision and on April 7, 2005, a rehearing was ordered for April 12, 2005 at Shawangunk. *Id.* ¶ 10; Docket No. 58–4 at 29.

[9]     *See* subsection B(2) *supra.*

[10]     Rule 113.24 prohibits the use of any controlled substance unless prescribed by facility medical staff. Selsky Decl. ¶ 9.

Hamilton refused to attend the rehearing. Docket No. 58–3 at 53. Hamilton alleges "that the rehearing was perfunctory and ... violated more due process rights than the first hearing ..." because (1) he was not provided with appropriate employee assistance to retrieve information sufficient to defend his case, (2) Hamilton was still unable to call the witnesses he deemed necessary which had led to the reversal of the first hearing, [11] and (3) over three months had passed since the time of the incident and in the interim Hamilton had been transferred, a witness had been released from custody, requested documents were difficult to locate or recall, the case was irreparably flawed, and DOCS should have been found at fault. Docket No. 58–4 at 30–38. Hamilton took issue with DOCS' refusal to contact D. Mathis, a former inmate, who eventually submitted an affidavit admitting that an Officer Fix told Mathis to provide him with what they both knew was dirty urine, attached Hamilton's name on Mathis' sample, tested the sample with positive results, and wrote Hamilton an unwarranted disciplinary charge for alleged drug use. Mathis Aff. (Docket No. 58–4 at 50–51) ¶¶ 2, 4, 6; Hamilton Dep. at 96–98, 121–23.

[11]     These witnesses included individuals who were aware of the selection and urinalysis testing procedures, counselors from the substance abuse

program Hamilton was attending, and Mathis. Hamilton Dep. at 47–48, 96–98.

 **\*5** Defendants determined that Hamilton refused to attend the rehearing and proceeded in his absence. Selsky Decl. ¶¶ 13, 15. Hamilton was ultimately found guilty of the charges and sentenced to eighteen months in SHU, loss of package privileges, commissary, telephone privileges, and twelve months loss of good time credit. *Id.* ¶ 15; Am. Compl. ¶ 25. On June 13, 2005, the conviction was affirmed, but the SHU penalty was modified to twelve months. Am. Compl. ¶ 26. Hamilton ultimately served ten months of the sentence. Am. Compl. ¶ 27. Hamilton was removed from the drug and alcohol treatment program in which he was enrolled pursuant to facility rules.

### E. Mail Tampering

On May 18, 2005, Hamilton was sent a letter from Brooklyn Law School responding to a request for legal assistance from Hamilton on March 21, 2005. Am. Compl. ¶ 28; Docket No. 58–3 at 5. The law school's response referred to other communications which Hamilton contends he never received. Am. Compl. ¶ 28; Docket No. 58–3 at 5. However, the law school "informed [Hamilton] in July 2002 that it could not be of assistance ... [and requested that s]ince [they would] not be able to assist [him, that he] please refrain from sending [them] any further papers." Docket No. 58–3 at 5.

Additionally, in June 2005, Nicole Esters sent Hamilton the Mathis affidavit,[12] but Hamilton did not receive it. Am. Compl. ¶ 29. On July 27, 2005, Esters sent Hamilton a letter stating that "on two separate occasions [she] mailed ... a notarized affidavit ...." to him at Shawangunk. Docket No. 58–3 at 2. The document was mailed on June 21 and July 5, 2005, both times by first class mail. *Id.* The documents were never returned to Esters. *Id.* On August 25, 2005, Hamilton wrote a letter requesting an investigation regarding mail being stolen from several inmates by staff. Docket No. 58–3 at 6; Am. Compl. ¶ 31.

[12]    *See* subsection D *supra.*

In December 2005, Nicole Saunders sent Hamilton legal documents via Federal Express. Am. Compl. ¶ 34. The documents never reached Hamilton, but they were assigned a tracking number. *Id.* When Saunders tracked the items, she discovered that the items were received at the Shawangunk facility. *Id.* She was informed by mail room staff that

defendant Maly was in possession of the documents and that if the documents did not comply with facility protocol, they would be sent back to her with a letter. *Id.* ¶ 35; Hamilton Dep. at 32–33. Saunders never received either the letter or the legal documents. Am. Compl. ¶ 35.[13]

[13]    Hamilton testified at his deposition that he could not recall to whether Esters or Saunders was the person involved in this mailing. *Id.* at 27.

While Saunders was attempting to send Hamilton the legal documents, Hamilton was placed on mail watch "[d]ue to an investigation involving all inmate correspondence with Prisoner Legal Services of Buffalo New York." J. Smith Decl. ¶ 6. The mail watch lasted from December 12, 2005 to March 10, 2006. *Id.* During that period, any mail which met the DOCS criteria articulated in Directives 4422 and 4421 would be delivered to Hamilton. *Id.* ¶ 7.

### F. Religious Meals

 **\*6** On July 20, 2005, Hamilton declared that "after religious counseling, [he] profess[ed] to be of the Jewish faith and not of the Roman Catholic faith as previously listed." Docket No. 58–2 at 19. Sometime thereafter, Hamilton was diagnosed with high blood pressure and cholesterol and was placed on a low-sodium medical diet. Am. Compl. ¶ 40; Hamilton Dep. at 41–42. Hamilton filed a grievance on January 27, 2006 alleging that Shawangunk refused to provide him with a medical diet which also complied with his religious tenets. Docket No. 58–2 at 24; Hamilton Dep. at 101–103. The grievance was denied because, pursuant to Directive 4311, "[i]nmate requests for religious foods/diets, shall not be prescribed by the health care provider ... [and thus i]t is [Hamilton's] option to select either a religious diet or a medically prescribed diet." Docket No. 58–2 at 24 (internal citations omitted); J. Smith Decl. ¶¶ 32–35 (explaining that the religious diet is a state-wide menu provided by an outside vendor and, as such, there is currently no religious diet option for those practicing Judaism who require the therapeutic standards of meals which are low in fat, cholesterol, and sodium); Hamilton Dep. at 43–44.

On October 13, 2006, Hamilton complained that Shawangunk "refuse[d] to allow [him] to receive kosher foods low in sodium, [w]hich [he is] required to eat due to religious and medical dietary needs." Docket No. 58–2 at 23. Hamilton requested that he be allowed either to purchase foods through

the commissary to supplement his diet or that the facility order an additional low-sodium, kosher, cold, alternative diet tray. *Id.* Again, Hamilton's grievance was denied. Docket No. 51–5 at 237; Docket No. 58–2 at 22. Hamilton appealed the denial, but that appeal was denied. Docket No. 58–2 at 25–26.

While Hamilton was receiving the religious and not the therapeutic diet, his blood pressure and cholesterol levels elevated. Hamilton Dep. 43. Because Hamilton was unable to receive a religious meal that complied with his therapeutic conditions, he was forced to change his religion.[14] *Id.* at 44.

[14]    Hamilton testified that "[I] studied ... [and] affiliated with almost every religion ... [because] you're only limited to go to one religious service at a time, so if [he] wanted to learn about Judaism, I just couldn't go down to the Judaism service to learn. I had to convert first and then go there to learn." Hamilton Dep. at 45–46. Hamilton recently converted to Christianity but continued to assert the religious meals claim. *Id* . at 70.

### G. Notification of the Death of a Family Member

Hamilton's son, Andrell Napper, died while Hamilton was incarcerated at Shawangunk. *See generally* Docket No. 58–5 at 40. Hamilton had never listed Napper as one of his children when he entered DOCS custody and Napper did not identify himself as Hamilton's son when he visited Hamilton in prison. Hamilton Dep. at 124–26, 128–29. Additionally, Hamilton was not legally recognized as Napper's father until January 3, 2000 when the child was approximately fifteen years old. Docket No. 58–5 at 44.

Hamilton was thus unable to request leave to attend Napper's funeral. On August 24, 2006, Hamilton was advised by Napper's mother of the circumstances surrounding Napper's death. Hamilton Dep. at 138–39. "Maly reports that the facility made every reasonable effort to verify the relationship between [Hamilton] ... and [the] deceased. Unfortunately, no documentary evidence was found to confirm a relationship." Docket No. 51–5 at 252; Docket No. 58–5 at 45, Hamilton Dep. at 136–38. Hamilton appealed the denial, claiming that he was never questioned about his relationship to Napper. *Id.;* Hamilton Dep. at 131–34 On appeal, the request was again denied. Docket No. 51–5 at 254; Docket No. 58–5 at 46–47.

### H. Placement in Close Supervision Unit

**\*7**  On June 1, 2006, Hamilton was placed in Shawangunk's Close Supervision Unit (CSU) without a hearing or an opportunity to dispute the placement. Am. Compl. ¶ 81. This placement was based on false information given by Smith. Hamilton Dep. at 104–11. Hamilton's placement in CSU was "based on ... [his] proven inability to coexist in the general population evidenced by [his] disruptive conduct, poor custodial adjustment and ... involvement in an unusual incident which resulted in the stabbing death of another inmate." Docket No. 58–5 at 27; Hamilton Dep. at 104–05. Hamilton contends that he was not involved in the stabbing, an assertion with which Smith concurred but did nothing to correct in Hamilton;s records. Hamilton Dep. at 110–11.

While in CSU, Hamilton lost the opportunity to engage in employment in the mess hall. However, Hamilton did not want a job and, if he did, CSU permitted employment as a porter. *Id.* at 108–09. Hamilton was still permitted to go to the library and commissary. *Id.* at 109.

### II. Discussion

In his amended complaint, Hamilton alleges multiple violations of federal statutes and constitutional rights. First, Hamilton asserts that his First Amendment rights were violated when defendants (1) disclosed his confidential medical information to other staff in retaliation for Hamilton filing grievances, (2) tampered with his mail, (3) failed to produce him for his Family Court proceedings, and (4) refused to provide him with a therapeutic meal which also complied with his religious tenets. Second Hamilton asserts that his Eighth Amendment rights were violated when defendants (1) subjected him to contaminated water, dusty cells, broken ventilators, and mold-infested recreation areas; (2) failed to protect his medical confidentiality; (3) refused to provide him with medical treatment for his mental health ailments, drug addiction, or Hepatitis A; and (4) deliberately treated the drinking water with chemicals that aggravated his underlying medical problems. Finally, Hamilton asserts that his Fourteenth Amendment rights were violated when defendants, (1) improperly conducted his disciplinary rehearing, (2) failed to notify him of the death of his son, and (3) inappropriately placed him in CSU.

Defendants move for summary judgment on the grounds that (1) there is no merit to Hamilton's HIPPA, RLUIPA, or constitutional claims; (2) defendants Gonzales, Slesky, Parisi, Genovese, and Davis were not personally involved; and (3) defendants are entitled to qualified immunity.

### A. Legal Standard

A motion for summary judgment may be granted if there is no genuine issue as to any material fact if supported by affidavits or other suitable evidence and the moving party is entitled to judgment as a matter of law. The moving party has the burden to show the absence of disputed material facts by informing the court of portions of pleadings, depositions, and affidavits which support the motion. Fed.R.Civ.P. 56; *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). Facts are material if they may affect the outcome of the case as determined by substantive law. *Anderson v. Liberty Lobby,* 477 U.S. 242, 248 (1986). All ambiguities are resolved and all reasonable inferences are drawn in favor of the non-moving party. *Skubel v. Fuoroli,* 113 F.3d 330, 334 (2d Cir.1997).

**\*8** The party opposing the motion must set forth facts showing that there is a genuine issue for trial. The non-moving party must do more than merely show that there is some doubt or speculation as to the true nature of the facts. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986). It must be apparent that no rational finder of fact could find in favor of the non-moving party for a court to grant a motion for summary judgment. *Gallo v. Prudential Residential Servs.* 22 F.3d 1219, 1223–24 (2d Cir.1994); *Graham v. Lewinski,* 848 F.2d 342, 344 (2d Cir.1988).

When, as here, a party seeks summary judgment against a pro se litigant, a court must afford the non-movant special solicitude. *Triestman v. Fed. Bureau of Prisons,* 470 F.3d 471, 477 (2d Cir.2006); *see also Sealed Plaintiff v. Sealed Defendant # 1,* 537 F.3d 185, 191 (2d Cir.2008) ("On occasions too numerous to count, we have reminded district courts that 'when [a] plaintiff proceeds *pro se,* ... a court is obliged to construe his pleadings liberally.' " (citations omitted)). However, the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact. *Anderson,* 477 U.S. at 247–48.

### C. First Amendment

#### 1. Retaliation

Hamilton contends that defendants disclosed his confidential medical information in retaliation for filing grievances. To establish a claim for retaliation, a plaintiff must first demonstrate that the plaintiff's conduct was constitutionally protected and that this protected conduct was a substantial factor that caused the adverse action against plaintiff. *Graham v. Henderson,* 89 F.3d 75, 79 (2d Cir.1996). "Under this analysis, adverse action taken for both proper and improper reasons may be upheld if the action would have been taken based on the proper reasons alone." *Jackson v. Onondaga County,* 549 F.Supp.2d 204, 215 (N.D.N.Y.2008) (*citing Graham v. Henderson,* 89 F.3d 75, 79 (2d Cir.1996)). Additionally, courts must view retaliation claims with care and skepticism to avoid judicial intrusion into prison administration matters. *Id.* Conclusory allegations alone are insufficient. *Id.* (*citing Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983).

In this case, Hamilton has failed to demonstrate facts sufficient to support a retaliation claim. Filing grievances is an activity protected by the First Amendment. However, as discussed *infra,* there is no evidence to support the contention that defendants disclosed any medical information as retaliation rather than for proper purposes. To investigate effectively and thoroughly the grievances Hamilton submitted concerning the medical treatment which he received, the staff and inmate representatives needed to view his medical records to assess whether there was validity to his claim. Docket No. 58–2 at 33; J. Smith Decl. ¶¶ 28–30; Hamilton Dep. at 38–39. When viewing the facts in the light most favorable to Hamilton, no evidence has been presented to support a claim that any disclosure was motivated by retaliation.

**\*9** Accordingly, defendants' motion should be granted on this ground.

#### 2. Denial of Access to Courts

"It is now established beyond a doubt that prisoners have a constitutional right of access to the courts." *Bounds v. Smith,* 430 U.S. 817, 821 (1977). "Interference with legal mail implicates a prison inmate's rights to access to the courts

2009 WL 3199531

and free speech as guaranteed by the First and Fourteenth Amendments to the U .S. Constitution." *Davis v. Goord,* 320 F.3d 346, 351 (2d Cir.2003). In order to state a claim of denial of access to the courts, including those premised on interference with legal mail, a plaintiff must allege "that a defendant caused 'actual injury,' i.e. took or was responsible for actions that 'hindered [a plaintiff's] efforts to pursue a legal claim.' " *Id.* (*citing Monsky v. Moraghan,* 127 F.3d 243, 247 (2d Cir.1997) (*quoting Lewis v. Casey,* 518 U.S. 343, 351 (1996)).

"[R]egardless of the type of legal access claim, the plaintiff would have to show actual harm to a legal claim ... [and t]he cause of the injury must be the inadequacy of the method of access." *Bowe v. Barkley,* No. 95–CV–247 (RSP/GJD), 1997 WL 204311, at *2 (N.D.N.Y. Apr, 15, 1997) (*citing Lewis,* 518 U.S. at 351). "[A]n isolated incident of mail tampering is usually insufficient to establish a constitutional violation .... Rather, the inmate must show that prison officials regularly and unjustifiably interfered with the incoming legal mail." *Id.* (citations omitted); *see also Washington v. James,* 782 F.2d 1134, 1139 (2d Cir.1986) (explaining that an action may not give rise to damages if there was "no showing ... that the inmate's right of access to the courts was chilled or the legal representation was impaired."); *Morgan v. Montanye,* 516 F.2d 1367, 1371 (2d Cir.1975) (holding that a single instance of mail tampering which did not lead the plaintiff to suffer any damage was insufficient to support a constitutional challenge).

Defendants allegedly precluded Hamilton from attending a court proceeding telephonically. Docket No. 58–2 at 11. The failure to appear resulted in a dismissal of the case. *Id.* However, this dismissal was without prejudice and permitted reinstated at any time. Docket No. 5105 at 217; Docket No. 58–2 at 8. Therefore, Hamilton has failed to show that he suffered an actual injury. At best, he has suffered a delay in the resolution of the ongoing legal proceedings, but he was not prohibited from re-instituting the proceeding and carrying it forward to conclusion. Therefore, defendants' motion for summary judgment as to this claim should be granted on this ground.

Additionally, Hamilton contends that defendants interfered with the delivery to him of Mathis' affidavit and legal papers from Brooklyn Law School. Docket No. 58–4 at 30–38. First, Hamilton only alleged one instance involving mail from the law school, which is insufficient to establish a First Amendment violation. *See Davis v. Goord,* 320 F.3d 346, 351

(2d Cir.2003) ( "[A]n isolated incident of mail tampering is usually insufficient to establish a constitutional violation .... Rather, the inmate must show that prison officials regularly and unjustifiably interfered with the incoming legal mail."). Furthermore, Hamilton eventually received the paperwork from the law school which indicated that they had previously assessed Hamilton's case in 2002 and determined that there was no assistance which the law school could provide. Docket No. 58–3 at 5. Thus, even viewing Hamilton's allegations in the light most favorable to him, he had already received notice that the law school would not assist him in his case and he suffered no actual injury. *See GonzalezCifuentes v. Torres,* No. 04–CV–1470 (GLS/DRH), 2007 WL 499620, at *6 (N.D.N.Y. Feb. 13, 2007) (stating that plaintiff "identifies no particular case or claim which was impeded or how any defendant's conduct impeded his litigation of a claim or defense [and h]e has thus failed sufficiently to allege any actual injury from this alleged incident, much less that [the] conduct was deliberate and malicious.") (internal citations and quotations omitted). Thus, defendants' motion for summary judgment should be granted on this ground.

**\*10** However, the alleged denial of Mathis' affidavit yields a different result. When Hamilton was sent the affidavit, he was on mail watch. J. Smith Decl. ¶ 6. Viewing the facts in the light most favorable to Hamilton, defendants received the affidavit, reviewed it, and were obligated either to forward it to Hamilton or return it to the sender. Am. Compl. ¶ 35; Hamilton Dep. at 32–33. The delivery of mail to Hamilton stopped multiple times at the second stage of review. Am. Compl. ¶ 35. As Hamilton was never given the Mathis affidavit nor was Esters instructed on how to resend the affidavit to comply with DOCS regulations, a question of fact is raised as to whether defendants intentionally interfered with Hamilton's ability to receive the exculpatory evidence in the Mathis affidavit. While it is unclear whether the affidavit would have altered the outcome of the proceeding, viewing the evidence in the light most favorable to Hamilton, it reasonably likely that it would have. Thus, if proven, these repeated incidents of seizing the Mathis affidavit rather than delivering it or returning it constitute more than mere negligence and indicate intentional interference sufficient to raise a material question of fact. *See generally Holmes v. Grant,* No. 03–CV–3426 (RJH/RLE), 2006 WL 851753, at *12 (S.D.N.Y. Mar. 31, 2006) ("Mere negligence resulting in the loss of legal papers, ... does not state an actionable claim [as] plaintiff must allege facts demonstrating that defendants deliberately and maliciously interfered with his access to the courts ... [such as allegations] that the defendants

deliberately stole his legal papers.") (internal quotations and citations omitted). Therefore, defendants' motion for summary judgement should be denied on this ground as to Maly for his failure to either deliver or return the mail and Smith for alleged negligent supervision and the procedures followed with respect to such packages but granted as to all other defendants.

### 3. Religious Meals

Hamilton alleges that his First Amendment right to the free exercise of his religion was violated when defendants failed to provide him with kosher meals which were also low in sodium and cholesterol as required by his therapeutic diet.

"The First Amendment ... guarantees the right to the free exercise of religion." *Johnson v. Guiffere,* No. 04–CV–57 (DNH), 2007 WL 3046703, at *4 (N.D.N.Y. Oct. 17, 2007) (citing *Cutter v. Wilkinson,* 544 U.S. 709, 719 (2005). "Prisoners have long been understood to retain some measure of the constitutional protection afforded by the First Amendment's Free Exercise Clause." *Ford v. McGinnis,* 352 F.3d 582, 588 (2d Cir.2003) (citing *Pell v. Procunier,* 417 U.S. 817, 822 (1974)). This right "is not absolute or unbridled, and is subject to valid penological concerns ...." *Johnson,* 2007 WL 3046703, at * 4.

The Free Exercise Clause extends "into other aspects of prison life including ... that of an inmate's diet ...." *Id.* The Second Circuit has held that it is "clearly established that a prisoner has a right to a diet consistent with his or her religious scruples ...." *Ford,* 352 F.3d at 597 (citations omitted). Therefore, to "deny prison inmates the provision of food that satisfies the dictates of their faith ... unconstitutionally burden[s] their free exercise rights." *McEachin v. McGuinnis,* 357 F.3d 197, 203 (2d Cir.2004).

> **\*11**  A party asserting a free exercise claim bears the initial burden of establishing that the disputed conduct infringes on his or her sincerely held religious beliefs.... [T]he burden then shifts to the defendant to identify a legitimate penological purpose justifying the decision ... [and i]n the event such a[n] interest is articulated,

its reasonableness is then subject to analysis under ... *Turner* ....

*Johnson,* 2007 WL 3046703, at * 4–5 (citations omitted).

In this case, defendants first contend that Hamilton's conversion to Judaism and request for kosher meals was not the result of his sincerely held religious beliefs but only his curiosity. Defs. Mem. of Law (Docket No. 51–6) at 11–12. To determine the sincerity of a religious belief, "the relevant inquiry is not whether, as an objective matter, the belief is accurate or logical ... [but] ... whether the beliefs ... are sincerely held and whether they are, in his own scheme of things, religious." *Jackson v. Mann,* 196 F.3d 316, 320 (2d Cir.1999); *see also Jolly v. Coughlin,* 76 F.3d 468, 476 (2d Cir.1996) (holding that a court's inquiry is limited to "whether the belief is religious in nature").

> An inquiry any more intrusive would be inconsistent with our nation's fundamental commitment to individual religious freedom; thus, courts are not permitted to ask whether a particular belief is appropriate or true-however unusual or unfamiliar the belief may be. While it is a delicate task to evaluate religious sincerity without questioning religious verity, our free exercise doctrine is based upon the premise that courts are capable of distinguishing between these two questions.)

*Jolly,* 76 F.3d at 476. Therefore, courts are instructed to "[v]iew ... [the question] through the prism of sincerity, [examining whether an inmate] ... has produced sufficient evidence to raise a genuine issue of material fact as to whether his religious beliefs are 'sincerely held.' " *Jackson,* 196 F.3d at 320.

It is clear that Hamilton has produced sufficient evidence to raise a question of material fact as to whether his beliefs were sincerely held as he (1) listed his religious preference as Jewish, (2) participated in the kosher meal program, and (3) attended religious services. *See id.* (finding a material

issue of fact when plaintiff listed his religious preference as Jewish, participated in kosher meal programs in several other correctional facilities, and abstained from eating for several days to avoid eating non-kosher food). Thus, defendants' contention on this ground should be rejected.

Additionally, Hamilton has raised an issue of fact as to whether defendants imposed a substantial burden on his exercise of his religious beliefs because he effectively was forced to choose between his religion and his health. The applicability of the substantial burden test has been much discussed in this circuit, but as long as "an asserted claim [is not] so bizarre, [or] clearly nonreligious in motivation, [it is] ... entitled to protection under the Free Exercise Clause." *Thomas v. Review Bd. of Ind. Employment Sec.,* 450 U.S. 707, 725; *see also Ford,* 352 F.3d at 591–93 (discussing the development of the substantial burden test in Free Exercise challenges). [15]

[15]    As the Supreme Court has stated, "it is not within the judicial function and judicial competence to inquire whether the petitioner ... more correctly perceived the commands of [his] faith [as c]ourts are not arbiters of scriptural interpretation." *Thomas,* 450 U.S. at 715–16; *see also Ford,* 352 U.S. at 593 (explaining the trepidation of applying the substantial burden test because it "requires courts to distinguish important from unimportant religious beliefs, a task for which [a court is] particularly ill-suited [due to] the danger that courts will make conclusory judgments about the unimportance of the religious practice to the adherent[.]")

*\*12* In this case, Hamilton has sufficiently demonstrated a First Amendment violation. Subscription to a kosher diet constitutes a material tenet of Judaism consistently found entitled to protection under the Free Exercise Clause. *See, e.g., Jackson v. Mann,* 196 F.3d 316, 320–21 (2d Cir.1999) (denying government's motion for summary judgment on claim for denial of kosher meals for Jewish prisoner because, *inter alia,* prisoners are "entitled to a reasonable accommodation of [their] religious beliefs ... includ [ing their] religious dietary beliefs ... [mandating] prison officials [to] provide a prisoner a diet that is consistent with his religious scruples.") (internal quotations and citations omitted). Defendants have not challenged the validity of this religious practice. The denial of such meals on a constant basis infringes Hamilton's religious beliefs.

However, defendants did not refuse Hamilton a kosher diet but stated that they could not provide him with the low-sodium, low cholesterol kosher diet he required for his health. Defendants assert that DOCS policy required an inmate either to choose a religious or a therapeutic meal as medical staff were responsible for prescribing therapeutic meals but have no authority to provide kosher meals. Docket No. 58–2 at 24; J. Smith Decl. ¶¶ 32–35. Defendants advise that DOCS contracted with outside providers for the preparation and delivery of religious and therapeutic meals and that these providers did not offer an option for low-sodium, low-cholesterol kosher food. Thus, DOCS lacked the ability to provide inmates with meals which were kosher as well as low-sodium and low-cholesterol. J. Smith Decl. ¶¶ 32–35. However, defendants have proffered no legitimate penological reason other than administrative inconvenience why Hamilton could not receive a meal that was both therapeutic and kosher. Defendants' refusal required Hamilton to elect between his health needs and his religious beliefs. This burden on Hamilton's exercise of his religious beliefs creates a question of fact on this issue. *See Bass v. Coughlin,* 976 F.2d 98, 99 (2d Cir.1992) (stating that "as early as 1975, it was established that prison officials must provide a prisoner a diet that is consistent with his religious scruples" and noting that this precedent "remains the law.") (*citing Kahane v. Carlson,* 527 F.2d 492, 495 (2d Cir.1975) and *Benjamin v. Coughlin,* 905 F.2d 571, 579 (2d Cir.1990)).

Even assuming that economic or administrative convenience constituted a legitimate penological interest in these circumstances, forcing Hamilton to this choice here remained unreasonable. *See Moore v. Goord,* No. 01–CV–1607(GLS/ GJD), Mem.-Decision & Order (Docket No. 60) at 22–35 (N.D.N.Y. filed Sept. 28, 2005) (assessing the reasonableness of mandating a prisoner to choose between his health and religion and finding that the weight of the *Turner* factors precluded a grant of summary judgment for defendants). [16]

[16]    To determine reasonableness, courts must assess whether the challenged regulation or official action has a valid, rational connection to a legitimate governmental objective; whether prisoners have alternative means of exercising the burdened right; the impact on guards, inmates, and prison resources of accommodating the right; and the existence of alternative means of facilitating exercise of the right that have only

a de minimis adverse effect on valid penological interests.

*Salahuddin v. Goord,* 467 F.3d 263, 274 (2d Cir.2006) (*citing Turner v. Safley,* 482 U.S. 78, 84 (1987). As previously noted, the challenged regulation is a product of economic and administrative convenience. It could not be circumvented by prisoners confined to SHU as they had lost their commissary privileges and could not purchase food to supplement their diet. Additionally, the impact on the prison staff, inmates, and prison resources was no greater than that which already existed except that an additional menu option. The effect of offering a diet which was low-sodium, low-cholesterol, and kosher would have had a de minimis effect on DOCS as each inmate had to be provided with a meal and these changes would only involve a small percentage of inmates. Thus, the DOCS policy fails the reasonableness determination.

**\*13** Accordingly, defendants' motion for summary judgment should be denied on this ground as to Smith for his alleged failure to create a procedure for inmates with low-sodium and low-cholesterol needs to receive religious meals and granted as to all other defendants.

### E. Eighth Amendment

The Eighth Amendment explicitly prohibits the infliction of "cruel and unusual punishment." U.S. CONST. amend. VIII.

### 1. Medical Treatment

The Eighth Amendment provision against cruel and unusual punishment includes the provision of medical care. *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994) (citations omitted). A prisoner advancing an Eighth Amendment claim for denial of medical care must demonstrate deliberate indifference to a serious medical need. *Wilson v. Seiter,* 501 U.S. 294, 297 (1991); *Hathaway,* 37 F.3d at 66. More than negligence is required "but less than conduct undertaken for the very purpose of causing harm." *Hathaway,* 37 F.3d at 66. The test for a § 1983 claim is twofold. First, the prisoner must show that there was a sufficiently serious medical need. *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998). Second, the prisoner must show that the prison official demonstrated deliberate indifference by having knowledge of the risk and

failing to take measures to avoid the harm. *Id.* "[P]rison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted." *Farmer v. Brennan,* 511 U.S. 825, 844 (1994).

" 'Because society does not expect that prisoners will have unqualified access to healthcare,' a prisoner must first make [a] threshold showing of serious illness or injury" to state a cognizable claim. *Smith v. Carpenter,* 316 F.3d 178, 184 (2d Cir.2003) (quoting *Hudson v. McMillian,* 503 U.S. 1,9 (1992)). Because there is no distinct litmus test, a serious medical condition is determined by factors such as "(1) whether a reasonable doctor or patient would perceive the medical need in question as 'important and worthy of comment or treatment,' (2) whether the medical condition significantly affects daily activities, and (3) the existence of chronic and substantial pain." *Brock v. Wright,* 315 F.3d 158, 162–63 (2d Cir.2003) (citing *Chance,* 143 F.3d at 702). The severity of the denial of care should also be judged within the context of the surrounding facts and circumstances of the case. *Smith,* 316 F.3d at 185.

Deliberate indifference requires the prisoner "to prove that the prison official knew of and disregarded the prisoner's serious medical needs." *Chance,* 143 F.3d at 702. Thus, prison officials must be "intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed." *Estelle v. Gamble,* 429 U.S. 97, 104, (1976). "Mere disagreement over proper treatment does not create a constitutional claim," as long as the treatment was adequate. *Id.* at 703. Thus, "disagreements over medications, diagnostic techniques (e.g., the need for X-rays), forms of treatment, or the need for specialists ... are not adequate grounds for a § 1983 claim." *Magee v. Childs,* No. 04–CV1089 (GLS/RFT), 2006 WL 681223, at *4 (N.D.N.Y. Feb. 27, 2006). Furthermore, allegations of negligence or malpractice do not constitute deliberate indifference unless the malpractice involved culpable recklessness. *Hathaway v.. Coughlin,* 99 F.3d 550, 553 (2d Cir.1996).

### a. Mental Health Treatment

**\*14** "Treatment of mental disorders of mentally disturbed inmates is ... a serious medical need" as contemplated by *Estelle. Guglielmoni v. Alexander,* 583 F.Supp. 821, 826 (D.Conn.1984). Thus, Hamilton's contentions that he had a

history of suicidal thoughts, including the evening he reported to Shawangunk, are sufficient to raise a question of fact as to a serious medical need. Am. Compl. ¶ 21; Hamilton Dep. at 19–20.

However, Hamilton has failed to demonstrate facts sufficient to support a finding of deliberate indifference. Hamilton underwent a mental health examination upon his arrival at Shawangunk and, in defendant Skies' professional opinion, further observation was not necessary because Hamilton was not displaying harmful tendencies despite his statements. Skies Aff. ¶ 11. Hamilton testimony that he had never attempted suicide despite his depression and suicidal thoughts corroborates this evidence. Hamilton's claim here reduces to a disagreement over the course of treatment Hamilton underwent. This is insufficient to establish a claim under the Eighth Amendment. Because Hamilton received an entrance interview and Skies appropriately evaluated him, the record is devoid of any evidence that Skies was either deliberately indifferent or intentionally delayed access to care or treatment options. Hamilton's conclusory allegations are insufficient to withstand a motion for summary judgment.

Accordingly, defendants' motion for summary judgement on this ground should be granted.

### b. Hepatitis A

Hamilton also contends that his Eighth Amendment rights were violated when defendants refused to treat his Hepatitis A. [17] Am. Compl. ¶ 23; Hamilton Dep. at 30–32. First, it does not appear that Hamilton was suffering from any severe symptoms which would render his Hepatitis a severe medical condition. However, even viewing the facts in the light most favorable to Hamilton and regardless of the fact that asymptomatic Hepatitis A may not constitute a serious medical condition, Hamilton has failed to raise an issue of fact whether defendants were deliberately indifferent. No treatment exists for Hepatitis A, the disease must run its course, and the individual will never again be infected by the disease. It is unclear what medical intervention Hamilton contends that defendants should have undertaken, but, again, the basis of Hamilton's claim here is a dispute over the medical treatment rendered by defendants. Because there was no known treatment or cure for Hepatitis A and in the absence of any demonstrated treatment offered by Hamilton, there can be no dispute that defendants acted pursuant to generally

accepted medical guidelines. *Hathaway v. Coughlin,* 99 F.3d 550, 553 (2d Cir.1996).

[17]    "Hepatitis A is a contagious liver disease ... [that] can range in severity from a mild illness lasting a few weeks to a severe illness lasting several months. Hepatitis A is usually spread when a person ingests fecal matter ... from contact with objects, food or drinks contaminated by the feces ... of an infected person." http:// www.cdc.gov/ hepatits/A/aFAQ.htm. Hepatitis is generally spread when a person does not properly wash his or her hands and then handles food or other objects. *Id.* Once an individual recovers from Hepatitis A, the body develops protective antibodies for life, and the individual can never be infected again. *Id.* Thus, "[t]here are no special treatments for hepatitis A. Most people ... will feel sick for a few months before they begin to feel better. A few people will need to be hospitalized ... [R]est, adequate nutrition, and fluids" are the recommended treatment. *Id.*

Therefore, defendants' motion for summary judgment on this ground should be granted.

### c. Substance Abuse

To the extent that Hamilton attempts to assert that defendants improperly dealt with his addiction because they did not mandate substance abuse treatment, it is noted that "[t]he claim to a constitutional right to treatment for narcotics addiction has no basis in either the provisions of the Constitution or the decisions of the courts ...." *Smith v. Follette,* 445 F.2d 955, 961 (2d Cir.1971); *see also Doe v. Goord,* No. 04–CV–570 (GBD/AJP), 2005 WL 3116413, at *16 (S.D.N.Y. Nov. 22, 2005). Thus, defendants' motion for summary judgment should be granted on this ground.

### d. Confidentiality

**\*15** Hamilton has alleged that defendants' disclosure of his medical records constituted a deliberate indifference to his serious medical needs. As previously discussed, Hamilton's Hepatitis A was not a serious medical need. Additionally, while high blood pressure and cholesterol may require medical treatment, they do not substantially affect

an individual's quality of life or leave an individual in pain and agony. Thus, these ailments, which are controllable with medication, without more serious indications of decline or deterioration, does not warrant Eighth Amendment protection.

However, even if the conditions reflected in Hamilton's records constituted serious medical needs, the disclosure of that information to staff and inmate representatives did not constitute malicious interference or deliberate indifference. The disclosures were necessary to investigate the pending grievances to determine their validity. The disclosures were limited in scope and purpose and, at most, could be categorized as negligent if others viewed them. As previously discussed, negligent behavior is not actionable under § 1983. *Hathaway,* 99 F.3d at 553. [18]

[18]   Claims surrounding disclosure of confidential medical information have been analyzed under both the Eighth and Fourteenth Amendments. *See generally Rodriguez v. Ames,* 287 F.Supp.2d 213, 218–221 (S.D.N.Y.2003). Liberally construing the complaint, Hamilton has also alleged a Fourteenth Amendment violation pertaining to the disclosure of his medical records.

As of 1999, prisoners retained a right to privacy for medical information unless (1) that disclosure was reasonably related to legitimate penological interests or (2) the information contained within the medical records was not the type of sensitive medical information contemplated by the courts for constitutional protection. *See Powell v. Schriver,* 175 F.3d 107, 111–13 (2d Cir.1999); *see also Rodriguez v. Ames,* 287 F.Supp.2d 213, 219–20 (W.D.N.Y .2003) (upholding Fourteenth Amendment protection in cases where the prisoner "has an unusual medical problem which, if disclosed unnecessarily to other inmates, would likely expose plaintiff to discrimination, intolerance, or potential violence," or where the information "spread through 'humor or gossip.' ") (quotations omitted); *Webb v. Goldstein,* 117 F.Supp.2d 289, 298–99 (E.D.N.Y.2000) (dismissing a Fourteenth Amendment claim because the prisoner "has not alleged that his prison records contained the sort of sensitive medical information at issue in ... *Powell.* "); *Khalfani v. Sec., Dep't of Veterans Affairs,* No. 94–CV–5720 (JG), 1999 WL 138247, at *6 (E.D.N.Y.

Mar. 10, 1999) ("The records at issue in this case contained rather mundane information regarding [plaintiff]'s tendon avulsion, his physical therapy and limitations on his ability to work-not the type of deeply personal information that was at issue in prior cases.").

Here, information surrounding Hamilton's high blood pressure and cholesterol and previous Hepatitis A infection are not the kind of facts expected to invoke discrimination, intolerance, or violence. Additionally, the disclosures were made in conducting an investigation of Hamilton's grievance, a legitimate penological interest. Accordingly, to the extent that Hamilton has alleged a Fourteenth Amendment claim, it is without merit.

Therefore, defendants' motion for summary judgment in this respect should be granted.

### e. Water Treatment

Liberally construing the amended complaint, Hamilton also contends that defendants' treatment of the water left its saline content at dangerously high levels, jeopardizing his high blood pressure and cholesterol and leading to neurological damage. As discussed above, Hamilton's high blood pressure and cholesterol was well monitored and controlled with medication. Thus, his conclusory assertions, without more, are insufficient to establish a serious medical condition. In the same vein, Hamilton has offered no proof of any neurological conditions he has suffered as a result of the water. Hamilton Dep. at 135. Conclusory allegations are insufficient to withstand a motion for summary judgment.

Additionally, to the extent that defendants treated the water, they neither did so in a deliberately indifferent manner. The water readings, as confirmed by state agencies regularly checking the water, indicate that the facility was appropriately purifying the water and that it was within state-mandated specifications. Docket No. 51–5 at 229. Hamilton has offered no evidence to the contrary. Thus, the record demonstrates that defendants' water treatment nullified and eradicated potential toxins. Their efforts were tested, confirmed, and authenticated by state agencies so responsible for providing potable water. J. Smith Decl. ¶ 22; Docket No. 51–5 at 235; Docket No. 53–3 at 64–68.

2009 WL 3199531

Therefore, defendants' motion on this ground should be granted.

## 2. Living Conditions

Hamilton alleges that he was confined in inhumane conditions in violation of the Eighth Amendment. "The Constitution does not mandate comfortable prisons but neither does it permit inhumane ones, and it is now settled that the treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment." *Farmer v. Brennan,* 511 U.S. 825, 832 (1970); *see also Johnson v. Smith,* No. 03–CV–1050 (FJS/DEP), 2006 WL 1843292, at *8 (N.D.N.Y. June 29, 2006). As with other Eighth Amendment claims, a "plaintiff must satisfy both an objective ... and subjective test." *Jolly v. Coughlin,* 76 F.3d 468, 480 (2d Cir.1996) (citations omitted). Thus, "[c]onditions of confinement only constitute an Eighth Amendment violation if they involve the deprivation of a single identifiable human need or denial of the minimum civilized measure of life's necessities, and the defendants' state of mind was one of deliberate indifference to that deprivation." *Johnson,* 2006 WL 1843292, at *9 (citations omitted).

**\*16** The objective prong can be satisfied by

> conditions of confinement ... [which] in combination [constitute an Eighth Amendment violation] when each would not do so alone ... [such as] when the conditions have a mutually enforcing effect that produces the deprivation of a single, identifiable human need such as food, warmth, or exercise—for example, a low cell temperature at night combined with a failure to issue blankets.

*Davidson v. Murray,* 371 F.Supp.2d 361, 370 (W.D.N.Y.2005) (citations omitted). However, "[n]othing so amorphous as overall conditions can rise to the level of cruel and unusual punishment when no specific deprivation of a single human need exists." *Id.* (*citing Wilson v. Seiter,* 501 U.S. 294, 304–05 (1991)). The subjective prong requires "a prison official

[to] have a sufficiently culpable state of mind ..., of deliberate indifference to inmate health or safety" *Farmer,* 511 U.S. at 834 (citations omitted).

In this case, Hamilton has alleged facts sufficient to satisfy the objective prong of the analysis concerning the water and ventilation at Upstate. The objective prong is satisfied as to the contaminated water claim because multiple inmates have corroborated Hamilton's complaints of (1) non-potable water, (2) the refusal of DOCS to provide inmates with bottled water, and (3) the inability of inmates in SHU to purchase bottled water from the commissary. Am. Compl. ¶ 43; Docket No. 58–5 at 12, 13, 16, 22, 25. If proven, these facts, in combination, are separately, suffice to constitute a constitutional violation as they result in the deprivation of a single, identifiable human need, fresh water fit for consumption.

Additionally, the objective prong is satisfied as to the ventilation claim because multiple inmates have corroborated Hamilton's complaints of (1) poorly or non-functional ventilation units, (2) poor air quality and breathing conditions, (3) poor cleaning and sanitary services to clean the resulting dust which was not properly circulated from the cells. Am. Compl. ¶ 44; Docket No. 58–3 at 13–50. If proven, these facts, in combination, suffice to constitute a constitutional violation as they result in the deprivation of a single, identifiable need, air with a quality which is breathable and does not result in nose bleeds, headaches, and colds.

However, Hamilton has not offered evidence sufficient to satisfy the objective prong of the analysis concerning the lights that remained on in SHU and the growth of mold in the recreation areas. When Hamilton testified concerning the lights, he admitted that the claim was dramatic and overstated. Hamilton Dep. 141–42. This claim, as well as the reference to mold, relate at best to the general living conditions. Additionally, Hamilton does not articulate how this constant lighting or growth of mold resulted in the deprivation of an identifiable human need. Even if it could be said that Hamilton satisfied the objective prong, he has not offered facts sufficient to satisfy the subjective element.

**\*17** In any event, Hamilton has not shown in any instance that defendants possessed the requisite culpable state of mind. Defendants did not disregard the multiple prisoner complaints. As demonstrated by the water tests, memoranda circulated throughout the prison, and correspondence with Hamilton, defendants were constantly assessing the quality of

the water and air. J. Smith ecl. ¶¶ 10–11, 22; Docket No. 51–5 at 235, 245; Docket No. 53–3 at 64–68; Docket No. 58–3 at 51. Additionally, the windows needed to remain closed during the winter months to retain a comfortable temperature for inmates and staff and the ventilation system was, therefore, regularly inspected. Docket No. 51–1 at 245; Docket No. 58–3 at 51; J. Smith Aff. ¶¶ 10–11; Hamilton Dep. at 36. Furthermore, the lights remained on in the gallery for inmate safety as Hamilton's gallery housed particularly dangerous inmates. Hamilton Dep. 56–58. Finally, with all of the actions taken by defendants, any residual conditions which resulted at worst from defendants' negligence and not from any conscious and deliberate disregard for the inmates' health and safety. As previously stated, negligence is insufficient to sustain an Eighth Amendment claim. *Hathaway v. Coughlin,* 99 F.3d 550, 553 (2d Cir.1996).

Accordingly, defendants' motion for summary judgment on this ground should be granted.

### F. Fourteenth Amendment

### 1. Due Process

Hamilton contends that defendants violated his due process rights by refusing to allow him to call witnesses in his rehearing, failing to notify him of the death of his son, and improperly placing him in CSU. Additionally, liberally construing the amended complaint, it appears that Hamilton contends that Maly, the hearing officer, was biased.

As a threshold matter, an inmate asserting a violation of his or her right to due process must establish the existence of a protected interest in life, liberty, or property. *See Perry v. McDonald,* 280 F.3d 159, 173 (2d Cir.2001). To establish a protected liberty interest, a prisoner must satisfy the standard set forth in *Sandin v. Conner,* 515 U.S. 472, 483–84 (1995). This standard requires a prisoner to establish that the deprivation was atypical and significant in relation to ordinary prison life. *Id.* at 484; *Jenkins v. Haubert,* 179 F.3d 19, 28 (2d Cir.1999); *Frazier v. Coughlin,* 81 F.3d 313, 317 (2d Cir.1996). The fact that an inmate has been disciplined with a SHU confinement alone is insufficient to establish an atypical and significant deprivation. The Second Circuit has articulated a two-part test whereby the length of time a prisoner was placed in SHU as well as "the conditions of the prisoner's confinement in SHU relative to the conditions of the general prison population" are to be considered. *Vasquez*

*v. Coughlin,* 2 F.Supp.2d 255, 259 (N.D.N.Y.1998) (citing *Brooks v. DiFasi,* 112 F.3d 46, 49 (2d Cir.1997)).

### a. Disciplinary Hearing and Rehearing

### i. Length of Incarceration in SHU

**\*18** The Second Circuit has held "that a sentence of one year in SHU was a sufficient length to be atypical under *Sandin." Gates v. Selsky,* No. 02–CV–496, 2005 WL 3132725, at *5 (W.D.N.Y. Nov. 22, 2005) (*citing Sims v. Artuz,* 230 F.3d 14, 23 (2d Cir.2000)). As Hamilton ultimately served twelve months in SHU, the duration of his SHU confinement suffices to create an issue of fact on this issue. Am. Compl. ¶ 26.

### ii. Biased Hearing Officers and Prohibition on Calling Witnesses

Prisoners have a constitutional right to have a fair and impartial hearing officer preside over their disciplinary hearings. *See, e.g., Sira v. Morton,* 380 F.3d 57, 69 (2d Cir.2004). However, "[t]he degree of impartiality required of prison officials does not rise to the level of that required of judges ... [as i]t is well recognized that prison disciplinary hearing officers are not held to the same standard of neutrality as adjudicators in other contexts." *Allen v. Cuomo,* 100 F.3d 253, 259 (2d Cir.1996) (citations omitted). While the Supreme Court held "that the requirements of due process are satisfied if some evidence supports the decision by the [hearing officer] ...." the Second Circuit has held that the test is whether there was " 'reliable evidence' of the inmate's guilt." *Luna v. Pico,* 356 F.3d 481, 487–88 (2d Cir.2004); *see also Superintendent, Mass. Corr. Inst. v. Hill,* 472 U.S. 445, 455 (1985).

To the extent that Hamilton alleges that he was not provided with impartial hearing officers, nothing in the hearing transcripts or either parties' submissions indicate that Davis or Maly was biased in any regard. Additionally, the findings produced during the investigations and drug tests leading to the misbehavior reports, the regulations in question, and the information upon which Davis and Maly relied all serve as reliable evidence supporting Hamilton's convictions and sentences. Selsky Decl. ¶ 8; Docket No. 58–3 at 53.

Additionally, Hamilton's amended complaint alleges that he was precluded from calling additional witnesses during his hearings. "It is well settled that an official may refuse to call witnesses as long as the refusal is justifiable [such as] ... on the basis of irrelevance or lack of necessity." *Scott v. Kelly,* 962 F.2d 145, 146–47 (2d Cir.1992) (internal quotations and citations omitted); *see also Richardson,* 833 F.Supp. at 152. However, Mathis was no longer incarcerated but was specifically identified and allegedly possessed exculpatory evidence regarding Hamilton's innocence. It appears that Maly's refusal to call him as a witness was unjustified. Mathis Aff. ¶¶ 2, 4, 6; Hamilton Dep. at 96–98, 121–23. Furthermore, it appears that Hamilton has raised a question of fact as to the refusal to call a representative from the substance abuse program to provide mitigating evidence.

Thus, defendants' motion should be denied concerning Hamilton's claim against Maly and Selsky for refusing to allow Hamilton to call Mathis and substance abuse program representatives as witnesses but should otherwise be granted as to all other defendants.

### b. Notification of Death in the Family

**\*19** "It is well-settled that there is no constitutionally protected liberty or property interest in attending the funeral of a family member." *Roman v. Donelli,* No. 06–CV–1071 (GLS/GJD), 2007 WL 2993825, at \*4 (N.D.N.Y. Oct. 10, 2007). Therefore, Hamilton had no constitutional right to the notification of or attendance at his son's funeral.

Additionally, while the "state may create liberty or property interests that are not conferred by the constitution ..., [the creation of such interests] must use explicitly mandatory language, must place substantive limitations on official discretion, and must require that a particular result is to be reached upon the finding of substantive predicates." *Id.* (internal quotations and citations omitted).

> The authority for deathbed and funeral visits is articulated in section 113 of the New York Corrections Law [and] ... simply states that the commissioner of correctional services **"may permit"** inmates to attend funerals of certain family members or to visit the individual if "death be imminent." The statute further provides that the power to grant these visits will be governed by rules and regulations promulgated by the commissioner. There is **no mandatory language** in this statute that would confer a liberty interest in being afforded the opportunity to go on either one of these types of visits.... [Additionally t]he notification of the death ... of an inmate's family member is governed by [DOCS] Directive No. 4206 ... [which] also shows that there is **no mandatory language** in that directive that would assure the approval of a deathbed or funeral visit if certain substantive criteria were met.... [T]he visit is contingent upon both verification of relationship **and Superintendent approval.** There is no mandatory language indicating that the Superintendent must approve any type of visit. Thus, no liberty interest is created by the statute or directives ... and [b]ecause there was no liberty interest created, [Hamilton's] due process claim must fail.

*Id.* (internal quotations and citations omitted) (emphasis in the original).

Thus, Hamilton had no protected liberty interest. Additionally, to the extent that Hamilton alleges that defendants did not comply with the DOCS directive in conducting an adequate investigation into his relationship to his son, Hamilton neither declared Napper as his son in his personal papers filed at the facility nor did Napper declare Hamilton to be his father when he visited the prison. Hamilton Dep. at 124–26, 128–29. Therefore, at best, defendants were negligent in their investigation of Hamilton's relationship to Napper which is insufficient to establish a constitutional violation. *Roman,* 2007 WL 2993825 at \*6.

Accordingly, defendants' motion as to this claim should be granted.

### c. Placement in CSU

Hamilton contends that his placement and subsequent hearings affirming the appropriateness of his assignment to CSU violated his due process rights. However, Hamilton has "no liberty interest ... in remaining free from confinement in the CSU." *Frazier v. Coughlin,* 81 F.3d 313, 318 (2d Cir.1996).

> **\*20** [I]nmates in the CSU are confined to their cells for the same amount of time per day as inmates in the general prison population. Moreover, ... the only substantive differences between confinement in the CSU and in the general prison population are (i) that prisoners in the CSU are ineligible for certain prison jobs, and (ii) that additional corrections officers may be assigned to the CSU.

*Id.*

Additionally, to the extent that Hamilton alleges that this placement deprived him of his constitutionally protected right to engage in certain types of employment, that argument also fails. First, "New York law does not give a prisoner any statutory, regulatory or precedential right to his prison job ... [thus] the State commissioner or prison officials may provide jobs for prisoners," but no liberty or property interest results. *Gill v. Mooney,* 824 F.2d 192, 194 (2d Cir.1987). Moreover, inmates have no constitutional right to any particular position or employment. *Hodges v. Jones,* 873 F.Supp. 737, 745 (N.D.N.Y.1995) (citations omitted). Finally, since Hamilton failed to establish a protected liberty interest in remaining free from confinement in CSU, no claim lies for denial of due process. *Frazier,* 81 F.3d at 318.

Accordingly, it is recommended that defendants be granted summary judgment as to any claim on this ground.

### G. RLUIPA Claim

The RLUIPA provides that "[n]o government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution ... unless the government demonstrates that imposition of the burden on that person (1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000cc–1. In a RLUIPA claim, "[t]he prisoner must show at the threshold that the disputed conduct substantially burdens his sincerely held religious beliefs. The defendants then bear the relatively limited burden of identifying the legitimate penological interests that justify the impinging conduct." *Salahuddin v. Goord,* 467 F.3d 263, 274–75 (2d Cir.2006).

As discussed above in subsection C(3), Hamilton has raised questions of fact as to whether defendants substantially burdened his religious beliefs. Defendants have failed to offer facts sufficient to satisfy their burden of identifying a legitimate penological interest. Accordingly, defendants' motion for summary judgment on this ground should be denied.

### H. HIPAA Claim

HIPAA creates a monetary remedy for the wrongful disclosure of medical information. 42 U.S.C. § 1320d–6. However, HIPAA "does not confer a private cause of action to any particular class of individuals ... [or] either explicitly or implicitly, confer to private individuals a right of enforcement." *Barnes v. Glennon,* No. 9:05–CV–0153 (LEK/RFT), 2006 WL 2811821 at \*5 (N.D.N.Y. Sept. 28, 2006) (citations omitted). Furthermore, "HIPAA provides for no federal cause of action; instead, HIPAA provides for an enforcement mechanism for the Secretary of Health and Human Services [HHS]." *Id.* at \*6 (internal quotations and citations omitted). Therefore, Hamilton cannot sustain his HIPAA claim since there is no private cause of action granted by the statute. Hamilton's only recourse through this statute is to request the State of New York or the Secretary of HHS to bring the action on his behalf.

**\*21** Accordingly, defendants' motion for summary judgment on this ground should be granted.

### I. Personal Involvement

Defendants contend that Hamilton has failed to establish the personal involvement of defendants Gonzalez, Selsky, Genovese, and Davis. " '[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.' " *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (quoting *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir.1991)). Thus, supervisory officials may not be held liable merely because they held a position of authority. *Id.; Black v. Coughlin,* 76 F.3d 72, 74 (2d Cir.1996). However, supervisory personnel may be considered "personally involved" if:

> (1) [T]he defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

*Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995) (citing *Williams v. Smith,* 781 F.2d 319, 323–24 (2d Cir.1986)).

### a. Gonzalez

Gonzalez was DOCS Deputy Counsel. Am. Compl. Viewing the record on this motion in the light most favorable to Hamilton, Gonzalez' only personal involvement with Hamilton was as the author of the letter to the Kings County Family Court requesting that Hamilton be allowed to appear telephonically. Docket No. 51–5 at 221. Pursuant to the letter's request, Hamilton was allowed to and did appear telephonically at the date and time arranged by Gonzalez. Am. Compl. ¶ 20. The case was adjourned, although Gonzalez had no involvement or reason to know about the resolution of those proceedings or subsequent developments. Even when

construing the amended complaint in the light most favorable to Hamilton, the record contains no other factual basis for finding personal involvement by Gonzalez. There likewise exists no basis in the record to find that Gonzalez negligently supervised any subordinate, created a hiring or retention policy which allowed constitutional violations to continue, or was grossly negligent in managing subordinates.

Accordingly, defendants' motion for summary judgment in this respect should be granted as to Gonzalez.

### b. Genovese

Genovese, a physician, was involved in the provision of inmate health care and was able to prescribe therapeutic meals to inmates. However, she had no authority to provide an inmate with a religious meal or make a religious meal available to an inmate. Genovese Decl. ¶ 6. Additionally, as a physician, Genovese had no authority to change DOCS policies and procedures for prescribing special inmate diets. See *Hatzfeld v. Goord,* No. 04–CV159, 2007 WL 700961, at *3 (N.D.N.Y. Feb. 28, 2007) (dismissing claims against a prison superintendent as there were no allegations that he had the power to create or to terminate the policy in question). Even construing the amended complaint in the light most favorable to Hamilton, any conclusory allegations that Genovese could prescribe both a religious and a therapeutic diet would still lack any factual basis. Additionally, there exists no basis in the record to find that there was any negligent supervision by Genovese, she created a hiring or retention policy which allowed constitutional violations to continue, or she was grossly negligent in managing subordinates.

*\*22 Accordingly, defendants' motion for summary judgment in this respect should be granted.

### c. Selsky

Selsky, DOCS Director of SHU, directly reviewed and ruled on three disciplinary convictions which form the basis of Hamilton's due process claims. Selsky Decl. ¶¶ 8–10. "[A]ffirming the administrative denial of a prison inmate's grievance by a high-level official is insufficient to establish personal involvement under section 1983." *Manley v. Mazzuca,* No. 01–CV–5178 (KMK), 2007 WL 162476, at *10 (S.D.N.Y. Jan. 19, 2007) (*citing Foreman v. Goord,*

No. 02–CV–7089 (SAS), 2004 WL 1886928, at *7 (S.D.N.Y. Aug. 23, 2004) ("The fact that [the prison superintendent] affirmed the denial of plaintiff's grievances is insufficient to establish personal involvement.")). However, where a supervisory official receives, reviews, and responds to a prisoner's complaint, personal involvement may be found. *See Bodie,* 342 F.Supp.2d at 203 (citations omitted).

In this case, the record is undisputed that Selsky was a supervisory official. While personal involvement cannot be founded solely on supervision, liability can be found if the official proactively participated in reviewing the administrative appeals as opposed merely to rubber-stamping the results. Selsky was intimately involved with the hearings and rehearing which gave rise to Hamilton's due process claims as Selsky was the individual who signed all administrative findings and ordered the rehearing of Hamilton's disciplinary proceedings. This suffices to raise questions of fact as to Selsky's personal involvement.

Accordingly, defendants' motion for summary judgment in this respect should be denied.

#### d. Davis

Davis presided as the hearing officer at Hamilton's first disciplinary proceeding. Davis' finding that Hamilton was guilty and the sentence imposed were reversed by Selsky and the charge was remanded for a rehearing. The rehearing was held before a different hearing officer. Selsky Decl ¶¶ 8–9; Docket No. 58–3 at 53. As the hearing officer, Davis was directly involved in the hearing which is the subject matter of Hamilton's claims of a due process violation. Accordingly, defendants' motion for summary judgment in this respect should be denied.

### J. Qualified Immunity

Defendants claim that even if plaintiffs' constitutional claims are substantiated, they are entitled to qualified immunity. Qualified immunity generally protects governmental officials from civil liability "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982); *Aiken v. Nixon,* 236 F.Supp.2d 211, 229–30 (N.D.N.Y.2002) (McAvoy, J.), *aff'd,* 80 Fed.Appx. 146 (2d Cir. Nov. 10, 2003). However,

even if the constitutional privileges "are clearly established, a government actor may still be shielded by qualified immunity if it was objectively reasonable for the ... official to believe that his [or her] acts did not violate those rights." *Smith v. City of Albany,* No. 03–CV–1157, 2006 WL 839525 *16 (N.D.N.Y. Mar. 27, 2006)* (quoting *Kaminsky v. Rosenblum,* 929 F.2d 922, 925 (2d Cir.1991); *Magnotti v. Kuntz,* 918 F.2d 364, 367 (2d Cir.1990)) (internal citations omitted)).

**\*23** A court must first determine whether, if plaintiff's allegations are accepted as true, there would be a constitutional violation. *Saucier v. Katz,* 533 U.S. 194, 201 (2001). Only if there is a constitutional violation does a court proceed to determine whether the constitutional rights of which a reasonable person would have known were clearly established at the time of the alleged violation. *Aiken,* 236 F.Supp.2d at 230. Here, the second prong of the inquiry need not be reached concerning any of Hamilton's claims except (1) his First Amendment claims concerning the provision of his religious meals and the interference with the delivery of the Mathis affidavit prior to his disciplinary rehearing, and (2) his due process claims concerning his inability to call witnesses during his disciplinary rehearing.

As to those claims, it was clearly established by November 30, 2006 that inmates had (1) a First Amendment right to be provided with meals that conformed to their religious tenets, *see Ford,* 352 F.3d at 597;(2) a First Amendment right of access to the courts which included access to legal mail, *see David v. Goord,* 320 F.3d 346, 351 (2d Cir.2003);and (3) a Fourteenth Amendment right to a fair and impartial disciplinary hearing including the ability to call witnesses. *See Scott,* 962 F.2d at 145. Thus, accepting all of Hamilton's allegations concerning these claims as true, questions of fact exist precluding summary judgment for defendants on this ground.

Accordingly, defendants should be granted summary judgment on the ground of qualified immunity on all claims except those described above, and defendants' motion on this ground should otherwise be denied.

### III. Conclusion

For the reasons stated above, it is hereby **RECOMMENDED** that defendants' motion for summary judgment (Docket No. 51) be:

2009 WL 3199531

1. **DENIED** as to Hamilton's:

    A. First Amendment claims against Smith regarding the provision of meals which complied with both his health needs and religious tenets;

    B. First Amendment claims against Smith and Maly regarding the tampering with his legal mail, specifically the Mathis affidavit;

    C. Fourteenth Amendment claims against Maly and Selsky regarding the violation of his due process rights during his disciplinary rehearing where he was precluded from calling Mathis and substance abuse counselors during his presentation of evidence;

2. **GRANTED** as to as to all other claims and defendants; and

3. The case be **TERMINATED** in its entirety as to defendants Gonzalez, Genovese, Skies, Parisi, Chiapperino, and Davis.

Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993); *Small v. Sec'y of HHS,* 892 F.2d 15 (2d Cir.1989); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(e).

**All Citations**

Not Reported in F.Supp.2d, 2009 WL 3199531

---

**End of Document**        © 2021 Thomson Reuters. No claim to original U.S. Government Works.

Case 9:19-cv-01161-DNH-TWD    Document 79    Filed 11/10/21    Page 60 of 125

Helijas v. Corr. Med. Care, Inc., Not Reported in Fed. Supp. (2016)

2016 WL 5374124

🔸 KeyCite Overruling Risk - Negative Treatment

Overruling Risk   Darnell v. Pineiro,   2nd Cir.,   February 21, 2017

2016 WL 5374124
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Gail HELIJAS, as Administratrix of the
Estate of Lucky Lee Wilkins, Jr., Plaintiff,
v.

CORR. MED. CARE, INC.; Emre Umar; Maria
Carpio; Susan Morgan; Schenectady Cty.;
Dominic D'Agostino; Jim Barrett; John Does
No. 4-5, employees of Ellis Hospital whose
identities cannot presently be determined;
Carlos Valle; and Jane Doe No. 1, an employee
of Corr. Med. Care, Inc., whose identities
cannot presently be determined, Defendants.

1:15-CV-1049 (GTS/DJS)
|
Signed 09/26/2016

**Attorneys and Law Firms**

LAW OFFICES OF ELMER R. KEACH, III, P.C., One Pine
West Plaza, Suite 109, OF COUNSEL: ELMER R. KEACH,
III, ESQ., MARIA K. DYSON, ESQ., Albany, New York
12205, Counsel for Plaintiff.

STEWART BERNSTIEL REBAR & SMITH, Time &
Life Building, 1271 Avenue of the Americas, Suite 4300,
OF COUNSEL: CATHLEEN KELLY REBAR, ESQ.,
VINCENT CHIRICO, ESQ., New York, New York 10020,
Counsel for Defendants Corr. Med., Care, Inc., Emre Umar,
Maria Carpio, and Susan Morgan.

GOLDBERG SEGALLA LLP, 8 Southwoods Boulevard,
Suite 300, OF COUNSEL: JONATHAN BERNSTEIN,
ESQ., Albany, New York 12211, Counsel for Defendants
Schenectady, County, Dominic D'Agostino, and Jim, Barrett.

O'CONNOR, O'CONNOR, BRESEE & FIRST, P.C., 20
Corporate Wood Boulevard, OF COUNSEL: DENNIS A.
FIRST, ESQ., STEVEN V. DeBRACCIO, ESQ., Albany,
New York 12211, Counsel for Defendant Carlos Valle.

**DECISION and ORDER**

GLENN T. SUDDABY, Chief United States District Judge

**\*1**   Currently before the Court, in this prisoner civil rights
action filed by Gail Helijas as administratrix of the estate of
Lucky Lee Wilkins, Jr. ("Plaintiff") against the eleven above-
named entities and individuals (collectively, "Defendants")
pursuant to 42 U.S.C. § 1983, are the following three
motions: (1) a motion to dismiss Plaintiff's Second Amended
Complaint for failure to state a claim upon which relief
can be granted, pursuant to Fed. R. Civ. P. 12(b)(6), or, in
the alternative, to strike certain paragraphs thereof, pursuant
to Fed. R. Civ. P. 12(f), filed by Defendants Correctional
Medical Care, Inc., Emre Umar, Maria Carpio, and Susan
Morgan (sometimes "CMC Defendants") (Dkt. No. 16); (2)
a motion to dismiss Plaintiff's Second Amended Complaint
for failure to state a claim upon which relief can be granted,
pursuant to Fed. R. Civ. P. 12(b)(6), filed by Defendant
Carlos Valle (Dkt. No. 83); and (3) a motion to dismiss
cross-claims asserted by Defendants Schenectady County,
Dominic D'Agostino, and Jim Barrett, filed by Defendant
Carlos Valle (Dkt. No. 97). For the reasons set forth below,
CMC Defendants' motion is granted in part and denied in part;
Defendant Valle's motion to dismiss Plaintiff's Complaint is
granted in part and denied in part; and Defendant Valle's
motion to dismiss the cross-claims asserted against him is
denied.

**I. RELEVANT BACKGROUND**

**A. Plaintiff's Second Amended Complaint** [1]

[1]   Two notes about this pleading are in order. First,
although Plaintiff's current operative pleading is
captioned "Plaintiff's First Amended Complaint,"
Plaintiff's actual First Amended Complaint was
filed without objection on December 28, 2015.
(Dkt. No. 18.) As a result, the Court will refer
to Plaintiff's operative pleading (which was filed
with the consent of the parties and with the leave
of the Court on April 29, 2016) as the "Second
Amended Complaint." (Dkt. No. 75.) Second,
Plaintiff's Second Amended Complaint refers to
attached exhibits; those exhibits were filed with
Plaintiff's original Complaint, but were not filed
with Plaintiff's Second Amended Complaint. For
purposes of this Decision and Order, the Court

Helijas v. Corr. Med. Care, Inc., Not Reported in Fed. Supp. (2016)

2016 WL 5374124

cites the exhibits attached to Plaintiff's original Complaint. (Dkt. No. 1.) Page citations to these exhibits refer to the pagination generated by CM/ECF, the Court's electronic filing system.

Generally, in her Second Amended Complaint, Plaintiff alleges as follows. (Dkt. No. 75 [Plf.'s Second Am. Compl.].)

### 1. Medical Care and Death of Plaintiff's Decedent, Lucky Lee Wilkins, Jr.

On Friday, May 16, 2014, while being held at the Schenectady County Jail "(the Jail), Lucky Lee Wilkins, Jr. ("Wilkins"), Plaintiff's decedent and son, filled out a sick call slip. (*Id.* at ¶¶ 15, 17.) Plaintiff noted in his sick call slip that he was having " 'really bad' anxiety and panic attacks," that he was "depressed, was having trouble sleeping, and was feeling tired and weak." (*Id.* at ¶ 17.) Generally, during the course of his detainment, Wilkins exhibited symptoms of severe depression, including suicidal ideation, but did not "receive[ ] appropriate medical treatment" in light of those symptoms. (*Id.* at ¶ 16.)

**\*2** On Monday, May 19, 2014, Wilkins' sick call slip was triaged by Defendant Jane Doe No. 1, who evaluated Plaintiff and determined that "he was in need of emergent medical treatment." (*Id.* at ¶ 18.) Despite Wilkins' "obvious signs of depression and suicidal observation," however, Jane Doe No. 1 merely "placed [Wilkins] on a wait list to be seen by a mental health provider." (*Id.*)

On May 20, 2014, Wilkins was evaluated by Defendant Susan Morgan ("Morgan"), a licensed clinical social worker employed by Defendant Correctional Medical Care, Inc. ("CMC"). (*Id.* at ¶ 19.) Morgan observed that Wilkins was "experiencing severe symptoms of mental and physiological distress" and concerned about "several significant" personal issues, including "his criminal case, his wife's health, and his children." (*Id.*) Moreover, Wilkins exhibited "shortness of breath, rapid speech, anxious motor activity, an inability to sit still, heart palpitations when panicking, and anxiety." (*Id.*) Morgan noted in Wilkins' medical records that Wilkins "appeared overly anxious, afraid, or angry during his evaluation." (*Id.*) Wilkins informed Morgan that he had "a history of mental health issues," including "a prior involuntary commitment to a mental health hospital, a history of panic attacks and depression that had intensified during his detention at the jail." (*Id.*)

Despite Wilkins' complaints and Morgan's observations, Morgan did not refer Wilkins to a hospital or to be seen by a psychiatrist or psychologist, did not prescribe medication "to treat his emergent symptoms," and failed to ensure that Wilkins was "placed under any kind of mental health supervision," in violation of Schenectady County Jail's policies and procedures. (*Id.* at ¶ 20.) Rather, Morgan did only three things: (1) conducted a "brief" mental health screening and assessment; (2) gave Wilkins "literature that discussed" relaxation techniques and strategies for coping with anxiety; and (3) placed Wilkins on a "wait list" to see Defendant Dr. Carlos Valle ("Dr. Valle"), who was employed by CMC and was "the doctor responsible for providing mental health treatment at the jail." (*Id.* at ¶¶ 20-21.) Although Morgan placed Wilkins on a wait list to see Dr. Valle, Morgan "failed to inform Dr. Valle of the emergent nature of Wilkin[s'] symptoms," or, "[a]lternatively," Morgan *did* inform Dr. Valle of Wilkins' symptoms, and "Dr. Valle failed to take action." (*Id.* at ¶ 21.)

In addition to the complaints Wilkins conveyed in his sick call slip and to medical staff, as well as the symptoms with which he presented, other detainees at the Jail "also reported that [Wilkins] was severely depressed," threatened to commit suicide on multiple occasions, and "was being denied medical treatment." (*Id.* at ¶ 22.) One detainee "observed [Wilkins] try to scratch a tattoo ... off of his neck," and others observed that he was "overly distressed about his personal relationship" and was denied medical care because the medical staff "thought he was 'faking' his condition." (*Id.*)

On May 28, 2014, before he was evaluated by Dr. Valle or seen again by any other medical staff at the Jail, Wilkins committed suicide. (*Id.* at ¶¶ 15, 21.)

### 2. Role of Correctional Medical Care, Inc.

CMC, a private corporation, together with its president, Emre Umar ("Umar"), and owner, Maria Carpio ("Carpio"), have "engaged in a well-documented pattern and practice of providing inadequate and unqualified medical providers at the various" county correctional facilities for which they have contracted to provide services, "as well as inadequate medical and mental health care in general." (*Id.* at ¶ 25.) CMC provides inadequate care as a cost-saving measure and to enhance the profitability of its contracts with local municipalities. (*Id.*) The New York State Commission of Correction has repeatedly "found deficiencies in staffing and

2016 WL 5374124

care of detainees" at other New York State county jails at which CMC provides such services, resulting in detainee suicides committed at Tioga County Jail and Dutchess County Jail, and two suicides committed at Ulster County Jail.[2] (*Id.* at ¶ 26.) Moreover, the New York State Office of the Attorney General ("OAG") has investigated CMC and, following that investigation, CMC executed an "Assurance of Discontinuance." (*Id.* at ¶ 28; *accord*, Dkt. No. 1 at 36-63.)[3] ["Exhibit D," Assurance of Discontinuance].)

[2]      According to an exhibit attached to Plaintiff's Complaint, one of the deaths investigated by the Commission of Correction was that of Latisha Mason, who died in February 2011 while detained at the Schenectady County Jail "from complications that developed from undetermined causes[.]" (Dkt. No. 1 at 21 ["Exhibit B," Final Report in the Matter of the Death of Latisha Mason].) According to the report, Mason "had an acute psychosis due to PCP use that required extraordinary mental health management" and was in such a state "as to be unmanageable in jail." (*Id.*) The Commission of Correction found that her death was "precipitated by inadequate psychiatric and medical care by Ellis Hospital," to which she had been transported following her arrest and from which she was apparently released to the Jail. (*Id.*; *id.* at 25 ["The baseless discharge from Ellis Hospital of a combative, uncommunicative, intoxicated patient with frank psychotic symptoms without an adequate discharge plan to a facility manifestly incapable of caring for her represents grossly and flagrantly inadequate medical care by Ellis Hospital."].) Ultimately, a Schenectady County Sheriff's Department officer was terminated from employment for failing to "respond to Mason's medical emergency," and the Commission of Correction recommended that CMC "shall assure that facility medical staff comply with" its policy of conducting a "Receiving Screening" and 9 N.Y.C.R.R. § 7010.2(d), which requires that any "inmate" who "still appears to be intoxicated by alcohol or drugs" twelve hours after admission "shall be immediately examined by a physician."

[3]      The Assurance of Discontinuance (which was executed by the OAG on September 22, 2014) reflects as follows. From 2009 to 2012, six

deaths occurred at five county jails that had contracted with CMC for the provision of health services. (Dkt. No. 1 at 38 ¶ 7.) Investigations of the deaths, undertaken by the New York State Commission of Correction's Medical Review Board ("CCMRB"), "revealed that there were egregious lapses in medical care with respect to each of the deaths." (*Id.*) Its investigation into one such death, in Tioga County in October 2011, revealed "suicide by hanging following CMC's failure to provide appropriate medical and mental health care[ and] mental health care provided by an unlicensed provider." (*Id.*) Based on the "serious deficiencies and illegalities" revealed by its investigations (including "unlicensed and inexperienced staff[,] inadequate staffing[,] lack of adequate medical oversight[, and failure to adhere to medical and administrative protocols and procedures[,]" CCMRB and the New York State Education Department requested that OAG investigate CMC's conduct statewide. (*Id.* at ¶¶ 11-12.)

OAG's investigation focused on CMC's provision of contracted-for medical services in the "jail systems" of Monroe County and Tioga County, and "examined CMC's corporate structure, together with its performance pursuant to its contracts," including time records, staffing credentials, policies, and procedures. (*Id.* at ¶ 13.) Following its investigation, OAG concluded, *inter alia*, that CMC (1) unlawfully engaged in the corporate practice of medicine, (2) failed to provide proper medical oversight to Tioga County's jail population, including on-site physician coverage for the number of hours required by its contract, (3) employed an unlicensed Director of Forensic Medicine at the Tioga County Jail, and (4) failed to maintain complete and accurate time records for its Tioga County Jail staff, and failed to employ "nursing personnel with the requisite experience" and "maintain adequate staffing" at "the Monroe Jail/Facility." (*Id.* at ¶¶ 51-56.)

As part of the Assurance of Discontinuance, CMC agreed to, *inter alia*, restructure its business operations, employ an independent contract monitor to ensure CMC's compliance with its contracts, pay $100,000 in restitution to Tioga County, and pay a civil penalty of $100,000 to the OAG. (*Id.* at ¶¶ 58-70.) The Assurance of

Case 9:19-cv-01161-DNH-TWD    Document 79    Filed 11/10/21    Page 63 of 125

*Helijas v. Corr. Med. Care, Inc.*, Not Reported in Fed. Supp. (2016)

2016 WL 5374124

Discontinuance does not refer to any investigation, incident, or alleged wrongdoing with respect to CMC's provision of medical services in Schenectady County. Notably, the Assurance of Discontinuance provides that it is "not intended for use by any third party in any other proceeding and is not intended, and should not be construed, as an admission of liability by CMC." (*Id.* at ¶ 74.)

**\*3** CMC is also currently "on probation with" the National Commission of Correctional Health Care, which "regulates the quality of health services provided in correctional facilities." (Dkt. No. 75 at ¶ 33.) This fact was known to Defendants Dominic D'Agostino ("D'Agostino") and Jim Barrett ("Barrett"), the Sheriff of Schenectady County and Jail Administrator of the Schenectady County Jail, respectively.[4] (*Id.*) Moreover, fines imposed against CMC (with respect to its contract with Schenectady County for unspecified reasons), which should have been paid to the County Executive or other appropriate authority, were actually paid to D'Agostino. (*Id.* at ¶ 31.) This payment, in addition to "the thousands of dollars receive[d] by D'Agostino in campaign contributions, provides a clear financial incentive for him to look the other way while his inmates die and suffer egregious injuries at his facility." (*Id.*)

[4]     Where practical, the Court refers to Defendants Schenectady County, D'Agostino, and Barrett as "County Defendants."

### 3. Claims Arising from These Allegations

Based upon these factual allegations, Plaintiff asserts the following four claims: (1) a claim that all Defendants were deliberately indifferent to Wilkins' serious medical needs by willfully denying medical treatment to a detainee with serious medical needs as either medical staff members or policy makers, in violation of the Eighth Amendment of the United States Constitution as well as 42 U.S.C. § 1983 ("First Cause of Action"); (2) a claim that CMC, Umar, Carpio, Valle, D'Agostino, and Barrett were deliberately indifferent to Wilkins' serious medical needs by implementing a municipal policy or practice "of not providing appropriate medical care to detainees at the Schenectady County Jail," as well as "many other local jails across the State" ("Section Cause of Action"); (3) a claim for conscious pain and suffering and loss of companionship, inflicted on Wilkins' two children ("Third Cause of Action"); and (4) a claim for wrongful death under New York State law, due to Defendants failure "to timely

and appropriately treat" Wilkins in light of his "severe mental health symptoms" ("Fourth Cause of Action").[5] (*Id.* at ¶¶ 38-57.)

[5]     The Court addresses its construction of Plaintiff's Second Amended Complaint in greater detail *infra*, in Part III.A of this Decision and Order.

Familiarity with the factual allegations supporting Plaintiff's claims is assumed in this Decision and Order, which is intended primarily for the review of the parties.

### B. County Defendants' Cross-Claims

On May 26, 2016, County Defendants filed an Answer, in which they (among other things) denied Plaintiff's substantive allegations and asserted cross-claims for (1) common law contribution and indemnification, (2) breach of contract (as against CMC only),[6] and (3) contractual indemnification (as against CMC and Umar). (Dkt. No. 82 at ¶¶ 64-68 [County Defs.' Answer].)

[6]     More specifically, County Defendants allege that, if Plaintiff "recovers any Judgment against" them, this recovery will have been the result of CMC's failure to acquire professional liability, general liability, and personal injury insurance policies naming County Defendants as additional insureds, as agreed to in the Health Services Agreement between CMC, Schenectady County, and Sheriff D'Agostino. (Dkt. No. 82 at ¶ 65-66.)

### C. Parties' Briefing of the Pending Motions

#### 1. CMC Defendants' Motion to Dismiss Plaintiff's Second Amended Complaint[7]

[7]     The CMC Defendants' motion to dismiss was initially filed with respect to Plaintiff's original Complaint and on behalf of CMC and Umar only. (Dkt. No. 16.) However, since that time, (1) Plaintiff filed her Amended Complaint, naming Morgan as a Defendant for the first time (Dkt. No. 18), (2) defense counsel appeared on behalf of Carpio and Morgan and requested that the Court deem their motion to dismiss as filed on behalf of Morgan and Carpio as well (Dkt. Nos. 36-37, 43-44), and (3) defense counsel requested that

Case 9:19-cv-01161-DNH-TWD   Document 79   Filed 11/10/21   Page 64 of 125

Helijas v. Corr. Med. Care, Inc., Not Reported in Fed. Supp. (2016)

2016 WL 5374124

the Court consider CMC Defendants' motion to dismiss in light of Plaintiff's Second Amended Complaint (Dkt. No. 81).

### a. CMC Defendants' Memorandum of Law

**\*4** Generally, in support of their motion to dismiss Plaintiffs' Second Amended Complaint, CMC Defendants assert five arguments: (1) Plaintiff's deliberate indifference claim must be dismissed because she has failed to allege facts plausibly suggesting that (a) Wilkins' condition (or its seriousness) was communicated to CMC Defendants, and (b) CMC Defendants' actions or failure to act shocked the conscience or was "barbaric" in nature (Dkt. No. 16 at 10-13 [CMC Defs.' Memo. of Law] ); (2) Plaintiffs' "Second Cause of Action" must be dismissed because (a) she has failed to allege facts plausibly suggesting a "tangible connection between" Wilkins' death and the individual CMC Defendants' actions or inactions, (b) the allegations in her Complaint concerning Defendants' "past issues with patient care ... focus on a general pattern and practice of negligence by Defendants, rather than a pattern and practice specific to" Wilkins, and (c) she has failed to allege facts plausibly suggesting that Umar was personally involved in the constitutional violations that Wilkins suffered (*id.* at 13-14); (3) Plaintiff's "Third Cause of Action" must be dismissed because (a) she has failed to allege facts plausibly suggesting that Wilkins' children are entitled to damages for loss of companionship, and (b) she has failed to allege facts plausibly suggesting (i) the state law theory of liability pursuant to which he is seeking or entitled to damages for conscious pain and suffering (i.e., as a survivorship claim or as part of a wrongful death claim) or (ii) the nature of the pain and suffering that he experienced, or the manner in which he died (*id.* at 14-16); (4) Plaintiff is not entitled to punitive damages because she has failed to allege facts plausibly suggesting that CMC Defendants acted with evil motive or intent or reckless indifference to Wilkins' constitutional rights (*id.* at 16); and (5) in the alternative, the Court should strike paragraphs 18, 21-27, as well as specific portions of paragraphs 20, 28, and 29, because (a) these paragraphs contain allegations about the provision of medical care to other individuals and are therefore irrelevant, and (b) these paragraphs are scandalous because they are "speculative" and "go into far too much detail" about CMC Defendants' "past alleged wrongs" (*id.* at 17-18).

### b. Plaintiff's Opposition Memorandum of Law

Generally, in opposition to CMC Defendants' motion, Plaintiff asserts nine arguments: (1) she has alleged facts plausibly suggesting that CMC Defendants were subjectively aware of Wilkins' serious medical condition, based upon (a) the content of his sick call slip, (b) his report that he had a history of psychiatric problems, (c) CMC Defendants' observations of his physical condition, (d) Jane Doe No. 1's decision to refer him to be seen by a mental health provider, (e) the reasonable inference that his symptoms were severe, drawn from the fact that he actually killed himself, and (f) the reports of "numerous inmates" that Wilkins had previously communicated to CMC Defendants his threats to commit suicide (Dkt. No. 30 at 10-15 [Plf.'s Opp'n Memo. of Law to CMC Defs.' Mtn.] ); (2) the reasonableness of CMC Defendants' determination that Wilkins was "faking" his medical condition, or its severity, should be evaluated on a complete evidentiary record, rather than at the pleading stage (*id.* at 15); (3) Plaintiff has alleged facts plausibly suggesting that CMC is subject to liability under *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978), because, as she adequately alleges, (a) CMC has policies, customs, and/or practices of providing inadequate medical care and employing unqualified medical care providers at the Jail, and other correctional facilities across New York State, for the sake of profitability, (b) CMC's policies, customs, and/or practices are matters of public record, in that they are reflected in, *inter alia*, investigations undertaken, reports issued, and penalties imposed against CMC by governmental agencies, and (c) Plaintiff is not required to plead with special particularity the precise policies, customs, or practices at issue (*id.* at 16-20); (4) in the alternative, the Court should grant Plaintiff leave to amend her Second Amended Complaint so that she may assert further factual allegations in support of her theory of municipal liability (*id.* at 20-21); (5) Plaintiff has alleged facts plausibly suggesting that Umar was personally involved in the violation of Wilkins' federal constitutional rights because, as she adequately alleges, (a) Umar had direct knowledge of his employees' "repeated misconduct" related to "highly publicized deaths that occurred at [other] CMC facilities" that occurred in the years before Wilkins' suicide, but he failed to take remedial action, (b) Umar's company (CMC) based its employees' compensation on the number of "times they refused to send inmates in need of emergent medical treatment to the hospital or to outside specialists," and (c) Umar failed to retain "appropriately licensed medical staff" (*id.* at 21-23); (6) in the alternative, the Court should grant Plaintiff leave to amend her Second Amended Complaint so that she may assert further factual allegations concerning Umar's personal involvement (*id.* at 23); (7) CMC Defendants'

2016 WL 5374124

motion to strike certain paragraphs of Plaintiff's Second Amended Complaint must be denied because (a) these factual allegations support Plaintiff's assertion that Wilkins suffered constitutional violations pursuant to CMC's policies, customs, or practices under *Monell*, (b) these factual allegations (and the documents attached to Plaintiff's Complaint, on which these factual allegations are based) are relevant to Defendants' knowledge, notice, motive, and modus operandi, and (c) CMC Defendants will not be unfairly prejudiced by these factual allegations because they are largely matters of public record and government investigation (*id.* at 23-27); (8) Plaintiff has alleged facts plausibly suggesting the appropriateness of imposing punitive damages, and whether such damages are warranted should be determined based on record evidence (*id.* at 27-28); and (9) Plaintiff has adequately pleaded claims for conscious pain and suffering and wrongful death under New York State law and, to the extent that she has not, the Court should grant her leave to amend her Second Amended Complaint to "include information about how and why each distributee of the decedent's estate is entitled to inherit should ... Plaintiff successfully prosecute her claims" (*id.* at 29-30).

### c. CMC Defendants' Reply Memorandum of Law

**\*5** Generally, in their reply, CMC Defendants reiterate the arguments set forth in their memorandum of law and further argue as follows: (1) Plaintiff's "First Cause of Action" and "Second Cause of Action" (i.e., her deliberate medical indifference claim and municipal liability claim pursuant to *Monell*) must be dismissed because (a) Plaintiff's factual allegations in support of those claims are made "upon information and belief" and are conclusory and unsupported, (b) Plaintiff has failed to allege facts plausibly suggesting that Wilkins notified any of the CMC Defendants that he "had any suicidal ideation," (c) the Complaint's factual allegations do not specify the identities of the "other inmates" who reported that Wilkins was severely depressed and threatened to commit suicide, or to whom their "reports" were made, (d) CMC Defendants' alleged actions or failures to act were not "barbarous" or conscience-shocking, but rather constitute mere disagreement over the proper course of treatment, (e) Plaintiff has failed to allege facts plausibly suggesting that Wilkins made any other complaints in the eight-day period between his visit with Morgan and his suicide, and (f) Plaintiff has failed to adequately plead the existence of a municipal policy or custom because the Second Amended Complaint's factual allegations concern

only Wilkins' "individual experience" (Dkt. No. 35 at 4-8, 12 [CMC Defs.' Reply Memo. of Law] ); (2) the factual allegations in Plaintiff's Second Amended Complaint that concern other inmates at other locations are irrelevant to Plaintiff's claims (*id.* at 8-10); (3) Plaintiff's "alternative guesses" about "what may have happened to" Wilkins–including that the Commission of Correction may be investigating his death, that D'Agostino improperly received payments from CMC and "look[ed] the other way" with respect to CMC's inadequate services, and that CMC rewards employees for saving on costs by providing inadequate medical care–are mere unsupported "ruminations" (*id.* at 8-9); (4) Umar was not personally involved in any alleged violations of Wilkins' constitutional rights, and Plaintiff has failed to allege facts plausibly suggesting that Wilkins' "situation" was "brought to the attention of" Umar (*id.* at 10); (5) Plaintiff has failed to allege facts plausibly suggesting entitlement to damages for Wilkins' conscious pain and suffering because the Second Amended Complaint does not allege "the method of" Wilkins' suicide or the length and extent of his suffering "between his initial attempt and his death" (*id.* at 13); and (6) Plaintiff has failed to allege facts plausibly suggesting that his dependents have any reasonable expectation of pecuniary benefit such that damages for loss of companionship are appropriate (*id.* at 13). [8]

[8]   County Defendants also filed a memoranda of law in opposition to CMC Defendants' motion to dismiss, arguing that, to the extent that CMC Defendants are also seeking dismissal of County Defendants' cross-claims, CMC Defendants' motion should be denied at this time. (Dkt. No. 29, Attach. 6 [County Defs.' Opp'n Memo. of Law to CMC Defs.' Mtn. to Dismiss].) In their reply to Plaintiff's opposition, CMC Defendants note that they do not oppose County Defendants' interposition of cross-claims, but that they "reserve their rights to address" the cross-claims if Plaintiff's Second Amended Complaint is not dismissed in its entirety. (Dkt. No. 35 at 15-16.) The Court does not construe CMC Defendants' motion to dismiss as requesting dismissal of County Defendants' cross-claims and, given CMC Defendants' lack of opposition to the interposition of these cross-claims, the Court need not further discuss these cross-claims at this time.

Case 9:19-cv-01161-DNH-TWD   Document 79   Filed 11/10/21   Page 66 of 125

Helijas v. Corr. Med. Care, Inc., Not Reported in Fed. Supp. (2016)

2016 WL 5374124

### 2. Dr. Valle's Motion to Dismiss
### Plaintiff's Second Amended Complaint

#### a. Dr. Valle's Memorandum of Law

Generally, in support of his motion to dismiss Plaintiff's Second Amended Complaint, Dr. Valle advances the following five arguments: (1) Plaintiff's deliberate indifference to serious medical needs claim must be dismissed because (a) to the extent that Plaintiff has pleaded facts plausibly suggesting that Morgan failed to inform Dr. Valle about the seriousness of Wilkins' condition, Dr. Valle could not have known of, and disregarded, an excessive risk to Wilkins' health or safety, (b) she has failed to allege facts plausibly suggesting that Wilkins' suffered a sufficiently serious deprivation of medical care, in that the alleged delay of eight days (i.e., the time between the date on which Wilkins was seen by Morgan and the date on which he committed suicide) was not an unreasonable delay or interruption in his medical care, (c) Plaintiff has not alleged facts plausibly suggesting that Wilkins informed Morgan that he had experienced suicidal ideations, and his score on his mental health screening did not reveal "expressed suicidal symptoms," (d) Plaintiff has failed to allege facts plausibly suggesting that Dr. Valle's actions or failure to act amounted to deliberate indifference, that he was aware of the reports of "other inmates" about Wilkins' behavior, or that he shared in CMC's alleged motives or recklessness based on other, unrelated incidents (Dkt. No. 83, Attach. 3, at 6-13 [Valle's Memo. of Law in Support of Mtn. to Dismiss Plf.'s Second Am. Compl.] ); (2) Plaintiff's "Second Cause of Action" must be dismissed because (a) she has not alleged facts plausibly suggesting that Dr. Valle was personally involved in any constitutional deprivation to which Wilkins was subjected, took part in any unconstitutional "pattern [or] practice" adopted by CMC, or knew or should have known about the actions of any other CMC employee (*id.* at 13-18); (3) the Court should decline to exercise supplemental jurisdiction over Plaintiff's state law claims (*id.* at 19); (4) Plaintiff's claims for wrongful death and conscious pain and suffering must be dismissed because she has failed to allege facts plausibly suggesting that Dr. Valle acted wrongfully or negligently with respect to Wilkins, or that a physician-patient relationship existed between them (*id.* at 19-21); and (5) Plaintiff has failed to allege facts plausibly suggesting that Dr. Valle had the "evil motive or intent" required to establish entitlement to punitive damages in connection with her § 1983 claim (*id.* at 21).

#### b. Plaintiff's Opposition Memorandum of Law

**\*6** Generally, in opposition to Dr. Valle's motion to dismiss her Second Amended Complaint, Plaintiff asserts the following five arguments: (1) she has adequately pleaded Dr. Valle's personal involvement in the violation of Wilkins' constitutional rights because she has alleged facts plausibly suggesting that (a) Dr. Valle was "personally informed" of Wilkins' mental health condition, complaints of anxiety, depression, lethargy, and suicidal ideations, physical symptoms, and psychiatric history by Morgan, (b) other inmates reported their observations of Plaintiff's behavior before his death, including his "multiple" threats to commit suicide, (c) Dr. Valle "created and/or tolerated" a policy of "failing to provide appropriate levels of qualified medical providers at" the Jail, and failed to "adopt appropriate policies regarding" the screening and supervision of detainees at the Jail, and (d) Dr. Valle, a supervisory official, "failed to act on information that constitutional rights were being violated" as evidenced by "highly publicized deaths" at the Jail and other "CMC facilities" (Dkt. No. 85 at 6-14 [Plf.'s Opp'n Memo. of Law] ); (2) the fact that Dr. Valle did not actually evaluate or treat Wilkins is not dispositive of her wrongful death claim, and Dr. Valle had a legal duty, by virtue of his position, to provide Wilkins with adequate medical care (*id.* at 14-15); (3) the Court should exercise supplemental jurisdiction over Plaintiff's state law claims against Dr. Valle because several federal claims against other Defendants remain pending (*id.* at 16); (4) Plaintiff has adequately pleaded her entitlement to punitive damages in light of Dr. Valle's failure to evaluate or treat Wilkins, despite knowledge of Wilkins' medical condition and complaints, and (b) CMC's conduct "across the State of New York and the Commonwealth of Pennsylvania" (*id.* at 17-18); and (5) in the alternative, Plaintiff should be given leave to amend her Second Amended Complaint [9] if the Court concludes that dismissal of "some or all" of her claims is warranted (*id.* at 18-19).

[9]   In support of this request, Plaintiff notes that she has "obtained new evidence ... by way of subpoenas" to, *inter alia*, the Commission of Correction and OAG, including "discovery relative to four other individuals who died at the Schenectady County Correctional Facility in the span of less than three years that detail the

Case 9:19-cv-01161-DNH-TWD    Document 79    Filed 11/10/21    Page 67 of 125

Helijas v. Corr. Med. Care, Inc., Not Reported in Fed. Supp. (2016)

2016 WL 5374124

horrifically inadequate medical care they were provided[.]" (Dkt. No. 85 at 19.)

#### c. Dr. Valle's Reply Memorandum of Law

Generally, in his reply memorandum of law, Dr. Valle reiterates the arguments set forth in his memorandum of law and further argues as follows: (1) Plaintiff's deliberate indifference claim, as framed by the Second Amended Complaint's factual allegations, asserts a "medical delay," rather than a "medical denial" (Dkt. No. 87 at 3 [Valle's Reply Memo. of Law] ); (2) Plaintiff's factual allegations concerning the actions not taken by Morgan constitute mere disagreements over the proper course of treatment, rather than a deliberate indifference to Wilkins' serious medical needs (*id.* at 3-4, 15); (3) Plaintiff has not alleged facts plausibly suggesting that Morgan was aware of Wilkins' "threats of suicide," and therefore could not have advised Dr. Valle of those threats (*id.* at 4-5); (4) Plaintiff's factual allegation that Morgan placed Wilkins on a wait list to see Dr. Valle does not render plausible Plaintiff's factual allegation that Wilkins' medical condition was severe (*id.* at 5); (5) Plaintiff's factual allegation that other detainees reported that Wilkins was "severely depressed" before his death does not render his claims plausible because Plaintiff has failed to allege facts plausibly suggesting that Dr. Valle was aware of this information (*id.* at 5-6); (6) according to the "screening report" completed by Morgan, Wilkins "had no history of previous suicidal ideations or attempts, did not show signs of depression, and did not express feelings of hopelessness" (*id.* at 7); (7) Morgan's medical notes reflect that Wilkins had only a "minor" psychiatric history (*id.* at 8); (8) Plaintiffs' factual allegations concerning the unconstitutional policies, customs, and practices that existed at CMC facilities do not refer to Dr. Valle, but rather to CMC, Umar, and Carpio (*id.* at 10-11, 14); (9) Plaintiff has failed to allege facts plausibly suggesting that Dr. Valle, or his subordinates, were involved in any "previous misconduct carried out by ... CMC" or that Dr. Valle was on notice that his subordinates behaved improperly (*id.* at 12-13); and (10) Plaintiff should not be permitted to amend her Second Amended Complaint because (a) amendment would be futile, (b) she does not argue that the "newly discovered evidence" to which she refers in her opposition memorandum of law could not have been discovered earlier with reasonable diligence, and (c) she does not argue that the "newly discovered evidence" relates to Dr. Valle (*id.* at 19-21).

### 3. Dr. Valle's Motion to Dismiss Cross-Claims Interposed by County Defendants

#### a. Dr. Valle's Memorandum of Law

**\*7** Generally, in support of his motion to dismiss County Defendants' cross-claims, Dr. Valle asserts two arguments: (1) County Defendants may not recover under theories of common law contribution or indemnification with respect to § 1983 claims; (2) if his motion to dismiss Plaintiff's Second Amended Complaint is granted, then County Defendants' common law contribution and indemnification claims against him must also be dismissed because (a) Dr. Valle would have breached no duty owed to Wilkins as a matter of law and (b) the nature of Plaintiff's factual allegations with respect to County Defendants' conduct is different in nature than those relating to Dr. Valle. (Dkt. No. 97, Attach. 1, at 5-6 [Valle's Memo. of Law in Support of Mtn. to Dismiss County Defs.' Cross-Claims].)

Generally, in opposition to Dr. Valle's motion, County Defendants assert three arguments: (1) if Dr. Valle failed to provide proper medical care to Wilkins, then County Defendants "are entitled to pass that liability onto Dr. Valle for failing to fulfill the obligation to supply the County with medical treatment for inmates at the [J]ail"; (2) if County Defendants are ultimately found liable pursuant to Plaintiff's state law claims and "have to pay [P]laintiff for any fault of Dr. Valle," they are entitled to seek contribution from Dr. Valle; and (3) the fact that Plaintiff's allegations concerning County Defendants relate to issues not directly involving Dr. Valle (for example, contracting with CMC despite its probationary status and improper payments to D'Agostino) is irrelevant to Dr. Valle's potential liability to County Defendants for contribution. (Dkt. No. 98 at 2-5 [County Defs.' Opp'n Memo. of Law to Valle's Mtn. to Dismiss Cross-Claims].)

Generally, in reply, Dr. Valle argues that he is seeking dismissal of County Defendants' cross-claims only if his motion to dismiss Plaintiff's Second Amended Complaint is granted. (Dkt. No. 106 at 4 [Valle's Reply Memo. of Law in Further Support of Mtn. to Dismiss County Defs.' Cross-Claims].)

## II. RELEVANT LEGAL STANDARDS

Case 9:19-cv-01161-DNH-TWD    Document 79    Filed 11/10/21    Page 68 of 125

Helijas v. Corr. Med. Care, Inc., Not Reported in Fed. Supp. (2016)

2016 WL 5374124

### A. Standard Governing Motions to Dismiss

It has long been understood that a dismissal for failure to state a claim upon which relief can be granted, pursuant to Fed. R. Civ. P. 12(b)(6), can be based on one or both of two grounds: (1) a challenge to the "sufficiency of the pleading" under Fed. R. Civ. P. 8(a)(2); or (2) a challenge to the legal cognizability of the claim. *Jackson v. Onondaga Cty.*, 549 F. Supp. 2d 204, 211, nn. 15-16 (N.D.N.Y. 2008) (McAvoy, J., adopting Report-Recommendation on *de novo* review).

Because such dismissals are often based on the first ground, a few words regarding that ground are appropriate. Rule 8(a)(2) of the Federal Rules of Civil Procedure requires that a pleading contain "a *short and plain* statement of the claim *showing* that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2) (emphasis added). In the Court's view, this tension between permitting a "short and plain statement" and requiring that the statement "show[ ]" an entitlement to relief is often at the heart of misunderstandings that occur regarding the pleading standard established by Fed. R. Civ. P. 8(a)(2).

On the one hand, the Supreme Court has long characterized the "short and plain" pleading standard under Fed. R. Civ. P. 8(a)(2) as "simplified" and "liberal." *Jackson*, 549 F. Supp. 2d at 212, n.20 (citing Supreme Court case). On the other hand, the Supreme Court has held that, by requiring the above-described "showing," the pleading standard under Fed. R. Civ. P. 8(a)(2) requires that the pleading contain a statement that "give[s] the defendant *fair notice* of what the plaintiff's claim is and the grounds upon which it rests." *Jackson*, 549 F. Supp. 2d at 212, n.17 (citing Supreme Court cases) (emphasis added).

 **\*8** The Supreme Court has explained that such *fair notice* has the important purpose of "enabl[ing] the adverse party to answer and prepare for trial" and "facilitat[ing] a proper decision on the merits" by the court. *Jackson*, 549 F. Supp. 2d at 212, n.18 (citing Supreme Court cases); *Rusyniak v. Gensini*, 629 F. Supp. 2d 203, 213 & n.32 (N.D.N.Y. 2009) (Suddaby, J.) (citing Second Circuit cases). For this reason, as one commentator has correctly observed, the "liberal" notice pleading standard "has its limits." 2 *Moore's Federal Practice* § 12.34[1][b] at 12-61 (3d ed. 2003). For example, numerous Supreme Court and Second Circuit decisions exist holding that a pleading has failed to meet the "liberal" notice pleading standard. *Rusyniak*, 629 F. Supp. 2d at 213, n.22 (citing Supreme Court and Second Circuit cases); *see also Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949-52 (2009).

Most notably, in *Bell Atl. Corp. v. Twombly*, the Supreme Court reversed an appellate decision holding that a complaint had stated an actionable antitrust claim under 15 U.S.C. § 1. *Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955 (2007). In doing so, the Court "retire[d]" the famous statement by the Court in *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957), that "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Twombly*, 127 S. Ct. at 1968-69. Rather than turn on the *conceivability* of an actionable claim, the Court clarified, the "fair notice" standard turns on the *plausibility* of an actionable claim. *Id.* at 1965-74. The Court explained that, while this does not mean that a pleading need "set out in detail the facts upon which [the claim is based]," it does mean that the pleading must contain at least "some factual allegation[s]." *Id.* at 1965. More specifically, the "[f]actual allegations must be enough to raise a right to relief above the speculative level [to a plausible level]," assuming (of course) that all the allegations in the complaint are true. *Id.*

As for the nature of what is "plausible," the Supreme Court explained that "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 129 S.Ct. at 1949. "[D]etermining whether a complaint states a plausible claim for relief ... [is] a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.... [W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged–but it has not show[n]–that the pleader is entitled to relief." *Id.* at 1950 (internal quotation marks and citations omitted). However, while the plausibility standard "asks for more than a sheer possibility that a defendant acted unlawfully," *id.*, it "does not impose a probability requirement." *Twombly*, 550 U.S. at 556.

Because of this requirement of factual allegations plausibly suggesting an entitlement to relief, "the tenet that a court must accept as true all of the allegations contained in the complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by merely conclusory statements, do not suffice." *Iqbal*, 129 S. Ct. at 1949. Similarly, a pleading that only "tenders naked assertions devoid of further factual enhancement" will not suffice. *Id.* (internal citations and alterations omitted). Rule 8 "demands

Case 9:19-cv-01161-DNH-TWD    Document 79    Filed 11/10/21    Page 69 of 125

Helijas v. Corr. Med. Care, Inc., Not Reported in Fed. Supp. (2016)

2016 WL 5374124

more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Id.* (citations omitted).

**\*9** Finally, a few words are appropriate regarding what documents are considered when a dismissal for failure to state a claim is contemplated. Generally, when contemplating a dismissal pursuant to Fed. R. Civ. P. 12(b)(6) or Fed. R. Civ. P. 12(c), the following matters outside the four corners of the complaint may be considered without triggering the standard governing a motion for summary judgment: (1) documents attached as an exhibit to the complaint or answer, (2) documents incorporated by reference in the complaint (and provided by the parties), (3) documents that, although not incorporated by reference, are "integral" to the complaint, or (4) any matter of which the court can take judicial notice for the factual background of the case.[10]

10      *See* Fed. R. Civ. P. 10(c) ("A copy of any written instrument which is an exhibit to a pleading is a part thereof for all purposes."); *L-7 Designs, Inc. v. Old Navy, LLC*, No. 10-573, 2011 WL 2135734, at \*1 (2d Cir. June 1, 2011) (explaining that conversion from a motion to dismiss for failure to state a claim to a motion for summary judgment is not necessary under Fed. R. Civ. P. 12[d] if the "matters outside the pleadings" in consist of [1] documents attached to the complaint or answer, [2] documents incorporated by reference in the complaint (and provided by the parties), [3] documents that, although not incorporated by reference, are "integral" to the complaint, or [4] any matter of which the court can take judicial notice for the factual background of the case); *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010) (explaining that a district court considering a dismissal pursuant to Fed. R. Civ. 12(b)(6) "may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint.... Where a document is not incorporated by reference, the court may nevertheless consider it where the complaint relies heavily upon its terms and effect, thereby rendering the document 'integral' to the complaint.... However, even if a document is 'integral' to the complaint, it must be clear on the record that no dispute exists regarding the authenticity or accuracy of the document. It must also be clear that there exist no material disputed issues of fact regarding the

relevance of the document.") [internal quotation marks and citations omitted]; *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2009) ("The complaint is deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference.") (internal quotation marks and citations omitted); *Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.*, 62 F.3d 69, 72 (2d Cir. 1995) (per curiam) ("[W]hen a plaintiff chooses not to attach to the complaint or incorporate by reference a [document] upon which it solely relies and which is integral to the complaint," the court may nevertheless take the document into consideration in deciding [a] defendant's motion to dismiss, without converting the proceeding to one for summary judgment.") (internal quotation marks and citation omitted).

## B. Legal Standards Governing Claim of Deliberate Indifference to Serious Medical Needs

"A prison official's 'deliberate indifference' to a substantial risk of serious harm to an inmate violates the Eighth Amendment." *Farmer v. Brennan*, 511 U.S. 825, 828 (1994) (quoting *Helling v. McKinney*, 509 U.S. 25, 25 [1993]).[11] Within that framework, "[t]he Cruel and Unusual Punishments Clause of the Eighth Amendment imposes a duty upon prison officials to ensure that inmates receive adequate medical care." *Salahuddin v. Goord*, 467 F.3d 263, 279 (2d Cir. 2006); *accord, Estelle v. Gamble*, 429 U.S. 97, 103 (1976). However, "[b]ecause society does not expect that prisoners will have unqualified access to health care, deliberate indifference to medical needs amounts to an Eighth Amendment violation only if those needs are 'serious.' " *Hudson v. McMillian*, 503 U.S. 1, 9 (1992) (citing *Estelle*, 429 U.S. at 103-04). In this context, a prison official violates the Eighth Amendment only when two requirements are satisfied. *Farmer*, 511 U.S. at 834.

11      *See also Iacovangelo v. Corr. Med. Care, Inc.*, 624 Fed.Appx. 10, 12 (2d Cir. 2015) ("A claim for indifference to the medical needs of a pre-trial detainee in state custody is properly analyzed under the Due Process Clause of the Fourteenth Amendment, though such claims 'should be analyzed under the same standard irrespective of whether they are brought under the Eighth or Fourteenth Amendment.' ") (quoting *Caiozzo v. Koreman*, 581 F.3d 63, 72 [2d Cir. 2009]).

Case 9:19-cv-01161-DNH-TWD    Document 79    Filed 11/10/21    Page 70 of 125

Helijas v. Corr. Med. Care, Inc., Not Reported in Fed. Supp. (2016)
2016 WL 5374124

### 1. Objective Requirement–Serious Medical Needs

**\*10** "The first requirement is objective: the alleged deprivation of adequate medical care must be 'sufficiently serious.' " *Salahuddin*, 467 F.3d at 279 (citation and internal quotation marks omitted); *accord, Farmer*, 511 U.S. at 834. Evaluation of the objective prong involves two inquiries: (1) "whether the prisoner was actually deprived of adequate medical care," and (2) "whether the inadequacy in medical care is sufficiently serious." *Salahuddin*, 467 F.3d at 279-80.

With regard to the first inquiry, because a prison official need only provide "reasonable care," one who acts reasonably in response to an inmate's health risk "cannot be found liable under the Cruel and Unusual Punishments clause." *Id.* at 279-80 (quoting *Farmer*, 511 U.S. at 845). "The word 'adequate' reflects the reality that '[p]rison officials are not obligated to provide inmates with whatever care the inmates desire.' " *Banks v. Annucci*, 48 F. Supp. 3d 394, 408-09 (N.D.N.Y. 2014) (Hurd, J.) (quoting *Jones v. Westchester Cty. Dep't of Corrs. Med. Dep't*, 557 F. Supp. 2d 408, 413 [S.D.N.Y. 2008]).

With regard to the second inquiry, determining whether the alleged inadequacy was "sufficiently serious" involves an examination of "how the offending conduct is inadequate and what harm, if any, the inadequacy has caused or will likely cause the prisoner." *Salahuddin*, 467 F.3d at 280 (citation omitted). If the unreasonable medical care alleged was a "failure to provide any treatment" for the inmate's medical condition, courts examine whether the condition itself is sufficiently serious. *Id.*; *see also Smith v. Carpenter*, 316 F.3d 178, 185-86 (2d Cir. 2003) ("There is no need to distinguish between a prisoner's underlying 'serious medical condition' and the circumstances of his 'serious medical need' when the prisoner alleges that prison officials have failed to provide general treatment for his medical condition.") (footnote omitted). "Factors relevant to the seriousness of a medical condition include whether 'a reasonable doctor or patient would find [it] important and worthy of comment,' whether the condition 'significantly affects an individual's daily activities,' and whether it causes 'chronic and substantial pain.' " *Salahuddin*, 467 F.3d at 280 (quoting *Chance v. Armstrong*, 143 F.3d 698, 702 [2d Cir. 1998]); *accord, Rodriguez v. Manenti*, 606 Fed.Appx. 25, 26 (2d Cir. 2015) (summary order); *Hathaway v. Coughlin*, 99 F.3d 550, 553 (2d Cir. 1996) ("Objectively, the alleged deprivation must be 'sufficiently serious,' in the sense that 'a condition of urgency,

one that may produce death, degeneration, or extreme pain' exists.") (citation omitted). "A finding of a serious medical need 'is necessarily contextual and fact-specific,' and thus 'must be tailored to the specific circumstances of each case.' " *Shenk v. Cattaraugus Cty.*, 305 Fed.Appx. 751, 753 (2d Cir. 2009) (summary order) (quoting *Smith*, 316 F.3d at 185).

However, "[i]n cases where the inadequacy is in the medical treatment given," as opposed to a complete absence of treatment, "the seriousness inquiry is narrower." *Salahuddin*, 467 F.3d at 280. "For example, if the prisoner is receiving ongoing treatment and the offending conduct is an unreasonable delay or interruption in that treatment, the seriousness inquiry 'focus[es] on the challenged delay or interruption in treatment rather than the prisoner's underlying medical condition alone.' " *Id.* (quoting *Smith*, 316 F.3d at 185). "In other words, the Court asks 'whether, from an objective standpoint, the temporary deprivation was sufficiently harmful to establish a constitutional violation.' " *Kidkarndee v. Koenigsmann*, 12-CV-0502, 2014 WL 1239319, at \*14 (N.D.N.Y. Mar. 25, 2014) (Suddaby, J., adopting Report-Recommendation of Hummel, M.J.) (quoting *Frank v. Cty. of Ontario*, 884 F. Supp. 2d 11, 19 [W.D.N.Y. 2012]). In short, although courts "sometimes speak of a 'serious medical condition' as the basis for an Eighth Amendment Claim, such a condition is only one factor in determining whether a deprivation of adequate medical care is sufficiently grave to establish constitutional liability." *Salahuddin*, 467 F.3d at 280.

### 2. Subjective Requirement–Deliberate Indifference

**\*11** "The second requirement for an Eighth Amendment violation is subjective: the charged official must act with a sufficiently culpable state of mind." *Salahuddin*, 467 F.3d at 280. "[A] complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment." *Estelle*, 429 U.S. at 106; *accord, Daniels v. Williams*, 474 U.S. 327, 331-33 (1986) (explaining that "injuries inflicted by governmental negligence are not addressed by the United States Constitution"). "[D]eliberate indifference [for purposes of an Eighth Amendment claim] describes a state of mind more blameworthy than negligence," *Farmer*, 511 U.S. at 835, equivalent to "subjective recklessness, as the term is used in criminal law." *Salahuddin*, 467 F.3d at 280; *Smith*, 316 F.3d at 184. "This mental state requires that the charged official act or fail to act while actually aware of a substantial risk that serious inmate harm

Case 9:19-cv-01161-DNH-TWD    Document 79    Filed 11/10/21    Page 71 of 125

*Helijas v. Corr. Med. Care, Inc.*, Not Reported in Fed. Supp. (2016)

2016 WL 5374124

will result." *Salahuddin*, 467 F.3d at 280; *accord, Farmer*, 511 U.S. at 837-38 ("An act or omission unaccompanied by knowledge of a significant risk of harm might well be something society wishes to discourage, and if harm does result society might well wish to assure compensation. The common law reflects such concerns when it imposes tort liability on a purely objective basis."). Because this inquiry is subjective, "[p]rison officials may ... introduce proof that they were not so aware, such as testimony that 'they knew the underlying facts but believed (albeit unsoundly) that the risk to which the facts gave rise was insubstantial or nonexistent.'" *Salahuddin*, 467 F.3d at 280 (quoting *Farmer*, 511 U.S. at 844). However, "evidence that the risk was obvious or otherwise must have been known to a defendant is sufficient to permit a jury to conclude that the defendant was actually aware of it." *Brock v. Wright*, 315 F.3d 158, 164 (2d Cir. 2003). "Whether a course of treatment was the product of sound medical judgment, negligence, or deliberate indifference depends on the facts of the case." *Chance*, 143 F.3d at 703.

## III. ANALYSIS

### A. Construction of Plaintiff's Second Amended Complaint

As an initial matter, a few words are appropriate regarding the nature of the claims and factual allegations set forth in Plaintiff's Second Amended Complaint. Plaintiff's "Second Cause of Action" is asserted against CMC, Dr. Valle, Umar, Carpio, D'Agostino, and Barrett, and is predicated on the "express policy, practices or the inactions of [CMC's] policy makers[.]" (Dkt. No. 75 at ¶ 47.) Plaintiff alleges that "these defendants failed to adopt appropriate policies regarding appropriate supervision and/or screening for [*sic*] detainees at the Schenectady County Jail who were in need of closer supervision because of mental health problems[.]" (*Id.*) Plaintiff further alleges that "one reason why [Wilkins] failed to receive adequate medical treatment was because of concerns by the above-listed defendants regarding the expenses involved in properly caring for him and other detainees." (*Id.* at ¶ 48.) Moreover, Plaintiff alleges that all Defendants "were acting under color of state law" at all times relevant to her claims. (*Id.* at ¶ 35.)

Irrespective of the labels denoting Plaintiff's claims set forth in, and the structure of, Plaintiff's Second Amended Complaint, the Court notes that "*Monell* does not create a standalone cause of action under which a plaintiff may sue over a governmental policy, regardless of whether he suffered

the infliction of a tort resulting from the policy." *Askins v. Doe No. 1*, 727 F.3d 248, 253 (2d Cir. 2013). Rather, "[l]iability under section 1983 is imposed on the municipality when it has promulgated a custom or policy that violates federal law and, pursuant to that policy, a municipal actor has tortiously injured the plaintiff." *Askins*, 727 F.3d at 253 (citing *Segal v. City of New York*, 459 F.3d 207, 219 [2d Cir. 2006] ["*Monell* does not provide a separate cause of action for the failure by the government to train its employees; it *extends* liability to a municipal organization where that organization's failure to train, or the policies or customs that it has sanctioned, led to an independent constitutional violation."] ). Establishing municipal liability thus requires a plaintiff to demonstrate that (1) he "suffered a tort in violation of federal law committed by the municipal actors," and (2) "that their commission of the tort resulted from a custom or policy of the municipality." *Id.* (citing *Monell*, 436 U.S. at 690-91). Relatedly, § 1983 claims asserted against local government officials in their official capacity are duplicative of claims asserted directly against the municipal organization on the basis of a municipal policy or custom pursuant to which a plaintiff's constitutional rights were violated. *See Kentucky v. Graham*, 473 U.S. 159, 167 n.14 (1985) ("There is no longer a need to bring official-capacity actions against local government officials, for under *Monell* ... local government units can be sued directly for damages and injunctive or declaratory relief."); *accord, e.g., Henning v. New York City Dep't of Corr.*, 14-CV-9798, 2016 WL 297725, at *1 (S.D.N.Y. Jan. 22, 2016) (concluding that, "because Plaintiff has failed to state a claim under *Monell*, any claims against the Individual Defendants in their official capacities must also be dismissed").

**\*12** Affording Plaintiff's Second Amended Complaint a liberal construction, the Court construes it to assert (1) a § 1983 claim against the individual Defendants (that is, deliberate indifference to Wilkins' serious medical needs, as set forth in Plaintiff's "First Cause of Action"), for which CMC and Schenectady County are also liable because the underlying constitutional violation was undertaken pursuant to a policy, custom, or practice of CMC and/or Schenectady County (as asserted in Plaintiff's "Second Cause of Action"); (2) a claim for wrongful death under New York State law (as asserted in Plaintiff's "Fourth Cause of Action"); and (3) claims for conscious pain and suffering (on behalf of Wilkins' estate) [12] and loss of companionship (on behalf of Wilkins' surviving children) under New York State Law (as asserted in Plaintiff's "Third Cause of Action"). (Dkt. No. 75 at ¶¶ 38-57.) To the extent that Plaintiff identifies Umar, Carpio, Dr. Valle, D'Agostino, and Barrett as the Defendants

Case 9:19-cv-01161-DNH-TWD    Document 79    Filed 11/10/21    Page 72 of 125

Helijas v. Corr. Med. Care, Inc., Not Reported in Fed. Supp. (2016)

2016 WL 5374124

at issue with respect to her "Second Cause of Action" (i.e. her *Monell* claim), the Court construes Plaintiff's "Second Cause of Action" as asserting official capacity claims against these Defendants.

12     "In contrast to a claim for wrongful death, which 'belongs to the decedent's distributees and is designed to compensate the distributees themselves for their pecuniary losses as a result of the wrongful act,' a claim for conscious pain and suffering may only be brought by 'the estate of the deceased, rather than the distributees.' " *Quinn v. U.S.*, 946 F. Supp. 2d 267, 277-78 (N.D.N.Y. 2013) (Suddaby, J.) (quoting *Cragg v. Allstate Indem. Corp.*, 17 N.Y.3d 118, 121 [N.Y. 2011]).

### B. Whether Plaintiff's Deliberate Indifference Claim Should Be Dismissed with Respect to Morgan and Dr. Valle [13]

13     Because these Defendants are implicated directly in the provision of medical care to Wilkins, the Court considers their respective motions together.

After carefully considering the matter, the Court answers this question in the negative for substantially the reasons set forth in Plaintiff's opposition memoranda of law. (Dkt. No. 30 at 10-15 [Plf.'s Opp'n Memo. of Law to CMC Defs.' Mtn.]; Dkt. No. 85 at 6-10 [Plf.'s Opp'n Memo. of Law to Valle's Mtn. to Dismiss Plf.'s Second Am. Compl.].) To these reasons, the Court adds the following analysis, which is intended to supplement (and not to supplant) the reasons.

The crux of the above-referenced Defendants' arguments with respect to Plaintiff's deliberate indifference claim is that no one communicated the seriousness of Plaintiff's condition to them. Specifically, CMC Defendants acknowledge that suicidality is a serious medical condition for purposes of Plaintiff's deliberate indifference claim. (Dkt. No. 16 at 11 [CMC Defs.' Memo. of Law] ["Admittedly, suicide is a serious condition, as required by this cause of action."].) Instead, CMC Defendants argue that (1) Plaintiff has failed to allege facts plausibly suggesting that the seriousness of Wilkins' condition was communicated to them and (2) although Plaintiff's factual allegations "potentially demonstrate a lapse in medical care," they do not plausibly suggest deliberate indifference to Wilkins' serious medical needs. (*Id.* at 11-13.)

Similarly, Dr. Valle argues that "this is a 'medical delay' case," and that the delay in time to which Wilkins was subjected in order to see Dr. Valle–eight days–was not sufficiently harmful. [14] (Dkt. No. 83, Attach. 3, at 9-10 [Valle's Memo. of Law].) Dr. Valle further argues that the length of the delay in seeing Wilkins was the result of Wilkins' failure to communicate the seriousness of his condition. (*Id.* at 10 ["Plaintiff never pleaded that decedent told ... Morgan that he was experiencing suicidal ideations."] [footnote omitted]; *id.* at 11 ["Decedent never made defendant Morgan aware, and thus defendant Morgan never made defendant Valle aware, that he was experiencing suicidal ideation."] ). Accordingly, Dr. Valle argues that Plaintiff has not adequately pleaded that he was deliberately indifferent toward Wilkins (i.e., the subjective prong of the legal standard) because, again, Plaintiff has not alleged facts plausibly suggesting that Valle was aware of Plaintiff's condition. (*Id.* at 12-13 [arguing that plaintiff's allegation regarding reports from other inmates "does not help because plaintiff does not allege that defendant Valle was ever made aware of this information."].)

14     This eight-day period appears to refer to the time between the date on which Morgan placed Wilkins on Dr. Valle's wait list and the date of Wilkins' suicide. Of course, this argument presumes that the "delay" or "interruption" in treatment would not have actually been longer (i.e., that Dr. Valle would have seen and/or treated Plaintiff on the eighth day, but for Wilkins' suicide). Plaintiff does not allege that Wilkins was actually scheduled to be seen by Dr. Valle on any particular date.

**\*13** With respect to the objective prong of an Eighth Amendment claim, "courts have found that depression with suicidal ideation, or severe anxiety attacks are sufficiently severe conditions to meet the objective element of the deliberate indifference standard." *Allah v. Kemp*, 08-CV-1008, 2010 WL 1036802, at \*6 n.9 (N.D.N.Y. Feb. 25, 2010), *adopted*, 2010 WL 1035657, at \*1 (N.D.N.Y. Mar. 18, 2010) (Mordue, C.J.) (citing *Covington v. Westchester Cty. Dep't of Corr.*, 06-CV-5369, 2010 WL 572125, at \*6 [S.D.N.Y. Jan. 25, 2010] and *Zimmerman v. Burge*, 06-CV-0176, 2009 WL 3111429, at \*8 [N.D.N.Y. Sept. 24, 2009] [Sharpe, J., adopting Report-Recommendation of Lowe, M.J.] ).

With respect to the subjective prong of an Eighth Amended claim, Plaintiff's Second Amended Complaint alleges, *inter alia*, the following: (1) on May 16, 2014, Wilkins submitted

Case 9:19-cv-01161-DNH-TWD    Document 79    Filed 11/10/21    Page 73 of 125

*Helijas v. Corr. Med. Care, Inc.*, Not Reported in Fed. Supp. (2016)

2016 WL 5374124

a sick call slip, in which he complained of "really bad" anxiety and panic attacks, depression, trouble sleeping, and feeling tired and weak (Dkt. No. 75 at ¶ 17); (2) on May 19, 2014, Jane Doe No. 1 "triaged" his sick call slip and concluded, from her observations and conversations with Wilkins, that he was "exhibiting obvious signs of depression and suicidal observation [*sic*]" (*id. at* ¶ 18); (3) on May 20, 2014 (four days later after Wilkins submitted his sick call slip), Morgan (a licensed clinical social worker) conducted "a 'brief' mental health screening and assessment" (*id. at* ¶ 19); (4) during that visit, (a) Morgan "directly observed" Wilkins' shortness of breath, rapid speech, "anxious motor activity, "an inability to sit still, heart palpitations when panicking, and anxiety" (*id.*), (b) Wilkins informed Morgan of a "prior involuntary commitment" and his "history of mental health issues," including panic attacks and depression, which had grown worse since being detained at the Jail (*id.*) and (c) Wilkins talked about "several significant issues in his life," including his criminal case and "his wife's health" (*id.*); and (5) other inmates also reported, to unspecified individuals, that Wilkins (a) was "severely depressed," (b) "threatened to commit suicide on multiple occasions," (c) was "being denied medical treatment," (d) felt "unhappy" and "left alone," (e) attempted to "scratch a tattoo ... off of his neck," and (f) was overheard "screaming on the phone" the night of his death (*id.* at ¶ 22). Despite the complaints and medical history that Wilkins relayed to Jane Doe No. 1 and Morgan, as well as Morgan's observations, Morgan merely gave Wilkins "literature" on anxiety-coping skills and relaxation techniques and placed him on a wait list to see Dr. Valle (where he remained for eight days until his suicide). (*Id.* at ¶ 21.)

Accepting Plaintiff's factual allegations as true, the Court concludes that Plaintiff has, albeit barely,[15] adequately pleaded a claim for deliberate indifference to Wilkins' serious medical needs, based upon a medical condition that was sufficiently communicated to the moving Defendants.[16] To the extent Defendants argue that they lacked the requisite subjective culpability to support Plaintiff's deliberate indifference claim, this argument presumes the existence of a factual record supporting it.[17] *See Farmer*, 511 U.S. at 842 ("Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways ...."); *Chance*, 143 F.3d at 703 ("Whether a course of treatment was the product of sound medical judgment, negligence, or deliberate indifference depends on the facts of the case.").

[15]   CMC Defendants argue that Plaintiff's Second Amended Complaint does not specify the identity of "other inmates" who made "reports" of Wilkins' troubling behavior and statements preceding his suicide, to whom those reports were made, or when those reports were made. (Dkt. No. 16 at 12.) The Court concludes that, in light of Plaintiff's other factual allegations (taken together and accepted as true), Plaintiff's failure to allege these specifics does not (at this stage of the litigation) warrant dismissal of her deliberate indifference claim. *Twombly*, 127 S. Ct. at 1974 ("[w]e do not require heightened fact pleading of specifics ...."). The Court offers no opinion whether Plaintiff's claim may survive a motion for summary judgment.

[16]   Although Dr. Valle identifies the alternative way that he was allegedly deliberately indifferent (Dkt. No. 3, Attach. 3, at 8-9; *accord*, Dkt. No. 75 at ¶ 21 [alleging that "Morgan failed to inform Dr. Valle of the emergent nature of" Wilkins' symptoms, or, "[a]lternatively," Morgan "did inform Dr. Valle ... and [Dr. Valle] failed to take action"] ), Dr. Valle does not argue that Plaintiff's use of alternative pleading is improper under the circumstances. Generally, such alternative pleading is permissible. Fed. R. Civ. P. 8(d)(2). Moreover, in her memorandum of law in opposition to Dr. Valle's motion to dismiss, Plaintiff "acknowledges that [s]he cannot state a [d]eliberate [i]ndifference claim against ... [Dr.] Valle if he was not actually informed about ... Plaintiff's deteriorating mental health condition." (Dkt. No. 85 at 6 [footnote omitted].)

[17]   In support of his motion to dismiss, Dr. Valle has filed an exhibit titled "Intake Mental Health Screening and Assessment." (Dkt. No. 83, Attach. 1 [capitalization omitted].) The form reflects that Wilkins did have a history of psychiatric care, prescribed psychotropic medications, and a psychiatric commitment. (*Id.*) However, as Dr. Valle observes, the form also reflects that Wilkins scored only "3 Yes's" based (presumably) on his responses to Morgan's questions; the form directs the screener completing it to "alert Shift Commander and place inmate on constant observation" where the detainee scores an "8" or more. (*Id.*) The form was not attached

Case 9:19-cv-01161-DNH-TWD    Document 79    Filed 11/10/21    Page 74 of 125

Helijas v. Corr. Med. Care, Inc., Not Reported in Fed. Supp. (2016)

2016 WL 5374124

to Plaintiff's Second Amended Complaint or expressly referenced therein, but, as discussed above, some of Plaintiff's central factual allegations concern what information Wilkins conveyed to Morgan. Under the circumstances, even assuming that this document may properly be considered on Dr. Valle's motion to dismiss, the Court concludes that its contents do not "contradict" Plaintiff's factual allegations, such that Plaintiff's factual allegations related to his screening by Morgan are stripped of their presumption of truth for purposes the pending motions to dismiss. *Cf. Amidax Trading Grp. v. S.W.I.F.T. SCRL*, 671 F.3d 140, 147 (2d Cir. 2011). The form may be persuasive to a factfinder charged with determining whether Morgan and/or Dr. Valle were made aware of the seriousness of Plaintiff's medical condition. At this stage, however, the document (which, presumably, was created by Morgan) reflects a factual dispute between the parties that is potentially pivotal to Plaintiff's deliberate indifference claim.

**\*14** Accordingly, CMC Defendants' motion to dismiss Plaintiff's deliberate indifference claim is denied with respect to Morgan, and Dr. Valle's motion to dismiss Plaintiff's deliberate indifference claim to, the extent that it is asserted against him in his personal capacity, is also denied.

### C. Whether Plaintiff's Deliberate Indifference Claim Should Be Dismissed as to Umar and Carpio for Failure to Allege Facts Plausibly Suggesting Personal Involvement in the Violation of His Constitutional Rights

After carefully considering the matter, the Court answers this question in the affirmative for the reasons stated in CMC Defendants' memoranda of law. (Dkt. No. 16 at 13-14 [CMC Defs.' Memo. of Law]; Dkt. No. 35 at 10-12 [CMC Defs.' Reply Memo. of Law].)

The Court would add only that the single substantive factual allegation referencing Umar or Carpio in Plaintiff's Second Amended Complaint is as follows:

> Defendant CMC, together with its President Emre Umar and owner Maria Carpio (who are married to each other), have engaged in a well-documented pattern and practice of providing inadequate and unqualified medical providers at the various facilities they manage, as well as inadequate medical and mental health care in general. Included in these practices is the affirmative policy of CMC in basing its employee's salaries, and continued retention, on the number of times that they send detainees to outside medical providers. The basis for this pattern and practice is simple: Money. [CMC] takes enormous sums from various municipalities throughout New York State, some of which are provided by contracts secured through political contributions, and then provides inadequate staffing and medical care in the name of profitability. The contracts that CMC has with various county governments are "all inclusive," with every dollar that CMC pays for outside medical providers coming directly through CMC's profit margins.

(Dkt. No. 75 at ¶ 25.)

Based upon this singular reference to the role of Umar and Carpio (even when it is considered in conjunction with the other factual allegations set forth in Plaintiff's Second Amended Complaint), the Court concludes that Plaintiff has not alleged facts plausibly suggesting that Umar or Carpio were personally involved in any violation of Wilkins' constitutional rights.

As CMC Defendants correctly note, Umar and Carpio cannot be held liable under § 1983 solely on the basis of their supervisory positions. (Dkt. No. 16 at 14 [CMC Defs.' Memo. of Law].) Rather, a supervisory official's personal involvement must be shown by evidence demonstrating that the official did the following: (1) "participated directly in the" constitutional violation complained of, (2) "after being informed of the violation through a report or appeal, failed to remedy the wrong," (3) "created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom," (4) "was grossly negligent in supervising subordinates who committed the wrongful acts," or (5) "exhibited deliberate indifference

Case 9:19-cv-01161-DNH-TWD   Document 79   Filed 11/10/21   Page 75 of 125

Helijas v. Corr. Med. Care, Inc., Not Reported in Fed. Supp. (2016)

2016 WL 5374124

to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring." *Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995); *accord, Henderson v. Fischer*, 12-CV-1704, 2015 WL 1413965, at *9-10 (N.D.N.Y. Mar. 18, 2015) (McAvoy, J., adopting Report-Recommendation of Dancks, M.J.).

**\*15** However, Plaintiff has not alleged facts plausibly suggesting that Umar or Carpio were personally involved under either the first or second *Colon* prongs (that is, that they participated directly in Wilkins' medical care or were informed of any constitutional violation and failed to remedy it). Moreover, for the same reasons discussed below in Part III.D of this Decision and Order (with respect to whether Wilkins' rights were violated pursuant to a policy or custom of CMC), Plaintiff's allegation that Umar and Carpio were personally involved in the violation of Wilkins' constitutional rights because they "cut corners" in the name of profit at other facilities is entirely conclusory and/or conjectural. With respect to the fourth *Colon* prong, Plaintiff does not allege in her Second Amended Complaint that Umar or Carpio had supervisory responsibility with respect to either Morgan or Dr. Valle. [18] Moreover, Plaintiff does not allege facts plausibly suggesting the manner in which the supervision of medical staff at the Jail was grossly negligent, or a causal connection between any such gross negligence in supervision and Wilkins' death. Finally, Plaintiff has not alleged facts plausibly suggesting that Umar or Carpio failed to act on information that unconstitutional acts were occurring at the Jail, given the relatively small number of factually unrelated incidents that allegedly occurred at other facilities (in previous years) at which CMC provided medical services across New York State.

[18]    In her Second Amended Complaint, Plaintiff alleges that Dr. Valle was "responsible for providing mental health care at the ... Jail, and for supervising mental health staff employed by CMC at the ... Jail." (Dkt. No. 75 at ¶ 11.) It is not clear from Plaintiff's Second Amended Complaint whether Umar or Carpio had any medical education or training, or who (if anyone) served in a supervisory or directorial role for CMC at the Jail. Moreover, Plaintiff has not alleged facts plausibly suggesting that Dr. Valle's supervision of Morgan was inadequate, the manner in which it was inadequate, or that Dr. Valle's supervision had

a causal relationship with the violation of Wilkins' constitutional rights.

For each of these reasons, as well as those set forth in CMC Defendants' memoranda of law, Plaintiff's deliberate indifference claim is dismissed as asserted against Umar and Carpio in their individual capacities. [19]

[19]    "Although the Supreme Court's decision in *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), may have heightened the requirements for showing a supervisor's personal involvement with respect to certain constitutional violations, we need not reach *Iqbal*'s impact on *Colon* in this case, for [Plaintiff's] [Second Amended C]omplaint did not adequately plead [Umar's or Carpio's] personal involvement even under *Colon*." *Shaw v. Prindle*, 15-CV-2883, 2016 WL 4578630, at *1 n.2 (2d Cir. Sept. 1, 2016) (quoting *Grullon v. City of New Haven*, 720 F.3d 133, 139 [2d Cir. 2013]).

**D. Whether Plaintiff's Deliberate Indifference Claim Should Be Dismissed with Respect to CMC**

After carefully considering the matter, the Court answers this question in the affirmative for the reasons stated in CMC Defendants' reply memorandum of law. (Dkt. No. 35 at 11-12 [CMC Defs.' Reply Memo. of Law].) [20]

[20]    "Corporate entities ... are treated the same as a municipality when performing the public function of running a jail." *Mercado v. City of New York*, 08-CV-2855, 2011 WL 6057839, at *7 n.10 (S.D.N.Y. Dec. 5, 2011) (citations omitted). Thus, CMC "enjoys the benefits of the *Monell* requirements for the same reason it may be named as a defendant in a § 1983 suit." *Cruz v. Corizon Health Inc.*, 13-CV-2563, 2016 WL 4535040, at *8 n.11 (S.D.N.Y. Aug. 29, 2016) (quoting *Bess v. City of New York*, 11-CV-7604, 2013 WL 1164919, at *2 [S.D.N.Y. Mar. 19, 2013]) (concluding that "[t]he analysis under *Monell* ... applies equally to Corizon," a private entity that "provides medical care in prisons and thus 'performs a role traditionally within the exclusive prerogative of the state' "); *see generally Rojas v. Alexander's Dep't Store, Inc.*, 924 F.2d 406, 409 (2d Cir. 1990) ("Although *Monell* dealt with municipal employers, its rationale has been extended to private businesses.").

Case 9:19-cv-01161-DNH-TWD    Document 79    Filed 11/10/21    Page 76 of 125

Helijas v. Corr. Med. Care, Inc., Not Reported in Fed. Supp. (2016)

2016 WL 5374124

The Court would add only that Plaintiff has not alleged facts plausibly suggesting that CMC has a policy of making decisions regarding medical intervention based on cost and profitability concerns, much less that Wilkins' harm was causally connected to such a policy; Plaintiff's factual allegations in this respect are conclusory and/or conjectural. Moreover, Plaintiff has not alleged facts plausibly suggesting "a sufficiently widespread practice among" CMC employees generally, or at the Jail in particular, to support the conclusion that insufficient screening and supervision of detainees with respect to medical and/or mental health problems was a custom of which CMC supervisory personnel was aware. *See Iacovangelo,* 624 Fed.Appx. at 14 ("Here, although Correctional Medical Care appears to have a troubled track record in many respects, the plaintiff has not pleaded a *custom* of not providing adequate medical supervision for inmates going through drug or alcohol withdrawal.").[21]

[21]

In *Iacovangelo,* the Second Circuit affirmed that portion of the district court's order dismissing a *Monell* claim similar to that asserted in this case. *See Iacovangelo v. Corr. Med. Care, Inc.,* 13-CV-6466, 2014 WL 4955366, (W.D.N.Y. Oct. 2, 2014), *aff'd in part, vacated in part, and remanded, Iacovangelo,* 624 Fed.Appx. at 13–14 ("The Court finds that given the very large number of inmates that CMC employees must have treated over the years on a continuous basis, nine unrelated deaths, five of which were by suicide and one of which was due to an undetermined cause, over the course of several years does not plausibly suggest the existence of a policy of providing sub-standard care in order to save money, such as is alleged here."); *see also McNulty v. Yaneka,* 11-CV-8320, 2013 WL 684448, at *9 (S.D.N.Y. Feb. 25, 2013) ("Plaintiff's speculative and conclusory allegations of an unlawful custom or practice are insufficient to support a claim of municipal liability against CMC. Plaintiff's theory that CMC has a policy of making medical decisions based on cost is based on mere conjecture. Even accepting as true Plaintiff's allegation that the number of suicides and deprivations of medical treatment has increased since CMC became the medical provider at [Dutchess County Jail], Plaintiff has failed to allege any factual nexus between these incidents and any alleged policy or custom by CMC."). Even if the handful of other incidents referenced in Plaintiff's Second Amended Complaint were similar to the acts or omissions to which Wilkins was allegedly subjected, Plaintiff has not alleged facts plausibly suggesting (1) that CMC Defendants were found to be liable in some way for those other incidents, or (2) a sufficiently widespread or pervasive custom such that CMC may be held liable for the violation of Wilkins' constitutional rights in this case. *See, e.g., Walker v. City of New York,* 12-CV-5902, 2014 WL 1259618, at *3 (S.D.N.Y. Mar. 18, 2014) ("The paltry [ten] complaints (none resulting in an adjudication of liability), spread over [a decade] in a city so large, hardly suggests the frequency or pervasiveness of the purported custom that is required to state a *Monell* claim.").

*16 For each of these reasons, as well as those set forth in CMC Defendants' memoranda of law, Plaintiff's deliberate indifference claim is dismissed as to CMC.[22]

[22]

To the extent that Plaintiff's reference to Umar, Carpio, and Dr. Valle in the caption of her "Second Cause of Action" reflects her intention to assert § 1983 claims against them in their official capacities (Dkt. No. 75 at 12), those claims must also be dismissed because they are duplicative of her *Monell* claim against CMC. *Henning,* 2016 WL 297725, at *1; *accord, Davis v. Stratton,* 360 Fed.Appx. 182, 183 (2d Cir. 2010).

**E. Whether Plaintiff's Wrongful Death Claim Should Be Dismissed**

After carefully considering the matter, the Court answers this question in the negative for the reasons stated in Plaintiff's opposition memoranda of law.[23] (Dkt. No. 30 at 29-30; Dkt. No. 85 at 14-16.) The Court would add only two brief points.

[23]

"Under New York law, as a general matter, the elements of a wrongful-death action are '(1) the death of a human being born alive; (2) a wrongful act, neglect or default of the defendant by which the decedent's death was caused, provided the defendant would have been liable to the deceased had death not ensued; (3) the survival of distributees who suffered pecuniary loss by reason of the death of decedent; and (4) the appointment of a personal representative of the decedent.' " *Kastle v. Town of Kent, N.Y.,* 13-CV-2256, 2014

Case 9:19-cv-01161-DNH-TWD  Document 79  Filed 11/10/21  Page 77 of 125

Helijas v. Corr. Med. Care, Inc., Not Reported in Fed. Supp. (2016)

2016 WL 5374124

WL 1508703, at *14 (S.D.N.Y. Mar. 21, 2014) (citations and internal quotation marks omitted).

First, CMC Defendants do not expressly argue that dismissal is warranted with respect to Plaintiff's wrongful death claim. (Dkt. No. 16 at 15-16 [CMC Defs.' Memo. of Law, addressing only Plaintiff's claim for conscious pain and suffering and damages for loss of companionship].) [24]

> [24]  To the extent that Defendants may be understood to argue that Plaintiff has not sufficiently identified his distributees, the Court finds this argument unpersuasive at the motion to dismiss stage. *See, e.g., Melvin v. Cty. of Westchester*, 14-CV-2995, 2016 WL 1254394, at *23 (S.D.N.Y. Mar. 29, 2016) (rejecting argument that allegation that decedent had "at least four children who are his surviving next of kin" was not sufficiently specific to state a wrongful death claim).

Second, in his reply memorandum of law, Dr. Valle argues that Plaintiff has failed to adequately plead that Dr. Valle's "actions constituted any more than a disagreement in treatment." (Dkt. No. 87 at 15.) This argument may prove persuasive based on an evidentiary record on a motion for summary judgment or at trial, because it will be incumbent on Plaintiff to demonstrate either ordinary negligence or medical malpractice on the part of Dr. Valle to support her wrongful death claim. However, for the same reasons discussed in the context of Plaintiff's deliberate indifference claim, the Court concludes that Plaintiff has adequately pleaded a claim for wrongful death under New York State law.

### F. Whether Plaintiff's Claim for Conscious Pain and Suffering Should Be Dismissed

After carefully considering the matter, the Court answers this question in the negative for the reasons stated in Plaintiff's opposition memorandum of law. (Dkt. No. 30 at 28-30 [Plf.'s Opp'n Memo. of Law to CMC Defs.' Mtn.].)

**\*17**  The Court would add only that, although Plaintiff's Second Amended Complaint does not alleged facts revealing the manner in which Wilkins took his own life (a fact which would presumably be within the knowledge of Defendants) or the nature or length of suffering before his death, at least one New York State court has suggested that damages of conscious pain and suffering may be recoverable on the theory that a defendant's treatment of the decedent's depression prior to suicide exacerbated the condition. *See Stolarski v. Family*

*Servs. of Westchester, Inc.,* 110 A.D.3d 980, 982 (N.Y. App. Div. 2d Dep't 2013) (stating that plaintiff was not precluded from "attempting to prove her entitlement to [conscious pain and suffering] damages on the theory that the decedent's [depression] was exacerbated by Family Services' alleged failure to provide proper treatment" before her suicide).

### G. Whether Plaintiff's Claim for Damages on Behalf of Wilkins' Children Should Be Dismissed

After carefully considering the matter, the Court answers this question in the negative for the reasons stated in Plaintiff's memoranda of law. (Dkt. No. 30 at 29-30 [Plf.'s Opp'n Memo. of Law to CMC Defs.' Mtn.].) Here, because dismissal of Plaintiff's wrongful death claim is unwarranted at this stage, the Court concludes dismissal of her claim for damages on behalf of Wilkins' children is also unwarranted. However, a point of clarification is in order.

Plaintiff's Second Amended Complaint seeks damages for "loss of companionship for the children of Wilkins." (Dkt. No. 75 at ¶ 53.) New York law "steadfastly restrict[s] recovery [in a wrongful death action] to 'pecuniary injuries,' or injuries measurable by money, and denied recovery for grief, loss of society, affection, conjugal fellowship and consortium[.]" *Gonzalez v. New York City Housing Auth.,* 77 N.Y.2d 663, 667-68 (N.Y. 1991). The word "pecuniary is "used in distinction to those injuries to the affections and sentiments which arise from the death of relatives" and "excludes those losses which result from the deprivation of the society and companionship of relatives[.]" *Gonzalez,* 77 N.Y.2d at 667.

CMC Defendants' argument that Wilkins' children are not "automatically" entitled to such damages is well-taken. (Dkt. No. 16 at 14-15 [CMC Defs.' Memo of Law]; Dkt. No. 35 at 13 [CMC Defs.' Reply Memo. of Law].) "[T]he essence of the cause of action for wrongful death ... is that the plaintiff's reasonable expectancy of future assistance or support by the decedent was frustrated by the decedent's death." *Gonzalez,* 77 N.Y.2d at 668. "The fact that there are children who are distributees of the estate is not, by itself, sufficient to establish that there was a pecuniary loss." *Melvin,* 2016 WL 1254394, at *23 n.17 (quoting *Pub. Adm'r of Queens Cty. ex rel. Estate & Beneficiaries of Guzman v. City of N.Y.,* 06-CV-7099, 2009 WL 498976, at *12 [S.D.N.Y. Feb. 24, 2009]). Although the Court can (barely) reasonably infer from Plaintiff's Second Amended Complaint a plausible assertion to entitlement to such damages, "going forward, Plaintiff will need to offer

Case 9:19-cv-01161-DNH-TWD   Document 79   Filed 11/10/21   Page 78 of 125

Helijas v. Corr. Med. Care, Inc., Not Reported in Fed. Supp. (2016)

2016 WL 5374124

proof of pecuniary loss." *Melvin*, 2016 WL 1254394, at *23 n.17.

### H. Whether Plaintiff's Claim for Punitive Damages Should Be Dismissed

After carefully considering the matter, the Court answers this question in the negative for the reasons set forth in Plaintiff's opposition memoranda of law. (Dkt. No. 30 at 27-28; Dkt. No. 85 at 17-18.) The Court would add only two brief points.

First, "[a] demand or request for punitive damages is parasitic and possesses no viability absent its attachment to a substantive cause of action." *Quinn*, 946 F. Supp. 2d at 286 (quoting *Yong Wen Mo v. Gee Ming Chan*, 17 A.D.3d 356, 359 [N.Y. App. Div. 2d Dep't 2005]).

Second, as Defendants correctly note (Dkt. No. 16 at 16 [CMC Defs' Memo. of Law]; Dkt. No. 83, Attach. 3, at 21 [Valle's Memo. of Law] ), "[t]o recover punitive damages under § 1983 against a government official in his individual capacity, the Plaintiff must show that the official acted with a malicious or evil intent or in callous disregard of the Plaintiff's federally protected rights." *Pritchard v. Town of New Hartford*, 14-CV-1477, 2016 WL 4523986, at *4 n.2 (N.D.N.Y. Aug. 22, 2016) (McAvoy, J.) (citing *Smith v. Wade*, 461 U.S. 30 [1983]); *accord, Wilson v. Aquino*, 233 Fed.Appx. 73, 77 (2d Cir. 2007). Although the Court is skeptical of Plaintiff's entitlement to punitive damages, under the circumstances, whether the individual Defendants possessed the requisite "callous disregard" is a question more appropriately addressed with the benefit of an evidentiary record.

### I. Whether Dr. Valle's Motion to Dismiss Cross-Claims Interposed by County Defendants Should Be Dismissed

**\*18** After carefully considering the matter, the Court answers this question in the negative for the reasons set forth in County Defendants' opposition memorandum of law. (Dkt. No. 98 at 2-5 [County Defs.' Opp'n Memo of Law to Valle's Mtn. to Dismiss Cross-Claims].)

### J. Whether Plaintiff Should Be Permitted to Amend Her Second Amended Complaint

As noted above, Plaintiff argues in her opposition memoranda of law (at various points) that, prior to dismissal of any of her claims, she should be granted leave to amend her

Second Amended Complaint to supplement (again) her factual allegations. (Dkt. No. 30 at 20, 23, 30; Dkt. No. 85 at 18-20). Additionally, in a letter dated September 19, 2016, addressed to United States Magistrate Judge Daniel J. Stewart, Plaintiff's counsel has requested a motion conference "to discuss [the] need to amend [Plaintiff's Second Amended] Complaint." (Dkt. No. 112 at 1.) More specifically, Plaintiff's counsel asserts that further amplification of Plaintiff's factual allegations is necessary to address pleading deficiencies upon which Defendants' motions to dismiss are based. (*Id.*) In conjunction with this request (which, Plaintiff's counsel notes, Defendants oppose), Plaintiff's counsel also requests that "a decision on Defendants' [m]otion[s] to [d]ismiss be held in abeyance" until the Court determines whether Plaintiff should again be permitted to amend her Second Amended Complaint. (*Id.* at 2.)

First, with regard to Plaintiff's alternative requests to amend in her opposition memoranda of law, "numerous courts have held that a 'bare request to amend a pleading' contained in a brief, which does not also attach the proposed amended pleading, is improper under Fed. R. Civ. P. 15." *Garnett-Bishop v. N.Y. Cmty. Bancorp, Inc.*, 12-CV-2285, 2014 WL 5822628, at *5 (E.D.N.Y. Nov. 6, 2014) (collecting cases); *see also Shah v. Helen Hayes Hosp.*, 252 Fed.Appx. 364, 366 (2d Cir. 2007) ("A party may not use his or her opposition to a dispositive motion as a means to amend the complaint."); *Matthew v. Corning Inc.*, 77 F. Supp. 3d 275, 301 (W.D.N.Y. 2014). Moreover, Local Rule 7.1(a)(4) of the Court's Local Rules of Practice requires that a party seeking leave to amend a pleading must "attach an unsigned copy of the proposed amended pleading to its motion papers," and "set forth specifically the proposed insertions and deletions of language and identify the amendments in the proposed pleading, either through the submission of a redline/strikeout version of the pleading sought to be amended or through other equivalent means." N.D.N.Y. L.R. 7.1(a)(4). Plaintiff has not done this.

Alternatively, Plaintiff has not shown cause for her request. Specifically, Plaintiff has not shown why she could not have, through the exercise of due diligence, obtained the "new" evidence on which she relies before she filed her Second Amended Complaint. Nor has she shown the lack of undue prejudice to Defendants if the amendment is allowed.

Finally, Plaintiff's September 19, 2016, letter request–which was addressed to Magistrate Judge Stewart and seeks to hold the decision of this Court on Defendants' motions to dismiss in abeyance–is both completely without legal basis and in

Case 9:19-cv-01161-DNH-TWD    Document 79    Filed 11/10/21    Page 79 of 125

Helijas v. Corr. Med. Care, Inc., Not Reported in Fed. Supp. (2016)

2016 WL 5374124

contravention of the Court's Local Rules of Practice. CMC Defendants' motion to dismiss was filed in December 2015, and at no point in the nine-plus months since that time (or, indeed, since this case was filed) have the parties consented to Magistrate Judge Stewart exercising jurisdiction over, *inter alia*, the handling and determination of the parties' dispositive motions. *See* N.D.N.Y. L.R. 72.2(b), 72.3(b); 28 U.S.C. § 636(c).

**\*19** For each of these reasons, Plaintiff's improperly interposed request to amend her Second Amended Complaint is denied.

**ACCORDINGLY,** it is

**ORDERED** that CMC Defendants' motion to dismiss Plaintiff's Second Amended Complaint (Dkt. No. 16) is **GRANTED in part and DENIED in part**; and it is further

**ORDERED** that Dr. Valle's motion to dismiss Plaintiff's Second Amended Complaint (Dkt. No. 83) is **GRANTED in part and DENIED in part**; and it is further

**ORDERED** that Dr. Valle's motion to dismiss cross-claims interposed by Defendants Schenectady County, D'Agostino, and Barrett (Dkt. No. 97) is **DENIED**; and it is further

**ORDERED** that Plaintiff's First Cause of Action (asserting a claim of deliberate indifference to decedent's serious medical needs, in violation of the Eighth Amendment of the United States Constitution) is **DISMISSED** with respect to only Defendants Umar and Carpio in their personal capacities; and it is further

**ORDERED** that Plaintiff's Second Cause of Action (asserting municipal liability and official capacity claims for the violations asserted in Plaintiff's First Cause of Action) is **DISMISSED** with respect to Defendants CMC, Umar, Carpio, and Dr. Valle; and it is further

**ORDERED** that surviving Defendants' motions are the following claims:

(1) Plaintiff's First Cause of Action with respect to Defendants Morgan, Dr. Valle, D'Agostino, and Barrett in their personal capacities;

(2) Plaintiff's Second Cause of Action with respect to Defendants Schenectady County and Defendants D'Agostino and Barrett in their official capacities;

(3) Plaintiff's Third Cause of Action with respect to all Defendants;

(4) Plaintiff's Fourth Cause of Action with respect to all Defendants;

(5) all claims with respect to John Does No. 4 and 5 and Jane Doe No. 1; and

(6) all cross-claims that have been interposed in this action; and it is further

**ORDERED** that Plaintiff's letter request (Dkt. No. 112) to amend her Second Amended Complaint is **DENIED**; and it is further

**ORDERED** that Defendants file an answer to the Plaintiff's Second Amended Complaint within 14 days of the date of this Decision & Order pursuant to Fed.R.Civ.P. Rule 12(a)(4)(a).

Dated: September 26, 2016.

**All Citations**

Not Reported in Fed. Supp., 2016 WL 5374124

---

End of Document

© 2021 Thomson Reuters. No claim to original U.S. Government Works.

2010 WL 5860290
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Kah'sun Creator ALLAH, Plaintiff,
v.
Tim KEMP, Office of the Mental Health
Unit Chief, Upstate Correctional Facility;
Wayne Crosier, Mental Health Social Worker,
Upstate Correctional Facility, Defendants.

No. 9:08–CV–1008 (NAM/GHL).
|
Nov. 9, 2010.

**Attorneys and Law Firms**

Kah'Sun Creator Allah, Comstock, NY.

Hon. Andrew M. Cuomo, Charles J. Quackenbush, Esq., of Counsel, Attorney General for the State of New York, Albany, NY, for Defendants.

*REPORT–RECOMMENDATION and ORDER*

GEORGE H. LOWE, United States Magistrate Judge.

**\*1** This *pro se* prisoner civil rights action, commenced pursuant to 42 U.S.C. § 1983, has been referred to me for Report and Recommendation by the Honorable Norman A. Mordue, Chief United States District Judge, pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3(c). Plaintiff Kah'Sun Creator Allah alleges that Defendants Tim Kemp and Wayne Crosier violated his Eighth Amendment rights by acting with deliberate indifference in failing to provide him with mental health evaluation and treatment. (Dkt. No. 1 ¶¶ 30–32.) Currently pending before the Court is Defendants' Motion for Summary Judgment pursuant to Federal Rule of Civil Procedure 56(b). (Dkt. No. 43.) Plaintiff opposes the motion. (Dkt.Nos.29, 46.) For the reasons that follow, I recommend that Defendants' motion be denied.

**I. BACKGROUND**

**A. Factual Background**

Plaintiff Kah'Sun Creator Allah alleges in his Complaint that his Eighth Amendment rights were violated during his confinement at Upstate Correctional Facility ("Upstate") between July 2006 and March 2007. (Dkt. No. 1.)

In July 2006, Plaintiff was observed at Downstate Correctional Facility ("Downstate") "putting a noose around his neck attempting suicide," and he subsequently was confined to "suicide watch." (Dkt. No. 1 ¶ 9.) Plaintiff's Downstate mental health providers placed him on service level four, indicating that he "needs/may need mental health intervention (excluding medication) for disorders such as anxiety, mild depression, adjustment disorders or life circumstance problems." (Dkt.47, Ex. A.) Plaintiff's Screening and Admission Note also stated that he "should be evaluated by mental health upon arrival at his next facility." *Id.,* Ex. B. Finally, a July 2006 Termination Transfer Progress Note stated that Plaintiff "needs to be seen by M.H. upon arrival" at Upstate. *Id.,* Ex. C.

Upstate serves as a housing facility for "inmates serving disciplinary dispositions specifying assignment to a Special Housing Unit." (Dkt. No. 43–8 ¶ 3.) Under the Central New York Psychiatric Center's Outpatient Operations Policy and Procedure Manual ("Manual"), within thirty days of a service level four inmate's "admission to the Special Housing Unit, an OMH clinician must conduct a personal interview" with the inmate. (Dkt.47, Ex. D .) Inmates on the "mental health active patient caseload" at the time of their admission are to be seen by an OMH clinician who "completes a SHU screening/admission form and a treatment needs/service level designation form." *Id.* In or about July or August 2006, Plaintiff was transferred to Upstate where he remained at service level four. (Dkt. No. 43–6 ¶ 6.)

The Manual states that every service level four inmate "should be offered a minimum of one (1) private confidential session a month with a primary therapist." (Dkt. No. 47 at 24, Ex. D.) A psychiatrist "should also have one (1) private/confidential session at least quarterly (every 90 days) for all active inmates on the caseload regardless of OMH service level designation". *Id.*

**\*2** Defendant Crosier, an OMH Social Worker, evaluated Plaintiff on November 20, 2006. (Dkt. No. 44 at 353.) Defendant Crosier's evaluation stated that Plaintiff had "[n]o indication for active mental health services," and that Plaintiff had "[n]o thoughts or intent of suicide or self-harm." *Id.*

On January 23, 2007, Plaintiff "again attempted suicide by tying a noose around his neck and tying it to the shower dead

[sic] ....“ (Dkt. No. 1 ¶ 16.) Plaintiff's cell-mate intervened and summoned assistance. *Id.* Plaintiff told Defendant Crosier that “he couldn't take any more and had nothing to live for and didn't want to live no more.” *Id.* ¶ 18. Plaintiff was moved to an observation cell and put on suicide watch. *Id.* ¶ 19. Plaintiff claims that Defendants did not provide for his evaluation by a psychiatrist or provide other mental health treatment. *Id.* ¶ 23. Plaintiff was released from observation on January 25, 2007, and returned to his cell without provision for ongoing mental health care. *Id.* ¶ 21. Before returning Plaintiff to his cell, Defendant Crosier evaluated Plaintiff and indicated that Plaintiff presented as “happy (smiling)” and that he appeared “to be bored ... with staying in the infirmary.” (Dkt. No. 43–7 ¶ 10; Dkt. No. 44 at 357.) Defendant Crosier “discontinued [Plaintiff] from special watch and from active screening status,” but Plaintiff remained at service level four. (Dkt. No. 43–7 ¶ 10; Dkt. No. 44 at 357.)

Plaintiff did not see mental health staff again until March 8, 2007 after he started hearing voices and attempted suicide by “cutting along his arm severely with a razor causing severe pain and suffering.” (Dkt. No. 1 ¶ 24.) Correctional officers intervened, and Plaintiff was taken to the facility hospital where his arm wounds were treated. *Id.* ¶¶ 25–27. Plaintiff was again taken to an observation cell and placed on suicide watch. *Id* . ¶ 27.

Plaintiff claims that Defendants Kemp and Crosier acted with deliberate indifference in violation of his Eighth Amendment rights in failing to provide Plaintiff with mental health evaluation and treatment. (Dkt. No. 1 ¶¶ 30–32.) Plaintiff sues each of the Defendants in their “individual and official capacities.” *Id.* ¶¶ 3–4. Plaintiff seeks (1) a declaration that Defendants violated his Eighth Amendment rights; (2) compensatory and punitive damages; and (3) other relief as may be warranted. (Dkt. No. 1 at 5–7.)

### B. Summary of Grounds in Support of Defendants' Motion

Defendants argue that (1) the Eleventh Amendment bars Plaintiff's claims against them in their official capacities;[1] (2) Plaintiff cannot prevail on his Eighth Amendment inadequate medical care claim because Defendants were not deliberately indifferent to a serious medical need; (3) Plaintiff does not allege sufficient personal involvement on the part of Defendant Kemp;[2] and (4) Defendants are entitled to qualified immunity. (Dkt. No. 43–1.)

[1]    Although the Complaint explicitly states that Defendants are being sued in their official capacities (Dkt. No. 1 ¶¶ 3–4), Defendants do not explicitly move to dismiss on Eleventh Amendment sovereign immunity grounds. Defendants, however, state in a footnote that Eleventh Amendment sovereign immunity bars any suit against the Defendants in their official capacities. (Dkt. 43–1 at 3 n. 1.)

[2]    For the purposes of Defendants' motion, Defendant Crosier concedes that he was “personally involved” in Plaintiff's “mental health care during the relevant period of time.” (Dkt. No. 43–1 at 7; Dkt. 43–7 ¶ 2.)

### C. Summary of Plaintiff's Response to Defendants' Arguments

**\*3** In response,[3] Plaintiff argues that (1) Defendants' failure to provide Plaintiff with mental health evaluation and treatment upon his arrival at Upstate constituted deliberate indifference and (2) Defendants are not entitled to qualified immunity. (Dkt. No. 47 .) Plaintiff has not responded to Defendants' argument that the Eleventh Amendment bars Plaintiff's claims against Defendants in their official capacities or Defendant Kemp's argument that he was not personally involved in any alleged constitutional violations.

[3]    The Court granted the Plaintiff's request to have his Memorandum of Law in opposition to the Defendants' Motion for Judgment on the Pleadings (Dkt. No. 29) serve as his Memorandum of Law in opposition to Defendants' Motion for Summary Judgment. (Dkt. No. 46.)

## II. LEGAL STANDARD GOVERNING MOTIONS FOR SUMMARY JUDGMENT

Under Federal Rule of Civil Procedure 56, summary judgment is warranted if “the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law.” Fed.R.Civ.P. 56(c)(2). The party moving for summary judgment bears the initial burden of showing, through the production of admissible evidence, that no genuine issue of material fact exists. Only after the moving party has met this burden is the non-moving party required to produce evidence demonstrating that genuine issues of material fact exist. *Salahuddin v. Goord,* 467 F.3d 263, 272–73 (2d Cir.2006).

The nonmoving party must do more than "rest upon the mere allegations ... of his pleading" or "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 585–86 (1986). Rather, a dispute regarding a material fact is *genuine* "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). In determining whether a genuine issue of material fact [4] exists, the Court must resolve all ambiguities and draw all reasonable inferences against the moving party. *Major League Baseball Props., Inc. v. Salvino,* 542 F.3d 290, 309 (2d Cir.2008).

[4]    A fact is "material" only if it would have some effect on the outcome of the suit. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248

Under Local Rules 7.1(a) and 56.1, a motion for summary judgment must be accompanied by a memorandum of law, an affidavit containing only factual and procedural background relevant to supporting the motion, and a Statement of Material Facts. The "opposing party must file a response to the Statement of Material Facts," which mirrors the "movant's Statement of Material Facts by admitting and/or denying each of the movant's assertions in matching numbered paragraphs" and "set forth any additional material facts that the non-movant contends are in dispute". L.R. 7.1(a)(3). The Court will "deem admitted any facts set forth in the Statement of Material Facts that the opposing party does not specifically controvert." *Id.*

The Court granted Plaintiff's request that his Memorandum of Law in Opposition to Defendants' Motion for Judgment on the Pleadings (Dkt. No. 29) serve as his Memorandum of Law in response to the pending summary judgment motion. (Dkt. Nos.45–46.) Although Plaintiff did not provide an affidavit as required by Local Rule 7.1(a)(2), he has provided a response to Defendants' Statement of Material Facts. (Dkt. No. 48.) The Court notes that this response is not in full compliance with Local Rules 7.1(a)(3) and 56.1 because the response does not mirror Defendants' Statement of Material Facts "by admitting and/or denying each of [the Defendants'] assertions." The response, however, addresses each of the paragraphs in Defendants' statement, and the response provides citations to the record. (Dkt. No. 48.)

 **\*4**  In this Circuit, a district court has broad discretion in determining whether to overlook a party's failure to comply

with local court rules. *Holtz v. Rockefeller & Co.,* 258 F.3d 62, 73 (2d Cir.2001) (citing *Wright v. BankAmerica Corp.,* 219 F.3d 79, 85 (2d Cir.2000)). Thus, a district court, in its discretion, may "conduct an assiduous review of the record" even where one of the parties has failed to file a Local Rule 56.1 statement. *Id.* (quoting *Monahan v. New York City Dep't of Corrs.,* 214 F.3d 275, 292 (2d Cir.2000)). Moreover, where a party is proceeding *pro se,* the court must "read [his or her] supporting papers liberally, and ... interpret them to raise the strongest arguments that they suggest." *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994). Accordingly, I recommend that the Court exercise its discretion and overlook Plaintiff's failure to fully comply with the local rules.

## III. ANALYSIS

### A. Claims Against Defendants in Their Official Capacities

Plaintiff's complaint named Defendants "in their individual and official capacities." (Dkt. No. 1 ¶¶ 3–4.) Under the principle of sovereign immunity, the Eleventh Amendment bars a citizen from bringing a suit against his or her own state in federal court. *See Tenn. Student Assistance Corp. v. Hood,* 541 U.S. 440, 446 (2004); *Idaho v. Coeur D'Alene Tribe,* 521 U.S. 261, 267 (1997); *Hans v. Louisiana,* 134 U.S. 1, 10–21 (1890); *see also* U.S. Const. amend. XI ("The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by another State, or by Citizens or Subjects of any Foreign State."). State immunity extends not only to the states but also to state agencies and to state officers who act on behalf of the state. *See Puerto Rico Aqueduct & Sewer Auth. v. Metcalf,* 506 U.S. 139, 142–47 (1993).

OMH is an agency of the State of New York. *See* N.Y. Mental Hyg. Law § 7.01. Thus, as an arm of the state, OMH and its employees acting in their official capacities are entitled to immunity. *See Limwongse v. NYS Office of Mental Health,* 249 F. App'x 862, 862–63 (2d Cir.2007); [5] *McChesney v. Hogan,* No. 9:08–CV–0163 (FJS/DEP), 2010 WL 3602660, at \*4, 2010 U.S. Dist. LEXIS 92948, at \*14–15 (N.D.N.Y. Aug. 17, 2010) [6] (Peebles, Mag. J.) (holding that sovereign immunity protects OMH employees who are sued in their official capacities). A federal court must dismiss an action where a defendant demonstrates successfully that he is entitled to sovereign immunity because the court lacks subject matter jurisdiction over such an action. *McGinty v. New York,*

Allah v. Kemp, Not Reported in F.Supp.2d (2010)
Case 9:19-cv-01161-DNH-TWD    Document 79    Filed 11/10/21    Page 83 of 125
2010 WL 5860290

251 F.3d 84, 100 (2d Cir.2001); *see also* Fed.R.Civ.P. 12(h)(3).

<sup>5</sup>    The Court will provide Plaintiff with a copy of this unpublished decision in accordance with the Second Circuit's decision in *Lebron v. Sanders,* 557 F.3d 76 (2d Cir.2009).

<sup>6</sup>    The Court will provide Plaintiff with a copy of this unpublished decision in accordance with the Second Circuit's decision in *Lebron v. Sanders,* 557 F.3d 76 (2d Cir.2009).

Here, the Complaint states that the Defendants are sued in their "individual and official capacities." (Dkt. No. 1 ¶¶ 3–4.) Although Defendants do not explicitly move to dismiss on sovereign immunity grounds, they note that sovereign immunity bars the suit against the Defendants in their official capacities. (Dkt. No. 43–1 n. 3.) To the extent that Defendants neglected to move explicitly to dismiss on sovereign immunity grounds, I recommend that the Court *sua sponte* dismiss any claims against Defendants in their official capacities. *See* 28 U.S.C. § 1915(e)(2)(B)(iii).

### B. Defendant Kemp's Personal Involvement

**\*5** Defendant Kemp argues that he is "written into the action only by virtue of his supervisory role as Mental Health Unit Coordinator at Upstate," and not through his personal involvement in the alleged constitutional violations. (Dkt. 43–1 at 9.) A defendant's personal involvement "in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (quoting *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir.1991)). To prevail, the plaintiff must show some tangible connection between the alleged unlawful conduct and the defendant. *Bass v. Jackson,* 790 F.2d 260, 263 (2d Cir.1986). Where a defendant is a supervisory official a mere "linkage" to the unlawful conduct through "the prison chain of command" (i.e. under the doctrine of *respondeat superior* ) is insufficient to show his personal involvement in that unlawful conduct. *Polk County v. Dodson,* 454 U.S. 312, 325 (1981); *Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir.2003).

Supervisory officials may not be held liable merely because they held a position of authority. *Black v. Coughlin,* 76 F.3d 72, 74 (2d Cir.1996). Rather, supervisory personnel may be considered "personally involved" only if they (1) directly participated in the violation; (2) failed to remedy that violation after learning of it through a report or appeal; (3) created, or allowed to continue, a policy or custom under which the violation occurred; (4) had been grossly negligent in managing subordinates who caused the violation; or (5) exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that violation was occurring. *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995) (citing *Williams v. Smith,* 781 F.2d 319, 323–24 (2d Cir.1986)). <sup>7</sup>

<sup>7</sup>    The Supreme Court's decision in *Ashcroft v. Iqbal,* ––– U.S. ––––, 129 S.Ct. 1937 (2009), arguably casts in doubt the continued viability of some of the categories set forth in Colon. *See Sash v. United States,* 674 F.Supp.2d 531 (S.D.N.Y.2009). Here, the Court will assume *arguendo* that all of the *Colon* categories apply.

During the time in question Defendant Kemp was the Forensic Unit Coordinator at OMH. (Dkt. No. 43–8 ¶ 1.) He had "administrative authority" over Defendant Crosier but Defendant Kemp claimed that he "did not become personally involved in [Defendant Crosier's] work with assigned inmates." *Id.* ¶ 8. However, in daily treatment meetings, Defendant Kemp and his staff, including Defendant Crosier, "discussed operational issues and inmates who were presenting particular needs," which included Plaintiff's case. (*Id.* ¶¶ 6, 11.) Defendant Kemp asserts that neither he nor anyone on his team disagreed with Defendant Crosier's clinical judgment, and that he would have "pursued" a "higher level of services" had Plaintiff's circumstances required them. (*Id.* ¶ 11.) By Defendant Kemp's own declaration, he, at the very least, discussed Plaintiff's case with Defendant Crosier. (*Id.* ¶¶ 6, 11.)

Moreover, Defendant Kemp "believes" that his "first personal interaction with" Plaintiff occurred immediately following Plaintiff's March 8, 2007 suicide attempt. *Id.* ¶ 12. But Plaintiff, in his deposition, recalls that both Defendants visited him in his observation cell following the January 2007 suicide attempt. Dkt. No. 43–13 at 21, 23. This statement is not disputed anywhere in Defendants' papers supporting their summary judgment motion. As such, I find that it is possible for a reasonable jury to conclude that Defendant Kemp's involvement in this matter rises beyond mere supervisory authority and that he was personally involved in any alleged constitutional violations. Accordingly, I recommend that Defendant Kemp's motion for summary judgment on the grounds of lack of personal involvement be denied.

### C. Eighth Amendment Claims

**\*6** Plaintiff alleges that Defendants failed to provide him with mental health evaluation and treatment during the period of July 2006 through January 2007 even though Plaintiff had attempted suicide three days before he arrived at Upstate and despite the fact that his mental health records advised of his need for such care. (Dkt. No. 1.) Further, Plaintiff alleges that after his second suicide attempt in January 2007, Defendants failed to properly evaluate his condition and withheld treatment, leading to a third suicide attempt just two months later. *Id.*

The Eighth Amendment to the United States Constitution prohibits "cruel and unusual" punishment. The word "punishment" refers not only to deprivations imposed as a sanction for criminal wrongdoing, but also to deprivations suffered during imprisonment. *Estelle v. Gamble,* 429 U.S. 97, 102–03 (1976). Punishment is "cruel and unusual" if it involves the unnecessary and wanton infliction of pain or if it is incompatible with "the evolving standards of decency that mark the progress of a maturing society." *Estelle,* 429 U.S. at 102. Thus, the Eighth Amendment imposes on jail officials the duty to "provide humane conditions of confinement" for prisoners. *Farmer v. Brennan,* 511 U.S. 825, 832 (1994). In fulfilling this duty, prison officials must ensure, among other things, that inmates receive adequate medical care. *Id.* (citing *Hudson v. Palmer,* 468 U.S. 517, 526–27 (1984)).

There are two elements to a prisoner's claim that prison officials violated his Eighth Amendment right to receive medical care: "the plaintiff must show that she or he had a serious medical condition and that it was met with deliberate indifference." *Caiozzo v. Koreman,* 581 F.3d 63, 72 (2d Cir.2009) (citation and punctuation omitted). "The objective 'medical need' element measures the severity of the alleged deprivation, while the subjective 'deliberate indifference' element ensures that the defendant prison official acted with a sufficiently culpable state of mind." *Smith v. Carpenter,* 316 F.3d 178, 183–84 (2d Cir.2003).

#### 1. Serious Medical Condition

A "serious medical condition" is "a condition of urgency, one that may produce death, degeneration, or extreme pain." *Nance v. Kelly,* 912 F.2d 605, 607 (2d Cir.1990) (Pratt, J., dissenting) (citations omitted), *accord, Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998); *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1996), *cert. denied,* 513 U.S. 1154 (1995).

Relevant factors to consider when determining whether an alleged medical condition is sufficiently serious include, but are not limited to: (1) the existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; (2) the presence of a medical condition that significantly affects an individual's daily activities; and (3) the existence of chronic and substantial pain. *Chance,* 143 F.3d at 702–03. This "inquiry must be tailored to the specific circumstances of each case." *Smith,* 316 F.3d at 185.

**\*7** In this Circuit, "psychiatric or mental health care 'is an integral part of medical care' and falls under the rule laid out in *Estelle* which requires that such care be provided to prisoners." *Atkins v. County of Orange,* 372 F.Supp.2d 377, 408 (S.D.N.Y.2005) (quoting *Langley v. Coughlin (Langley I),* 888 F.2d 252, 254 (2d Cir.1989)). This Court has previously surveyed case law around the country and found that "in the context of suicide, jailers are not required to safeguard every inmate; only those presenting a 'strong likelihood of suicide' are entitled to protection." *Burke v. Warren County Sheriff's Dep't,* No. 900–CV–597, 1994 WL 675042, at \*6, 1994 U.S. Dist. LEXIS 17233, at \*19–20 (N.D.N.Y. Nov. 25, 1994)[8] (internal citations omitted). "[T]o establish a strong likelihood of suicide, a detainee must have made a previous threat of or an earlier attempt at suicide." *Id.*

[8]     The Court will provide Plaintiff with a copy of this unpublished decision in accordance with the Second Circuit's decision in *Lebron v. Sanders,* 557 F.3d 76 (2d Cir.2009).

Here, the record reflects at least two incidents where Plaintiff fashioned and displayed a noose. (Dkt. No. 1 ¶¶ 9, 16; Dkt. No. 29, Exs. B, E; Dkt. No. 43–6 ¶¶ 5, 10; Dkt. No. 43–7 ¶¶ 8–9; Dkt. No. 43–8 ¶ 10; Dkt. No. 44 at 355, 386, 392.) Defendants referred to these incidents as attention-getting "suicidal gestures ." (Dkt. No. 43–1 at 10–11, 15; Dkt No. 43–7 ¶ 8; Dkt. No. 43–8 ¶ 10; Dkt. No. 49.) Plaintiff, however, considers each of these incidents as "suicide attempts." (Dkt. No. 48 ¶¶ 6, 11–12, 16 .) I find that a reasonable jury could disagree with Defendants' characterization of these incidents as merely "suicidal gestures," intending nothing more than to draw the attention of prison officials and OMH staff. Therefore, because the summary judgment standard requires the Court to resolve all ambiguities and draw all reasonable inferences against the moving party, I find that there are factual issues on whether Plaintiff suffered from a sufficiently serious medical need.

2. *Deliberate Indifference*

Medical mistreatment rises to the level of deliberate indifference only when it "involves culpable recklessness, i.e., an act or a failure to act ... that evinces 'a conscious disregard of a substantial risk of serious harm.' " *Chance,* 143 F.3d, 698, 703 (quoting *Farmer v. Brennan,* 511 U.S. 825, 835 (1994)). "[M]ere disagreement over the proper treatment does not create a constitutional claim. So long as the treatment given is adequate, the fact that a prisoner might prefer a different treatment does not give rise to an Eighth Amendment violation." *Id.*

Thus, to establish deliberate indifference, an inmate must prove that (1) a prison medical care provider was aware of facts from which the inference could be drawn that the inmate had a serious medical need; and (2) the medical care provider actually drew that inference. *Farmer,* 511 U.S. at 837; *Chance,* 143 F.3d at 702–703. The inmate then must establish that the provider consciously and intentionally disregarded or ignored that serious medical need. *Farmer,* 511 U.S. at 835; *Ross v. Giambruno,* 112 F.3d 505 (2d Cir.1997). An "inadvertent failure to provide adequate medical care" does not constitute "deliberate indifference." *Estelle,* 429 U.S. at 105–06. Moreover, "a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim ... under the Eighth Amendment." *Id.*

**\*8** Stated another way, "medical malpractice does not become a constitutional violation merely because the victim is a prisoner." *Id.; Smith,* 316 F.3d at 184 ("Because the Eighth Amendment is not a vehicle for bringing medical malpractice claims, nor a substitute for state tort law, not every lapse in prison medical care will rise to the level of a constitutional violation."). However, malpractice that amounts to culpable recklessness constitutes deliberate indifference. Accordingly, "a physician may be deliberately indifferent if he or she consciously chooses an easier and less efficacious treatment plan." *Chance,* 143 F.3d at 703. As such, in a summary judgment motion, the critical question is whether a reasonable jury could conclude that Defendants "knew of and disregarded an excessive risk to [Plaintiff's] health and safety and that [Defendants were] both aware of facts from which the inference could be drawn that a substantial risk of serious harm existed, and also drew the inference." *Caiozzo,* 581 F.3d at 72 (internal quotation marks and alterations omitted).

In an inmate suicide context, there are two scenarios where deliberate indifference may exist. *See Kelsey v. City of New York,* 2006 WL 3725543, at \*5, 2006 U.S. Dist. LEXIS 91977, at \* 16 (E.D.N.Y. Dec. 18, 2006) [9] (citing *Rellergert v. Cape Girardeau County, Mo.,* 924 F.2d 794, 796 (8th Cir.1991)). First, "officials could be deliberately indifferent to the risk of suicide by failing to discover an individual's suicidal tendencies." *Id.* Second, officials "could have discovered and have been aware of the suicidal tendencies, but could be deliberately indifferent in the manner by which they respond to the recognized risk of suicide." *Id.* The second scenario "focuses on the adequacy of preventive measures." *Id.*

[9] The Court will provide Plaintiff with a copy of this unpublished decision in accordance with the Second Circuit's decision in *Lebron v. Sanders,* 557 F.3d 76 (2d Cir.2009).

Courts "have repeatedly noted that while one isolated failure to treat, without more, is ordinarily not actionable, it may in fact rise to the level of a constitutional violation if the surrounding circumstances suggest a degree of deliberateness, rather than inadvertence in the failure to render meaningful treatment." *Langley v. Coughlin (Langley I ),* 715 F.Supp. 522, 536 (S.D.N.Y.1989) (citing *Gill v. Mooney,* 824 F.2d 192, 196 (2d Cir.1987)). Further,

> while a single instance of medical care denied or delayed, viewed in isolation, may appear to be the product of mere negligence, repeated examples of such treatment bespeak a deliberate indifference by prison authorities to the agony engendered by haphazard and ill-conceived procedures. Indeed, it is well-settled in this circuit that "a series of incidents closely related in time ... may disclose a pattern of conduct amounting to deliberate indifference to the medical needs of prisoners."

*Todaro v. Ward,* 565 F.2d 48, 52 (2d Cir.1977) (quoting *Bishop v. Stoneman,* 508 F.2d 1224, 1226 (2d Cir.1974)). Finally, "a serious failure to provide needed medical attention when defendants are fully aware of that need could well constitute deliberate indifference, even if they did not act with a punitive intent." *Langley v. Coughlin (Langley I),* 715 F.Supp. 522, 536 (S.D.N.Y.1989) (citing *Doe v. New York City Dep't of Soc. Servs.,* 649 F.2d 134, 144–45 (2d Cir.1981), *cert. denied,* 464 U.S. 864 (1983)).

**\*9** After a review of the record, this Court finds that a reasonable jury viewing the evidence in the light most favorable to Plaintiff could conclude that Defendants acted

with deliberate indifference to Plaintiff's serious medical needs. Following Plaintiff's July 2006 suicide attempt at Downstate, he was evaluated by Social Worker Sueann Smith ("Smith") and Dr. Srinvasa Reddy ("Reddy"). (Dkt. No. 1 ¶ 11; Dkt. No. 47, Exs. A–C.) Smith assigned Plaintiff to service level four and recommended that Plaintiff "be evaluated by mental health upon arrival at" Upstate. (Dkt. No. 47, Exs.A–B.) Plaintiff arrived at Upstate in or about July or August 2006 where he remained at service level four. (Dkt. No. 44 at 1; Dkt. No. 43–6 ¶ 6.) Defendants state that Plaintiff would have been placed under Defendant Crosier's care shortly after Plaintiff's arrival. (Dkt. No. 43–6 ¶ 7; Dkt. No. 43–7 ¶ 3; Dkt. No. 43–8 ¶ 9.) But the earliest indication in the record of Defendant Crosier's evaluation of Plaintiff was in November 2006, approximately three to four months after Plaintiff's arrival at Upstate. [10] (Dkt. No. 44 at 353.) On that evaluation, Defendant Crosier stated that Plaintiff had no "indication for active mental health services" and that he had no "thoughts or intent of suicide."

[10]   Plaintiff's OMH Record contains a Mental Health Evaluation signed by Defendant Crosier on November 20, 2006. (Dkt. No. 44 at 353.) Although the Chronological Record of Plaintiff's transfers (Dkt. No. 44 at 1–4) indicates that he was on service level four on August 15, 2006, there is no accompanying Mental Health Evaluation. Without one, it is unclear if Plaintiff was placed on service level four based on the recommendation of the Downstate therapists or if there was another evaluation upon his arrival at Upstate. Thus, viewing the record in the light most favorable to Plaintiff, it is reasonable to conclude that his earliest evaluation by a therapist at (1986) Upstate was on November 20, 2006.

The next documented evaluation of the Plaintiff occurred after his suicide attempt of January 23, 2007, when Defendant Crosier placed Plaintiff on active screening status. (Dkt. No. 44 at 348, 350.) The very next day, Defendant Crosier removed Plaintiff from active screening status and returned him to his cell. (Dkt. No. 43–7 ¶ 10; Dkt. No. 44 at 349, 351, 357.) The January 24 evaluation stated: "No mental health issues reported or observed. Presents as happy (smiling) when informed he will be returning to his cell. Appears to be bored at this time with staying in the infirmary." (Dkt. No. 44 at 351, 357.) Defendant Crosier submits that he removed Plaintiff from active screening status based on personal "perceptions," "observations," and "reasonable judgment." (Dkt. No. 43–7

¶ 10.) The next documented evaluation of Plaintiff occurred after the March 8, 2007, suicide attempt when Defendant Kemp evaluated Plaintiff on March 9 and March 14. (Dkt. No. 44 at 18, 19.) The record does not show any other evaluations of Plaintiff between November 20, 2006 and January 23, 2007, or between January 24, 2007, and March 8, 2007. Moreover, Plaintiff argues that neither Defendants nor anyone else from OMH visited him after he returned to his regular cell. (Dkt. No. 43–13 at 36–37, 42; Dkt. No. 48 ¶ 14.) Defendants have not addressed this argument.

Defendants argue that Plaintiff's OMH record of non-lethal suicidal gestures indicated to them that he did not need more extensive mental health assistance. (Dkt. No. 43–1 at 10–11, 15; Dkt. No. 43–7 ¶ 8; Dkt. No. 43–8 ¶ 10.) Certainly, Defendants' conclusion could be reasonable in light of Plaintiff's OMH history, but when viewing the evidence in the light most favorable to Plaintiff, the record is insufficient to show that no genuine issues of material fact exist. For example, even if Defendants did not have any intent to harm Plaintiff, a reasonable jury could conclude that Defendants were deliberately indifferent to Plaintiff's serious medical needs, which is all that is required to show an Eight Amendment violation. *See Doe,* 649 F.2d at 144–45 (test is indifference, not harm). Likewise, whether Defendant Crosier's professional judgment to remove Plaintiff from an observation cell and active screening status forty-eight hours after a suicide attempt was a result of Defendant Crosier's deliberate indifference to Plaintiff's serious medical needs or mere negligence, or whether it was medically sound, remains an issue of material fact. Accordingly, I recommend that Defendants' motion for summary judgment on Plaintiff's Eighth Amendment claim be denied.

**D. Qualified Immunity**

 **\*10**  Defendants also argue that they are entitled to qualified immunity. (Dkt. No. 43–1 at 14.) The affirmative defense of qualified immunity "shields government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.' " *Stephenson v. Doe,* 332 F.3d 68, 76 (2d Cir.2003) (quoting *McCardle v. Haddad,* 131 F.3d 43, 50 (2d Cir.1997)).

A qualified immunity inquiry in prisoner civil rights cases generally involve two issues: (1) "whether the facts, viewed in the light most favorable to the plaintiff establish a constitutional violation"; and (2) "whether it would be clear to a reasonable officer that his conduct was unlawful in the

situation confronted." The right to be free from deliberate indifference to serious medical needs is a clearly established constitutional right. *LaBounty v. Coughlin,* 137 F.3d 68, 74 (2d Cir.1998) (citing *Estelle,* 429 U.S. at 104). But whether particular acts are objectively reasonable, however, is a highly fact-specific inquiry. *See Kaminsky v. Rosenblum,* 929 F.2d 922, 925 (2d Cir.1991). Thus, the defense is unavailable and summary judgment is inappropriate where "the objective reasonableness of defendants' actions turns on disputed questions of fact." *Id.* at 927. To establish the qualified immunity defense, defendants "must show that it was 'objectively reasonable' ... for them to believe that they had not acted with the requisite deliberate indifference." *McKenna v. Wright,* 386 F.3d 432, 437 (2d Cir.2004) (quoting *Ford v. McGinnis,* 352 F.3d 582, 597 (2d Cir.2003)).

As I discussed above, a reasonable jury could conclude that Defendants acted with deliberate indifference in failing to provide proper mental health services to Plaintiff. Likewise, a reasonable jury could also conclude that it was not objectively reasonable for Defendants to believe that they had not acted with the requisite deliberate indifference. Accordingly, I recommend that Defendants' motion for summary judgment on qualified immunity grounds be denied.

**ACCORDINGLY,** it is

**RECOMMENDED** that the Defendants' motion for summary judgment (Dkt. No. 43) be ***DENIED,*** and it is further

**ORDERED** that the clerk provide copies of *Limwongse v. NYS Office of Mental Health,* 249 F. App'x 862 (2d Cir.2007); *McChesney v. Hogan,* No. 9:08–CV–0163 (FJS/DEP), 2010 WL 3602660, 2010 U.S. Dist. LEXIS 92948 (N.D.N.Y. Aug. 17, 2010); *Kelsey v. City of New York,* No. 03–CV–597, 2006 WL 3725543, 2006 U.S. Dist. LEXIS 91977 (E.D.N.Y. Dec. 18, 2006); *Burke v. Warren County Sheriff's Dep't,* No. 900–CV–597, 1994 WL 675042, 1994 U.S. Dist. LEXIS 17233 (N.D.N.Y. Nov. 25, 1994) in accordance with the Second Circuit's decision in *Lebron v. Sanders,* 557 F.3d 76 (2d Cir.2009).

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. ***FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.*** *Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993) (citing *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989)); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a).

**All Citations**

Not Reported in F.Supp.2d, 2010 WL 5860290

---

**End of Document**                              © 2021 Thomson Reuters. No claim to original U.S. Government Works.

🚩 KeyCite Yellow Flag - Negative Treatment

Distinguished by THOMAS BRYANT, Plaintiff, v. CHRISTOPHER
MILLER, Super., Great Meadow C.F.; J. SCROGGY, Sr. Counselor, Great
Meadow C.F.; SAVAGE, Corr. Officer, Great Meadow, C.F.; KAISER, Corr.
Officer, Great Meadow C.F.; BOGARDUS, Corr. Officer, Great Meadow
C.F.; D. COONRADT, Sgt., Great Meadow C.F.; McCLOSKEY, Therapist,
MHU, Great Meadow C.F.; C. MEYERS, Nurse Prac., Great Meadow C.F.;
MEAGHAN BERNSTEIN, Risk Mgmt. Specialist, CNYPC; DEBORAH
J. McCULLOCH, Exec. Dir., CNYPC; JAMES STEED, Clinical Risk
Reviewer, OMH; M. HAWK, Sgt., Great Meadow C.F.; and ANNE MARIE
SULLIVAN, Comm'r, OMH, Defendants.,    N.D.N.Y.,    September 21,
2021

2012 WL 566875
Only the Westlaw citation is currently available.
United States District Court,
W.D. New York.

Nathaniel SIMS, Plaintiff,
v.
Dr. GORMAN, R. Powell, M. Stirk, K.
Washington, and M. Kearney, Defendants.

No. 09–CV–6643 (MAT).
|
Feb. 21, 2012.

**Attorneys and Law Firms**

Nathaniel Sims, Romulus, NY, pro se.

J. Richard Benitez, NYS Attorney General's Office,
Department of Law, Rochester, NY, for Defendants.

**DECISION AND ORDER**

MICHAEL A. TELESCA, District Judge.

**I. Introduction**

 **\*1**  Plaintiff Nathaniel Sims ("Sims" or "Plaintiff"), a New
York State prison inmate who is proceeding *pro se* and
*in forma pauperis,* commenced this action pursuant to 42
U.S.C. § 1983, complaining of a violation of his civil rights
at the hands of prison officials and seeking recovery of
compensatory and punitive damages. Sims contends that by
their actions, defendants subjected him to cruel and unusual
punishment, in violation of the Eighth Amendment to the
United States Constitution, and violated his substantive right
to due process. For the reasons set forth below, the Court

finds that both Plaintiff's claims are subject to dismissal on
the merits as a matter of law.

**II. Background**

At all times relevant to this lawsuit, Sims was an inmate of the
New York State Department of Correction and Community
Services ("NYSDOCCS"),[1] housed at Wende Correctional
Facility ("Wende") from August 28, 2009, until September 2,
2010. Because of his diagnoses of bipolar disorder and anti-
social personality disorder, Sims received psychiatric care
from the Mental Health Unit ("MHU") at Wende. Defendants
Kevin Gorman, M.D. ("Dr.Gorman"); MHU Chief Rasheen
Powell, ("Powell"); social worker Margaret Stirk, L.M.S.W.
("Stirk"); and therapist Kendra Washington ("Washington"),
were, at all relevant times, employed by NYSDOCCS at
Wende's MHU. They are collectively referred to hereinafter as
"the MHU Defendants". Defendant Captain Martin Kearney
("Capt.Kearney") was, at all relevant times, a supervising
corrections officer at Wende.

[1]    On April 1, 2011, New York State Department of
Correctional Services and Parole merged together
into one agency now known as New York
State Department of Corrections and Community
Supervision.

On August 28, 2009, at 8:41 a.m., Dr. Gorman observed
in his treatment notes that Plaintiff has been placed in the
Residential Crisis Treatment Program ("RCTP") because
he was "threatening self harm by cutting up or hanging
up if he had to remain in SHU [ ("special housing
unit") ]." (000004).[2] Dr. Gorman remarks that Plaintiff ate
dinner the previous day and had not harmed himself in RCTP,
but was still refusing his medications. *Id.* Apparently, Plaintiff
had been released from RCTP on August 27, 2009, but had
been "readmitted rapidly as he threatened self harm...." *Id.*

[2]    Numbers in parentheses refer to the Bates-
numbered documents attached as Exhibits A and
B to Defendants' Appendix to Local Rule 56.1
Statement of Material Facts.

With regard to Plaintiff's "SUICIDE RISK ASSESSMENT,"
Dr. Gorman noted that Plaintiff was "no longer agitated, [was]
eating but refusing medication. He is not actively suicidal
today [August 28th] ... He is released from RCTP." (000004)
(capitals in original). At about 11:30 a.m. on August 28, 2009,
the nursing progress report notes as follows: "Quiet, behavior
has been uneventful, seen by treatment team, presents angry

and states he has suicidal ideations, released from RCTP to SHU, no distress noted. 12 p.m. [Plaintiff discharged] from RCTP per Margaret Stark [sic]." (000007).

After his discharge from RCTP and prior to his admission to the SHU, Plaintiff was placed in a holding cell where he was examined by a psychologist, James A. Nesser, Ph. D. ("Dr.Nesser"). Dr. Nesser, who is not a defendant in this action, opined that it was "likely that [Sims's] statements regarding self-harm are instrumental [sic] to avoid being transferred to the SHU." (000008). Plaintiff declined to describe his suicide plans to Dr. Nesser, but "indicated that he did have a plan." (000008). Noting that Plaintiff was classified as "MHL 1S [sic], has a life sentence"; had been diagnosed with Bipolar Disorder as well as Anti–Social Personality Disorder; and had a history of three or more suicide attempts, Dr. Nesser concluded that Plaintiff "posed a significant threat of self-harm based on his level of distress, diagnoses, self-harm history, and his sentence." *Id.* When Dr. Nesser communicated this information to the administrative staff, he was informed that Powell, the MHU Chief had ordered Plaintiff not to be returned to RCTP based upon threats of self-harm alone. Dr. Nesser adhered to his recommendation that Plaintiff should be transferred to RCTP "due to the risk of self-harm." *Id.*

**\*2** Plaintiff was admitted to SHU and later that day fashioned a noose and hung himself from the cell bars at about 1:45 p.m. The following misbehavior report was filed in connection with the incident:

> [Plaintiff] removed his underware [sic] and began to rip them up. Sgt. Kintzel told him to give up the underware [sic] but the inmate refused. The Sgt. then ordered me to remain in front of the cell while he left the company. Simms [sic] then proceeded to tie the strips of cloth into a noose and attach it to the cell door bars. I immediately signaled CO Mack that Simms [sic] was attempting to hang-up. An extraction team (assembled earlier) came down the company, cell 5 was opened, the noose was cut with scissors, the inmate was removed from the cell. The inmate was placed on a

stretcher, handcuffed and taken to the RMU [ ("Regional Medical Unit") ].

(000005). After that incident, Sims was placed in MHU for observation.

The treatment notes from later that day (August 29th) indicate that Sims "[was][q]uiet, lying in bed, refused to talk, using hand gestures, offers no complaint, no distress noted." (000006). At 6 p .m., the treatment notes indicate that Sims "continues in deso. [sic] calm & quiet. Lying on bunk much of the shift. Pleasant on approach. Cooperative with p.m. meds. No lethality voiced[;] will continue to assess." *Id.*

On September 2, 2009, Plaintiff was discharged from MHU and transferred to SHU.[3] Capt. Kearney issued a "deprivation order" which stated that pursuant to 7 N.Y.C.R.R. § 305.2, Sims was

3

> Defendants inexplicably have omitted from their Statement of Material Facts any description of the subsequent events-such as Sims's discharge from MHU and transfer to SHU. Nor have defendants described the facts giving rise to Plaintiff's complaints against Capt. Kearney. The Court has pieced together the narrative from Plaintiff's Rebuttal to Defendants' Summary Judgment Motion ("Pl.Reb.") and the Exhibits to Defendants' Appendix.

being deprived of ... all in cell property except 1 MHU gown, 1 MHU matt [sic], 1 pair shower shoes because it is determined that a threat to the safety or security of staff, inmates or State property exists and for the fallowing specific reason (s): You continue to manipulate staff by threatening, feigning, and actually committing acts of self harm.

(000031). Plaintiff asserts that he was constantly cold and became ill with flu-like symptoms "due to [the] icy cold condition" in the stripped cell. Plaintiff's Rebuttal ("Pl.Reb.") at 7.

The following day, September 3, 2009, the deprivation order was modified: Plaintiff was given a toothbrush, undergarments, pen, paper, and two envelopes. (000031). On September 4, 2009, he was given a set of "greens" (pants and shirt), a mattress, two sheets, a pillow and pillowcase, and a

Case 9:19-cv-01161-DNH-TWD   Document 79   Filed 11/10/21   Page 90 of 125
Sims v. Gorman, Not Reported in F.Supp.2d (2012)
2012 WL 566875

blanket. *Id.* On September 8, 2009, all of his property was returned to him. (000032).

Plaintiff pursued his administrative remedies, seeking compensatory and punitive damages from NYSDOCCS based upon the failure to return him to RCTP after he voiced suicide threats to Dr. Nesser and the deprivation order. These applications were denied, and Plaintiff subsequently instituted this proceeding. Currently pending before the court is a motion for summary judgment filed on behalf of the defendants named in Sims's complaint. In their motion, argue that both claims are lacking in merit.

**\*3** Although defendants in their answer raised the affirmative defense that Sims had failed to exhaust his administrative remedies, they have not reasserted such an argument in their motion for summary judgment. Sims has submitted documentation substantiating his completion of the administrative grievance process, and it appears that his claims are exhausted.

For the reasons that follow, defendants' motion for summary judgment (Dkt.30) is granted and the complaint (Dkt.1) is dismissed in its entirety.

### III. Discussion

#### A. General Legal Standards

#### 1. Summary Judgment

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). In reaching this determination, the court must assess whether there are any material factual issues to be tried while resolving ambiguities and drawing reasonable inferences against the moving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248–49, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A material fact is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248.

Unrepresented litigants are entitled to "a certain liberality with respect to procedural requirements." *Mount v. Book–of–the–Month Club, Inc.,* 555 F.2d 1108, 1112 (2d Cir.1977); *see also Moates v. Barkley,* 147 F.3d 207, 209 (2d Cir.1998) ( *"[P]ro se* litigants are afforded some latitude in

meeting the rules governing litigation[.]") (citations omitted). Nevertheless, a *pro se* plaintiff must establish more than mere "metaphysical doubt as to the material facts [,]" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986), in order to defeat a motion for summary judgment.

#### 2. 42 U.S.C. § 1983

Plaintiff brings this action pursuant to 42 U.S.C. § 1983, which provides in relevant part as follows:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage of any state ..., subjects, or causes to be subjected, any citizen of the United States ... to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law ... for redress.

42 U.S.C. § 1983. To state a claim under § 1983, a plaintiff must allege (1) that the challenged conduct was attributable at least in part to a person acting under color of state law, and (2) that such conduct deprived plaintiff of a right, privilege, or immunity secured by the Constitution or laws of the United States. *E.g., Dwares v. City of N.Y.,* 985 F.2d 94, 98 (2d Cir.1993).

#### 3. Due Process

The Due Process Clause of the Fourteenth Amendment contains both a substantive component and a procedural component. *Zinernon v. Burch,* 494 U.S. 113, 125, 110 S.Ct. 975, 108 L.Ed.2d 100 (1990). The substantive component "bars certain arbitrary, wrongful government actions regardless of the fairness of the procedures used to implement them[,]" *id.* (internal quotations marks and citation omitted), while the procedural component bars "the deprivation by state action of a constitutionally protected interest in life, liberty, or property ... *without due process of law* [,]" *id.* at 125–126 (internal quotations marks and citations omitted; emphasis in original). A substantive due process violation "is complete when the wrongful action is taken," while a procedural due process violation "is not complete unless and until the State fails to provide due

2012 WL 566875

process," which may occur after the wrongful action in question. *Id.*

### 3. Eighth Amendment

**\*4** The Eighth Amendment of the United States Constitution prohibits the infliction of "cruel and unusual punishments[,]" U.S. CONST., amend VIII, which "includes punishments that 'involve the unnecessary and wanton infliction of pain.' " *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998) (quoting *Gregg v. Georgia,* 428 U.S. 153, 173, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976)). In order to establish an Eighth Amendment claim arising out of inadequate medical care, a prisoner must prove "deliberate indifference to [his] serious medical needs." *Estelle v. Gamble,* 429 U.S. 97, 104, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). This standard includes both subjective and objective components. *Chance,* 143 F.3d at 702 (citing *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994) (explaining that the alleged deprivation of medical care must be, in objective terms, "sufficiently serious", and must be committed by a defendant acting "with a sufficiently culpable state of mind")). "An official acts with the requisite deliberate indifference when that official 'knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.' " *Chance,* 143 F.3d at 702 (quoting *Farmer v. Brennan,* 511 U.S. 825, 837, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994)).

Proof of deliberate indifference may be found where a prison official or employee "intentionally den[ies] or delay[s] access to medical care or intentionally interfer[es] with the treatment once prescribed." *Estelle v. Gamble,* 429 U.S. at 104–05. Deliberate indifference requires intentional or criminally reckless conduct; negligence or even gross negligence will not suffice. *See Farmer,* 511 U.S. at 835–40. The totality of an inmate's medical care must be considered in order to determine whether a prison official has acted with deliberate indifference to serious medical needs. *Gutierrez v. Peters,* 111 F.3d 1364, 1375 (7th Cir.1997).

### B. Analysis of Plaintiff's Claims

### 1. Deliberate Indifference to Plaintiff's Mental Health Needs by the MHU Defendants in Violation of the Eighth Amendment

Plaintiff alleges that on August 28, 2009, the MHU Defendants were deliberately indifferent to his medical needs

when they refused to return him to RCTP and allowed him to be placed in SHU despite his history of suicide attempts and the fact that he threatened to harm himself if placed in SHU. Defendants argue that mere differences of opinion between the doctor and the inmate over the inmate's treatment are insufficient to state an Eighth Amendment claim. *See Estelle v. Gamble,* 429 U.S. at 106 ("Medical malpractice does not become a constitutional violation merely because the victim is a prisoner."); *Dean v. Coughlin,* 804 F.2d 207, 215 (2d Cir.1986) ( "The Constitution does not command that inmates be given medical attention that judges would wish to have for themselves.").

The Court finds that Sims's diagnosed mental illnesses (bipolar and antisocial personality disorders), and concomitant suicidal ideation and actual suicide attempts, constituted a serious medical need. However, the Court does not find that on this record, the MHU Defendants acted with "deliberate indifference" for purposes of an Eighth Amendment claim. Although one medical professional, Dr. Nesser, believed that Sims should be placed in psychiatric observation in MHU because he was voicing suicidal threats immediately before being placed in SHU, the MHU Defendants, who had been treating and interacting with Sims for a much longer period of time while he was in RCTP, disagreed.

**\*5** The MHU Defendants, after treating Plaintiff and observing that he was psychiatrically stable, declined to place Plaintiff in RCTP based solely on his suicide threats. The MHU Defendants likely surmised that Plaintiff's statements to Dr. Nesser, made just before being placed into an SHU cell, reflected attempts at manipulation rather than a true crisis. [4] Even Dr. Nesser found that Sims's suicide threats were manipulative and made in an attempt to prevent his placement in SHU.

[4]    In similar cases, medical professionals have observed that placing inmates on suicide watch or in crisis-care simply at their behest is counter-therapeutic. *See Gay v. Hammersley,* 2009 WL 596114, at \*7.

Federal courts faced with similar claims have noted that "[w]hether to place a prisoner on suicide watch and what level of precaution to take with an inmate are issues within a professional medical judgment." *Gay v. Hammersley,* No. 08–59, 2009 WL 596114, at \*6 (S.D.Ill. Mar.6, 2009) (citing *Estate of Cole by Pardue v. Fromm,* 94 F.3d 254, 261

(7th Cir.1996) (noting the distinction between a "medical judgment" and deliberate mistreatment: "a medical decision not to order an X-ray, or like measures, does not represent cruel and unusual punishment" and "[a]t most it is medical malpractice ...")); *see also Hott v. Hennepin Cnty., Minn.,* 260 F.3d 901, 905 (8th Cir.2001) ("We have generally treated allegations that officials failed to prevent jail suicides as claims for failure to provide adequate medical treatment."); *Simmons v. Navajo Cnty., Ariz.,* 609 F.3d 1011, 1019 (9th Cir.2010) ("We make no determination as to whether Nurse Jones's decision to transfer Jasper from Level I suicide watch to Level II was medically prudent under the circumstances.... Although in hindsight, Nurse Jones may not have made the best or even the proper medical decisions[.]"); *Starks v. Couch,* No. 08CV407, 2009 WL 331357, *2 (S.D.Ill. Feb.11, 2009) ("Defendant Rhodes's precautionary measure of placing Starks on suicide watch to prevent him from harming himself was a discretionary function done in good faith as a mental health professional."). "It is well established that mere differences in opinion regarding medical treatment do not give rise to an Eighth Amendment violation." *Dean,* 804 F.2d at 215; *see also Gamble,* 429 U.S. at 107; *Corby v. Conboy,* 457 F.2d 251, 254 (2d Cir.1972). "Negligence, even if it constitutes medical malpractice, does not, without more, engender a constitutional claim." *Chance,* 143 F.3d at 703.

Here, although Sims disagreed with the MHU Defendants' decision not to return him to RCTP for psychiatric observation, this disagreement is not an actionable Eighth Amendment claim for purposes of 42 U.S.C. § 1983. *Accord Gay,* 2009 WL 596114, at *6 ("While Plaintiff disagreed with Defendant's decision not to place him on suicide watch ..., that does not give rise to civil rights claim for violation of his Eighth Amendment right.") (citing *Garvin v. Armstrong,* 236 F.3d 896, 897 (7th Cir.2001) ("[A] difference of opinion as to how a condition should be treated does not give rise to a constitutional violation.") An inmate does not get to decide on a particular course of treatment. *Meriweather v. Faulkner,* 821 F.2d 408, 413 (7th Cir.1987)); *see also* 2009 WL 596114, at *14 ("Simply put, an inmate does not have a constitutionally protected right to be placed on crisis watch at any time he chooses."). The fact that the MHU Defendants' opinion conflicted with that of another medical professional does not chage the result. *See Estate of Cole,* 94 F.3d at 262 ("Mere differences of opinion among medical personnel regarding a patient's appropriate treatment do not give rise to deliberate indifference.") (citing *Estelle v. Gamble,* 429 U.S. at 107; *White v. Napoleon,* 897 F.2d 103, 109–10 (3d Cir.1990)).

*6 In a similar case involving a prison doctor's failure to prevent sufficient precautions to prevent an inmate from committing suicide, the Seventh Circuit held that "[L]iability may be imposed only when the decision by the professional is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible did not base the decision on such a judgment." *Id.* (footnotes omitted).

Considering the totality of Sims's treatment by the MHU Defendants and the timing of his suicide threats, the Court finds as a matter of law that even if the MHU Defendants' treatment decision was erroneous, deliberate indifference cannot be inferred because the decision was not "such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible did not base the decision on such a judgment," *Estate of Cole,* 94 F.3d at 262 (citing *Youngberg v. Romeo,* 457 U.S. 307, 322–23, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982)). Accordingly, Plaintiff's first cause of action alleging an Eighth Amendment violation against the MHU Defendants is dismissed. *See Estate of Cole,* 94 F.3d at 263 (prison doctor's diagnosis of pre-trial detainee (who asphyxiated himself with a plastic bag) as a "potential suicide risk" rather than as a "high suicide risk" requiring greater precautions was such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the doctor did not base her diagnosis on such judgment; thus, plaintiffs cannot establish that the doctor was deliberately indifferent to the decedent's serious medical needs).

### 2. Substantive Due Process Violation by Captain Kearney

As his second cause of action, Plaintiff contends that Captain Kearney violated his constitutional rights by ordering that he be placed in a " 'stripped cell' with nothing but a half-inch 'mat'[.]" Pl. Reb. at 6. In his complaint, Plaintiff characterizes this cause of action as a due process claim arising under the Eleventh Amendment. *See* Dkt. # 1. Defendants have interpreted his allegations as sounding in substantive due process, and the Court agrees with this approach.

"Substantive due process protects individuals against government action that is arbitrary, ... conscience-shocking, ... or oppressive in a constitutional sense, ... but not against constitutional action that is incorrect or ill-advised." *Lowrance v. Achtyl,* 20 F.3d 529, 537 (2d Cir.1994) (internal quotation marks and citations omitted). "Very few conditions

of prison life are 'shocking' enough to violate a prisoner's right to substantive due process." *Samms v. Fischer,* No. 9:10–CV–0349 (GTS/GHL), 2011 WL 3876528, at \*12 (N.D.N.Y. Mar.25, 2011) (citing *Sandin v. Conner,* 515 U.S. 472, 479 n. 4, 484, 115 S.Ct. 2293, 132 L.Ed.2d 418, (1995) (providing only two examples of the type of condition "shocking" enough to offend substantive due process principles-the transfer to a mental hospital and the involuntary administration of psychotropic drugs)).

**\*7** The first step in a substantive due process analysis is to identify the precise constitutional right at stake. *Lowrance,* 20 F.3d at 537 (citing *Collins v. City of Harker Heights,* 503 U.S. 115, 125, 112 S.Ct. 1061, 117 L.Ed.2d 261 (1992)). Here, the Court assumes for the sake of argument that Plaintiff had a substantive due process right to possess the property in question (e.g., clothing, normal bedding, and other items of personal property) unless grounds existed for Captain Kearney to deny Plaintiff access to them. *E.g., Smith v. Burge,* No. 9:03–CV–0955 (LEK/GHL), 2006 WL 2805242, at \*8 (N.D.N.Y. Sept.28, 2006) (citing 7 N.Y.C.R.R. § 305.2(a) ("An order depriving an inmate of a specific item ... may be issued when it is determined that a threat to the safety or security of staff, inmates, or State property exists ....")); *see also* 7 N.Y.C.R.R. § 305.2(e) ("Any deprivation order depriving an inmate of minimum standard items (e.g., bedding, clothing, etc.) for 'mental health' or 'psychiatric' reasons must be approved by an appropriate clinical professional or, in their absence, by the ranking facility health service professional.").

Sims contends that Captain Kearney's deprivation order citing safety and security concerns was unfounded given MHU's assessment that he was no longer a threat to himself and could be placed in a regular cell in SHU. Therefore, Sims argues, the deprivation was not authorized under 7 N.Y.C.R.R. § 305.2(a). *See* Pl. Reb. at 6–7. Sims also asserts that Captain Kearney's deprivation order could not be justified under 7 N.Y.C.R.R. § 305.2(e) because individuals in the MHU "assured [him] that it wasn't a decision by [a] mental health or medical professional," Pl. Reb. at 7, to issue the deprivation order.

However, "it is not material to a substantive due process claim whether an inmate's conduct 'in fact gave [a corrections officer] reasonable grounds to believe that [the inmate] posed a threat to the order of the [correctional] facility or whether [the alleged deprivation sustained by the inmate] therefore in fact violated [a particular DOCS rule or regulation] [,]' "

*Smith v. Burge,* 2006 WL 2805242, at \*9 (quoting *Lowrance,* 20 F.3d at 537, n. 6) ( "We express no view as to whether [ the inmate]'s conduct in fact gave [the officer] reasonable grounds to believe that [the inmate] posed a threat to the order of the facility or whether [the inmate]'s administrative confinement therefore in fact violated section 251–1.6(a). These issues, which rely on facts that may be disputed, are not material to [the inmate]'s due process claims.").)

The Court agrees with Plaintiff that the manner in which the deprivation order was written (noting that Plaintiff "continue[s] to manipulate staff by threatening, feigning and actually committing acts of self harm") could be interpreted as retributive. In addition, it is arguable that 7 N.Y.C.R.R.R. § 305.2(e) may not apply when a safety concern does not affect inmates other than the one who is suffering the deprivation order, and that *id.,* § 305.2(e), which permits deprivations for psychiatric or mental reasons, instead should have applied here. However, whether or not Captain Kearney in fact violated 7 N.Y.C.R.R. § 305.2 is not dispositive because the standard for substantive due process claims is whether the complained-of conduct was arbitrary or conscienceshocking. *See Smith v. Burge,* 2006 WL 2805242, at \*9 (citing *Lowrance,* 20 F.3d at 537). Captain Kearney arguably could have concluded that in light of Sims's recent suicide attempt upon being moved from MHU to SHU, it would be prudent to deprive Sims of the means to make another such attempt and observe how he adjusted to his new situation for a period of time. Furthermore, the total deprivation only lasted for one day; Plaintiff was given a toothbrush, undergarments, pen, paper, and two envelopes on September 3, 2009. On September 4, 2009, he was given a set of "greens" (pants and shirt), a mattress, two sheets, a pillow and pillowcase, and a blanket. On September 8, 2009, all of his property was returned to him.

**\*8** Given Plaintiff's history and the brief length of the deprivation, the Court concludes that, as matter of law, Captain Kearney's conduct was not arbitrary or conscience-shocking in the constitutional sense. In other words, Plaintiff has failed to create a triable question of fact as to whether the state action-the deprivation order-was arbitrary in the constitutional sense and therefore violative of substantive due process. Accordingly, the Court grants summary judgment dismissing the second cause of action involving Captain Kearney.

### IV. Conclusion

For the foregoing reasons, defendants' motion for summary judgment (Dkt.# 30) is granted and Plaintiff's complaint (Dkt.# 1) is dismissed in its entirety with prejudice. The Clerk of the Court is directed to close this case.

**SO ORDERED.**

**All Citations**

Not Reported in F.Supp.2d, 2012 WL 566875

---

**End of Document**

© 2021 Thomson Reuters. No claim to original U.S. Government Works.

Case 9:19-cv-01161-DNH-TWD    Document 79    Filed 11/10/21    Page 95 of 125

Robinson v. Taylor, Not Reported in Fed. Supp. (2019)

2019 WL 1429529

2019 WL 1429529
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Rendell ROBINSON, Plaintiff,

v.

James TAYLOR, et al., Defendants.

9:16-CV-285 (DJS)
|
Signed 03/29/2019

**Attorneys and Law Firms**

RENDELL ROBINSON, Plaintiff, Pro Se, 400 East 30th Street, New York, NY 10016.

HON. LETITIA JAMES, OF COUNSEL: RYAN L. ABEL, ESQ., Assistant Attorney General, New York State Attorney General, The Capitol, Albany, New York 12224, Attorney for Defendants.

**MEMORANDUM-DECISION and ORDER** [1]

[1]   The parties have consented, pursuant to 28 U.S.C. § 636(c), to have the undersigned handle all proceedings in this case. Dkt. No. 55.

Daniel J. Stewart, U.S. Magistrate Judge

*1  Plaintiff, formerly an inmate in the custody of the New York State Department of Corrections and Community Supervision ("DOCCS"), brings this *pro se* action pursuant to 42 U.S.C. § 1983, alleging that Defendants violated his rights while incarcerated at the Great Meadow Correctional Facility. Dkt. No. 1, Compl. Presently pending is Defendants' Motion for Partial Summary Judgment. Dkt. No. 82. Defendants additionally filed various medical records in support of the Motion. Dkt. Nos. 83 & 84. Plaintiff made several submissions in opposition to the Motion. Dkt. Nos. 96, 98, 101, & 103. Defendants filed a Reply Memorandum of Law. Dkt. No. 102. For the reasons which follow, Defendants' Motion is granted.

**I. LEGAL STANDARD FOR SUMMARY JUDGMENT**

Pursuant to FED. R. CIV. P. 56(a), summary judgment is appropriate only where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The moving party bears the burden to demonstrate through "pleadings, depositions, answers to interrogatories, and admissions on file, together with [ ] affidavits, if any," that there is no genuine issue of material fact. *F.D.I.C. v. Giammettei*, 34 F.3d 51, 54 (2d Cir. 1994) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) ).

To defeat a motion for summary judgment, the non-movant must set out specific facts showing that there is a genuine issue for trial and cannot rest merely on allegations or denials of the facts submitted by the movant. FED. R. CIV. P. 56(c); *see also Scott v. Coughlin*, 344 F.3d 282, 287 (2d Cir. 2003) ("Conclusory allegations or denials are ordinarily not sufficient to defeat a motion for summary judgment when the moving party has set out a documentary case."); *Rexnord Holdings, Inc. v. Bidermann*, 21 F.3d 522, 525-26 (2d Cir. 1994). To that end, sworn statements are "more than mere conclusory allegations subject to disregard ... they are specific and detailed allegations of fact, made under penalty of perjury, and should be treated as evidence in deciding a summary judgment motion" and the credibility of such statements is better left to a trier of fact. *Scott v. Coughlin*, 344 F.3d at 289 (citing *Flaherty v. Coughlin*, 713 F.2d 10, 13 (2d Cir. 1983) and *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995) ).

When considering a motion for summary judgment, the court must resolve all ambiguities and draw all reasonable inferences in favor of the non-movant. *Nora Beverages, Inc. v. Perrier Group of Am., Inc.*, 164 F.3d 736, 742 (2d Cir. 1998). "[T]he trial court's task at the summary judgment motion stage of the litigation is carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them. Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution." *Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1224 (2d Cir. 1994). Furthermore, where a party is proceeding *pro se*, the court must "read [his or her] supporting papers liberally, and ... interpret them to raise the strongest arguments that they suggest." *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994); *see also Soto v. Walker*, 44 F.3d 169, 173 (2d Cir. 1995). Nonetheless, summary judgment is appropriate "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

Case 9:19-cv-01161-DNH-TWD    Document 79    Filed 11/10/21    Page 96 of 125

Robinson v. Taylor, Not Reported in Fed. Supp. (2019)
2019 WL 1429529

## II. FACTUAL BACKGROUND

*2  The allegations in the Complaint, as relevant to this Motion, concern events in March 2013 at Great Meadow Correctional Facility where Plaintiff was then confined, Compl. at ¶ 25, and are outlined in summary form below. This factual recitation sets forth the general timeline and substance of the allegations at issue in the present Motion. The Court acknowledges that many particular facts related to these events are clearly disputed by the parties. The parties dispute, for example, who was present during certain medical appointments, whether Plaintiff cooperated during his medical examinations, whether Plaintiff made genuine threats of self-harm, whether Plaintiff actually attempted to commit suicide on March 20th or merely feigned that attempt, and whether other inmates refused to testify at Plaintiff's disciplinary hearing. *Compare generally* Dkt. No. 82-1, Defendants' Statement of Material Facts ("Defs.' 7.1 Statement") *with* Dkt. No. 96, Plaintiff's Response to Defendants' Statement of Material Facts ("Pl.'s' 7.1 Statement"). In addressing Defendants' arguments in favor of the Motion, the Court has, as it must, construed those factual disputes in the light most favorable to the Plaintiff. *Quaratino v. Tiffany & Co.*, 71 F.3d 58, 64 (2d Cir. 1995). For the reasons set forth in Part III of this Opinion, however, many of those factual disputes do not present disputes as to "material facts" which preclude summary judgment.

### 1. Plaintiff's Medical Claims

On March 12th, Plaintiff was involved in a use of force incident with a number of correctional staff. *Id.* at ¶¶ 53-65. [2] Following that incident, Plaintiff was seen by Physician's Assistant Nesmith. Dkt. No. 82-3, Declaration of Fisher Nesmith ("Nesmith Decl."), ¶¶ 1-2. Nesmith's examination noted no apparent injuries and no need for treatment, although Plaintiff alleges that he was suffering pain and requested, but was denied, treatment for that pain. *Id.* at ¶ 3; Dkt. No. 96-1, Declaration of Rendell Robinson ("Robinson Decl."), ¶¶ 14-15.

[2]    Defendants have not sought summary judgment as to the circumstances underlying that incident.

Within Great Meadow Correctional Facility there is a Residential Crisis Treatment Program ("RCTP") for the treatment of inmates whose mental health condition necessitates special treatment. Dkt. No. 82-7, Declaration of Kalyana Battu ("Battu Decl."), ¶¶ 3-4. Observation cells within the RCTP are commonly referred to as the "OBS Unit." *Id.* at ¶ 3. Treatment staff in the RCTP are commonly mental health professionals employed by the New York State Office of Mental Health, not DOCCS. *See generally id.* After being seen by Nesmith, the decision was made to admit Plaintiff for observation in the RCTP rather than admit him to Great Meadow's Special Housing Unit ("SHU") because of potential threats of self-harm made by Plaintiff. *See id.* at ¶¶ 11-12. Over the course of the next several days Dr. Battu, who is a psychiatrist, and other OMH employees met with Plaintiff and evaluated his mental health. *Id.* at ¶¶ 1; 13-29.

On March 14th, Plaintiff was seen during sick call by Nurse Kimberly Lipka. Dkt. No. 82-4, Declaration of Kimberly Lipka ("Lipka Decl."), ¶ 2. Lipka maintains that she examined Plaintiff, who complained of ear pain, but noted no distress, no difficulty hearing, and no drainage from his ear. *Id.* at ¶¶ 3-4. Plaintiff contends that he requested medical treatment from Lipka, which was not provided. Compl. at ¶ 158. Later that day, Defendant Nesmith saw Plaintiff during emergency sick call. Nesmith Decl., at ¶ 8. At this time Plaintiff complained of eye, foot, and face pain, but Nesmith found no acute distress. *Id.* at 10; Declaration of Richard Lombardo ("Lombardo Decl."), Ex. A ("Pl.'s Dep.") at p. 209. Plaintiff requested x-rays, ice, and pain medication. *Id.* Nesmith did order that Plaintiff receive pain medication and that Plaintiff be admitted to the facility infirmary. Nesmith Decl. at ¶ 11. The following day, Dr. Raymond Maddocks saw Plaintiff in the infirmary. Dkt. No. 82-5, Declaration of Raymond Maddocks ("Maddocks Decl."), ¶¶ 2 & 4. Plaintiff complained of similar injuries and requested medication and that x-rays be done. Pl.'s Dep. at pp. 212-213. Maddocks observed no significant injuries and discharged Plaintiff from the infirmary. Maddocks Decl. at ¶¶ 4-5.

Between March 12th and March 20th, DOCCS and OMH staff had numerous interactions with Plaintiff assessing whether his mental health conditions required that he remain in the RCTP or be admitted to SHU, which security staff had directed following the March 12th use of force incident. Battu Decl. at ¶¶ 10-29; Dkt. No. 84. On March 20th, Dr. Battu directed that Plaintiff be discharged from the RCTP. Battu Decl. at ¶ 26. Dr. David Karandy, the DOCCS Facility Health Services Director at Great Meadow, reviewed Plaintiff's medical records and cleared Plaintiff for admission to SHU. Dkt. No. 82-6, Declaration of David Karandy ("Karandy Decl.") at ¶¶ 1-4.

Case 9:19-cv-01161-DNH-TWD    Document 79    Filed 11/10/21    Page 97 of 125

Robinson v. Taylor, Not Reported in Fed. Supp. (2019)
2019 WL 1429529

**\*3** Shortly after being admitted to SHU Plaintiff claims he attempted suicide. Pl.'s Dep. at pp. 219-221; Compl. at ¶ 140. Plaintiff was brought back to the facility infirmary where he claims that Karandy and Lipka denied him proper medical treatment. Compl. at ¶¶ 142-151. Karandy contends that he observed no injuries upon examining Plaintiff. Karandy Decl. at ¶¶ 8 & 10.

### 2. Plaintiff's Conditions of Confinement Claim

The Complaint alleges that while housed in the OBS Unit, Plaintiff was denied food, showers, and access to mental health treatment over a period of approximately eight days. *See* Compl. at ¶¶ 79-80. Plaintiff claims that Defendants falsified the OBS logbook on those occasions when they denied him a meal or other services so that the logbook reflected that Plaintiff refused the meal, shower, or to see medical personnel. *Id.* During this time Corrections Officer Leon Renaud worked in the OBS Unit only four days. Dkt. No. 82-10, Declaration of Leon Renaud ("Renaud Decl."), ¶ 12. Each of those days, Defendant Renaud worked the 4 p.m. to midnight shift. *Id.* On those days, all meals, showers, and mental health treatment was provided prior to Renaud coming on duty in the OBS Unit. *Id.* at ¶¶ 14-38. Also, during that time period, the OBS Unit logbook does not reflect that Plaintiff refused any service while Renaud was on duty. Lombardo Decl., Ex. K.

### 3. Plaintiff's Due Process Claim

On March 12th, Plaintiff was issued a misbehavior report by Sgt. James Taylor. Lombardo Decl. at Ex. L. That report charged Plaintiff with seven violations of facility rules regarding the event that led to the use of force on that date. *Id.* Plaintiff was served with a copy of the report and received assistance from an employee prior to a hearing held regarding the report. Lombardo Decl., Ex. P at p. 3. At the hearing, Plaintiff requested certain documentary material, some of which was provided to him, and some of which he was advised did not exist. *Id.* at pp. 16-17 & 33. Plaintiff requested the testimony of three inmate witnesses, all of whom the hearing officer was told refused to testify. *Id.* at p. 24. At the completion of the hearing, Plaintiff was found guilty of five of the charges lodged in the misbehavior report and not guilty of the remaining two charges. Lombardo Decl., Ex. Q at p. 2. Plaintiff was sentenced to disciplinary confinement in SHU

where he served approximately 150 days confinement prior to the disciplinary determination being reversed. Dkt. No. 82-11, Declaration of Donald Venettozzi, ¶¶ 8-9.

### III. ANALYSIS OF DEFENDANTS' MOTION

Thirteen Defendants remain in this action following the Court's initial review of the Complaint under 28 U.S.C. §§ 1915(e)(2)(B) and 1915A(b). Dkt. No. 7. Seven of those Defendants, Nesmith, Lipka, Maddocks, Karandy, Battu, Renaud, and Quinn seek summary judgment here. The allegations against Nesmith, Lipka, Maddocks, Karandy, and Battu are that they were deliberately indifferent to Plaintiff's medical needs in violation of the Eighth Amendment. Plaintiff's claim against Defendant Renaud is also an Eighth Amendment claim, but relates to allegedly unlawful conditions of confinement. Plaintiff alleges that Defendant Quinn denied him due process in violation of the Fourteenth Amendment in the manner through which Quinn conducted a disciplinary hearing involving charges against Plaintiff.

### A. Medical Indifference Claims

**\*4** To state an Eighth Amendment claim for denial of adequate medical care, a prisoner must demonstrate that prison officials acted with "deliberate indifference to serious medical needs." *Estelle v. Gamble,* 429 U.S. 97, 104 (1976). "[T]he plaintiff must allege conduct that is 'repugnant to the conscience of mankind' or 'incompatible with the evolving standards of decency that mark the progress of a maturing society.' " *Ross v. Kelly,* 784 F. Supp. 35, 44 (W.D.N.Y. 1992) (quoting *Estelle v. Gamble,* 429 U.S. at 102, 105-06). To state a claim for denial of medical care, a prisoner must demonstrate (1) a serious medical condition and (2) deliberate indifference. *Farmer v. Brennan,* 511 U.S. 825, 834-35 (1994); *Hathaway v. Coughlin* ("*Hathaway I*"), 37 F.3d 63, 66 (2d Cir. 1994).

The first prong is an objective standard and considers whether the medical condition is "sufficiently serious." *Farmer v. Brennan,* 511 U.S. at 834 (quoting *Wilson v. Seiter,* 501 U.S. 294, 297 (1991) ). The Second Circuit has stated that a medical need is serious if it presents "a condition of urgency that may result in degeneration or extreme pain." *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir. 1998) (internal quotation marks and citation omitted). Among the relevant factors to consider are "[t]he existence of an injury that a

2019 WL 1429529

reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain." *Id.* (quoting *McGuckin v. Smith*, 974 F.2d 1050, 1059-60 (9th Cir. 1992) ).

The second prong of the Eighth Amendment analysis is a subjective standard requiring a plaintiff to demonstrate that the defendant acted with the requisite culpable mental state similar to that of criminal recklessness. *Wilson v. Seiter*, 501 U.S. at 301-03; *Hathaway I*, 37 F.3d at 66. A plaintiff must demonstrate that the defendant acted with reckless disregard to a known substantial risk of harm. *Farmer v. Brennan*, 511 U.S. at 836. In order to rise to the level of deliberate indifference, the defendant must have known of and disregarded an excessive risk to the inmate's health or safety. *Wright v. Genovese*, 694 F. Supp. 2d 137, 154 (N.D.N.Y. 2010) (citing *Chance v. Armstrong*, 143 F.3d at 702). The defendant must both be aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists, and he or she must draw that inference. *Chance v. Armstrong*, 143 F.3d at 702 (quoting *Farmer v. Brennan*, 511 U.S. at 837).

### 1. Nesmith

Following a use of force incident at Great Meadow, Plaintiff was brought to the facility infirmary for an examination which was conducted by Defendant Nesmith. Nesmith Decl. at ¶ 2. Nesmith observed no visible injuries and no acute distress on the part of Plaintiff during this examination. *Id.* at ¶ 3. Accordingly, no treatment was provided. *Id.*; *see also* Dkt. No. 83 at pp. 3-6. Plaintiff claims that he suffered significant injuries during the use of force, including contusions and lacerations, and was suffering from pain. Pl.'s Decl. at ¶ 14. The Court has reviewed photographs and video taken of Plaintiff after the incident, Lombardo Decl., Exs. C & D; Dkt No. 103, and concludes that there are no readily visible injuries which could create questions of fact regarding Defendant Nesmith's recitation of Plaintiff's injuries. The videos also clearly establish that, contrary to his claims, Plaintiff had the opportunity to advise Nesmith of pain he was suffering but did not do so. Lombardo Decl., Ex. C. Nesmith examined Plaintiff and made a medical judgment regarding Plaintiff's condition and need for treatment. In doing so he was not indifferent to any serious medical need.

**\*5** Nesmith saw Plaintiff again on March 14th at which time Plaintiff was complaining of head, ear, eye, face, neck, leg, and foot pain. Compl. at ¶ 158; Pl.'s Dep. at pp. 204-206. Plaintiff claims that Defendant failed to have x-rays taken to assess his condition. Compl. at ¶ 160; Pl.'s Dep. at p. 204. Nesmith's failure to order x-rays is no basis for relief as it is well established that "disagreements over medications, diagnostic techniques (*e.g.*, the need for X-rays), forms of treatment, or the need for specialists or the timing of their intervention, are not adequate grounds for a Section 1983 claim." *Sonds v. St. Barnabas Hosp. Corr. Health Servs.*, 151 F. Supp. 2d 303, 312 (S.D.N.Y. 2001); *see also Revels v. Corr. Med. Care, Inc.*, 2018 WL 1578157, at *4 (N.D.N.Y. Mar. 28, 2018) ("A mere disagreement with a prescribed course of treatment is not sufficient to establish a violation of the Eighth or Fourteenth Amendment."); *Washington v. Westchester Cty. Dep't of Corr.*, 2014 WL 1778410, at *6 (S.D.N.Y. Apr. 25, 2014) ("it is well-settled that the ultimate decision of whether or not to administer a treatment or medication is a medical judgment that, without more, does not amount to deliberate indifference.").

In addition, the record fails to support a claim of deliberate indifference given the treatment that was provided. Nesmith performed an examination of Plaintiff during which he observed no acute distress and normal vital signs. Nesmith Decl. at ¶ 10. Nesmith's nonetheless directed that Plaintiff be admitted to the facility hospital and prescribed Tylenol for his pain. *Id.* at ¶ 11; Lombardo Decl., Ex. B at p. 7. Such conduct clearly did not demonstrate that the defendant acted with reckless disregard to a known substantial risk of harm, *Farmer v. Brennan*, 511 U.S. at 836, but instead was aware of Plaintiff's complaints and admitted him to the hospital for further observation by medical staff. Doing so was not deliberately indifferent to Plaintiff's needs.

Accordingly, Defendant Nesmith's Motion for Summary Judgment is granted.

### 2. Lipka

Plaintiff alleges that Nurse Lipka was deliberately indifferent to his medical needs on March 14, 2013. The record establishes that Plaintiff was seen by Defendant Lipka that day in his cell during sick call rounds. Plaintiff complained of ear pain. Lipka Decl. at ¶ 4. Nurse Lipka examined Plaintiff, found him to be in no acute distress with no difficulty hearing, and she noted no drainage from his ear. Dkt. No. 83 at

Case 9:19-cv-01161-DNH-TWD    Document 79    Filed 11/10/21    Page 99 of 125

Robinson v. Taylor, Not Reported in Fed. Supp. (2019)

2019 WL 1429529

p. 7. A serious medical need is "a condition of urgency that may result in degeneration or extreme pain." *Chance v. Armstrong*, 143 F.3d 698, 702. Plaintiff makes no allegation that his ear pain worsened with time or was causing him any other difficulty that would raise a question of fact regarding its seriousness. Plaintiff's alleged ear pain, especially in the absence of any difficulty hearing or other obvious sign of trauma to the ear, fails to establish a serious medical condition sufficient to establish an Eighth Amendment claim. *Chavis v. Chappius*, 2015 WL 1472117, at *17 (W.D.N.Y. Mar. 31, 2015); *Jones v. Furman*, 2007 WL 894218, at *10 (W.D.N.Y. Mar. 21, 2007) (noting that soreness, small abrasions on the nose, and swelling and pain behind the right ear and back of the head are not serious medical conditions).

Plaintiff also claims that Nurse Lipka was present on March 20th when he was brought to the facility infirmary. Plaintiff claims that Lipka failed to provide Plaintiff with ice and pain medication on that occasion. Even if true, this factual allegation alone is insufficient to establish deliberate indifference. "While Plaintiff did not receive his desired treatment including being provided with an ice pack and receiving pain medication, 'it is well-settled that the ultimate decision of whether or not to administer a treatment or medication is a medical judgment that, without more, does not amount to deliberate indifference.' " *Crouch v. Spaulding*, 2019 WL 1004539, at *4 (N.D.N.Y. Jan. 24, 2019), *report and recommendation adopted*, 2019 WL 1004357 (N.D.N.Y. Mar. 1, 2019) (quoting *Washington v. Westchester Cty. Dep't of Corr.*, 2014 WL 1778410, at *6 (S.D.N.Y. Apr. 25, 2014) ); *see also White v. Williams*, 2016 WL 1237712, at *12 (N.D.N.Y. Jan. 11, 2016), *report and recommendation adopted*, 2016 WL 1239263 (N.D.N.Y. Mar. 29, 2016) (claim that inmate should have been given ice pack and pain medication "amounts to a dispute over the appropriate treatment, and does not state an Eighth Amendment claim.").

**\*6** For these reasons, Defendant Lipka's Motion for Summary Judgment is granted.

### 3. Maddocks

Plaintiff was seen in the facility infirmary on March 15, 2013 by Dr. Maddocks in relation to complaints of head, back, and neck pain after Plaintiff had been admitted to the infirmary the previous day by Nesmith. Maddocks Decl. at ¶ 2. Defendant reviewed Plaintiff's records, including notations that Plaintiff had been ambulating with no apparent difficulty,

and examined Plaintiff and noted no apparent injury. *Id.* at ¶¶ 3-4. Maddocks, therefore, ordered Plaintiff discharged from the infirmary. *Id.* at ¶ 5. Plaintiff claims Maddox was indifferent to his medical needs because he failed to provide Plaintiff with ice and pain medication and also failed to order x-rays. Pl.'s Dep. at p. 212. As already discussed "disagreements over medications, diagnostic techniques (e.g., the need for X-rays), [and] forms of treatment ... are not adequate grounds for a Section 1983 claim." *Sonds v. St. Barnabas Hosp. Corr. Health Servs.*, 151 F. Supp. 2d at 312. Given that Plaintiff's sole claim is that he requested particular treatment from Maddox that was not provided, he has failed to establish deliberate indifference. *Crouch v. Spaulding*, 2019 WL 1004539, at *4 (N.D.N.Y. Jan. 24, 2019), *report and recommendation adopted*, No. 2019 WL 1004357 (N.D.N.Y. Mar. 1, 2019); *Washington v. Westchester Cty. Dep't of Corr.*, 2014 WL 1778410, at *6.

Maddocks' Motion for Summary Judgment, therefore, is granted.

### 4. Karandy

Plaintiff alleges that on March 20, 2013 after being admitted to the Special Housing Unit he attempted suicide by trying to hang himself with torn bed sheets. Pl.'s Dep. at pp. 219-221. Plaintiff claims that Dr. Karandy was deliberately indifferent to his medical needs both in clearing Plaintiff for admission to SHU and then in failing to provide adequate treatment after the suicide attempt. *Id.* at pp. 219-224.

On March 20th, Plaintiff was housed in OBS, but had been cleared by OMH staff to be released to SHU. Karandy Decl. at ¶ 2. Plaintiff then needed to be cleared by DOCCS medical staff and Dr. Karandy, the Facility Health Services Director, undertook a review of Plaintiff's records. *Id.* at ¶¶ 2-3. In reviewing the records, Defendant found no evidence of significant or acute injury or ongoing medical problems that would preclude Plaintiff from being admitted to SHU and medically cleared him. *Id.* at ¶¶ 2-4. Plaintiff concedes that Dr. Karandy reviewed his records before clearing Plaintiff to be moved to SHU, but alleges that Defendant was aware of other medical facts that Plaintiff's claims should have precluded him from admission to SHU. Pl.'s 7.1 Statement at ¶ 10. Significantly, not included in the list of other relevant facts is any claim that Plaintiff was then suicidal. *Id.*; Compl. at ¶ 134. In making a decision about whether Plaintiff could be medically cleared for SHU admission, Dr. Karandy was

2019 WL 1429529

clearly exercising medical judgment. "Issues of medical judgment cannot be the basis of a deliberate indifference claim where evidence of deliberate indifference is lacking." *Hill v. Curcione*, 657 F.3d 116, 123 (2d Cir. 2011). Apart from apparently disagreeing with the determination, Plaintiff offers no evidence that rather than exercising his judgment Karandy knew Plaintiff was not medically able to go to SHU but chose to clear him anyway and so he cannot establish deliberate indifference. *Id.*

**\*7** Shortly after his admission to SHU, Plaintiff was discovered by staff with torn bed sheets around his neck. He was transported from SHU to the infirmary at Great Meadow where he was seen by Dr. Karandy. Dr. Karandy examined Plaintiff and noted no apparent injuries, no cervical marks or deformities, and observed that Plaintiff could easily move his neck in multiple directions. Karandy Decl. at ¶¶ 8 & 10. Based on his examination, Dr. Karandy found that no further treatment was necessary, but referred Plaintiff back to the OBS Unit for further evaluation. Karandy Decl. at ¶ 10. Far from deliberate indifference, referring Plaintiff to the supervision of mental health staff following his alleged suicide attempt demonstrates that Defendant was not disregarding a known risk to Plaintiff's health and safety. *Atkins v. Cty. of Orange*, 372 F. Supp. 2d 377, 413 (S.D.N.Y. 2005) (no deliberate indifference when Plaintiff was referred to mental health housing unit after suicide attempt).

Dr. Karandy's Motion for Summary Judgment is granted.

### 5. Battu

Dr. Battu is employed by OMH, not DOCCS, as a psychiatrist. Battu Decl. at ¶ 1. He worked as part of a treatment team evaluating Plaintiff's mental health during admissions to the OBS unit at Great Meadow between March 12 and March 25, 2013. *See generally* Battu Decl. Plaintiff alleges that Dr. Battu was deliberately indifferent to his medical needs during this time period because Plaintiff made multiple statements to Battu that if forced to return to SHU he would attempt suicide, but that Dr. Battu failed to provide appropriate treatment. Pl.'s Dep. at pp. 225-230.

The record establishes that Plaintiff spoke with Dr. Battu on multiple occasions.[3] They first met on March 13th and while Plaintiff suggested that he would try to kill himself on that date, Battu observed Plaintiff to have "no suicidal ideations, behaviors or plans; no acute warning signs or triggers; and

no risk factors of suicide." Battu Decl. at ¶ 13. Dr. Battu concluded in his judgment that Plaintiff was not a harm to himself, but prescribed him medication and directed that he remain in the OBS Unit for continued observation. *Id.*

[3]      Plaintiff and Dr. Battu spoke via video conference, apparently because Dr. Battu worked at Central New York Psychiatric Center not Great Meadow. *See* Battu Decl. at ¶¶ 2 & 13.

Defendant spoke with Plaintiff again the next day, again noting no suicidal ideations, behaviors or plans; no acute warning signs or triggers; and no risk factors of suicide. *Id.* at ¶ 15. Given his judgment that Plaintiff was not suicidal, Plaintiff was cleared for release from the OBS Unit. *Id.* Between March 14 and March 20, Plaintiff was regularly seen by DOCCS health facility and OMH Staff which ultimately resulted in Plaintiff's readmission to the OBS Unit. *Id.* at ¶¶ 16-25. Dr. Battu spoke again with Plaintiff on the morning of March 20th, the day after being brought back to the OBS Unit. *Id.* at ¶ 26. Dr. Battu again concluded that, based on his medical judgment, Plaintiff did not pose a danger to himself and could be released from the OBS Unit. *Id.*

Later in the day on March 20th, Plaintiff claims to have attempted suicide. Compl. at ¶ 140. The fact that Plaintiff attempted suicide after medical professionals had examined him and found him not to be a risk of harm to himself does not itself establish deliberate indifference. *Sonberg v. Niagara Cty. Jail*, 2012 WL 5617539, at \*9 (W.D.N.Y. Nov. 15, 2012). The record establishes that medical providers attending to Plaintiff believed his threats of suicide were an attempt to manipulate staff to avoid being sent to SHU. *See* Battu Decl. at ¶ 38. In that regard this case is similar to *Sims v. Gorman* where mental health professionals named as defendants believed the plaintiff's threats of suicide "reflected attempts at manipulation rather than a true crisis." 2012 WL 566875, at \*5 (W.D.N.Y. Feb. 21, 2012). The Court there found no deliberate indifference despite an eventual suicide attempt by the plaintiff because the decisions made by mental health professionals "are issues within a professional medical judgment" which does not form a basis for an Eighth Amendment claim. *Id.* (citing cases). That Defendant Battu "might have ultimately been wrong in his professional judgment does not support a showing of deliberate indifference." *Mercado v. City of New York*, 2011 WL 6057839, at \* 5 (S.D.N.Y. Dec. 5, 2011). Given the record in this case of Battu's actions, including initially continuing Plaintiff for observation in the OBS Unit and prescribing him medication, Plaintiff fails to raise any triable question of fact

Case 9:19-cv-01161-DNH-TWD    Document 79    Filed 11/10/21    Page 101 of 125

Robinson v. Taylor, Not Reported in Fed. Supp. (2019)

2019 WL 1429529

that Defendant was acting out of indifference rather than in exercise of his judgment.

**\*8** For these reasons, Defendant Battu's Motion for Summary Judgment is granted.

### B. Conditions of Confinement Claim

> Generally, to state a claim of inadequate prison conditions, a plaintiff must allege facts plausibly suggesting two things: (1) that the conditions of his confinement resulted in deprivation that was sufficiently serious such that the prisoner was denied the minimal civilized measure of life's necessities; and (2) that the defendant acted with deliberate indifference to the plaintiff's health or safety.

*Sharpe v. Taylor*, 2009 WL 1743987, at \*11 (N.D.N.Y. June 18, 2009) (citing *Farmer v. Brennan*, 511 U.S. 825, 834 (1994); *Trammell v. Keane*, 338 F.3d 155, 161 (2d Cir. 2003) ). Plaintiff alleges that Defendant Renaud is liable under the Eighth Amendment because he denied Plaintiff meals, showers, and access to mental health treatment while Plaintiff was housed in the OBS unit in March 2013. Pl.'s Dep. at p. 178. While such claims potentially could give rise to an Eighth Amendment claim depending upon the circumstances, *see Butler v. Hogue*, 2010 WL 4025886, at \*3 (N.D.N.Y. Oct. 13, 2010), the facts do no bear out Plaintiff's claims and as a result Defendant's Motion for Summary Judgment is granted. During the time in question, Defendant Renaud worked in the OBS Unit on only four days, March 12, 13, 18, and 19, and always on the 4 p.m. to midnight shift. Renaud Decl. at 12; Defs.' 7.1 Statement at ¶ 17; Pl.'s 7.1 Statement at ¶ 17. Plaintiff claims that on these days, Renaud refused to provide Plaintiff with meals, showers, or access to mental health treatment providers and that any notations in facility log books indicating instead that Plaintiff refused these meals or services are falsified. Pl.'s Dep. at pp. 183-184. A review of those facility logbook entries for the time in dispute, however, reveals that on the days that Defendant Renaud worked all meals, showers, and mental health treatment had already

been provided before Renaud came to work. *See generally* Lombardo Decl., Ex. K. On each of these days, for example, dinner was served before Renaud went to work at 4 p.m. *Id.* at pp. 8 (dinner served at 2:45 p.m. on March 12); 13 (dinner served at 2:50 p.m. on March 13); 35 (dinner served at 2:38 p.m. on March 18); 40 (dinner served at 2:40 p.m. on March 19). Similarly, the records show that on March 13 and March 18 showers were provided to inmates in the morning, again before Renaud's shift began at 4 p.m. *Id.* at pp. 9 & 31.[4] Finally, on each of the days in question inmates were seen by mental health providers in the morning. *Id.* at pp. 3, 4, 9, 31, & 36.

[4]    These were the only days at issue when showers were provided.

While the OBS logbook reflects a number of times when Robinson allegedly refused meals or showers, there is no such reference when Renaud was working. Lombardo Decl., Ex. K. There is no entry that Robinson refused any direction of staff during the four shifts Renaud worked. *See id.* As a result, even accepting as true for purposes of the Motion Plaintiff's claim that the logbook was falsified, there is no evidence in the record that Renaud refused Plaintiff a meal, shower, or mental health services. Plaintiff has thus failed to establish Renaud's involvement in any alleged constitutional deprivation and summary judgment is appropriate. *See, e.g.,* *McKinnon v. Patterson*, 568 F.2d 930, 934 (2d Cir. 1977) ("In this Circuit personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.").

### C. Due Process Claim

**\*9** In the context of an inmate disciplinary proceeding, due process requires that the inmate be: (1) afforded advance written notice of the charges against him; (2) provided a written statement supporting the disposition and reasons for the disciplinary action taken; (3) permitted to call witnesses and present documentary evidence; (4) entitled to a fair and impartial hearing officer; and (5) found guilty only if the disposition is supported by at least "some evidence." *Wolff v. McDonnell*, 418 U.S. 539, 563–64 (1974); *Kalwasinski v. Morse*, 201 F.3d 103, 108 (2d Cir. 1999) (citing cases). Additionally, because Plaintiff was confined to a special housing unit prior to his disciplinary hearing, he was also entitled to an employee assistant. *Clark v. Gardner*, 256 F. Supp. 3d 154, 170 (N.D.N.Y. 2017). The record here

Case 9:19-cv-01161-DNH-TWD   Document 79   Filed 11/10/21   Page 102 of 125

Robinson v. Taylor, Not Reported in Fed. Supp. (2019)

2019 WL 1429529

establishes that all of these due process requirements were complied with in Plaintiff's case. [5]

[5]    Defendant also contends summary judgment is appropriate based on Plaintiff's failure to establish that he had a protected liberty interest. *See Sandin v. Connor*, 515 U.S. 472 (1995). Plaintiff alleges that while confined in SHU he was forced to use stained linens and a dirty mattress with holes in it. Pl.'s Decl. at ¶ 56. Plaintiff also alleges that he was denied recreation, showers, and the ability to clean his cell on occasions. *Id.* at ¶ 64. For purposes of this Motion, these allegations are sufficient to establish questions of fact precluding summary judgment on this ground. *Welch v. Bartlett*, 196 F.3d 389, 393 (2d Cir. 1999) (finding questions of fact when SHU inmate's allegations of atypicality include receiving inadequate amounts of soap and cleaning materials and having a filthy mattress).

As to some of these requirements, there is no dispute. Plaintiff concedes that he received advance written notice of the charges. Defs.' 7.1 Statement at ¶ 18; Pl.'s 7.1 Statement at ¶ 18. There is also no dispute that Quinn provided Plaintiff with a copy of his written disposition of the charges. Defs.' 7.1 Statement at ¶ 22; Pl.'s 7.1 Statement at ¶ 22. Plaintiff also admits that he received assistance prior to the hearing. Defs.' 7.1 Statement at ¶ 19; Pl.'s 7.1 Statement at ¶ 19.

### *1. Denial of Witnesses and Documentary Evidence*

Plaintiff alleges that he was denied the testimony of three inmate witnesses. During the hearing Defendant Quinn discussed with Plaintiff the three inmates Plaintiff wished to have testify. Quinn advised Plaintiff that each refused to testify. The fact that "Plaintiff's witnesses refused to testify on his behalf does not alter the fact that the was given the opportunity to call witnesses." *Weaver v. Gutwein*, 2014 WL 906150, at *4 (N.D.N.Y. Mar. 7, 2014) (citing cases). While it may be that under New York State regulations a hearing officer may be under an obligation to conduct a further inquiry regarding the refusal to testify in certain circumstances, *see, e.g.*, *Moore v. Goord*, 281 A.D.2d 736, 737 (3d Dep't 2001); Lombardo Decl., Ex. R, it is established that as a matter of federal due process "a hearing officer is under no obligation to 'make an independent evaluation of the basis for the refusal to testify.' " *Smith v. Prack*, 2015 WL 5512951, at *7 (N.D.N.Y. Sept. 14, 2015) (quoting *Greene v. Coughlin*, 1995

WL 60020, at *14 (S.D.N.Y. Feb. 10, 1995) ) (citing cases); *see also Geraci v. Sticht*, 2017 WL 5501084, at *7 (W.D.N.Y. Nov. 16, 2017) ("courts in this Circuit have concluded that a hearing officer does not have to conduct an independent investigation before accepting an inmate-witness's refusal to testify.") (citing cases); *Jamison v. Fischer*, 2013 WL 5231457, at *3 (S.D.N.Y. July 11, 2013) ("an inmate has no constitutional claim simply because the hearing officer chooses not to inquire into a witness's reasons for refusing to testify"). Any error as a matter of state law in this regard, however, is not the basis for a federal constitutional claim against Quinn. *Caimite v. Venettozzi*, 2018 WL 6069458, at *5 (N.D.N.Y. Oct. 29, 2018), *report and recommendation adopted*, 2018 WL 6068414 (N.D.N.Y. Nov. 20, 2018) ("a violation of DOCCS procedures or state procedural rules regarding disciplinary hearings do not, alone, demonstrate a federal due process claim under § 1983").

**\*10** Plaintiff also claims that he was denied certain documentary evidence at the hearing, but the record does not support this allegation. Plaintiff requested an unusual incident report and video footage from his housing unit, both of which Quinn advised Plaintiff did not exist. Lombardo Decl., Ex. P at pp. 16-17 & 33; Pl.'s Dep. at p. 141. Plaintiff has not disputed that these documents do not exist and under well-established law "where the requested documents are found to be nonexistent, the inmate suffers no constitutional deprivation." *Mohamed v. Phelix*, 2017 WL 4326660, at *12 (N.D.N.Y. June 13, 2017), *report and recommendation adopted*, 2017 WL 4326520 (N.D.N.Y. Sept. 28, 2017) (citing *Mays v. Mahoney*, 1994 WL 48831, at * 7 (S.D.N.Y. Feb. 14, 1994) ). Plaintiff did request photographs which were provided at the hearing. Pl.'s Dep. at p. 140. This record establishes that Plaintiff was not denied any documentary evidence at his disciplinary hearing.

### *2. Alleged Bias on the Part of the Hearing Officer*

Plaintiff also claims that Quinn was not impartial in conducting the hearing. Plaintiff's claim of bias is largely conclusory. He contends that Quinn allowed Sergeant Taylor, the author of the misbehavior report against Plaintiff, to testify falsely. Pl.'s Dep. at pp. 130-31. He also contends that Quinn made certain off the record comments that he had to find Plaintiff guilty or certain unnamed individuals were "going to get on me." *Id.* at p. 133.

Case 9:19-cv-01161-DNH-TWD    Document 79    Filed 11/10/21    Page 103 of 125

Robinson v. Taylor, Not Reported in Fed. Supp. (2019)

2019 WL 1429529

"An impartial hearing officer is one who 'does not prejudge the evidence' or an inmate's guilt." *Sowell v. Bullis*, 2016 WL 1696454, at \*13 (N.D.N.Y. Mar. 25, 2016), *report and recommendation adopted*, 2016 WL 1700410 (N.D.N.Y. Apr. 27, 2016); *see also Allah-Kasiem v. Sidorowicz*, 2012 WL 2912930, at \*11 (S.D.N.Y. July 17, 2012). Plaintiff's only claim that Quinn prejudged the matter relates to his alleged off the record statement that he had to find Plaintiff guilty. "Plaintiff's unsupported assertion is the only evidence of this statement. Where claims of bias are based on purely conclusory allegations, 'they are routinely dismissed.' " *Williams v. Chuttey*, 2017 WL 9673722, at \*11 (N.D.N.Y. Sept. 5, 2017), *report and recommendation adopted*, 2018 WL 1413049 (N.D.N.Y. Mar. 21, 2018) (quoting *McAllister v. Call*, 2014 WL 5475293, at \*12 (N.D.N.Y. Oct. 29, 2014) ); *see also Brown v. Dubois*, 2017 WL 9511165, at \*3 (N.D.N.Y. Feb. 28, 2017), *report and recommendation adopted*, 2017 WL 1102746 (N.D.N.Y. Mar. 24, 2017) ("Claims of hearing officer bias are common in § 1983 cases by inmate plaintiffs, and where they are based on purely conclusory allegations, they are routinely dismissed."); *Lopez v. Whitmore*, 2015 WL 4394604, at \*11 (N.D.N.Y. July 16, 2015) ("An inmate's own subjective belief that the hearing officer was biased is insufficient to create a genuine issue of material fact.").

The conduct of the hearing also suggests that Quinn was not biased against Plaintiff. Plaintiff requested to see photographs taken after the use of force which Quinn allowed Plaintiff to have access to despite finding that they were not relevant to the charges lodged against Plaintiff. Lombardo Decl., Ex. P at p. 33. More significantly, the record establishes that Plaintiff was charged with seven facility rule violations and found guilty of five and not guilty of two. Lombardo Decl., Ex. Q at p. 2. That Quinn found Plaintiff not guilty of two of the charges lodged against him is perhaps the "most important[ ]" evidence suggesting a lack of bias. *Allah-Kasiem v. Sidorowicz*, 2012 WL 2912930, at \*11.

### 3. Sufficiency of the Evidence

Plaintiff does not specifically challenge the sufficiency of the evidence relied upon by Quinn to support his determination, apart from his claim that Taylor testified falsely at the hearing.

**\*11** "The Supreme Court has clarified that judicial review of the written findings required by due process is limited to determining whether the disposition is supported by some evidence." *McDonald v. Zerniak*, 2016 WL 6581289, at \*5 (N.D.N.Y. Nov. 4, 2016) (internal quotation omitted). This requires the Court to determine "whether there was reliable evidence of the inmate's guilt." *Luna v. Pico*, 356 F.3d 481, 488 (2d Cir. 2004). The record establishes that Quinn relied principally on the misbehavior report and Taylor's testimony, which Quinn found to be credible. Lombardo Decl., Ex Q at p. 4. "As the hearing officer, Defendant [Quinn] was authorized to make credibility determinations." *Lopez v. Whitmore*, 2015 WL 4394604, at \*11; *see also Neree v. O'Hara*, 2011 WL 3841551, at \*19 (N.D.N.Y. July 20, 2011), *report and recommendation adopted*, 2011 WL 3841553 (N.D.N.Y. Aug. 29, 2011) (noting discretion afforded to hearing officers). The "some evidence" standard is satisfied when hearing testimony was consistent with the written misbehavior report. *See Hinton v. Prack*, 2014 WL 4627120, at \*15 (N.D.N.Y. Sept. 11, 2014) ("some evidence" standard satisfied where the misbehavior report was made by the officer personally involved in the incident and was based upon his first hand observation and detailed account of the incident); *Kotler v. Daby*, 2013 WL 1294282, at \*10 (N.D.N.Y. Mar. 28, 2013) (same); *Creech v. Schoellkoph*, 688 F. Supp. 2d 205, 214 (W.D.N.Y. 2010) (same).

For these reasons, Defendant Quinn's Motion for Summary Judgment is granted.

### IV. CONCLUSION

For the reasons stated herein, it is hereby

**ORDERED**, that Defendants' Motion for Summary Judgment (Dkt. No. 82) be **GRANTED**; and it is further

**ORDERED**, that the following Defendants are Dismissed from this action: Nesmith, Lipka, Maddocks, Karandy, Battu, Renaud, and Quinn; and it is further

**ORDERED**, that the Clerk of the Court serve a copy of this Memorandum Decision and Order upon the parties to this action.

### All Citations

Not Reported in Fed. Supp., 2019 WL 1429529

**Robinson v. Taylor, Not Reported in Fed. Supp. (2019)**

2019 WL 1429529

---

**End of Document**
© 2021 Thomson Reuters. No claim to original U.S. Government Works.

---

2020 WL 1329138
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Nicholas ZIMMERMAN, Plaintiff,

v.

Steven RACETTE, et al., Defendants.

No. 9:17-CV-375
|
Signed 03/23/2020

**Attorneys and Law Firms**

Nicholas Zimmerman, Auburn, NY, pro se.

Brian W. Matula, New York State Attorney General, Albany, NY, for Defendants.

**DECISION & ORDER**

THOMAS J. McAVOY, Senior United States District Judge

**I. INTRODUCTION**

*1 This *pro se* action brought pursuant to 42 U.S.C. § 1983 was referred to the Hon. Christian F. Hummel, United States Magistrate Judge, for report and recommendation. Magistrate Judge Hummel issued a Report-Recommendation and Order on January 24, 2020 which addresses Defendants' motion for partial summary judgment (Dkt. No. 68). *See* 1/24/20 Rep.-Rec. & Ord. (Dkt. No. 83) ("Rep. Rec."). Magistrate Judge Hummel recommends that Defendants' motion for partial summary judgment be granted and that the following claims be dismissed with prejudice: (1) First Amendment retaliation claims against Sgt. Orzech, C.O. Mailloux, Sgt. Randall, C.O. Gadway, C.O. Lee, C.O. Beaudette, Sgt. Delisle, C.O. Stickney, and Dr. Adams; (2) First Amendment claim against Librarian Delisle; (3) First Amendment mail tampering claim against Clemons; and (4) Eighth Amendment medical indifference claim against Dr. Gillani. Rep. Rec. at 71-72. Magistrate Judge Hummel also recommends that the following defendants be terminated from this action: Dr. Gillani, Dr. Adams, Librarian Delisle, C.O. Mailloux, C.O. Beaudette, C.O. Gadway, C.O. Stickney, and Clemons. *Id.* at 72. Plaintiff filed objections to these recommendations. Pl. Obj., Dkt. No. 86.

**II. STANDARD OF REVIEW**

When objections to a magistrate judge's report and recommendation are lodged, the district court makes a "*de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made." See 28 U.S.C. § 636(b)(1)(C); *see also United States v. Male Juvenile*, 121 F.3d 34, 38 (2d Cir. 1997)(The Court must make a *de novo* determination to the extent that a party makes specific objections to a magistrate's findings.). "[E]ven a *pro se* party's objections to a Report and Recommendation must be specific and clearly aimed at particular findings in the magistrate's proposal, such that no party be allowed a second bite at the apple by simply relitigating a prior argument." *Machicote v. Ercole*, 2011 WL 3809920, at * 2 (S.D.N.Y., Aug. 25, 2011)(citations and interior quotation marks omitted); *DiPilato v. 7-Eleven, Inc.*, 662 F. Supp.2d 333, 340 (S.D.N.Y. 2009)(same).

General or conclusory objections, or objections which merely recite the same arguments presented to the magistrate judge, are reviewed for clear error. *Farid v. Bouey*, 554 F. Supp. 2d 301, 306 n. 2 (N.D.N.Y. 2008); *see Fisher v. Miller*, No. 916CV1175GTSATB, 2018 WL 3854000, at *3 (N.D.N.Y. Aug. 14, 2018)("[W]hen an objection merely reiterates the same arguments made by the objecting party in its original papers submitted to the magistrate judge, the Court subjects that portion of the report-recommendation challenged by those arguments to only a clear error review."); *Alaimo v. Bd. of Educ.*, 650 F. Supp. 2d 289, 291 (S.D.N.Y. 2009)(same); *Chime v. Peak Sec. Plus, Inc.*, 137 F. Supp. 3d 183, 187 (E.D.N.Y. 2015)(same). After reviewing the report and recommendation, the Court may "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions." 28 U.S.C. § 636(b)(1)(C).

**III. DISCUSSION**

*2 The Court presumes familiarity with Magistrate Judge Hummel's Report-Recommendation and Order. To the extent Plaintiff makes general objections to the report and recommendation, the Court finds no clear error and therefore these general objections are overruled. The majority of Plaintiff's other objections appear to be re-arguments that were presented to Magistrate Judge Hummel and rejected, and the Court considered these arguments under plain error review and finds none.

To the extent that Plaintiff challenges Magistrate Judge Hummel's recommendations on the asserted grounds that

material questions of fact exist that must be determined by a jury, Plaintiff fails to recognize - as pointed out by Magistrate Judge Hummel - that on a motion for summary judgment once the moving party establishes a *prima facie* basis for dismissal, the burden shifts to the nonmovant to establish by admissible evidence that a disputed question of material fact exists. *See* Rep. Rec. at 35-36. This burden may not be satisfied by "simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), and "[c]onclusory allegations, conjecture, and speculation ... are insufficient to create a genuine issue of fact." *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998); *see* Rep. Rec. at 36-37. [1] Further, although a court must afford a *pro se* litigant special solicitude, this special solicitude does not exempt a *pro se* litigant from compliance with relevant rules of procedural and substantive law. Rep. Rec. at 37. It is also important to note that the Second Circuit requires courts to examine prisoners' claims of retaliation "with skepticism and particular care" because prisoner retaliation claims are easily fabricated. Rep. Rec. at 39-40.

[1]    Magistrate Judge Hummel wrote after discussing *Matsushita* and *Kerzer*:

A party opposing summary judgment is required to submit admissible evidence. *See Spiegel v. Schulmann*, 604 F.3d 72, 81 (2d Cir. 2010) ("It is well established that in determining the appropriateness of a grant of summary judgment, [the court] ... may rely only on admissible evidence.") (internal quotation marks and citation omitted); *see also Schwapp v. Town of Avon*, 118 F.3d 106, 111 (2d Cir. 1997) ("[A]ffidavtis must be based upon concrete particulars, not conclusory allegations." (internal quotation marks and citation omitted)). "Statements that are devoid of any specifics, but replete with conclusions, are insufficient to defeat a properly supported motion for summary judgment." *Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 452 (2d Cir. 1999). " 'The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could *reasonably* find for the plaintiff.' " *Jeffreys v. City of New York*, 426 F.3d 549, 554 (2d Cir. 2005) (brackets omitted) (quoting *Anderson*, 477 U.S. at 252).

Rep. Rec. at 36-37 (emphasis added by Magistrate Judge Hummel).

Plaintiff's argument that a question of fact exists as to whether all seven of his bags of property were transferred from Attica Correctional Facility to Clinton Correctional Facility on April 17, 2014, and whether at least one of his bags was hidden and later accessed by Clinton staff to obtain incriminating evidence against him, is insufficient. Obj. 2-6, 9. His contention that the defendants lied that the bags were transmitted in three parts is a broad conclusory allegation insufficient to contest the Defendants' properly supported contentions to the contrary. *See e.g.*, Dkt. 68-31. Similarly, Plaintiff presents nothing other than a broad conclusory allegations that C.O. Gadway went to a hidden bag to obtain incriminating evidence against him. Obj. at 9. Further, Plaintiff's objection to Magistrate Judge Hummel's "findings that Gadway's violation of media review guidelines was unsupported and previously denied by court (pg. 52)" as being "a lie," Obj. at 10, misunderstands Magistrate Judge Hummel's finding. In footnote 12 on page 52, Magistrate Judge Hummel wrote:

**\*3** Plaintiff also appears to allege that C.O. Gadway violated his constitutional rights by confiscating certain items of his property because "the mailroom and Media Review Committee allowed [him] to possess them," and by failing to submit the confiscated items to the Media Review Committee. Dkt. No. 14-1 at 13 ¶ 20. His claims in this regard are conclusory in that they are unsupported by any record evidence and, therefore, do not defeat defendants' motion for partial summary judgment. See *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998). To the extent plaintiff alleges that C.O. Gadway violated DOCCS media review procedures, such claims were previously dismissed by the Court's November 2017 Order on initial review. *See* Dkt. No. 17 at 55-56, 60.

Rep. Rec. at 52, n. 12.

Magistrate Judge Hummel did not find that C.O. Gadway's violation of Media Review Guidelines was unsupported but rather that, even if C.O. Gadway's conduct violated the Media Review Guidelines this conduct did not arise to a constitutional violation. Indeed, this was precisely the determination made by the Court in the November 2017 Order on initial review that Magistrate Judge Hummel referenced in footnote 12. Plaintiff's objection in this regard is without merit and is overruled.

Zimmerman v. Racette, Slip Copy (2020)

2020 WL 1329138

Plaintiff's objections to Magistrate Judge Hummel's recommendation to dismiss certain claims based upon Plaintiff's unsupported belief as to what actually occurred with regard to his bags and as to what material he possessed in his cell, *see* Obj. at 2-6, 8-9, are insufficient and overruled. The Court adopts Magistrate Judge Hummel's recommendations relative to dismissal of the First Amendment retaliation claims against Sgt. Orzech, C.O. Mailloux, and C.O. Gadway for the reasons stated in the Report Recommendation at pages 40-45 and 50-52.

Plaintiff's argument that he was denied due process because he did not receive his property from his transferred bags in a timely fashion, Obj. at 5, was not presented to Magistrate Judge Hummel and will not be considered on these objections. *See Monroe v. Kocienski*, No. 9:17-CV-1050 (GTS/DEP), 2019 WL 409412, at *2 (N.D.N.Y. Feb. 1, 2019)("[A] district court will ordinarily refuse to consider argument that could have been, but was not, presented to the magistrate judge in the first instance.")(citing *Zhao v. State Univ. of N.Y.*, 04-CV-0210, 2011 WL 3610717, at *1 (E.D.N.Y. Aug. 15, 2011) ("[I]t is established law that a district judge will not consider new arguments raised in objections to a magistrate judge's report and recommendation that could have been raised before the magistrate but were not.") (internal quotation marks and citation omitted); *Hubbard v. Kelley*, 752 F. Supp.2d 311, 312-13 (W.D.N.Y. 2009) ("In this circuit, it is established law that a district judge will not consider new arguments raised in objections to a magistrate judge's report and recommendation that could have been raised before the magistrate but were not.") (internal quotation marks omitted)); *Charlot v. Ecolab, Inc.*, 97 F. Supp. 3d 40, 51 (E.D.N.Y. 2015)("[A] district court generally will not consider new arguments raised for the first time in objections to a magistrate judge's report and recommendation that could have been raised before the magistrate but were not.")(citing cases); *Santiago v. City of New York*, No. 15-cv-517, 2016 WL 5395837, at *1 (E.D.N.Y. Sept. 27, 2016), *aff'd*, 697 F. App'x 36 (2d Cir. Sept. 6, 2017) ("[C]ourts ordinarily refuse to consider arguments, case law and/or evidentiary material which could have been, but was not, presented to the magistrate judge in the first instance.")(quotations and citation omitted)).

Despite being allowed discovery in this matter, Plaintiff offers only a broad conclusory allegation to counter Sgt. Orzech's sworn statement that he did not damage a CD by putting a staple thru it. *See* Obj. at 13 ("What do you think he gonna [*sic*] say? That he did it? Yeah right! Orzech was last [*sic*]

person in possession of the CD and I have a letter from a witness that says a staple was in it when they got it. So unless the Post Office did it, it was Orzech!"). Plaintiff's objection on this ground is overruled.

**\*4**  Plaintiff's broad conclusory allegations, Obj. at 7, also do not overcome Defendants' evidence that 13 Cell is "a cell in normal use in Unit-14 SHU and is regularly maintained," Dkt. No. 68-32 at ¶ 6, that Plaintiff was "afforded the opportunity for additional cleaning supplies Tuesdays, Thursdays, and Saturdays weekly" if he was unhappy with the cleanliness of his cell, *id.*, and that he was placed in 13 Cell based upon his behavior and cell availability. *See* Rep. Rec. at 45-46. [2] Furthermore, Plaintiff does not overcome Magistrate Judge Hummel's alternative basis to dismiss the First Amendment retaliation claim against Sgt. Randall. *See* Rep. Rec. at 46-49. Accordingly, the objections in this regard are overruled and the Court adopts Magistrate Judge Hummel's recommendation to dismiss the First Amendment retaliation claim against Sgt. Randall. *Id.*

[2]     Plaintiff asserts in his objections that he has a recorded conversation between himself and Randall that allegedly indicates that his behavior did not warrant being placed in 13 Cell. *See* Obj. at 7. To the extent this references a DVD that Plaintiff claims to have that shows his interactions with correction officers in the property area, Magistrate Judge Hummel notes that Plaintiff stated that he could controvert Defendants' assertion that he became aggressive in the property area but that "no such evidence has been submitted to the Court as of the filing of plaintiff's opposition on July 22, 2019; the deadline for filing opposition papers has expired; and plaintiff's general disagreement with defendants' documentary evidence fails to raise a genuine issue of material fact." Rep. Rec at 44. To the extent that Plaintiff's objection is based upon the same DVD, or is based on a different recording that was not presented to the magistrate judge, this evidence will not be considered on the objection. *See Monroe*, 2019 WL 409412, at *2("[A] a district court will ordinarily refuse to consider evidentiary material that could have been, but was not, presented to the magistrate judge in the first instance."). "[F]or the district judge to review new evidence or arguments would reduce the magistrate's work to something akin to a meaningless dress rehearsal," *Michalow v.*

*East Coast Restoration & Consulting Corp.*, No. 09-cv-5475, 2018 WL 1559762, at * 6 (E.D.N.Y. Mar. 31, 2018)(quotations and citation omitted), and would frustrate the congressional objective behind § 636(b)(1) which is intended to alleviate the congestion of litigation in the district courts. *Cf. U.S. v. Raddatz*, 447 U.S. 667, 676, n.3 (1980) ("[T]o construe § 636(b)(1) to require the district court to conduct a second hearing whenever either party objected to the magistrate's credibility findings would largely frustrate the plain objective of Congress to alleviate the increasing congestion of litigation in the district courts."); Fed. R. Civ. P. 72(b), Advisory Committee Notes: 1983 Addition ("The term '*de novo*' does not indicate that a secondary evidentiary hearing is required.")).

As to Plaintiff's claims against C.O. Lee, Plaintiff's contention that C.O. Lee had no basis for a cell shield order because Plaintiff said that he was going to "verbally violate" C.O. Lee as opposed to violate him in some physical sense is of no moment because Magistrate Judge Hummel found that there was nothing in the record to indicate C.O. Lee was responsible for the shield order. Rep. Rec. at 54. Plaintiff's conclusory and unsupported contention to the contrary, *see* Obj. at 10 ("Lee was directly responsible for the cell shield order because he requested it and provided the false information to obtain it.") is insufficient to satisfy Plaintiff's burden on the summary judgment motion. *See* Rep. Rec. at 54. [3] Likewise, there is no basis to find that C. O. Lee issued a retaliatory false misbehavior report because Plaintiff admits that he said he was going to "violate" C.O. Lee. Whether this was a contention that he would verbally violate C.O. Lee or violate Lee is some other sense still provides a basis to conclude that Plaintiff threatened C.O. Lee. Plaintiff's objection based upon the nomenclature of his threat does not create a material issue of fact warranting denial of the motion in this regard.

[3]   ("[T]he record evidence establishes only that (1) plaintiff was placed in a cell with a shield after C.O. Lee informed his area supervisor of plaintiff's threatening statements; (2) Sgt. Delisle and Sgt. Orzech recommended renewing the shield order on three separate occasions because "monitoring indicate[d] that the threat to staff ... ha[d] not lessened" and "continuation of th[e shield] order for staff protection [wa]s warranted at th[ose] time[s]"; and (3) the shield order was authorized by

higher ranking Clinton personnel. Dkt. No. 14-4 at 46, 47, 48.")

**\*5**  Furthermore, Plaintiff does not overcome Magistrate Judge Hummel's conclusion that C.O. Lee's conduct in issuing July 12, 2015 misbehavior reports caused no adverse action as required to satisfy the second element of a First Amendment retaliation claim because Plaintiff suffered no harm as a result. Rep. Rec. at 56-57. Accordingly, Plaintiff's objection in this regard is overruled.

Regarding the claim that C.O. Lee retaliated against Plaintiff by destroying his books and papers, Magistrate Judge Hummel wrote:

> [D]efendants have established that the property C.O. Lee confiscated from plaintiff's cell during the June and July 2015 cell searches was destroyed in September 2015 pursuant to DOCCS Directive #4911 because the visitor plaintiff selected to receive that property never visited the facility within the specified time-frame—not out of retaliation for plaintiff filing his May 2015 grievance. *See* Dkt. No. 14-5 at 16, 17. Indeed, plaintiff signed the Authorization for Disposal of Personal Property form on August 14, 2015, which explicitly provided that "[t]he items [would] be held a maximum of 14 days pending arrival of a visitor," and plaintiff did not select an alternative choice for disposition of his property in the event the visitor did not accept his property. Dkt. No. 68-28 at 1. Therefore, defendants have established that plaintiff's excess magazines and books would have been destroyed regardless of any retaliatory motive.

Rep. Rec. at 53 (case citations omitted). Plaintiff's conclusory allegation that "it does not matter which visitor showed up on his visit because the package room said they had no packages for me to send out anyway! Lee had already destroyed everything!" is insufficient to overcome the evidence submitted by the Defendants and relied upon by Magistrate Judge Hummel in rejecting this claim. The objection in this regard is overruled.

Plaintiff's objection to Magistrate Judge Hummel's determination regarding the First Amendment retaliation claim against C.O. Beaudette is overruled. *See* Obj. at 11. Magistrate Judge Hummel correctly determined that C.O. Beaudette's actions resulted in *de minimus* deprivations to Plaintiff, and that 7 N.Y.C.R.R. § 113.16 prohibits an inmate for processing stamps in excess of $22.50 in value. *See*

Rep. Rec. at 57-59. Plaintiff's objections in this regard are overruled.

Plaintiff's objections to Magistrate Judge Hummel's determination regarding the First Amendment retaliation claims against Sgt. Delisle and C.O. Stickney are overruled. Regardless of whether Plaintiff had a First Amendment right to "publish and promote [his] book, [his] website, [his] literature, [his] company, and the Clean up the Clinton SHU Campaign," Obj. at 11, he "admitted at his deposition to engaging in the unauthorized operation of several businesses while incarcerated." Rep. Rec. at 60. (citing Dkt. No. 68-13 at 19-20). Thus, there was a legitimate basis to dismiss the operative claims against Sgt. Delisle and C.O. Stickney.

Plaintiff's objection to the magistrate judge's recommendation regarding the First Amendment retaliation claim against Dr. Adams is overruled. After the Court's initial review of Plaintiff's Amended Compliant, it found that the only claim that survived against Dr. Adams was a First Amendment retaliation claim. *See* Dkt. No. 17 at 60-61. In addressing this claim, Magistrate Judge Hummel wrote:

> **\*6** [I]t is unclear whether plaintiff even bases his First Amendment retaliation claim against Dr. Adams on his filing of grievances against Dr. Adams, as he explicitly argues that Dr. Adams refused him medical treatment "based largely (or probably solely) on [his] refusal to discuss [his] case [concerning Sing Sing] with him." Dkt. No. 14-1 at 26 ¶ 36. However, even assuming plaintiff does premise his retaliation claim against Dr. Adams on his constitutionally-protected conduct of filing grievances against him, *see Davis*, 320 F.3d at 352-53, defendants are still entitled to summary judgment. Plaintiff's own documentary evidence establishes that, contrary to his contention, Dr. Adams did, in fact, examine plaintiff and proscribe various medications to treat his skin condition, including "Hydrocortisone, Fluocinonide[,] and Clindamyacin." Dkt. No. 14-5 at 9; Dkt. No. 14-4 at 68. In addition, plaintiff's documentary evidence establishes that Dr. Adams "determined that an electric shaver and Magic Shave [we]re not medically indicated" and that there was "no medical indication for medical boots." Dkt. No. 14-5 at 8; Dkt. No. 14-4 at 68. Dr. Adams' declaration, in which he states that his "denial of plaintiff's requests for medical boots, lotion, blood pressure and other medications was based on [his] professional evaluation of [p]laintiff's medical needs"; that "[i]n [his] estimation, the boots and medications requested were unnecessary"; and that he "never ... with[e]ld medications as a means of retaliation for

[plaintiff's] filing of grievances," corroborates plaintiff's documentary evidence. Dkt. No. 68-14 at 2 ¶¶ 6, 8. Plaintiff's conclusory allegations to the contrary, including that the skin prescriptions do not work, *see* Dkt. No. 14-1 at 29 ¶ 38, fail to raise a genuine issue of material fact, are unsupported by the record, and amount only to a personal disagreement with Dr. Adams' treatment based on his professional medical judgment—which fails to support a constitutional claim. *See Chance*, 143 F.3d at 703 ("It is well-established that mere disagreement over the proper treatment does not create a constitutional claim."). Consequently, it is recommended that plaintiff's First Amendment retaliation claim against Dr. Adams be dismissed.

Rep. Rec. at 63-64.

Plaintiff objects to this recommendation because, he contends, he "never said anything about grievances," and "said it was because [Plaintiff] wanted to talk to [Dr. Adams] about [Plaintiff's] case." Obj. at 12. Plaintiff asserts that "Adams only prescribed the medications in question after three complaints and it was the wrong medication! [*sic*]" *Id.* He argues that a jury "needs to decide if Dr. Adams [*sic*] actions is [*sic*] that of a normal doctor or acceptable standards of practice." *Id.* Plaintiff's objection is merely a re-argument of that presented to and rejected by Magistrate Judge Hummel, and supports the magistrate judge's conclusion that Plaintiff fails to raise a viable constitutional claim because his claim amounts only to a personal disagreement with Dr. Adams' treatment based on Dr. Adams' professional medical judgment. Plaintiff's objection in this regard is overruled.

Plaintiff asserts in conclusory fashion that Defendant Clemons did not obtain a valid mail watch order and that such an order "doesn't even state what the probable cause is." Obj. at 12. However, this conclusory contention does not overcome Magistrate Judge Hummel's finding that "defendants establish through admissible evidence [that] Clemons did obtain a 60-day mail watch order for all of plaintiff's incoming and outgoing non-privileged correspondence, which Supt. Kirkpatrick approved on December 9, 2016." Rep. Rec. at 65 (citing Dkt. No. 68-16 at 2 ¶ 7). For reasons discussed above regarding Plaintiff's burden in opposing a properly supported motion for summary judgment, this objection is overruled.

As to Plaintiff's Eighth Amendment medical indifference claim against Dr. Gillani, Magistrate Judge Hummel wrote:

Upon careful review of the evidence, the undersigned concludes that no reasonable juror could conclude that Dr. Gillani acted with deliberate indifference to plaintiff's serious medical needs. It is undisputed that plaintiff was placed in the [mental health unit ("MHU") ] on April 27, 2014, where he stayed until May 1, 2015, because he expressed threats of self-harm. *See* Dkt. No. 14-1 at 10 ¶ 17; Dkt. No. 68-25 at 3 ¶ 13. Plaintiff told Dr. Gillani "[e]very[ ]day ... throughout [his] stay" in [MHU] that he "would commit suicide if [he] was forced to go back to 13 Cell and live under such inhumane conditions." Dkt. No. 14-1 at 10 ¶ 17; *see* Dkt. No. 68-13 at 39. Thus, plaintiff's stated intention to commit suicide establishes the objective element of the deliberate medical indifference test. *See Allah*, 2010 WL 5860290, at *8.

As defendants argue, however, the record establishes that Dr. Gillani did not act with deliberate indifference. *See* Dkt. No. 68-3 at 13-14. Dr. Gillani's sworn declaration and treatment notes establish that he conducted an evaluation of plaintiff on May 1, 2014, and concluded that plaintiff was not suffering from any psychiatric illness, but rather, exhibiting an "environment-related agenda" designed at being "released from the SHU" and "that plaintiff's complaints did not stem from mental illness, but rather, were calculated toward an effort to be released from his confinement in the SHU." Dkt. No. 68-25 at 3 ¶¶ 23-25. Dr. Gillani based his conclusion on numerous factors, including that he had been informed that plaintiff had not engaged in self-harming behavior prior to his April 2014 transfer to MHU, his statements to Dr. Gillani that he did not wish to return to SHU and that he would prefer to return to general population to use the law library, and his denial of having suicidal ideas. *See id.* at 3 ¶¶ 15-16, 19. Dr. Gillani also observed that plaintiff had been eating and sleeping normally, denied having psychotic or anxiety symptoms, and had a history of engaging in "self-harming gestures" but no history of in-patient psychiatric treatment. *Id.* at ¶ 21; see id. at ¶¶ 17, 19. Dr. Gillani's May 1, 2014 conclusions are bolstered by plaintiff's deposition testimony in which he stated that, "[a]t one point, [he] couldn't take the smell [of 13 Cell] so [he] attempted suicide to get out of the cell so that they going to move [him] to [MHU] so that [he] didn't ... have to take the smell inside of [13 C]ell." Dkt. No. 68-13 at 23. Moreover, consistent with Dr. Gillani's analysis, following his release back to SHU, on May 5, 2014, plaintiff alleges only that he engaged in the self-harming gesture of "fixing a noose around [his] neck," but does not allege in his Amended

Complaint that he engaged in any actual suicide attempt on that date. *See* Dkt. No. 14-1 at 10 ¶ 17. Based on the foregoing, "deliberate indifference cannot be inferred" from Dr. Gillani's decision to discharge plaintiff back to SHU on May 1, 2015, as the evidence before the Court does not establish that his decision "was ... such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that [Dr. Gillani] did not base [his] decision on such a judgment." *Sims*, 2012 WL 566875, at *6.

**\*7** Moreover, plaintiff's allegations, made for the first time at deposition, that he made two suicide attempts shortly after being examined by Dr. Gillani on two unspecified occasions, are uncorroborated by the record and do not defeat defendants' properly supported motion for partial summary judgment as to his Eighth Amendment medical indifference claim. *See* Dkt. No. 68-13 at 30, 37-42. Plaintiff's deposition testimony that he actually attempted suicide by hanging on two occasions is wholly self-serving and directly contradicts the allegations made in the Amended Complaint, which state only that he "became suicidal," expressed "suicidal plans and ideations" prior to being admitted to MHU in April 2014; "fix[ed] a noose to his neck" after being released on March 5, 2014; and that he "told [Dr.] Gillani of [his] suicidal plans if [he] returned to 13 Cell." Dkt. No. 14-1 at 10 ¶ 17, 66 ¶ 95 (internal quotation marks omitted). Indeed, when asked whether he "kn[e]w the dates" of his two suicide attempts, plaintiff responded "I don't. They're listed in the complaint." Dkt. No. 68-13 at 30. However, no such dates or events are mentioned in the Amended Complaint, and the record is devoid of any evidence corroborating these belated and self-serving allegations. *See* Dkt. No. 14-1 at 10-11 ¶ 17, 66 ¶ 95. Thus, although plaintiff's *pro se* submissions are to be construed to raise the strongest arguments they suggest, a party opposing summary judgment "may not rely merely on allegations ... in its own pleading; rather, it[ ] must ... set out specific facts showing a genuine issue for trial." *Green v. Gunn*, No. 06-CV-6248 (CJS), 2009 WL 1809932, at *5 (W.D.N.Y. June 24, 2009) (internal quotation marks and citation omitted). Plaintiff has failed to make such a specific factual showing to raise a genuine issue for trial concerning Dr. Gillani's conduct. Accordingly, it is recommended that plaintiff's Eighth Amendment deliberate medical indifference claim against Dr. Gillani be dismissed.

Rep. Rec. at 68-71.

In his objections addressed to this claim, Plaintiff argues first that "even if Gillani concluded on May 1, 2014, that I was not suffering from any psychiatric illness, but rather exhibiting an environment-related agenda, he still should not have set me back to the SHU to kill myself! I don't know any other doctor that would, except the ones that work for MHU of course!" Obj. at 13. This objection is based upon a disagreement with Dr. Gillani's medical opinion and does provide a sufficient basis to reject Magistrate Judge Hummel's recommendation.

Plaintiff argues next that Dr. Gillani's affidavit "is not acceptable because it is based on third-party hearsay" that he had been informed that Plaintiff had not engaged in self-harming behavior prior to his April 2014 transfer to MHU. Medical opinions are often based upon the representations of third parties as to a patient's conduct or exhibition of symptoms, and as Magistrate Judge Hummel indicates, Dr. Gillani's opinion was based upon a number of factors including what Plaintiff himself told the doctor about his aversion to returning to 13 Cell in the SHU, and Dr. Gillani's observation that Plaintiff had been eating and sleeping normally, denied having psychotic or anxiety symptoms, and had a history of engaging in self-harming gestures but no history of in-patient psychiatric treatment. The reference to third-party representations was not the central basis of Dr. Gillani's opinion and is not a basis to reject that opinion or Magistrate Judge Hummel's recommendation to dismiss this claim based on Plaintiff's failure to demonstrate deliberate indifference related to the decision to discharge Plaintiff back to SHU on May 15, 2015. Plaintiff's current contention that he never told Dr. Gillani that he was not having suicidal ideations, or that he was eating and sleeping normally, appear to be issues raised for the first time in the objections and therefore failed to provide a sufficient basis to reject the magistrate judge's thorough opinion. Moreover, as Magistrate Judge Hummel stated, Dr. Gillani concluded that Plaintiff was not suffering from any psychiatric illness and had no history of in-patient psychiatric treatment, but rather was exhibiting an "environment-related agenda" designed to avoid being released from the MHU to the SHU. Further, as also stated by the magistrate judge, Dr. Gillani's May 1, 2014 conclusions are bolstered by Plaintiff's deposition testimony in which he stated that, "[a]t one point, [he] couldn't take the sm ell

[of 13 Cell] so [he] attempted suicide to get out of the cell so that they going to move [him] to [MHU] so that [he] didn't ... have to take the smell inside of [13 C]ell." Dkt. No. 68-13 at 23. Moreover, consistent with Dr. Gillani's analysis, following his release back to SHU on May 5, 2014, Plaintiff alleges only that he engaged in the self-harming gesture of "fixing a noose around [his] neck," but does not allege in his Amended Complaint that he engaged in any actual suicide attempt on that date. Plaintiff's current contention that he was "depressed and suicidal out of mind" does not provide a sufficient basis to conclude that the magistrate judge should have rejected Dr. Gillani's opinion and found that Dr. Gillani acted with deliberate indifference to Plaintiff's well-being. Plaintiff's objections in this regard are overruled.

### IV. CONCLUSION

 **\*8** For the reasons discussed above, the Court **ACCEPTS and ADOPTS** the recommendations in the January 24, 2020 Report-Recommendation and Order, Dkt. No. 83, for the reasons stated therein. Thus, it is hereby

**ORDERED** that Defendants' motion for partial summary judgment, Dkt. No. 68, is **GRANTED,** and the following claims are **DISMISSED with prejudice**: (1) First Amendment retaliation claims against Sgt. Orzech, C.O. Mailloux, Sgt. Randall, C.O. Gadway, C.O. Lee, C.O. Beaudette, Sgt. Delisle, C.O. Stickney, and Dr. Adams; (2) First Amendment claim against Librarian Delisle; (3) First Amendment mail tampering claim against Clemons; and (4) Eighth Amendment medical indifference claim against Dr. Gillani, and it is further

**ORDERED** that the following defendants are **TERMINATED from this action**: Dr. Gillani, Dr. Adams, Librarian Delisle, C.O. Mailloux, C.O. Beaudette, C.O. Gadway, C.O. Stickney, and Clemons.

**IT IS SO ORDERED.**

**All Citations**

Slip Copy, 2020 WL 1329138

---

**End of Document**                    © 2021 Thomson Reuters. No claim to original U.S. Government Works.

2012 WL 3705009
Only the Westlaw citation is currently available.
United States District Court,
E.D. New York.

Joseph GUMBS, Plaintiff,

v.

Mrs. DYNAN, Assistant Warden of Medical
at MDC–Brooklyn; Medical Department at
MDC–Brooklyn et al.; Mr. Marousis–Bush,
Head of Medical; Mr. Ittayem, Assistant
Health Services Administrator; Mr. Georgy,
Assistant Health Services Administrator;
Dr. Newland, Administrative Director; Dr.
Michael Borecky; Dr. Jusayan; Mr. Edwards,
Counselor of Unit I–61; Known and Unknown
Bureau of Prisons staff (All defendants in
official and unofficial capacity), Defendants.

No. 11–CV–857 (RRM)(LB).
|
Aug. 26, 2012.

**Attorneys and Law Firms**

Joseph Gumbs, Freehold, NJ, pro se.

Layaliza K. Soloveichik, United States Attorneys Office,
Brooklyn, NY, for Defendants.

### MEMORANDUM & ORDER

ROSLYNN R. MAUSKOPF, District Judge.

**\*1** *Pro se* plaintiff Joseph Gumbs ("Gumbs"), a pre-
trial detainee held at the Metropolitan Detention Center
("MDC") Brooklyn, filed the present action against the
Medical Department at the MDC as well as individual MDC
employees pursuant to 42 U.S.C. § 1983, asserting an Eighth
Amendment claim of deliberate indifference to petitioner's
medical needs after he allegedly sustained neck, back and
shoulder injuries from a March 2009 fall at the MDC. (Compl.
Addendum (Doc. No. 1) ¶¶ 2, 5.) Defendants move to dismiss
plaintiff's claim pursuant to Fed.R.Civ.P. 12(b) or, in the
alternative, for summary judgment pursuant to Fed.R.Civ.P.
56. Plaintiff is granted *in forma pauperis* status for purposes
of the present action. For the reasons set forth herein,

defendants' motion is GRANTED with respect to defendant
MDC Medical Department pursuant to Fed.R.Civ.P. 12(b)(1),
under the doctrine of sovereign immunity, and with respect to
individual defendants pursuant to Fed.R.Civ.P. 56.

### BACKGROUND

Plaintiff arrived at the MDC Brooklyn for pre-trial detention
in February 2009. (Defs.' 56.1 Stmt. (Doc. No. 26) ¶ 1.) On
March 10, 2009, plaintiff fell in the MDC shower and the
"unit officer" [1] called for medical assistance on his behalf. It
is alleged that despite further phone calls by unit officers to
the Medical Department at the MDC "in the days following"
the fall, plaintiff received no medical attention. Plaintiff states
that he had no other means of seeking medical attention
except through filing sick call slips and written requests, [2]
which he did numerous times to no avail. (Compl. Addendum
¶¶ 2–5.) Plaintiff states that because he was suffering
extreme pain, he next sought the assistance of defendant
Counselor Edwards, the counselor assigned to plaintiff's unit
at the MDC, to schedule a medical appointment. Defendant
Edwards allegedly told plaintiff that "pre-trial inmates are of
no great concern here at MDCBrooklyn. You'll have to just
keep filing requests. Now get out of my office." (*Id.* ¶ 6.)

[1]  Inmates at the MDC are house in separate units,
and the correctional officer assigned to a given
unit on a given shift is known as that unit's "unit
officer." (Defs.' 56.1 Stmt. ¶ 159.)

[2]  As described in the MDC's Admission and
Orientation Manual, the primary means for a MDC
inmate to obtain medical care is by filling out a sick
call sheet and placing it in the sick call box to notify
medical personnel that he would like to request an
appointment. (*See* Defs.' Reply 56.1 Stmt. (Doc.
No. 32) ¶ 40.) If unsuccessful, the Admission and
Orientation Manual instructs that an inmate can
then submit written requests, commonly known as
"copouts" among MDC inmates, to a staff member
detailing the need for appropriate medical care. (*Id.*
¶¶ 44–45.)

Plaintiff further alleges that a five-month delay between the
March 2009 injury and August 2009 medical visit "prevented
the plaintiff from receiving treatment for his injuries and
left the plaintiff in a perpetual state of pain." (*Id.* ¶ 7.)
Medical records show that on August 14, 2009, roughly

five months after plaintiff's alleged fall, plaintiff received medical attention from defendant Dr. Borecky for a six-month follow-up regarding his diabetes.[3] (Defs.' 56.1 Stmt. ¶ 75; *see* Compl. Addendum ¶ 7.) Plaintiff reported that he had been experiencing intermittent pain in his left shoulder for the past two and half months but made no mention of neck or back pain. (Decl. of Layaliza K. Soloveichik ("Soloveichik Decl.") Ex. B (Doc. No. 29, Attach.1) at 24.) Dr. Borecky assessed plaintiff's condition as joint pain in the left shoulder region stemming from a 2005 injury, gave plaintiff a new painkiller prescription, and ordered x-ray films to be taken of plaintiff's left shoulder. (*Id.* at 26; *see* Compl. Addendum ¶ 9.) Contrary to plaintiff's assertion that "the medical staff delayed an additional three months before actually conducting the x-ray" ordered by Dr. Borecky on August 14, 2009 (Compl. Addendum ¶ 9), medical records show that on August 27, 2009, x-rays were taken of plaintiff's left shoulder and the findings of the radiologist were negative. (Soloveichik Decl. Ex. B at 28.)

[3]    Plaintiff reported that he was diabetic during the health screening given to newly arrived inmates on February 6, 2009. The August 14, 2009 visit with Dr. Borecky was a six-month follow-up to plaintiff's February 18, 2009 visit with Dr. Borecky at the MDC medical clinic for diabetic inmates. (*See* Def. Am. 56.1 Stmt. ¶¶ 66,70.)

**\*2** In November 2009, plaintiff filed an Inmate Request for Informal Resolution, otherwise known as a BP–8. A BP–8 is the first step in the administrative remedy process. Plaintiff's BP–8, dated November 12, 2009, only identified pain in his left shoulder and was received by MDC staff on November 24, 2009. (*Id.* at 29.) The next day, plaintiff was seen by Dr. Borecky for "progressively worsening pain in the left shoulder." (*Id.* at 30.) On this visit, plaintiff reported that the history of trauma date back to 2005 when his left arm was twisted behind his back during the course of an arrest. (*Id.*.) Dr. Borecky prescribed medication and requested an orthopedic consultation. A follow-up visit was scheduled for February 2010. (*Id.* at 32.) On February 3, 2010, defendant Dr. Jusayan,[4] who was plaintiff's assigned treating physician approximately from the latter part of 2009 until March 2010 (Defs.' 56.1 Stmt. ¶ 63), examined plaintiff. (Soloveichik Decl. Ex. B at 34.)

[4]    Individual defendant Dr. Jusayan has not been served.

Plaintiff alleges that approximately thirteen months after sustaining the injuries, plaintiff was sent to see an orthopedic specialist who ordered an MRI scan to be performed, and that it took an additional three months for plaintiff to receive the MRI. (Compl. Addendum ¶ 10.) Medical records indicate that on February 17, 2010, roughly eleven months after plaintiff's March 2009 injury, plaintiff received an orthopedic consultation at New York downtown Hospital, which recommended an MRI of his left shoulder and a return for a second consultation after the MRI. On the same day, Dr. Jusayan requested an MRI for plaintiff's left shoulder as recommended by the orthopedic clinic, orthopedic surgery as a follow-up after the MRI, and authorized plaintiff to request a two-piece prison jump suit. (Soloveichik Decl. Ex. B at 43–44.) On October 4, 2010, plaintiff underwent an MRI of his left shoulder at New York Downtown hospital. (*Id.* at 49–50.)

The first mention in plaintiff's medical records of lower back pain, but not neck pain, by plaintiff to a member of the MDC medical staff was during a February 2, 2011 visit with defendant Dr. Newland .[5] (*See id.* at 66.) On March 11, 2011, plaintiff received a follow-up consultation with an orthopedic surgeon, who recommended physical therapy. (*Id.* at 71.) the MDC approved the request for said physical therapy on March 18, 2011. (Defs.' 56.1 Stmt. ¶¶ 131–33.) On April 18, 2011, plaintiff was evaluated by an outside rehabilitation specialist for the appropriate course of physical therapy and, upon plaintiff's return to the MDC, defendant Dr. Borecky prescribed medication for plaintiff's left shoulder pain and ordered physical therapy to begin. On the same visit, Dr. Borecky also ordered x-rays of plaintiff's cervical and lumbar spine because plaintiff complained of neck and lower pain; this appears to be the first mention of neck pain in plaintiff's medical records. (*See* Soloveichik Decl. Ex. B at 73.)

[5]    Defendant Dr. Newland became plaintiff's assigned treating physician in early 2011. (Defs.' 56.1 Stmt. ¶ 65.)

**\*3** Plaintiff underwent three sessions of physical therapy in June 2011. (Defs.' 56.1 Stmt. ¶¶ 143–44, 147.) On July 7, 2011, plaintiff was seen by Dr. Newland and requested a stop to the physical therapy because of unbearable pain he experienced on each of the three sessions. Dr. Newland granted plaintiff's request to discontinue physical therapy. (*See* Soloveichik Decl. Ex. B at 86, 88.)

Plaintiff, proceeding *pro se,* filed the present action on February 15, 2011. By Order dated March 3, 2011, the Court

2012 WL 3705009

construed plaintiff's § 1983 action as one pursuant to *Bivens v. Six Unkown Fed. Narc. Agents,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971) and dismissed the *Bivens* claims against defendant Federal Bureau of Prisons ("BOP") and against individual defendants in their official capacities under the doctrine of sovereign immunity. [6] (March 3, 2011 Order (Doc. No. 3).)

[6]   By the same Order, the Court also dismissed plaintiff's *Bivens* claims against individual defendants Cameron Lindsay, the Warden of MDC; the Assistant Warden of Administrative Remedy at MDC; the Central Office Administrative Remedy Coordinator; and the Regional Office Administrative Remedy Coordinator in their individual capacities pursuant to 28 U.S.C. § 1915A(b) for plaintiff's failure to show these defendants' personal involvement in the alleged deprivation of plaintiff's civil rights. (March 3, 2011 Order at 4–5.)

### STANDARD OF REVIEW

"A document filed *pro se* is to be liberally construed and a *pro se* complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers." *Boykin v. KeyCorp,* 521 F.3d 202, 214 (2d Cir.2008) (internal quotation marks omitted). Accordingly, the Court construes plaintiff's Complaint with "special solicitude" and interprets it to raise the strongest arguments it suggests. *Triestman v. Fed. Bureau of Prisons,* 470 F.3d 471, 474–75 (2d Cir.2006) (quoting *Ruotolo v. I.R.S.,* 28 F.3d 6, 8 (2d Cir.1994)).

### Legal Standards Governing Motions Pursuant to Fed.R.Civ.P. 12(b)

To survive a Rule 12(b)(6) motion to dismiss for failure to state a claim, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). A complaint need not contain " 'detailed factual allegations,' " but it must contain "more than an unadorned, the-defendant-unlawfully-harmedme accusation." *Iqbal,* 129 S.Ct. at 1949 (quoting *Twombly,* 550 U.S. at 555). In other words, "[t]hreadbare recitals of the elements of a cause of action, supported

by mere conclusory statements, do not suffice." *Id.* (citing *Twombly,* 550 U.S. at 555). Rather, the plaintiff's complaint must include "enough facts to state a claim to relief that is plausible on its face." *Twombly,* 550 U.S. at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal,* 129 S.Ct. at 1949 (citing *Twombly,* 550 U.S. at 570). The determination of whether "a complaint states a plausible claim for relief will ... be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 1950 (citing *Iqbal v. Hasty,* 490 F.3d 143, 157–58 (2d Cir.2007)).

**\*4** "The standard for a Rule 12(b)(1) motion to dismiss for lack of subject matter jurisdiction is 'substantively identical' to the 12(b)(6) standard, except that the plaintiff has the burden of establishing jurisdiction in a 12(b)(1) motion." *S & R Dev. Estates, LLC v. Bass,* 588 F.Supp.2d 452, 460 (S.D.N.Y.2008); *see Lerner v. Fleet Bank, N.A.,* 318 F.3d 113, 128 (2d Cir.2003). "A case is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it." *Makarova v. United States,* 201 F.3d 110, 113 (2d Cir.2000) (citing Fed.R.Civ.P. 12(b)(1)); *see also Oscar Gruss & Son, Inc. v. Hollander,* 337 F.3d 186, 193 (2d Cir.2003) ( "Failure of subject matter jurisdiction, of course, is not waivable and may be raised at any time by a party or by the court *sua sponte.*") In considering a motion to dismiss for lack of subject matter jurisdiction, a district court "must accept as true all material factual allegations in the complaint, but [is] not to draw inferences from the complaint favorable to plaintiffs." *J.S. ex rel. N.S. v. Attica Cent. Sch.,* 386 F.3d 107, 110 (2d Cir.2004) (citation omitted). This Court, however, "may consider affidavits and other materials beyond the pleadings to resolve the jurisdictional issue, but [it] may not rely on conclusory or hearsay statements contained in the affidavits." *Id.* (citations omitted). "The plaintiff bears the burden of proving subject matter jurisdiction by a preponderance of the evidence." *Aurecchione v. Schoolman Transp. Sys. Inc.,* 426 F.3d 635, 638 (2d Cir.2005).

### Legal Standards Governing Motions Pursuant to Fed.R.Civ.P. 56

Summary judgment is appropriate when the pleadings, depositions, interrogatories, admissions, and affidavits demonstrate that there are no genuine issues of material fact in dispute and that one party is entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S.

317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

In deciding a summary judgment motion, a district court must draw all reasonable inferences in favor of the non-moving party. *See id.* at 249 (citing *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970)); *Castle Rock Entm't, Inc. v. Carol Publ'g Grp., Inc.,* 150 F.3d 132, 137 (2d Cir.1998). Thus, the court must not "weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments." *Amnesty America v. Town of W. Hartford,* 361 F.3d 113, 122 (2d Cir.2007) (quoting *Weyant v. Okst,* 101 F.3d 845, 854 (2d Cir.1996)). Any evidence in the record of any material fact from which an inference could be drawn in favor of the non-moving party precludes summary judgment. *See Castle Rock Entm't,* 150 F.3d at 137.

**\*5** Once the movant has demonstrated that no genuine issue of material fact exists, such that it is entitled to judgment as a matter of law, then "the non-moving party must come forward with 'specific facts showing that there is a genuine issue for trial.' " *Matsushita Elec. Indust. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (quoting Fed.R.Civ.P. 56(e)). "Conclusory allegations will not suffice to create a genuine issue. There must be more than a 'scintilla of evidence,' and more than 'some metaphysical doubt as to the material facts.' " *Del. & Hudson Ry. Co. v. Consol. Rail Corp.,* 902 F.2d 174, 178 (2d Cir.1990) (citing *Anderson,* 477 U.S. at 252; *Matsushita,* 475 U.S. at 586.) Instead, the non-moving party must present "concrete evidence from which a reasonable juror could return a verdict in his favor." *Anderson,* 477 U.S. at 256. Only disputes over material facts "that might affect the outcome of the suit under the governing law" will properly preclude the entry of summary judgment. *Id.* at 248; *see also Matsushita,* 475 U.S. at 586.

*DISCUSSION*

# I. DOCTRINE OF SOVEREIGN IMMUNITY BARS CLAIM AGAINST MDC'S MEDICAL DEPARTMENT

All of plaintiff's claims against the MDC's Medical Department must be dismissed for lack of subject matter jurisdiction pursuant to Fed.R.Civ.P. 12(b)(1). "Because an action against a federal agency or federal officers in their official capacities is essentially a suit against the United States, such suits are also barred under the doctrine of sovereign immunity, unless such immunity is waived." *Robinson v. Overeas Military Sales Corp.,* 21 F.3d 502, 510 (2d Cir.1994) (citing *Federal Deposit Ins. Corp. v. Meyer,* 510 U.S. 471, 484–86, 114 S.Ct. 996, 127 L.Ed.2d 308 (1994); *Kentucky v. Graham,* 473 U.S. 159, 166–67, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985)). As such, the Court hereby dismisses plaintiff's *Bivens* claims against defendant Medical Department at MDC, a federal agency, for a lack of subject matter jurisdiction under the doctrine of sovereign immunity. *See, e.g., Nkansah v. Medical Dept. of MCC,* No. 10 CV 3211, 2011 WL 4073362, at \*3 (E.D.N.Y. Sept.13, 2011) (dismissing claims against the MDC's Medical Department for lack of subject matter jurisdiction); *Demartino v. Zenk,* No. 04 CV 3880(SLT)(LB), 2006 WL 1455456, at \*4 (E.D.N.Y. May 25, 2006) (dismissing *Bivens* claims against the MDC's Medical Department under doctrine of sovereign immunity); *cf. Keene Corp. v. United States,* 700 F.2d 836, 845 n. 13 (2d Cir.1983) ("*Bivens* authorizes suits against the responsible federal official, not against the government itself, and *Bivens*-type actions against the United States are ... routinely dismissed for lack of subject matter jurisdiction." (citations omitted)).

# II. CLAIMS AGAINST INDIVIDUAL DEFENDANTS ARE NOT ADMINSTRATIVELY EXHAUSTED UNDER THE PLRA AND REQUIRE DISMISSAL

Plaintiff's *Bivens* claims against individual defendants are dismissed for failure to exhaust administrative remedies before bringing said claims in federal court.

## A. Standard for Administrative Exhaustion Under the PLRA

**\*6** The Prison Litigation Reform Act ("PLRA") requires inmates to exhaust available administrative remedies before filing actions under federal law challenging prison conditions. [7] 42 U.S.C. § 1997e(a) ("No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."); *see Porter v. Nussle,* 534 U.S. 516, 532, 122 S.Ct. 983, 152

2012 WL 3705009

L.Ed.2d 12 (2002) ("[T]he PLRA's exhaustion requirement
applies to all inmate suits about prison life, whether they
involve general circumstances or particular episodes, and
whether they allege excessive force or some other wrong.").
The PLRA's administrative exhaustion requirement applies
equally to *Bivens* claims, including but not limited to
*Bivens* claims seeking monetary damages for allegedly
negligent medical care that plaintiff received at the MDC.
*See Williams v. Metro. Det. Ctr.,* 418 F.Supp.2d 96, 100–01
(E.D.N.Y.2005).

7    The administrative exhaustion requirement of
     the PLRA exists to give " 'prison officials an
     opportunity to resolve disputes concerning the
     exercise of their responsibilities before being haled
     into court[,]' and also creates an administrative
     record that facilitates judicial review." *Torres v.
     Anderson,* 674 F.Supp.2d 394, 397 (E.D.N.Y.2009)
     (quoting *Jones v. Bock,* 549 U.S. 199, 204, 127
     S.Ct. 910, 166 L.Ed.2d 798 (2007) (citations
     omitted); *see Woodford v. Ngo,* 548 U.S. 81, 91 n.
     2, 126 S.Ct. 2378, 165 L.Ed.2d 368 (2006) (noting
     the purpose of PLRA's administrative exhaustion
     requirement to be the prevention of "flood of
     prisoner litigation in the federal courts").

Because "[t]he exhaustion requirement covers all claims that
an inmate might bring, ... [i]t follows that failure to exhaust
prior to the commencement of a lawsuit requires dismissal of
the prisoner's claim." *Torres v. Anderson,* 674 F.Supp.2d at
397 (citations omitted). "Courts must construe the exhaustion
requirement strictly.... [A]n inmate can no longer claim that
partial exhaustion of administrative remedies is sufficient
because prison officials have notice of his claim." *Petrucelli
v. Hasty,* 605 F.Supp.2d 410, 419 (E.D.N.Y.2009) (citations
omitted).

To administratively exhaust claims under the PLRA, inmates
at federal correctional facilities must seek formal review
of their claims through a multi-step process known as
the Administrative Remedy Program. *See* 28 C.F.R. §§
542.10–542.19; Defs.' 56.1 Stmt. ¶ 178. First, an inmate
must present a claim to BOP staff for informal resolution
by filing an "Inmate Request for Informal Resolution", also
known as a BP–8 form. *See* 28 C.F.R. § 542.13; Defs.'
56.1 Stmt. ¶¶ 182–84. Second, if the issue is not resolved
informally or if a waiver for bypassing informal resolution
is granted, the inmate must submit to the MDC Warden
("Warden") a "Request for Administrative Remedy", also
known as a BP–9 form, within 20 calendar days of the

event forming the basis for the Request. *See* 28 C.F.R. §
542.14(a); Defs.' 56.1 Stmt. ¶¶ 185–87. Third, if not satisfied
with the Warden's response to the BP–9, the inmate can
then appeal to the appropriate Regional Director by filing
a "Regional Administrative Remedy Appeal", also known
as a BP–10 form, within 20 calendar days of the date on
the Warden's signed response to the BP–9. *See* 28 C.F.R. §
542.15(a); Defs.' 56.1 Stmt. ¶¶ 188–90. Fourth, a negative
decision from the Regional Director may be appealed to the
office of the General Counsel ("General Counsel" or "Central
Office") by filing a "Central Office Administrative Remedy
Appeal", or a BP–11 form, within 30 calendar days of the
date on Regional Director's signed response to the BP–10.
*See* 28 C.F.R. § 542.15(a); Defs.' 56.1 Stmt. ¶ 191. Inmates
must use the appropriate form at each stage of administrative
remedy appeal, and no claim is considered to have been fully
exhausted under the Administrative Remedy Program until it
has been considered by the General Counsel's office. *See* 28
C.F.R. §§ 542.14(a), 524.15(b); Defs.' 56.1 Stmt. ¶¶ 200–01.

### B. Plaintiff's Failure to Fully Exhaust Claim of Inadequate Medical Care for Shoulder Pain

**\*7** Plaintiff initiated but did not complete the administrative
remedy process for his *Bivens* claim of inadequate medical
care for his left shoulder. This failure to fully exhaust
administrative remedies as required by the PLRA requires
dismissal of plaintiff's claim regarding medical treatment
for his shoulder pain. *See Petrucelli,* 605 F.Supp.2d at 419
(inmate cannot claim that partial exhaustion of administrative
remedies is sufficient to satisfy the PLRA because prison
officials have notice of his claim) (citing *Macias v. Zenk,* 495
F.3d 37, 43 (2d Cir.2007)).

In November 2009, plaintiff submitted a BP–8 for the claim of
inadequate medical care regarding his left shoulder pain, and
thereby initiated the administrative remedy process. Plaintiff
stated on the BP–8 that his painkiller prescription had run
out since receiving medical attention from the doctor back in
August 2009. Although the BP–8 was dated November 12,
2009, MDC staff's written response on the BP–8 reflects that it
was not received until November 24, 2009. (*See* Soloveichik
Decl. Ex. B at 29.) On the very next day, November 25,
2009, plaintiff was seen by Dr. Borecky, who issued new
painkiller prescriptions for plaintiff, requested an orthopedic
consultation, and scheduled a follow-up visit for February
2010. (*Id.* at 30–32.)

If the response to the BP–8 did not resolve the issue and
plaintiff wished to file a BP–9, he was required to submit

2012 WL 3705009

one to the Warden within 20 calendar days of the conduct forming the basis of the BP–9. *See* 28 C.F.R. § 542.14(a); Defs.' 56.1 Stmt. ¶¶ 185–87. On January 26, 2010, [8] plaintiff filed a BP–9, stating that he had run out of pain medication and was still waiting for the orthopedic consultation that Dr. Borecky requested back in November 2009. (*See* Pltf. Resp., Ex. B.) The Warden rejected plaintiff's BP–9 as untimely on January 29, 2010. [9] (Defs.' 56.1 Stmt. ¶ 206.) On February 9, 2010, [10] plaintiff filed a BP–10 with the BOP Regional Director to appeal the Warden's rejection of his BP–9. (*See* Pltf. Resp., Ex. C.) On March 29, 2010, the BOP Regional Director rejected the BP–10 but instructed the Warden to address the BP–9's merits if plaintiff resubmitted it. [11] (Defs.' 56.1 Stmt. ¶¶ 208–09.) Instead of resubmitting the BP–9 to the Warden as instructed, however, on March 25, 2010 plaintiff filed a BP–11 to appeal the BOP Regional Director's rejection of the BP–10. (*See* Pltf. Resp., Ex. D.) On April 16, 2010, the General Counsel rejected the BP–11 and, like the BOP Regional Director, instructed plaintiff in the rejection notice to resubmit his BP–9 so as to have its merits addressed by the Warden. (Defs.' 56.1 Stmt. ¶ ¶ 212–13.) Plaintiff never resubmitted his BP–9 to the Warden despite having been twice instructed to do so.

[8]    Defendants state that according to records from BOP's computerized database SENTRY, plaintiff filed his BP–9 on January 29, 2010, three days after the date reflected on the copy of the BP–9 submitted by plaintiff. (*Compare* Defs.' 56.1 Stmt. ¶ 205 *with* Pltf. Resp., Ex. B.) Because the discrepancy is immaterial to any issue, the Court adopts the earlier filing date in a light more favorable to plaintiff.

[9]    An inmate's BP–9, BP–10, or BP–11 can be rejected, respectively, by the Warden, Regional Office, or Central Office without addressing the merits for failure to comply with the Administrative Remedy Program's procedural requirements. In such situations, the inmate would receive a rejection notice explaining the procedural defect and how to correct it if the defect is curable. *See* 28 C.F.R. §§ 542.14(a), (c), 542.15(b), 542.17(b); Defs.' 56.1 Stmt. ¶ ¶ 196–97.

[10]    Defendants state that according to records from BOP's computerized database SENTRY, plaintiff filed his BP–10 on February 16, 2010, one week after the date reflected on the copy of the BP–10 submitted by plaintiff. (*Compare* Defs.' 56.1 Stmt. ¶ 207 *with* Pltf. Resp., Ex. C.) Because the discrepancy is immaterial to any issue, the Court adopts the earlier filing date in a light more favorable to plaintiff.

[11]    When the MDC Warden rejects a BP–9 on grounds of procedural defect such as untimeliness and the inmate appeals, the Regional Director and/or General Counsel's Office may reject the appeal on grounds of the same defect or, in the alternative, direct the inmate to resubmit the BP–9 and the Warden to address the BP–9 on its merits upon resubmission. *See* 28 C.F.R. § 542.17(c); Defs.' 56.1 Stmt. ¶ 198.

By abandoning the administrative remedy process that he initiated, plaintiff has failed to fully exhaust administrative remedies regarding his left shoulder. *See Macias v. Zenk,* 495 F.3d 37, 43 (2d Cir.2007) (regardless of whether prisoner's informal complaints put the prison officials on notice of his grievance in a substantive sense, to satisfy the PLRA prisoner must also procedurally exhaust available administrative remedies); *McDowall v. MDC,* No. 08–CV–9329, 2010 WL 649744, at *5 (S.D.N.Y. Feb.22, 2010) (dismissing plaintiff's claim of deliberate indifference to medical needs for failure to exhaust where plaintiff voluntarily withdrew his BP–9 prior to BOP's decision on its merits). Administrative exhaustion is not complete until plaintiff resubmits his BP–9 to have its merits addressed by the Warden and fully appeals the Warden's response to the resubmitted BP–9 to both the Regional Director and the General Counsel's office. (Defs.' 56.1 Stmt. ¶¶ 198–200.)

**\*8** Plaintiff claims he was prevented from resubmitting his BP–9 to the Warden because defendant Counselor Edwards refused to take the second BP–9 and plaintiff had no other way of resubmitting the BP–9 except through Counselor Edwards. (*See* Pltf. Resp. at 2–3.) However, such unsworn, conclusory statements about a MDC staff member's obstruction of plaintiff's utilization of the grievance process are insufficient to raise a genuine dispute of material fact. *See Mitchell v. Senkowski,* No. 04–1792, 158 Fed. Appx. 346, at 350 (2d Cir.2005) ("Appellant's conclusory assertion that prison officials obstructed his utilization of the grievance process is insufficient to raise a genuine dispute of material fact that would defeat summary judgment."). In any case, plaintiff claims only that he attempted to resubmit his BP–9 after being instructed to do so by the Central Office, but does not

2012 WL 3705009

satisfactorily explain why he failed to resubmit his BP–9 after first being instructed to do so by the Regional Director. [12] Moreover, plaintiff fails to explain why he could not seek the assistance of other MDC staff members on his unit team for the resubmission of his BP–9. In his response to defendants' motion, plaintiff mentions that he received assistance from his case manager during the administrative appeal process when the case manager attempted to contact the Regional Director's office. (*See* Pltf. Resp. at 3.) Furthermore, the record reflects, and plaintiff does not dispute, that MDC inmates who were assigned to defendant Counselor Edwards could also seek assistance from Counselor Gail McMillan, who shared an office with Edwards and often helped inmates assigned to Edwards if they came to the office with questions while Edwards was out of the office. (Defs.' Reply 56.1 Stmt. (Doc. No. 32) ¶¶ 171–73.) Thus, plaintiff has neither established that defendant Counselor Edwards was plaintiff's only avenue for BP–9 resubmission, nor explained why he could not have sought the assistance of another counselor or MDC staff member on his unit team to resubmit the BP–9. Accordingly, plaintiff's *Bivens* claim regarding his left shoulder must be dismissed for failure to fully exhaust administrative remedies under the PLRA.

[12]     Plaintiff states that after the Regional Director's office instructed him to resubmit his BP–9 to the Warden and plaintiff's "unit team to contact the region", plaintiff's case manager attempted to contact the Regional Director's office but to no avail. (*See* Pltf. Resp. at 2–3.) However, this fails to explain why plaintiff did not resubmit a BP–9 to the Warden as instructed by the Regional office before appealing the Region Director's decision to the Central Office.

Plaintiff cites *Martinez v. Weir,* No. 00–CV–1140 (DJS), 2006 WL 2884775 (D.Conn. Oct.10, 2006) in support of the position that the Court must deny summary judgment to defendants when plaintiff has provided evidence of attempting to exhaust administrative remedies prior to filing his action in court. (*See* Pltf. Resp. at 4.) The facts in *Martinez* are inapposite. In *Martinez,* the court found that "plaintiff has provided evidence that he attempted to exhaust his administrative remedies ... twice prior to filing" the lawsuit and followed prison officials' instruction to re-file a level 1 grievance after being informed that there was no record of the original level 1 grievance filed by the plaintiff. 2006 WL 2884775, at *5. Here, plaintiff was given two opportunities to refile his BP–9 and failed to avail himself of either one.

As such, his claims are barred for failure to exhaust his administrative remedies.

## C. Plaintiff's Failure to Administratively Exhaust Claims of Inadequate Medical Care for Neck and Back Injuries

**\*9**  The only BP forms filed by plaintiff are with regard to medical treatment of his left shoulder but make no mention of neck or back injuries. (*See* Pltf. Resp. (Doc. No. 22), Exs. A–D; Defs.' 56.1 Stmt. ¶¶ 203–11.) Plaintiff does not appear to have filed a BP–9 (Request for Administrative Remedy), let alone a BP–10 (Regional Administrative Remedy Appeal) or a BP–11 (Central Office Administrative Remedy Appeal), to exhaust claims of inadequate medical care for his neck and back injuries. (*See* Defs.' 56.1 Stmt. ¶ 202.) Accordingly, plaintiff's *Bivens* claim of inadequate medical care for his neck and back injuries must be dismissed for failure to exhaust administrative remedies as required by the PLRA. *See, e.g., McDowall v. MDC,* No. 09–CV–0695, 2010 WL 3521879, at *2 (E.D.N.Y. Aug. 31, 2010) (dismissing *pro se* plaintiff inmate's *Bivens* claim for failure to file a BP–9, BP–10, and BP–11). Plaintiff's *pro se* status does not change the result. *See, e.g., Houze v. Segarra,* 217 F.Supp.2d 394, 395–96 (S.D.N.Y.2002) (dismissing prisoner's complaint for failure to exhaust administrative remedies as required by PLRA after acknowledging that his *pro se* status is generally accorded leniency).

Plaintiff attempts to rely on the same conclusory allegations that certain individuals "conspired and acted in concert with one another as confederates to deny the plaintiff the ability to exhaust his administrative remedy process by refusing to accept the plaintiff's forms, thereby preventing the plaintiff from going anywhere on the administrative ladder." (*See* Compl. Addendum ¶ 14.) However, nowhere does plaintiff explain what prevented him from mentioning neck and back injuries, allegedly all caused by the same fall in the MDC shower, on the same BP–8, BP–9, BP–10, and BP–11 forms that he filed seeking medical treatment for his left shoulder pain. In short, plaintiff has provided no expalnation for his abandonment of the MDC's administrative review process before bringing his claims of inadequate medical care for neck and back injuries in federal court.

## III. *BIVENS* CLAIMS OF INADEQUATE MEDICAL CARE REQUIRE DISMISSAL AS A MATTER OF LAW

2012 WL 3705009

Plaintiff's *Bivens* claims of inadequate medical care, besides failing the PLRA's requirement for administrative exhaustion, also warrant dismissal as a matter of law. Plaintiff makes the following allegations against individual defendants: (1) from April 2009 to January 2011, defendants Dynan, Marousis–Bush, Ittayem, Georgy, and Dr. Newland were informed on numerous occasions of plaintiff's medical needs and told "plaintiff that they would get back to him" but never did, (Compl. Addendum ¶ 8); (2) the aforementioned defendants as well as defendant Dr. Borecky were "deliberately indifferent to the plaintiff's medical needs when they would let the plaintiff run out of pain medication" and then tell plaintiff that he needed to buy his own pain medication from the prison commissary, (*id.* ¶ 12); (3) defendant Dr. Borecky refused to perform an MRI scan and other forms of treatment when he saw plaintiff because BOP policy only allows treatment for one injury at a time, and told plaintiff that "his other injuries would have to wait" while the injury to his shoulder was being treated, (*id.* ¶ 13); (4) plaintiff was in extreme pain but was denied access to the Medical Department when defendant Counselor Edwards, refusing to contact the Medical Department on plaintiff's behalf, allegedly told plaintiff that "pre-trial inmates are of no great concern here at MDC–Brooklyn. You'll have to just keep filing requests. Now get out of my office," (*id.* ¶ 6); (5) defendant Counselor Edwards interfered with the processing of paperwork requesting a medically authorized two-piece jump suit uniform for plaintiff because "he did not believe that a two piece uniform was medically necessary," thereby causing a delay that inflicted extreme pain upon plaintiff while he struggled to get in and out of his regular one-piece jump suit, (*id.* ¶ 11).

## A. Legal Standard Governing *Bivens* Claims of Inadequate Medical Care

**\*10** Because at the time of the alleged conduct, plaintiff was not a convicted federal prisoner but a pre-trial detainee held in a federal facility, his *Bivens* claims of inadequate medical care should not be assessed under the Eighth amendment as characterized by plaintiff (*See* Compl. Addendum ¶¶ 5–8) but rather, under the Fifth Amendment's Due Process Clause. *See Cuoco v. Moritsugu,* 222 F.3d 99, 106 (2d Cir.2000). This distinction is not significant, however, since the analysis of a pre-trial federal detainee's claim of deliberate indifference to his medical needs under the Due Process Clause of the Fifth Amendment is the same as that for a convicted federal inmate under the Eighth Amendment. *Id.*

To establish a claim of inadequate medical care, plaintiff must establish that he had a "serious medical need" and that defendants showed "deliberate indifference" to that need. *Smith v. Carpenter,* 316 F.3d 178, 183 (2d Cir.2003); *see Farmer v. Brennan,* 511 U.S. 825, 834–35, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). The first element of "serious medical need" is an objective one and requires that "the alleged deprivation must be sufficiently serious, in the sense that a condition of urgency, one that may produce death, degeneration or extreme pain exists." *Hathaway v. Coughlin,* 99 F.3d 550, 553 (2d Cir.1996) (internal quotation marks and citation omitted). Where the basis of an inmate's claim is a temporary delay or interruption in the provision of otherwise adequate medical treatment, rather than prison official(s)'s failure to provide medical treatment altogether, the seriousness inquiry focuses on "the particular risk of harm faced by a prisoner due to the challenged deprivation of care, rather than the severity of the prisoner's underlying medical condition, considered in the abstract." *Carpenter,* 316 F.3d at 185–86 (internal quotation marks omitted). In any event, "a prisoner does not have the right to choose his medical treatment as long as he receives adequate treatment." *Hill v. Curcione,* 657 F.3d 116, 123 (2d Cir.2011).

"Deliberate indifference," the second and subjective element of a *Bivens* claim of inadequate medical care, measures whether prisoner officials acted with "a sufficiently culpable state of mind." *Salahuddin v. Goord,* 467 F.3d 263, 280 (2d Cir.2006) (citing *Wilson v. Seiter,* 501 U.S. 294, 300, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991)). To prove this element, plaintiff must show that "the charged official act[ed] or fail[ed] to act while actually aware of a substantial risk that serious inmate harm will result.... The reckless official need not desire to cause such harm or be aware that such harm will surely or almost certainly result. Rather, proof of awareness of a substantial risk of the harm suffices." *Salahuddin,* 467 F.3d at 280 (citing *Farmer,* 511 U.S. at 836–37, 842). A showing of the subjective "deliberate indifference" element "requires more than negligence, but less than conduct undertaken for the very purpose of causing harm." *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994) (citing *Farmer,* 511 U.S. at 826). That is, the "deliberate indifference" prong requires plaintiff to show that a prison official "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Hathaway v. Coughlin,* 37 F.3d at 66 (quoting *Farmer,* 511 U.S. at 837).

### B. Plaintiff Cannot Sufficiently Show Objective Element of "Serious Medical Need"

**\*11** The record is clear that plaintiff received on-going treatment for his shoulder pain and then later for his back and neck pains from August 2009 to August 2011. (*See* Defs.' 56.1 Stmt. ¶¶ 74–151; Pltf. Resp. at 7.) The on-going treatment consisted of the following: (1) physical examinations and post-consultation visits with the MDC medical staff, (Defs.' 56.1 Stmt. ¶¶ 75, 90, 104, 111, 113, 121, 125, 135, 137, 148); (2) multiple pain medication prescriptions from August 2009 through June 2011, (*id.* ¶¶ 79, 93, 102, 116, 129, 135, 140); (3) x-rays taken of plaintiff's left shoulder in August 2009 and December 2010, and of his neck and back in May 2011, (*id.* ¶¶ 81, 120, 136); 4) consultations with an orthopedic surgeon at New York Downtown Hospital in Feburary 2010 and March 2011, (*id.* ¶¶ 103, 130); (4) a consultation with a rehabilitation specialist to dereimine the appropriate course of physical therapy in April 201, (*id.* ¶ 134); and 5) three session of physical therapy at a facility outside the MDC in June 2011, (*see id.* ¶¶ 143, 144, 147.)

Given the on-going nature of plaintiff's medical treatment at the MDC, the "serious medical need" inquiry need only focus on the risk of harm faced by plaintiff due to the alleged delays in the provision of medical care by individual defendants. *See Carpenter,* 316 F.3d at 183–84. However, accepting plaintiff's allegations as true and drawing all reasonable inferences in his favor, plaintiff has not satisfied the objective seriousness inquiry. After a combination of repeated medical appointments, analgesic prescriptions, radiology tests and other specialists' consultations, all spanning a two-year period, the ultimate recommendation for defendant's continued course of treatment was that plaintiff undergo physical therapy. (Defs.' 56.1 Stmt. ¶¶ 130–31, 134, 144, 147.) And it is undisputed that plaintiff refused such therapy, even though plaintiff was advised that his physical condition might not improve if he persisted in his refusal. (*Id.* ¶ 150, 154–56.) Having received two years of ongoing evaluation and treatment, culminating in a plan of treatment that plaintiff rejected, plaintiff cannot plausibly suggest that any harm has been caused by defendants' purported delays. Indeed, plaintiff does not point to any such harm, but merely makes the circular assertion that the alleged delays in treatment "held up" his treatment. *See* Comp .l. Add'm ¶ 9. Thus, plaintiff fails to plead a sufficiently serious medical need.

### C. Plaintiff Fails to Show Subjective Element of "Deliberate Indifference" by Any Individual Defendant

Even if he has established a plausible and sufficiently serious medical need, Plaintiff has failed to show the second element of his *Bivens* claims, namely that any individual defendant was deliberately indifferent.

### 1. Insufficient Showing of Deliberate Indifference by Individual Defendants Dr. Newland, Dynan, Marousis–Bush, Ittayem, and Georgy for Alleged Promise and Failure to Respond to Plaintiff's Medical Needs

**\*12** Plaintiff claims that from April 2009 to January 2011, defendants Associate Warden Dynan, Health Services Administrator Georgy, Assistant Health Services Administrator Ittayem, Health Services Administrative Assistant Marousis–Bush, and Dr. Newland were informed on numerous occasions of plaintiff's medical needs but, despite promising plaintiff that they would address the issue and get back to him, failed to do so. (*See* Compl. Addendum ¶ 8.)

As an initial matter, conclusory allegations that defendants were aware of plaintiff's medical needs and chronic pain but failed to respond are generally not sufficient proof of defendants' deliberate indifference and cannot survive a Rule 12(b)(6) motion to dismiss. *See, e.g., Adekoya v. Holder,* 751 F.Supp.2d 688, 691, 697 (S.D.N.Y.2010) (finding conclusory allegations that medical staff defendants were aware of plaintiff's medical needs and failed to provide adequate care to be insufficient in defeating a motion to dismiss *Bivens* claim of inadequate medical care).

Even assuming *arguendo* that plaintiff's conclusory allegations are true, Dr. Newland, could not have shown deliberate indifference to plaintiff's serious medical needs by failing to respond to plaintiff's various verbal inquiries from April 2009 to January 2011, since he was not working at the MDC during this time. Defendant Dr. Newland left the MDC in March 2009 for another job position within the BOP and did not return to the MDC's medical staff until January 2011. (Defs.' 56.1 Stmt. ¶¶ 35–37.)

Claims against defendants Dynan, Georgy, and Marousis–Bush fare no better. *See, e.g.,* As the Court previously explained, the "serious medical need" inquiry, and by inference the corresponding "deliberative indifference" inquiry, needs to focus only on the alleged *delays* in plaintiff's

on-going medical treatment. Plaintiff has identified two such delays: 1) the five-month delay between sustaining injury and receiving medical attention in August 2009, and 2) the three-month delay between the August 2009 medical appointment and November 2009 referral for an orthopedic consultation. The record reflects, and plaintiff does not dispute, that defendants Dynan, Georgy, and Marousis–Bush did not join the MDC staff until November 2010, January 2010, and April 2010 respectively. (*See* Defs.' Reply 56.1 Stmt. ¶¶ 13, 22, 32.) Plaintiff does not explain what role did any individual defendant play in causing the two alleged delays, which took place in 2009, in plaintiff's medical treatment. As such, these defendants cannot be said to have been deliberately indifferent when they did not participate in the treatment of which plaintiff complains. *See Gray v. Metropolitan Detention Center,* No. 09–CV–4520(KAM)(LB), 2011 WL 2847430, at *1, 11 (E.D.N.Y. July 15, 2011) (conclusory allegations that plaintiff reported his medical situation to individual defendants without establishing that individual defendants had any role in plaintiff's medical care did not establish that defendants acted with deliberate indifference to plaintiff's serious medical needs).

*13 Moreover, Marousis–Bush and defendant Assistant Health Services Administrator Ittayem performed administrative duties at the MDC's Medical Department, including tasks such as budgeting and supervising responses to administrative remedy requests regarding medical care. They are not MDC medical providers and do not provide medical care to inmates. (*See* Defs.' 56.1 Stmt. ¶¶ 28–29.) And plaintiff fails to explain what role they could have played in causing or expediting delays in plaintiff's medical treatment. Thus, from the facts alleged, they cannot be said plausibly to have been deliberately indifferent to plaintiff's medical needs.

### 2. Insufficient Showing of Deliberate Indifference by Individual Defendants Dr. Borecky, Dr. Newland, Dynan, Marousis–Bush, Ittayem, and Georgy for Allegedly Telling Plaintiff to Purchase Pain Medication from Commissary

Plaintiff claims that defendants Dr. Borecky, Dr. Newland, Dynan, Marousis–Bush, Ittayem, and Georgy were "deliberately indifferent to the plaintiff's medical needs when they would let the plaintiff run out of pain medication" and then tell plaintiff that he needed to buy his own pain medication from the prison commissary. (*See* Compl. Addendum ¶ 12.) According to plaintiff, this caused him to "suffer unbearably" because BOP policy limited medication purchases from the commissary to one bottle per order and

no more than once every two weeks, [13] which did not meet plaintiff's dosage requirements for pain medication. (*See* Compl. Addendum ¶ 12.) Plaintiff's claim, in essence, appears to be that individual defendants should have increased the dosage and/or duration of his prescriptions.

[13]   The quantity limitation to MDC inmates' purchases of over-the-counter analgesics from the prison commissar, it is in place to protect the health of inmates, presumably from potential consequences like medication overdoses. (*See* Defs.' 56.1 Stmt. ¶ 51; Decl. of Michael Borecky ("Borecky Decl.") (Doc. No. 28, Attach.6) ¶ 5.)

The aforementioned individual defendants' alleged advice for plaintiff to purchase mediation from the commissary once his prescription medication ran out, even if true, does not show that they "knew of and disregarded an excessive risk" to plaintiff's health. *Hathaway,* 37 F.3d at 67. To the extent that plaintiff is challenging the dosage level or duration of his prescription pain medication as insufficient, his claim of deliberate indifference by individual defendants fails because plaintiff does not allege that any individual defendant prescribed medication to plaintiff with the requisite culpable state of mind. *See Lopez v. City of New York,* No. 05 Civ. 10321(NRB), 2009 WL 229956, at *11 (S.D.N.Y. Jan.30, 2009) (dismissing inmate's challenge of prescription dose level's adequacy for lack of medical testimony supporting such challenge and for lack of evidence that prison doctors prescribed said dosage with requisite awareness and disregard of excessive risk to inmate safety).

As an initial matter, plaintiff's claim against defendants Dynan, Marousis–Bush, Ittayem, and Georgy must be dismissed because they are not MDC medical providers and have no control over the dosage level and duration of medical prescriptions to inmates. (*See* Defs.' 56.1 Stmt. ¶¶ 15, 24, 29, 33.) As for defendant Dr. Borecky, who ceased being plaintiff's assigned treating physician after August 2009, the only pain medication that Dr. Borecky prescribed and could have been deliberately indifferent to plaintiff for its dosage level or prescribed duration was the acetaminophen prescribed on August 14, 2009 (*See* Soloveichik Decl. Ex. B at 25–26), when Dr. Borecky was presumably still plaintiff's assigned treating physician. [14] *See Cuoco,* 222 F.3d at 11 (prison doctor's refusal to intervene in the medical treatment of a patient not assigned to him, despite ability to prescribe medication and inmate's demand for prescription, was objectively reasonable as matter of law). The August 14,

2012 WL 3705009

2009 acetaminophen prescription was for fifteen days, putting the earliest time where plaintiff could have run out of pain medication at late August or early September 2009. By this time, however, Dr. Borecky was no longer plaintiff's assigned treating physician and therefore, as a matter of law, could no longer be liable for deliberate indifference toward plaintiff's medical needs.

14     Defendant Dr. Borecky was plaintiff's assigned treating physician only from February until sometime in August 2009, when Dr. Jusayan took over the responsibility. Upon Dr. Jusayan's departure from the MDC around March 2010, Dr. Borecky along with other medical providers filled in at medical appointments for inmates like plaintiff who had Dr. Jusayan as their assigned treating physician. In early 2011, defendant Dr. Newland became plaintiff's assigned treating physician when he joined the MDC medical staff. (See Defs.' 56.1 Stmt. ¶¶ 62–65.) In light of this timeline, the only pain medication for which Dr. Borecky could be potentially liable for the dosage level and prescribed duration is the acetaminophen oral tablets prescribed on August 14, 2009, when Dr. Borecky was presumably still plaintiff's assigned treating physician. (See Soloveichik Decl. Ex. B at 25–26.)

*14 Similarly, remaining defendant Dr. Newland could not be capable of deliberate indifference toward plaintiff until he became plaintiff's assigned treating physician upon his January 2011 arrival at the MDC. Dr. Newland first saw plaintiff on a medical visit on February 2, 2011, issued plaintiff pain medication prescription on that visit, and again issued another prescription following a June 2011 visit, with each prescription lasting for a duration of six months. (See Defs.' 56.1 Stmt. ¶¶ 125, 129, 137, 140.) Filed on February 15, 2011, plaintiff's complaint about Dr. Newland's failure to intervene after plaintiff ran out of pain medications is simply contradictory to plaintiff's medical records.

For the reasons above, plaintiff has failed to show that any individual defendant was deliberately indifferent to the plaintiff's medical needs by directing him to buy his own pain medication from the prison commissary after he ran out of prescribed pain medication.

3. **Insufficient Showing of Deliberate Indifference by Individual Defendant Dr. Borecky for Allegedly Refusing to Treat More than One Injury at a Time**

Plaintiff claims that defendant Dr. Borecky refused to perform an MRI scan or other forms of treatment when he saw plaintiff because BOP policy only allows treatment for one injury at a time, and told plaintiff that "his other injuries would have to wait" while his shoulder injury was being treated. (See Compl. Addendum ¶ 13.) Contrary to this assertion, plaintiff's medical records show that on each of his visits with Dr. Borecky, he was treated and/or prescribed medication for other ailment(s) in addition to his shoulder injury. For example, Dr. Borecky treated plaintiff for chronic conditions like diabetes, esophageal reflux, and hyperlipidemia in addition to shoulder pain during both the August 14, 2009 visit and the November 16, 2010 visit. (Soloveichik Decl. Ex. B at 25, 55.) On April 18, 2011, Dr. Borecky treated plaintiff for shoulder, neck, and lower back pains. (Id. at 73.)

Plaintiff's allegation regarding Dr. Borecky's failure to prescribe an MRI scan is without merit as well. The MRI of plaintiff's shoulder that Dr. Jusayan requested in February 2010 was, as a matter of fact, recommended by the very orthopedic specialist with whom Dr. Borecky requested a consultation for plaintiff in November 2009. (See Defs.' 56.1 Stmt. ¶¶ 94, 103–05.) Plaintiff's claim, in essence, appears to be the following: Dr. Borecky's failure to immediately request an MRI scan when he treated plaintiff in August 2009 and then again in November 2009 constituted deliberate indifference to plaintiff's medical needs. However, a medical judgment is not deliberate indifference just because it is not the inmate's preferred course of treatment. "Whether to order an MRI or similar diagnostic treatments is a classic example of a matter for medical judgment,' and where the treatment provided is responsive to the prisoner's condition, ... the fact that a prisoner might prefer different treatment does not give rise to" a Constitutional violation. Victor v. Milicevic, 361 Fed. Appx. 212, 215 (2d Cir.2010) (internal quotation marks and citations omitted). Medical records demonstrate that Dr. Borecky took specific actions, in addition to prescribing medications, as a response to plaintiff's complaints of shoulder pain. In fact, following the August 14, 2009 visit, Dr. Borecky ordered x-rays to be taken of plaintiff's shoulder, and said order was executed roughly two weeks later. (Soloveichik Decl. Ex. B at 26, 28.) Also, following the November 25, 2009 visit, Dr. Borecky requested an orthopedic consultation that eventually led to an MRI scan of plaintiff's shoulder. (See id. at 32.)

**\*15** For these reasons, plaintiff has failed to show that defendant Dr. Borecky was deliberately indifferent to the plaintiff's medical needs by refusing to perform an MRI scan and allegedly telling plaintiff that "his other injuries would have to wait" while the injury his shoulder was being treated.

### 4. Insufficient Showing of Deliberate Indifference by Individual Defendant Edwards for Allegedly Refusing to Contact Medical Department on Plaintiff's Behalf

Plaintiff's first allegation against defendant Edwards is that at some point between his March 2009 injury and August 2009 treatment, Edwards refused to help plaintiff in getting medical attention, instead telling him "[y]ou'll have to just keep filing requests" because pre-trial MDC inmates' medical needs were not important. (*See* Compl. Addendum ¶ 6.)

However, the record reflects that the undisputed primary means for an inmate to obtain medical care is not through his assigned counselor, but by filling out a sick call sheet and placing it in the sick call box to notify medical personnel that he would like to request an appointment, as described in the Admission and Orientation Manual. (*See* Defs.' Reply 56.1 Stmt. ¶ 40.) An inmate can obtain blank sick call sheets from any member of his unit team, such as his counselor, case manager, or unit manager. (*See id.* ¶ 41.) Under the "Emergency Sick Calls" heading of the Admission and Orientation Manual, inmates are advised that if they require medical attention after regular sick call hours or on weekends and holidays, they could ask the unit officer or work detail supervisor to contact health services, which would in turn honor the request if the physician feels immediate medical attention is necessary in a particular inmate's case. (*See id.* ¶ 42.) If unsuccessful, the Admission and Orientation Manual instructs that an inmate can then submit written requests to a staff member detailing the need for appropriate medical care and, if still dissatisfied, initiate the aforementioned multi-step Administrative Remedy Program. (*See id.* ¶¶ 44–46.)

Drawing all reasonable inferences in plaintiff's favor, plaintiff's allegations against defendant Edwards fail to establish that Edwards was deliberately indifferent. Edwards' alleged refusal to help plaintiff secure a medical appointment and instruction for plaintiff to "keep filing requests" (Compl. Addendum ¶ 11), while less than courteous in tone, does not deviate from the procedures for inmates seeking medical attention as set forth in the Admission and Orientation Manual for MDC inmates. Such compliance with MDC procedures does not constitute deliberate indifference on Edwards' part.

*See Demartino,* 2006 WL 1455456, at \*8 (allegation that MDC unit manager did nothing to help plaintiff inmate get medical attention and told plaintiff to be patient because understaffed MDC medical department "could take as long as they want" fails to establish unit manager was aware of and ignored substantial risk of serious harm to plaintiff).

**\*16** Plaintiff's BP–8 filing initiated the administrative remedy process in November 2009 seeking resolution for his shoulder pain, implying that he received a copy of the Admission and Orientation Manual or, at the very least, was familiar with the Manual's procedures for MDC inmates seeking medical attention. (*See* Defs .' Reply 56.1 Stmt. ¶ 203.) Furthermore, plaintiff does not allege that defendant Edwards interfered with plaintiff's ability to utilize these MDC procedures by, for example, denying plaintiff the use of blank sick call sheets to fill out additional medical appointment requests, or refusing to make emergency sick calls on plaintiff's behalf to health services after regular sick call hours or on weekends and holidays.

In short, defendant Edwards' alleged refusal to help plaintiff secure a medical appointment and instruction for plaintiff to "keep filing requests" did not constitute deliberate indifference, as it was in compliance with standard procedures for MDC inmates seeking medical attention.

### 5. Claim Against Individual Defendant Edwards for Causing Delay in Issuance of Two–Piece Prison Jumpsuit Uniform Sufficiently Shows Deliberate Indifference But Requires Dismissal for Lack of Administrative Exhaustion

Plaintiff's second allegation against defendant Edwards is that he knowingly caused a delay in the processing of paperwork requesting a medically authorized two-piece prison jumpsuit uniform for plaintiff, thereby inflicting extreme pain upon plaintiff while he struggled to get in and out of his regular one-piece jump suit. (Compl. Addendum ¶ 11.)

To obtain a two-piece jumpsuit, an inmate must obtain a medical authorization and bring it to a counselor; the counselor, in turn, will sign and date a Laundry Clothing Issue and Exchange Form, staple the medical authorization to said Form, and submit the Form to the laundry unit, which will distribute the new uniform to the inmate. (Defs.' 56.1 Stmt. ¶¶ 168–69.) Plaintiff claims that he did not receive his medically authorized two-piece jumpsuit until approximately seven weeks after the authorization was issued on February 17, 2010, which subjected him to extreme pain in the interim

and forced him to defecate in his clothing at times, and that defendant Counselor Edwards knowingly caused this delay.

However, it is undisputed that at the time of events giving rise to the present action, Edwards shared an office with Counselor Gail McMillan, and the two counselors were in the habit of helping inmates on each other's caseload depending on who was in the office when an inmate came with a question. (Defs.' Reply 56.1 Stmt. ¶ 171.) Medical records and Counselor McMillan's affidavit reflect that on April 5, 2010, plaintiff brought the medical authorization for a two-piece jumpsuit dated February 17, 2010 to the shared office of Counselors McMillan and Edwards. Because plaintiff's assigned counselor, defendant Edwards, was not in the office at the time, Counselor McMillan helped plaintiff. (*Id.* ¶¶ 172–73.) Counselor McMillan states in her affidavit that, consistent with her practice in the past, she completed a Laundry Clothing Issue and Exchange Form that same day, and stapled a copy of plaintiff's medical authorization to the Form. (*Id.* ¶¶ 170, 174; *see* McMillan Decl. (Doc. No. 28, Attach.8) ¶¶ 11, 12 & Ex. 1.) Plaintiff admits that he received the two-piece jumpsuit shortly after Counselor McMillan's processing of the authorization on April 5, 2010. (*See* Compl. Addendum ¶ 11.) [15]

[15] Moreover, plaintiff has not administratively exhausted his claim, as required by the PLRA, against defendant Edwards regarding this particular claim. Said defect is ground for dismissal, without prejudice, of the claim against Edwards regarding his allegedly knowing delay in processing plaintiff's medically authorization for a two-piece jumpsuit. *See, e.g., Henry v. Nassau Univ. Med. Ctr.,* No. 06–CV–6867 (JS)(ETB), 2008 WL 638246, at *3 (S.D.N.Y. July 22, 2011) (dismissing inmate's deliberate indifference claim without prejudice for failure to exhaust administrative remedies as required by PLRA).

## IV. PLAINTIFF'S REQUEST FOR DISCOVERY IS DENIED

**\*17** Plaintiff requests the Court to deny defendants' pre-discovery motion and allow plaintiff to conduct discovery in order to oppose the motion. (*See* Pltf. Resp. at 10–11.) The Court interprets plaintiff's request as an application for discovery under Fed.R.Civ.P. 56(d). [16] A party resisting summary judgment and requesting Rule 56(d) discovery must submit an affidavit showing "(1) what facts are sought to resist the motion and how they are to be obtained, (2) how those facts are reasonably expected to create a genuine issue of material fact, (3) what effort the affiant has made to obtain them, and (4) why the affiant was unsuccessful in those efforts." *Alcantara v. City of New York,* 646 F.Supp.2d 449, 463 (S.D.N.Y.2009) (citations omitted).

[16] Fed.R.Civ.P. 56(d) was formerly Fed.R.Civ.P. 56(f), which plaintiff cites in his response to defendants' motion, (*See* Pltf. Resp. at 10–11), before being recodified in 2010 with no substantial changes.

As an initial matter, plaintiff has failed to submit such an affidavit, despite having been served with a Notice to *Pro Se* Litigant Opposing Motion To Dismiss or Motion For Summary Judgment, which attached Fed.R.Civ.P. 56(d) and set forth the requirement for an affidavit supporting a Rule 56(d) discovery request. (*See* September 2, 2011 Letter to Plaintiff (Doc. No. 19).) Plaintiff's failure to submit an affidavit under Rule 56(d) is sufficient grounds for denying his discovery request. *See, e.g., Capital Partners v. Alternative Constr. Tech.,* 638 F.Supp.2d 360 (S.D.N.Y.2009) (citing *Di Benedetto v. Pan Am World Service, Inc.,* 359 F.3d 627, 630 (2d Cir.2004)).

Even setting aside plaintiff's failure to submit an affidavit, he has not described any of the following four categories of information requisite to this Court's permission to conduct Rule 56(d) discovery: the specific facts he seeks to discover, how he expects these facts to create a genuine issue of material fact, what efforts he has made to obtain these facts, and why these efforts failed. *See Alcantara,* 646 F.Supp.2d at 463. On the contrary, plaintiff only states in general, conclusory terms that "plaintiff has not been given his medical records" and "needs to conduct discovery to obtain factual information to further oppose defendants['] motion." (Pltf. Resp. at 11.) However, "a bare assertion that the evidence supporting a plaintiff's allegation is in the hands of the defendant is insufficient to justify a denial of a motion for summary judgment under Rule 56(f) [now recodified as Rule 56(d) ]." *Paddington Partners v. Bouchard,* 34 F.3d 1132, 1138 (2d Cir.1994) (internal quotation makrs and citations omitted); *accord Aguiar v. Lindsay,* Nos. 07–CV–3104 (DLI)(LB), 07–CV–3140 (DLI)(LB), 07–CV–3141 (DLI)(LB), 08–CV–03311 (DLI)(LB), 2010 WL 1286217, at *7 (E.D.N.Y. Mar. 31, 2010). For the reasons above, the Court denies plaintiff's rule 56(d) application for discovery.

Case 9:19-cv-01161-DNH-TWD    Document 79    Filed 11/10/21    Page 125 of 125

2012 WL 3705009

### *CONCLUSION*

For the reasons stated herein, defendants' motion to dismiss or in the alternative for summary judgment (Doc. No. 24) is granted, and this action is dismissed. The Clerk of Court shall enter judgment accordingly, mail a copy of this Memorandum and Order to plaintiff *pro se,* and close this case.

**\*18** The Court certifies pursuant to 28 U.S.C. § 1915(a)(3) that appeal would not be taken in good faith and therefore *in forma pauperis* status is denied for the purpose of any appeal. *Coppedge v. United States,* 369 U.S. 438, 444–45, 82 S.Ct. 917, 8 L.Ed.2d 21 (1962).

SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2012 WL 3705009

---

    © 2021 Thomson Reuters. No claim to original U.S. Government Works.

 © 2021 Thomson Reuters. No claim to original U.S. Government Works.